**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| THRASIO HOLDINGS, INC., et al., | Case No. 24-11840 (CMG) |
| Debtors.[1] | (Joint Administration Requested) |

## DECLARATION OF JOSH BURKE, CHIEF FINANCIAL OFFICER OF THRASIO HOLDINGS, INC., IN SUPPORT OF FIRST DAY MOTIONS

I, Josh Burke, Chief Financial Officer of Thrasio Holdings, Inc., a corporation incorporated under the laws of Delaware ("Thrasio" and, together with its debtor affiliates, collectively, the "Debtors" and, with their non-debtor subsidiaries, the "Company"), hereby declare under penalty of perjury:

### Introduction[2]

1.      Each day, Amazon.com processes approximately 20 orders per second and ships approximately 1.6 million packages to customers across hundreds of countries.[3]  More than 60% of sales on the Amazon marketplace come from independent, third-party sellers.[4]  Often led by entrepreneurial founders, these sellers typically produce only a single or limited number of products.  Many sellers have strong aspirations for growth but are unable to grow their businesses

---

[1]      The last four digits of Debtor Thrasio Holdings, Inc.'s tax identification number are 8327.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.kccllc.net/Thrasio.  The Debtors' service address for purposes of these chapter 11 cases is 85 West Street, 3rd Floor, Walpole, MA, 02081.

[2]      Capitalized terms used but not defined in the Introduction shall have the meaning ascribed to them in this Declaration.

[3]      Andrew Buck, *57 Amazon Statistics to Know in 2023*, LANDINGCUBE (Dec. 20, 2022), https://landingcube.com/amazon-statistics/.

[4]      *At a Glance: Selling in Amazon's Store*, AMAZON SELLING PARTNERS, https://sellingpartners.aboutamazon.com/impact.

effectively on Amazon or other channels due to the economies of scale that their larger e-commerce competitors enjoy.

2.      Thrasio is an "aggregator" of these sellers.  Thrasio acquires seller brands and their underlying businesses from founders or owners and consolidates these businesses into Thrasio's platform.  After completing an acquisition, Thrasio works to generate cost-saving and revenue-enhancing synergies with other businesses in its portfolio to facilitate growth.  This provides sellers with an "exit" from the business and positions Thrasio to realize the full potential of these brands.  Thrasio's current management team has deep experience in growing such brands—by using data science, logistical and marketing expertise, and a deep understanding of the e-commerce space, Thrasio allows a brand to expand its offerings.  Thrasio also expertly navigates the Amazon selling process to position its brands to better reach and serve customers around the globe.  This model has proven successful: despite only being founded in 2018, Thrasio is now a top-five seller on Amazon.  One in two households in the United States have received a product from a Thrasio brand.

3.      The last five years have been exceptionally turbulent for e-commerce companies due to unexpected demand shifts and supply chain disruption caused, in large part, by the COVID-19 pandemic.  In 2020 and 2021, demand for Thrasio's products skyrocketed due to unprecedented consumer spending on Amazon and other e-commerce sites, especially as many brick-and-mortar stores shifted to an online-focused business model.  To keep up with demand, Thrasio made several business decisions that, through the benefit of hindsight, have been identified as having a negative effect on the Company's financial position.  During this time frame, Thrasio quickly grew without the proper protocols in place to scale efficiently and limit costs.  Thrasio also over-purchased and overpaid for inventory to meet forecasted demand, over-hired in anticipation

of forecasted growth, and acquired or invested in certain businesses that ultimately failed to cleanly integrate into the Company's portfolio. When demand for e-commerce unexpectedly decreased in late 2021,[5] the Company's significant fixed costs quickly began to constrain the Company's liquidity and threaten the health of the business. The Company's capital structure, which increased in magnitude as the Company sought to fuel its rapid growth, also caused financial pressure.

4.      Beginning in 2022, Thrasio commenced a series of initiatives to address its operational issues and position Thrasio for long-term growth and profitability in this new macroeconomic environment. Thrasio retained AlixPartners to assist in these efforts. In what would ultimately be an 11-month operational transformation, Thrasio, with the assistance of AlixPartners, began to refocus its approach, including adhering to a more disciplined acquisition strategy, disposing of excess inventory, reducing warehousing and storage expenses, and cutting costs. Thrasio also hired a new, seasoned management team with demonstrated experience in e-commerce. Under this team's leadership, Thrasio's initiatives reduced the Company's annual net cash flows used in operating activities from $680 million for 2021 to $419 million for 2022.

5.      Thrasio's operational turnaround put the Company on strong footing and significantly increased its operational efficiency and margins. However, the Company's operational initiatives did not address its balance sheet or liquidity needs. Servicing the Company's over-levered capital structure continued to put pressure on the Company and limit growth opportunities. Accordingly, Thrasio commenced discussions with its stakeholders and

---

[5]      Joel Alcedo et al, *Pandemic's E-commerce Surge Proves Less Persistent, More Varied*, IMF BLOG (Mar. 17, 2022), https://www.imf.org/en/Blogs/Articles/2022/03/17/pandemics-e-commerce-surge-proves-less-persistent-more-varied#:~:text=On%20average%2C%20the%20online%20share,to%2012.2%20percent%20in%202021. ("On average, the online share of total spending rose sharply from 10.3 percent in 2019 to 14.9 percent at the peak of the pandemic, but then fell to 12.2 percent in 2021.").

investors on the terms of a deleveraging transaction to support the next phase of the Company's operations and generate additional capital.

6.      These chapter 11 cases are designed to expeditiously and consensually address the Company's balance sheet issues, and are the final step in Thrasio's transformative efforts. Thrasio enters chapter 11 with the support of its lenders and commitments for up to $90 million of new capital through the DIP Facility, as well as a Restructuring Support Agreement with its lenders who, collectively, hold approximately 81% of outstanding RCF Loans and 88% of outstanding Term Loans and approximately 81.1% of the Company's total outstanding debt. Entering chapter 11 with this strong consensus and support will allow Thrasio to move swiftly through these cases, maximize the value of its business, and ensure that its portfolio of brands experiences minimal disruption.

**Background**

7.      I am the Chief Financial Officer of Thrasio. I joined Thrasio as Chief Financial Officer in March 2023. Before joining Thrasio, I served as Chief Financial Officer of Gopuff, an online delivery company, from November 2020 to September 2022. Prior to that, I was the Chief Financial Officer of Backcountry, an online specialty retailer of outdoor gear and clothing, from July 2018 to November 2020. From 2011 to 2018, I held various financial management positions at Under Armour, including as Vice President of FP&A. I hold a Master of Business Administration from Darden Graduate School of Business Administration at the University of Virginia and a Bachelor of Science and Management in Finance and Accounting from Tulane University.

8.      I am generally familiar with the day-to-day operations, business and financial affairs, and books and records of Thrasio and its direct and indirect Debtor subsidiaries. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal

4

knowledge, my discussions with other members of the Debtors' management team and advisors (including the teams from Kirkland, as legal counsel, Centerview, as investment banker, and AlixPartners, as financial advisor, who are working under my supervision), my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and/or my opinions based upon my experience and knowledge.

9.      On February 28, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Declaration, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

10.      To familiarize the Bankruptcy Court with the Company, its business, the circumstances leading up to these chapter 11 cases, and the relief the Debtors are seeking in the first day motions for chapter 11 relief (the "First Day Motions"), I have organized this Declaration in four sections:

- **Part I** provides background information on the Company's business operations;

- **Part II** offers an overview of the Company's prepetition corporate and capital structure;

- **Part III** describes the circumstances leading to the filing of these chapter 11 cases and an overview of the proposed restructuring and proposed DIP Facility; and

- **Part IV** summarizes the relief requested in the First Day Motions.

I.      **Thrasio's History and Operations**

A.      **Business Overview**

11.      Thrasio was founded in 2018 by an experienced team of entrepreneurs and investors. Thrasio grew rapidly—in the five years since its inception, Thrasio's platform evolved from a small start-up to become the largest aggregator of e-commerce brands, with more than 36 million unique customer orders in 2023 alone. Although Thrasio's official headquarters is in Walpole, Massachusetts, virtually all of Thrasio's workforce is remote, and the Company employs approximately 415 employees in the United States, approximately 100 employees in China and 74 independent contractors across the world. Thrasio also contracts with professional employment organizations to employ approximately 185 employees in 9 other countries.

12.      Thrasio's rapid growth was fueled by aggressive M&A. Thrasio acquires and aggregates consumer product businesses with the goal of positioning them to succeed in the e-commerce marketplace. Thrasio uses data-driven analysis, proprietary software tools and algorithms, and management expertise to identify targets. Thrasio steers away from "fads and fashion" brands, which ultimately allows for long-term customer loyalty if the brand can continue to meet expectations. During the acquisition diligence process, Thrasio's M&A team works closely with its brand team, which includes experienced supply-chain and marketing and brand professionals, to identify ways for the seller to improve margins and scale. Ultimately, Thrasio's platform and expertise is crucial to its brands' longevity and success.

13.      Thrasio's strong logistics and supply chain management capabilities are critical to its ability to grow its acquired brands. Each year, Thrasio markets and sources inventory for over 24,000 unique products through a highly complex network of over 350 contract manufacturers, 35 third-party warehouses, and numerous third-party fulfillment centers, including Amazon and Ware2Go, among others. Thrasio manages all aspects of the shipping and logistics process for its

brands and contracts directly with freight forwarders, steamship lines, and international trucking companies to move products around the world.

### B.    Portfolio of Brands

14.    Thrasio acquires brands that are primed for growth and operational synergies even before Thrasio steps in.  These brands frequently share certain common features, since Thrasio targets highly ranked, profitable products with a proven track record with consumers.  Thrasio leverages these characteristics when employing its own proprietary processes to build upon the brands' success and boost their growth.

15.    Since inception, Thrasio has acquired over 200 brands and provided over 250 sellers with an "exit" from the brand they founded.  Though the Company has many successes, notable examples of the value and diverse reach of Thrasio's business model are exhibited through three of its products: Angry Orange, ThisWorx, and Becky Cameron Home.

### 1.    Angry Orange

16.    Prior to Thrasio's acquisition, Angry Orange was a four-year-old brand generating over $2 million in annual revenue.  While the product was already successful on a commercial level, it was not yet primed for daily consumer use.  Thrasio executed a  comprehensive rebrand of the entire Angry Orange product line, improving its packaging, implementing an array of marketing initiatives, expanding the brand's product offerings, and enhancing distribution to certain Target, Walmart, Ace Hardware, and True Value stores across the country.  The results of these initiatives were swift and dramatic.  After only two years under Thrasio's ownership, Angry Orange's trailing 12-month revenue increased from $2.1 million to $34 million, an increase of 1,519%.

### 2.      ThisWorx

17.      Thrasio acquired ThisWorx in 2019, which produces and sells a handheld car vacuum.  Consumers were already loyal to ThisWorx, but the product was in close competition



with another brand offering a similar product.  Thrasio identified ways to give ThisWorx a competitive edge, such as running various promotions, optimizing pricing, and using professional photographs to market its product.  Since its acquisition, Thrasio successfully scaled

ThisWorx's trailing 12-month revenue from $3.6 million to $34 million, an increase of 844%.

### 3.      Becky Cameron Home

18.      Thrasio acquired Becky Cameron Home in 2020, which remains one of its largest brand acquisitions.  Prior to Thrasio's acquisition, the brand's signature product, the 2-Pack Gel Queen Pillow Set, had the second-highest number of reviews in its category on Amazon.  Thrasio built on this position by consolidating the product line,



shoring up the supply chain, and improving search engine optimization functions.   In under three weeks, Becky Cameron Home improved its seller rank on Amazon by 95%.  Since acquisition, Thrasio has successfully scaled

the brand's trailing 12-month revenue from $29 million to $96 million, an increase of 231%.

### C.      Non-Amazon Sales Channels

19.      Although the vast majority of Thrasio's brands sell their products exclusively on Amazon, Thrasio also has developed its existing infrastructure to provide alternative opportunities to sell its brands.  Thrasio has a small direct-to-consumer ("DTC") business that allows consumers to directly purchase products from a branded website with a specific domain name, which has been

used successfully to market a number of product lines, including Angry Orange.  Additionally, Thrasio has been developing its wholesale business, which will help expand access to products into new channels, including brick-and-mortar stores, through partnerships with channels such as Walmart, Target, and Nordstrom.  Thrasio's wholesale channels account for a small percentage of sales of brands and accounted for approximately $30 million of revenue in 2023.

20.    Thrasio also has a nascent marketplace business that allows it to cross-list certain brands from Amazon to Walmart.com and Target.com.  Access to products in those marketplaces will allow new consumers that prefer to exclusively shop in those channels, rather than Amazon, to purchase Thrasio products for the first time.  Although still in early stages, the technology has been built, and the process of preliminary cross-listing on these marketplaces has begun.  The Company believes that there is potential to drive greater value as this channel further develops in the future.  Each of the marketplace business, wholesale, and DTC businesses is likely to provide incremental value and growth opportunities to a more diversified Thrasio in the future.

### D.    Technological Innovation and Improvement

21.    One of Thrasio's most valuable assets is its technology.  Thrasio employs an experienced technology team that was instrumental in helping the Company implement the operational initiatives further discussed herein.  Among other things, the Company developed a system to control inventory, which predicts replenishment quantities and automates execution, which will increase the productivity and efficiency of the Company's operations.  Thrasio's technology team also developed sophisticated pricing and marketing spend optimization tools that take into account the elasticity of the product, competitive dynamics, and current inventory levels of product, which help Thrasio to optimize profit per sale.  Thrasio's consistent innovation is a key component of the long-term value that it can bring to its brands and indicative of the Company's ethos of always being on the cutting edge of the e-commerce industry.

## II.    Prepetition Corporate and Capital Structure

### A.    Thrasio's Corporate Structure

22.    As set forth on the structure chart attached hereto as **<u>Exhibit B</u>**, Thrasio wholly owns, directly or indirectly, each of the Debtors.

### B.    Thrasio's Capital Structure

23.    As of the Petition Date, Thrasio has approximately $855.2 million in funded debt outstanding and approximately $2.3 billion of outstanding preferred stock.[6]  The relative amounts of each debt obligation and preferred equity tranche are set forth herein as follows:

| *Funded Debt* | *Maturity* | *Amount Outstanding (in millions)* |
|---|---|---|
| Revolving Credit Facility | December 2025 | $66.2 |
| *Letters of Credit* | | $2.5 |
| Term Loan Facility | December 2026 | $786.5 |
| *Total Debt Obligations* | | *$855.2* |
| *Preferred Equity* | *Liquidation Preference Priority (on proceeds)* | *Amount of Series (in millions)* |
| Series X Redeemable Preferred Stock | First Priority | $739.4 |
| Series D Preferred Stock | Second Priority | $1,075 |
| Series C Preferred Stock & Senior Series B Preferred Stock | Third Priority | $646 |
| Junior Series B Preferred Stock | Fourth Priority | $36 |
| Series A Preferred Stock | Fifth Priority | $16 |
| Series Seed Preferred Stock | Sixth Priority | $6 |
| *Total Preferred Equity Outstanding* | | *$2,518.4* |
| *Total Debt and Preferred Equity Outstanding* | | *$3,373.6* |

### 1.    The Credit Agreement

24.    On December 18, 2020, Thrasio, LLC and certain of its subsidiaries entered into that certain first lien credit agreement, as amended by that certain first amendment, dated as of May 28, 2021, as amended by that certain second amendment, dated as of September 17, 2021, as

---

[6]    Unless otherwise stated, all amounts outstanding referenced herein are inclusive of accrued interest and fees.

amended by that certain third amendment, dated as of June 30, 2023, as amended by that certain forbearance and fourth amendment, dated as of September 29, 2023, and as amended by that certain forbearance and fifth amendment, dated as of December 29, 2023, and as otherwise amended, restated, supplemented, or otherwise modified from time to time (the "Credit Agreement"), by and between Thrasio Intermediate Sub, LLC, as parent guarantor ("Holdings"), Thrasio, LLC, as borrower ("Borrower"), Royal Bank of Canada as administrative agent for the lenders (the "Administrative Agent"), and those lenders party thereto (as referenced herein, the "RCF Lenders" or the "Term Loan Lenders," as applicable, and collectively, the "First Lien Lenders"). The Credit Agreement is governed by New York law. All credit facilities governed by the Credit Agreement (as described below) are secured on a *pari passu* basis with respect to all collateral securing the credit facilities.

### (1)    The Revolving Credit Facility

25.    The Credit Agreement provides the Company with a $65,000,000 first lien revolving credit facility (the "Revolving Credit Facility" and the loans thereunder, the "RCF Loans"). The Revolving Credit Facility is guaranteed by Holdings and certain of the Borrower's subsidiaries (the "Guarantors") and secured by a first priority lien on any and all property of the Borrower and each of its subsidiaries that are party to the Credit Agreement, except for "Excluded Assets" (as defined in the Credit Agreement) (the "First Lien Collateral"). The Borrower can select one month, three months, six months, or 12 months (or, to the extent available to all relevant affected lenders under the Revolving Credit Facility, a shorter period) as the interest period for each draw. The Revolving Credit Facility accrues interest at a rate per annum equal to either ABR plus 6.00% or Term SOFR plus 7.00% (subject to adjustments downward based on the then-current leverage ratio). The Revolving Credit Facility matures on December 18, 2025.

26.     As of the Petition Date, the Company has drawn approximately $66,200,000 in principal amount, as well as $2,500,000 of outstanding letters of credit.

**(2)     The Term Loan Facility**

27.     The Credit Agreement also provides for a term loan facility comprised of a $250,000,000 initial term loan tranche (the "Initial Term Tranche"), a $165,000,000 initial delayed draw tranche (the "Initial Delayed Draw Tranche"), and an incremental delayed draw tranche (the "Incremental Delayed Draw Tranche" and, together with the Initial Term Tranche and the Initial Delayed Draw Tranche, the "Term Loan Facility," and the loans provided thereunder, the "Term Loans").  As of the Petition Date, approximately $786,500,000 is outstanding under the Term Loan Facility.

(a)     The Initial Term Tranche

28.     The Initial Term Tranche is guaranteed by the Guarantors and secured by a first priority lien on the First Lien Collateral.  The Initial Term Tranche accrues interest at a rate per annum equal to the secured overnight financing rate ("SOFR") plus 7.00% and matures on December 18, 2026.  As of the Petition Date, the Initial Term Tranche is fully drawn.

(b)     The Initial Delayed Draw Tranche

29.     The Initial Delayed Draw Tranche is guaranteed by the Guarantors and secured by a first-priority lien on the First Lien Collateral.  The Initial Delayed Draw Tranche accrues interest at a rate per annum equal to SOFR plus 7.00% and matures on December 18, 2026.  As of the Petition Date, the Initial Delayed Draw Tranche is fully drawn.

(c)     The Incremental Delayed Draw Tranche

30.     Finally, the Credit Agreement permits the Borrower to add one or more new classes of delayed draw term loan facilities pursuant to the Incremental Delayed Draw Tranche, guaranteed by the Guarantors and secured by a first-priority lien on the First Lien Collateral.  The

Credit Agreement permits the incurrence of additional debt under the Incremental Delayed Draw Tranche, as restricted by certain financial conditions.  Currently, the Company is unable to incur additional debt through the Incremental Delayed Draw Tranche.  The Incremental Delayed Draw Tranche accrues interest at a rate per annum equal to SOFR plus 7.00% and matures on December 18, 2026.

## 2.    Equity Interests in Thrasio

31.    As of the Petition Date, Thrasio has six series of preferred stock outstanding: (i) the "Series X Redeemable Preferred Stock"; (ii) the "Series D Preferred Stock"; (iii) the "Series C-1 Preferred Stock," the "Series C-2 Preferred Stock," and the "Series C-3 Preferred Stock" (and together with the Series C-1 Preferred Stock and the Series C-2 Preferred Stock, the "Series C Preferred Stock"); (iv) the "Series B Preferred Stock"; (v) the "Series A Preferred Stock"; and (vi) the "Series Seed Preferred Stock" (collectively, the "Preferred Stock").

### (1)    Series X Redeemable Preferred Stock

32.    Approximately 500,000 shares of Series X Redeemable Preferred Stock are outstanding as of the Petition Date.  Funds affiliated with Oaktree Capital Management, L.P. ("Oaktree"), own all outstanding shares of the Series X Redeemable Preferred Stock.  Dividends accumulate on a daily basis in arrears at 14.6% per year, compounding on a quarterly basis with the dividend rate increasing upon certain events occurring and continuing, which include the filing of the chapter 11 proceedings, by 1.0% per year.  The Series X Redeemable Preferred Stock is not convertible into Common Stock.

### (2)    Series D Preferred Stock

33.    Approximately 53,086,366 shares of Series D Preferred Stock are outstanding as of the Petition Date.  A fund associated with Silver Lake Partners ("Silver Lake") owns slightly less than a majority of the outstanding shares of Series D Preferred Stock but controls a majority of the

Series D Preferred Stock voting power pursuant to a voting proxy over certain shares held by other investors. Shares of Series D Preferred Stock are convertible into Common Stock and accumulate dividends in arrears. Shares of Series D Preferred Stock are senior in right of payment to all shares of Series C Preferred Stock, Series B Preferred Stock, Series A Preferred Stock, and Series Seed Preferred Stock.

**(3)     Series C Preferred Stock**

34.     Approximately 94,803,814 shares of Series C Preferred Stock, with 55,933,930 shares of Series C-1 Preferred Stock, 30,686,751 shares of Series C-2 Preferred Stock, and 8,183,133 shares of Series C-3 Preferred Stock, respectively, are outstanding as of the Petition Date. Funds associated with Advent International Corporation ("Advent") own a majority of the outstanding shares of Series C Preferred Stock. Shares of Series C Preferred Stock are (A) *pari passu* with 50% of the liquidation amount owed to the holders of the shares of the Series B Preferred Stock (the "Senior Series B Preferred Stock") and (B) senior in right of payment to (i) 50% of the liquidation amount to the holders of the shares of the Series B Preferred Stock (the "Junior Series B Preferred Stock") and (ii) all shares of Series A Preferred Stock and Series Seed Preferred Stock.

**(4)     Series B Preferred Stock**

35.     Approximately 22,840,130 shares of Series B Preferred Stock are outstanding as of the Petition Date. Funds associated with Peak6 Group LLC and Upper90 own a majority of the outstanding shares of Series B Preferred Stock. Shares of Series B Preferred Stock are convertible into Common Stock. While the Senior Series B Preferred Stock is *pari passu* with the Series C Preferred Stock in right of payment and senior in right of payment to all shares of the Junior Series B Preferred Stock, Series A Preferred Stock, and Series Seed Preferred Stock, the Junior Series B

14

Preferred Stock is only senior in right of payment to all shares of Series A Preferred Stock and Series Seed Preferred Stock.

<div align="center">

**(5)        Series A Preferred Stock**

</div>

36.      Approximately 17,496,600 shares of Series A Preferred Stock are outstanding as of the Petition Date.  Funds associated with Peak6 Group LLC and Upper90 own a majority of the outstanding shares of Series A Preferred Stock.  Shares of Series A Preferred Stock are convertible into Common Stock.  Shares of Series A Preferred Stock are senior in right of payment to all shares of Series Seed Preferred Stock.

<div align="center">

**(6)        Series Seed Preferred Stock**

</div>

37.      Approximately 57,495,520 shares of Series Seed Preferred Stock are outstanding as of the Petition Date.  Each share of Series Seed Preferred Stock is convertible into Common Stock.  Shares of Series Seed Preferred Stock are only senior in right of payment to all shares of Common Stock.

<div align="center">

**(7)        Common Stock**

</div>

38.      Approximately 56,770,393 shares of Common Stock are outstanding as of the Petition Date.  Shares of the Company's Common Stock are widely held by current and former employees, by current and former management of the Debtors, and early-stage investors.  The Common Stock is junior in right of payment to all shares of Preferred Stock.

**III.    Events Leading to These Chapter 11 Cases**

**A.      Industry-Wide Headwinds and the Impact of the COVID-19 Pandemic**

39.      Thrasio's business was built on the belief that small e-commerce businesses would be an important part of the slow shift to a retail landscape dominated by online shopping.  That "slow shift" in consumer sentiment was radically accelerated by the onset of the COVID-19 pandemic.  In the first year of the pandemic, U.S. consumers' online spending increased by 43%,

<div align="center">15</div>

surging from $571.2 billion in 2019 to $815.4 billion in 2020.[7]  While many brick-and-mortar retailers struggled to survive, Thrasio experienced a tremendous boom in growth as demand for online retail skyrocketed.

40.    The dramatic increase in online spending created unique problems that the e-commerce industry, as a whole, was not prepared to address.  The sudden increase in demand shocked the global supply chain as suppliers rushed to meet demand and produce inventory, and strained the transportation industry's ability to move products cost-efficiently or, in some cases, move products at all.  The inability of suppliers to meet demand led to 60 billion out-of-stock messages from March 2020 to February 2022, a 235% increase since pre-pandemic levels.[8]  Fear of losing market share and sales caused an inventory buying frenzy, as online sellers, including Thrasio, attempted to keep items in stock.  The global supply chain slowdown persisted through 2020 and 2021, all while e-commerce sellers sought to acquire disproportionate amounts of inventory to maintain market share and meet customer demand.  E-commerce sellers thus became mired in a vicious feedback loop:  sellers were forced to purchase substantial amounts of inventory to keep up with surging consumer demand, which contributed to high demand for merchandise; high demand for merchandise led to months-long delays in shipping, which exacerbated demand for inventory and forced sellers to over-purchase inventory to avoid running out of stock; to keep

---

[7]    Mayumi Brewster, *Annual Retail Trade Survey Shows Impact of Online Shopping on Retail Sales During COVID-19 Pandemic*, UNITED STATES CENSUS BUREAU (April 27, 2022), https://www.census.gov/library/stories/2022/04/ecommerce-sales-surged-during-pandemic.html#:~:text=According%20to%20the%20most%20recent,to%20%24815.4%20billion%20in%202020.

[8]    *Adobe: U.S. Consumers Spent $1.7 Trillion Online During the Pandemic, Rapidly Expanding the Digital Economy*, ADOBE (Mar. 15, 2022), https://news.adobe.com/news/news-details/2022/Adobe-U.S.-Consumers-Spent-1.7-Trillion-Online-During-the-Pandemic-Rapidly-Expanding-the-Digital-Economy/default.aspx.

demand in stock, e-commerce businesses sought to acquire more inventory, leading back to "square one"—increased demand for inventory.

41.      Industry experts predicted that, though the end of the COVID-19 pandemic would dampen demand for e-commerce, the industry would continue to grow by double digits through 2023 due to a permanent change in consumer preferences.[9]  These predictions were, ultimately, incorrect.  In fact, post-pandemic demand for e-commerce actually, and unpredictably, dropped between 2022 and 2023.[10]  The decrease in consumer demand was driven by consumers seeking out brick-and-mortar shopping experiences as a social activity, as well as rising inflation that reduced consumer demand.

### B.      Strategic Missteps

42.      Although the Company's founding in 2018 preceded the most explosive era for e-commerce growth in history, to keep up with surging consumer demand and support its brands, the Company made a number of operational decisions that, ultimately, sacrificed future flexibility and adversely affected the Company's margins when e-commerce demand slowed in 2021.

### 1.      Inventory Over-purchasing and Overreliance on Amazon

43.      As discussed above, the "vicious cycle" of surging consumer demand led to surging demand for inventory.  Thrasio's need for inventory was also influenced by its reliance on Amazon as the sole platform on which it was able to sell goods.  Amazon prioritizes sellers and suppliers who keep their products in stock to provide a positive customer experience.  Thus, sellers who do not remain in stock may find their products deprioritized in search results and have fewer of their

---

[9]     Sara Lebow, *Worldwide Ecommerce Continues Double-Digit Growth Following Pandemic Push to Online*, EMARKETER (Aug. 19, 2021), https://www.insiderintelligence.com/content/worldwide-ecommerce-continues-double-digit-growth-following-pandemic-push-online.

[10]    *Post Pandemic eCommerce*, INTERNATIONAL TRADE ADMINISTRATION, https://www.trade.gov/post-pandemic-ecommerce.

ads shown.  In the early stages of the COVID-19 pandemic, Thrasio was heavily penalized due to inventory shortages and an inability to keep its products in stock.  To avoid being penalized further, Thrasio radically adjusted its inventory purchasing policies and purchased significant amounts of inventory on terms that were materially above what "market" terms would be in a pandemic-free economy.  As consumer demand began to wane and pandemic restrictions eased, Thrasio found itself burdened by an overhang of expensive, surplus inventory.  At the end of 2022, Thrasio estimated that it had approximately $425 million of excess inventory on hand.  Thrasio has a strong relationship with Amazon that has been, and will continue to be, integral to its success.  However, the COVID-19 pandemic demonstrated that only having one platform through which to sell products was a strategic weakness that put the Company's business at risk.

44.    Inventory over-purchasing negatively affected the Company's business beyond just the cost outlays associated with the purchase.  At the height of the pandemic, the Company had over 200 warehouse leases due to, in large part, its need of physical space to store its products.  Transporting products to these warehouses also required the Company to expend significant resources to do so.  The costs pressured the Company's margins, especially as the Company needed to be able to move inventory to decrease its warehouse footprint—something that was not immediately easy to do.

### 2.  Over-hiring and Operational Shortcuts

45.    The Company was also not equipped with the internal infrastructure necessary to handle the surge in demand that the Company's portfolio of brands experienced during the pandemic.  In an effort to simply keep up with demand, the Company neglected to implement efficient operational structures or limit fixed costs where possible.  The Company engaged over 40 third-party logistics providers ("3PLs") to support its supply chain management system compared to the industry-standard two or three 3PLs.  The Company also engaged over 4,000

individual vendors and suppliers to support its business.  The collective result of the Company's failure to scale efficiently resulted in significant fixed costs that did not "scale back" when demand slowed.

46.    Further, Thrasio's previous management team believed that the Company would grow at a historic pace and would need a large workforce to survive.  Accordingly, in the United States, Thrasio hired approximately 240 employees in 2020 and approximately 900 employees in 2021.  Ultimately, the costs associated with this oversized and underutilized employee base adversely affected the Company's margins through 2021 and 2022 and wrought administrative complexities that impacted the Company's ability to operate efficiently.

### 3.    Investments and Acquisitions

47.    The pandemic presented the Company with significant avenues for M&A outside of its core Amazon and e-commerce business and into adjacent sectors and industries.  The Company viewed this as an opportunity to grow exponentially, especially as acquisition targets were increasingly interested in partnering with Thrasio to jumpstart their growth.  Some of these acquisitions were successful, but several failed to achieve the revenue and / or cost synergies anticipated at the time of the acquisition or investment.  These unsuccessful ventures created a material cash and profit drain that dragged on the Company's core business.

### C.    2022 Operational Initiatives

48.    Demand for the e-commerce solutions began to plateau as pandemic restrictions began to ease, and the significant operational issues affecting the Company's margins became more apparent.  Accordingly, the Company's board of directors determined that the Company would need to adapt to the "new normal" to position itself for long-term profitability.

49.    In February 2022, Thrasio engaged AlixPartners, LLP ("AlixPartners") to implement a number of profit-generating, cost-reduction, and savings initiatives to generate

operational flexibility. AlixPartners' turnaround efforts ultimately took nearly 11 months to implement. The Company worked together with AlixPartners on a full assessment of the operating model, including a department-by-department review of organizational structures to ensure right-sizing across all functions. During AlixPartners' engagement, the Company and AlixPartners implemented price increases to improve profits across the Company's brand portfolio and eliminated certain Amazon promotions and unsustainably low pricing initiatives, along with a series of initiatives to address excess inventory including the strategic acceleration of sales, slowing ordering, and facilitating bulk inventory liquidations. AlixPartners also identified critical supply chain savings initiatives centered on the Company's consolidation of its 3PL network, improved contract rates with domestic transportation carriers, and reduced unplanned air freight, demurrage, and other unplanned expenses. Together, AlixPartners and the Company reduced the Company's bank account footprint from a high of 749 bank accounts to 376 current bank accounts, its warehouse footprint from more than 200 to approximately 129 and its supplier count from 1,300 to 350. Thrasio was able to sell down 28% of its $700 million worth of excess inventory and implement protocols for further sales. The Company paused its M&A initiatives and refocused on its core businesses, completing only one seller acquisition, Ranger Ready Repellants, in the last 9 months. The Company also took significant steps to right-size its employee footprint, reducing headcount by approximately 600 individuals. In total, the Company's operational initiatives and internal restructuring efforts resulted in $365 million of total annual cost savings. The Company's current management team is proud of the work that has been accomplished to date, though the Company remains cognizant of the work that remains.

### D.      2023 Capital Raise

50.      The Company's operational initiatives did not obviate the need for incremental financing. Thrasio's board of Directors and management team understood that the Company's

existing debt service obligations would continue to pressure cash flows despite the implementation of various cost saving initiatives.  Further, the Company required additional financing to fund operations until inventory returns to a healthy level, and achieve positive cash flow and EBITDA. Accordingly, in the spring of 2023, Thrasio engaged Centerview Partners LLC ("Centerview") to advise on a capital raise process targeting both third parties and existing investors.  Around the same time, Thrasio engaged Kirkland & Ellis LLP ("Kirkland") as legal counsel to assist in evaluating potential transactions.

51.    Thrasio's initial efforts focused on targeted outreach to third-party capital providers with deep knowledge of the e-commerce or "aggregator" sectors and/or experience executing structured capital investments.  The latter experience was important because structuring the financing in a way that minimized the number of consents required from existing investors, and the associated execution risk, was valuable to the Company.  However, Thrasio's external capital raise unfortunately coincided with a period of significant macroeconomic headwinds and global volatility.  Rampant inflation and interest rate "hikes" by the U.S. Federal Reserve contributed to fears of a global recession and pullback in consumer spending, which created a difficult market environment for raising capital.  Thrasio was also in the midst of an operational turnaround, which gave certain potential investors pause.

52.    Ultimately, two parties entered into confidentiality agreements with the Debtors. Centerview provided these parties with a copy of Thrasio's investor presentation and access to a virtual data room with incremental information regarding the Company's business operations and financial position.  The initial virtual data room was robust, supplemented throughout the marketing process, and ultimately contained hundreds of pages of diligence information.  Members of Thrasio's management team also presented to one of the interested parties on the business,

recent performance, and management's business plan. However, neither party ultimately submitted an actionable proposal.

53. Around the same time, Thrasio explored the feasibility of a strategic combination with a third party, including a combination of transactions with another Amazon aggregator. However, many Amazon aggregators are currently experiencing the same macroeconomic headwinds and capital structure challenges as Thrasio. Ultimately, Thrasio determined that a restructuring and reorganization presented the Company with a more certain path towards a value-maximizing transaction.

54. Due to the challenges of raising third-party capital, Thrasio and Centerview engaged with certain of the Company's preferred equityholders to evaluate their appetite to contribute new capital to the business. To help support their diligence, Centerview prepared an extensive virtual data room and hosted multiple virtual and in-person meetings. Ultimately, the Company received one transaction proposal from an existing investor in August 2023. The proposal was predicated on receiving certain stakeholder consents and conditions precedent, including unanimous lender consent for a significant reduction of the Company's outstanding debt. After engaging with the investor and thoroughly evaluating the proposal, the Company deemed the proposal unactionable, and began to prepare for engagement with its lenders on a potential lender-led transaction. Around the same time, Thrasio's board of directors appointed two disinterested directors to review and evaluate potential strategic alternatives. The disinterested directors have since met regularly with Thrasio's management team advisors to evaluate the merits of the transactions proposals that the Company received.

E.    **Lender Engagement and the Forbearance Agreement**

55. In August 2023, Centerview and the Company initiated outreach to several of the Company's largest Term Loan Lenders. The Company's Term Loan Lenders organized into an

ad hoc group that holds approximately 88% of outstanding Term Loans under the Credit Agreement (the "Ad Hoc Group"), and retained Gibson Dunn & Crutcher LLP as legal advisor and Evercore Group L.L.C. as investment banker. The administrative agent under the Credit Agreement, in its capacity as administrative agent under the Revolving Credit Facility, also retained Simpson Thacher & Bartlett LLP.

56.    The Company and the Ad Hoc Group began to engage in discussions on potential transaction considerations and to diligence the needs of the go-forward business beginning in August 2023. The Company and its advisors hosted multiple in-person meetings, participated in weekly virtual diligence sessions, and maintained an extensive data room with thousands of pages of diligence information for the Ad Hoc Group and its advisors. However, as discussions with the Ad Hoc Group unfolded, sustained macroeconomic headwinds and the lack of new capital began to put pressure on the Company's liquidity position, especially in light of the approximately $25 million interest and amortization payment due under the Credit Agreement on September 29, 2023. As discussions with the Ad Hoc Group progressed, it became clear that agreement on a financing transaction would not be reached prior to the interest and amortization payment deadline.

57.    The Company, in an exercise of its business judgment and after consulting with the Ad Hoc Group, ultimately decided that making the quarterly payments due on September 29, 2023 was not advisable in light of Thrasio's liquidity position. Both the Company and the Ad Hoc Group were also acutely aware of the negative effect that missing the payments could have on the market's perception of Thrasio, especially as other e-commerce aggregators showed signs of distress, and understood that poor messaging could exacerbate Thrasio's liquidity problem. Accordingly, in September, Thrasio pivoted its focus to negotiating the terms of a forbearance with the Ad Hoc Group. Those efforts resulted in a forbearance agreement executed with the Ad

Hoc Group on September 29, 2023 (the "Forbearance Agreement") prior to the interest and amortization payment deadline.  The Forbearance Agreement contained, among other things, an agreement from the consenting lenders to forbear from exercising their rights and remedies under the Credit Agreement through November 30, 2023, as well as certain milestones intended to drive parties to consensus on a transaction.  Prior to executing the Forbearance Agreement, and as a condition to its execution, the Company drew down on its Revolving Credit Facility under the Credit Agreement to provide the Company with liquidity to operate while negotiations progressed.

**F.    Ad Hoc Group Negotiations and Stakeholder Engagement**

58.    Following execution of the Forbearance Agreement, the Company and the Ad Hoc Group recommenced negotiations on a lender-led restructuring transaction.  The Ad Hoc Group extended the Forbearance Agreement several times to facilitate further discussions.  However, in January 2024, the Company received a joint proposal from Corner Capital Management, LLC ("Corner"), and J. Safra Sarasin ("Safra"), investment managers for certain existing preferred equityholders, regarding an alternative proposed plan of reorganization.  The proposal contemplated a substantial new money cash infusion into the Debtors, though the proposal remained subject to further diligence and final investor sign off.  To facilitate further discussions and diligence efforts, the Ad Hoc Group further extended the Forbearance Agreement.  The parties engaged in several weeks of discussions but were ultimately unable to reach agreement on terms of a transaction structure prior to the Petition Date.  The Company intends to continue discussions with Corner, Safra, and the Ad Hoc Group postpetition.

59.    Following several months of arms-length, good-faith negotiations, the Ad Hoc Group and the Company reached agreement in principle on a comprehensive deleveraging transaction effectuated through a chapter 11 plan of reorganization.  On February 27, 2024, the Company and certain of the First Lien Lenders executed the Restructuring Support Agreement, a

24

copy of which is attached hereto as **Exhibit C**.  The Restructuring Support Agreement represents a significant achievement for Thrasio and is a testament to the commitment of its lenders to support a value-maximizing path forward upon emergence from these chapter 11 cases.  Holders of approximately 81% of the Company's first lien debt executed the Restructuring Support Agreement.  The transactions contemplated by the Restructuring Support Agreement will eliminate approximately $495 million of the Company's existing $855.2 million in debt, and the commitments for up to $90 million of new money DIP financing will support the Company's operations during chapter 11 and ensure a smooth and timely exit from chapter 11.

### G.    Proposed DIP Financing

60.    The DIP Facility is a critical and integral component of the transaction.  Absent the funds available from the DIP Facility, the Debtors could face a value-destructive interruption to their business and lose support from important stakeholders on whom the Debtors' business depends.  This, in turn, would hinder the Debtors' ability to maximize the value of their estates and may even force the Debtors to curtail their operations significantly to the detriment of their estates.  Critically, while backstopped by the Ad Hoc Group, participation in the DIP Facility is being offered to all First Lien Lenders on a *pro rata* basis.

61.    The Debtors also seek to use cash on hand generated from operations to fund working capital, capital expenditures, development efforts, and for other general corporate purposes.  Access to the proposed DIP Facility and use of cash collateral is essential to enable the Debtors to ultimately consummate their restructuring, all while continuing to operate their business by satisfying payroll obligations, paying suppliers, covering overhead costs, and satisfying any other payments that are essential for the continued management, operation, and preservation of the Debtors' assets.

62.     In connection with the development of the capital sizing analysis and DIP marketing process, the Debtors and their advisors evaluated the Debtors' liquidity position and developed projections (as updated from time to time in accordance with the terms of the DIP Facility, the "Approved Budget") of post-petition cash needs for the Debtors' businesses in the initial 13 weeks of these chapter 11 cases (including detailed line items for categories of cash flows anticipated to be received or disbursed during this period), as well as longer-term monthly forecasts, to determine the amount of post-petition financing required to administer these chapter 11 cases.  The Approved Budget and projections provide an accurate reflection of the Debtors' likely funding requirements over the identified periods, respectively, and are appropriate under the circumstances.   The Approved Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of their business for the period set forth in the Approved Budget.

63.     As detailed further in the declarations submitted in support of the DIP Facility, the Debtors require immediate access to additional liquidity to ensure that they are able to continue to operate during these chapter 11 cases.  Specifically, based on the Debtors' forecast, the Debtors anticipate that they will be unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover the projected restructuring costs of these chapter 11 cases without access to the post-petition financing provided by the DIP Facility.

## IV.    Evidentiary Support for First Day Motions

64.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize their business operations, facilitate the efficient administration of these chapter 11 cases, and execute a swift and smooth restructuring.  I have reviewed each of the First Day Motions and I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal

disruption during the pendency of these chapter 11 cases.  A description of the relief requested and
the facts supporting each of the First Day Motions is detailed in **Exhibit A**.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  February 28, 2024                    */s/ Josh Burke*
                                                          Josh Burke
                                                          Thrasio Holdings, Inc.
                                                          Chief Financial Officer

## Exhibit A

**Evidentiary Support for First Day Motions**[1]

---

[1]    Capitalized terms used but not defined herein have the meanings ascribed to them in the applicable First Day Motion.

## Administrative and Procedural Motions

I.    **Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion").**

1.    The Debtors have filed several purely administrative or procedural First Day Motions, including a motion to jointly administer the Debtors' bankruptcy cases.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

2.    Moreover, joint administration will not adversely affect the Debtors' respective constituencies.  The motion seeks only administrative, not substantive, consolidation of the Debtors' estates.  Parties in interest will not be harmed by the relief requested; rather, parties in interest will benefit from (i) the cost reductions associated with the joint administration of these chapter 11 cases and (ii) ease of reference to one main case docket throughout these chapter 11 cases.

3.    I believe that the relief requested in the Joint Administration Motion necessary, appropriate, and is in the best interests of the Debtors' estates and creditors, and the relief will enable the Debtors to continue to effectively administer these chapter 11 cases.  Accordingly, I respectfully submit that the Joint Administration Motion should be approved.

II.    **Debtors' Motion for Entry of an Order Establishing a Record Date for Potential Notice and Sell-Down Procedures for Trading in Certain Claims Against the Debtors' Estates (the "_Record Date Motion_").**

4.    Pursuant to the Record Date Motion, the Debtors seek entry of an order establishing the effective date for certain potential notice and sell-down procedures for trading in certain claims against the Debtors' estates in order to preserve the Debtors' ability to formulate a plan of reorganization that maximizes the use of their Tax Attributes.

5.    The Debtors had, as of December 31, 2022, approximately $1.1 billion of federal NOLs, approximately $187.8 million of 163(j) Carryforwards, and approximately $15.9 million of capital loss carryforwards.  The Debtors expect to generate substantial additional tax attributes in the current tax year, including during the pendency of these chapter 11 cases.  The Tax Attributes are potentially of significant value to the Debtors and their estates because Tax Attributes may offset U.S. federal taxable income or U.S. federal tax liability in future years, including any taxable income generated by transactions consummated during these chapter 11 cases (including with respect to any taxable disposition of some or all of the Debtors' assets).  Accordingly, the value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

6.    The Debtors' ability to use their Tax Attributes may, however, be lost (or severely limited) if they experience an "ownership change" for tax purposes and are unable to take advantage of certain favorable rules that apply to ownership changes that occur pursuant to a bankruptcy plan of reorganization.  The Debtors expect such favorable rules will provide substantial value to the Debtors' estates through the preservation of the Tax Attributes. Accordingly, to protect their ability to use the Tax Attributes (and, specifically, to rely on the favorable rule described below), the Debtors may ultimately need to seek a Sell-Down Order requiring any person or entities (as defined in section 101(15) of the Bankruptcy Code) that have acquired debt claims against the Debtors during these chapter 11 cases in such an amount that the

3

holders of such claims would be entitled to receive more than 4.5 percent of the equity of the reorganized Debtors, to sell-down their claims below this threshold amount.

7.      At this stage, it is too early to determine whether it is (or will be) necessary for the Debtors to obtain a Sell-Down Order, so the Record Date Motion does not seek entry of a Sell-Down Order.  Instead, the Record Date Motion merely seeks to establish the Record Date through entry of the proposed Record Date Order.  The Record Date Order will provide notice of the Record Date to persons or entities that trade claims against the Debtors that their claims ultimately may be subject to sell-down.  This notice will communicate: (a) that, subject to further Court order (*i.e.*, a Sell-Down Order), such creditor's claims may ultimately be subject to sell-down; and (b) the date after which purchased claims could be subject to sell-down (*i.e.*, on or after the Record Date).  Thus, the ***only*** purpose of the Record Date Order is to set and provide notice of the Record Date, which will serve as a placeholder should the Debtors later determine that a Sell-Down Order is necessary to preserve the Tax Attributes.  To the extent the Debtors later determine that a Sell-Down Order is necessary, the Debtors will file a separate motion requesting entry of a Sell-Down Order applicable to claims traded ***after*** the Record Date.

8.      Nevertheless, the Debtors anticipate that they may need to seek entry of a Sell-Down Order that will enable them to (a) determine whether the Debtors will qualify for the Section 382(l)(5) Exception and, if necessary, (b) require certain Substantial Claimholders to "sell-down" claims to the extent necessary to allow the Debtors to qualify for the Section 382(l)(5) Exception.  The Record Date Order is designed to ensure that the Debtors preserve their ability to request this relief to the extent the Debtors determine that the Sell-Down Procedures are necessary to preserve the Tax Attributes.

9.      I believe that the relief requested in the Record Date Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to effectively administer these chapter 11 cases.  Accordingly, on behalf of the Debtors, I submit that the Record Date Motion should be approved.

**III.    Debtors' Motion for Entry of an Order Establishing Certain Notice, Case Management, and Administrative Procedures (the "Case Management Motion").**

10.      Pursuant to the Case Management Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to designate these chapter 11 cases as complex cases, and (b) approving and implementing certain notice, case management, and administrative procedures as described in Exhibit 1 of Exhibit A attached to the Case Management Motion.

11.      There are hundreds of creditors and parties in interest in these chapter 11 cases. Notice of all pleadings and other papers filed in these chapter 11 cases to each of these parties would be extremely burdensome and costly to the Debtors' estates.  The costs of photocopying, postage, and other expenses associated with such large mailings would be excessive and practically prohibitive.  The relief sought in the Case Management Motion is tailored to address such concerns while simultaneously ensuring timely notification to those parties actively participating in these chapter 11 cases or those parties whose rights are directly affected by a given matter.

12.      Given the size and complexity of these chapter 11 cases, I believe that the Case Management Procedures will facilitate service of Court Filings and Orders in a manner that will maximize the efficiency and orderly administration of the chapter 11 cases, while at the same time ensuring that appropriate notice is provided, particularly to parties who express an interest in these chapter 11 cases and those directly affected by a request for relief.

13.      I believe that the relief requested in the Case Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the

Debtors to continue to effectively administer these chapter 11 cases.  Accordingly, on behalf of

the Debtors, I submit that the Case Management Motion should be approved.

IV.    **Debtors' Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "<u>Schedules/SOFAs Extension Motion</u>").**

14.    Pursuant to the Schedules/SOFAs Extension Motion, the Debtors seek entry of an

order:  authorizing the Debtors to extend the deadline by which the Debtors must file their

schedules of assets and liabilities, schedules of current income and expenditures, schedules of

executory contracts and unexpired leases, and statements of financial affairs (collectively,

the "<u>Schedules and Statements</u>") by sixteen (16) days, for a total of thirty (30) days from the

Petition Date, to and including March 28, 2024, without prejudice to the Debtors' ability to request

additional extensions for cause shown.

15.    I believe that good and sufficient cause exists for granting an extension of time to

file the Schedules and Statements.  The ordinary operation of the Debtors' business requires the

Debtors to maintain voluminous books, records, and complex accounting systems.  To prepare the

Schedules and Statements, the Debtors must compile information from those books and records,

and from documents relating to the claims of their thousands of creditors aggregated among all the

Debtor entities, as well as the Debtors' many assets, contracts, and leases.  This information is

extensive and located in numerous places throughout the Debtors' organization.  Collecting the

necessary information requires an enormous expenditure of time and effort on the part of the

Debtors, their employees, and their professional advisors in the near term—when these resources

would be best used to stabilize the Debtors' business operations.

16.    Given the amount of work entailed in completing the Schedules and Statements and

the competing demands on the Debtors' employees and professionals to assist with stabilizing

business operations during the initial postpetition period, and the critical matters that the Debtors'

management and professionals were required to address prior to the commencement of these chapter 11 cases, the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the required time period.

17.    I believe that the relief requested in the Schedules/SOFAs Extension Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to effectively administer these chapter 11 cases.  Accordingly, on behalf of the Debtors, I submit that the Schedules/SOFAs Extension Motion should be approved.

**V.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, (B) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, and (C) Redact Certain Personally Identifiable Information, (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (III) Waiving the Requirement to File a List of Equity Security Holders (the "Creditor Matrix Motion").**

18.    Pursuant to the Creditor Matrix Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to (i) file a consolidated list of the Debtors' thirty (30) largest unsecured creditors in lieu of filing separate creditor lists for each Debtor, (ii) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, and (iii) redact certain personally identifiable information; (b) approving the form and manner of notifying creditors of the commencement of these chapter 11 cases and other information; and (c) waiving the requirement to file a list of, and provide direct notice to, equity security holders.

19.    ***Consolidated Creditor Matrix.***  I believe allowing the Debtors to prepare and maintain a Consolidated Creditor Matrix in lieu of filing a separate creditor matrix for each Debtor is warranted under the circumstances of these chapter 11 cases where there are hundreds of creditors and parties in interest.  Converting the Debtors' computerized information to a format compatible with the matrix requirements, as well as the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, administratively burdensome, and increase

7

the risk of error with respect to information already on computer systems maintained by the Debtors or their agents.  Accordingly, I believe that filing a Consolidated Creditor Matrix is in the best interests of the Debtors' estates.

20.      ***Consolidated List of the 30 Largest Unsecured Creditors.***  The Debtors request authority to file a single, consolidated list of their 30 largest general unsecured creditors.  Because the top creditor lists for each individual Debtor overlap, I believe that filing separate lists for each Debtor would be of limited utility.  In addition, the exercise of compiling separate top creditor lists for each individual Debtor could consume an excessive amount of the Debtors', and their advisors', limited time and resources.  I believe that the Top 30 List will better aid the U.S. Trustee in the efforts to communicate with these creditors.

21.      ***Redact Certain Personally Identifiable Information.***  I believe that it is appropriate to authorize the Debtors to redact certain personally identifiable information from any paper filed, or to be filed, with the Court in these chapter 11 cases, including the Creditor Matrix and Schedules and Statements, because such information can be used to perpetrate identity theft or locate survivors of domestic violence, harassment, or stalking.  In addition, privacy and data protection regulations have been enacted in key jurisdictions in which the Debtors and non-Debtor affiliates do business.  Disclosure risks violating these data and privacy laws and regulations, exposing the Debtors to potential civil liability and significant financial penalties.  The Debtors shall provide an unredacted version of the Creditor Matrix, Schedules and Statements, and any other applicable redacted filings to the Court, the U.S. Trustee, counsel to any statutory committee appointed in these chapter 11 cases (if any), and any party in interest upon a request to the Debtors or to the Court that is reasonably related to these chapter 11 cases.

22.      ***Service of Required Notices to Creditors.***   The Debtors propose that KCC, the Debtors' Proposed Claims and Noticing Agent, undertake all mailings directed by the Court or the U.S. Trustee or as required in section 342(a) of the Bankruptcy Code and Bankruptcy Rules 2002(a) and (f), including the notice of commencement of these chapter 11 cases, on all parties listed on the Consolidated Creditor Matrix to advise them of the meeting of creditors under section 341 of the Bankruptcy Code.  I believe that service of the Notice of Commencement will not only avoid confusion among creditors but will also prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous Creditor Matrix.

23.      ***Waiver of the Requirement to File a List of Equity Security Holders.***   The requirements to file a list of, and to provide notice directly to, equity holders should be waived as to Debtor Thrasio Holdings, Inc.  As of the Petition Date, Thrasio Holdings, Inc. has various series of preferred equity outstanding to hundreds of equity holders.  Such equity holders may change during the chapter 11 cases, requiring the Debtors to continually expend estate resources to maintain an accurate list of equity holders.  Thrasio Holdings, Inc. has taken several actions to inform its equity holders of the commencement of these chapter 11 cases.  On the Petition Date, the Debtors will issue a press release announcing the filing.  Furthermore, Thrasio Holdings, Inc. disclosed its most significant holders of outstanding equity in connection with its statement of corporate ownership, and each of its affiliated Debtors filed a list of significant equity holders with their petitions.  The Debtors will provide all known equity holders with notice of the Debtors' confirmation hearing, which will permit them to assert their interests.  Accordingly, the Debtors request that the requirements to file a list of, and to provide notice directly to, Thrasio Holdings, Inc.'s equity security holders be waived.

24.     I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to effectively administer these chapter 11 cases.  Accordingly, on behalf of the Debtors, I submit that the Creditor Matrix Motion should be approved.

**VI.     Debtors' Application for Entry of an Order Authorizing the Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective as of the Petition Date (the "<u>KCC 156(c) Retention Application</u>").**

25.     Although the Debtors have not yet filed their schedules of assets and liabilities and statements of financial affairs, they anticipate that there will be hundreds of creditors and parties in interest to be noticed, many of which may file proofs of claim.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the appointment of a claims, noticing, and solicitation agent will provide the most effective and efficient means of noticing, administering claims, and soliciting and tabulating votes.

**VII.    Debtors' Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock (the "<u>NOL Motion</u>").**

26.     The Debtors currently estimate that, as of December 31, 2023, they had approximately $1.1 billion of U.S. federal NOLs, and approximately $187.8 million of 163(j) Carryforwards, and $15.9 million of capital loss carryforwards.[2] The Debtors expect to generate substantial additional Tax Attributes in the current tax year, including during the pendency of these chapter 11 cases.  I believe that the Tax Attributes are potentially of significant value to the Debtors and their estates because the Tax Attributes may offset future federal taxable income or federal tax liability in future years.  In addition, I understand that the Debtors may utilize such Tax Attributes to offset any taxable income generated by transactions consummated during

---

[2]     Amounts are estimates and are subject to change.

these chapter 11 cases.  Accordingly, I believe that the value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

27.     To maximize the use of the Tax Attributes and enhance recoveries for the Debtors' stakeholders, I understand that the Debtors seek limited relief that will enable them to closely monitor certain transfers of Beneficial Ownership of Common Stock and Preferred Stock and certain worthless stock deductions with respect to Beneficial Ownership of Common Stock and Preferred Stock so as to be in a position to act expeditiously to prevent such transfers or worthlessness deductions, if necessary, with the purpose of preserving the Tax Attributes.  I believe that by establishing and implementing such Procedures, the Debtors will be in a position to object to "ownership changes" that threaten their ability to preserve the value of their Tax Attributes for the benefit of the estates.

28.     I believe that the relief requested in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to effectively operate their businesses during these chapter 11 cases.  Accordingly, on behalf of the Debtors, I submit that the NOL Motion should be approved.

**VIII.  Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests (the "<u>Utilities Motion</u>").**

29.     Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (a) approving the Debtors' proposed adequate assurance of payment for future utility services; (b) prohibiting utility providers from altering, refusing, or discontinuing services; and (c) approving the Debtors' proposed procedures for resolving Adequate Assurance Requests.

30.     In connection with the operation of their business and properties, the Debtors obtain internet and services (collectively, the "<u>Utility Services</u>") from a small number of Utility

11

Providers.[3]    On average, the Debtors pay approximately $12,100 each month for the Utility Services.    The Debtors estimate that their cost for Utility Services during the thirty (30) days following the Petition Date will be approximately $12,100.

31.    To provide additional assurance of payment, the Debtors propose to deposit $6,655 into a segregated account (the "Adequate Assurance Deposit").  The Adequate Assurance Deposit represents an amount equal to approximately one-half of the Debtors' average monthly cost of Utility Services, calculated on a historical monthly average of payment to the Utility Providers over the last ten (10) months.

32.    I believe that uninterrupted Utility Services are essential to the Debtors' ongoing business operations and hence, the overall success of these chapter 11 cases.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations may be severely disrupted, and such disruption would jeopardize the Debtors' ability to manage their reorganization efforts.  Accordingly, it is essential that the Utility Services continue uninterrupted during these chapter 11 cases.

33.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

---

[3]    Pursuant to certain leases to which the Debtors are party to, certain utility services, such as electricity, natural gas, and water (the "Additional Utility Services") are billed directly to the Debtors' landlords and passed through to the Debtors as part of the Debtors' lease payments in accordance with the applicable lease agreements.  For the avoidance of doubt, the Debtors are not seeking relief with respect to these Additional Utility Services.

**Operational Motions**

**IX.    Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue Using their Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Maintain Existing Business Forms, and (IV) Perform Intercompany Transactions (the "Cash Management Motion").**

34.    In addition to the administrative or procedural First Day Motions, the Debtors have also filed certain motions that will ensure that the Debtors can operate efficiently and effectively during the pendency of these chapter 11 cases, including the Cash Management Motion.  Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders:  authorizing the Debtors to (i) continue using their Cash Management System, (ii) honor certain prepetition obligations related thereto, (iii) maintain existing Business Forms in the ordinary course of business, and (iv) continue to perform the Intercompany Transactions consistent with historical practice.

35.    In the ordinary course of business, the Debtors and their Non-Debtor Affiliates operate a complex Cash Management System.  The Debtors use their Cash Management System to collect, transfer, and disburse funds, and to facilitate cash monitoring, forecasting, and reporting. The Debtors' treasury department maintains daily oversight of the Cash Management System and implements cash management controls for accepting, processing, and releasing funds, including in connection with any Intercompany Transactions.  The Debtors' accounting department regularly reconciles the books and records to ensure that all transfers are accounted for properly.

36.    The Cash Management System is similar to those commonly employed by businesses comparable in size and scale to the Debtors to help control funds, ensure cash availability and liquidity, and reduce administrative expenses by facilitating the movement of funds among multiple entities and accounts.  As of the Petition Date, there is approximately $28.5 million in cash in the Debtor Bank Accounts.

37.    As of the Petition Date, the Company's Cash Management System is composed of 376 Bank Accounts that are owned by the Debtors and certain non-Debtor affiliates.  The Bank Accounts are held at fifteen (15) banks across five (5) countries utilizing seven (7) different currencies.  Of those Bank Accounts, 341 are owned and controlled by the Debtors (the "Debtor Bank Accounts"), while the remainder are owned by foreign based Non-Debtor Affiliates (the "Non-Debtor Bank Accounts") that are direct and indirect subsidiaries of Debtor Thrasio, LLC ("Thrasio LLC").  The following are the Debtor Bank Accounts maintained at First Republic, JPMorgan, KeyBank, OFX, Payoneer, PayPal, PNC, RBC, Stripe, and Webster (the "Cash Management Banks"):

| Cash Management Banks | Number of Bank Accounts |
|---|---|
| *Debtor Bank Accounts* | |
| First Republic Bank ("First Republic") | 169 |
| JPMorgan Chase Bank, N.A. ("JPMorgan") | 5 |
| KeyBank N.A. ("KeyBank") | 3 |
| USForex Inc. d/b/a OFX ("OFX") | 38 |
| Payoneer Inc. ("Payoneer") | 63 |
| PayPal ("PayPal") | 12 |
| PNC Bank, N.A. ("PNC") | 45 |
| Royal Bank of Canada ("RBC") | 1 |
| Stripe, Inc. ("Stripe") | 4 |
| Webster Bank, N.A. ("Webster") | 1 |
| *Total Debtor Bank Accounts* | 341 |

38.    The Debtor Bank Accounts consist of: (a) 297 Depository Accounts, the brand-level Bank Accounts into which all Receipts are deposited on a daily basis; (b) fourteen (14) Concentration Accounts, the Bank Accounts that pool all incoming funds from Depository Accounts; (c) twenty-five (25) Operation and Disbursement Accounts, the Bank Accounts that

fund corporate disbursements; (d) two (2) Investment Accounts, the Bank Accounts that invest and maintain excess cash in money market funds; and (e) three (3) Restricted CD Accounts, the Bank Accounts that hold an aggregate balance of $3.6 million of restricted cash as of the Petition Date.  On a daily or weekly basis,[4] amounts deposited into the Depository Accounts are swept into the Concentration Accounts for cash pooling and consolidation purposes.  Amounts are then manually transferred to the Operating and Disbursement Accounts, generally on a weekly basis, to fund operations and fulfill financial obligations.  Amounts may also be manually or automatically transferred from the Concentration Accounts into the Investment Accounts based on funding needs or when there is an excess cash position.

39.    Five of the ten Cash Management Banks where the Debtor Bank Accounts are maintained as Authorized Depositories under the U.S. Trustee Guidelines.  Likewise, most of the Debtor Bank Accounts are insured by the FDIC.  I believe the remaining Debtor Bank Accounts are maintained at well-capitalized and sophisticated financial institutions.  Further, I believe that relocating the Bank Accounts to authorized depositories could have potentially significant tax or regulatory impacts.

40.    ***Bank Fees.***  In the ordinary course of business, the Debtors incur Bank Fees in connection with maintenance of the Cash Management System.  The Debtors incur approximately $42,000 per month in aggregate net Bank Fees each month under the Cash Management System to maintain the Debtor Bank Accounts.  The Debtors estimate that they owe approximately $60,000 per month total in prepetition Bank Fees as of the Petition Date.

---

[4]    Depository Accounts with OFX, PayPal, and Payoneer are automatically swept on a weekly basis.  The remainder of the Depository Accounts are automatically swept on a daily basis.

41.     ***Credit Card Program.***  As part of the Cash Management System, in the ordinary course of business and in accordance with the terms of the existing agreements between the Debtors and JPMorgan, the Debtors use credit cards issued by JPMorgan under the Credit Card Program to primarily pay for marketing expenses, certain other travel expenses, such as hotel stays, meals, and other necessary and approved company expenditures.

42.     The Credit Card Program is mainly used for Marketing Expenses for payments to Amazon and non-Amazon counterparties on account of banner advertisements, sponsor posts, and lightning advertisements, among other things.  The Marketing Expenses are automatically charged by Amazon, as needed, and are charged on a bi-weekly basis by non-Amazon counterparties. Payments made on account of the Credit Card Program by the Debtors are paid from the Operating and Disbursement Accounts.

43.     As of the Petition Date, JPMorgan has issued 220 credit cards under the Credit Card Program to employees of the Debtors.  Debtor Thrasio, LLC guarantees all obligations owing under the Credit Card Program, including any obligations incurred by the Debtors that use the Credit Card Program (collectively, such obligations and guarantee of such obligations, the "Credit Card Obligations").  On average, the Credit Card Obligations amount to approximately $2 million in the aggregate per month, all of which is typically paid by Debtor Thrasio, LLC.  Payments made in respect of the Credit Card Obligations are made weekly to JPMorgan.

44.     The Credit Card Program is an integral part of the Cash Management System.  The Debtors' continued use of the credit cards for Marketing Expenses and travel purposes is essential to the continued operation of the Debtors' businesses.  As applicable, and to the extent not otherwise authorized under any order of this Court granting the relief requested in the Wages

Motion,[5] the Debtors seek authority to (a) continue using credit cards and incurring Credit Card Obligations on a postpetition basis pursuant to the Credit Card Program, subject to the terms of any applicable debtor-in-possession financing orders and related postpetition loan documents pursuant to which the Credit Card Obligations are included as obligations thereunder; and (b) honor all past and future Credit Card Obligations of any of the Debtors to JPMorgan and any of its affiliates in connection with the Credit Card Program, in the ordinary course of business on a postpetition basis, including, without limitation, making timely payments on account of charges that were made under the Credit Card Program both prior to and after the Petition Date.

45.    ***Intercompany Transactions.***  As explained above, the Debtors operate as a global enterprise, and thus, the Debtors routinely engage in intercompany financial transactions (the "Intercompany Transactions") with each other and Non-Debtor Affiliates.  At any given time, as a result of the Intercompany Transactions, there may be claims owing by or to one Debtor or Non-Debtor Affiliate to another Debtor or Non-Debtor Affiliate, resulting in Intercompany Claims.  The Intercompany Claims and Intercompany Transactions cover a number of different categories, including, for example, cash sweep activity (as described above), purchasing, management services, financing, licensing, and merchandising.  These Intercompany Claims are reflected as receivables and payables, as applicable, in the respective Debtors' and Non-Debtor Affiliates' accounting records.  The Debtors track all fund transfers through their accounting system and can ascertain, trace, and account for all Intercompany Transactions.

46.    Debtor Bank Accounts transfer cash to Non-Debtor Bank Accounts in Germany and China in the ordinary course of business.  Transfers to Germany are primarily to fund the

---

[5]    The "Wages Motion" means *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (II) Continue Employee Benefits Programs* filed contemporaneously herewith.

relevant importer of record in that jurisdiction for inventory purchases and operating expenses. Most Non-Debtor operating expenses are billed to Debtor entities, paid by Debtor Bank Accounts, and do not directly require Intercompany Transactions.  Transfers to China are based on forecasts approved by the US and Chinese governments.  China is not a revenue generating business, and instead acts as a support center for certain company brands.  Most of the Chinese Non-Debtor funding is allocated to employee salaries, rent, and other operating expenses.  In 2023, the average monthly cash transfers to the Chinese and German entities were $650,000 and $100,000 (both in US Dollars), respectively.

47.     The Company also has Non-Debtor Bank Accounts and operations in Australia and Japan, which function similarly to Germany.  However, no transfers between Debtor Bank Accounts and Non-Debtor Bank Accounts have occurred in 2023 in these countries, as they are comparatively smaller operations that are currently focused on selling down inventory on hand rather than actively purchasing new inventory.  However, as operational funding requirements may change, there may be future cash transfers to these Non-Debtor entities.

48.     Cash transfers from Debtor to Non-Debtor entities with sales operations (all except China) are offset by the sweep of cash, generated by sales at Non-Debtor entities, from the respective Non-Debtor Bank Accounts to Debtor Bank Accounts on a periodic basis.  Such sweeps are generally done on a daily basis.  Due to timing differences between inventory purchases and sales, these Intercompany Transfers to and from Non-Debtor bank accounts vary from month to month.

49.     The Debtors are able to closely monitor and record the Intercompany Transactions under the Cash Management System and will continue to track postpetition Intercompany Claims consistent with historical practice.  The Debtors would be unduly burdened, both financially and

logistically, if the Debtors were required to halt Intercompany Transactions or otherwise make material changes to the Cash Management System.  The Debtors seek authority to continue the Intercompany Transactions in the ordinary course of business consistent with past practice and to grant administrative expense status to Intercompany Claims due from the Debtors to other Debtors or Non-Debtor Affiliates as a result of Intercompany Transactions.

50.    ***Business Forms and Books and Records.***  As part of the Cash Management System, the Debtors use a variety of Business Forms in the ordinary course of business.  The Debtors also maintain Books and Records to document their financial results and a wide array of operating information.

51.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I submit that the Cash Management Motion should be approved.

**X.    Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (II) Continue Employee Benefits Programs (the "<u>Wages Motion</u>").**

52.    Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to:  (a) pay all prepetition wages, salaries, incentives, other compensation, and Reimbursable Expenses on account of the Compensation and Benefits and (b) continue to administer the Compensation and Benefits in the ordinary course of business, including payment of prepetition obligations related thereto.

53.    As of the Petition Date, the Debtors employ approximately 415 Employees, 414 of whom are employed on a full-time basis.  The Employees include personnel who are intimately familiar with the Debtors' business, processes, and systems, and possess unique skills and experience with respect to the Debtors' core business segments.  In addition to the Employees, the

Debtors' workforce includes approximately 74 Independent Contractors, who perform a variety of necessary services for the Debtors.

54.     The vast majority of the Employees and Independent Contractors rely on their compensation and benefits to pay their daily living expenses.  These workers will be unfairly harmed if the Debtors are not permitted to continue paying compensation and providing health and other benefits during these chapter 11 cases.  Without the continued, uninterrupted services of the Employees, the Debtors' business operations will be halted and the administration of the estates will be materially impaired.  Consequently, I believe the relief requested in the Wages Motion is necessary and appropriate.

55.     The Debtors are seeking authority to pay and honor certain prepetition claims relating to the Compensation and Benefits, including, among other things, wages, salaries, incentives, other compensation, withholding obligations, payroll processing fees, reimbursable expenses, non-insider employee bonus programs, health insurance, life insurance, workers' compensation benefits, disability coverage, retirement plans, paid leave, severance, and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business and as further described in the Wages Motion.

56.     The Debtors do not believe that amounts owed to any Employees on account of the Employee Compensation and Benefits Programs will exceed the statutory cap of $15,150 under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

57.     Pursuant to the Wages Motion, the Debtors also seek authority to maintain certain Non-Insider Retention Bonus Programs (as defined therein) for certain non-insider Employees. The Debtors implemented the Non-Insider Bonus Programs prepetition to retain certain valuable Employees that are vital to maintaining the Debtors' business and to encourage Employees to

outperform and drive value for all stakeholders. The Debtors do not expect to pay any discretionary bonuses under the Non-Insider Bonus Programs during the pendency of these chapter 11 cases, and do not believe that there are any prepetition amounts outstanding on account of the Non-Insider Bonus Programs. Nevertheless, the Debtors seek authority to pay any amounts on account of the Non-Insider Bonus Programs that may come due and continue the Non-Insider Bonus Programs on a postpetition basis in the ordinary course of business. The Debtors believe the Non-Insider Employee Retention Bonus Program and Commissions drive Employees' performance, align Employees' interests with those of the Debtors generally, and promote the overall efficiency of the Debtors' operations.

58.    I understand that "insiders" (as the term is defined in section 101(31) of the Bankruptcy Code) of the Debtors are excluded from the relief requested in the Wages Motion with respect to any retention programs or bonus programs. I also understand that to the extent any insiders are eligible for severance during the course of the chapter 11 cases, the Debtors do not seek to make any payments above the cap set forth in section 503(c)(2) of the Bankruptcy Code.

59.    The Debtors' Employees are essential to the Debtors' business, and payment of the Compensation and Benefits at this time is necessary to avoid potential material disruption to the Debtors' ordinary-course operations. Finding, attracting, and training new qualified talent would be extremely difficult, particularly given current labor market conditions. Such recruitment efforts would most likely require, among other things, higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees. The Debtors therefore believe that payment of the prepetition obligations with respect to Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give

the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

60.     Payment of the Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases.  Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Compensation and Benefits. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

61.     I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I submit that the Wages Motion should be granted.

**XI.    Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Maintain Insurance and Surety Coverage Entered Into Prepetition and Pay Related Prepetition Obligations, (II) Continue to Pay Certain Brokerage Fees, (III) Renew, Supplement, Modify, or Purchase Insurance and Surety Coverage, and (IV) Enter into New Financing Agreements in the Ordinary Course of Business (the "Insurance Motion").**

62.     Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders, authorizing the Debtors to: (a) pay their obligations under prepetition insurance policies and surety bonds; (b) continue to pay certain brokerage fees; (c) renew, supplement, modify, or purchase insurance and surety coverage in the ordinary course; and (d) enter into new premium financing agreements in the ordinary course of business.

63.     ***Insurance Policies and Related Obligations.***  In the ordinary course of business, the Debtors maintain approximately thirty (30) Insurance Policies that are administered by various third-party insurance carriers, as well as two (2) Surety Bonds by Roanoke and Marsh (and

together with Roanoke, the "Sureties"). The Insurance Policies provide coverage for, among other things, the Debtors' products liability, general liability, umbrella liability, property, marine, stock throughput, employed lawyers, directors' and officers' liability, employment practices liability, business travel, fiduciary liability, crime, and cyber. All of the Insurance Policies are essential to the ongoing operation of the Debtors' businesses. The aggregate annual premium for the Insurance Policies is approximately $4.7 million including applicable taxes, surcharges, and Broker Fees (as defined below). In addition to the Insurance Policies, the Debtors maintain several workers' compensation policies for which relief is not sought in the Insurance Motion.

64.     The Debtors estimate that, as of the Petition Date, there are no in premiums due on account of the Insurance Policies. Nevertheless, out of the abundance of caution, the Debtors seek authority to satisfy any prepetition amounts outstanding or any amounts that arise in the ordinary course of business to ensure uninterrupted coverage under the Insurance Policies. Further, the Debtors may need to renew certain Insurance Policies that will expire during the pendency of these chapter 11 cases and incur corresponding premium payments for renewal. The Debtors seek authority to pay any prepetition obligations owing on account of the Insurance Policies, renew and maintain such Insurance Policies, and make such premium payments in the ordinary course of business when they come due.

65.     Under certain Insurance Policies, the Debtors are required to pay various Insurance Deductibles or Self-Insured Retentions. Generally, if a claim is made against the Insurance Policies that is subject to an Insurance Deductible, the Debtors' applicable insurance carrier will administer the claim and make payments in connection therewith and then invoice the Debtors for any Insurance Deductibles. When a policy is subject to a deductible, a compensable claim is typically assessed from dollar one and then the deductible is subtracted from the claim. A

Self-Insured Retention is the required portion of the insured claim to be paid or incurred by the Debtors before the insurance policy will be affected and is a condition precedent to coverage for payment of the portion of a loss in excess of the Self-Insured Retentions.

66.    The Insurance Carriers may have prepetition claims against the Debtors due to the prepetition payment of the claims without a corresponding Insurance Deductible.  As of the Petition Date, the Debtors do not believe that they owe any amounts to Insurance Carriers relating to Insurance Deductibles or Self-Insured Retentions.  Nevertheless, out of the abundance of caution, the Debtors seek authority to satisfy any prepetition amounts outstanding or that arise postpetition in the ordinary course of business in connection with the Insurance Deductibles and Self-Insured Retentions.

67.    ***Financing Agreement.***  It is common for companies in the Debtors' industry to finance insurance policies through borrowing from a third-party lender.  Seventeen (17) of the Debtors' Insurance Policies are financed through a premium financing agreement with AFCO, dated as of March 9, 2023 (the "Financing Agreement").  Pursuant to the Financing Agreement, the Debtors are required to pay nine (9) monthly installments of approximately $204,000 each, which began in March 2023.  The aggregate annual premium for the Insurance Policies financed under the Financing Agreement is approximately $2.1 million, including applicable taxes and surcharges, with an interest rate of approximately 7.2 percent.  The Debtors estimate that, as of the Petition Date, there is no outstanding balance due on account of the Financing Agreement.  Nevertheless, out of an abundance of caution, the Debtors seek the authority to honor any prepetition amounts outstanding under the terms of the Financing Agreement and to pay any amounts owing thereunder in the ordinary course of business during the administration of these chapter 11 cases.  Furthermore, the Debtors seek authority to enter into new Financing Agreements

or new non-financed Insurance Policies, as necessary or appropriate in the ordinary course of business.

68.     Continuation of the Insurance Policies and the Financing Agreement, and the ability to enter into new insurance policies, is essential to the preservation of the value of the Debtors' businesses and operations.  Moreover, in many instances, insurance coverage is required by the regulations, laws, certain credit agreements, and contracts that govern the Debtors' commercial activities, including the requirement by the U.S. Trustee that a debtor maintain adequate coverage given the circumstances of these chapter 11 cases.  The Debtors seek authorization to maintain and renew their existing Insurance Policies and the Financing Agreement, pay prepetition obligations related thereto, and enter into new insurance policies and financing agreements in the ordinary course of business.

69.     ***Surety Bonds.***  In the ordinary course of business, the Debtors maintain three (3) Surety Bonds.  The Surety Bonds are issued for the benefit of the U.S. Customs to guarantee the Debtors' obligations to pay any applicable duties, taxes, and fees on account of their imports.  Maintaining the Surety Bonds are necessary for the operation of the Debtors' businesses so that the Debtors may remain in compliance with certain obligations in relation to U.S. Customs.

70.     The issuance of a surety bond shifts the risk of the Debtors' nonperformance or nonpayment from the Debtors to the Sureties.  Unlike an insurance policy, if a surety incurs a loss on a surety bond, it is entitled to recover the full amount of that loss from the principal.  To that end, the Sureties required the Debtors to issue three Letters of Credit in the aggregate amount of $7.9 million and provide $2 million of cash collateral to back its Surety Bond and effectively indemnify the Sureties from any loss, cost, or expense it may incur on account of the issuance of

the Surety Bond.  As of the Petition Date, the Debtors do not believe that they owe any amounts
to the Sureties under the Letters of Credit and the Surety Bonds.

71.     To continue their business operations during these chapter 11 cases, the Debtors
must be able to maintain the Letters of Credit to provide financial assurance to the Sureties.  Such
Letters of Credit are required for the Debtors to maintain their Surety Bond.  Accordingly, the
Debtors request authority to pay the prepetition obligations owed on account of the Surety Bonds,
maintain and renew the Surety Bonds and Letters of Credit in the ordinary course of business,
enter into any Surety Bonds or Letters of Credit in the ordinary course of business, and continue
to pay such obligations postpetition as they come due in the ordinary course of business to maintain
uninterrupted coverage thereunder.

72.     ***Insurance and Surety Brokers.***  The Debtors retain the services of insurance
brokers to help manage their portfolios of risk.  The Debtors obtain all of their Insurance Policies
through Marsh and their Surety Bonds through Flexport Inc. (collectively, the "Brokers").  The
Brokers, among other things, (a) assist the Debtors in obtaining comprehensive insurance and
surety coverage for their operations in a cost-effective manner; (b) manage renewal data;
(c) market the Insurance Policies; (d) provide all interactions with carriers, including negotiating
policy terms, provisions, and premiums; and (e) provide ongoing support throughout the
applicable policy periods.  In exchange for these services, the Brokers earn a commission or
brokerage fee, as applicable, covered by each respective Insurance Carrier or Surety

73.     The Debtors do not believe there are any Broker Fees due and owing as of the
Petition Date.  Nevertheless, out of the abundance of caution, the Debtors seek the authority to
honor any prepetition amounts outstanding with respect to the Broker Fees and to pay any amounts

owing thereunder in the ordinary course of business during the administration of these chapter 11 cases to ensure uninterrupted coverage under the Insurance Policies and the Surety Bonds.

74.    I believe that failure to receive the requested relief in the Insurance Motion at the outset of these chapter 11 cases would expose the Debtors to direct liability for payment of claims otherwise covered by the Insurance Policies, distract the Debtors from the vital task of stabilizing their business through this process, and disrupt the Debtors' operations at this important juncture. The relief requested in the Insurance Motion is necessary for the Debtors to operate their business in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders.  I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to effectively operate their businesses during these chapter 11 cases.  Accordingly, on behalf of the Debtors, I submit that the Insurance Motion should be approved.

**XII.    Debtors' Motion for Entry of Interim and Final Orders Authorizing the Payment of Certain Taxes and Fees (the "Taxes Motion").**

75.    Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to (a) remit and pay (or use tax credits to offset) Taxes and Fees in the ordinary course of business that are payable or become payable during these chapter 11 cases, including obligations arising on account of an Audit or Assessment; and (b) undertake the Tax Planning Activities.

76.    In the ordinary course of business, I understand that the Debtors collect, withhold, and incur Taxes and Fees.  The Debtors pay or remit, as applicable, Taxes and Fees to various Authorities on a monthly, quarterly, annual, or other periodic basis depending on the nature and incurrence of a particular Tax or Fee and as required by applicable laws and regulations.  I also

understand that the Debtors generally pay and remit Taxes and Fees through checks and electronic transfers that are processed through their banks and other financial institutions or service providers. Additionally, I understand that the Debtors are subject to, or may become subject to, routine Audits during these chapter 11 cases.  Such Audits may result in Assessments against the Debtors.

77.    I believe that any failure by the Debtors to pay Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including (but not limited to): (a) the initiation of Audits by the Authorities, which I believe would unnecessarily divert the Debtors' attention from these chapter 11 cases; (b) the suspension of the Debtors' operations, the filing of liens, the lifting of the automatic stay, and/or the pursuit of other remedies that I believe will harm the Debtors' estates by the Authorities; and (c) in certain instances, the subjection of Debtors' directors and officers to claims of personal liability, which I believe would distract those key individuals from their duties related to the Debtors' restructuring.  I understand that Taxes and Fees not timely paid as required by law may result in fines and penalties, the accrual of interest, or both.  I also understand that the Debtors also collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates.

78.    The Debtors estimate that approximately $10,067,000 in Taxes and Fees is outstanding as of the Petition Date.

79.    ***Income Taxes.***  The Debtors incur and are required to pay various state, local, and federal Income Taxes in the jurisdictions where the Debtors operate.  The Debtors generally remit Income Taxes to relevant Authorities in accordance with the statutory requirements of each applicable jurisdiction.  In 2023, the Debtors remitted approximately $1,100,000 in Income Taxes

to the applicable Authorities.  As of the Petition Date, the Debtors estimate that they do not owe any prepetition amounts on account of prepetition Income Taxes to the applicable Authorities.

80.    ***Franchise Taxes.***  The Debtors are required to pay various franchise taxes in the ordinary course to conduct their business pursuant to state and local laws.  Franchise taxes are generally accrued and paid monthly.  In 2023, the Debtors remitted approximately $2,000,000 in Franchise Taxes to the applicable Authorities.  As of the Petition Date, the Debtors owe approximately $1,600,000 of such Franchise Taxes to the applicable Authorities.

81.    ***Property Taxes.***  The Debtors pay property taxes in various jurisdictions on account of the Debtors' real and personal property located in such jurisdictions.  State and local laws in the jurisdictions where the Debtors operate generally grant Authorities the power to levy Property Taxes against the Debtors' property.  To avoid the imposition of statutory liens on their real and personal property, the Debtors pay the Property Taxes as they come due in the ordinary course of business.  In 2023, the Debtors remitted approximately $7,000 in Property Taxes to the applicable Authorities.  As of the Petition Date, the Debtors estimate that they have incurred approximately $7,000 in Property Taxes that have not been remitted to the applicable Authorities.

82.    ***Sales and Use Taxes, GST, and VAT.***  The Debtors operate international businesses with operations in North America, Europe, Asia, and Australia.  In connection with these operations, the Debtors incur, collect, and remit Sales and Use Taxes, GST, and VAT to the Authorities for the sale, purchase, and use of goods and services, and the value added to such goods and services.  The process by which the Debtors remit Sales and Use Taxes, GST, and VAT varies depending on the Authority.  The Debtors generally accrue Sales and Use Taxes, GST, and VAT monthly and remit such taxes either monthly, quarterly, or annually, depending on the authority. In 2023, the Debtors remitted approximately $5,000,000 in aggregate Sales and Use Taxes, GST,

and VAT to the applicable Authorities.  As of the Petition Date, the Debtors estimate that they have incurred or collected approximately $2,500,000 in Sales and Use Taxes, GST, and VAT that have not been remitted to the applicable Authorities.

83.     ***Customs and Import Duties.***  The Debtors incur certain duty and excise taxes related to the purchase and sale of goods from or in foreign jurisdictions.  In 2023, the Debtors paid approximately $11,200,000 in aggregate Customs and Import Duties to the applicable authorities.  As of the Petition Date, the Debtors estimate that they have incurred or accrued, but have not remitted, approximately $5,900,000 in Customs and Import Duties.

84.     ***Regulatory and Other Taxes and Fees.***  The Debtors incur, in the ordinary course of business, Regulatory and Other Taxes and Fees.  The Debtors generally remit Regulatory and Other Taxes and Fees to the applicable Authorities on an annual basis.  In 2023, the Debtors have paid approximately $95,000 in Regulatory and Other Taxes and Fees to the applicable Authorities. As of the Petition Date, the Debtors estimate that approximately $40,000 in Regulatory and Other Taxes and Fees will have accrued and remain unpaid to the applicable Authorities.

85.     ***Tax Service Providers.***  The Debtors use, in the ordinary course of business, third-party Tax Service Providers to facilitate payment of certain Taxes and Fees.  In 2023, the Debtors paid approximately $400,000 in aggregate fees to the Tax Service Providers.  As of the Petition Date, the Debtors estimate that they owe approximately $20,000 in prepetition amounts owed to the Tax Service Providers.

86.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to effectively operate their businesses in these chapter 11 cases.  Accordingly, on behalf of the Debtors, I submit that the Taxes Motion should be approved.

**XIII.** **Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of (A) Lien Claimants, (B) Foreign Vendors, (C) 503(B)(9) Claimants, and (D) Critical Vendors, and (II) Confirming Administrative Expense Priority of Outstanding Orders (the "Vendors Motion").**

87.     Pursuant to the Vendors Motion, the Debtors seek interim and final orders (a) authorizing the Debtors to pay, in their sole discretion and in the ordinary course of business, certain prepetition claims of (i) shippers, warehousers, fulfillment centers, logistics providers, distribution vendors, and other lien claimants, (ii) foreign vendors; (iii) vendors from which the Debtors received goods or services within the twenty (20) day window immediately preceding the Petition Date, and (iv) Critical Vendors, and (b) confirming the administrative expense priority status of certain Outstanding Orders and authorizing the payment of such obligations in the ordinary course of business.

88.     I understand that the Debtors rely on third-party Vendors for, among other things, manufacturing, shipping, warehousing, fulfillment, and logistics needs.  Such goods and services are crucial to the Debtors' ability to manage source and store inventory as well as promptly ship products to customers worldwide.  Without access to the Vendors' goods and services, the Debtors would be unable to source inventory and sell products, both of which are crucial to the Debtors' operations.  Any disruption in receiving the Vendors' goods and services would bring the Debtors' business to a complete halt and severely hinder operations.

89.     The Debtors are making every effort to avoid interruptions to their operations and supply chain during the pendency of these chapter 11 cases.  The Debtors believe that many Vendors who are not party to executory contracts with the Debtors will threaten to cease doing business with the Debtors unless they are paid on account of their prepetition debt.  Without these Vendors, the Debtors would be left without the goods and services necessary to maintain the smooth operation of the Debtors' businesses while in chapter 11.

90.     To maintain stability during the initial days of these chapter 11 cases and to avoid jeopardizing the Debtors' ability to service their customers going forward, the Debtors request authorization to pay certain outstanding prepetition claims of the Lien Claimants and the Foreign Vendors.  The Debtors estimate that as of the Petition Date, the Debtors owe $19,200,000 on account of the Trade Claims with $7,370,000 to become due and owing within the first thirty (30) days of these chapter 11 cases.

91.     ***Lien Claimants.***  The Debtors routinely transact with a number of Lien Claimants who have, or may during these chapter 11 cases, assert various statutory liens, including shipper's, warehouse, possessory, or other similar liens against the Debtors and their property and the property of the Debtors' customers if the Debtors fail to pay for the services rendered.  The Lien Claimants primarily consist of shipping, fulfillment, and warehouse vendors.

92.     The Lien Claimants transport, distribute, and warehouse the products that the Debtors provide to their customers.  The Lien Claimants include commercial common carriers, shippers, freight forwarders/consolidators, delivery services, warehousers, fulfillment centers, logistics providers, and other similar third-party transportation service providers.  The Lien Claimants ship, transport, store, and otherwise facilitate the movement of goods; deliver goods through established distribution networks; and utilize a network of third-party warehouses to store such goods in transit.

93.     Under certain non-bankruptcy laws, the Lien Claimants may be able to assert liens on the goods in their possession or on the property they improved (as applicable) to secure payment of the charges or expenses incurred in connection with these prepetition obligations.  Accordingly, in the event these claims remain unpaid, the Lien Claimants could attempt to assert such liens and refuse to deliver or release goods in their possession or otherwise impede the Debtors', and the

Debtors' customers', use of property until their claims are satisfied and their liens redeemed. The Lien Claimants' possession (and retention) of the Debtors' goods and supplies or enforcement of such liens would disrupt the Debtors' operations, harm the Debtors' customers, and affect the Debtors' ability to efficiently administer these chapter 11 cases, and in many cases, the cost of such disruption to the Debtors' estates would likely be greater than the applicable Lien Claims. Furthermore, pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which could require the Debtors to make cash payments on account of the Lien Claims in any event. On average, the Debtors pay $13,220,000 each month to the Lien Claimants. As of the Petition Date, the Debtors estimate that they have accrued approximately $8,630,000 on account of the Lien Claims, approximately $2,850,000 of which is due or will become due within the first thirty (30) days of these chapter 11 cases.

94.    *Foreign Vendor Claims.* I understand that in the ordinary course of business, the Debtors routinely engage in transactions with the Foreign Vendors that are crucial to the Debtors' business operations. Specifically, the Debtors incur certain obligations from manufacturers and suppliers located outside of the United States, including, but not limited to China, India, Germany, and the United Kingdom. Additionally, certain Foreign Vendors in the United Kingdom provide necessary logistics services to the Debtors. The Debtors require these goods and services from the Foreign Vendors to properly operate their businesses in the ordinary course as these goods and services help the Debtors maintain inventory and timely deliver products to customers.

95.    Many of the Foreign Vendors lack meaningful, if any, contacts with the United States. Thus, the Foreign Vendors may consider themselves beyond the jurisdiction of the Court, and therefore, may disregard the automatic stay, notwithstanding the automatic stay's global effect.

Lawsuits in non-U.S. courts and efforts to exercise other remedies in non-U.S. jurisdictions, including the assertion of liens by the Foreign Vendors, could result from a failure to make payment to such parties in the ordinary course, including on account of prepetition claims.  It would be unduly time-consuming and burdensome for the Debtors to seek to enforce an order of the Court in the creditor's home country in many instances, thereby compounding the loss and disruption in services.

96.     For the twelve months before the Petition Date, on average, the Debtors paid the Foreign Vendors approximately $8,830,000 per month.  The Debtors estimate that, as of the Petition Date, approximately $8,430,000 is outstanding on account of Foreign Vendors, approximately $3,040,000 of which is due or will become due within the first thirty (30) days of these chapter 11 cases.

97.     To maintain access to the critical goods and services provided by the Foreign Vendors, the Debtors request authority to pay the prepetition Foreign Vendors as they become due and payable and to continue paying the Foreign Vendors in the ordinary course of business.  For the avoidance of doubt, the Debtors intend to pay prepetition Foreign Vendors only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs.

98.     *503(b)(9) Claims*.  The Debtors may have received certain inventory, goods, and/or materials from the 503(b)(9) Claimants within the twenty days immediately preceding the Petition Date, thereby giving rise to claims that are accorded administrative priority under section 503(b)(9) of the Bankruptcy Code.  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts or supply agreements.  Instead, the Debtors obtain inventory, goods, or other materials from such claimants on a purchase order basis.  As a result, a 503(b)(9)

34

Claimant may refuse to supply new orders without payment of its 503(b)(9) Claims, and such refusal could negatively affect the Debtors' estates as the Debtors' businesses are dependent on the steady flow of inventory and timely shipping of the debtors' products.

99.    Additionally, certain 503(b)(9) Claimants supply goods or materials that are critical to the Debtors' ongoing operations.  Unless the Debtors pay some or all of the prepetition claims owing to such vendors, the 503(b)(9) Claimants may reduce the Debtors' existing trade credit or refuse to ship postpetition.  Any interruption in the flow of these goods would be highly disruptive to the Debtors' operations, value-destructive for the Debtors' businesses, and potentially harmful for certain of the Debtors' customers given the extremely competitive marketplace in which the Debtors operate.  As such, the Debtors believe that payment of the 503(b)(9) Claimants is essential to avoid disruptions to the Debtors' operations.

100.    The Debtors estimate that, as of the Petition Date, approximately $740,000 is outstanding on account of 503(b)(9) Claims, and the Debtors are seeking authority to pay approximately $ 740,000 during the first thirty (30) days of these chapter 11 cases.

101.    ***Critical Vendor Claims***.  The Debtors' ability to continue generating revenue and operating their businesses, and thus the success of these chapter 11 cases, fundamentally depends on the Debtors' continued access to inventory and shipping services.  As such, the Debtors rely on products and services provided by certain indispensable vendors that enable them to effectively provide the goods and services that are fundamental to the success of their business.

102.    The ability to maintain relationships with the Critical Vendors throughout the pendency of these chapter 11 cases is imperative to the Debtors' ability to preserve and maximize value for the benefit of their estates. The Critical Vendors consist of sole source manufacturers responsible for manufacturing the Debtors' products and related components, including

customized chemical formulas, bespoke packaging design and tailored labeling.  Any disruption

to the Debtors' supply of inventory and supply chain services risks significant and irreparable harm

to the Debtors' businesses, as customers would almost certainly turn to the many alternative

sources in the market for the Debtors' products.  In light of these concerns, the Debtors, with the

assistance of their advisors, have spent significant time evaluating the vendor relationships and the

supply chain, consulting operation managers and merchandise managers, reviewing contracts and

supply agreements, and analyzing applicable law, regulations, and historical practices to identify

the Critical Vendors that supply the products and services most vital to the Debtors' go-forward

operations.

103.    For the twelve months before the Petition Date, on average, the Debtors paid the

Critical Vendors approximately $1,900,000 per month.  The Debtors estimate that, as of the

Petition Date, approximately $1,400,000 is outstanding on account of Critical Vendor Claims, and

the Debtors are seeking authority to pay approximately $700,000 during the first thirty (30) days

of these chapter 11 cases.

104.    ***Customary Trade Terms.***  Subject to the Court's approval, the Debtors intend to

pay the Trade Claims only to the extent necessary to preserve the value of their estates.  To that

end, in return for paying a portion of the Trade Claims, the Debtors propose that they be authorized

to require the Vendors to provide favorable trade terms for the postpetition procurement of their

goods and services.  The Debtors seek authorization to condition payment of the Trade Claims

upon each Vendor's agreement to (a) continue—or recommence—providing goods and/or services

to the Debtors in accordance with the Customary Trade Terms, and (b) agree that they shall not be

permitted to cancel any contract, agreement, or arrangement pursuant to which they provide such

goods and/or services to the Debtors during the course of these chapter 11 cases.  The Debtors also

seek authorization to require all Lien Claimants, Foreign Vendors, 503(b)(9) Claimants, and Critical Vendors to enter into a Trade Agreement evidencing such Customary Trade Terms, the form of which is attached hereto as Exhibit 1 thereto. The Debtors shall require that any agreement to Customary Trade Terms be made in writing, either by use of the Trade Agreement or e-mail.

105.    The Debtors request that if any party accepts payment pursuant to the relief requested by the Vendors Motion and thereafter ceases to provide goods and services in accordance with the Customary Trade Terms: (a) the Debtors may take any and all appropriate steps to recover from such Vendor any payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts then owing to such party; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment on account thereof had not been made; and (c) if an outstanding postpetition balance is due from the Debtors to such party, (i) the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Vendors Motion to such outstanding postpetition balance, and (ii) such party will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

106.    ***Payment of Outstanding Orders.*** Before the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (collectively, the "Outstanding Orders"). To avoid the risk of becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition. To prevent any disruption to the Debtors' business operations, and given that goods delivered after the Petition Date are

afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders, and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business as they come due.

107.    I believe that the relief requested in the Vendors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I submit that the Vendors Motion should be approved.

**XIV.  Debtors' Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and *Ipso Facto* Protections of the Bankruptcy Code, and (II) Approving the Form and Manner of Notice (the "Automatic Stay Motion").**

108.    Pursuant to the Automatic Stay Motion, the Debtors seek entry of an order: (a) restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and ipso facto protections of the Bankruptcy Code and (b) approving the form and manner of notice related thereto.

109.    The Debtors are one of the largest aggregators of e-commerce "sellers" or brands in the world and a "top five" seller on Amazon.  As of the Petition Date, Thrasio has sold millions of products to customers across the globe.   Thrasio has significant overseas operations and partnerships across the world, including in the United Kingdom, Germany, and China.

110.    Certain Debtors may owe non-U.S. customers prepetition and ongoing obligations, which such parties may attempt to enforce in violation of the automatic stay.  Additionally, upon the commencement of these chapter 11 cases, counterparties to certain leases and executory contracts could attempt to terminate such leases or contracts, including pursuant to ipso facto

provisions in contravention of sections 362 and 365 of the Bankruptcy Code. Similarly, governmental units outside of the United States may deny, suspend, terminate, or otherwise place conditions upon certain licenses, permits, charters, franchises, or other similar grants held by a Debtor that are required for the Debtors' ongoing business operations, in violation of sections 362 and 525 of the Bankruptcy Code.

111.    Additionally, in the ordinary course of business, certain Debtors may rely upon, and incur obligations to, providers of services and other parties that are primarily (if not exclusively) based outside of the United States, including in China, Germany, and the United Kingdom. Such creditors fulfill product purchase orders and perform services, including, among other things, supplier and logistics services. Without continued support from their non-U.S. service providers, the Debtors would face severe interruptions to their daily operations. Concurrently herewith, the Debtors have filed the Vendors Motion. Pursuant to the Vendors Motion, the Debtors seek authority to satisfy certain prepetition and postpetition claims of non-U.S. trade creditors as and when they come due. The Debtors anticipate that such relief will help deter parties from attempting to exercise remedies or take adverse action against the Debtors in non-U.S. jurisdictions on account of the commencement of these chapter 11 cases.

112.    Non-U.S. creditors and contract counterparties operating in various jurisdictions may be unfamiliar with chapter 11 processes, including the scope of a debtor-in-possession's authority to operate its business and the importance of the automatic stay. As discussed in detail in the Vendors Motion (as defined herein), certain of the Debtors' non-U.S. creditors could attempt to enforce liens against the Debtors' assets. These creditors and others may attempt to take actions violating the automatic stay to the detriment of the Debtors, their estates, and other creditors.

113.    The Debtors seek the relief requested herein out of an abundance of caution and to assist them in most effectively informing non-U.S. creditors of the broad protections offered by the Bankruptcy Code.  For the avoidance of doubt, the Debtors do not seek to expand or enlarge the rights afforded to them under the Bankruptcy Code with the Automatic Stay Motion.  Instead, the Debtors seek to affirm those rights and believe that an order from this Court will help protect the Debtors against improper actions taken by, and provide clarity for, non-U.S. parties in interest.

114.    I believe that the relief requested in the Automatic Stay Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I submit that the Automatic Stay Motion should be approved.

## XV.    Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue Utilizing Amazon Services in the Ordinary Course of Business and (II) Honor Any Obligations with Respect Thereto (the "Amazon Motion").

115.    Pursuant to the Amazon Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to:  (a) continue utilizing services pursuant to certain agreements between the Debtors and Amazon in the ordinary course of business; and (b) honor any obligations with respect thereto.

116.    I understand that the Debtors rely on Amazon's suite of services to market, ship, sell, and store their products.  Among other things, the Debtors:  (a) operate online seller accounts to list, sell, and receive payments for the sale of their products on Amazon's web platform; (b) rely on Amazon's Fulfillment by Amazon service for storage, warehousing, picking and packing, shipping, inventory management, and other fulfilment services; and (c) engage with Amazon for personalized advertisements on Amazon's website, Amazon's social media marketing programs, and Amazon's other marketing and advertising programs.  Each of the Debtors is party to a separate Amazon Service Business Solutions Agreement that covers the particular services and

offerings that Amazon provides to each brand.  The BSAs also contain the payment terms for the particular Amazon Services utilized by each brand.

117.    ***Amazon Services Fees***.  I understand that the Debtors generate revenue from sales once a product purchased through the Product Detail Page is shipped to the customer.  Amazon charges the customer directly for the purchase and deducts fees from the seller's Amazon Sale Account for any applicable Amazon Services as well as base fees for selling through Amazon's platform and may "holdback" funds for future returns, credit card chargebacks and other deductions.  The remaining proceeds are remitted to the Debtors, typically every ten (10) to fourteen (14) days.  For accounting purposes, the Debtors first record both the primary transaction between the customer and Amazon and any fees incurred to Amazon in accordance with the sale. The Debtors then "net" the difference of the two transactions on their books and records to properly account for the proceeds from each sale.  As of the Petition Date, the Debtors estimate that they do not owe any amounts to Amazon on account of the Amazon Sales Account and the services provided thereunder.  Additionally, due to the remittance payment system by which Amazon deducts fees and holds back funds from the Debtors' sale proceeds, the Debtors do not believe that they will need to pay separate costs associated with their Amazon Sales Accounts during these chapter 11 cases.

118.    ***"Fulfillment by Amazon":  The FBA Program.***  I understand that the FBA Program is a program offered by Amazon that allows sellers to outsource warehouse storage and order fulfillment to Amazon.  Amazon assists third-party sellers, including the Debtors, with each step of the order fulfillment process from order receipt and storage of inventory to shipment and delivery to customers.  Amazon also processes purchase returns and remits corresponding credits to customers.

119.    Substantially all of the Debtors' brands use the FBA Program for packaging, inventory, storage, and order fulfillment.  In exchange for the Debtors' access to the FBA Program, Amazon charges distribution fees and FBA Program participation fees.  Distribution fees are incurred on each product sold by the Debtors on a per-unit basis.  Sellers incur FBA Program participation fees on account of storing goods at the Amazon fulfillment centers.  FBA Program participation fees are calculated using the daily average volume for the space the inventory occupies in Amazon fulfillment centers.  The volume measurement is based on unit size when properly packaged and ready to ship, and may fluctuate depending on the time of year.  The Debtors may also incur long-term storage fees as part of the FBA Program if inventory sits in an Amazon warehouse for an extended period of time.  Like the fees related to Amazon Sale Accounts, the fees incurred in relation to the FBA Program are held back from the Debtors' Amazon proceeds prior to the remittance of the proceeds to the Debtors.

120.    As of the Petition Date, the Debtors estimate that they do not owe any amounts to Amazon on account of the FBA Program.  Additionally, due to remittance payment system by which Amazon deducts fees and holds back funds from the Debtors' Amazon Sales Accounts, the Debtors do not believe that they will need to pay costs associated with the FBA Program during these chapter 11 cases.

121.    ***Amazon Advertising Program***.  I understand that the Debtors engage in a variety of marketing, promotional, and advertising campaigns that drive sales of, and interest in, the Debtors' products.  Approximately 95% of the Debtors' marketing budget is spent on Amazon advertisements and marketing initiatives or third-party marketing initiatives that drive web traffic to Amazon.  Amazon allows sellers to post online advertisements, target specific keywords in sponsored product advertisements, run video advertisements, run promotions, and target potential

customers with discounts or offers to encourage sales of the sellers' products through the Amazon marketplace. Amazon's affiliate program also allows sellers to partner with social media influencers who then promote the sellers' products through the influencer's channels. The Debtors either pay costs associated with the Amazon Advertising Program automatically through their credit cards or through an invoice from Amazon the following month in lieu of Amazon deducting the costs from sales of the Debtors' products. In the ordinary course of business, the Debtors alternate between payment methods to be deducted from the costs from sales when required for business continuity.

122. The Debtors rely on the Amazon Advertising Program to market their products and reach new customers through Amazon's platform. The Amazon marketplace and the e commerce industry are extremely competitive. A robust marketing scheme through multiple online and social media channels is required to successfully reach new customers, maintain relationships with existing customers, and sell products. The Debtors obtain approximately 50% of their total sales through some form of advertising and is a critical part of the business. The marketing scheme is highly effective because it is conducted through Amazon's platform. Additionally, the advertising initiatives are heavily monitored by the Debtors in the ordinary course via sales measurements using a return-on-investment basis and strict advertising budgets based on sales targets. Failure to obtain the services provided by the Amazon Advertising Program would decrease visibility of the Debtors' products to customers, lead to a decline in product sales, and harm the Debtors' estates.

123. As of the Petition Date, the Debtors estimate that they do not owe any amounts to Amazon regarding the Amazon Advertising Program.

124. Absent the relief requested in the Amazon Motion I understand that the Debtor's relationship with Amazon, the Debtors' primary selling platform, would be severely hindered.

Furthermore, I believe that the relief requested in the Amazon Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I submit that the Amazon Motion should be approved.

**XVI.    Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Maintain and Administer Their Existing Customer Programs and (II) Honor Certain Prepetition Obligations Related Thereto (the "<u>Customer Programs Motion</u>").**

125.    Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to: (a) maintain and administer their customer-related programs and policies and (b) honor certain prepetition obligations related thereto.

126.    In the ordinary course of business, the Debtors utilize certain marketing and sales practices to engage with new customers and foster goodwill with their existing customer base. These Customer Programs include:  (a) the Marketing Program; (b) the Warranty Program; and (c) the Refund Program.  The ability to continue the Customer Programs and to honor any obligations thereunder in the ordinary course of business is necessary to maintain the Debtors' reputation for reliability, to comply with their legal obligations, to meet competitive market pressures, to ensure customer satisfaction, and to develop and maintain relationships with customers in the highly competitive e-commerce space.  Continuing the Customer Programs during these chapter 11 cases will allow the Debtors to maintain the goodwill of their current customers and partners, attract new customers and partners, and, ultimately, enhance the Debtors' businesses' revenue and profitability to the benefit of all of the Debtors' stakeholders.

127.    I understand that pursuant to the Marketing Program, the Debtors run a variety of marketing, promotional, and advertising campaigns via websites and various social media channels, and in the ordinary course of business utilize digital platforms to manage these campaigns.  Advertising is done to promote the products of each of the subsidiary brands that the

Debtors own and operate. The Debtors' advertising initiative drives revenue and help the Debtors'
brands maintain a prominent presence in a hyper-competitive e-commerce industry. The
Marketing Program is vital to promote the Debtors' brands in a manner that streamlines customers
from advertisement to point of purchase.

128.    I understand that pursuant to the Warranty Program, the Debtors provide, in the
ordinary course of business and consistent with industry practice, product warranties covering
certain product non-conformities. The Warranty Program maintains the Debtors' reputation for
quality and is intended to maximize customer loyalty. The terms of the Warranties are typically
dependent on each of the Debtors' brands. The Warranties generally cover product defects that
are not attributable to external factors (such as damage caused by the customer or by other factors
beyond the Debtors' control). While the Warranties are primarily covered by Amazon and the
Debtors' other third-party sellers, under certain circumstances the Debtors cover their own
Warranties.

129.    Finally, the Debtors seek to continue to honor their Refund Program. I understand
that pursuant to the Refund Program, the Refund owed to each customer differs depending on the
method in which the original order was fulfilled. If the original order was fulfilled and shipped
through Amazon's fulfillment network, the customer will typically receive a full or partial Refund
within thirty (30) days of making the Refund request. If the original order was fulfilled by the
Debtors or another third-party fulfillment provider, the timing of the Refund varies based on the
brand and the third-party shipper that fulfilled the order. In addition, the timing and condition of
the returned product may influence the customer's total Refund amount. Like the Warranties, the
Refunds are primarily covered by Amazon and the Debtors' other third-party sellers, but under
certain circumstances the Debtors cover the Refunds. Programs like the Refund Program are

common in the e-commerce industry, and similar programs are administered by the Debtors'
competitors.  Maintaining the Refund Program is critical to maintaining the goodwill of the
Debtors' customer base.  Without the Refund Program, customers may be unwilling to order from
the Debtors' brands, which could lead to a decline in revenue, the ultimate cost of which would be
borne by the Debtors' estates.

130.    As of the Petition Date, there are approximately $6,610,000 of prepetition
obligations outstanding related to Marketing Program.

131.    I believe that continuing the Customer Programs without interruption during the
pendency of these chapter 11 cases will help to preserve the Debtors' valuable customer and
partner relationships and goodwill, and to maintain business and drive additional business, which
will inure to the benefit of all of the Debtors' stakeholders and their estates.  I understand that if
the Debtors are unable to continue the Customer Programs postpetition or pay amounts due and
fulfill obligations owing on account of the Customer Programs, the Debtors risk alienating certain
partners and customer constituencies (who might then initiate business relationships with the
Debtors' competitors) and suffer corresponding losses in customer acquisitions and loyalty that
will harm the Debtors' prospects for reorganization or otherwise damage the value of the estates.

132.    As such, I believe that the relief requested in the Customer Programs Motion is in
the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will
enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of
the Debtors, I respectfully submit that the Customer Programs Motion should be granted.

**Exhibit B**

**Structure Chart**



Thrasio Holdings, Inc. USA Delaware
Thrasio Ventures, Inc. USA Delaware
Thrasio International Holdings, Inc. USA Delaware
Thrasio Intermediate Sub, LLC USA Delaware
Domain Acquisitions 2 Ltd. Saint Kitts and Nevis Nevis
Thrasio Ventures N1, LLC USA Delaware
Thrasio Ventures Q1, LLC USA Delaware
Thrasio, LLC USA Delaware
Thrasio Services, LLC USA Delaware
IStack Parent Holdings Cayman Islands Cayman
Thrasio Australia Holdings Pty Ltd Australia New South Wales
Thrasio godo kaisha (Thrasio GK) Japan
Thrasio Holdings Hong Kong, Ltd. Hong Kong
JSCC Asset 001 Japan
Damaze Pty Ltd. (Checkered Chef) Australia New South Wales
The NutriLock Company Pty Ltd Australia Sydney
Thrasio Australia Import Pty Ltd Australia New South Wales
Thrasio Global Cross-border E-Commerce (Shenzhen) Co. Ltd. China Shenzen
Thrasio Supply Chain (Suzhou) Co. Ltd. China Suzhou
Thrasio E-Commerce (Shanghai) Co., Ltd. China Shanghai
1 Thrasio One, Inc. USA Delaware
2 B Bountiful, Inc. USA Delaware
Andromache, Inc. USA Delaware
Angor-Pet Thrasio Two, Inc. USA Delaware
Antiope, Corp. USA Delaware
Cafe Casa, Inc. USA Delaware
Califia Company USA Delaware
Charope, Inc. USA Delaware
Eurypyle, Inc. USA Delaware
HIC-Cork Thrasio One Inc. USA Delaware
Marpesia, Co. USA Delaware
Melanippe, Inc. USA Delaware
Orythia, Inc. USA Delaware
Pantariste, Inc. USA Delaware
Penthe Company USA Delaware
Prothoe Limited United Kingdom England & Wales
Thrasio Deutschland Holdings Gmbh Germany
Thrasio Deutschland Services Gmbh Germany
Bonstato GmbH Germany
Toxaris Limited United Kingdom England & Wales
Thrasio Bermuda Holdings Limited Bermuda
Thrasio Malta Holdings Co. Limited Malta Valletta
Thrasio International Co. Limited Malta Valletta
Hippolyte, Ltd USA Delaware
Thrasio India Holdings, Inc. USA Delaware
Thrasio LL Acquisitions, Inc. USA Delaware
25%
Lifelong Online Private Limited India
Thrasio UK Holdings, Ltd United Kingdom England & Wales
10 Thrasio Ten, Inc. USA Delaware
11 Thrasio Eleven, Inc. USA Delaware
12 Thrasio Twelve, Inc. USA Delaware
14 Thrasio Fourteen, Inc. USA Delaware
15 Thrasio Fifteen, Inc. USA Delaware
16 Thrasio Sixteen, Inc. USA Delaware
17 Thrasio Seventeen, Inc. USA Delaware
18 Thrasio Eighteen, Inc. USA Delaware
19 Thrasio Nineteen, Inc. USA Delaware
20 Thrasio Twenty, Inc. USA Delaware
21 Thrasio Twenty One, Inc. USA Delaware
22 Thrasio Twenty Two, Inc. USA Delaware
23 Thrasio Twenty Three, Inc. USA Delaware
24 Thrasio Twenty Four, Inc. USA Delaware
25 Thrasio Twenty Five, Inc. USA Delaware
3 Thrasio Three, Inc. USA Delaware
5 Thrasio Five, Inc. USA Delaware
6 Thrasio Six, Inc. USA Delaware
7 Thrasio Seven, Inc. USA Delaware
8 Thrasio Eight, Inc. USA Delaware
9 Thrasio Nine, Inc. USA Delaware
Acorn Creations, Inc. USA Delaware
Alloy Ideas, Inc. USA Delaware
Amber Ideas, Inc. USA Delaware
Amber Oasis, Inc. USA Delaware
Apple Affirmations, Inc. USA Delaware
Apricot Ideas, Inc. USA Delaware
Ash Developments, LLC USA Delaware
Assassin Bug Industries, Inc. USA Delaware
Autumn Ideas, Inc. USA Delaware
Autumn Waves, Inc. USA Delaware
Banana Beginnings, Inc. USA Delaware
Basketball Beginning, Inc. USA Delaware
Biscotti Solutions, Inc. USA Delaware
Bittersweet Billows, Inc. USA Delaware
Bonfire Solutions, Inc. USA Delaware
Bronze Projects, Inc. USA Delaware
Burning Neon, Inc. USA Delaware
Burnt Summer Citrus, Inc. USA Delaware
Buttercup Creations, Inc. USA Delaware
Butterscotch Beginnings, Inc. USA Delaware
California Poppy Projects, Inc. USA Delaware
Candlelit Creations, Inc. USA Delaware
Cantaloupe Creations Company USA Delaware
Caramel Creations, Inc. USA Delaware
Carnation Creations, Inc. USA Delaware
Carotene Consortium, Inc. USA Delaware
Carrot Solutions, Inc. USA Delaware
Cayenne Solutions, Inc. USA Delaware
Champagne Projects, Inc. USA Delaware
Cheddar Creations, Inc. USA Delaware
Chestnut Creations, Inc. USA Delaware
Chili Clove, Inc. USA Delaware
Chili Flakes, Inc. USA Delaware
Chrysanthemum Creations, Inc. USA Delaware
Cider Creations, Inc. USA Delaware
Cinnabar Creations, Inc. USA Delaware
Citrine Solutions, Inc. USA Delaware
Classy Mango, Inc. USA Delaware
Classy Tangerine, Inc. USA Delaware
Clementine Creations, Inc. USA Delaware
Clownfish Creations, Inc. USA Delaware
Comet Creations, Inc. USA Delaware
Copperhead Conspiracies, Inc. USA Delaware
Coral Chrome, Inc. USA Delaware
Corn Snake Surprises, Inc. USA Delaware
Crawfish Creations, Inc. USA Delaware
Daffodil Design, Inc. USA Delaware
Dahlia Dreams, Inc. USA Delaware
Dark Honey Design, Inc. USA Delaware
Dark Orange Design, Inc. USA Delaware
Daybreak Developments, Inc. USA Delaware
Daylily Dreams, Inc. USA Delaware
Discus Dreams, Inc. USA Delaware
DMD Group Inc USA New Jersey
eCom Heights LLC USA Delaware
Emberglow Ideas, Inc. USA Delaware
Faint Orange Horizon, Inc. USA Delaware
Fall Foundations, Inc. USA Delaware
Fawn Foundations, Inc. USA Delaware
Foxy Creations, Inc. USA Delaware
Frosty Dream, Inc. USA Delaware
Fyer Tropics, Inc. USA Delaware
Ginger Cat Creations, Inc. USA Delaware
Ginger Creations, Inc. USA Delaware
Gingersnap Solutions, Inc. USA Delaware
Golden Gate Solutions, Inc. USA Delaware
Golden Kiwifruit Enterprises, Inc. USA Delaware
Goldfish Memories, Inc. USA Delaware
Habanero Pepper Projects, Inc. USA Delaware
Harley Orange, Inc. USA Delaware
Harvest Charm, Inc. USA Delaware
Honey Sunset, Inc. USA Delaware
Ideal Monarch, Inc. USA Delaware
Influencer Ideas, Inc. USA Delaware
Ivory Ideas, Inc. USA Delaware
Jasper Gesture, Inc. USA Delaware
Jupiter Gesture, Inc. USA Delaware
Ideastream Consumer Products, LLC USA Delaware
Orange Fantasy, Inc. USA Delaware
Sandcastle Days, Inc. USA Delaware
Khaki Trips, Inc. USA Delaware
KingFisher Creations Inc. USA Delaware
Koi Creations, Inc. USA Delaware
Lace Decisions, Inc. USA Delaware
Laranja Logistics, Inc. USA Delaware
Latte Logistics, Inc. USA Delaware
Leather Logistics, Inc. USA Delaware
Lemon Logistics, Inc. USA Delaware
Lemur Logistics, Inc. USA Delaware
Levita Holdings, LLC USA Massachusetts
Lionfish Logistics, Inc. USA Delaware
Lobster Logistics, Inc. USA Delaware
Magenta Peel Solutions, Inc. USA Delaware
Mahogany Movements Inc. USA Delaware
Malt Decisions, Inc. USA Delaware
Mango Movements, Inc. USA Delaware
Mango Wonder, Inc. USA Delaware
Maple Movements, Inc. USA Delaware
Marigold Creations, Inc. USA Delaware
Marmalade Mansions, Inc. USA Delaware
Marmalade Movements, Inc. USA Delaware
Mars Makers, Inc. USA Delaware
Mauve Monkey, Inc. USA Delaware
Melon Movements, Inc. USA Delaware
Meteor Movements, Inc. USA Delaware
Mimosa Movements, Inc. USA Delaware
Ochre Organization, Inc. USA Delaware
Old Rust Organization, Inc. USA Delaware
Orange Crush Organization, Inc. USA Delaware
Orange Hope, Inc. USA Delaware
Orange Margarita, Inc. USA Delaware
Orange Organization, Inc. USA Delaware
Orange Peach Projects, Inc. USA Delaware
Orange Peel Projects, Inc. USA Delaware
Orange Umbrella Creations, Inc. USA Delaware
Orangutan Organization, Inc. USA Delaware
Oranssi Organization, Inc. USA Delaware
Oyster Oasis, Inc. USA Delaware
Pantone Projects, Inc. USA Delaware
Papaya Projects, Inc. USA Delaware
Parchment Principles, Inc. USA Delaware
Peach Projects, Inc. USA Delaware
Peanut Projects, Inc. USA Delaware
Penny Rose Solutions, Inc. USA Delaware
Pennycopper Trading, Inc. USA Delaware
Persian Projects, Inc. USA Delaware
Persimmon Projects, Inc. USA Delaware
Pizza Projects, Inc. USA Delaware
Poppy Projects, Inc. USA Delaware
Portocale Projects, Inc. USA Delaware
Primrose Projects, Inc. USA Delaware
Radiant Orange, Inc. USA Delaware
Rose Bud Creations, Inc. USA Delaware
Rosewood Wish, Inc. USA Delaware
SafeRest Holdings, LLC USA Florida
Salmon Solutions, Inc. USA Delaware
Sandpaper Solutions, Inc. USA Delaware
Sandsnake Ventures, Inc. USA Delaware
Sandstorm Solutions, Inc. USA Delaware
Sapphire Monkey, Inc. USA Delaware
Scarlet Solutions, Inc. USA Delaware
Scotch Solutions, Inc. USA Delaware
Seashell Solutions, Inc. USA Delaware
Sherbet Solutions, Inc. USA Delaware
Shortbread Solutions, Inc. USA Delaware
Siberian Tiger Solutions, Inc. USA Delaware
Sockeye Strategies, Inc. USA Delaware
Soft Spice, Inc. USA Delaware
Spicy Solutions, Inc. USA Delaware
Starfish Solutions, Inc. USA Delaware
Strawflower Solutions, Inc. USA Delaware
Sundaze Blaze Solutions, Inc. USA Delaware
Sunflare Solutions, Inc. USA Delaware
Sunflower Saturnalia, Inc. USA Delaware
Sunkiss Solutions, Inc. USA Delaware
Sunny Operations, Inc. USA Delaware
Sunrise Martinis, Inc. USA Delaware
Sunrise Season, Inc. USA Delaware
Sweet Nectar Enterprises, Inc. USA Delaware
Sweet Potato Solutions, Inc. USA Delaware
Tangelo Tendencies, Inc. USA Delaware
Tangerine Ideas, Inc. USA Delaware
Tawny Tasks, Inc. USA Delaware
Tea Rose Risings, Inc. USA Delaware
Teal Monkey, Inc. USA Delaware
Tiger Affirmations, Inc. USA Delaware
Tiger Stripe Creations, Inc. USA Delaware
Tomato Tasks, Inc. USA Delaware
Topaz Traditions, Inc. USA Delaware
Tortilla Tasks, Inc. USA Delaware
Traffic Cone Tuesdays, Inc. USA Delaware
Turmeric Transitions, Inc. USA Delaware
Wallaby42 Pty Ltd Australia New South Wales
Warm Red Wonders, Inc. USA Delaware
Zabba, Inc. USA Delaware
Thrasio Malta Holdings Co. Limited Malta Valletta
Thrasio International Co. Limited Malta Valletta
AirOrb Ltd United Kingdom England & Wales
Attain Recruitment Ltd United Kingdom England & Wales
Bartstr Ltd United Kingdom England & Wales
Beast Gear Limited United Kingdom Scotland
Bellezo.com Ltd United Kingdom England & Wales
Chipshot Ltd United Kingdom England & Wales
Dots for Spots Ltd United Kingdom England & Wales
E & I Trading Ltd United Kingdom England & Wales
E&L Enterprises Limited United Kingdom England & Wales
Green Cricket Ltd United Kingdom England & Wales
Jiminy Ltd United Kingdom England & Wales
Joss Solutions 2016 Limited United Kingdom England & Wales
Kitchen Tools Ltd United Kingdom England & Wales
Modetro Retail Limited United Kingdom England & Wales
Pearoller Ltd United Kingdom England & Wales
Pro Grade Products Ltd United Kingdom England & Wales
Pure Chimp Ltd United Kingdom England & Wales
Rissav Limited United Kingdom England & Wales
Sandy Leaf Farm, Ltd. United Kingdom England & Wales
Sasana Group Limited United Kingdom England & Wales
Scouse Ltd United Kingdom England & Wales
Truverge International Ltd United Kingdom England & Wales
William Evans Retail Ltd United Kingdom England & Wales

## <u>Exhibit C</u>

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE
WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A
CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY
CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE
SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING
CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN
ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE
AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED
BINDING ON ANY OF THE PARTIES HERETO.

## *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 15.02, this "**Agreement**") is made and entered into as of February 27, 2024 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iii) of this preamble, collectively, the "**Parties**"):[1]

   i.     Thrasio Holdings, Inc., a company incorporated under the Laws of Delaware ("**Thrasio**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Lenders (the Entities in this clause (i), collectively, the "**Company Parties**");

   ii.    the undersigned holders (or beneficial holders) of, or investment advisors, sub-advisors, or managers of discretionary accounts in their capacities as holders of RCF Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**Consenting RCF Lenders**");

   iii.   the undersigned holders (or beneficial holders) of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts in their capacities as holders of Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting Term Lenders**" and, together with the Consenting RCF Lenders, the "**Consenting Lenders**"); and

   iv.    certain undersigned holders of outstanding Series D Preferred Stock Interests and Series C Preferred Stock Interests (the "**Consenting Sponsors**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Lenders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and

---

[1]   Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

as specified in the term sheet attached as **Exhibit C** hereto (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties shall implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## *AGREEMENT*

**Section 1.**   *Definitions and Interpretation*.

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**Ad Hoc Group Advisors**" means (a) Gibson, Dunn & Crutcher LLP, as counsel to the Ad Hoc Group, (b) Evercore Group L.L.C., as financial advisor to the Ad Hoc Group, (c) Sills Cummis & Gross P.C., as local counsel to the Ad Hoc Group, and (d) such other professionals as may be retained by or on behalf of the Ad Hoc Group with the consent of the Company Parties (such consent not to be unreasonably withheld).

"**Ad Hoc Group**" means that certain ad hoc group of lenders under the First Lien Credit Agreement represented by the Ad Hoc Group Advisors.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the First Lien Credit Agreement, the DIP Facility, or the Exit Facilities, including any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 15.02 (including the Restructuring Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring**" means any sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties, the debt, equity, or other interests in any one or more Company Parties, that is an alternative to one or more of the Restructuring Transactions.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash Collateral**" has the meaning set forth in section 363(a) of the Bankruptcy Code.

"**Causes of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Company Claims/Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the First Lien Claims and the Preferred Equity Interests.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan.

"**Consenting Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting RCF Lenders**" has the meaning set forth in the preamble of this Agreement.

"**Consenting Sponsors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases listed on **Exhibit B**.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Agent**" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, and any successors and permitted assigns, in such capacity.

"**DIP Credit Agreement**" means the debtor-in-possession financing credit agreement, consistent with the terms set forth in the DIP Term Sheet, by and among certain Company Parties, the DIP Agent, and the lenders party thereto setting forth the terms and conditions of the DIP Facility.

"**DIP Documents**" means, collectively, the documentation governing the DIP Facility, including, without limitation, the DIP Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, the DIP Orders, the DIP Motion, and any amendments, modifications and supplements to or in respect of any of the foregoing.

"**DIP Facility**" means the new superpriority secured term loans to be made in accordance with the DIP Credit Agreement.

"**DIP Motion**" means any motion filed with the Bankruptcy Court seeking approval of the DIP Facility and the DIP Credit Agreement.

"**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

"**DIP Term Sheet**" means the term sheet describing the terms of the DIP Facility that is attached to the Restructuring Term Sheet as Exhibit 2.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement as a disclosure statement meeting the applicable requirements of the Bankruptcy Code and, to the extent necessary, approving the Solicitation Materials.

"**Disinterested Directors**" means, collectively, Anthony Horton and Stefan Selig.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), of common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit Facilities**" means the First-Out Take-Back Debt Facility and the Second-Out Take-Back Debt Facility, each as defined in the Restructuring Term Sheet.

"**Exit Facilities Documents**" means the credit agreement governing the Exit Facilities and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

"**Final DIP Order**" means any order (and all exhibit and schedules thereto, including any budget), substantially consistent with the Interim DIP Order (as modified to reflect the final nature thereof), entered by the Bankruptcy Court on a final, non-appealable basis (i) approving the DIP Facility, the DIP Credit Agreement, and the DIP Motion; (ii) authorizing the Debtors' use of Cash Collateral; and (iii) providing for adequate protection of secured creditors.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**First Lien Agent Advisors**" means (a) Simpson Thacher & Bartlett LLP, as counsel to the Agent under the First Lien Credit Agreement and (b) one local counsel of the Agent under the First Lien Credit Agreement.

"**First Lien Claims**" means, collectively, the RCF Claims and the Term Loan Claims.

"**First Lien Credit Agreement**" that certain  first lien credit agreement, as amended by that certain first amendment, dated as of May 28, 2021, as amended by that certain second

5

amendment, dated as of September 17, 2021, as amended by that certain third amendment, dated as of June 30, 2023, and as amended by that certain forbearance and fourth amendment, dated as of September 29, 2023, and as amended by that certain forbearance and fifth amendment, dated as of December 29, 2023, and as otherwise amended, restated, supplemented, or otherwise modified from time to time.

"**First Lien Credit Documents**" means the First Lien Credit Agreement together with all other related documents, instruments, and agreements (including all Loan Documents (as defined in the First Lien Credit Agreement), in each case as supplemented, amended, restated, or otherwise modified from time to time.

"**First Lien Lender**" shall have the meaning ascribed to it in the Restructuring Term Sheet.

"**Governmental Entity**" means any applicable federal, state, local, or foreign government or any agency, bureau, board, commission, court, or arbitral body, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof, or any self-regulatory organization.  For the avoidance of doubt, the term Governmental Entity includes any Governmental Unit (as such term is defined in section 101(27) of the Bankruptcy Code).

"**Interim DIP Order**" means any order (and all exhibit and schedules thereto, including any budget), entered by the Bankruptcy Court on an interim basis (i) approving the DIP Facility, the DIP Credit Agreement, and the DIP Motion; (ii) authorizing the Debtors' use of Cash Collateral; and (iii) providing for adequate protection of secured creditors.

"**Joinder**" means an executed form of the joinder agreement providing, among other things, that a signatory thereof is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit E**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"**Milestones**" has the meaning set forth in the Restructuring Term Sheet.

"**New Common Stock**" has the meaning set forth in the Restructuring Term Sheet.

"**New Organizational Documents**" means the new organizational documents of the Reorganized Debtors, to be entered into on the Plan Effective Date, including certificates of incorporation, limited liability agreements, stockholders or shareholders agreements, operating agreements, equity subscription or purchase agreements, charters or by-laws, which shall be consistent in all material respects with this Agreement and the applicable terms of the Restructuring Term Sheet and otherwise in form and substance acceptable to the Required Consenting Lenders and the Company Parties.

"**New Stockholders Agreement**" means that certain stockholders' agreement that will govern certain matters related to the governance of Reorganized Thrasio and the New Common Stock, which shall be consistent in all material respects with the Restructuring Term Sheet.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transfer**" means each Transfer of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Person**" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a Governmental Entity, a Third Party Association, or any legal entity or association.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code, including all exhibits and schedules thereto, that embodies and is substantially in accordance with the Restructuring Transactions.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Releases**" means customary mutual releases by the Parties to be included in the Plan as set forth in <u>Exhibit 3</u> to the Restructuring Term Sheet and otherwise in form and substance reasonably acceptable to the Company Parties and the Required Consenting Lenders.  For the avoidance of doubt, the Plan Releases remain subject to the ongoing Independent Investigation being conducted by the Disinterested Directors.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Preferred Equity Interests**" means the shares of preferred stock, including, for the avoidance of doubt, the Series Seed Preferred Stock, the Series A Preferred Stock, the Series B Preferred Stock, the Series C Preferred Stock, the Series D Preferred Stock, and the Series X Redeemable Preferred Stock, each as defined in the Restructuring Term Sheet.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

7

"**RCF Claims**" means any Claim on account of the Revolving Credit Facility, including Claims for all principal amounts outstanding, reimbursement for letters of credit, and accrued and unpaid interest, fees, expenses, costs, indemnification and other amounts and Obligations (as defined in the First Lien Credit Agreement) arising under or related to the First Lien Credit Documents.

"**Related Party**" means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

"**Reorganized Debtors**" has the meaning set forth in the Restructuring Term Sheet.

"**Required Consenting Lenders**" means, as of the relevant date, the Consenting Lenders holding at least 66.66% of the aggregate outstanding principal amount of RCF Claims and Term Loan Claims (taken together) that are held by Consenting Lenders.

"**Required Consenting RCF Lenders**" means, as of the relevant date, Consenting Lenders holding at least 66.66% of the aggregate outstanding principal amount of RCF Claims that are held by Consenting Lenders.

"**Required Consenting Term Lenders**" means, as of the relevant date, Consenting Lenders holding at least 66.66% of the aggregate outstanding principal amount of the Term Loan Claims that are held by Consenting Lenders.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Revolving Credit Facility**" means that first lien revolving credit facility provided for under the First Lien Credit Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Series C Preferred Stock Interests**" has the meaning set forth in the Restructuring Term Sheet.

"**Series D Preferred Stock Interests**" has the meaning set forth in the Restructuring Term Sheet.

"**Solicitation Materials**" means all materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code, together with the Disclosure Statement, Disclosure Statement Order, and any cure notices to be sent to counterparties to executory contracts or unexpired leases in connection with the assumption, or assumption and assignment, of such contracts or leases.

"**Term Loan**" means term loans outstanding under term loan facilities provided for under the First Lien Credit Agreement.

"**Term Loan Claims**" means any Claim on account of the Term Loan arising under, derived from or based upon the First Lien Credit Documents, including Claims for all principal amounts outstanding and accrued and unpaid interest, fees, expenses, costs, indemnification and other amounts and Obligations (as defined in the First Lien Credit Agreement) arising under or related to the First Lien Credit Documents.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, or 11.04.

"**Third Party Association**" means any trade, industry, business or sector association, body, group or council, or similar entity.

"**Transaction Expenses**"  means all (1) reasonable and documented fees, costs and expenses of each of the Ad Hoc Group Advisors (a) in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of this Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing whether incurred or accrued prior to the Agreement Effective Date or after and (b) to the extent applicable, consistent with any engagement letters or fee reimbursement letters entered into between the applicable Company Parties, on the one hand, and each Ad Hoc Group Advisor, on the other hand, with respect to the fees, costs and expenses of the Ad Hoc Group Advisors (in any such case, as supplemented and/or modified by this Agreement), (2) all reasonable and documented fees, costs and expenses of the First Lien Agent Advisors, including in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of this Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing whether incurred or accrued prior to the Agreement Effective Date or after and (3) all reasonable and documented fees, costs and expenses of the Ad Hoc Group Consultant.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**.

1.02.  <u>Interpretation</u>.  For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not; and

(j)      the phrase "counsel to the Consenting Lenders" refers in this Agreement to each counsel specified in Section 15.10 other than counsel to the Company Parties.

**Section 2.**      *Effectiveness of this Agreement*.

2.01.   This Agreement shall become effective and binding upon each of the Parties on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived by the applicable Party or Parties in accordance with this Agreement (such date, the "**Agreement Effective Date**" and such parties, the "**Initial Parties**"):

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Initial Parties;

(b)      the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties:

(i)      holders of at least 66.66% of the aggregate outstanding principal amount of Term Loan Claims; and

(ii)      holders of at least 66.66% of the aggregate outstanding principal amount of RCF Claims; and

(c)      counsel to the Company Parties shall have given notice to counsel to the Consenting Lenders in the manner set forth in Section 15.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2.01 have occurred; and

(d)      The Company Parties shall have paid in full to the Ad Hoc Group Advisors and the First Lien Agent Advisors all Transaction Expenses for which an invoice has been received by the Company Parties on or before the date that is three (3) Business Days prior to the Agreement Effective Date.

2.02.   Without limiting any provision of Section 12 of this Agreement, following the Agreement Effective Date, additional holders of Company Claims/Equity Interests may become party to this Agreement by executing a Joinder.

**Section 3.**      *Definitive Documents*.

3.01.   The Definitive Documents governing the Restructuring Transactions shall include the following:

(a)      any documents in connection with any First Day Pleadings or "second day" pleadings and all orders sought pursuant thereto;

(b)      the DIP Documents, including, without limitation, the DIP Credit Agreement, the DIP Orders, and the DIP Motion;

(c)      the Solicitation Materials, including the Disclosure Statement and the Disclosure Statement Order;

(d)      the Plan;

(e)      the Confirmation Order;

(f)      the Exit Facilities Documents;

(g)      the New Organizational Documents;

(h)      the New Stockholders Agreement;

(i)      the Plan Supplement (including, for the avoidance of doubt, all definitive documentation related to any of the documents, schedules, and exhibits included as part of the Plan Supplement or in a form attached as part of the Plan Supplement);

(j)      such other definitive documentation relating to a recapitalization or restructuring of the Company Parties as is necessary or desirable to consummate the Restructuring Transactions; and

(k)      any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents, motions, pleadings, and/or agreements relating to any of the foregoing.

Each Definitive Document, including all exhibits, annexes, schedules and material amendments, supplements or modifications thereof relating to such Definitive Documents, shall be consistent with this Agreement and otherwise in form and substance acceptable to the Required Consenting Lenders.

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions, including without limitation, the Syndication Procedures (as defined in the Interim DIP Order), shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12.  Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date (including the Syndication Procedures) shall otherwise be in form and substance acceptable to the Company Parties and the Required Consenting Lenders and otherwise consistent with this Agreement. In addition, the New Stockholders Agreement shall contain customary minority protections to be provided for in the Plan Supplement, which remains subject to further negotiation and completion, and in form and substance reasonably satisfactory to the Required Consenting RCF Lenders.  For the avoidance of doubt, Consenting Lender consent shall not be required for the filing of any ministerial notices and similar ministerial documents, retention applications, fee applications, fee statements, similar pleadings or motions relating to the retention or fees of any professional, or statements of financial affairs and schedules of assets and liabilities.

**Section 4.        *Commitments of the Consenting Lenders.***

4.01.    General Commitments.

(a)      During the Agreement Effective Period, each Consenting Lender severally, and not jointly or jointly and severally, agrees, in respect of all of its Company Claims, to:

(i)      use commercially reasonable efforts and take to all reasonable actions necessary to support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions, *provided* that notwithstanding anything else herein, the Consenting Lenders shall not be obligated to incur out-of-pocket costs or liabilities in order to comply with this provision;

(ii)     use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii)     use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in Section 4.02(b), provided, that the foregoing shall not require any Consenting Lender to file any pleadings with respect thereto if, in consultation with the Debtors, they determine a pleading is not reasonably necessary to comply with this provision;

(iv)     give any notice, order, instruction, or direction to the Agents necessary to give effect to the Restructuring Transactions; *provided* that no Consenting Lender shall be required hereunder to provide such Agents or any other Person with any indemnities or similar undertakings in connection with taking any such action or incur any fees or expenses in connection therewith; and

(v)     negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

(b)     During the Agreement Effective Period, each Consenting Lender severally, and not jointly or jointly and severally, agrees, in respect of all of its Company Claims, that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)     file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement, the Restructuring Term Sheet, or the Plan;

(iv)     initiate, or direct the initiation of, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)     direct any Agent to take any action inconsistent with such Consenting Lender's obligations under this Agreement;

(vi)     following the Execution Date, provide each First Lien Lender that is not a DIP Backstop Party with no less than twenty (20) days to elect to participate ratably in the DIP Facility in accordance with the Restructuring Term Sheet and DIP Term Sheet, and provide such First Lien Lenders with access to reasonable financial information and an opportunity to discuss such information with the Debtors' professionals in connection with such First Lien Lenders' determination whether to participate in the DIP Facility;

(vii)    exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Company Claims; or

(viii)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

4.02.    <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)    During the Agreement Effective Period, each Consenting Lender that is entitled to vote to accept or reject the Plan pursuant to its terms severally, and not jointly or jointly and severally, agrees that it shall, subject to receipt by such Consenting Lender, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)    vote each of its Company Claims to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)    not opt out of, object to, or otherwise hinder or delay approval of the Plan Releases, injunctions, discharge, and exculpation provisions provided in the Plan;

(iii)    to the extent it is permitted to elect whether to opt out of the Plan Releases, elect not to opt out of the Plan Releases by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iv)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i), (ii), and (iii) above; *provided*, however, that such vote may be revoked or changed (and upon such revocation or change, the prior vote being deemed void ab initio) by such Consenting Lender if this Agreement has been terminated in accordance with its terms with respect to such Consenting Lender.

(b)    During the Agreement Effective Period, each Consenting Lender, in respect of each of its Company Claims, severally, any not jointly or jointly and severally, agrees that it will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

(c)    Each Party agrees to release, waive and discharge any and all Claims and Causes of Action it may have against the Company Parties and each other Party pursuant to the terms of the Plan.

(d)    Other than as expressly contemplated by the DIP Term Sheet and as otherwise expressly provided for in the Restructuring Term Sheet with respect to the obligations of the DIP Backstop Parties, nothing herein shall require any Consenting Lender to participate in the DIP Facility.

**Section 5.    *Additional Provisions Regarding the Consenting Lenders' Commitments*.**

5.01    Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Lender to consult with any other Consenting Lender, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Lender to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (d) limit the rights of any Consenting Lender under the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Case, so long as the exercise of any such right is not inconsistent with such Consenting Lender's obligations hereunder; (e) limit the ability of any Consenting Lender to purchase, sell, or enter into any transactions regarding the Company Claims/Interests, subject to the terms hereof; (f) constitute a waiver or amendment of any term or provision of First Lien Credit Agreement or any of the other Loan Documents (as defined in the First Lien Credit Agreement); (g) constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Parties that secure the obligations under the First Lien Credit Agreement or any of the other Loan Documents (as defined in the First Lien Credit Agreement); or (h) prevent any Consenting Lender from taking any action that is required to comply with applicable Law.

5.02.   Solely to the extent that such Consenting Lender is also a DIP Backstop Party (as defined in the DIP Term Sheet), to the extent that each of the "Conditions Precedent to Initial Funding" specified in the DIP Term Sheet have been satisfied or waived in accordance with the terms set forth therein, the DIP Backstop Parties agree to backstop the DIP Facility contemporaneously with the DIP Closing Date (as defined in the DIP Term Sheet) in accordance with this Agreement and the Definitive Documents.

**Section 6.**   *Commitments of the Company Parties*.

6.01.   <u>Affirmative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a)      support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement and the Restructuring Term Sheet, including (i) subject to Section 7.01, commencing solicitation on the Plan pursuant to the Disclosure Statement and related Solicitation Materials, (ii) using commercially reasonable efforts to consummate the Restructuring Transactions, and (iii) using commercially reasonable efforts to obtain entry of the Confirmation Order, approval of the applicable Definitive Documents, and consummation of the Restructuring Transactions pursuant to the Plan, in each case, in accordance with the applicable Milestones unless waived in accordance with the terms hereof;

(b)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment in consultation with the Required Consenting Lenders;

(c)    use commercially reasonable efforts to promptly obtain any and all governmental, regulatory and/or third-party approvals that are necessary or advisable to effectuate and consummate the Restructuring Transactions as determined by the Company Parties in consultation with the Required Consenting Lenders;

(d)    negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement and the Restructuring Term Sheet;

(e)    provide each First Lien Lender that is not a DIP Backstop Party with access to reasonable financial information and an opportunity to discuss such information with the Company Parties' professionals in connection with such First Lien Lenders' determination whether to participate in the DIP Facility;

(f)    use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(g)    (1) provide counsel for the Consenting Lenders a reasonable opportunity to review draft copies of all material First Day Pleadings and, (2) to the extent reasonably practicable, provide a reasonable opportunity to counsel to any Consenting Lenders materially affected by such filing to review draft copies of other documents that the Company Parties intend to file with Bankruptcy Court, as applicable;

(h)    inform counsel to the Consenting Lenders as soon as reasonably practicable (and in any event within three (3) Business Days of such actual knowledge) after becoming aware of: (i) the occurrence, or failure to occur, of any event that (a) would permit any Party to terminate this Agreement and (b) is known by the Company Party aware of such event to permit a Party to terminate this Agreement; (ii) receipt of any written notice from any third party that the Company Parties deem credible alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring Transactions; (iii) receipt of any written notice from any governmental or regulatory body regarding any approval necessary to consummate the Restructuring Transactions; (iv) any matter or circumstance which any Company Party knows is reasonably likely to be a material impediment to the implementation or consummation of the Restructuring Transactions; and (v) any notice of any commencement of any proceeding commenced, or, to the actual knowledge of the Company Parties, threatened against any of the Company Parties, relating to or involving or otherwise affecting in any material respect the Restructuring Transactions; *provided* that all notices of threatened proceedings delivered as of the Agreement Effective Date shall be deemed sufficient notice of such threatened proceedings and no further notice of such threatened proceedings shall be required;

(i)    to the extent applicable, use commercially reasonable efforts to provide counsel to the Consenting Lenders with a review period of at least two (2) calendar days (or such shorter review period as is necessary or appropriate under the circumstances) prior to the date when the Company Parties intend to file any (i) Definitive Document with the Bankruptcy Court, with the filing of such Definitive Document subject to the consent rights set forth in this Agreement, and (ii) other material pleading with the Bankruptcy Court (excluding, among other things, monthly or

quarterly operating reports, retention applications, fee applications, fee statements, and any declarations in support thereof or related thereto) and consult in good faith with counsel to the Consenting Lenders regarding the form and substance of any such proposed filing;

(j)        provide to the Ad Hoc Group Advisors and First Lien Agent Advisors, on behalf of the Consenting Lenders, upon written request (email being sufficient): (i) reasonable access (without any material disruption to the conduct of the Debtors' businesses) during normal business hours to the books and records of the Company Parties, (ii) reasonable access (without any material disruption to the conduct of the Debtors' businesses) to the management of and advisors to the Company Parties for the purpose of evaluating the Company Parties' finances and operations and participating in the planning process with respect to implementation of the Restructuring Transactions, (iii) timely updates  (which may, for the avoidance of doubt, be provided by the Company Parties' advisors) regarding the Restructuring Transactions, including any material developments or any material conversations with parties in interest, (iv) timely updates (which may, for the avoidance of doubt, be provided by the Company Parties' advisors) regarding the status of obtaining any necessary or desirable authorizations (including any consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body, and (v) any other reasonable information related to the Restructuring Transaction reasonably requested by the Consenting Lenders in writing (e-mail shall suffice);

(k)        to the extent applicable, oppose and, if necessary, object to any motion filed with the Bankruptcy Court by any Person (i) seeking the entry of an order terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization or (ii) seeking the entry of an order terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset that, to the extent such relief was granted, would have a material adverse effect on or delay the consummation of the Restructuring Transactions;

(l)        not file any pleading seeking entry of an order, and object to any motion filed with the Bankruptcy Court by any person seeking the entry of an order, (i) directing the appointment of an examiner or a trustee, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases, or (iv) for relief that (x) is inconsistent with this Agreement or the Restructuring Term Sheet in any material respect or (y) would reasonably be expected to frustrate the purposes of this Agreement, including by preventing or delaying the consummation of the Restructuring Transactions;

(m)        promptly upon receipt, and in any event within forty-eight (48) hours[2] following receipt thereof, provide a copy of any Alternative Restructuring Proposal received by any Company Party to counsel to the Consenting Lenders; *provided*, that if the confidentiality obligations applicable to such Alternative Restructuring Proposal would prevent such Company Party from sharing a copy of such Alternative Restructuring Proposal, such Company Party shall (i) promptly inform counsel to the Consenting Lenders that such Company Party has received an

---

[2]    In the event that an Alternative Restructuring Proposal is received pursuant to this section 6.02(m) on a Saturday or Sunday, the Company Parties shall have an additional twenty-four (24) hours following receipt to provide a copy.

Alternative Restructuring Proposal and (ii) share a summary of the terms of such Alternative Restructuring Proposal;

(n)      facilitate calls between counsel for the Consenting Lenders and counsel for the Disinterested Directors to ensure the Consenting Lenders are apprised of the progress of the Disinterested Directors' investigation;

(o)      timely oppose any objections filed with respect to the Bankruptcy Court's approval of any of the Definitive Documents; and

(p)      except as otherwise expressly set forth in this Agreement, use commercially reasonable efforts to continue to operate in the ordinary course of business consistent with past practices; *provided* that the parties to this Agreement expressly acknowledge that undertaking the Chapter 11 Cases and Restructuring Transactions will require the Company Parties to, among other things, undertake certain operations outside of the ordinary course of business to effectuate the Restructuring Transactions and ensure the continued operation of the Company Parties' business, and no action made, in good faith, by the Company Parties shall constitute a breach of the commitment set forth in this Section 6.01(n).

6.02.    Negative Commitments.  Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      except as contemplated by Section 7.02 of this Agreement, solicit, support, or vote for any Alternative Restructuring, or consummate, or enter into a binding agreement to consummate, such Alternative Restructuring prior to the Consummation of the Restructuring Transactions;

(c)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement, the Restructuring Term Sheet, the Definitive Documents, or the Plan;

(d)      modify the Plan or any Definitive Document, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(e)      (i) execute, deliver, and/or file with the Bankruptcy Court any agreement, instrument, motion, pleading, order, form, or other document that is to be utilized to implement or effectuate, or that otherwise relates to, this Agreement, the Plan, and/or the Restructuring Transactions that, in whole or in part, is not consistent with this Agreement or is otherwise not in form and substance acceptable in accordance with the terms set forth in Section 3.02 hereof, or if applicable, file any pleading with the Bankruptcy Court seeking authorization to accomplish or effect any of the foregoing; or (ii) waive, amend, or modify any of the Definitive Documents, or, if applicable, file with the Bankruptcy Court a pleading seeking to waive, amend, or modify any term or condition of any of the Definitive Documents, which waiver, amendment, modification, or filing contains any provision that is not consistent with this Agreement and the Restructuring

Term Sheet or is otherwise not in form and substance acceptable in accordance with the terms set forth in Section 3.02 hereof;

(f)  file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement, the Restructuring Term Sheet, or the Plan;

(g)  outside the ordinary course of business, and without the prior written consent of the Required Consenting Lenders, (with respect to any action set forth in this paragraph taken with respect to only non-insider employees of the Company Parties, such consent not to be unreasonably withheld, conditioned, or delayed), (i) enter into or amend, establish, adopt, restate, supplement, or otherwise modify or accelerate (x) any deferred compensation, incentive, success, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans, or agreements, including, without limitation, offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of any employee, or (y) any contracts, arrangements, or commitments that entitle any current and former director, officer, employee, manager, or agent to indemnification from the Company Parties, or (ii) amend or terminate any existing compensation or benefit plans or arrangements (including employment agreements);

(h)  grant, agree to grant, or make any payment on account of (including pursuant to a key employee retention plan, key employee incentive plan, or other similar agreement or arrangement) any additional or any increase in the wages, salary, bonus, commissions, retirement benefits, pension, severance, or other compensation or benefits of any director, manager, officer, or management- or executive-level employee of the Debtors without the prior written consent of the Required Consenting Lenders;

(i)  (i) seek discovery in connection with, prepare, or commence any proceeding or other action that challenges (A) the amount, validity, allowance, character, enforceability, or priority of any Company Claims/Interests of any of the Consenting Lenders, or (B) the validity, enforceability, or perfection of any lien or other encumbrance securing (or purporting to secure) any Company Claims/Interests of any of the Consenting Lenders; (ii) otherwise seek to restrict any rights of any of the Consenting Lenders; or (iii) support any Person in connection with any of the acts described the foregoing clauses;

(j)  without the prior written consent of the Required Consenting Lenders, enter into any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements;

(k)  amend or change, or propose to amend or change, any of their respective organizational documents;

(l)  (i) authorize, create, issue, sell, or grant any additional Equity Interests, or (ii) reclassify, recapitalize, redeem, purchase, acquire, declare any distribution on, or make any distribution on any Equity Interests;

(m)  other than as required by law, as agreed to by the Required Consenting Lenders or as contemplated by the Definitive Documents, make or change any material tax election other than

19

in the ordinary course of business, adopt or change any material accounting methods, practices, or periods for tax purposes other than in the ordinary course of business, make or request any tax ruling, enter into any tax sharing or similar agreement or arrangement (other than agreements entered in the ordinary course of business the primary purpose of which are not taxes), or settle any tax claim or assessment for an amount greater than $250,000;

(n)    without the prior written consent (not to be unreasonably withheld) of the Required Consenting Lenders, enter into any proposed settlement outside the ordinary course of business of any Claim, litigation, dispute, controversy, Cause of Action, proceeding, appeal, determination or investigation if such settlement will adversely affect the Debtors' ability to consummate the Restructuring Transactions; or

(o)    commence solicitation upon any chapter 11 plan of reorganization (which, for the avoidance of doubt, shall include any Plan) that is not in form and substance acceptable to the Required Consenting Lenders.  For the avoidance of doubt, there shall be no cure period for breach of this negative commitment.

**Section 7.    *Additional Provisions Regarding Company Parties' Commitments*.**

7.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement; provided, however, that the Company Parties shall promptly notify each of the Consenting Lenders of any determination to take such action or inaction, to the extent such action or inaction would materially affect the Consenting Lenders, within twenty-four (24) hours following such determination.  Notwithstanding anything to the contrary herein, each Consenting Lender reserves its rights to challenge any action taken or not taken in the exercise of such fiduciary duties.

7.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Lender), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals. The Company Parties shall further keep the Consenting Lenders reasonably informed as to the status and substance of discussions or actions

or inactions surrounding any Alternative Restructuring Proposal or the exercise of rights under this Section.

7.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

7.04.    The Company Parties acknowledge and agree that Gibson, Dunn & Crutcher LLP, as counsel to the Ad Hoc Group, may retain up to one (1) consultancy firm and up to one (1) independent advisor (each, an "Ad Hoc Group Consultant") acceptable to the Required Consenting Lenders for the duration of the chapter 11 cases to assist the Ad Hoc Group in the evaluation of the Company Parties' financial condition, assets, liabilities, operations and/or businesses, as determined by the Required Consenting Lenders in their sole discretion. The Company Parties agree that, for the duration of the Chapter 11 Cases, they shall (i) participate in weekly calls, if requested by the Ad Hoc Group and at a mutually agreed upon time, with the Ad Hoc Group Consultant and the Ad Hoc Group Advisors and (ii) provide such reports and information (financial or otherwise) as the Ad Hoc Group Consultant may request from time to time, *provided* that the Ad Hoc Group shall make reasonable effort to provide the Ad Hoc Group Consultant with previously furnished diligence and take reasonable steps to avoid duplicative requests for information. Further, the Company Parties agree that, to the extent necessary, the Ad Hoc Group Consultant will be provided with reasonable access to the (i) board of directors of Thrasio Holdings, Inc. and (ii) certain officers of the Company Parties identified by the Ad Hoc Group. The Company Parties acknowledge and agree that the fees, costs and expenses of the Ad Hoc Group Consultant shall constitute "Transaction Expenses" under this Agreement.

**Section 8.**    *Transfer of Interests and Securities*.

8.01.    During the Agreement Effective Period, no Consenting Lender shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims to any non-Affiliated Person, unless either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Lender and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.

8.02.    Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.    This Agreement shall in no way be construed to preclude the Consenting Lenders from acquiring additional Company Claims/Interests; provided, however, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Lender be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Lenders)

and (b) such Consenting Lender must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

8.04.   This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Lender to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.   Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within ten (10) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the Transfer otherwise is a permitted Transfer under Section 8.01.  To the extent that a Consenting Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Lender without the requirement that the transferee be a Permitted Transferee.

8.06.   Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.** *Representations and Warranties of Consenting Lenders*.  Each Consenting Lender severally, and not jointly, represents and warrants that, as of the date such Consenting Lender executes and delivers this Agreement and as of the Plan Effective Date:

(a)   it is the beneficial or record owner (which shall be deemed to include any unsettled trades) of the face amount of the Company Claims or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims other than those reflected in, such Consenting Lender's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)   it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims;

(c)      such Company Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, approve changes to, and transfer all of its Company Claims referable to it as contemplated by this Agreement subject to applicable Law;

(e)      solely with respect to holders of Company Claims or to DIP Backstop Parties, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Lender in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

**Section 10.** *Mutual Representations, Warranties, and Covenants*.  Each of the Parties severally, and not jointly or jointly and severally, represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Plan Effective Date:

(a)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements (including related to any Alternative Restructuring) with any other party that have not been disclosed to all Parties to this Agreement.

**Section 11.**     *Termination Events*.[3]

11.01. <u>Consenting Lender Termination Events</u>.    This Agreement may be terminated (a) with respect to the Consenting Term Lenders, by the Required Consenting Term Lenders, and (b) with respect to the Consenting RCF Lenders, by the Required Consenting RCF Lenders, in each case, by the delivery to the Company Parties of a written notice in accordance with Section 15.10 hereof upon the occurrence of the following events:

(a)     the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Lenders seeking termination pursuant to this provision and (ii) remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Lenders transmit a written notice in accordance with Section 15.10 hereof detailing any such breach;

(b)     the failure to meet any of the Milestones set forth in the Restructuring Term Sheet, which Milestone has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Lender in violation of its obligations under this Agreement;

(c)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) days after such terminating Consenting Lenders transmit a written notice in accordance with Section 15.10 hereof detailing any such issuance; <u>provided</u> that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(d)     any Company Party (i) publicly announces, or announces in writing, to any of the Consenting Lenders or other holders of Company Claims/Interests, its intention not to support or pursue the Restructuring Transactions; (ii) exercises any right pursuant to Section 7.01 or enters into definitive documentation regarding an Alternative Restructuring Proposal pursuant to Section 7.01, without the consent of the Required Consenting Term Lenders; or (iii) breaches any of the covenants, agreements or obligations set forth in Section 6.02(b);

(e)     any Company Party (i) files any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this Agreement and such motion has not been withdrawn within five (5) calendar days of receipt by the Company Parties of written notice from the party that such motion or pleading is inconsistent with this Agreement, or (ii) seeks to amend or modify any Definitive Document in a manner that is materially inconsistent with or not permitted by this Agreement (including with respect to the consent rights afforded the Consenting Lenders under this Agreement) without the consent of the Required Consenting Lenders;

---

[3]     Notwithstanding anything to the contrary herein, the right to terminate this Agreement under this Section 11 shall not be available to any Company Party or Consenting Lender whose failure to fulfill any material obligation under this Agreement has been the primary cause of, or has resulted in, the occurrence of the applicable Termination Event.

(f)      any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(g)      the Bankruptcy Court enters an order denying confirmation of the Plan and such order is not reversed, stayed, or amended in a manner acceptable to the Required Consenting Lenders, or the Bankruptcy Court does not enter an order confirming a Plan acceptable to the Required Consenting Lenders, in each case, within fifteen (15) Business Days;

(h)      any Company Party, without the consent of the Required Consenting Lenders, (i) commences a voluntary case under the Bankruptcy Code other than the Chapter 11 Cases; (ii) consents to the appointment of, or taking possession by, a receiver, liquidator, assignee, custodian, trustee, or sequestrator (or similar official) of any Company Party or the property or assets of any Company Party; (iii) seeks any arrangement, adjustment, protection, or relief of its debts other than the Chapter 11 Cases; or (iv) makes any general assignment for the benefit of its creditors;

(i)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Lenders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) dismissing one or more of the Chapter 11 Cases;

(j)      the Bankruptcy Court grants relief that (i) is inconsistent with this Agreement or the Restructuring Term Sheet in any material respect or (ii) frustrates the purposes of this Agreement, including by entering an order denying confirmation of the Plan or disallowing a material provision thereof (without the consent of the Required Consenting Lenders), unless the order granting such relief has been stayed, modified, or reversed within fourteen (14) days after such terminating party deliver a written notice in accordance with Section 15.10 hereof;

(k)      any Company Party (i) withdraws the Plan; (ii) publicly announces, or announces to any of the Required Consenting Lenders or other holders of Company Claims/Interests, its intention to withdraw the Plan or not support the Plan; or (iii) moves to voluntarily dismiss any of the Chapter 11 Cases;

(l)      any of the Company Parties (i) files any motion seeking to avoid, invalidate, disallow, subordinate, recharacterize, or limit any Company Claims/Interests, Lien, or interest held by any Consenting Lender; or (ii) shall have supported any application, adversary proceeding, or Cause of Action referred to in the immediately preceding subsection (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action without the prior written consent of the Required Consenting Lenders;

(m)      the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any of the Company Claims/Interests of any of the Consenting Lenders;

(n)      the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material

asset of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or to consummate the Restructuring Transactions;

(o)      termination of the Debtors' right to use cash collateral or debtor-in-possession financing, in each case, approved in the Chapter 11 Cases;

(p)      subject to the terms of the DIP Orders and other orders of the Bankruptcy Court, failure of the Company Parties to pay the Transaction Expenses, as and when required by the terms of this Agreement;

(q)      after entry by the Bankruptcy Court of the Confirmation Order or the DIP Orders, either of the Confirmation Order or the DIP Orders is (i) reversed, dismissed, or vacated without the prior written consent of the Required Consenting Lenders, or (ii) modified or amended in a manner that is inconsistent with this Agreement without the prior written consent of the Required Consenting Lenders and such modification or amendment remains unchanged for a period of ten (10) days after the terminating party delivers a written notice in accordance with Section 15.10 hereof detailing any such modification or amendment;

(r)      the occurrence of a Event of Default under the DIP Credit Agreement that has not been cured (to the extent curable) or waiver (to the extent waivable) in accordance with the DIP Credit Agreement;

(s)      upon the commencement of an involuntary case against any of the Company Parties or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of the Company Parties or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative, receivership or similar law now or hereafter in effect, provided that such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof, or if any court order grants the relief sought in such involuntary proceeding; or

(t)      seven (7) Business Days after the occurrence of any court of competent jurisdiction or other competent governmental or regulatory authority issuing a ruling or an order and such ruling or order becoming final and non-appealable, making illegal or otherwise restricting, preventing or prohibiting the consummation of the transactions contemplated by this Agreement in a way that cannot be reasonably remedied by the Company Parties.

11.02.   <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 15.10 hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect by one or more of the Consenting Lenders of any of the representations, warranties, or covenants set forth in this Agreement that remains uncured for a period of fifteen (15) Business Days after the receipt by the Consenting Lenders of notice of such breach; provided, however, that such termination shall only be effective as against the breaching Consenting Lender(s); provided, further, that the Company Parties may terminate this Agreement with respect to all Parties if such termination would result in  the Consenting Lenders

holding an amount of First Lien Claims that would result in the non-breaching Consenting Lenders holding less than 66.66% of the aggregate principal amount of the First Lien Claims;

(b)      the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel and after providing any applicable notice to counsel to the Consenting Lenders, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal; provided that the Company Parties shall give the Consenting Lenders not less than three (3) days prior written notice before exercising the termination right under this section 11.02(b);

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 15.10 hereof detailing any such issuance; provided, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement;

(d)      the Bankruptcy Court enters an order denying confirmation of the Plan;

(e)      the filing of any motion or pleading by any Consenting Lender(s) holding at least 33.33% of aggregate principal amount of First Lien Claims with the Bankruptcy Court that (i) is inconsistent in any material respect with this Agreement, the Plan or the Restructuring Term Sheet or (ii) seeks approval of any Definitive Document or authority to amend or modify any Definitive Document in a manner that is materially inconsistent with or not permitted by this Agreement (including with respect to the consent rights afforded the Company Parties under this Agreement) without the consent of the Company Parties, and such motion or pleading has not been withdrawn within five (5) Business Days of such filing;

(f)      the entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases, (ii) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, or (iii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party;

(g)      upon the commencement of an involuntary case against any of the Company Parties or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of the Company Parties or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative, receivership or similar law now or hereafter in effect, provided, that such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof, or if any court order grants the relief sought in such involuntary proceeding; and

(h)      seven (7) Business Days after the occurrence of any court of competent jurisdiction or other competent governmental or regulatory authority issuing a ruling or an order and such ruling or order becoming final and non-appealable, making illegal or otherwise restricting,

preventing or prohibiting the consummation of the transactions contemplated by this Agreement in a way that cannot be reasonably remedied by the Company Parties.

11.03. <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Required Consenting Lenders; and (b) each Company Party.

11.04. <u>Automatic Termination</u>. This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

11.05. <u>Effect of Termination</u>. Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action. Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; provided, however, any Consenting Lender withdrawing or changing its vote pursuant to this Section 11.05 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court. Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Lenders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Lender, and (b) any right of any Consenting Lender, or the ability of any Consenting Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Lender. No purported termination of this Agreement shall be effective under this Section 11.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, and such material breach causes or results in the occurrence of the applicable termination event, except for a termination pursuant to Section 11.02(b) or Section 11.02(d). Nothing in this Section 11.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(b).

**Section 12.** *Amendments and Waivers.*

(a)    This Agreement and any exhibits or schedules here (including, but not limited to, the Restructuring Term Sheet) may not be modified, amended, or supplemented, and no condition

or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)      This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party and (b) the Required Consenting Lenders; provided, however, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims held by a Consenting Lender, then the consent of each such affected Consenting Lender shall also be required to effectuate such modification, amendment, waiver or supplement; provided, further, however, that if the proposed modification, amendment, waiver, or supplement has a material effect on the Company Claims held by the Consenting RCF Lenders, then the Required Consenting RCF Lenders shall also be required to effectuate such amendment, waiver, or supplement.

(c)      Any amendment that modifies (i) the defined term "Required Consenting Lenders" shall require the consent of each Consenting Lender, (ii) the defined term "Required Consenting RCF Lenders" shall require the consent of each Consenting RCF Lender, (iii) the defined term "Required Consenting Term Lenders" shall require the consent of each Consenting Term Lender, and (iv) the language contained in this Section 12 shall require the consent of each affected Party.

(d)      Any Consenting Lender may terminate this Agreement solely as to itself, upon written notice to the Company Parties and the Consenting Lenders, in the event that this Agreement or any Definitive Document is modified, amended, or supplemented, or a condition or requirement of either this Agreement or any Definitive Document is waived in such a way as to (i) materially and adversely affect the Consenting Lender, or (ii) disproportionately and adversely alter the proposed treatment of any Consenting Lender's First Lien Claims relative to similarly situated claimants.

(e)      Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(f)      The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.**      *Plan Releases*

13.01.  Each party to this Agreement agrees to support the Plan Releases contained in the Restructuring Term Sheet subject to the ongoing Independent Investigation.

**Section 14.**      *Consenting Sponsor Commitments*.

14.01.  The Consenting Sponsors agree to abide by the Consenting Lender commitments in this Agreement as applicable by virtue of their status as Consenting Sponsors.

**Section 15.**     *Miscellaneous*

15.01.  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

15.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

15.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, each Party hereby covenants and agrees to cooperate with each other in good faith with respect to the pursuit, approval, implementation, and consummation of the Restructuring Transactions and the Plan, as well as the negotiation, drafting, execution, and delivery of documents (including any related orders, agreements, instruments, schedules, or exhibits) described in this Agreement or the Definitive Documents or otherwise necessary or appropriate to effectuate the Restructuring Transactions in accordance with this Agreement and the Definitive Documents; *provided* that this Section 15.03 shall not limit the right of any Party hereto to exercise any right or remedy provided for in this Agreement (including the approval rights set forth in Sections 3.01 and 3.02). Furthermore, subject to the terms hereof, each Party shall take such action as may be reasonably appropriate or necessary to effectuate the Restructuring Transactions.

15.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

15.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereby agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Federal District Court for the Southern District of New York in New York City, New York or the state courts located therein, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of such court; (b) waives any objection to laying venue in any such action or proceeding in such court; and (c) waives any objection that such court is an inconvenient forum or does not have

jurisdiction over any Party to this Agreement.  Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement. Each Party hereby agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

15.06.  TRIAL BY JURY WAIVER.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15.07.  Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

15.08.  Rules of Construction.  This Agreement is the product of negotiations among the Company Parties and the Consenting Lenders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

15.09.  Successors and Assigns; Third Parties.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

15.10.  Notices.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to a Company Party, to:

Thrasio Holdings, Inc.
Attention: Greg Greeley, Josh Burke, Mike Fahey
E-mail address: greg.greeley@thras.io, josh.burke@thras.io,
mike@thras.io

with copies to:

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Anup Sathy
E-mail address: asathy@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Matthew C. Fagen, Francis Petrie, Evan Swager
E-mail addresses:  matthew.fagen@kirkland.com
                             francis.petrie@kirkland.com
                             evan.swager@kirkland.com

(b)      if to a Consenting Term Lender, to:

Gibson, Dunn & Crutcher LLP
200 Park Ave
New York, NY 10166
Attention:  Scott J. Greenberg, Joe Zujkowski, Matt Rowe
E-mail addresses:  sgreenberg@gibsondunn.com
                             jzujkowski@gibsondunn.com
                             mrowe@gibsondunn.com

and

Sills Cummis & Gross P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
Attention: Andrew H. Sherman
E-mail address:  asherman@sillscummis.com

(c)      if to a Consenting RCF Lender, to:

Simpson Thacher & Bartlett LLP, as counsel to the Agent
425 Lexington Avenue
New York, NY 10017
Attention:  Nicholas Baker, Philip L. DiDonato, Amy W. Zhou

Email addresses:  nbaker@stblaw.com

32

philip.didonato@stblaw.com
amy.zhou@stblaw.com

Any notice given by delivery, mail, or courier shall be effective when received.

15.11. <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Lender hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

15.12. <u>Enforceability of Agreement</u>.  The Parties hereby acknowledge and agree that (a) the provision of any notice or exercise of termination rights under this Agreement is not prohibited by the automatic stay provisions of the Bankruptcy Code and (b) that they waive any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulate and consent hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

15.13. <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

15.14. <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

15.15. <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

15.16. <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

15.17. <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

15.18.  <u>Capacities of Consenting Lenders</u>.  Each Consenting Lender has entered into this agreement on account of all Company Claims that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims.

15.19.  <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 15 and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.  For the avoidance of doubt, the Parties acknowledge and agree that if this Agreement is terminated, Section 15 shall survive such termination.

15.20.  <u>Email Consents</u>.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 12, or otherwise, including a written approval by the Company Parties or the Required Consenting Lenders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

15.21.  <u>Public Disclosure</u>.  The Company Parties shall deliver drafts to the Consenting Lenders' advisors of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement, the Restructuring Term Sheet, the Restructuring Transactions, or any amendment thereof to the general public (each, a "<u>Public Disclosure</u>") at least one (1) calendar day before making any such disclosure.  Any Public Disclosure shall be reasonably acceptable to the Company Parties and the Required Consenting Lenders.  Except as required by Law, no Party or its advisors shall make any public disclosure that would disclose either: (a) the holdings of any Consenting Lender (including on the signature pages of the Consenting Lenders, which shall not be publicly disclosed or filed) or (b) the identity of any Consenting Lender, in each case without the prior written consent of such Consenting Lender or an order of a court with competent jurisdiction; provided, however, that notwithstanding the foregoing, (x) if such disclosure is required by Law, and to the extent reasonably practicable and not otherwise prohibited by Law, the disclosing Party shall afford the relevant Consenting Lender a reasonable opportunity to review and comment in advance of such disclosure and such Party shall take all reasonable measures to limit such disclosure and (y) the Company Parties shall not be required to keep confidential the aggregate holdings of all Consenting Lenders, and each Consenting Lender hereby consents to the disclosure of the execution of this Agreement by the Company Parties, and the terms and contents hereof, in any filings required by applicable law or regulation or the rules of any applicable stock exchange or regulatory body.

15.22.  <u>Payment of Fees and Expenses</u>. Whether or not the transactions contemplated by this Agreement are consummated, the Company Parties hereby agree, on a joint and several basis, to pay in cash the Transaction Expenses as follows: (i) all accrued and unpaid reasonable and documented Transaction Expenses incurred up to (and including) and after the Agreement Effective Date, (ii) after the Petition Date, on a regular and continuing basis, (iii) upon any

termination of this Agreement with respect to any Consenting Lenders, all accrued and unpaid Transaction Expenses which have been incurred up to (and including) the applicable Termination Date, in cash promptly (but in any event within five (5) Business Days) and (iv) on the Plan Effective Date, without any requirement for the Bankruptcy Court to provide further review or additional court orders.

15.23.  No Third-Party Beneficiaries.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other Person or entity shall be a third-party beneficiary hereof.

15.24.  Capacities of Consenting RCF Lenders.  The Parties understand that certain of the Consenting RCF Lenders are engaged in a wide range of financial services and businesses, and therefore, in furtherance of the foregoing, the Parties acknowledge and agree that, to the extent a Consenting RCF Lender expressly indicates on its signature page hereto that it is executing this agreement on behalf of specific trading desk(s) and/or business group(s) of such Consenting RCF Lender, the obligations set forth in this Agreement shall only apply to such trading desk(s) and/or business group(s) and shall not apply to any other trading desk or business group of the applicable Consenting RCF Lender until such trading desk or business group becomes party to this Agreement.  Notwithstanding anything to the contrary contained in this Agreement, to the extent that a Consenting RCF Lender also acts as an Agent, such consenting RCF Lender shall only be bound by this Agreement in its capacity as a Consenting RCF Lender and not in its capacity as an Agent.  If such consenting RCF Lender that is also acting as an Agent is instructed to act or refrain from acting, in its capacity as an Agent, by the requisite lenders under the First Lien Credit Agreement, any such action or inaction shall not constitute a breach of this Agreement by such Consenting RCF Lender.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**1 Thrasio One, Inc.**
**10 Thrasio Ten, Inc.**
**11 Thrasio Eleven, Inc.**
**12 Thrasio Twelve, Inc.**
**14 Thrasio Fourteen, Inc.**
**15 Thrasio Fifteen, Inc.**
**16 Thrasio Sixteen, Inc.**
**17 Thrasio Seventeen, Inc.**
**18 Thrasio Eighteen, Inc.**
**19 Thrasio Nineteen, Inc.**
**2 B Bountiful, Inc.**
**20 Thrasio Twenty, Inc.**
**21 Thrasio Twenty One, Inc.**
**22 Thrasio Twenty Two, Inc.**
**23 Thrasio Twenty Three, Inc.**
**24 Thrasio Twenty Four, Inc.**
**25 Thrasio Twenty Five, Inc.**
**3 Thrasio Three, Inc.**
**5 Thrasio Five, Inc.**
**6 Thrasio Six, Inc.**
**7 Thrasio Seven, Inc.**
**8 Thrasio Eight, Inc.**
**9 Thrasio Nine, Inc.**
**Acorn Creations, Inc.**
**AirOrb Ltd**
**Alloy Ideas, Inc.**
**Amber Ideas, Inc.**
**Amber Oasis, Inc.**
**Andromache, Inc.**
**Angor-Pet Thrasio Two, Inc.**
**Antiope, Corp.**
**Apple Affirmations, Inc.**
**Apricot Ideas, Inc.**
**Ash Developments, LLC**
**Assassin Bug Industries, Inc.**
**Attain Recruitment Ltd**
**Autumn Ideas, Inc.**
**Autumn Waves, Inc.**
**Banana Beginnings, Inc.**
**Bartstr Ltd**
**Basketball Beginning, Inc.**
**Beast Gear Limited**
**Bellezo.com Ltd**
**Biscotti Solutions, Inc.**

Bittersweet Billows, Inc.
BONFIRE SOLUTIONS, INC.
Bonstato GmbH
Bronze Projects, Inc.
BURNING NEON, INC.
Burnt Summer Citrus, Inc.
Buttercup Creations, Inc.
Butterscotch Beginnings, Inc.
Cafe Casa, Inc.
Califia Company
California Poppy Projects, Inc.
Candlelit Creations, Inc.
Cantaloupe Creations Company
Caramel Creations, Inc.
Carnation Creations, Inc.
Carotene Consortium, Inc.
Carrot Solutions, Inc.
CAYENNE SOLUTIONS, INC.
Champagne Projects, Inc.
Charope, Inc.
Cheddar Creations, Inc.
Chestnut Creations, Inc.
Chili Clove, Inc.
CHILI FLAKES, INC.
Chipshot Ltd
Chrysanthemum Creations, Inc.
Cider Creations, Inc.
Cinnabar Creations, Inc.
Citrine Solutions, Inc.
Classy Mango, Inc.
CLASSY TANGERINE, INC.
Clementine Creations, Inc.
Clownfish Creations, Inc.
Comet Creations, Inc.
Copperhead Conspiracies, Inc.
Coral Chrome, Inc.
Corn Snake Surprises, Inc.
Crawfish Creations, Inc.
Daffodil Design, Inc.
Dahlia Dreams, Inc.
Damaze Pt Ltd.
Dark Honey Design, Inc.
Dark Orange Design, Inc.
Daybreak Developments, Inc.
Daylily Dreams, Inc.
Discus Dreams, Inc.

**DMD Group Inc**
**Domain Acquisitions 2 Ltd.**
**Dots for Spots Ltd**
**E & I Trading Ltd**
**E&L Enterprises Limited**
**eCom Heights LLC**
**Emberglow Ideas, Inc.**
**Eurypyle, Inc.**
**Faint Orange Horizon, Inc.**
**Fall Foundations, Inc.**
**Fawn Foundations, Inc.**
**Foxy Creations, Inc.**
**Frosty Dream, Inc.**
**FYER TROPICS, INC.**
**Ginger Cat Creations, Inc.**
**Ginger Creations, Inc.**
**Gingersnap Solutions, Inc.**
**Golden Gate Solutions, Inc.**
**GOLDEN KIWIFRUIT ENTERPRISES, INC.**
**Goldfish Memories, Inc.**
**Green Cricket Ltd**
**Habanero Pepper Projects, Inc.**
**Harley Orange, Inc.**
**HARVEST CHARM, INC.**
**HIC-Cork Thrasio One Inc.**
**Hippolyte, Ltd**
**Honey Sunset, Inc.**
**Ideal Monarch, Inc.**
**Ideastream Consumer Products, LLC**
**Influencer Ideas, Inc.**
**IStack Parent Holdings**
**Ivory Ideas, Inc.**
**Jasper Gesture, Inc.**
**Jiminy Ltd**
**Joss Solutions 2016 Limited**
**JSCC Asset 001**
**Jupiter Gesture, Inc.**
**Khaki Trips, Inc.**
**KingFisher Creations Inc.**
**Kitchen Tools Ltd**
**Koi Creations, Inc.**
**Lace Decisions, Inc.**
**Laranja Logistics, Inc.**
**Latte Logistics, Inc.**
**Leather Logistics, Inc.**
**Lemon Logistics, Inc.**

Lemur Logistics, Inc.
Levita Holdings, LLC
Lionfish Logistics, Inc.
Lobster Logistics, Inc.
Magenta Peel Solutions, Inc.
Mahogany Movements Inc.
MALT DECISIONS, INC.
Mango Movements, Inc.
MANGO WONDER, INC.
Maple Movements, Inc.
Marigold Creations, Inc.
Marmalade Mansions, Inc.
Marmalade Movements, Inc.
Marpesia, Co.
Mars Makers, Inc.
Mauve Monkey, Inc.
Melanippe, Inc.
Melon Movements, Inc.
Meteor Movements, Inc.
Mimosa Movements, Inc.
Modetro Retail Limited
Ochre Organization, Inc.
Old Rust Organization, Inc.
Orange Crush Organization, Inc.
ORANGE FANTASY, INC.
Orange Hope, Inc.
Orange Margarita, Inc.
Orange Organization, Inc.
Orange Peach Projects, Inc.
Orange Peel Projects, Inc.
Orange Umbrella Creations, Inc.
Orangutan Organization, Inc.
Oranssi Organization, Inc.
Orythia, Inc.
OYSTER OASIS, INC.
Pantariste, Inc.
Pantone Projects, Inc.
Papaya Projects, Inc.
Parchment Principles, Inc.
Peach Projects, Inc.
Peanut Projects, Inc.
Pearoller Ltd
Penny Rose Solutions, Inc.
Pennycopper Trading, Inc.
Penthe Company
Persian Projects, Inc.

**Persimmon Projects, Inc.**
**Pizza Projects, Inc.**
**Poppy Projects, Inc.**
**Portocale Projects, Inc.**
**Primrose Projects, Inc.**
**Pro Grade Products Ltd**
**Prothoe Limited**
**Pure Chimp Ltd**
**Radiant Orange, Inc.**
**Rissav Limited**
**Rose Bud Creations, Inc.**
**Rosewood Wish, Inc.**
**SafeRest Holdings, LLC**
**Salmon Solutions, Inc.**
**Sandcastle Days, Inc.**
**Sandpaper Solutions, Inc.**
**SANDSNAKE VENTURES, INC.**
**Sandstorm Solutions, Inc.**
**Sandy Leaf Farm, Ltd.**
**Sapphire Monkey, Inc.**
**Sasana Group Limited**
**Scarlet Solutions, Inc.**
**Scotch Solutions, Inc.**
**Scouse Ltd**
**Seashell Solutions, Inc.**
**Sherbert Solutions, Inc.**
**Shortbread Solutions, Inc.**
**Siberian Tiger Solutions, Inc.**
**Sockeye Strategies, Inc.**
**Soft Spice, Inc.**
**Spicy Solutions, Inc.**
**Starfish Solutions, Inc.**
**Strawflower Solutions, Inc.**
**Sundaze Blaze Solutions, Inc.**
**Sunflare Solutions, Inc.**
**Sunflower Saturnalia, Inc.**
**Sunkiss Solutions, Inc.**
**Sunny Operations, Inc.**
**Sunrise Martinis, Inc.**
**Sunrise Season, Inc.**
**Sweet Nectar Enterprises, Inc.**
**Sweet Potato Solutions, Inc.**
**Tangelo Tendencies, Inc.**
**Tangerine Ideas, Inc.**
**Tawny Tasks, Inc.**
**Tea Rose Risings, Inc.**

**Teal Monkey, Inc.**
**The NutriLock Company Pty Ltd**
**Thrasio Australia Holdings Pty Ltd**
**Thrasio Australia Import Pty Ltd**
**Thrasio Bermuda Holdings Limited**
**Thrasio Deutschland Holdings Gmbh**
**Thrasio Deutschland Services Gmbh**
**Thrasio E-Commerce (Shanghai) Co., Ltd.**
**Thrasio Global Cross-border E-Comerce (Shenzhen) Co. Ltd.**
**Thrasio godo kaisha (Thrasio GK)**
**Thrasio Holdings, Inc.**
**Thrasio Hong Kong, Ltd.**
**Thrasio India Holdings, Inc.**
**Thrasio Intermediate Sub, LLC**
**Thrasio International Co. Limited**
**Thrasio International Holdings, Inc.**
**Thrasio LL Acquisitions, Inc.**
**Thrasio Malta Holdings Co. Limited**
**Thrasio Services, LLC**
**Thrasio Supply Chain (Suzhou) Co. Ltd.**
**Thrasio UK Holdings, Ltd**
**Thrasio Ventures N1, LLC**
**Thrasio Ventures Q1, LLC**
**Thrasio Ventures, Inc.**
**Thrasio, LLC**
**Tiger Affirmations, Inc.**
**Tiger Stripe Creations, Inc.**
**Tomato Tasks, Inc.**
**Topaz Traditions, Inc.**
**Tortilla Tasks, Inc.**
**Toxaris Limited**
**Traffic Cone Tuesdays, Inc.**
**Truverge International Ltd**
**Turmeric Transitions, Inc.**
**Wallaby42 Pty Ltd**
**WARM RED WONDERS, INC.**
**William Evans Retail Ltd**
**Zabba, Inc.**

By: _____ */s/ Josh Burke*

Name: Josh Burke

Authorized Signatory

## EXHIBIT A

**Company Parties**

1 Thrasio One, Inc.
10 Thrasio Ten, Inc.
11 Thrasio Eleven, Inc.
12 Thrasio Twelve, Inc.
14 Thrasio Fourteen, Inc.
15 Thrasio Fifteen, Inc.
16 Thrasio Sixteen, Inc.
17 Thrasio Seventeen, Inc.
18 Thrasio Eighteen, Inc.
19 Thrasio Nineteen, Inc.
2 B Bountiful, Inc.
20 Thrasio Twenty, Inc.
21 Thrasio Twenty One, Inc.
22 Thrasio Twenty Two, Inc.
23 Thrasio Twenty Three, Inc.
24 Thrasio Twenty Four, Inc.
25 Thrasio Twenty Five, Inc.
3 Thrasio Three, Inc.
5 Thrasio Five, Inc.
6 Thrasio Six, Inc.
7 Thrasio Seven, Inc.
8 Thrasio Eight, Inc.
9 Thrasio Nine, Inc.
Acorn Creations, Inc.
AirOrb Ltd
Alloy Ideas, Inc.
Amber Ideas, Inc.
Amber Oasis, Inc.
Andromache, Inc.
Angor-Pet Thrasio Two, Inc.
Antiope, Corp.
Apple Affirmations, Inc.
Apricot Ideas, Inc.
Ash Developments, LLC
Assassin Bug Industries, Inc.
Attain Recruitment Ltd
Autumn Ideas, Inc.
Autumn Waves, Inc.
Banana Beginnings, Inc.
Bartstr Ltd
Basketball Beginning, Inc.
Beast Gear Limited
Bellezo.com Ltd

**Biscotti Solutions, Inc.**
**Bittersweet Billows, Inc.**
**BONFIRE SOLUTIONS, INC.**
**Bonstato GmbH**
**Bronze Projects, Inc.**
**BURNING NEON, INC.**
**Burnt Summer Citrus, Inc.**
**Buttercup Creations, Inc.**
**Butterscotch Beginnings, Inc.**
**Cafe Casa, Inc.**
**Califia Company**
**California Poppy Projects, Inc.**
**Candlelit Creations, Inc.**
**Cantaloupe Creations Company**
**Caramel Creations, Inc.**
**Carnation Creations, Inc.**
**Carotene Consortium, Inc.**
**Carrot Solutions, Inc.**
**CAYENNE SOLUTIONS, INC.**
**Champagne Projects, Inc.**
**Charope, Inc.**
**Cheddar Creations, Inc.**
**Chestnut Creations, Inc.**
**Chili Clove, Inc.**
**CHILI FLAKES, INC.**
**Chipshot Ltd**
**Chrysanthemum Creations, Inc.**
**Cider Creations, Inc.**
**Cinnabar Creations, Inc.**
**Citrine Solutions, Inc.**
**Classy Mango, Inc.**
**CLASSY TANGERINE, INC.**
**Clementine Creations, Inc.**
**Clownfish Creations, Inc.**
**Comet Creations, Inc.**
**Copperhead Conspiracies, Inc.**
**Coral Chrome, Inc.**
**Corn Snake Surprises, Inc.**
**Crawfish Creations, Inc.**
**Daffodil Design, Inc.**
**Dahlia Dreams, Inc.**
**Damaze Pt Ltd.**
**Dark Honey Design, Inc.**
**Dark Orange Design, Inc.**
**Daybreak Developments, Inc.**
**Daylily Dreams, Inc.**

**Discus Dreams, Inc.**
**DMD Group Inc**
**Domain Acquisitions 2 Ltd.**
**Dots for Spots Ltd**
**E & I Trading Ltd**
**E&L Enterprises Limited**
**eCom Heights LLC**
**Emberglow Ideas, Inc.**
**Eurypyle, Inc.**
**Faint Orange Horizon, Inc.**
**Fall Foundations, Inc.**
**Fawn Foundations, Inc.**
**Foxy Creations, Inc.**
**Frosty Dream, Inc.**
**FYER TROPICS, INC.**
**Ginger Cat Creations, Inc.**
**Ginger Creations, Inc.**
**Gingersnap Solutions, Inc.**
**Golden Gate Solutions, Inc.**
**GOLDEN KIWIFRUIT ENTERPRISES, INC.**
**Goldfish Memories, Inc.**
**Green Cricket Ltd**
**Habanero Pepper Projects, Inc.**
**Harley Orange, Inc.**
**HARVEST CHARM, INC.**
**HIC-Cork Thrasio One Inc.**
**Hippolyte, Ltd**
**Honey Sunset, Inc.**
**Ideal Monarch, Inc.**
**Ideastream Consumer Products, LLC**
**Influencer Ideas, Inc.**
**IStack Parent Holdings**
**Ivory Ideas, Inc.**
**Jasper Gesture, Inc.**
**Jiminy Ltd**
**Joss Solutions 2016 Limited**
**JSCC Asset 001**
**Jupiter Gesture, Inc.**
**Khaki Trips, Inc.**
**KingFisher Creations Inc.**
**Kitchen Tools Ltd**
**Koi Creations, Inc.**
**Lace Decisions, Inc.**
**Laranja Logistics, Inc.**
**Latte Logistics, Inc.**
**Leather Logistics, Inc.**

**Lemon Logistics, Inc.**
**Lemur Logistics, Inc.**
**Levita Holdings, LLC**
**Lionfish Logistics, Inc.**
**Lobster Logistics, Inc.**
**Magenta Peel Solutions, Inc.**
**Mahogany Movements Inc.**
**MALT DECISIONS, INC.**
**Mango Movements, Inc.**
**MANGO WONDER, INC.**
**Maple Movements, Inc.**
**Marigold Creations, Inc.**
**Marmalade Mansions, Inc.**
**Marmalade Movements, Inc.**
**Marpesia, Co.**
**Mars Makers, Inc.**
**Mauve Monkey, Inc.**
**Melanippe, Inc.**
**Melon Movements, Inc.**
**Meteor Movements, Inc.**
**Mimosa Movements, Inc.**
**Modetro Retail Limited**
**Ochre Organization, Inc.**
**Old Rust Organization, Inc.**
**Orange Crush Organization, Inc.**
**ORANGE FANTASY, INC.**
**Orange Hope, Inc.**
**Orange Margarita, Inc.**
**Orange Organization, Inc.**
**Orange Peach Projects, Inc.**
**Orange Peel Projects, Inc.**
**Orange Umbrella Creations, Inc.**
**Orangutan Organization, Inc.**
**Oranssi Organization, Inc.**
**Orythia, Inc.**
**OYSTER OASIS, INC.**
**Pantariste, Inc.**
**Pantone Projects, Inc.**
**Papaya Projects, Inc.**
**Parchment Principles, Inc.**
**Peach Projects, Inc.**
**Peanut Projects, Inc.**
**Pearoller Ltd**
**Penny Rose Solutions, Inc.**
**Pennycopper Trading, Inc.**
**Penthe Company**

**Persian Projects, Inc.**
**Persimmon Projects, Inc.**
**Pizza Projects, Inc.**
**Poppy Projects, Inc.**
**Portocale Projects, Inc.**
**Primrose Projects, Inc.**
**Pro Grade Products Ltd**
**Prothoe Limited**
**Pure Chimp Ltd**
**Radiant Orange, Inc.**
**Rissav Limited**
**Rose Bud Creations, Inc.**
**Rosewood Wish, Inc.**
**SafeRest Holdings, LLC**
**Salmon Solutions, Inc.**
**Sandcastle Days, Inc.**
**Sandpaper Solutions, Inc.**
**SANDSNAKE VENTURES, INC.**
**Sandstorm Solutions, Inc.**
**Sandy Leaf Farm, Ltd.**
**Sapphire Monkey, Inc.**
**Sasana Group Limited**
**Scarlet Solutions, Inc.**
**Scotch Solutions, Inc.**
**Scouse Ltd**
**Seashell Solutions, Inc.**
**Sherbert Solutions, Inc.**
**Shortbread Solutions, Inc.**
**Siberian Tiger Solutions, Inc.**
**Sockeye Strategies, Inc.**
**Soft Spice, Inc.**
**Spicy Solutions, Inc.**
**Starfish Solutions, Inc.**
**Strawflower Solutions, Inc.**
**Sundaze Blaze Solutions, Inc.**
**Sunflare Solutions, Inc.**
**Sunflower Saturnalia, Inc.**
**Sunkiss Solutions, Inc.**
**Sunny Operations, Inc.**
**Sunrise Martinis, Inc.**
**Sunrise Season, Inc.**
**Sweet Nectar Enterprises, Inc.**
**Sweet Potato Solutions, Inc.**
**Tangelo Tendencies, Inc.**
**Tangerine Ideas, Inc.**
**Tawny Tasks, Inc.**

**Tea Rose Risings, Inc.**
**Teal Monkey, Inc.**
**The NutriLock Company Pty Ltd**
**Thrasio Australia Holdings Pty Ltd**
**Thrasio Australia Import Pty Ltd**
**Thrasio Bermuda Holdings Limited**
**Thrasio Deutschland Holdings Gmbh**
**Thrasio Deutschland Services Gmbh**
**Thrasio E-Commerce (Shanghai) Co., Ltd.**
**Thrasio Global Cross-border E-Comerce**
**(Shenzhen) Co. Ltd.**
**Thrasio godo kaisha (Thrasio GK)**
**Thrasio Holdings, Inc.**
**Thrasio Hong Kong, Ltd.**
**Thrasio India Holdings, Inc.**
**Thrasio Intermediate Sub, LLC**
**Thrasio International Co. Limited**
**Thrasio International Holdings, Inc.**
**Thrasio LL Acquisitions, Inc.**
**Thrasio Malta Holdings Co. Limited**
**Thrasio Services, LLC**
**Thrasio Supply Chain (Suzhou) Co. Ltd.**
**Thrasio UK Holdings, Ltd**
**Thrasio Ventures N1, LLC**
**Thrasio Ventures Q1, LLC**
**Thrasio Ventures, Inc.**
**Thrasio, LLC**
**Tiger Affirmations, Inc.**
**Tiger Stripe Creations, Inc.**
**Tomato Tasks, Inc.**
**Topaz Traditions, Inc.**
**Tortilla Tasks, Inc.**
**Toxaris Limited**
**Traffic Cone Tuesdays, Inc.**
**Truverge International Ltd**
**Turmeric Transitions, Inc.**
**Wallaby42 Pty Ltd**
**WARM RED WONDERS, INC.**
**William Evans Retail Ltd**
**Zabba, Inc.**

**<u>Exhibit B</u>**

**Debtor Parties**

**Thrasio Holdings, Inc.**
**1 Thrasio One, Inc.**
**10 Thrasio Ten, Inc.**
**11 Thrasio Eleven, Inc.**
**12 Thrasio Twelve, Inc.**
**14 Thrasio Fourteen, Inc.**
**15 Thrasio Fifteen, Inc.**
**16 Thrasio Sixteen, Inc.**
**17 Thrasio Seventeen, Inc.**
**18 Thrasio Eighteen, Inc.**
**19 Thrasio Nineteen, Inc.**
**2 B Bountiful, Inc.**
**20 Thrasio Twenty, Inc.**
**21 Thrasio Twenty One, Inc.**
**22 Thrasio Twenty Two, Inc.**
**23 Thrasio Twenty Three, Inc.**
**24 Thrasio Twenty Four, Inc.**
**25 Thrasio Twenty Five, Inc.**
**3 Thrasio Three, Inc.**
**5 Thrasio Five, Inc.**
**6 Thrasio Six, Inc.**
**7 Thrasio Seven, Inc.**
**8 Thrasio Eight, Inc.**
**9 Thrasio Nine, Inc.**
**Acorn Creations, Inc.**
**AirOrb Ltd**
**Alloy Ideas, Inc.**
**Amber Ideas, Inc.**
**Amber Oasis, Inc.**
**Andromache, Inc.**
**Angor-Pet Thrasio Two, Inc.**
**Antiope, Corp.**
**Apple Affirmations, Inc.**
**Apricot Ideas, Inc.**
**Ash Developments, LLC**
**Assassin Bug Industries, Inc.**
**Attain Recruitment Ltd**
**Autumn Ideas, Inc.**
**Autumn Waves, Inc.**
**Bartstr Ltd**
**Basketball Beginning, Inc.**
**Beast Gear Limited**
**Bellezo.com Ltd**

**Biscotti Solutions, Inc.**
**Bittersweet Billows, Inc.**
**Bonfire Solutions, Inc.**
**Bronze Projects, Inc.**
**Burning Neon, Inc.**
**Burnt Summer Citrus, Inc.**
**Buttercup Creations, Inc.**
**Butterscotch Beginnings, Inc.**
**Cafe Casa, Inc.**
**Califia Company**
**California Poppy Projects, Inc.**
**Candlelit Creations, Inc.**
**Cantaloupe Creations Company**
**Caramel Creations, Inc.**
**Carnation Creations, Inc.**
**Carotene Consortium, Inc.**
**Carrot Solutions, Inc.**
**Cayenne Solutions, Inc.**
**Champagne Projects, Inc.**
**Charope, Inc.**
**Cheddar Creations, Inc.**
**Chestnut Creations, Inc.**
**Chili Clove, Inc.**
**Chili Flakes, Inc.**
**Chipshot LTD**
**Chrysanthemum Creations, Inc.**
**Cider Creations, Inc.**
**Cinnabar Creations, Inc.**
**Citrine Solutions, Inc.**
**Classy Mango, Inc.**
**Classy Tangerine, Inc.**
**Clementine Creations, Inc.**
**Clownfish Creations, Inc.**
**Comet Creations, Inc.**
**Copperhead Conspiracies, Inc.**
**Coral Chrome, Inc.**
**Corn Snake Surprises, Inc.**
**Crawfish Creations, Inc.**
**Daffodil Design, Inc.**
**Dahlia Dreams, Inc.**
**Dark Honey Design, Inc.**
**Dark Orange Design, Inc.**
**Daybreak Developments, Inc.**
**Daylily Dreams, Inc.**
**Discus Dreams, Inc.**
**DMD Group Inc**

**Dots for Spots Ltd**
**E & I Trading Ltd**
**E&L Enterprises Limited**
**ECOM HEIGHTS LLC**
**Emberglow Ideas, Inc.**
**Eurypyle, Inc.**
**Faint Orange Horizon, Inc.**
**Fall Foundations, Inc.**
**Fawn Foundations, Inc.**
**Foxy Creations, Inc.**
**Frosty Dream, Inc.**
**Fyer Tropics, Inc.**
**Ginger Cat Creations, Inc.**
**Ginger Creations, Inc.**
**Gingersnap Solutions, Inc.**
**Golden Gate Solutions, Inc.**
**Golden Kiwifruit Enterprises, Inc.**
**Goldfish Memories, Inc.**
**Green Cricket LTD**
**Habanero Pepper Projects, Inc.**
**Harley Orange, Inc.**
**Harvest Charm, Inc.**
**HiC-Cork Thrasio One Inc.**
**Hippolyte, Ltd.**
**Honey Sunset, Inc.**
**Ideal Monarch, Inc.**
**Ideastream Consumer Products, LLC**
**Influencer Ideas, Inc.**
**Ivory Ideas, Inc.**
**Jasper Gesture, Inc.**
**Jiminy LTD**
**Joss Solutions 2016 Limited**
**Jupiter Gesture, Inc.**
**Khaki Trips, Inc.**
**KingFisher Creations Inc.**
**Kitchen Tools Ltd**
**Koi Creations, Inc.**
**Lace Decisions, Inc.**
**Laranja Logistics, Inc.**
**Latte Logistics, Inc.**
**Leather Logistics, Inc.**
**Lemon Logistics, Inc.**
**Lemur Logistics, Inc.**
**Levita Holdings, LLC**
**Lionfish Logistics, Inc.**
**Lobster Logistics, Inc.**

**Magenta Peel Solutions, Inc.**
**Mahogany Movements Inc.**
**Malt Decisions, Inc.**
**Mango Movements, Inc.**
**Mango Wonder, Inc.**
**Maple Movements, Inc.**
**Marigold Creations, Inc.**
**Marmalade Mansions, Inc.**
**Marmalade Movements, Inc.**
**Marpesia, Co.**
**Mars Makers, Inc.**
**Mauve Monkey, Inc.**
**Melanippe, Inc.**
**Melon Movements, Inc.**
**Meteor Movements, Inc.**
**Mimosa Movements, Inc.**
**Modetro Retail Limited**
**Ochre Organization, Inc.**
**Old Rust Organization, Inc.**
**Orange Crush Organization, Inc.**
**Orange Fantasy, Inc.**
**Orange Hope, Inc.**
**Orange Margarita, Inc.**
**Orange Organization, Inc.**
**Orange Peach Projects, Inc.**
**Orange Peel Projects, Inc.**
**Orange Umbrella Creations, Inc.**
**Orangutan Organization, Inc.**
**Oranssi Organization, Inc.**
**Orythia, Inc.**
**Oyster Oasis, Inc.**
**Pantariste, Inc.**
**Pantone Projects, Inc.**
**Papaya Projects, Inc.**
**Parchment Principles, Inc.**
**Peach Projects, Inc.**
**Peanut Projects, Inc.**
**Pearoller LTD**
**Penny Rose Solutions, Inc.**
**Pennycopper Trading, Inc.**
**Penthe Company**
**Persian Projects, Inc.**
**Persimmon Projects, Inc.**
**Pizza Projects, Inc.**
**Poppy Projects, Inc.**
**Portocale Projects, Inc.**

**Primrose Projects, Inc.**
**Pro Grade Products Ltd**
**Prothoe Limited**
**Pure Chimp Ltd**
**Radiant Orange, Inc.**
**Rissav Limited**
**Rose Bud Creations, Inc.**
**Rosewood Wish, Inc.**
**SAFEREST HOLDINGS, LLC**
**Salmon Solutions, Inc.**
**Sandcastle Days, Inc.**
**Sandpaper Solutions, Inc.**
**Sandsnake Ventures, Inc.**
**Sandstorm Solutions, Inc.**
**Sandy Leaf Farm Ltd.**
**Sapphire Monkey, Inc.**
**Sasana Group Limited**
**Scarlet Solutions, Inc.**
**Scotch Solutions, Inc.**
**Scouse LTD**
**Seashell Solutions, Inc.**
**Sherbert Solutions, Inc.**
**Shortbread Solutions, Inc.**
**Siberian Tiger Solutions, Inc.**
**Sockeye Strategies, Inc.**
**Soft Spice, Inc.**
**Spicy Solutions, Inc.**
**Starfish Solutions, Inc.**
**Strawflower Solutions, Inc.**
**Sundaze Blaze Solutions, Inc.**
**Sunflare Solutions, Inc.**
**Sunflower Saturnalia, Inc.**
**Sunkiss Solutions, Inc.**
**Sunny Operations, Inc.**
**Sunrise Martinis, Inc.**
**Sunrise Season, Inc.**
**Sweet Nectar Enterprises, Inc.**
**Sweet Potato Solutions, Inc.**
**Tangelo Tendencies, Inc.**
**Tangerine Ideas, Inc.**
**Tawny Tasks, Inc.**
**Tea Rose Risings, Inc.**
**Teal Monkey, Inc.**
**Thrasio Australia Holdings Pty Ltd**
**Thrasio Intermediate Sub, LLC**
**Thrasio Services, LLC**

**Thrasio UK Holdings, Ltd**
**Thrasio, LLC**
**Tiger Affirmations, Inc.**
**Tiger Stripe Creations, Inc.**
**Tomato Tasks, Inc.**
**Topaz Traditions, Inc.**
**Tortilla Tasks, Inc.**
**Toxaris Limited**
**Traffic Cone Tuesdays, Inc.**
**Truverge International Ltd**
**Turmeric Transitions, Inc.**
**Warm Red Wonders, Inc.**
**William Evans Retail Ltd**
**Zabba, Inc.**

[*Signature Pages Omitted for Purposes of Filing*]

## **EXHIBIT C**

### **Restructuring Term Sheet**

# THRASIO HOLDINGS, INC.

## RESTRUCTURING TERM SHEET

## FEBRUARY 27, 2024

THIS RESTRUCTURING TERM SHEET (TOGETHER WITH ALL ANNEXES, SCHEDULES, AND EXHIBITS HERETO, THIS "RESTRUCTURING TERM SHEET") DESCRIBES THE PRINCIPAL TERMS AND CONDITIONS OF A RESTRUCTURING TRANSACTION FOR THRASIO HOLDINGS, INC. ("THRASIO") AND CERTAIN OF ITS SUBSIDIARIES AND AFFILIATES (TOGETHER WITH THRASIO, THE "COMPANY") THAT WILL BE EFFECTUATED THROUGH VOLUNTARY PREARRANGED CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (THE "CHAPTER 11 CASES") IN THE BANKRUPTCY COURT, ON THE TERMS, AND SUBJECT TO THE CONDITIONS, SET FORTH IN THE RESTRUCTURING SUPPORT AGREEMENT (TOGETHER WITH THE EXHIBITS AND SCHEDULES ATTACHED TO SUCH AGREEMENT, INCLUDING THIS RESTRUCTURING TERM SHEET, EACH AS MAY BE AMENDED, RESTATED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH THE TERMS THEREOF, THE "RESTRUCTURING SUPPORT AGREEMENT").

THIS RESTRUCTURING TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL COMPLY WITH ALL APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.

CAPITALIZED TERMS USED BUT NOT INITIALLY DEFINED IN THIS RESTRUCTURING TERM SHEET SHALL HAVE THE MEANING HEREINAFTER ASCRIBED TO SUCH TERMS, OR IF NOT DEFINED IN THIS RESTRUCTURING TERM SHEET, SUCH TERMS SHALL HAVE THE MEANING ASCRIBED TO SUCH TERMS IN THE RESTRUCTURING SUPPORT AGREEMENT.

THIS RESTRUCTURING TERM SHEET IS FOR DISCUSSION PURPOSES ONLY AND DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.

| **GENERAL PROVISIONS** |
| --- |

| **Company Parties** | A list of the Company Parties is attached to the Restructuring Support Agreement as **Exhibit A**. |
| --- | --- |
| **Debtors** | A list of Debtors is attached to the Restructuring Support Agreement as **Exhibit B**. |
| **Proposed Filing Date and Venue** | No later than February 27, 2024 (the "**Petition Date**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"). |
| **Chapter 11 Plan** | The Restructuring Transactions shall be effectuated pursuant to a prearranged plan of reorganization (the "**Plan**"), which shall be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Lenders and otherwise consistent in all material respects with the Restructuring Support Agreement and this Restructuring Term Sheet.<br><br>On the Plan Effective Date, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described in this Restructuring Term Sheet in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to among the Reorganized Debtors, the Required Consenting Lenders, and the Holder of such Allowed Claim or Allowed Interest.<br><br>For the avoidance of doubt, any action required to be taken by the Debtors on the Plan Effective Date pursuant to this Restructuring Term Sheet may be taken on the Plan Effective Date or as soon as is reasonably practicable thereafter. |
| **Existing Capital Structure** | Revolving Credit Facility:  consisting of the $65,000,000 first lien revolving credit facility (the "**Revolving Credit Facility**") pursuant to that certain credit agreement (as, restated, supplemented, or otherwise modified from time to time, including on May 28, 2021, September 17, 2021, June 30, 2023, and September 29, 2023, the "**First Lien Credit Agreement**"), by and between Thrasio Intermediate Sub, LLC, as parent guarantor, Thrasio, LLC, as borrower ("**Borrower**"), those term lenders party thereto (the "**Term Loan Lenders**") and those revolving lenders party thereto (the "**RCF Lenders,**" and together with the Term Loan Lenders, the "**First Lien Lenders**"), Royal Bank of Canada and JPMorgan Chase Bank, N.A as Issuing Banks (as defined in the First Lien Credit Agreement) and Royal Bank of Canada as administrative agent (together with any successor agent, the "**Administrative Agent**"). As of the date hereof, approximately $62,500,000 in principal amount and $2,500,000 of letters of credit are outstanding (collectively, the "**RCF Loans**").<br><br>Initial Term Facility:  consisting of the $250,000,000 initial term loan facility (the "**Initial Term Facility**") pursuant to the First Lien Credit Agreement.  As of the date hereof, the Initial Term Facility is fully drawn and $250,000,000 in principal amount is outstanding under the Initial Term Facility. |

<u>Initial Delayed Draw Term Facility</u>: consisting of the $165,000,000 delayed draw term loan facility (the "**Initial Delayed Draw Term Facility**"). As of the date hereof,  the Initial Delayed Draw Term Facility is fully drawn and $165,000,000 in principal amount is outstanding under the Initial Delayed Draw Term Facility.

<u>Incremental Delayed Draw Term Facility</u>:  the First Lien Credit Agreement permits the Borrower to add one or more new classes of delayed draw term loan facilities pursuant to an incremental facility amendment (such facility, the "**Incremental Delayed Draw Term Facility**" and, together with the Initial Delayed Draw Term Facility and the Initial Term Facility, the "**Term Loans**"). As of the date hereof, $325,000,000 in principal amount is outstanding under the Incremental Delayed Draw Term Facility.

<u>Series X Redeemable Preferred Stock</u>:  As of the date hereof, approximately 500,000 shares of "**Series X Redeemable Preferred Stock**" are outstanding. The Series X Redeemable Preferred Stock is not convertible into Common Stock.

<u>Series D Preferred Stock</u>:   As of the date hereof, approximately 53,086,366 shares of "**Series D Preferred Stock**" are outstanding.  Unless further adjusted, including for certain anti-dilution adjustments, each share of Series D Preferred Stock is currently convertible into one (1) share of Common Stock at a conversion price of $20.250019 per share of Series D Preferred Stock.

<u>Series C Preferred Stock</u>:  As of the date hereof, approximately 94,803,814 shares of "**Series C Preferred Stock**," inclusive of 55,933,930 shares of "**Series C-1 Preferred Stock**," 30,686,751 shares of "**Series C-2 Preferred Stock**" and 8,183,133 shares of "**Series C-3 Preferred Stock**," respectively, are outstanding.   Unless further adjusted, including for certain anti-dilution adjustments, each share of Series C-1 Preferred Stock, Series C-2 Preferred Stock, and Series C-3 Preferred Stock is currently convertible into 1 share of Common Stock at a conversion price of $4.6479810 per share of Series C-1 Preferred Stock, $8.146838 per share of Series C-2 Preferred Stock, and $12.220257 per share of Series C-3 Preferred Stock.  50% of the shares of the Series B Preferred Stock (as defined below) are *pari passu* with the Series C Preferred Stock in right of payment.

<u>Series B Preferred Stock</u>:   As of the date hereof, approximately 22,840,130 shares of "**Series B Preferred Stock**" are outstanding.  Unless further adjusted, including for certain anti-dilution adjustments, each share of Series B Preferred Stock is currently convertible into one (1) share of Common Stock at a conversion price of $3.1845930 per share of Series B Preferred Stock.

<u>Series A Preferred Stock</u>:  As of the date hereof, approximately 17,496,600 shares of "**Series A Preferred Stock**" are outstanding. Unless further adjusted, including for certain anti-dilution adjustments, each share of Series A Preferred Stock is currently convertible into one (1) share of Common Stock at a conversion price of $0.8567931 per share of Series A Preferred Stock.

<u>Series Seed Preferred Stock</u>:   As of the date hereof, approximately 57,495,520 shares of "**Series Seed Preferred Stock**" are outstanding. Unless further adjusted, including for certain anti-dilution adjustments, each share of Series Seed Preferred Stock is currently convertible into one (1) share of

| | |
|---|---|
| | Common Stock at a conversion price of $0.10 per share of Series Seed Preferred Stock. <br><br> <u>Common Stock</u>:  As of the date hereof, approximately 56,770,393 shares of "**Common Stock**" are outstanding. |
| **Definitive Documents** | This Restructuring Term Sheet is illustrative, and any definitive or binding agreement shall be subject to the Definitive Documents, which Definitive Documents shall be consistent with the terms of this Restructuring Term Sheet and the Restructuring Support Agreement. <br><br> Any documents contemplated by this Restructuring Term Sheet, including any Definitive Documents, that remain the subject of negotiation as of the Agreement Effective Date shall be subject to the rights and obligations set forth in <u>Section 3</u> of the Restructuring Support Agreement.  Failure to reference such rights and obligations as it relates to any document referenced in this Restructuring Term Sheet shall not impair such rights and obligations. |
| **Tax Structure** | To the extent practicable, the Restructuring Transactions contemplated by this Restructuring Term Sheet will be structured so as to obtain the most beneficial tax structure for the Company Parties and the Consenting Lenders. |
| **DIP Financing** | The Company shall seek approval of a $360 million super-senior secured debtor-in-possession financing facility (the "**DIP Facility**," all obligations arising thereunder, the "**DIP Obligations**," the claims related thereto, the "**DIP Facility Claims**," and the lenders thereunder, the "**DIP Lenders**").  The DIP Facility shall be consistent with the term sheet (the "**DIP Term Sheet**") attached hereto as **Exhibit 2**, which shall be acceptable to the DIP Agent, the DIP Lenders, and the Company Parties. <br><br> The DIP Facility shall consist of (i) "new money" term loans in an aggregate principal amount equal to $90 million, which shall be converted into the First-Out Take-Back Loan Facility upon the Plan Effective Date and (ii) a "roll-up" in the amount of $270 million of the Term Loans, which shall be converted into the Second-Out Take-Back Loan Facility upon the Plan Effective Date (the "**Roll-Up**" and collectively, (the "**DIP Loans**").  The DIP Loans shall be funded in accordance with the terms set forth in the DIP Term Sheet. <br><br> Participation in the DIP Facility shall be offered on a ratable basis to each First Lien Lender based on such First Lien Lender's *pro rata* holdings of loans outstanding under the First Lien Credit Agreement.  For the avoidance of doubt, "loans" under the First Lien Credit Agreement shall include both the RCF Loans (including letter of credit exposure) and the Term Loans. |

|  | The DIP Facility shall be backstopped by certain members of the ad hoc group of lenders under the First Lien Credit Agreement represented by Gibson Dunn & Crutcher LLP  and Evercore, LLC (the "**Ad Hoc Group**," and each solely in their capacity as DIP Lenders, and collectively, the "**DIP Backstop Parties**").   In consideration for backstopping the DIP Facility, the DIP Backstop Parties will receive, on a *pro rata* basis, the Backstop Payment. |
|  | The proceeds of the DIP Facility will be used, among other things, (i) for working capital and general corporate purposes, (ii) to fund the administration of the Chapter 11 Cases, each solely in accordance with a budget reasonably acceptable to the DIP Lenders, and (iii) to fund the carve-out (the form of which is attached to the DIP Term Sheet as <u>Annex A</u>). |
|  | Holders of Allowed DIP Facility Claims shall receive:  (i) their *pro rata* share of the First-Out Take-Back Debt Facility, (ii) their *pro rata* share of the Second-Out Take-Back Debt Facility, and (iii) their *pro rata* share of 40% of New Common Stock, subject to dilution only by the Management Incentive Plan (the "**DIP Exit Fee**"), pursuant to the terms of and approval of the Confirmation Order. |
| **Exit Financing** | On the Plan Effective Date, Reorganized Thrasio shall enter into the following Exit Facilities:  (i) a senior secured, first lien "first-out" term loan facility  (the "**First-Out  Take-Back  Debt  Facility**"),  and  (ii) a senior secured, first lien "second-out" term loan facility which shall consist of a $270 million roll-up of existing First Lien Claims, (the "**Second-Out Take-Back Debt Facility**" and, together with the First-Out Take-Back Debt Facility, the "**Exit Facilities**").  The terms, conditions, structure, and principal amount of the Exit Facilities shall be in form and substance acceptable to the Required Consenting Lenders and the Company  Parties  consistent  in  all  material  respects  with  the Restructuring Support Agreement and this Restructuring Term Sheet. |
| **Backstop Commitment** | In accordance with Section 5.02 of the Restructuring Support Agreement, the DIP Backstop Parties will agree to backstop the full amount of the DIP Loans.  In consideration for backstopping the DIP Facility the DIP Backstop Parties shall receive their *pro rata* share of an amount of (i) Cash in the aggregate amount of 7.5% of the New Money Loans (as defined in the DIP Term Sheet) or (ii) solely upon confirmation of the Plan, 10% of New Common Stock, subject to dilution only from the Management Incentive Plan.  The Backstop Commitment shall be fully earned and approved on a final basis upon the entry of the Interim Order, but payable pursuant to the Confirmation Order upon the occurrence of the Plan Effective Date. |

| **New Common Stock** | On the Plan Effective Date, Reorganized Thrasio shall issue a single class of common equity interests (the "**New Common Stock**").  The New Common Stock shall be distributed in accordance with this Restructuring Term Sheet and the Plan. |
|---|---|
| **Cash on Hand** | Cash distributions, in accordance with this Restructuring Term Sheet and the Plan, shall be made from Cash on hand as of the Plan Effective Date. |

| TREATMENT OF CLAIMS AND INTERESTS | | | |
|---|---|---|---|
| Class No. | Type of Claim | Treatment | Impairment/ Voting |
| | | Unclassified Non-Voting Claims | |
| N/A | DIP Facility Claims | On the Plan Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, (i) each Holder of an Allowed DIP Facility Claim shall receive their *Pro Rata* share of:<br><br>(a) the First-Out Take-Back Debt Facility;<br><br>(b) the Second-Out Take-Back Debt Facility; and<br><br>(b) 40% of the New Common Stock. | N/A |
| N/A | Administrative Claims | On the Plan Effective Date or as soon as reasonable practicable thereafter, except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall receive treatment in a manner consistent with section 1129(a)(2) of the Bankruptcy Code. | N/A |
| N/A | Priority Tax Claims | On the Plan Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |

| Classified Claims and Interests of the Debtors | | | |
|---|---|---|---|
| **Class 1** | **Other Secured Claims** | On the Plan Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed prepetition secured claim other than a First Lien Claim (each, an "**Other Secured Claim**") agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtors or Reorganized Debtors, as applicable: either (i) payment in full in Cash of the unpaid portion of its Other Secured Claim on the Plan Effective Date or as soon as reasonably practicable thereafter (or if payment is not then due, shall be paid in accordance with its terms), (ii) Reinstatement, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | Unimpaired; Deemed to Accept |
| **Class 2** | **Other Priority Claims** | On the Plan Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired; Deemed to Accept. |
| **Class 3** | **First Lien Claims** | On the Plan Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of a First Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed First Lien Claim, each Holder of an Allowed First Lien Claim shall receive its *Pro Rata* share of 100% of the New Common Stock, subject to dilution by (i) the DIP Exit Fee, (ii) the Backstop Payment, and (iii) the Management Incentive Plan. | Impaired; Entitled to Vote. |

| Class 4 | **General Unsecured Claims** | On the Plan Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its *Pro Rata* share of the GUC Recovery. | Impaired; Entitled to Vote. |
|---|---|---|---|
| Class 5 | **Series X Redeemable Preferred Stock Interests** | On the Plan Effective Date, or as soon as reasonably practicable thereafter, all Series X Redeemable Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series X Redeemable Preferred Stock Interests will receive a distribution under the Plan. | Impaired; Deemed to Reject |
| Class 6 | **Series D Preferred Stock Interests** | On the Plan Effective Date, or as soon as reasonably practicable thereafter, all Series D Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series D Preferred Stock Interests will receive a distribution under the Plan. | Impaired; Deemed to Reject. |
| Class 7 | **Series C Preferred Stock Interests** | On the Plan Effective Date, or as soon as reasonably practicable thereafter, all Series C Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series C Preferred Stock Interests will receive a distribution under the Plan. | Impaired; Deemed to Reject. |
| Class 8 | **Series B Preferred Stock Interests** | On the Plan Effective Date, or as soon as reasonably practicable thereafter, all Series B Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series B Preferred Stock Interests will receive a distribution under the Plan. | Impaired; Deemed to Reject. |

| Class 9 | **Series A Preferred Stock Interests** | On the Plan Effective Date, or as soon as reasonably practicable thereafter, all Series A Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series A Preferred Stock Interests will receive a distribution under the Plan. | Impaired; Deemed to Reject. |
| --- | --- | --- | --- |
| Class 10 | **Series Seed Preferred Stock Interests** | On the Plan Effective Date, or as soon as reasonably practicable thereafter, all Series Seed Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series Seed Preferred Stock Interests will receive a distribution under the Plan. | Impaired; Deemed to Reject. |
| Class 11 | **Common Stock Interests** | On the Plan Effective Date, or as soon as reasonably practicable thereafter, all Common Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Common Stock Interests will receive a distribution under the Plan. | Impaired; Deemed to Reject. |
| Class 12 | **Intercompany Claims** | On the Plan Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Intercompany Claim, Allowed Intercompany Claims shall, in a manner consistent with the Restructuring Transactions Memorandum, as applicable, be either:  (i) Reinstated;  or (ii) distributed, contributed, set off, cancelled, and released without any distribution on account of such Claims, or otherwise addressed at the option of the Reorganized Debtors. | Unimpaired; Deemed to Accept / Impaired; Deemed to Reject. |
| Class 13 | **Intercompany Interests** | On the Plan Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Intercompany Interest, Allowed Intercompany Interests shall, in a manner consistent with the Restructuring Transactions Memorandum, as applicable, be either:     (i) Reinstated;  or | Unimpaired; Deemed to Accept / Impaired; Deemed to Reject. |

| | | (ii) cancelled and released without any distribution on account of such Interests. | |
|---|---|---|---|

| **MILESTONES** |
|---|
| 1. No later than February 27, 2024, the Debtors shall have commenced the Chapter 11 Cases. |
| 2. No later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the interim DIP Order. |
| 3. No later than seven (7) days after the Petition Date, the Debtors shall have Filed the Bar Date Motion and the Solicitation Materials. |
| 4. No later than thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered the Bar Date Order. |
| 5. No later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order. |
| 6. No later than forty (40) days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order. |
| 7. No later than eighty-five (85) days after the Petition Date, the Bankruptcy Court shall have held a hearing to consider entry of the Confirmation Order. |
| 8. No later than ninety (90) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order. |
| 9. No later than one-hundred (100) days after the Petition Date, the Plan Effective Date shall have occurred. |

| **GENERAL PROVISIONS REGARDING THE PLAN** | |
|---|---|
| **Subordination** | Except as otherwise set forth in this Restructuring Term Sheet and the Restructuring Support Agreement, the classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Restructuring Term Sheet or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled, and the Debtors' obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Definitive Documents, the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services that employees of the Debtors have performed prior to the Plan Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (c) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Plan Effective Date. |

| | |
|---|---|
| **Survival of Indemnification Provisions and D&O Insurance[4]** | Except as expressly provided herein, all indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the Indemnified Parties shall be reinstated and shall survive the Plan Effective Date on terms no less favorable to the Indemnified Parties than the indemnification provisions in place prior to the Plan Effective Date.<br><br>In addition, after the Plan Effective Date, the Company Parties will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Plan Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Plan Effective Date. |
| **Management Incentive Plan** | The New Board shall, following the Plan Effective Date, adopt a new management incentive plan (the "**Management Incentive Plan**"), in form and substance reasonably acceptable to the Company Parties and the Required Consenting Lenders, reserving up to [●]% of the New Common Stock, with structure, awards and terms of the Management Incentive Plan to be determined by the New Board. |
| **Employment Obligations and Programs** | Pursuant to the Restructuring Support Agreement and this Restructuring Term Sheet, the Consenting Lenders consent to the continuation of the Company Parties' wages, compensation, and benefits programs according to existing terms and practices, as of the Agreement Effective Date, including executive compensation programs and any motions in the Bankruptcy Court for approval thereof. On the Plan Effective Date, the Debtors shall assume all employment agreements or letters, severance agreements, or other agreements entered into with current and former employees on or before the date of the Restructuring Support Agreement (or thereafter with the consent of the Required Consenting Lenders other than with respect to ordinary course hiring needs). |

---

[4]    The survival of the indemnification obligations contained in this Restructuring Term Sheet is subject to the ongoing Independent Investigation.

| | |
|---|---|
| **Retained Causes of Action** | The Reorganized Debtors shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action released by the Debtors pursuant to the release and exculpation provisions outlined in this Restructuring Term Sheet. |
| **Releases** | Subject to Sections 3 and Section 13 of the Restructuring Support Agreement, the Plan and the Confirmation Order shall contain the exculpation provisions and releases set forth in **Exhibit 3** attached hereto. |
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from registration under the Securities Act and applicable law. |
| **Governance** | On the Plan Effective Date, the New Board shall be appointed in accordance with the terms of the New Organizational Documents, and the identity of the New Board shall be set forth in the Plan Supplement to the extent known at the time of Filing. <br><br> The New Organizational Documents, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with the Restructuring Support Agreement, this Restructuring Term Sheet, the Plan Supplement, and section 1123(a)(6) of the Bankruptcy Code, and shall be in form and substance satisfactory to the Company Parties and the Required Consenting Lenders. |
| **Conditions Precedent to the Plan Effective Date** | The following shall be conditions to the Plan Effective Date (the "**Conditions Precedent to the Plan Effective Date**"): <br><br> (i) the Restructuring Support Agreement shall have not been terminated and shall remain in full force and effect; <br><br> (ii) there shall not have been instituted or threatened or be pending any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) (or there shall not have been any material adverse development to any action, application, claim, counterclaim, or proceeding currently instituted, threatened or pending) before or by any court, governmental, regulatory, or administrative agency or instrumentality, domestic or foreign, or by any other Person, domestic or foreign, in connection with the Restructuring Transactions that, in the reasonable judgment of the Company Parties and the Required Consenting Lenders, would prohibit, prevent, or restrict consummation of the Restructuring Transactions; <br><br> (iii) each document or agreement constituting the applicable Definitive Documents shall have been executed and/or effectuated, shall be in |

form and substance consistent with the Restructuring Support Agreement, and any conditions precedent related thereto or contained therein, shall have been satisfied prior to or contemporaneously with the occurrence of the Plan Effective Date or otherwise waived;

(iv)    the Company Parties shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

(v)     the New Organizational Documents shall have been executed and/or effectuated, shall be in form and substance consistent with the Restructuring Support Agreement, and any conditions precedent related thereto, shall have been satisfied prior to or contemporaneously with the occurrence of the Plan Effective Date or otherwise waived;

(vi)    all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses in full after the Plan Effective Date have been placed in the professional fee escrow account;

(vii)   all accrued and unpaid Transaction Expenses shall have been paid in full accordance with the Restructuring Support Agreement;

(viii)  the Bankruptcy Court shall have entered the Confirmation Order and such order shall be a Final Order;

(ix)    there shall be no Events of Default under the DIP Credit Agreement

(x)     all conditions precedent to the issuance or incurrence of the Exit Facilities, shall have been satisfied or duly waived, and the Exit Facilities, including all documentation related thereto, shall be in form and substance reasonably satisfactory to the Required Consenting Lenders and the Company Parties and in effect;

(xi)    the New Common Stock shall have been issued by Reorganized Thrasio;

(xii)   to the extent not otherwise addressed herein, all actions, documents, and agreements necessary to implement and consummate the Restructuring Transactions shall have been effected and executed, and shall be in form and substance consistent with the Restructuring Support Agreement and Restructuring Term Sheet or otherwise reasonably acceptable to the Company Parties and the Required Consenting Lenders;[5]

(xiii)  all conditions denominated "Closing Conditions" in the Plan shall    have    been    satisfied,    waived,    or    satisfied

---

[5]    The parties shall work in good faith to identify any other documents included in this subpart (xi) before the commencement of solicitation.

| | |
|---|---|
| | contemporaneously with the occurrence of the Plan Effective Date; and |
| | (xiv) the Company Parties shall have otherwise substantially consummated the Restructuring Transactions, and all transactions contemplated herein, in a manner consistent in all respects with the Restructuring Support Agreement and the Plan. |
| **Waiver of Conditions Precedent to the Plan Effective Date** | The Conditions Precedent to the Plan Effective Date may not be waived without the express prior written consent (which may be via email) of the Debtors and the Required Consenting Lenders, which waiver shall be effective without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan. |

## EXHIBIT 1

**Definitions**

| TERM | DEFINITION |
|---|---|
| **Ad Hoc Group** | As defined in this Restructuring Term Sheet. |
| **Administrative Agent** | As defined in this Restructuring Term Sheet. |
| **Administrative Claim** | A Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code. |
| **Affiliate** | As defined in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code. |
| **Agreement Effective Date** | The date on which the conditions set forth in <u>Section 2</u> of the Restructuring Support Agreement have been satisfied or waived by the appropriate Party or Parties in accordance with the Restructuring Support Agreement. |
| **Allowed** | As to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors may affirmatively determine to deem unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law.  "**Allow**," "**Allowing**," and "**Allowance**" shall have correlative meanings.<br><br>On the Plan Effective Date, the First Lien Claims shall be Allowed in the aggregate principal amount of $[●]. |
| **Backstop Payment** | As defined in this Restructuring Term Sheet. |
| **Bankruptcy Code** | Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended. |
| **Bankruptcy Court** | As defined in this Restructuring Term Sheet. |
| **Bankruptcy Rules** | The Federal Rules of Bankruptcy Procedure. |
| **Bar Date** | Collectively, the dates established by the Bankruptcy Court by which Proofs of Claim must be Filed pursuant to an order entered by the Bankruptcy Court. |

| **TERM** | **DEFINITION** |
|---|---|
| **Bar Date Motion** | The motion seeking approval of the Bar Date. |
| **Bar Date Order** | The order approving the Bar Date. |
| **BlackRock Consenting Creditors** | All funds and accounts that are managed by BlackRock Capital Investment Advisors, LLC or its affiliates that are signatories to the Restructuring Support Agreement. |
| **Borrower** | As defined in this Restructuring Term Sheet. |
| **Business Day** | Any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York. |
| **Cash** | Legal tender of the United States of America. |
| **Causes of Action** | Any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws. |
| **Chapter 11 Cases** | As defined in this Restructuring Term Sheet. |
| **Claim** | As defined in the Restructuring Support Agreement. |
| **Common Stock** | As defined in this Restructuring Term Sheet. |
| **Common Stock Interest** | Any share or interest of Common Stock |
| **Company** | As defined in this Restructuring Term Sheet. |
| **Company Parties** | As defined in the Restructuring Support Agreement. |

| **TERM** | **DEFINITION** |
|---|---|
| **Conditions Precedent to the Plan Effective Date** | As defined in this Restructuring Term Sheet. |
| **Confirmation** | As defined in the Restructuring Support Agreement. |
| **Confirmation Date** | As defined in the Restructuring Support Agreement. |
| **Confirmation Order** | As defined in the Restructuring Support Agreement. |
| **Consenting Lenders** | The Consenting RCF Lenders and the Consenting Term Lenders. |
| **Consenting RCF Lenders** | As defined in the Restructuring Support Agreement. |
| **Consenting Term Lenders** | As defined in the Restructuring Support Agreement. |
| **Consummation** | The occurrence of the Plan Effective Date. |
| **Debtors** | As defined in the Restructuring Support Agreement. |
| **Definitive Documents** | As defined in the Restructuring Support Agreement. |
| **DIP Agent** | Wilmington Savings Fund Society, FSB, in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, and any successors and permitted assigns, in such capacity. |
| **DIP Backstop Party** | As defined in this Restructuring Term Sheet. |
| **DIP Credit Agreement** | As defined in this Restructuring Term Sheet. |
| **DIP Exit Fee** | As defined in this Restructuring Term Sheet. |
| **DIP Facility** | As defined in this Restructuring Term Sheet. |
| **DIP Facility Claims** | Claims arising on account of a DIP Loan. |
| **DIP Interim Order** | Any order (and all exhibit and schedules thereto, including any budget), entered by the Bankruptcy Court on an interim basis (i) approving the DIP Facility, the DIP Credit Agreement, and the DIP Motion; (ii) authorizing the Debtors' use of Cash Collateral; and (iii) providing for adequate protection of secured creditors. |
| **DIP Lenders** | As defined in this Restructuring Term Sheet. |
| **DIP Loans** | As defined in this Restructuring Term Sheet. |
| **DIP Obligations** | As defined in this Restructuring Term Sheet. |

| **TERM** | **DEFINITION** |
|---|---|
| **DIP Order** | As defined in the Restructuring Support Agreement. |
| **DIP Term Sheet** | As defined in this Restructuring Term Sheet. |
| **Disclosure Statement** | As defined in the Restructuring Support Agreement. |
| **Disclosure Statement Order** | As defined in the Restructuring Support Agreement. |
| **Disinterested Directors** | As defined in the Restructuring Support Agreement. |
| **Entity** | As defined in the Restructuring Support Agreement. |
| **Estate** | The estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case. |
| **Exculpated Parties** | As defined in **Exhibit 3**. |
| **Exit Facilities** | As defined in this Restructuring Term Sheet. |
| **File, Filed, or Filing** | File, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases. |
| **Final Order** | An order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; _provided_ that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order. |
| **First Lien Claims** | As defined in the Restructuring Support Agreement. |
| **First Lien Credit Agreement** | As defined in this Restructuring Term Sheet. |

| **TERM** | **DEFINITION** |
|---|---|
| **First Lien Credit Documents** | As defined in the Restructuring Support Agreement. |
| **First Lien Lenders** | As defined in this Restructuring Term Sheet. |
| **First-Out Take-Back Debt Facility** | As defined in this Restructuring Term Sheet. |
| **General Unsecured Claim** | Any unsecured Claim, including (x) any deficiency claim held by any First Lien Lenders on account of the First Lien Claims and (y) and any Claim held by an ordinary course trade vendor of the Debtors against any of the Debtors on account of ordinary course goods and/or services provided to any of the Debtors, against a Debtor that is not (i) a DIP Facility Claim, (ii) an Administrative Claim, (iii) a Priority Tax Claim, (iv) an Other Secured Claim, (v) an Other Priority Claim, (vi) a First Lien Claim, (vii) an Intercompany Claim, (viii) a Series X Redeemable Preferred Stock Interest, (ix) a Series D Preferred Stock Interest, (x) a Series C Preferred Stock Interest, (xi) a Series B Preferred Stock Interest, (xi) a Series A Preferred Stock Interest, or (xiii) a Series Seed Preferred Stock Interest and (z) any Claim arising from or related to any indemnification provision that is not Reinstated. |
| **Governance Documents** | Documents including customary provisions for transactions of this nature including but not limited to: demand, piggy-back and S-3 registration rights; information and inspection rights; preemptive rights; rights of first refusal, co-sale and drag-along protections and obligations; customary non-financial affirmative and negative covenants; free transferability; and indemnification (all on terms satisfactory to the Required Consenting Lenders). |
| **Governmental Unit** | As defined in section 101(27) of the Bankruptcy Code. |
| **GUC Recovery** | $250,000. |
| **Holder** | An Entity holding a Claim against or an Interest in any Debtor, as applicable. |
| **Incremental Delayed Draw Term Facility** | As defined in this Restructuring Term Sheet. |
| **Indemnified Parties** | All current and former directors and officers, and current and former managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company Parties, as applicable. |
| **Independent Investigation** | That certain investigation undertaken by the Disinterested Directors, as more fully described in the Disclosure Statement. |

| **TERM** | **DEFINITION** |
|---|---|
| **Initial Delayed Draw Term Facility** | As defined in this Restructuring Term Sheet. |
| **Initial Term Facility** | As defined in this Restructuring Term Sheet. |
| **Intercompany Claim** | Any Claim against a Company Party held by another Company Party. |
| **Intercompany Interest** | Any Interest in a Debtor held by another Debtor. |
| **Interest** | Collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement). |
| **Issuing Banks** | As defined in the First Lien Credit Agreement. |
| **Laws** | Any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court). |
| **Lien** | As defined in section 101(37) of the Bankruptcy Code. |
| **Management Incentive Plan** | As defined in this Restructuring Term Sheet. |
| **New Board** | The board of directors of the Reorganized Debtors. |
| **New Common Stock** | As defined in this Restructuring Term Sheet. |
| **New Organizational Documents** | The Governance Documents and any organizational and governance documents for the Reorganized Debtors and its subsidiaries and Affiliates, including, without limitation, certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements (or equivalent governing documents), as applicable. The New Organizational Documents shall include terms necessary for each investor to make its investment in the Company in compliance with all legal and regulatory requirements. |
| **Other Priority Claim** | Any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |

| **TERM** | **DEFINITION** |
|---|---|
| **Other Secured Claim** | Any secured claim that is not a DIP Facility Claim or a First Lien Claim. |
| **Party or Parties** | As defined in the Restructuring Support Agreement. |
| **Person** | As defined in the Restructuring Support Agreement. |
| **Petition Date** | As defined in this Restructuring Term Sheet. |
| **Plan** | As defined in this Restructuring Term Sheet. |
| **Plan Effective Date** | The date that is the first Business Day after the Confirmation Date on which all Conditions Precedent to the Plan Effective Date have been satisfied or waived in accordance with the Plan. |
| **Plan Supplement** | As defined in the Restructuring Support Agreement. |
| **Preferred Equity Interests** | Collectively, all outstanding shares of preferred stock, including, for the avoidance of doubt, the Series Seed Preferred Stock, the Series A Preferred Stock, the Series B Preferred Stock, the Series C Preferred Stock, the Series D Preferred Stock, and the Series X Preferred Stock, each as defined in the Restructuring Term Sheet. |
| **Preferred Equity Documents** | Any and all documents required to implement, issue, and distribute the Series Seed Preferred Stock, Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, and Series X Preferred Stock. |
| **Priority Tax Claims** | Any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. |
| **Pro Rata** | The proportion that an Allowed Claim or Allowed Interest in a particular class bears to the aggregate amount of all Allowed Claims or Allowed Interests in that class. |
| **Proof of Claim** | A proof of claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable Bar Date as established by the Court. |
| **RCF Lenders** | As defined in this Restructuring Term Sheet. |
| **RCF Loans** | As defined in this Restructuring Term Sheet. |
| **Reinstatement or Reinstated** | With respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| **Related Party** | As defined in **Exhibit 3**. |

| TERM | DEFINITION |
|---|---|
| **Released Parties** | As defined in **Exhibit 3**. |
| **Releasing Parties** | As defined in **Exhibit 3**. |
| **Reorganized Debtor** | Thrasio, and any Debtors, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto, and including any entities establish to acquire all or a portion of the assets of Thrasio and/or its direct and indirect subsidiaries. |
| **Reorganized Thrasio** | Thrasio as reorganized pursuant to and under the Plan, including any successor thereto or any entity established to acquire, directly or indirectly, all or a portion of the assets of Thrasio and/or its direct and indirect subsidiaries. |
| **Required Consenting Lenders** | As defined in the Restructuring Support Agreement. |
| **Restructuring Support Agreement** | As defined in this Restructuring Term Sheet. |
| **Restructuring Transactions** | As defined in the Restructuring Support Agreement. |
| **Revolving Credit Facility** | As defined in this Restructuring Term Sheet. |
| **Second-Out Take-Back Debt Facility** | As defined in this Restructuring Term Sheet. |
| **Series A Preferred Stock** | As defined in this Restructuring Term Sheet. |
| **Series A Preferred Stock Interest** | Any share or interest of Series A Preferred Stock. |
| **Series B Preferred Stock** | As defined in this Restructuring Term Sheet. |
| **Series B Preferred Stock Interest** | Any share or interest of Series B Preferred Stock. |
| **Series C Preferred Stock** | As defined in this Restructuring Term Sheet. |
| **Series C Preferred Stock Interest** | Any share or interest of Series C Preferred Stock. |
| **Series C-1 Preferred Stock** | As defined in this Restructuring Term Sheet. |
| **Series C-2 Preferred Stock** | As defined in this Restructuring Term Sheet. |
| **Series C-3 Preferred Stock** | As defined in this Restructuring Term Sheet. |

| TERM | DEFINITION |
|------|------------|
| **Series D Preferred Stock** | As defined in this Restructuring Term Sheet. |
| **Series D Preferred Stock Interest** | Any share or interest of Series D Preferred Stock. |
| **Series Seed Preferred Stock** | As defined in this Restructuring Term Sheet. |
| **Series Seed Preferred Stock Interest** | Any share or interest of Series Seed Preferred Stock. |
| **Series X Redeemable Preferred Stock** | As defined in this Restructuring Term Sheet. |
| **Series X Redeemable Preferred Stock Interest** | Any share or interest of Series X Redeemable Preferred Stock. |
| **Term Loan Lenders** | As defined in this Restructuring Term Sheet. |
| **Term Loans** | As defined in this Restructuring Term Sheet. |
| **Thrasio** | As defined in this Restructuring Term Sheet. |
| **Transaction Expenses** | As defined in the Restructuring Support Agreement. |

**Execution Version**

# EXHIBIT 2

## DIP Term Sheet

# DIP TERM SHEET

## THRASIO HOLDINGS, INC., *ET AL.*

This summary of terms and conditions (this "**DIP Term Sheet**")[6] sets forth the material terms of a proposed debtor-in-possession financing facility that the DIP Lenders (as defined below) are contemplating providing to Thrasio, LLC, and certain of the Borrower's affiliates and subsidiaries that will be debtors and debtors-in-possession (collectively, the "Debtors") in connection with the chapter 11 cases (the "**Chapter 11 Cases**") to be filed by the Debtors under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**"), as well as the material terms of the exit facility that will be entered into in connection with the Debtors emergence from the Chapter 11 Cases and that are attached as Annex A hereto (the "**Exit Facility Term Sheet**").

This DIP Term Sheet does not attempt to describe all of the terms, conditions, and requirements that would pertain to the financings described herein, but rather is intended to be a summary outline of certain basic items, which shall be set forth in final documentation, which documentation shall be acceptable in all respects to the Debtors, the DIP Agent, and the DIP Lenders. This DIP Term Sheet should not be construed as a commitment to lend or to arrange for any credit facility and is for discussion purposes only.

| Borrower | Thrasio, LLC |
|---|---|
| Guarantors | The obligations of the Borrower shall be unconditionally guaranteed, on a joint and several basis, by each of Thrasio Holdings, Inc., a Delaware corporation ("**Holdings**"), Thrasio Intermediate Sub, LLC, a Delaware limited liability company ("**Intermediate Holdings**"), each Subsidiary Guarantor under the Prepetition Credit Agreement and certain other subsidiaries of Holdings[7] (collectively, the "**Guarantors**"; the Guarantors, together with the Borrower, the "**DIP Loan Parties**"). All obligations of the Borrower under the DIP Facility will be unconditionally guaranteed on a joint and several basis by the Guarantors. |
| DIP Facility | The $360 million super-senior secured debtor-in-possession financing facility (the "**DIP Facility**") in accordance with the terms of a debtor-in-possession credit agreement (the "**DIP Credit Agreement**") and the other definitive documentation, the forms of which shall be acceptable to the DIP Agent (as defined below), the DIP Lenders (as defined below) and the Borrower, with respect to the DIP Facility (collectively with the DIP Credit Agreement and the related security, guaranty and ancillary documents, the "**DIP Documents**," and all obligations arising thereunder, the "**DIP Obligations**") shall consist of: (i) "new money" term loans in an aggregate principal amount equal to $90 million (a) $35 million of which shall be available upon entry of the Interim Order, (b) $35 million of which |

---

[6] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet.

[7] Additional Subsidiary Guarantors to include each subsidiary of Holdings incorporated or organized under the laws of the United Kingdom, England, and Wales, subject to exceptions to be agreed between the Borrower and the Required DIP Lenders.

|  | shall be available upon entry of the Final Order, and (c) $20 million of which shall be committed upon entry of the Final Order and available from and upon entry of the Confirmation Order (or available up to five business days prior to the estimated entry of the Confirmation Order, solely with the consent of the Required DIP Lenders, in their sole and absolute discretion) (such date of funding, the "**Incremental DIP Loan Funding Date**", and such loans, the "**Incremental DIP Loans**"), subject in each case to the funding conditions set forth in this DIP Term Sheet and DIP Credit Agreement (collectively, the "**New Money Loans**"); and (ii) a "roll-up" in the amount of $270 million of the Prepetition First Lien Term Loans into the DIP Facility with $35 million deemed funded upon entry of the Interim Order (the "**Interim Roll-Up**") and $235 million deemed funded upon entry of the Final Order (the "**Final Roll-Up**" and together with the Interim-Roll-Up, the "**Roll-Up Loans**"), subject to the funding conditions set forth in this DIP Term Sheet and the DIP Credit Agreement (collectively, the "**DIP Loans**"). |
|---|---|
| **DIP Facility Interest Rate** | • New Money Loans: SOFR + 8.00%, payable monthly in Cash.<br><br>• Roll-Up Loans: SOFR + 10.00%, payable monthly in kind. |
| **Default Interest** | During the continuance of an Event of Default and upon the election of the Required DIP Lenders, any overdue principal on the DIP Loans will bear interest at an additional 2.00% per annum and any other overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% per annum.  Default interest shall be payable in cash on demand. |
| **DIP Facility Amortization** | None. |
| **DIP Facility Backstop Payment** | The DIP Backstop Parties' *pro rata* share of an amount of (i) Cash in the aggregate amount of 7.5% of the New Money Loans or (ii) solely upon confirmation of the Plan, 10% of New Common Stock, subject to dilution only from the Management Incentive Plan.  The Backstop Commitment shall be fully earned and approved on a final basis upon the entry of the Interim Order, but payable pursuant to the Confirmation Order upon the occurrence of the Plan Effective Date. |
| **DIP Facility OID** | 2.00% to be paid to each DIP Lender as and when such DIP Lender funds its New Money Loans (earned and netted on New Money Loans when funded). |
| **DIP Facility Maturity** | Unless converted to the Exit Facility (as defined below), all obligations under the DIP Facility will be due and payable in full in cash on the earliest of: (a) the date that is four (4) months after the date of execution and delivery of the definitive documentation for the DIP Facility (such date, the "**Closing Date**") (the "**Initial Maturity Date**"), *provided* that the Initial Maturity Date may be extended in one month increments for up to four (4) months with the consent of the Required DIP Lenders and upon payment of the Maturity Extension Fee (as defined below) for the applicable extension; |

42

| | |
|---|---|
| | (b) if the Final Order has not been entered by the Bankruptcy Court on or before the applicable Milestone (as defined below), the date of the applicable Milestone; (c) the date of acceleration of the DIP Loans and the termination of the DIP Lenders' commitments under the DIP Facility pursuant to the terms of the DIP Credit Agreement; (d) the date the Bankruptcy Court orders a conversion of the Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the chapter 11 case of any Debtor; or (e) the substantial consummation (as defined in 11 U.S.C. § 1101(2)) of a plan of reorganization of the Debtors which has been confirmed by the Confirmation Order (such earliest date, the "**Maturity Date**"). |
| **DIP Facility Maturity Extension Fee** | 1%, payable in kind upon each one-month extension of the Initial Maturity Date (the "**Maturity Extension Fee**"). |
| **DIP Agent** | Wilmington Savings Fund Society, FSB (the "**DIP Agent**"). |
| **DIP Lenders** | The DIP Facility shall be provided by certain Holders of First Lien Claims (in their capacity as lenders under the DIP Facility, collectively, the "**DIP Lenders**") and backstopped by certain members of the ad hoc group of lenders under the Prepetition Credit Agreement represented by Gibson Dunn & Crutcher LLP and Evercore Group L.L.C. (the "**Ad Hoc Group**," and solely in their capacity as backstopping parties, collectively, the "**DIP Backstop Parties**"). |
| | Each DIP Lender may participate in the DIP Facility on behalf of some or all accounts and funds managed by such DIP Lender and some or all accounts and funds managed by the investment manager, or any affiliate of the investment manager, of such DIP Lender, and may allocate its New Money Loans among such funds in its sole discretion; *provided* that any such fund to which any such allocation is made shall within three (3) business days of such allocation (i) execute a joinder to the Restructuring Support Agreement, to the extent it is not already a party and (ii) to the extent the Closing Date has occurred, become party to the DIP Credit Agreement, to the extent it is not already a party. |
| **Security and Priority** | Subject only to the carve out (as attached here as <u>Annex B</u>, the "**Carve Out**"), the DIP Facility shall be secured by automatically perfected liens and security interests in (and with the priorities set forth below and on <u>Annex B</u>) (collectively, the "**DIP Collateral**"): |
| | (a) all Collateral securing the Prepetition Credit Agreement, including the proceeds thereof, on a first priority priming basis; and |
| | (b) all other assets of the DIP Loan Parties that do not constitute Prepetition Collateral that constitute unencumbered assets immediately prior to the Petition Date and that are not perfected as permitted by section 546(b) of the Bankruptcy Code (collectively, the "**Unencumbered Collateral**") on a first priority basis, senior to, any unperfected liens existing as of the Petition Date on such Unencumbered Collateral. |
| | The DIP Facility shall also benefit from superpriority administrative expense claims against all DIP Loan Parties (the "**DIP Superpriority** |

| | |
|---|---|
| | **Claims**") that are senior to all other administrative expenses or other claims against the DIP Loan Parties, but which shall be junior to the Carve Out. |
| **Use of Proceeds** | The proceeds of the DIP Facility will be used, among other things, (a) for working capital and general corporate purposes, (b) to fund the administration of the Chapter 11 Cases; (c) to fund the Carve Out, and (d) to fund expenses, in the case of each of the foregoing (other than funding the Carve Out), solely in accordance with the DIP Budget. |
| **Conditions Precedent to Initial Funding** | To include, without limitation: <br><br> (a) Entry of the Interim Order; <br><br> (b) Execution and delivery of the DIP Documents in form and substance reasonably acceptable to the DIP Agent and the Required DIP Lenders; <br><br> (c) Receipt of a DIP Budget that is acceptable to the Required DIP Lenders and the DIP Agent; <br><br> (d) The absence of a default or an event of default under the DIP Documents; <br><br> (e) The representations and warranties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" or similar qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding; <br><br> (f) The Borrower shall have given the DIP Lenders one (1) business day's notice of its request for the initial draw under the DIP Facility; <br><br> (g) Other than (and subject to the entry of) the Interim Order, there shall not exist any law, regulation, ruling, judgment, order, injunction, or other restraint that prohibits, restricts, or imposes a materially adverse condition on the DIP Facility or the exercise by the DIP Agent of its rights as a secured party on a material portion of the DIP Collateral; <br><br> (h) The payment of all then accrued and unpaid reasonable and documented fees and out-of-pocket expenses of the advisors to the Ad Hoc Group; <br><br> (i) The Restructuring Support Agreement shall be in full force and effect and there shall be no defaults by the Debtors thereunder; and <br><br> (j) The Borrower shall direct each subsidiary (as reasonably determined by the Borrower and the Required DIP Lenders) of Holdings constituting a Subsidiary Guarantor, including, such subsidiaries incorporated or organized under the laws of the United Kingdom, England, and Wales to deliver such documents and take such actions reasonably requested by the DIP Agent (acting at the direction of the Required DIP Lenders) in connection with such designation. |

44

| | |
|---|---|
| **Conditions Precedent to Subsequent Funding** | To include, without limitation:<br><br>(a) Entry of the Final Order;<br><br>(b) The absence of a default or an event of default under the DIP Documents;<br><br>(c) Compliance with all Milestones;<br><br>(d) The payment of all then accrued and unpaid reasonable and documented fees and out-of-pocket expenses of the advisors to the Ad Hoc Group;<br><br>(e) The representations and warranties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" or similar qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding;<br><br>(f) The Borrower shall have given the DIP Lenders two (2) business day's notice of its request for any subsequent draws under the DIP Facility;<br><br>(g) The Restructuring Support Agreement shall be in full force and effect and there shall be no defaults by the Debtors thereunder; and<br><br>(h) The aggregate of the outstanding New Money Loans shall not exceed the Maximum Amount and the provision of the New Money Loans shall not result in the Maximum Amount being exceeded. |
| **Conditions Precedent to Funding of Incremental DIP Loans** | To include, without limitation, all of the Conditions Precedent to Subsequent Funding, as well as entry of the Confirmation Order, to be in form and substance acceptable to the Required DIP Lenders *provided* the Incremental DIP Loans may be available up to five business days prior to the estimated entry of the Confirmation Order, solely with the consent of the Required DIP Lenders, in their sole and absolute discretion. |
| **Use of Proceeds with Respect to Incremental DIP Loans** | The proceeds of the Incremental DIP Loan will be funded to the Borrower until unrestricted Cash on hand held by Loan Parties is greater than, or equal to, $70 million as of the Incremental DIP Loan Funding Date; *provided, that*, to the extent that unrestricted Cash on hand on the Incremental DIP Loan Funding Date held by Loan Parties would exceed $70 million if the entire amount of Incremental DIP Loans were funded to the Borrower, the proceeds of the Incremental DIP Loans that would exceed $70 million of unrestricted Cash on hand held by Loan Parties shall be funded to an escrow account on the Incremental DIP Loan Funding Date, the documentation with respect to which shall be acceptable to the Required DIP Lenders (the "**Incremental Loan Escrow Account**", and such proceeds, the "**Escrowed Incremental Proceeds**"); *provided, further*, that to the extent that unrestricted Cash on hand held by Loan Parties would not exceed $70 million on the Incremental DIP Loan Funding Date if the entire amount of Incremental DIP Loans were funded to the Borrower, such amount of Incremental DIP Loans will be funded to the Borrower on the Incremental DIP Loan Funding Date. |

45

| | |
|---|---|
| **Milestones** | Consistent with the milestones contained in the Restructuring Term Sheet. |
| **Mandatory Prepayments** | Subject to the Documentation Standard, consistent with the Prepetition Credit Agreement and reasonably acceptable to the Required DIP Lenders. For the avoidance of doubt, the DIP Documents shall not include an excess cash flow sweep. |
| **Covenants** | The affirmative and negative covenants in the DIP Documents shall be subject to the Documentation Standard and generally consistent with the Prepetition Credit Agreement, subject to (i) customary modifications required to reflect the Chapter 11 Cases, (ii) the addition of customary holding company covenants applicable to Holdings, (iii) customary additional restrictions on transactions between DIP Loan Parties and affiliates of Borrower that are not DIP Loan Parties, *provided* that clauses (ii) and (iii) do not impose an operational burdens on the DIP Loan Parties, and (iv) customary covenants regarding budgeting (including variance testing) and milestones. |
| | Other than with the consent of the Required DIP Lenders, the Borrower will not permit its liquidity and its subsidiaries' liquidity, as of the last Friday of every other calendar week (or, if such day is not a business day, the immediately following business day) to be less than $30 million. |
| **DIP Budget** | It shall be a condition precedent to the effectiveness of the DIP Facility that the Debtors shall have delivered a 13-week cash flow budget (the "**DIP Budget**"), broken down week by week, substantially in the form attached as **Exhibit A**, in form and substance acceptable to the Ad Hoc Group (it being agreed and understood that a form substantially consistent with the form attached as **Exhibit A** is acceptable to the Ad Hoc Group). |
| | The Debtors shall update the DIP Budget every four (4) weeks (with such updated DIP Budget being delivered to the Ad Hoc Group via the Debtors' public lender data site). The Debtors shall deliver the first subsequent DIP Budget on the first Friday following the fourth calendar week after entry of the Interim Order. Delivery of the DIP Budget shall only be made on a business day. If delivery of the DIP Budget falls on a Friday that is not a business day, the Debtors shall deliver the DIP Budget on the next day that is a business day. |
| | All subsequent DIP Budgets shall be in form and substance consistent with the form attached hereto as **Exhibit A** and acceptable to the Required DIP Lenders. |
| **Reporting** | Subject to the Documentation Standard, consistent with the Prepetition Credit Agreement and reasonably acceptable to the Required DIP Lenders (but subject to customary modifications required to reflect the Chapter 11 Cases, including delivery of weekly updates on professional fees and variance reports with regard to the DIP Budget). |
| **Representations and Warranties** | Subject to the Documentation Standard, consistent with the Prepetition Credit Agreement and reasonably acceptable to the Required DIP Lenders, but subject to modification as provided herein and pursuant to the DIP |

| | |
|---|---|
| | Documents (but subject to customary modifications required to reflect the Chapter 11 Cases). |
| **Events of Default** | Subject to the Documentation Standard, consistent with the Prepetition Credit Agreement and reasonably acceptable to the Required DIP Lenders; to be subject to modification from customary events of default in Chapter 11 Cases, including: conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; the dismissal of any of the Chapter 11 Cases (or any subsequent Chapter 7 case); extending, staying, vacating, or otherwise modifying in any material respect the Interim Order or Final Order, in each case acceptable to the Debtors and the DIP Lenders. |
| **Voting / Thresholds** | Subject to customary exceptions for certain provisions that require the consent of each affected DIP Lender, a majority of each adversely affected tranche or all DIP Lenders (including in the case of satisfaction of the DIP Loans in a manner other than in cash in full or by conversion on a dollar for dollar basis into the Exit Facility as set forth in **Annex A**), or all DIP Lenders, amendments and waivers of the DIP Facility, approval of the DIP Budget, waivers of Events of Default, and modifications of any Milestones will require the approval of DIP Lenders holding more than 50% of the outstanding principal amount of the DIP Loans (collectively, the "**Required DIP Lenders**"). Consents, amendments, waivers, and extensions can be effectuated pursuant to email via counsel from the advisors to the Ad Hoc Group on behalf of the Required DIP Lenders. |
| **Transferability** | No DIP Lender may assign all or a portion of its rights and obligations under the DIP Facility (including all or a portion of its commitment and the DIP Loans at the time owing to it) without the prior written consent of the Borrower (not to be unreasonably withheld, delayed or conditioned) and the Administrative Agent; *provided*, that (a) the Borrower shall be deemed to consent to any assignment of rights and obligations under the DIP Facility if there is no objection to such assignment within five (5) business days after receipt of notice thereof; and any DIP Lender may syndicate or assign all or a portion of its rights and obligations under the DIP Facility (including all or a portion of its commitment and the DIP Loans at time owing to it) to an affiliate, to another DIP Lender (or affiliate thereof), approved fund, or to another party to the Restructuring Support Agreement without the prior consent of the Borrower or the Administrative Agent; and (b) any DIP Lender may syndicate or assign all or a portion of its rights and obligations under the DIP Facility (including all or a portion of its commitment and the DIP Loans at time owing to it) to an affiliate, to another DIP Lender (or affiliate thereof), approved fund, or to any person at any time that an Event of Default has occurred and is continuing. |
| **Governing Law** | New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the State of New York (and, to the extent applicable, the Bankruptcy Code). |
| **Definitions** | |
| **Collateral** | All owned or hereafter acquired assets and property of the DIP Loan Parties (including, without limitation, inventory, accounts receivable, equipment, |

| | |
|---|---|
| | property, plant, equipment, material fee owned and ground leased real property, real property leaseholds, investment property, insurance proceeds, deposit accounts, rights under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property and capital stock of subsidiaries), and the proceeds thereof, but not including the Excluded Collateral. For the avoidance of doubt, Collateral shall include any unencumbered assets. |
| **Documentation Standard** | The DIP Credit Agreement shall be based on the Prepetition Credit Agreement, modified to reflect the terms and conditions set forth in this Term Sheet, that are customary for DIP or exit financings, as applicable, and necessary to reflect the transactions contemplated hereby; baskets, thresholds and exceptions shall be modified in a customary manner for debtor-in-possession facilities of this type or exit financings, as applicable, and shall be in form and substance reasonably acceptable to the Borrower and Required DIP Lenders (the "**Documentation Standard**"). |
| **Prepetition Credit Agreement** | That certain credit agreement dated December 18, 2020 (as, restated, supplemented, or otherwise modified from time to time, including on May 28, 2021, September 17, 2021, June 30, 2023, September 29, 2023, and December 29, 2023) by and between Thrasio Intermediate Sub, LLC, as Holdings, Thrasio, LLC, as Borrower, the lenders party thereto from time to time, and Royal Bank of Canada, as Administrative Agent. |
| **Excluded Collateral** | "Excluded Collateral" means: (a) all claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (collectively, the "**Avoidance Actions**") and, prior to entry of the Final Order, the proceeds of Avoidance Actions (collectively, the "**Avoidance Action Proceeds**") (it being understood that notwithstanding such exclusion of Avoidance Actions, per entry of the Final Order, to the extent approved by the Bankruptcy Court, such liens shall attach to Avoidance Action Proceeds); (b) leased (not owned) real property; (c) prior to entry of the Final DIP Order, any amounts surcharged pursuant to section 506(c) of the Bankruptcy Code; and (d) Excluded Assets (as defined below). <br><br> "**Excluded Assets**" means (a) all licenses and any other property and assets (including any lease, license, permit or agreement) (i) to the extent that the Administrative Agent may not validly possess a security interest therein under, or such security interest is restricted by, (x) applicable laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or (y) contract, lease, license or other agreement with a counterparty that is not a Debtor or an affiliate thereof and that exists on the Closing Date, (ii) the pledge or creation of a security interest in which would require the consent, approval, license or authorization of (x) a Governmental Authority or (y) a third party that is not a Debtor or an affiliate thereof, which third party right to consent, approve or authorize such a pledge or creation of a security interest exists on the Closing Date and, in each case of clause (i) and (ii), other than to the extent such prohibition or limitation is rendered ineffective under the UCC, the U.S. Bankruptcy Code, other applicable insolvency laws or other applicable law notwithstanding such prohibition or limitation, (b) any intent-to-use (or |

|  | similar) Trademark application prior to the filing with, and acceptance by, the U.S. Patent and Trademark Office of a "Statement of Use", "Declaration of Use", "Amendment to Allege Use" or similar filing with respect thereto, only to the extent, if any, that, and solely during the period if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use (or similar) Trademark application (or any Trademark registration resulting therefrom) under applicable Requirements of Law and (c) any asset with respect to which the Administrative Agent and the Borrower have reasonably determined that the cost, burden, difficulty or consequence (including any effect on the ability of the relevant Loan Party to conduct its operations and business in the ordinary course of business and including the cost of flood insurance (if necessary) or mortgage, stamp, intangible or other taxes or expenses) of obtaining a security interest therein outweighs, or is excessive in light of, the practical benefit of a security interest to the relevant Secured Parties afforded thereby (and the Collateral that may be provided by any Loan Party may be limited by agreement of the Administrative Agent and the Borrower to minimize stamp duty, notarization, registration or other applicable fees, taxes and duties where the Administrative Agent and the Borrower have reasonably determined that the benefit to the Secured Parties of increasing the secured amount is disproportionate to the level of such fees, taxes and duties); provided, however, that Excluded Assets shall not include any proceeds, substitutions or replacements of any Excluded Assets unless such proceeds, substitutions or replacements constitute Excluded Assets in accordance with clause (a) or (b) above. |
|---|---|
| **Maximum Amount** | $90 million. |
| **Prepetition Collateral** | Any and all property of the Borrower or the Guarantors subject (or purported to be subject) to a Lien (as defined in the Prepetition Credit Agreement). |
| **Restructuring Support Agreement** | That certain Restructuring Support Agreement made and entered into as of February 27, 2024 by and among the Debtors and the Consenting Lenders (as defined in the Restructuring Support Agreement). |
| **Restructuring Term Sheet** | That certain Restructuring Term Sheet attached as <u>Exhibit C</u> to the Restructuring Support Agreement. |

**Annex A**

**Exit Facility Term Sheet**

| Exit Facility General Terms | |
|---|---|
| **Exit Credit Facility** | The New Money Loans shall automatically convert on a dollar-for-dollar basis into a senior secured, first lien "first out" term loan facility (the "**First Out Take Back Debt Facility**") on the Plan Effective Date.<br><br>The Roll-Up Loans shall automatically convert on a dollar-for-dollar basis into a senior secured, first lien "second out" term loan facility (the "**Second Out Take Back Debt Facility**", together with the First Out Take Back Debt Facility, the "**Exit Facility**") on the Plan Effective Date.<br><br>Conversion of the New Money Loans and Roll-Up Loans into the First Out Take Back Debt Facility and the Second Out Take Back Debt Facility, respectively, shall be approved in connection with confirmation of the Plan. |
| **Collateral** | Substantially all the assets of the Borrower and the Guarantors (the "**Collateral**"), including 100% of the equity of the Debtors' foreign subsidiaries, subject to carve-outs to be mutually agreed among Borrower and the Required Consenting Lenders. |
| **Priority** | The Exit Facility shall be secured by a first priority lien on the Collateral, subject to customary carve-outs.<br><br>The Second Out Take Back Debt Facility will be fully subordinated to the First Out Take Back Debt Facility upon the Plan Effective Date. |
| **Conditions Precedent to the Closing of the Exit Facility** | The closing date (the "**Exit Date**") under the Exit Facility shall be subject to conditions to be mutually agreed among Borrower and the Required Consenting Lenders, including, without limitation, (i) delivery of customary legal opinions, with such exceptions as may be mutually agreed based on the nature of the transactions, (ii) the Bankruptcy Court shall have entered the Confirmation Order and such order shall be a Final Order; (iii) the Restructuring Transactions shall have been, or shall be substantially consummated in accordance with the Plan and (iv) the Transaction Expenses payable under the Restructuring Support Agreement shall have been paid in full. |
| **Exit Facility Maturity Date** | All obligations under the Exit Facility will be due and payable in full in cash on the earlier of (i) fifth year anniversary of the Exit Date and (ii) the date of any acceleration of the obligations in respect of the Exit Facility pursuant to the terms of the Exit Documents (the "**Exit Facility Maturity Date**"). |
| **Interest Rate** | First-Out Takeback Facility:<br><br>   o   For the period prior to the one-year anniversary of the Exit Date, SOFR + 10.00%, payable in kind<br><br>   o   For the period following the one-year anniversary of the Exit Date and prior to the second-year anniversary of the Exit Date, if |

| Exit Facility General Terms | |
|---|---|
| | (a) unrestricted Cash on hand held by Loan Parties is greater than, or equal to, $50 million at the end of any interest payment period, SOFR + 8.00%, payable in Cash or (b) if unrestricted Cash on hand held by Loan Parties is less than $50 million at the end of any interest payment period, SOFR + 10.00%, payable in kind |
| | ○ For the period following the second-year anniversary of the Exit Date and thereafter, SOFR + 8.00%, payable in Cash |
| | Second-Out Takeback Facility: |
| | ○ For the period prior to the one-year anniversary of the Exit Date, SOFR + 10.00%, payable in kind |
| | ○ For the period following the one-year anniversary of the Exit Date and thereafter, if (a) unrestricted Cash on hand held by Loan Parties is greater than, or equal to, $50 million at the end of any interest payment period, SOFR + 8.00%, payable in Cash or (b) if unrestricted Cash on hand held by Loan Parties is less than $50 million at the end of any interest payment period, SOFR + 10.00%, payable in kind |
| | Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year. |
| | Interest payment dates will be at the end of each applicable interest period, but no less frequently than every 3 months. |
| **Treatment of Incremental Loan Escrow Account** | To the extent there are any Escrowed Incremental Proceeds in the Incremental Loan Escrow Account on the Plan Effective Date, such Escrowed Incremental Proceeds will remain in the Incremental Loan Escrow Account following the Exit Date and may be disbursed to the Borrower subject to the satisfaction of the following conditions: |
| | • Unrestricted Cash on hand held by Loan Parties must be less than $50 million, and the Borrower shall not be permitted to draw Escrowed Incremental Proceeds to the extent unrestricted Cash on hand held by Loan Parties would exceed $50 million (*pro forma* for any Escrowed Incremental Proceeds); |
| | • On December 31, 2024, all undrawn Escrowed Incremental Proceeds in the Incremental Loan Escrow Account must be used to repay Loans under the First Out Take Back Debt Facility, in accordance with the terms of the Exit Credit Agreement; and |
| | • All positive net cash flow in Q42024 must be used to repay Loans under the First Out Take Back Debt Facility up to the amount of Escrowed Incremental Proceeds the Company has withdrawn from the Incremental Loan Escrow Account. |
| **Documentation** | The Exit Facility will be documented by a First Lien Credit Agreement (the "**Exit Credit Agreement**") and other guarantee, security and loan |

| Exit Facility General Terms | |
|---|---|
| | documentation (together with the Exit Credit Agreement, collectively, the "**Exit Documents**"), which shall be based on the Prepetition Credit Agreement, modified to reflect the Documentation Standard. |
| **Amortization** | None. |
| **Call Protection** | Any repayment of the Exit Facility shall be subject to a prepayment premium equal to (i) if occurring on or prior to the one-year anniversary of the Exit Date a 2.00% fee on the principal amount of such repayment (or amount subject to such amendment), and (ii) if occurring after the one-year anniversary of the Exit Date and on or prior to the two-year anniversary of the Exit Date, a 1.00% fee on the principal amount of such repayment (or amount subject to such amendment). |
| **Default Rate** | Following an event of default, overdue amounts (including overdue interest and fees and any accelerated amounts) shall accrue interest at the applicable non-default rate plus an additional 2.00% per annum. Default interest shall be payable in cash on demand. |
| **Financial Covenant** | Minimum liquidity covenant of $30 million at all times, non-compliance with which shall require Required Lender vote to waive. |
| **Representations and Warranties** | Subject to the Documentation Standard, consistent with the Prepetition Credit Agreement. |
| **Affirmative Covenants** | Subject to the Documentation Standard, consistent with the Prepetition Credit Agreement, subject to modified reporting requirements and information rights customary for facilities of this type (in each case to be mutually agreed among Borrower and the Required Consenting Lenders) and which shall also include a requirement that the Borrower use commercially reasonable efforts to have the Exit Facility rated within 30 days by Moody's and S&P (but have no requirement to obtain any specific rating). |
| **Negative Covenants** | Shall be consistent with the Prepetition Credit Agreement, but shall be modified in a manner mutually agreed among Borrower and the Required Consenting Lenders.<br>Such modifications will include, but are not limited to, a reduction in certain basket capacity, but sufficient to operate the business, and to include, in any event, the liability management protections detailed herein. |
| **Event of Default** | Subject to the Documentation Standard, consistent with the Prepetition Credit Agreement. |
| **Required Lenders** | Lenders holding at least 50.1% of the outstanding loans and unused commitments under the Exit Credit Agreement. |
| **Miscellaneous** | The Exit Documents shall include (i) new sacred rights and liability management protections (subject to any mutually agreed consent threshold modifications), which shall include, for the avoidance of doubt |

| Exit Facility General Terms |
|---|
| and without limitation, waterfall protection, pro rata protection, and "Serta", "J.Crew", "Chewy", "Envision", "At Home", and "Incora" protection, in each case  acceptable to the Required DIP Lenders and the Required Consenting Lenders in their sole and absolute discretion, notwithstanding anything to the contrary herein; (ii)   no day-one unrestricted subsidiaries and no ability to transfer assets to unrestricted subsidiaries, designate any new unrestricted subsidiaries, or hold assets at any unrestricted subsidiaries; (iii) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes (subject to customary qualifications)); (iv) tranche voting to the extent any tranche is adversely affected by any amendment, waiver or consent; and (v) waivers of consequential damages and jury trial. |

**Annex B**

1.    <u>Carve Out</u>.

(a)    <u>Carve Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means the sum

of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States

Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory

rate (without regard to the notice set forth in (iii) below) with respect to the Cases; (ii) all

reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the

Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed

at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses

(the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant

to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Creditors'

Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee

Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time

before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger

Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out

Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate

amount not to exceed $4.5 million incurred after the first business day following delivery by the

DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim

order, procedural order, or otherwise (the amounts set forth in this clause (iv) being

the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve Out Trigger

Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP

Agent to the Debtors, their lead restructuring counsel, counsel to the DIP Lenders, the U.S. Trustee,

and counsel to the Creditors' Committee, which notice may be delivered following the occurrence

and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)    <u>Carve Out Reserves</u>.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for New Money Loans under the New Money Commitments (on a pro rata basis based on the then outstanding New Money Commitments), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute New Money Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for New Money Loans under the New Money Commitments (on a pro rata basis based on the then outstanding New Money Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute New Money Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>" and,

together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  On the first business day after the DIP Agent gives such notice to such DIP Lenders, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for New Money Loans under the DIP Facility, any termination of the New Money Commitments with respect to New Money Loans following an Event of Default, or the occurrence of the Maturity Date, each DIP Lender of New Money Loans with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in

accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the DIP Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph [9], then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph [9], prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition Secured Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors *provided*, however, in no event shall the DIP Lenders be obligated to make DIP Obligations in excess of the aggregate amount of New Money Loans set forth in the DIP Documents. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or in any Prepetition Secured Facilities, the Carve Out shall be senior to all liens and claims securing

the DIP Facility, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

(c)     Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)     No Direct Obligation To Pay Allowed Professional Fees.  Subject to the terms of the Restructuring Support Agreement, the Prepetition Secured Creditors and Prepetition First Lien Agent reserve the right to object to the allowance of any fees and expenses, whether or not such fees and expenses were incurred in accordance with the Approved Budget.  Except for permitting the funding of the Carve Out Reserves as provided herein, none of the DIP Agent, DIP Lenders, or the Prepetition Secured Creditors shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person or any fees or expenses of the U.S. Trustee or Clerk of the Court incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     Payment of Carve Out On or After the Termination Declaration Date.  Following the delivery of the Carve Out Trigger Notice, all Allowed Professional Fees shall be paid from the applicable Carve Out Reserve, and no Professional Person shall seek payment of any Allowed Professional Fees from any other source until the applicable Carve Out Reserve has been exhausted.  Any payment or reimbursement made on or after the occurrence of the

Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

## Exhibit A

**Form of Budget**

**Thrasio Holdings, Inc.**
**Approved Budget**
*$ in 000s*

| Forecast / Actual | Fcst Week 1[(1)] | Fcst Week 2 | Fcst Week 3 | Fcst Week 4 | Fcst Week 5 | Fcst Week 6 | Fcst Week 7 | Fcst Week 8 | Fcst Week 9 | Fcst Week 10 | Fcst Week 11 | Fcst Week 12 | Fcst Week 13 | Fcst 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week # | | | | | | | | | | | | | | |
| Week Ending | 2-Mar | 9-Mar | 16-Mar | 23-Mar | 30-Mar | 6-Apr | 13-Apr | 20-Apr | 27-Apr | 4-May | 11-May | 18-May | 25-May | |
| **TOTAL COLLECTIONS** | $ 5,402 | $ 6,121 | $ 6,284 | $ 6,691 | $ 7,014 | $ 7,623 | $ 7,795 | $ 7,855 | $ 7,620 | $ 7,716 | $ 7,276 | $ 7,452 | $ 12,447 | $ 97,298 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | |
| Merchandise | - | (5,325) | (2,662) | (2,960) | (2,692) | (2,086) | (2,086) | (2,086) | (2,086) | (2,086) | (2,086) | (2,086) | (2,086) | (30,329) |
| Supply Chain | - | (4,964) | (2,487) | (3,287) | (2,487) | (2,428) | (2,428) | (3,528) | (2,528) | (2,478) | (2,478) | (3,478) | (2,578) | (35,148) |
| SG&A | - | (4,792) | (4,398) | (2,658) | (6,927) | (2,790) | (4,674) | (3,217) | (4,675) | (5,533) | (2,479) | (4,375) | (3,079) | (49,597) |
| Sales & Other Taxes | - | (1,310) | (307) | (217) | (149) | - | (12) | - | (444) | (23) | (3) | (136) | (46) | (2,646) |
| **Total Operating Disbursements** | $ - | $ (16,391) | $ (9,854) | $ (9,122) | $ (12,255) | $ (7,304) | $ (9,200) | $ (8,831) | $ (9,733) | $ (10,121) | $ (7,046) | $ (10,075) | $ (7,790) | $ (117,720) |
| Net Cash Flow - Adjacent Businesses | - | (373) | (292) | (284) | (117) | (245) | (130) | (142) | 82 | (119) | 131 | (243) | 166 | (1,566) |
| **NON-OPERATING CASH FLOWS** | | | | | | | | | | | | | | |
| Interest & Fees | - | (828) | - | - | (25) | (401) | (803) | - | - | (375) | (388) | - | - | (2,820) |
| Restructuring Professionals Fees | - | (70) | (228) | - | - | (70) | (1,668) | - | (5,484) | (70) | (1,418) | - | - | (9,008) |
| Divestitures/Asset Dispositions | - | - | - | - | - | - | - | - | - | 200 | - | - | - | 200 |
| Other Non-Operating | - | (475) | (464) | (200) | (354) | (200) | (200) | - | - | - | - | - | - | (1,893) |
| **Total Non-Operating Cash Flows** | $ - | $ (1,373) | $ (692) | $ (200) | $ (379) | $ (671) | $ (2,671) | $ - | $ (5,484) | $ (245) | $ (1,806) | $ - | $ - | $ (13,521) |
| **Net Cash Flow Before Financing** | $ 5,402 | $ (12,015) | $ (4,553) | $ (2,915) | $ (5,736) | $ (596) | $ (4,206) | $ (1,118) | $ (7,515) | $ (2,769) | $ (1,446) | $ (2,866) | $ 4,823 | $ (35,510) |
| DIP Draw / (Repayment) | - | 35,000 | - | - | - | - | 35,000 | - | - | - | - | - | - | 70,000 |
| **NET CASH FLOW** | $ 5,402 | $ 22,985 | $ (4,553) | $ (2,915) | $ (5,736) | $ (596) | $ 30,794 | $ (1,118) | $ (7,515) | $ (2,769) | $ (1,446) | $ (2,866) | $ 4,823 | $ 34,490 |
| **Beginning Operating Cash** | $ 25,692 | $ 31,094 | $ 54,079 | $ 49,526 | $ 46,611 | $ 40,875 | $ 40,279 | $ 71,073 | $ 69,955 | $ 62,440 | $ 59,671 | $ 58,226 | $ 55,359 | $ 25,692 |
| Add: Net Cash Flows | 5,402 | 22,985 | (4,553) | (2,915) | (5,736) | (596) | 30,794 | (1,118) | (7,515) | (2,769) | (1,446) | (2,866) | 4,823 | 34,490 |
| **Ending Operating Cash** | $ 31,094 | $ 54,079 | $ 49,526 | $ 46,611 | $ 40,875 | $ 40,279 | $ 71,073 | $ 69,955 | $ 62,440 | $ 59,671 | $ 58,226 | $ 55,359 | $ 60,182 | $ 60,182 |

*(1) Week 1 covers the period from February 27, 2024 to March 2, 2024*

**EXHIBIT 3**

**Release, Exculpation, and Injunction**

| RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS | |
|---|---|
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Plan Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Plan Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Plan Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Plan Effective Date occurring. |

| | |
|---|---|
| **Related Party**[1] | Collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, successors, assigns, subsidiaries, partners, limited partners, general partners, principals, members, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (including any attorneys or professionals retained by any current or former director or manager of a Debtor in his or her capacity as director or manager as a Debtor). |
| **Released Parties** | Collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Lenders; (d) the DIP Lenders; (e) the Ad Hoc Group and each member of the Ad Hoc Group; (f) the Administrative Agent; (g) each lender and Issuing Banks and other secured parties under the First Lien Credit Agreement; (h) the DIP Backstop Parties; (i) each current and former wholly-owned Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clauses (a) through this clause (j); *provided, however,* that each Entity that timely and properly opts out of the releases contemplated herein shall not be a Released Party. |
| **Releasing Parties**[2] | Collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Lenders; (d) the DIP Lenders; (e) the Ad Hoc Group and each member of the Ad Hoc Group; (f) the Administrative Agent; (g) each lender and Issuing Banks and other secured parties under the First Lien Credit Agreement; (h) the DIP Backstop Parties; (i) all Holders of Claims; (j) all holders of Interests; (k) each current and former wholly-owned Affiliate of each Entity in clause (a) through the following clause (l); and (l) each Related Party of each Entity in clauses (a) through this clause (l) for which such Entity is legally entitled to bind such Related Party to the releases contained herein under applicable law; *provided, however,* that each Entity that timely and properly opts out of the releases contemplated herein shall not be a Releasing Party; *provided, further, however,* that any |

---

[1]    For the avoidance of doubt, and notwithstanding anything in the Plan to the contrary, for the BlackRock Consenting Creditors, the defined term "Related Party" shall be limited to any Related Party of the BlackRock Consenting Creditors for which such BlackRock Consenting Creditors are legally entitled to bind under applicable law.

[2]    For the avoidance of doubt, and notwithstanding anything in the Plan to the contrary, for the BlackRock Consenting Creditors, the defined term "Releasing Party" shall be limited to any Releasing Party of the BlackRock Consenting Creditors for which such BlackRock Consenting Creditors are legally entitled to bind under applicable law.

| | |
|---|---|
| | Holder of Interests who acquired such Interests after the Voting Record Date (as such term is defined in the Disclosure Statement Order) and did not receive an opt out election form shall not be a Releasing Party. |
| **Releases by the Debtors**[3] | Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, as of the Plan Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Documents, the Preferred Stock Documents, the Exit Facilities, the Exit Facilities Documents, the DIP Facility, the DIP Orders, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or willful misconduct.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to |

---

[3]   All Releases contemplated in this Restructuring Term Sheet are subject to the ongoing Independent Investigation.

| | |
|---|---|
| | a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement. |
| **Releases by Holders of Claims and Interests of the Debtors**[4] | Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Documents, the Preferred Stock Documents, the Exit Facilities, the Exit Facilities Documents, the DIP Facility, the DIP Orders, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or willful misconduct.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement. |
| **Exculpated Parties** | Collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Lenders; (d) the DIP Lenders; (e) the Ad Hoc Group and each member of the Ad Hoc Group; (f) the Administrative Agent; (g) each lender and Issuing Banks and other secured parties under the First Lien Credit Agreement; (h) the DIP Backstop Parties; (i) each current and former wholly-owned Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clauses (a) through this clause (j). |
| **Exculpation** | Except as otherwise expressly provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable |

---

[4]    All Releases contemplated in this Restructuring Term Sheet are subject to the ongoing Independent Investigation.

| | law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the participation in the DIP Facility, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
|---|---|
| **Injunctions** | Except as otherwise specifically provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding |

|  | an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan. |

## <u>EXHIBIT D</u>

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among Thrasio Holdings, Inc. and its affiliates and subsidiaries bound thereto and the Consenting Lenders, including the transferor to the Transferee of any Company Claims (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Lender" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| RCF Claims | |
| Term Loan Claims | |

---

[1]  Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

## EXHIBIT E

### Form of Joinder

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [●], 2024 (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Agreement**"), by and among the Company Parties and the Consenting Lenders party thereto. Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

1.    Agreement to be Bound.  The Joinder Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached hereto as Annex I (as the same has been or may hereafter be amended, supplemented, amended and restated, or otherwise modified from time to time in accordance with the provisions hereof).  The Joinder Party shall hereafter be deemed to be a "Consenting Lender" and a "Party" for all purposes under the Agreement and with respect to all Company Claims held such Joinder Party.

2.    Representations and Warranties.  The Joinder Party hereby makes the representations and warranties of the Parties and Consenting Lenders set forth in the Agreement to each other Party.

3.    Notice.  The Joinder Party shall deliver an executed copy of this joinder agreement (the "**Joinder**") to the Parties identified in Section 15.10 of the Agreement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Date Executed: _____

_____

Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| RCF Claims | |
| Term Loan Claims | |