**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com

-and-

Matthew C. Fagen, P.C. (*pro hac vice* pending)
Francis Petrie (*pro hac vice* pending)
Evan Swager (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
matthew.fagen@kirkland.com
francis.petrie@kirkland.com
evan.swager@kirkland.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Jacob S. Frumkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
jfrumkin@coleschotz.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| THRASIO HOLDINGS, INC., *et al.*, | Case No. 24-11840 (CMG) |
| Debtors.[1] | (Joint Administration Requested) |

---

[1]  The last four digits of Debtor Thrasio Holdings, Inc.'s tax identification number are 8327.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.kccllc.net/Thrasio.  The Debtors' service address for purposes of these chapter 11 cases is 85 West Street, 3rd Floor, Walpole, MA, 02081.

**DEBTORS' MOTION
FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS
TO OBTAIN POSTPETITION SECURED FINANCING,
(II) GRANTING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE
OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V)
MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion (this "Motion"):[2]

**Relief Requested**

1.    The Debtors seek entry of interim and final orders, substantially in the forms

attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order,"[3] and

together with the Interim Order, the "DIP Orders"):

  a.   authorizing Thrasio, LLC, in its capacity as borrower (the "DIP Borrower"), to
       obtain postpetition financing, and for each of the other Debtors and certain
       non-debtor affiliates to guarantee unconditionally (the Debtors, other than the
       DIP Borrower, and those certain non-debtor affiliates, the "DIP Guarantors") on a
       joint and several basis, the DIP Borrower's obligations in connection with a
       superpriority senior secured delayed draw term loan credit facility in an aggregate
       principal amount of $360 million (the "DIP Facility") consisting of new money
       term loans in an aggregate principal amount equal to $90 million (the "New Money

---

[2]   A description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the
      Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Josh Burke, Chief Financial Officer
      of Thrasio Holdings, Inc. in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously
      with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code
      (the "Bankruptcy Code"), on February 28, 2024 (the "Petition Date").  In support of this motion, the Debtors
      respectfully submit the (a) *Declaration of Terrence F. Grossman in Support of the Debtors' Motion for Entry of
      Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting
      Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral,
      (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing*
      (the "Grossman Declaration") and (b) *Declaration of Samuel M. Greene in Support of the Debtors' Motion for
      Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing,
      (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of
      Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Scheduling a
      Final Hearing*, (the "Greene Declaration") filed contemporaneously herewith.  Capitalized terms used but not
      otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration, or DIP
      Credit Agreement (as defined herein), as applicable.

[3]   The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

Loans"):  (i) $35 million of which shall be made available upon entry of the Interim Order; (ii) $35 million of which shall be made available upon entry of the Final Order; and (iii) $20 million of which shall be committed upon entry of the Final Order and available from and upon entry of the Confirmation Order (or available up to five business days prior to the estimated entry of the Confirmation Order, solely with the consent of the Required DIP Lenders, in their sole and absolute discretion);

b.  authorizing, subject to the funding conditions set forth in this DIP Term Sheet and the DIP Credit Agreement, a "roll-up" in the total amount of $270 million of the Prepetition First Lien Term Loans into the DIP Facility with:  (i) $35 million of Prepetition First Lien Term Loans deemed funded upon entry of the Interim Order on a 1:1 basis of New Money Loans (the "Interim Roll-Up"); and (ii) $235 million of First Lien Term Loans deemed funded upon entry of the Final Order (the "Final Roll-Up," and together with the Interim Roll-Up, the "Roll-Up Loans");

c.  approving the terms of, and authorizing the Debtors party thereto to execute and deliver, that certain credit agreement attached to the Interim Order as Exhibit A (the "DIP Credit Agreement"), by and among the DIP Borrower, certain of the DIP Guarantors, Wilmington Savings Fund Society, FSB, as administrative agent and issuing bank (in such capacities, the "DIP Agent"), and the lenders from time to time a party thereto (the "DIP Lenders" and together with the DIP Agent, the "DIP Secured Parties"), together with the Interim Order and the Final Order, and any other agreements, instruments and documents related thereto (collectively, the "DIP Documents"), and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

d.  authorizing the Debtors to execute and deliver the DIP Documents, to grant the DIP Secured Parties allowed superpriority administrative expense claim status in each of these chapter 11 cases and any successor cases, subject to the Carve Out (as defined in the Interim Order), to incur all obligations owing to the DIP Secured Parties pursuant to the DIP Documents (collectively, the "DIP Obligations"), and to otherwise perform all of their respective obligations under the DIP Documents;

e.  subject to the Carve Out, granting to the DIP Agent (on behalf of the DIP Secured Parties) automatically perfected security interests in and liens on all of the DIP Collateral (as defined in the Interim Order), including, without limitation, all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date), other than payroll, trust, tax withholding and employee benefit accounts, or accounts located outside of the United States, or any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Collateral (together, "Cash Collateral"), which liens shall be subject to the priorities set forth herein;

f.  authorizing and directing the Debtors to use proceeds of the DIP Facility (as defined herein) and Cash Collateral to:  (a) pay the principal, interest, fees, expenses and other amounts payable and reimbursable under the DIP Documents or the Interim Order as such become due, including, without limitation, commitment fees and the fees and disbursements of the DIP Lender Professionals (as defined in the Interim Order); (b) make permitted adequate protection payments; (c) provide financing for working capital and other general corporate purposes, including for bankruptcy-related costs and expenses; and (d) to fund the Carve Out Reserves, all to the extent provided in, and in accordance with, the Approved Budget, the Interim Order, and the DIP Documents;

g.  authorizing the Debtors to use the Prepetition Collateral (as defined in the Interim Order), including all property constituting Cash Collateral of the Prepetition First Lien Secured Parties under the Prepetition Loan Documents (each term as defined in the Interim Order) on an interim basis in accordance with both the Approved Budget and the DIP Documents, and providing, among other things, adequate protection to the Prepetition First Lien Secured Parties for any diminution in value of their respective interests in the applicable Prepetition Collateral (including Cash Collateral), including resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral ("Diminution in Value"), subject to the restrictions set forth in the DIP Documents and the Interim Order;

h.  vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent set forth herein solely to the extent necessary to permit the Debtors, their affiliates, and the Prepetition Secured Parties implement and effectuate the terms and provisions of the DIP Documents and the Interim Order;

i.  authorizing payment of the certain fees and expenses;

j.  waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order and providing for the immediate effectiveness of the Interim Order; and

k.  scheduling a final hearing (the "Final Hearing") to consider the relief requested herein on a final basis and approving the form of notice with respect to the Final Hearing.

## Jurisdiction and Venue

2.  The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on

September 18, 2012 (Simandle, C.J.).  The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.       Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.       The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506(c), 507, and 552 of title 11 of the Bankruptcy Code, rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 4001-3, 9013-1, and 9013-5 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

### Background

5.       On the Petition Date, the Debtors filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

### Introduction

6.       The Debtors file these chapter 11 cases with committed debtor-in-possession financing that will provide them with sufficient liquidity to operate during these chapter 11 cases and, upon emergence, support go-forward operations.  Pursuant to this Motion, the Debtors request that the Court approve the DIP Facility in the aggregate amount of $360 million, including $90 million in new money commitments, with $35 million available on or after the date of the Court's entry of the Interim Order, $35 million available upon the date of the Court's entry of the Final Order, and up to $20 million in incremental new money financing committed from the Final

Order and available within 5 days prior to entry of the Confirmation Order.  On the effective date of the Debtors' chapter 11 plan (the "Plan Effective Date"), the New Money Loans will be converted (in accordance with the DIP Documents) to an exit senior secured, first lien "first out" term loan facility and the Roll-Up Loans will be converted (in accordance with the DIP Documents) on the Plan Effective Date into a senior secured, first lien "second out" term loan exit facility.  This Motion also requests approval for the Debtors' consensual use of the Cash Collateral on the terms and subject to the conditions set forth in the DIP Orders.

7.      Prior to these chapter 11 cases, the Debtors engaged in significant efforts to raise capital on either an in-court or out-of-court basis.  In the spring of 2023, the Debtors engaged Centerview Partners LLC ("Centerview") to assist the Debtors in an evaluation of strategic alternatives.  Centerview solicited interest from third-party investors and the Debtors' existing preferred equityholders on the terms of a debt or equity investment.  Ultimately, those efforts did not materialize into any actionable proposals due to, among other things, a difficult macroeconomic environment, the Debtors' ongoing operational turnaround, and investor reticence to fund into a complicated capital structure.

8.      In August 2023, the Debtors engaged with their existing lenders that formed the ad hoc group of lenders (the "Ad Hoc Group") holding approximately 81.1% of the Debtors outstanding debt.  The parties exchanged numerous term sheets over a multi-month period, and engaged in extensive, arm's length financing negotiations on the terms of the DIP Facility. Negotiations centered on fees, size of the new-money commitment, and the quantum of rolled-up First Lien Claims.  After several months, the Debtors, in consultation with their advisors, determined that the Ad Hoc Group's DIP Facility proposal was actionable and provided sufficient liquidity to operate the Debtors during these chapter 11 cases and through emergence.

9.     While negotiations with the Ad Hoc Group were ongoing, the Debtors conducted a "market test" to assess interest from third parties in providing debtor-in-possession financing on similar or better terms.  Only one party executed a non-disclosure agreement, and ultimately declined to submit a proposal.  Additionally, and as discussed in the First Day Declaration, the Debtors received a proposal from Corner Capital Management, LLC and J. Safra Sarasin to serve as plan sponsors for an in-court transaction (the "Corner Proposal").  The Ad Hoc Group extended its Forbearance Agreement several times to facilitate further discussions regarding the Corner Proposal.  The Corner Proposal was provided in the context of plan-sponsor led deal only, was non-binding, and remained subject to further diligence, ultimately rendering it unactionable. Accordingly, the terms of the DIP Facility are the best (and only) actionable postpetition financing terms available to the Debtors under the circumstances.

10.    The liquidity provided under the DIP Facility is necessary to allow the Debtors to satisfy postpetition obligations in the ordinary course, fund the Debtors' postpetition operations and chapter 11 process costs, and send a strong signal to the market and to the Debtors' key stakeholders that the Debtors have sufficient liquidity to continue to operate in the ordinary course. The "DIP-to-exit" structure of the DIP Facility is critical to the Debtors' restructuring as it provides the Debtors with a clear, definitive path to post-emergence financing for their go-forward enterprise from the outset of these chapter 11 cases.  Absent entry into the DIP Facility, the Debtors will have insufficient liquidity to implement the transaction contemplated by the Restructuring Support Agreement and continue operating their enterprise in the ordinary course, and have no other readily available sources of additional financing.

11.    Importantly, the DIP Facility is non-prejudicial to all other similarly-situated secured creditors.  Participation in the DIP Facility is open to all Holders of First Lien Claims on

a pro-rata basis.  This participation includes the ability to participate in the Roll-Up Loans on the same pro-rata basis that is being offered to the Ad Hoc Group.  As a result, every holder of First Lien Claims has the same opportunity as the members of the Ad Hoc Group to participate in the DIP Facility and benefit from the contemplated Roll-Up Loans.  The design and structure of the DIP Facility in this manner is a value-maximizing result for the estates.

12.    For these reasons, and for the reasons set forth below and in the Grossman Declaration, the Greene Declaration, and the First Day Declaration, the DIP Facility will maximize the value of the Debtors' estates and is a sound exercise of the Debtors' business judgment. Accordingly, the Debtors respectfully request that the Court enter the DIP Orders.

**Concise Statement Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-3**

## I.    Concise Statement regarding the DIP Facility.

13.    The following chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-3.[4]

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Thrasio, LLC, a Delaware limited liability company ("Thrasio").<br><br>*See* DIP Credit Agreement Preamble.<br><br>*See* Interim Order Preamble. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | The obligations of the Borrower shall be unconditionally guaranteed, on a joint and several basis, by each of Thrasio Holdings, Inc., a Delaware corporation ("Holdings"), Thrasio Intermediate Sub, LLC, a Delaware limited liability company ("Intermediate Holdings"), each Subsidiary Guarantor under the Prepetition Credit Agreement and certain other subsidiaries of Holdings  (collectively, the "Guarantors"; the Guarantors, together with the Borrower, the "DIP Loan Parties").  All obligations of the Borrower |

---

[4]    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion or this "Summary of Material Terms" is inconsistent in any respect with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | under the DIP Facility will be unconditionally guaranteed on a joint and several basis by the Guarantors.<br><br>*See* DIP Credit Agreement, Peamble. |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Wilmington Savings Fund Society, FSB. |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Certain Holders of First Lien Claims and backstopped by certain members of the Ad Hoc Group (the "DIP Backstop Parties").<br><br>*See* Restructuring Support Agreement, Exhibit B. |
| **Reporting Information**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility includes standard and customary conditions that require the DIP Borrowers to provide periodic reports to the DIP Lenders and their respective professionals regarding the Approved Budget, consolidated financial statements of the DIP Borrowers, key performance reports, summaries of accounts payable, and certain other matters.<br><br>*See* DIP Credit Agreement, Art. 5 § 1, 19. |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-3 | Unless converted to the Exit Facility, all obligations under the DIP Facility will be due and payable in full in cash on the earliest of: (a) the date that is four (4) months after the date of execution and delivery of the definitive documentation for the DIP Facility (such date, the "Closing Date") (the "Initial Maturity Date"), *provided* that the Initial Maturity Date may be extended in one month increments for up to four (4) months with the consent of the Required DIP Lenders and upon payment of the Maturity Extension Fee (as defined below) for the applicable extension; (b) if the Final Order has not been entered by the Bankruptcy Court on or before the applicable Milestone (as defined below), the date of the applicable Milestone; (c) the date of acceleration of the DIP Loans and the termination of the DIP Lenders' commitments under the DIP Facility pursuant to the terms of the DIP Credit Agreement; (d) the date the Bankruptcy Court orders a conversion of the Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the chapter 11 case of any Debtor; or (e) the substantial consummation (as defined in 11 U.S.C. § 1101(2)) of a plan of reorganization of the Debtors which has been confirmed by the Confirmation Order (such earliest date, the "Maturity Date").<br><br>*See* Restructuring Support Agreement, Exhibit B. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | New Money Loans:  $90 million with:  (a) $35 million available upon entry of the Interim Order; (b) $35 million available upon entry of the Final Order; and (c) up to $20 million, which shall be committed upon entry of the Final Order and available from and upon entry of the Confirmation Order (or available up to five business days prior to the estimated entry of the Confirmation Order, solely with the consent of the Required DIP Lenders, in their sole and absolute discretion).<br><br>Roll-Up Loans:  $270 million of the Prepetition First Lien Term Loans convert into the DIP Facility with:  (a) $35 million of Prepetition First Lien Term Loans deemed funded upon entry of the Interim Order on a 1:1 basis of New Money Loans; and (b) $235 million of First Lien Term Loans deemed funded upon entry of the Final Order.<br><br>*See* DIP Credit Agreement, Art. 2 § 1, Restructuring Support Agreement, Exhibit B. |
| **Conditions of Borrowing** | The DIP Documents include conditions to closing that are customary and appropriate for similar debtor-in-possession financings of this type. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | *See* DIP Credit Agreement, Art. 4. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | (a)  New Money Loans: SOFR + 8.00%, payable monthly in Cash.<br><br>(b)  Roll-Up Loans: SOFR + 10.00%, payable monthly in kind.<br><br>*See* Restructuring Support Agreement, <u>Exhibit B</u>. |
| **Use of DIP Financing Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-3 | The proceeds of the DIP Facility will be used, among other things, (a) for working capital and general corporate purposes, (b) to fund the administration of the Chapter 11 Cases; (c) to fund the Carve Out, and (d) to fund expenses, in the case of each of the foregoing (other than funding the Carve Out), solely in accordance with the DIP Budget.<br><br>*See* Restructuring Support Agreement, <u>Exhibit B</u>. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | As adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for any diminution in value of such interests, the Prepetition Secured Parties are granted automatically perfected postpetition security interests and liens as of the date of the Interim Order, as well as superpriority claims that have priority over all administrative expense claims against each of the Debtors subject to the Carve Out and the DIP Superpriority Claims.<br><br>*See* Interim Order ¶ F(v); ¶ 8. |
| **Roll-Up**<br>Local Rule 4001-3(b)(2)(D) | Subject to and upon entry of the Interim Order $35 million of outstanding Prepetition First Lien Term Loans shall "roll-up" into the DIP Facility.<br><br>Subject to entry of the Final Order, $235 million of outstanding Prepetition First Lien Term Loans shall "roll-up" into the DIP Facility for a total of $270 million in Roll-Up Loans.<br><br>The $270 million in aggregate amount of Roll-Up Loans shall convert into the Second-Out Term Loan Facility upon the Effective Date of the Plan.<br><br>*See* DIP Credit Agreement Art. 2 § 1(b); Interim Order Preamble. |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B)<br><br>Local Rule 4001-3<br><br>**Variance Covenant**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | The use of cash and proceeds from loans under the DIP Facility is subject to a customary budget.  The DIP Budget is attached to the Interim Order as <u>Exhibit B</u>.<br><br>*See* DIP Credit Agreement Art. 5 § 18.<br><br>*See* Interim Order ¶ 4, <u>Exhibit B</u>. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-3 | The DIP Credit Agreement and Interim Order contain events of default that are usual and customary for debtor-in-possession financings.<br><br>*See* DIP Credit Agreement, Art. 7. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Indemnification**<br>Bankruptcy Rule<br>4001(c)(1)(B)(ix) | The Borrower shall indemnify the Administrative Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages and liabilities (but limited, in the case of legal fees and expenses, to the actual reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, if reasonably necessary, one local counsel in any relevant jurisdiction to all Indemnitees, taken as a whole and solely in the case of an actual or perceived conflict of interest, (x) one additional counsel to all affected Indemnitees, taken as a whole, and (y) one additional local counsel to all affected Indemnitees, taken as a whole), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby or thereby and/or the enforcement of the Loan Documents, (ii) the use of the proceeds of the Loans, (iii) any actual or alleged Release or presence of Hazardous Materials on, at, under or from any property currently or formerly owned, leased or operated by the Borrower, any of its Subsidiaries or any other Loan Party or any Environmental Liability related to the Borrower, any of its Subsidiaries or any other Loan Party and/or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third party or by the Borrower, any other Loan Party or any of their respective Affiliates); provided that such indemnity shall not, as to any Indemnitee, be available to the extent that any such loss, claim, damage, or liability (i) is determined by a final and non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or, to the extent such judgment finds that any such loss, claim, damage, or liability has resulted from such Person's material breach of the Loan Documents or (ii) arises out of any claim, litigation, investigation or proceeding brought by such Indemnitee against another Indemnitee (other than any claim, litigation, investigation or proceeding that is brought by or against the Administrative Agent, acting in its capacity as the Administrative Agent) that does not involve any act or omission of Holdings, Intermediate Holdings, the Borrower or any of its subsidiaries.  Each Indemnitee shall be obligated to refund or return any and all amounts paid by the Borrower pursuant to Section 9.03(b) of the DIP Credit Agreement to such Indemnitee for any fees, expenses, or damages to the extent such Indemnitee is not entitled to payment thereof in accordance with the terms hereof.  All amounts due under this clause (b) shall be payable by the Borrower within ten (10) days (x) after receipt by the Borrower of a written demand therefor, in the case of any indemnification obligations and (y) in the case of reimbursement of costs and expenses, after receipt by the Borrower of an invoice setting forth such costs and expenses in reasonable detail, together with backup documentation supporting the relevant reimbursement request.  Section 9.03(b) shall not apply to Taxes other than any Taxes that represent losses, claims, damages or liabilities in respect of a non-Tax claim.<br><br>*See* DIP Credit Agreement, Art. 9 § 3(b).<br><br>*See* Interim Order ¶ 18. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule<br>4001(b)(l)(B)(i) | The Prepetition First Lien Agent, for the benefit of itself and the other Prepetition Secured Parties, respectively, has an interest in Cash Collateral.<br><br>*See* Restructuring Support Agreement, <u>Exhibit B</u>.. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Carve Out** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-3 | The DIP Orders provide a "Carve Out" of certain statutory fees and allowed professional fees, all as detailed in the Interim Order. <br><br> *See* Interim Order ¶ 9. |
| **Fees** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-3 | The DIP Credit Agreement and DIP Term Sheet provide: <br><br>     (a) a backstop payment (the "<u>Backstop Payment</u>") of the DIP Backstop Parties' *pro rata* share of an amount of (i) Cash in the aggregate amount of 7.5% of the New Money Loans or (ii) solely upon confirmation of the Plan, 10% of New Common Stock, subject to dilution only from the Management Incentive Plan. The Backstop Commitment shall be fully earned and approved on a final basis upon the entry of the Interim Order, but payable pursuant to the Confirmation Order upon the occurrence of the Plan Effective Date; <br><br>     (b) an original issue discount of 2.00% (earned and netted on the New Money Loans when funded); and <br><br>     (c) a maturity extension fee of 1.00% payment in kind for each one-month extension of the Initial Maturity Date. <br><br> The Interim Order provides that the Debtors are authorized to pay all reasonable and documented fees and expenses, whether incurred before or after the Petition Date, including all reasonable and documented fees and expenses of counsel and financial advisors to the DIP Agent and Prepetition Administrative Agent, DIP Lenders, Ad Hoc Group, and other professionals retained as provided for in the DIP Documents and this Interim Order, including, without limitation:  (i) Simpson Thacher & Bartlett LLP, as counsel to the RCF Lenders; (ii) Porzio, Bromberg & Newman, P.C., as local counsel to the RCF Lenders; (iii) Gibson, Dunn & Crutcher LLP as counsel to the DIP Lenders, DIP Agent, and the Ad Hoc Group; (iv) Sills Cummis & Gross P.C., as local bankruptcy counsel to the DIP Lenders and the Ad Hoc Group; (v) Evercore Group L.L.C., as financial advisor to the DIP Lenders and the Ad Hoc Group; and (vi) ArentFox Schiff LLP, as counsel to the DIP Agent. <br><br> *See* DIP Credit Agreement, Art. 2 § 12. <br><br> *See* Interim Order ¶ 18. <br><br> *See* Restructuring Support Agreement, <u>Exhibit B</u>. |
| **506(c) Waiver** <br> Bankruptcy Rule 4001(c)(1)(B)(x) <br><br> Local Rule 4001-3 <br><br> **Section 552(b)** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-3 | *Section 506(c) Claims*.  Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the chapter 11 cases at any time shall be charged against the DIP Agent, DIP Lenders, or, subject to entry of the Final Order, the Prepetition First Lien Secured Parties, or any of their respective claims, the DIP Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agents, DIP Lenders, or Prepetition First Lien Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders. <br><br> *Section 552(b)*.  Subject to entry of a Final Order, the Prepetition First Lien Secured Parties shall each be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition First Lien Secured Parties with respect to proceeds, product, offspring, or profits of any of the Collateral (including the Prepetition Collateral). |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | *See* Interim Order ¶¶ 34, 36. |
| **Liens on Avoidance Actions**<br>Local Rule 4001-3 | Proceeds from Avoidance Actions shall be subject to liens upon entry of the Final Order.<br><br>*See* Interim Order ¶ 6 |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-3 | After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately upon entry of the Interim Order, to certain stipulations regarding the validity and extent of the Prepetition First Lien Secured Parties' claims and liens.<br><br>*See* Interim Order, ¶ E. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i)<br><br>Local Rule 4001-3 | The liens contemplated by the DIP Credit Agreement will follow the following priority:<br><br>(a)  the Carve Out;<br><br>(b)  the DIP Liens;<br><br>(c)  the Prepetition Adequate Protection Liens.<br><br>*See* Interim Order ¶¶ 7-9. |
| **Chapter 11 Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | The Debtors are required to comply with the milestones contained in the Restructuring Term Sheet.<br><br>*See* Restructuring Support Agreement <u>Exhibit A</u>. |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-3 | The Interim Order provides for a standard and customary challenge period at the earliest of:<br><br>(a)  except as to any Committee, sixty (60) calendar days after entry of the Interim Order, and<br><br>(b)  in the case of any such adversary proceeding or contested matter filed by any Committee, sixty (60) calendar days after the appointment of such Committee, subject to further extension by written agreement of the Debtors and the Prepetition First Lien Agent (acting at the direction of the requisite Prepetition Lenders),<br><br>*provided that* if, prior to the end of the Challenge Period, (x) the cases convert to chapter 7, or (y) if a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended by the later of (A) the time remaining under the Challenge Period plus ten (10) days or (B) such other time as ordered by the Court solely with respect to any such trustee, commencing on the occurrence of either of the events discussed in the foregoing clauses (x) and (y).<br><br>*See* Interim Order ¶ 11. |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order.<br><br>*See* Interim Order, ¶ 10. |

## II.   The Debtors' Prepetition Capital Structure.

14.     As of the Petition Date, Thrasio has approximately $855.2 million in funded debt outstanding and $2.3 billion of outstanding preferred stock.[5]   The relative amounts of each debt obligation and preferred equity tranche are set forth herein are as follows:

### A.   The Credit Agreement.

15.     On December 18, 2020, Thrasio, LLC and certain of its subsidiaries entered into that certain senior secured first lien credit agreement, as amended by that certain first amendment, dated as of May 28, 2021, as amended by that certain second amendment, dated as of September 17, 2021, as amended by that certain third amendment, dated as of June 30, 2023, as amended by that certain forbearance and fourth amendment, dated as of September 29, 2023, and as amended by that certain forbearance and fifth amendment, dated as of December 29, 2023, and as otherwise amended, restated, supplemented, or otherwise modified from time to time, by and between Thrasio Intermediate Sub, LLC, as parent guarantor, Thrasio, LLC, as borrower, Royal Bank of Canada as administrative agent for the lenders, and the RCF Lenders and Term Loan Lenders as lenders party thereto (the "Credit Agreement").   The Credit Agreement is governed by New York law.   All credit facilities governed by the Credit Agreement (as described below) are secured on a *pari passu* basis with respect to all collateral securing the credit facilities.

---

[5]     Unless otherwise stated, all amounts outstanding referenced herein are inclusive of accrued interest and fees.

| *Funded Debt* | *Maturity* | *Amount Outstanding (in millions)* |
|---|---|---|
| Revolving Credit Facility | December 2025 | $66.2 |
| *Letters of Credit* | | $2.5 |
| Term Loan Facility | December 2026 | $786.5 |
| *Total Debt Obligations* | | *$855.2* |
| *Preferred Equity* | *Liquidation Preference Priority (on proceeds)* | *Amount of Series (in millions)* |
| Series X Redeemable Preferred Stock | First Priority | $739.4 |
| Series D Preferred Stock | Second Priority | $1,075 |
| Series C Preferred Stock & Senior Series B Preferred Stock | Third Priority | $646 |
| Junior Series B Preferred Stock | Fourth Priority | $36 |
| Series A Preferred Stock | Fifth Priority | $16 |
| Series Seed Preferred Stock | Sixth Priority | $6 |
| *Total Preferred Equity Outstanding* | | *$2,518.4* |
| *Total Debt and Preferred Equity Outstanding* | | *$3,373.6* |

### 1.    The Revolving Credit Facility.

16.    The Credit Agreement provides the Debtors with a $65,000,000 first lien revolving credit facility (the "Revolving Credit Facility").  The Revolving Credit Facility is guaranteed by Intermediate Holdings and certain of the Borrower's subsidiaries (the "Guarantors") and secured by a first priority lien on any and all property of the Borrower and each of its subsidiaries that are party to the Credit Agreement, except for "Excluded Assets" (as defined in the Credit Agreement) (the "First Lien Collateral").  The Borrower can select one month, three months, six months, or 12 months (or, to the extent available to all relevant affected lenders under the Revolving Credit Facility, a shorter period) as the interest period for each draw.  The Revolving Credit Facility accrues interest at a rate per annum equal to either ABR plus 6.00% or Term SOFR plus 7.00% (subject to adjustments downward based on the then-current leverage ratio).  The Revolving Credit Facility matures on December 18, 2025.

17.     As of the Petition Date, the Debtors have drawn approximately $66,200,000 in aggregate principal amount of revolving loans and have issued $2,500,000 of outstanding letters of credit.

### 2.     The Term Loan Facility.

18.     The Credit Agreement also provides for a term loan facility comprised of a $250,000,000 initial term loan tranche (the "Initial Term Tranche"), a $165,000,000 initial delayed draw tranche (the "Initial Delayed Draw Tranche"), and an incremental delayed draw tranche (the "Incremental Delayed Draw Tranche" and, together with the Initial Term Tranche and the Initial Delayed Draw Tranche, the "Term Loan Facility," and the loans provided thereunder, the "Term Loans").  As of the Petition Date, approximately $786,500,000 is outstanding under the Term Loan Facility.

(i)     The Initial Term Tranche.

19.     The Initial Term Tranche is guaranteed by the Guarantors and secured by a first priority lien on the First Lien Collateral.  The Initial Term Tranche accrues interest at a rate per annum equal to SOFR plus 7.00% and matures on December 18, 2026.  As of the Petition Date, the Initial Term Tranche is fully drawn.

(ii)     The Initial Delayed Draw Tranche.

20.     The Initial Delayed Draw Tranche is guaranteed by the Guarantors and secured by a first-priority lien on the First Lien Collateral.  The Initial Delayed Draw Tranche accrues interest at a rate per annum equal to SOFR plus 7.00% and matures on December 18, 2026.  As of the Petition Date, the Initial Delayed Draw Tranche is fully drawn.

(iii)     The Incremental Delayed Draw Tranche.

21.     Finally, the Credit Agreement permits the Borrower to add one or more new classes of delayed draw term loan facilities pursuant to the Incremental Delayed Draw Tranche,

16

guaranteed by the Guarantors and secured by a first-priority lien on the First Lien Collateral. The Credit Agreement permits the incurrence of additional debt under the Incremental Delayed Draw Tranche, as restricted by certain financial conditions. Currently, the Debtors are unable to incur additional debt through the Incremental Delayed Draw Tranche. The Incremental Delayed Draw Tranche accrues interest at a rate per annum equal to SOFR plus 7.00% and matures on December 18, 2026.

### B. Equity Interests in Thrasio.

22. As of the Petition Date, the Debtors have six series of preferred stock outstanding: (i) the Series X Redeemable Preferred Stock; (ii) the Series D Preferred Stock; (iii) the Series C Preferred Stock; (iv) the Series B Preferred Stock; (v) the Series A Preferred Stock; and (vi) the Series Seed Preferred Stock.

23. Approximately 56,730,393 shares of Common Stock are outstanding as of the Petition Date. Shares of the Debtors' common stock are widely held by employees, by current and former management of the Debtors, and primarily early-stage investors. The Common Stock is junior in right of payment to all shares of Preferred Stock.

### III. The Debtors Have a Need for Debtor-in-Possession Financing and Use of Cash Collateral.

24. The Debtors require immediate access to the DIP Facility in addition to continued use of the Prepetition First Lien Secured Parties' Cash Collateral to preserve the value of the Debtors' estates. As of the Petition Date, the operating cash balance of the Debtors (and their wholly owned subsidiaries) is approximately $25.7 million, which is insufficient to operate their enterprise and continue paying their debts as they come due. Grossman Decl. ¶ 14. If the Debtors cannot quickly access liquidity through the DIP Facility and the use of Cash Collateral, the Debtors will not be able to consummate the transaction contemplated by the Restructuring Support

Agreement while operating their business in the ordinary course during these chapter 11 cases. *Id*. In turn, this would negatively affect the Debtors' revenues, jeopardize the Debtors' stakeholders' confidence in the Debtors' business, and harm the value of the Debtors' estates to the detriment of all stakeholders. *Id*.  In addition, the Debtors rely on the Cash Collateral generated from their operations to, among other things, honor employee wages and benefits, procure goods and services integral to the Debtors' ongoing business operations, fund operational expenses, and maintain favorable relationships with their vendors, suppliers, employees, and customers. *Id*.  The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their business during the pendency of these chapter 11 cases.

25.    Prior to the Petition Date, the Debtors, in consultation with their proposed restructuring advisor, AlixPartners LLP, reviewed and analyzed their cash needs and prepared near-term and longer-term liquidity forecasts, including the Approved Budget.  Grossman Decl. ¶ 13.  The Debtors believe that the Approved Budget and the projections therein provide a good faith estimate of their funding requirements over the identified period and are reasonable and appropriate under the circumstances.  Furthermore, the Debtors relied on these forecasts to determine the amount of postpetition financing required to administer these chapter 11 cases. *Id*. Based on these analyses, the Debtors determined that they would require access to the $70 million in incremental liquidity provided by the DIP Facility during the pendency of the chapter 11 cases and the additional $20 million in liquidity upon entry of the Confirmation Order to effectuate the transaction contemplated by the Restructuring Support Agreement while providing sufficient liquidity to support the Debtors' business operations and go-forward enterprise.  Absent funds available from the DIP Facility and access to Cash Collateral, the Debtors would face a value-destructive interruption to their business operations and would have insufficient liquidity to

implement the restructuring transactions contemplated by the Restructuring Support Agreement. Grossman Decl. ¶ 14.

## IV.    Alternative Sources of Financing Are Not Available on Better Terms.

26.    Prior to executing the DIP Documents, the Debtors, the DIP Lenders, and the Ad Hoc Group engaged in good faith, arm's-length negotiations regarding the terms of the DIP Facility and the Debtors' use of Cash Collateral.  The Debtors conducted two marketing processes to solicit external financing proposals—one to solicit proposals from third-party investors for a capital injection, and another to solicit alternative debtor-in-possession financing proposals as a "market check" for the DIP Facility.  Neither process yielded an actionable alternative to the DIP Facility.

27.    In June 2023, Centerview initiated outreach for an incremental debt or equity investment on either an in-court or out-of-court basis.  Centerview reached out to parties with prior experience in either the aggregator space specifically or the e-commerce sector overall.  However, the Debtors' external capital raise efforts unfortunately coincided with a period of significant macroeconomic headwinds and global volatility.  Rampant inflation and interest rate "hikes" by the U.S. Federal Reserve contributed to fears of a global recession and pullback in consumer spending, which created a difficult market environment for raising capital.  At the conclusion of the process, the Debtors failed to receive a single actionable financing proposal.  Greene Decl. ¶ 10.  The Debtors received no proposals for a debt investment and only two proposals for an equity investment, which were predicated on significant concessions that rendered the proposals unactionable.  *Id.*  Accordingly, the Debtors pivoted to good faith, arm's length negotiations with the Ad Hoc Group on the terms of the Restructuring Support Agreement and, ultimately, the DIP Facility.  Greene Decl. ¶ 12.

28.      Prior to executing the Restructuring Support Agreement and DIP Documents, Centerview conducted a "market check" for the DIP Facility to ascertain whether an alternative debtor-in-possession financing facility was available.  Centerview contacted a number of potential lenders over several weeks.  Greene Decl. ¶ 12.  Ultimately, Centerview's market check yielded no actionable proposals for debtor-in-possession financing.  *Id*.  Accordingly, the terms of the DIP Facility are the best (and only) actionable postpetition financing terms available to the Debtors under the circumstances.

29.      The Debtors, in consultation with their advisors, determined that the DIP Lenders' financing proposal provides necessary liquidity on the best available terms.  The proposed DIP Facility is thus in the best interests of the Debtors and their estates.

<u>**Basis for Relief**</u>

**I.      The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents.**

   **A.      Entering into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

30.      The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the

lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

31.     Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

32.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP Lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. ***Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*** This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

33.    The Debtors' determination to move forward with the DIP Facility following a robust, arm's-length marketing and negotiation process is well within the Debtors' sound business judgment. The DIP Facility will allow the Debtors to: (a) fund ongoing operations during these chapter 11 cases; (b) send a clear "business-as-usual" message to customers, employees, and vendors; (c) fund the administrative costs of these chapter 11 cases; (d) bridge toward a successful restructuring; and (e) provide the Debtors with committed exit financing.

34.    The DIP Facility and the proposed terms for postpetition Cash Collateral use are tailored to the Debtors' capital structure and go-forward funding needs and provide for appropriate adequate protection terms as set forth in the Interim Order. Additionally, the DIP Facility's economic terms are competitive, and there are no alternative sources of postpetition financing available to the Debtors.

35.    Accordingly, the Debtors' entry into and performance under the DIP Facility is an exercise of the Debtors' sound business judgment and should be approved.

**B.    The Roll-Up of the Prepetition First Lien Term Loans Is Appropriate.**

36.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. It is well settled in

the Third Circuit that such transactions should be approved when they are supported by a sound

business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (so holding).  The

business judgment rule shields such business decisions from judicial second-guessing.

*In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy]

Code favors the continued operation of a business by a debtor and a presumption of reasonableness

attaches to a debtor's management decisions.").

  37. The repayment of prepetition funded indebtedness with postpetition financing

(often referred to as a "roll-up") is a common feature in debtor in possession financing

arrangements.   Courts in this jurisdiction and other jurisdictions have approved similar

DIP financing features, including on the first day of the case.  *See, e.g.*, *In re Rite Aid Corp.*,

No. 23-18993 (MBK) (Dec. 22, 2023) (authorizing a "creeping" roll-up of the prepetition ABL

facility pursuant to entry of the interim order and a final roll-up of the prepetition revolving facility

and prepetition FILO facility upon entry of the final order); *In re Cyxtera Techs., Inc.*,

No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023) (authorizing an approximately $200 million DIP

financing that included a roll-up of up to $36 million in prepetition first lien term loans debt

pursuant to interim order); *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. May

24, 2023) (authorizing a "creeping" roll-up of prepetition ABL facility pursuant to interim order

and a final roll-up of remaining amounts pursuant to final order); *In re Bed Bath & Beyond Inc.*,

No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 24, 2023) (authorizing an approximately $240 million

DIP financing that included a roll-up of up to $200 million in prepetition secured first in, last out

term loans debt pursuant to interim order); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS)

(Bankr. D. Del. July 23, 2019) (authorizing an approximately $240 million DIP financing that

included a roll-up of $70 million in prepetition term loans debt and up to $82 million of prepetition

ABL debt pursuant to interim order); *In re Charming Charlie LLC*, No. 19-11534 (CSS) (Bankr. D. Del. July 12, 2019) (authorizing a "creeping" roll-up of prepetition ABL facility pursuant to interim order and a final roll-up of remaining amounts pursuant to final order); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing an approximately $1.23 billion DIP financing including a full roll-up of the prepetition ABL outstanding principal of $639 million pursuant to interim order); *In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing approximately $338 million DIP and a roll-up of approximately $150 million which included a full ABL roll-up of $114 million pursuant to interim order).[6]

38.     The roll-up of the Prepetition First Lien Term Loans is a material component of the consideration required by the DIP Lenders as part of their commitment to provide postpetition financing.   Greene Decl. ¶ 16-17.   Additionally, the Roll-Up Loans are non-coercive and non-prejudicial to other holders of First Lien Claims.   This structure was purposefully designed by the Debtors and the Ad Hoc Group.   The DIP Facility and DIP Orders expressly contemplate a syndication period that will be open to all similarly situated holders of First Lien Claims allowing them to determine whether or not they want to participate in the DIP Facility, including the contemplated roll-up.   The open participation of the DIP Facility on a pro rata basis is an incredible result of arms-length negotiations that benefits the estates and helps ensure that the Debtors' have a value-maximizing path toward a reorganization because it does not prejudice any one class of secured creditors over another.

39.     Further, refinancing the Prepetition First Lien Term Loans will not prejudice any party's right to challenge the amount, validity, perfection, enforceability, priority, or extent of the

---

[6]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

Prepetition First Lien Term Loans or the liens thereto as the $235 million Final Roll-Up is subject to entry of a Final Order and subject to the challenge procedures set forth in the DIP Orders. Pursuant to the procedures set forth in the Interim Order, (a) any official committee of unsecured creditors, within sixty (60) calendar days after the appointment of such committee, and (b) except as to any committee, within sixty (60) calendar days after entry of the Interim Order, may bring a challenge proceeding seeking to avoid, object to, or otherwise challenge the validity, enforceability, extent, priority, or perfection of the (i) mortgages, security interest, and liens of the Prepetition First Lien Agent and the Prepetition First Lien Secured Parties, or (ii) the Prepetition Obligations. These procedures were developed to ensure that no non-Debtor party in interest would be prejudiced by the relief requested herein. *See* Interim Order ¶ 11.

40.     The DIP Facility, in addition to providing critical access to funding throughout the chapter 11 cases, also provides the Debtors with other important benefits. Significantly, the DIP Lenders have agreed to roll the Roll-Up Loans into a "second out" exit facility to fund the Debtors' emergence from chapter 11. Having exit financing in hand this early in the chapter 11 cases sends a strong and positive message to the Debtors' constituencies that they are already beginning to lay the groundwork to emerge and implement their reorganization strategy.

41.     Finally, the Ad Hoc Group indicated that they would not provide the DIP Facility absent inclusion of the roll-up, and no alternative sources of postpetition financing are available to the Debtors. Without access to the DIP Facility, the Debtors would be unable to continue as a going concern and bridge to the comprehensive restructuring contemplated by the Restructuring Support Agreement. Given these circumstances, the Roll-Up Loans are reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

**C.     The Debtors Should Be Authorized to Grant Liens, Priming Liens, and Superpriority Claims.**

42.     The Debtors propose to obtain financing under the DIP Facility by providing security interests, liens, including priming liens, and superpriority claims as set forth in the DIP Documents and the DIP Orders pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.  Specifically, the DIP Documents contemplate that the Debtors' obligations under DIP Credit Agreement will be secured by first-priority liens on all encumbered property that constitutes "Collateral" under the Credit Agreement, including the proceeds thereof and all other assets of the DIP Loan Parties that do not constitute "Collateral" under the Credit Agreement.

43.     These liens on encumbered and unencumbered assets are common features in postpetition financing facilities and are necessary to obtain the DIP Facility.  Indeed, postpetition financing facilities approved in this Circuit and elsewhere routinely are secured by a debtor's unencumbered assets and the proceeds thereof, such as proceeds of leaseholds that are subject to leases that prohibit the impositions of liens thereon.  *See, e.g.*, *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. Jan. 24, 2024) (approving DIP liens on collateral including any leasehold interests or the proceeds thereof as permitted by applicable law on an interim basis); *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Dec. 22, 2023) (approving DIP liens on collateral including any leasehold interests or the proceeds thereof as permitted by applicable law); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023) (same); *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. May 24, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 24, 2023) (same). [7]

---

[7]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

44.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."    11 U.S.C. § 364(c).    *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).    Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code.    Specifically, courts look to whether:

    a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

    b.    the credit transaction is necessary to preserve the assets of the estate; and

    c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

45.     The Debtors satisfy each part of this test:    ***First***, as described above, no third-party lender was willing to provide postpetition financing on an unsecured or junior priority basis, as evidenced by Centerveiw's marketing processes.    ***Second***, the additional liquidity provided by the DIP Facility is necessary for the Debtors to bridge to a successful reorganization, and the Debtors do not have any other viable postpetition financing options available to them.    Absent approval of the DIP Facility and use of Cash Collateral, the Debtors will have no clear path to exit chapter 11, and the value of the Debtors' estates will be significantly impaired to the detriment of all stakeholders.    ***Finally***, the DIP Facility is the market-tested product of good-faith, arm's-length negotiations among the Debtors and the DIP Lenders.    Given these circumstances, the Debtors

believe that the terms of the DIP Facility, as set forth in the DIP Documents and the Interim Order, are fair, reasonable, and adequate. For all these reasons, the Debtors have met the standard for obtaining postpetition financing under section 364(c) of the Bankruptcy Code.

46.     If a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving superpriority claims and liens on unencumbered property of the Debtors in favor of the DIP Lenders is also reasonable and appropriate.

47.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition First Lien Secured Parties have consented or (b) the Prepetition First Lien Secured Parties' interests in collateral are adequately protected. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

48.     Here, the applicable Prepetition First Lien Secured Parties are consenting to the priming DIP liens, and the Debtors are not seeking to grant priming DIP liens on a non-consensual basis.  In particular, the Debtors are not seeking to grant priming DIP liens on any Prepetition Collateral.  Moreover, the Interim Order includes customary adequate protection provisions to adequately protect the Prepetition First Lien Secured Parties' interests in collateral.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**D.      No Comparable Alternative to the DIP Facility Is Reasonably Available.**

49.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989);  *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

50.     Here, as described above, the Debtors conducted a comprehensive marketing process for a debt or equity investment and a "market check" process for alternative

debtor-in-possession financing proposals.  Neither process yielded an actionable alternative to the

DIP Facility.  The DIP Facility is only viable postpetition financing option available to the Debtors.

## II.    The Use of Cash Collateral Is Warranted and Should Be Approved.

51.    The Debtors' use of property of their estates, including the Cash Collateral, is

governed by section 363 of the Bankruptcy Code,[8] which provides in relevant part that:

> If the business of the debtor is authorized to be operated under
> section . . . 1108 . . . of this title and unless the court orders
> otherwise, the [debtor] may enter into transactions, including the
> sale or lease of property of the estate, in the ordinary course of
> business, without notice or a hearing, and may use property of the
> estate in the ordinary course of business without notice or a hearing.

52.    11 U.S.C. § 363(c)(1).  Pursuant to section 363(c)(2) of the Bankruptcy Code, a

debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral

consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in

accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

53.    Section 363(e) of the Bankruptcy Code provides for the adequate protection of

interests in property when a debtor uses Cash Collateral.  Further, section 362(d)(1) of the

Bankruptcy Code provides for adequate protection of interests in property due to the imposition

of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While

section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as

granting replacement liens and administrative claims, courts decide what constitutes sufficient

---

[8]    Section 363(a) of the Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash
> equivalents whenever acquired in which the estate and an entity other than the estate have an interest
> and includes the proceeds, products, offspring rents, or profits of property and the fees, charges,
> accounts or other payments for the use or occupancy of rooms and other public facilities in hotels,
> motels, or other lodging properties subject to a security interest as provided in section 552(b) of this
> title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

adequate protection on a case-by-case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also  In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

54.    The Debtors intend to provide the Prepetition First Lien Secured Parties with adequate protection in the form of (a) replacement liens and (b) Superpriority Claims, in each case subject to the Carve Out.  Further, the Prepetition First Lien Secured Parties will inherently benefit from the Debtors' proposed use of the Cash Collateral, which will prevent avoidable diminution in value of the Cash Collateral and enhance the likelihood of preserving the Debtors' overall going concern value as the Debtors operate their business within chapter 11.  Preservation of the Debtors' business as a going concern in and of itself serves to provide such parties "adequate protection" for Bankruptcy Code purposes.  *See 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("an

increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989).

55.    The importance and appropriateness of allowing debtors to use cash collateral and granting adequate protection to prepetition secured parties in large chapter 11 cases has been repeatedly recognized by courts in this district, and such courts have granted relief similar to the relief requested herein.  *See, e.g.*, *In re Careismatic Brands, LLC.*, No. 24-10561 (VFP) (Bankr. D.N.J. Jan. 24, 2024) (authorizing debtors to use cash collateral and granting adequate protection in the form of, among other things, replacement liens on prepetition collateral, superpriority administrative claims pursuant to section 507(b), and fees and expenses on an interim basis); *In re WeWork, Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. Dec. 11, 2023) (authorizing debtors to use cash collateral and granting adequate protection in the form of, among other things, replacement liens on prepetition collateral, superpriority administrative claims pursuant to section 507(b), and fees and expenses); *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Oct. 16, 2023) (same); *In re Cyxtera Techs., Inc.*, No. 23-14854 (JKS) (Bankr. D.N.J. Jun. 7, 2023) (same); *Bed Bath & Beyond, Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 24, 2023) (same).

56.    The proposed adequate protection in the proposed Interim Order is necessary and sufficient for the Debtors to continue to use Cash Collateral.  Accordingly, the adequate protection is (a) fair and reasonable, (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and (c) in the best interests of the Debtors and their estates.

**III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders under the DIP Documents.**

57.    Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees, expenses, and other payments to the DIP Agent and the DIP Lenders.  The Debtors

have also agreed to pay the fees and expenses of counsel and other professionals retained as provided for in the DIP Documents.  In particular, the Debtors have agreed to pay:

    a.   **Interest Rates:**  with respect to the New Money Loans, SOFR + 8.00%, payable monthly in Cash, and with respect to the Roll Up Loans, SOFR + 10.00%, payable monthly in kind;

    b.   **Original Issue Discount:**  two (2) percent (earned and netted on New Money Loans when funded**);**

    c.   **Backstop Payment**:  The DIP Backstop Parties' *pro rata* share of an amount of (i) Cash in the aggregate amount of 7.5% of the New Money Loans or (ii) solely upon confirmation of the Plan, 10% of New Common Stock, subject to dilution only from the Management Incentive Plan.  The Backstop Commitment shall be fully earned and approved on a final basis upon the entry of the Interim Order, but payable pursuant to the Confirmation Order upon the occurrence of the Plan Effective Date;

    d.   **Maturity Extension Fee**: one (1) percent payable in kind upon each one-month extension of the Initial Maturity Date; and

    e.   **Professional Fees:**  The Interim Order provides that the Debtors are authorized to pay all reasonable and documented fees and expenses, whether incurred before or after the Petition Date, including all reasonable and documented fees and expenses of counsel and financial advisors to the DIP Agent and Prepetition Administrative Agent, DIP Lenders, Ad Hoc Group, and other professionals retained as provided for in the DIP Documents and this Interim Order, including, without limitation:  (i) Simpson Thacher & Bartlett LLP, as counsel to the RCF Lenders; (ii) Porzio, Bromberg & Newman, P.C., as local counsel to the RCF Lenders; (iii) Gibson, Dunn & Crutcher LLP as counsel to the DIP Lenders, DIP Agent, and the Ad Hoc Group; (iv) Sills Cummis & Gross P.C., as local bankruptcy counsel to the DIP Lenders and the Ad Hoc Group; (v) Evercore Group L.L.C., as financial advisor to the DIP Lenders and the Ad Hoc Group; and (vi) ArentFox Schiff LLP, as counsel to the DIP Agent.

    58.    As set forth in the Greene Declaration, the fees and expenses were negotiated at arm's length and are, in aggregate, generally consistent with debtor-in-possession financings of this type.  Greene Decl. ¶ 19.  These fees, moreover, were expressly required by the Prepetition First Lien Secured Parties as a condition to providing financing.  *Id.*  The Debtors considered the amounts described above when determining in their sound business judgment that the DIP Facility constituted the best terms on which the Debtors could obtain the postpetition financing necessary

to continue their operations and prosecute these chapter 11 cases.  The Debtors do not believe that a loan with terms similar to those in the DIP Facility is available to the Debtors for lower fees. The fees and expenses provided for under the DIP Facility are reasonable and within market practice for debtor-in-possession financings of this size and type.  Accordingly, the Court should authorize the Debtors to pay the fees and expenses provided under the DIP Documents in connection with the DIP Facility.

59.     Courts have approved similar fees in large chapter 11 cases.  *See, e.g., In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. Jan. 24, 2024) (approving an 11% backstop premium, on an interim basis, payable-in-kind); *In re MD Helicopter Inc.*, No. 22-10263 (KBO) (Bankr. D. Del. April 4, 2022) (approving an 8% backstop fee payable in cash or equity interests); *In re Instant Brands Acquisition Holdings, Inc.*, No, 23-90716 (DRJ) (Bankr. S.D. Tex. August 9. 2023) (approving a 10% backstop fee payable in cash); *In re Party City Holdco Inc.*, No. 23-90005 (DRJ) (Bankr. S.D. Tex. March 3, 2023) (approving a 10% backstop commitment fee payable in cash); *In re Lumileds Holding B.V.*, No. 22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 13, 2022) (approving a 10.5% backstop fee in new common equity).

## IV.    The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protection under Section 364(e).

60.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such

authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

61.    The DIP Facility is the result of (i) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, and (ii) extensive arm's-length, good-faith negotiations with the DIP Lenders.  The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Agent and the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Agent and the DIP Lenders are entitled to all of the protections afforded thereby.

**V.    The Automatic Stay Should Be Modified on a Limited Basis.**

62.    The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the DIP Orders and authorize the Debtors to make, and the recipients to retain and apply, payments.  The proposed Interim Order further provides that the automatic stay is modified to the extent necessary to implement and effectuate the terms of the Interim Order.  Finally, the proposed Interim Order provides that the automatic stay shall be vacated and modified, subject to certain limitations, to the extent necessary to permit the DIP Agent and DIP Lenders to exercise certain remedies upon the occurrence of an event of default by the Debtors under the DIP Documents.

63.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. Jan. 24, 2024) (modifying automatic stay as necessary to effectuate the terms of the order on an interim basis); *In re Rite Aid Corp.*, No. 23-18992 (MBK) (Bankr. D.N.J. Dec. 22, 2023) (modifying automatic stay as necessary to effectuate the terms of the order); *In re WeWork Inc.,* No. 23-19865 (JKS) (Bankr. D.N.J. Dec. 11, 2023) (same); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023) (same); *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. May 24, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 24, 2023) (same); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. July 23, 2019) (same); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same).[9]

## VI.     Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

64.     Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court is empowered to conduct an interim expedited hearing on the motion at which it may authorize a debtor to use cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Bankruptcy Rule 4001(b)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable

---

[9]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).

65.    For the reasons detailed above, it is imperative that the Debtors obtain additional liquidity under the DIP Facility and access to use Cash Collateral at the outset of these chapter 11 cases. This relief is essential to the Debtors' preservation and maximization of estate value for the benefit of all stakeholders. Absent interim approval of the relief requested in this Motion, the Debtors would face immediate and irreparable harm due to liquidity constraints and resulting operational and business challenges, including erosion of employee, vendor, and customer confidence. As such, interim approval of the relief requested herein will be critical to the Debtors' ability to continue operating in the ordinary course of business and successfully administer these chapter 11 cases.

### Request for Final Hearing

66.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

### The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

67.    Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 30 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. The relief requested herein is vital to a smooth transition into chapter 11. Accordingly, the Debtors submit that they have satisfied

the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support the relief requested herein.

## Waiver of Memorandum of Law

68.     The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

## Reservation of Rights

69.     Nothing contained in this Motion or any order granting the relief requested in this Motion, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

**No Prior Request**

70.     No prior request for the relief sought in this Motion has been made to this or any

other court.

**Notice**

71.     The Debtors will provide notice of this Motion to the following parties and/or their

respective counsel, as applicable:  (a) the Office of the United States Trustee for the District of

New Jersey; (b) the Debtors' 30 largest unsecured creditors (on a consolidated basis); (c) Gibson,

Dunn & Crutcher LLP, as counsel to the Ad Hoc Group; (d) counsel to the Administrative Agent

under the Revolving Credit Facility; (e) the United States Attorney's Office for the District of New

Jersey; (f) the Internal Revenue Service; (g) the attorneys general in the states where the Debtors

conduct their business operations; (h) counsel to the DIP Lenders; (i) counsel to the DIP Agent;

and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit

that, in light of the nature of the relief requested, no other or further notice need be given.

**WHEREFORE**, the Debtors respectfully request that the Court enter the DIP Orders,

granting the relief requested herein and such other relief as is just and proper.

Dated: February 28, 2024

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Jacob S. Frumkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com
            jfrumkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com

-and-

Matthew C. Fagen, P.C. (*pro hac vice* pending)
Francis Petrie (*pro hac vice* pending)
Evan Swager (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
matthew.fagen@kirkland.com
francis.petrie@kirkland.com
evan.swager@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

## Exhibit A

**Interim Order**

**[TO COME]**