> **THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| THRASIO HOLDINGS, INC., *et al.*, | Case No. 24-11840 (CMG) |
| Debtors.[1] | (Joint Administration Requested) |

---

## DISCLOSURE STATEMENT FOR THE
## JOINT PLAN OF REORGANIZATION OF THRASIO HOLDINGS, INC.
## AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com

-and-

Matthew C. Fagen, P.C. (*pro hac vice* pending)
Francis Petrie (*pro hac vice* pending)
Evan Swager (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
matthew.fagen@kirkland.com
francis.petrie@kirkland.com
evan.swager@kirkland.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

Dated: February 28, 2024

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Jacob S. Frumkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
jfrumkin@coleschotz.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

---

[1] The last four digits of Debtor Thrasio Holdings, Inc.'s tax identification number are 8327. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims, noticing and solicitation agent at https://www.kccllc.net/Thrasio. The Debtors' service address for purposes of these chapter 11 cases is 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245.

**<u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>**

EACH OF THE DEBTORS STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS THAT ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE CLAIMS, NOTICING AND SOLICITATION AGENT NO LATER THAN [MAY 7], 2024 AT 4:00 P.M. (PREVAILING EASTERN TIME) PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOTS.  THE BOARD OF DIRECTORS, SOLE STOCKHOLDER, MEMBER, OR MANAGER, AS APPLICABLE, FOR EACH OF THE DEBTORS HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERIES TO HOLDERS OF CLAIMS.  AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF THRASIO HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.  IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF

THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS AND THEIR FUTURE RESULTS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING THE "RISK FACTORS" INCLUDED IN ARTICLE IX, BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS AND FORWARD LOOKING STATEMENTS

**The Plan and Disclosure Statement have neither been filed with, nor approved or disapproved by the SEC or any similar federal, state, local, or foreign federal regulatory authority and neither the SEC nor any such similar regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan.  The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue-Sky Laws").  Any representation to the contrary is a criminal offense.  The securities may not be offered or sold within the United States or to, or for the account or benefit of, United States persons (as defined in Regulation S under the Securities Act), except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable laws of other jurisdictions.**

**The Debtors will rely on section 1145 of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of New Common Stock under the Plan (other than the New Common Stock issued on account of the Backstop Payment and other than any New Common Stock underlying the Management Incentive Plan), and to the extent such exemption is not available, then such New Common Stock will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws, including Blue-Sky Laws.  Neither the solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.**

**Any New Common Stock issued on account of the Backstop Payment or underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon the exemption from registration provided by Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other exemptions from registration, and similar Blue-Sky Laws, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.**

**This Disclosure Statement contains "forward-looking statements" within the meaning of United States securities laws.  Statements containing words such as "anticipate," "believe," "estimate," "expect," "intend," "plan," "project," "target," "model," "can," "could," "may," "should," "will," "would," or similar words or the negative thereof, constitute "forward-looking statements."  However, not all forward-looking statements in this Disclosure Statement may contain one or more of these identifying terms.  Forward-looking statements are based on the Debtors' current expectations, beliefs, assumptions and estimates.  These statements are subject to significant risks, uncertainties and assumptions that are difficult to predict and could cause actual results to differ materially and adversely from those expressed or implied in the forward-looking statements.  The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:**

- **The Debtors' Plans, Objectives, and Expectations;**

- **The Debtors' Business Strategy;**

- **The Debtors' Financial Strategy, Budget, Projections, and Operating Results;**

- **The Debtors' Financial Condition, Revenues, Cash Flows, and Expenses;**

- **The Success of the Debtors' Operations;**

- **The Costs of Conducting the Debtors' Operations;**

- **The Debtors' Levels of Indebtedness, Liquidity, and Compliance With Debt Covenants;**

- **The Level of Uncertainty Regarding the Debtors' Future Operating Results;**

- **The Amount, Nature, and Timing of the Debtors' Capital Expenditures;**

- **The Terms of Capital Available to the Debtors;**

- **The Debtors' Ability to Satisfy Future Cash Obligations;**

- **The Integration and Benefits of Asset and Property Acquisitions and/or the Effects of Asset and Property Acquisitions or Dispositions on the Debtors' Cash Position and Levels of Indebtedness;**

- **The Risks Associated with Certain of the Debtors' Acquisitions;**

- **The Effectiveness of the Debtors' Risk Management Activities;**

- **The Debtors' Counterparty Credit Risk;**

- **The Outcome of Pending and Future Litigation Claims;**

- **General Economic and Business Conditions; and/or**

- **The Potential Adoption of New Governmental Regulations.**

**Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Reorganized Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties and factors may include the following: (a) the Debtors' ability to confirm and consummate the Plan; (b) the potential that the Debtors may need to pursue an alternative transaction if the Plan is not confirmed; (c) the Debtors' ability to reduce their overall financial leverage; (d) the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees; (e) the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; (f) customer responses to the Chapter 11 Cases; (g) the Debtors' inability to discharge or settle claims during the Chapter 11 Cases; (h) the Debtors' plans, objectives, business strategy, and expectations with respect to future financial results and liquidity, including the ability to finance operations in the ordinary course of business; (i) the Debtors' levels of indebtedness and compliance with debt covenants; (j) additional post-restructuring financing requirements; (k) the amount, nature, and timing of the Debtors' capital expenditures and cash requirements, and the terms of capital available to the Debtors'; (l) the effect of competitive products, services, or procuring by competitors; (m) the outcome of pending and future litigation claims; (n) the proposed restructuring and costs associated therewith; (o) the effect of natural disasters, pandemics, and general economic and political conditions on the Debtors; (p) the Debtors' ability to implement cost-reduction initiatives in a timely manner; (q) adverse tax changes; (r) the terms and conditions of the New Common Stock, to be entered into, or issued, as the case may be, pursuant to the Plan; (s) the results of renegotiating certain key commercial agreements and any disruptions to relationships with sellers, suppliers, partners, among others; (t) compliance with laws and regulations; and (u) each of the other risks identified in this Disclosure Statement. Due to these uncertainties, you cannot be assured that any forward-looking statements will prove to be correct. The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.**

**You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analysis, financial projections, and other projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims among other things, may be affected by many**

**factors that cannot be predicted.  Any analyses, estimates, or recovery projections may or may not turn out to be accurate.**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ...................................................................................................................1

II.     PRELIMINARY STATEMENT ..........................................................................................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        PLAN .......................................................................................................................................2

        A.      What is chapter 11?.................................................................................................2
        B.      Why are the Debtors sending me this Disclosure Statement?.............................2
        C.      Am I entitled to vote on the Plan?.........................................................................2
        D.      What will I receive from the Debtors if the Plan is consummated?....................3
        E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP
                Facility Claim, or a Priority Tax Claim?...............................................................5
        1.      Administrative Claims ............................................................................................5
        2.      Professional Fee Claims..........................................................................................6
        3.      DIP Facility Claims..................................................................................................7
        4.      Priority Tax Claims.................................................................................................7
        5.      Transaction Expenses..............................................................................................7
        6.      Statutory Fees..........................................................................................................7
        F.      Are any regulatory approvals required to consummate the Plan?....................8
        G.      What happens to my recovery if the Plan is not confirmed or does not go effective? ....8
        H.      Is there potential litigation related to the Plan?..................................................8
        I.      What is the Management Incentive Plan and how will it affect the distribution I receive
                under the Plan?........................................................................................................8
        J.      Does the Plan preserve Causes of Action?............................................................8
        K.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
                Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
                "Consummation?".....................................................................................................9
        L.      How do I know if my Claim is a General Unsecured Claim? ..............................9
        M.      What are the sources of Cash and other consideration required to fund the Plan?...........9
        N.      Are there risks to owning the New Common Stock upon emergence from Chapter 11?.....9
        O.      Will there be releases and exculpation granted to parties in interest as part of the Plan? ....9
        P.      What is the deadline to vote on the Plan? ...........................................................13
        Q.      How do I vote for or against the Plan?.................................................................13
        R.      Why is the Bankruptcy Court holding a Confirmation Hearing?....................14
        S.      When is the Confirmation Hearing set to occur?...............................................14
        T.      What is the purpose of the Confirmation Hearing?...........................................14
        U.      What is the effect of the Plan on the Debtors' ongoing business? ...................14
        V.      Will any party have significant influence over the corporate governance and operations of
                the Reorganized Debtors?.....................................................................................15
        W.      What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? ............15
        X.      Who do I contact if I have additional questions with respect to this Disclosure Statement
                or the Plan?...........................................................................................................15
        Y.      Do the Debtors recommend voting in favor of the Plan?..................................15
        Z.      Who Supports the Plan?.......................................................................................16

IV.     THE DEBTORS' HISTORY AND OPERATIONS .........................................................16

        A.      The Debtors' Corporate Structure and History ...............................................16
        B.      The Debtors' Assets and Operations...................................................................16
        C.      The Debtors' Prepetition Corporate and Capital Structure ...........................16

V.      EVENTS LEADING TO THESE CHAPTER 11 CASES ................................................17

        A.      Industry-Wide Headwinds and the Impact of the COVID-19 Pandemic .......17

| | B. | Strategic Missteps | 17 |
| | C. | 2022 Operational Initiatives | 18 |
| | D. | 2023 Capital Raise | 18 |
| | E. | Ad Hoc Group Negotiations | 19 |

**VI.** **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** ........................................................................................**20**

| | A. | First Day Motions and First Day Relief | 20 |
| | B. | Appointment of Unsecured Creditors' Committee | 20 |
| | C. | Contract Rejection and Optimization | 20 |
| | D. | Other Requested First-Day Relief and Retention Applications | 20 |
| | E. | Schedules and Statements | 21 |
| | F. | Approval of the DIP Facility and Exit Facilities | 21 |
| | G. | Independent Investigation | 21 |
| | H. | Proposed Confirmation Schedule | 22 |

**VII.** **SUMMARY OF THE PLAN** ........................................................................................**22**

| | A. | Compromise and Settlement of Claims, Interests, and Controversies | 22 |
| | B. | Restructuring Transactions | 22 |
| | C. | Cancellation of Notes, Instruments, Certificates, and Other Documents | 23 |
| | D. | Exemption from Certain Taxes and Fees | 23 |
| | E. | Sources of Consideration for Restructuring Transactions | 24 |
| | F. | New Stockholders Agreement | 24 |
| | G. | Issuance and Distribution of New Common Stock | 24 |
| | H. | Exit Facilities | 24 |
| | I. | Corporate Existence | 25 |
| | J. | Vesting of Assets in the Reorganized Debtors | 25 |
| | K. | Corporate Action | 25 |
| | L. | New Organizational Documents | 26 |
| | M. | Directors and Officers of the Reorganized Debtors | 26 |
| | N. | Effectuating Documents; Further Transactions | 26 |
| | O. | Preservation of Causes of Action | 26 |
| | P. | Management Incentive Plan | 27 |
| | Q. | Employee Obligations and Employee Arrangements | 27 |
| | R. | Closing the Chapter 11 Cases | 27 |
| | S. | Payment of Fees and Expenses of Certain Creditors | 27 |

**VIII.** **OTHER KEY ASPECTS OF THE PLAN** ..................................................................**27**

| | A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 27 |
| | B. | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases | 28 |
| | C. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 28 |
| | D. | Cure of Defaults for Assumed, or Assumed and Assigned, Executory Contracts and Unexpired Leases | 28 |
| | E. | Survival of the Debtors' Indemnification Obligations and Insurance Obligations | 29 |
| | F. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 29 |
| | G. | Reservation of Rights | 30 |
| | H. | Nonoccurrence of Effective Date | 30 |
| | I. | Contracts and Leases Entered Into After the Petition Date | 30 |
| | J. | Conditions Precedent to the Effective Date | 30 |
| | K. | Waiver of Conditions | 31 |
| | L. | Substantial Consummation | 31 |
| | M. | Effect of Nonoccurrence of Conditions to the Effective Date | 31 |

**IX.** **RISK FACTORS** ..............................................................................................................**32**

| | **A.** | Bankruptcy Law Considerations | 32 |
| | **B.** | Risks Related to Recoveries Under the Plan | 35 |

|  | C. | Risks Related to the Debtors' and the Reorganized Debtors' Businesses | 36 |
|  | D. | Risks Related to the Offer and Issuance of Securities Under the Plan | 40 |
| **X.** | **SOLICITATION AND VOTING PROCEDURES** | | **41** |
|  | A. | Classes Entitled to Vote on the Plan | 42 |
|  | B. | Classes Not Entitled to Vote on the Plan | 42 |
|  | C. | Votes Required for Acceptance by a Class | 42 |
|  | D. | Certain Factors to Be Considered Prior to Voting | 42 |
|  | E. | Solicitation Procedures. | 43 |
|  | F. | Voting Procedures | 44 |
|  | G. | Voting Tabulation | 45 |
|  | H. | Ballots Not Counted | 45 |
| **XI.** | **CONFIRMATION OF THE PLAN** | | **46** |
|  | A. | Requirements of Section 1129(a) of the Bankruptcy Code | 46 |
|  | B. | Best Interests of Creditors—Liquidation Analysis | 46 |
|  | C. | Feasibility | 47 |
|  | D. | Valuation | 47 |
|  | E. | Acceptance by Impaired Classes | 47 |
|  | F. | Confirmation Without Acceptance by All Impaired Classes | 48 |
| **XII.** | **IMPORTANT SECURITIES LAWS DISCLOSURES** | | **49** |
|  | A. | Issuance of Section 1145 Securities under the Plan | 49 |
|  | B. | Subsequent Transfers of 1145 Securities Issued under the Plan. | 49 |
|  | C. | Issuance of 4(a)(2)/Regulation S Securities | 50 |
| **XIII.** | **CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN** | | **52** |
|  | A. | Introduction | 52 |
|  | B. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors | 53 |
|  | C. | Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims | 55 |
|  | D. | Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims | 58 |
| **XIV.** | **RECOMMENDATION OF THE DEBTORS** | | **62** |

**EXHIBITS**

EXHIBIT A  Plan

EXHIBIT B  Restructuring Support Agreement

EXHIBIT C  Organizational Chart

EXHIBIT D  Financial Projections

EXHIBIT E  Valuation Analysis

EXHIBIT F  Liquidation Analysis

## I.    INTRODUCTION

Thrasio Holdings, Inc. and its debtor Affiliates (each, a "Debtor," and collectively, the "Debtors," and together with Thrasio Holdings, Inc.'s non-Debtor Affiliates, "Thrasio" or the "Company") submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the Debtors' *Joint Plan of Reorganization of Thrasio Holdings, Inc.. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith (as supplemented or amended from time to time, the "Plan").  A copy of the Plan is attached hereto as **Exhibit A** and is incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.[2]

**THE DEBTORS AND CERTAIN CONSENTING LENDERS THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF APPROXIMATELY 81.1 % OF FIRST LIEN CLAIMS, BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS AND INTERESTS. THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

Thrasio filed these Chapter 11 Cases to implement a comprehensive financial and operational restructuring. Founded in 2018, Thrasio evolved rapidly from a small start-up to the largest aggregator of e-commerce brands, with more than 36 million custom orders in 2023 alone.  Headquartered in Walpole, Massachusetts, the Company has approximately 415 employees in the United States, approximately 100 employees in China and 74 independent contractors across the world, most of which work remotely.  As of the Petition Date, the Debtors have approximately $855.2 million in total funded debt obligations.

The last five years have been exceptionally turbulent for e-commerce companies due to unexpected demand shifts and supply chain disruption caused, in large part, by the COVID-19 pandemic.  The tremendous boom in demand shocked the global supply chain as suppliers rushed to meet demand and produce inventory, which led to a vicious feedback loop:  sellers were forced to purchase substantial amounts of inventory to keep up with surging consumer demand, which contributed to high demand for merchandise; high demand for merchandise led to months-long delays in shipping, which exacerbated demand for inventory and forced sellers to over-purchase inventory to avoid running out of stock; to keep demand in stock, e-commerce businesses sought to acquire more inventory, leading back to "square one"—increased demand for inventory.  These headwinds were further exacerbated when the COVID-19 pandemic ended and post-pandemic demand for e-commerce dropped between 2022 and 2023.

In February 2022, Thrasio engaged AlixPartners, LLP ("AlixPartners") to implement a number of profit-generating, cost-reduction, and savings initiatives to solve significant operational issues affecting the Company's margins.  Thrasio, with the assistance of AlixPartners, implemented a series of operational initiatives to refocus its business, including adhering to a more disciplined acquisition strategy, disposing of excess inventory, reducing warehousing and storage expenses, diversifying its sales channels, and cutting costs — all with the goal of positioning the Company for long-term, sustainable growth.  Thrasio also hired a new, seasoned management team with demonstrated experience in the e-commerce industry.  Under this team's leadership, Thrasio's initiatives reduced the Company's annual net cash flows used in operating activities from $680 million for 2021 to $419 million for 2022.

Thrasio's operational turnaround significantly increased its operational efficiency and margins, but did not address its balance sheet or its liquidity needs.  Servicing the Company's over-levered capital structure continued to

---

[2]     Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan.  Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I.B of the Plan.  **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized.  In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

put pressure on the Company's liquidity position and limit its growth opportunities, and the Company needed an additional infusion of capital to implement the next phase of its business plan.  Consequently, in the spring of 2023, Thrasio engaged Centerview Partners LLC ("Centerview") to advise on a capital raise process targeting both third-party investors and the Company's existing stakeholders.  Around the same time, Thrasio also engaged Kirkland & Ellis LLP ("Kirkland") as legal counsel to assist in evaluating potential transactions.

Over the last several months, Thrasio engaged in discussions with its stakeholders and investors on the terms of a deleveraging transaction that would also provide growth capital to support the next phase of the Company's operations.  Those efforts proved to be successful.  On February 27, 2024, Thrasio entered into a Restructuring Support Agreement with its lenders who, collectively, hold approximately 81 percent of outstanding RCF Loans and 88 percent of outstanding Term Loans and approximately 81.1 percent of the Company's total outstanding debt.  These Chapter 11 Cases, which are designed to expeditiously and consensually address balance sheet issues, are the final step in Thrasio's transformative efforts.  The Debtors will continue their efforts to garner additional support for the Plan and anticipate that additional First Lien Claims and other stakeholders will execute the Restructuring Support Agreement or formally support the Plan in advance of Confirmation.

The Debtors strongly believe that the Plan is in the best interests of the Debtors' estates, and represents the best available alternative at this time.  Entering chapter 11 with strong consensus and support will allow Thrasio to move swiftly through these cases, maximize the value of its business, and ensure that its portfolio of brands experiences minimal disruption.  The Debtors are confident that they can efficiently implement the restructuring set forth in the Restructuring Support Agreement and emerge from these Chapter 11 Cases ready to resume their pre-restructuring business activities in the ordinary course.  For these reasons, and the reasons described in this Disclosure Statement, the Debtors strongly recommend that Holders of Claims entitled to vote to accept or reject the Plan vote to accept the Plan.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan of reorganization is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest Holder of the debtor (whether or not such creditor or equity interest Holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of Claims whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of [April 1], 2024).

Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| Class | Claim or Interest | Status | Voting |
|-------|-------------------|--------|--------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | First Lien Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Series X Redeemable Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Series D Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Series C Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Series B Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Series A Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Series Seed Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | Common Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 12 | Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| 13 | Intercompany Interests | Unimpaired/ Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |

### D.    What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan. Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]**

| Class | Claim/Interest | Treatment of Claim/Interest | Projected Allowed Amount of Claims | Estimated Recovery (%) |
|-------|----------------|------------------------------|-------------------------------------|------------------------|
| Class 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtors or Reorganized Debtors, as applicable, either: (i) payment in full in Cash of the unpaid portion of its Other Secured Claim on the Effective Date or as soon as reasonably practicable thereafter (or if payment is not then due, shall be paid in accordance with its terms); (ii)Reinstatement; or (iii)such other recovery | $[0] | 100% |

---

[3]    The recoveries set forth below may change based upon changes in the amount of Claims that are allowed as well as other factors related to the Debtors' business operations and general economic conditions.

| Class | Claim/Interest | Treatment of Claim/Interest | Projected Allowed Amount of Claims | Estimated Recovery (%) |
|---|---|---|---|---|
| | | necessary to satisfy section 1129 of the Bankruptcy Code. | | |
| Class 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | $[0] | 100% |
| Class 3 | First Lien Claims | Except to the extent that a Holder of a First Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed First Lien Claim, each Holder of an Allowed First Lien Claim shall receive its pro rata share of 100% of the New Common Stock, subject to dilution by the (i) DIP Exit Fee, (ii) Backstop Payment, and (iii) Management Incentive Plan. | $[855,200,000] | [●]% |
| Class 4 | General Unsecured Claims | Except to the extent that a Holder of a General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its pro rata share of the GUC Recovery Pool. | $[●] | [●]% |
| Class 5 | Series X Redeemable Preferred Stock Interests | All Series X Redeemable Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series X Redeemable Preferred Stock Interests will receive a distribution under the Plan. | $[739,400,000] | 0% |
| Class 6 | Series D Preferred Stock Interests | All Series D Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series D Preferred Stock Interests will receive a distribution under the Plan. | $[1,075,000,000] | 0% |
| Class 7 | Series C Preferred Stock Interests | All Series C Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series C Preferred Stock Interests will receive a distribution under the Plan. | $[560,000,000] | 0% |
| Class 8 | Series B Preferred Stock Interests | All Series B Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series B Preferred Stock Interests will receive a distribution under the Plan. | $[72,000,000] | 0% |
| Class 9 | Series A Preferred Stock Interests | All Series A Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series A Preferred Stock Interests will receive a distribution under the Plan. | $[16,000,000] | 0% |

4

| Class | Claim/Interest | Treatment of Claim/Interest | Projected Allowed Amount of Claims | Estimated Recovery (%) |
|---|---|---|---|---|
| Class 10 | Series Seed Preferred Stock Interests | All Series Seed Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect. No Holders of Series Seed Preferred Stock Interests will receive a distribution under the Plan. | $[6,000,000] | 0% |
| Class 11 | Common Stock Interests | All Common Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect. No Holders of Common Stock Interests will receive a distribution under the Plan. | N/A | 0% |
| Class 12 | Intercompany Claims | In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Intercompany Claim, Allowed Intercompany Claims shall, in a manner consistent with the Restructuring Transactions Memorandum, as applicable, be either (i) Reinstated; or (ii) distributed, contributed, set off, cancelled, and released without any distribution on account of such Claims, or otherwise addressed at the option of the Reorganized Debtors. | $[●] | [●]% |
| Class 13 | Intercompany Interests | In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Intercompany Interests, Allowed Intercompany Interests shall, in a manner consistent with the Restructuring Transactions Memorandum, as applicable, be either (i) Reinstated or (ii) cancelled and released without any distribution on account of such Interests. | $[●] | [●]% |

**E.     What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Facility Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Facility Claims, Priority Tax Claims, and Statutory Fees have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. The chart below summarizes the various unclassified claims and provides the relevant section of the Plan that addresses their treatment:

**1.     Administrative Claims**

Except as otherwise provided in Article I.E.1 of the Plan and except with respect to Administrative Claims that are Professional Fee Claims, DIP Facility Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party by the Claims Objection Bar Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Facility Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

2.      **Professional Fee Claims**

(a)      **Final Fee Applications and Payment of Professional Fee Claims**

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules.  The Reorganized Debtors shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

(b)      **Professional Fee Escrow Account**

No later than the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  No funds held in the Professional Fee Escrow Account shall be property of the Debtors' or the Reorganized Debtors' Estates, as applicable.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

(c)      **Professional Fee Escrow Amount**

The Professionals shall deliver to the Debtors and the Ad Hoc Group Advisors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before the anticipated Effective Date and projected to be outstanding as of the anticipated Effective Date and shall deliver such estimate no later than five (5) Business Days prior to the anticipated Effective Date.  For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional for purposes of funding the Professional Fee Escrow Amount.  The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

(d)        **Post-Confirmation Date Fees and Expenses**

Except as otherwise specifically provided for in the Plan, from and after the Confirmation Date, the Debtors and/or the Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to administration of the Chapter 11 Cases, prosecution of Causes of Action, and implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

3.        **DIP Facility Claims**

On the Effective Date, except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, on the Effective Date, each such Holder of an Allowed DIP Facility Claim shall receive its *pro rata* share of: (a) the First-Out Take-Back Debt Facility; (b) the Second-Out Take-Back Debt Facility; and (c) the DIP Exit Fee.  Upon the satisfaction of the Allowed DIP Facility Claims in accordance with the terms of the Plan, or other such treatment as contemplated by Article II.C of the Plan, all guarantees provided and all Liens and security interests granted, in each case, to secure such obligations shall be automatically released, terminated, and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Entry of the Confirmation Order shall constitute final approval of the DIP Exit Fee to be distributed to the DIP Lenders.  Further, upon the date of entry of the Confirmation Order, the terms and conditions of the DIP Exit Fee shall have been fully satisfied by the DIP Lenders and the DIP Exit Fee shall have been fully earned as a bargained for and integral part of the Restructuring Transactions contemplated under the Plan and the DIP Orders.

4.        **Priority Tax Claims**

On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

5.        **Transaction Expenses**

The Transaction Expenses incurred, or estimated to be incurred, up to and after the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid) in accordance with, and subject to, as applicable, the terms of the Restructuring Support Agreement and the DIP Orders and any other fee arrangements, without any requirement to file a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval. All Transaction Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; provided that such estimates shall not be considered an admission or limitation with respect to such Transaction Expenses.  Following the Effective Date, invoices for all Transaction Expenses shall be submitted to the Reorganized Debtors.

6.        **Statutory Fees**

All fees due and payable pursuant to 28 U.S.C. § 1930(a)(6) plus any interest due and payable under 31 U.S.C. § 3717 (together, the "Quarterly Fees") before the Effective Date shall be paid by the applicable Reorganized Debtor (or the Disbursing Agent on behalf of each applicable Reorganized Debtor) for each quarter

(including any fraction thereof) until such Reorganized Debtor's Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.

**F.      Are any regulatory approvals required to consummate the Plan?**

There are no known U.S. regulatory approvals that are required to consummate the Plan.  However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

**G.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Holders of Claims will receive the potential recoveries reflected herein.  It is possible that any alternative plan may provide Holders of Claims with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit F**.

**H.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article XI of this Disclosure Statement, entitled "Confirmation of the Plan".

**I.      What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

On or as soon as reasonably practicable following the Effective Date, the Reorganized Debtors shall adopt and implement the Management Incentive Plan.  The issuance of any awards under the Management Incentive Plan shall be at the discretion of the New Board.

**J.      Does the Plan preserve Causes of Action?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such Causes of Action in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action for later

adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**K.**      **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. "Consummation" of the Plan refers to the occurrence of the Effective Date. *See* Article VIII.J of this Disclosure Statement, entitled "Conditions Precedent to the Effective Date" for a discussion of conditions precedent to Confirmation and Consummation of the Plan.

**L.**      **How do I know if my Claim is a General Unsecured Claim?**

General Unsecured Claim means any Claim against any of the Debtors that is not Secured and is not: (a) a DIP Facility Claim, (b) an Administrative Claim, (c) a Priority Tax Claim, (d) an Other Secured Claim, (e) an Other Priority Claim, (f) a First Lien Claim, (g) an Intercompany Claim or Intercompany Interest, (h) a Series X Redeemable Preferred Stock Interest, (i) a Series D Preferred Stock Interest, (j) a Series C Preferred Stock Interest, (k) a Series B Preferred Stock Interest, (l) a Series A Preferred Stock Interest, and (m) a Series Seed Preferred Stock Interest. For the avoidance of doubt, all (i) claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation against one or more of the Debtors are General Unsecured Claims.

**M.**      **What are the sources of Cash and other consideration required to fund the Plan?**

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date, the revenues and proceeds of all assets of the Debtors, the Exit Facilities, and the New Common Stock.

**N.**      **Are there risks to owning the New Common Stock upon emergence from Chapter 11?**

Yes. *See* Article IX of this Disclosure Statement, entitled "Risk Factors" for a discussion of such risks. The Debtors do not intend to seek a listing of the New Common Stock on the New York Stock Exchange, the Nasdaq Stock Market or another comparable national securities exchange upon the Effective Date. The Debtors do not expect that Reorganized Thrasio or the Reorganized Debtors will be required to file public reports pursuant to the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"), or otherwise.

**O.**      **Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to provide releases to the Released Parties and to exculpate the Exculpated Parties.

**THE RELEASES AND EXCULPATIONS IN THE PLAN ARE EXPRESSLY SUBJECT TO THE OUTCOME OF THE INDEPENDENT INVESTIGATION, AND THE DISINTERESTED DIRECTORS' RIGHTS TO OBJECT TO SUCH PROVISIONS OR SEEK TO LIMIT THE SCOPE OF SUCH PROVISIONS.**

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through efforts to negotiate and implement the Plan, which will maximize value for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**ALL HOLDERS OF CLAIMS THAT (I) VOTE TO REJECT THE PLAN AND WHO AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; OR (II) ABSTAIN FROM VOTING ON THE PLAN AND AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED IN THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS OR THE REORGANIZED DEBTORS.**

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, to the extent requested by the Bankruptcy Court, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

1.    **Release of Liens**

**Except as otherwise specifically provided in the Plan, the Confirmation Order, the Exit Facilities Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, as applicable. The DIP Agent and the Administrative Agent shall, at the Reorganized Debtors' sole cost and expense, execute and deliver all documents reasonably requested by the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests on such assets of the Debtors that are subject to the Restructuring.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then such Holder (or the agent for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder) and take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facilities Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the execution and delivery of such releases and the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings, at the Reorganized Debtors' sole cost and expense, on such Holder's behalf. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens. Notwithstanding the foregoing paragraph, Error! Reference source not found. of the Plan shall not apply to any Secured Claims that are Reinstated pursuant to the terms of the Plan.**

2.      **Debtor Release**

**Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, as of the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Documents, the Preferred Equity Documents, the Exit Facilities, the Exit Facilities Documents, the DIP Facility, the DIP Orders, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, any Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, the Plan Supplement, any Definitive Document, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Dat; except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or willful misconduct. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.**

3.      **Release by Holders of Claims or Interests**

**Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Documents, the Preferred Equity Documents, the Exit Facilities, the Exit Facilities Documents, the DIP Facility, the DIP Orders, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, any Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, the Plan Supplement, any Definitive Document, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or willful misconduct. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.**

**Without limiting the foregoing, from and after the Effective Date, any Entity that is given the opportunity to opt out of the releases contained in <u>Article VIII.F</u> of the Plan and does not exercise such opt out**

may not assert any claim or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors.  From and after the Effective Date, any Entity (i) that opted out of the releases contained in Article VIII.F of the Plan or (ii) was deemed to reject the Plan may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in Article VIII.F of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article VIII.F of the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in Error! Reference source not found. of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

4.    **Exculpation**

Except as otherwise expressly provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Independent Investigation, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Independent Investigation, the filing of the Chapter 11 Cases, the participation in the DIP Facility, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, the Plan Supplement, any Definitive Document, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

5.    **Injunction**

Except as otherwise specifically provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

6.    **Definitions Related to the Releases**

"***Exculpated Party***" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Lenders; (d) the DIP Lenders; (e) the Ad Hoc Group and each member of the Ad Hoc Group; (f) the Administrative Agent; (g) each lender and Issuing Banks and other secured parties under the First Lien Credit Agreement; (h) the DIP Backstop Parties; (i) each current and former wholly-owned Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clauses (a) through this clause (j).[4]

"***Related Party***" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, successors, assigns, subsidiaries, partners, limited partners, general partners, principals, members, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (including any attorneys or professionals retained by any current or former director or manager of a Debtor in his or her capacity as director or manager as a Debtor).[5]

["***Released Party***" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Lenders; (d) the DIP Lenders; (e) the Ad Hoc Group and each member of the Ad Hoc Group; (f) the Administrative Agent; (g) the Arrangers, each lender, and Issuing Banks and other secured parties under the First Lien Credit Agreement; (h) the DIP Backstop Parties; (i) each current and former wholly-owned Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clauses (a) through this clause (j); *provided, however*, that each Entity that timely and properly opts out of the releases contemplated herein shall not be a Released Party.][6]

"***Releasing Parties***" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Lenders; (d) the DIP Lenders; (e) the Ad Hoc Group and each member of the Ad Hoc Group; (f) the Administrative Agent; (g) the Arrangers, each lender, and Issuing Banks and other secured parties under the First Lien Credit Agreement; (h) the DIP Backstop Parties; (i) all Holders of Claims; (j) all holders of Interests; (k) each current and former wholly-owned Affiliate of each Entity in clause (a) through the following clause (l); and (l) each Related Party of each Entity in clauses (a) through this clause (l); *provided, however*, that each Entity that timely and properly opts out of the releases contemplated herein shall not be a Releasing Party; *provided, further, however*, that any Holder of Interests who acquired such Interests after the Voting Record Date (as such term is defined in the Disclosure Statement Order) and did not receive an opt out election form shall not be a Releasing Party.[7]

**P.      What is the deadline to vote on the Plan?**

The Voting Deadline is **[May 7], 2024, at 4:00 p.m. (prevailing Eastern Time).**

**Q.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  To be counted as a vote to accept or reject the Plan, each ballot (a "Ballot")

---

[4]   For the avoidance of doubt, all exculpations remain subject to the Independent Investigation.

[5]   For the avoidance of doubt, and notwithstanding anything in the Plan to the contrary, for the BlackRock Consenting Creditors, the defined term "Related Party" shall be limited to any Related Party of the BlackRock Consenting Creditors for which such BlackRock Consenting Creditors are legally entitled to bind under applicable law.

[6]   For the avoidance of doubt, all releases remain subject to the Independent Investigation.

[7]   For the avoidance of doubt, and notwithstanding anything in the Plan to the contrary, for the BlackRock Consenting Creditors, the defined term "Releasing Party" shall be limited to any Releasing Party of the BlackRock Consenting Creditors for which such BlackRock Consenting Creditors are legally entitled to bind under applicable law.

must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **actually received** before the Voting Deadline by Kurtzman Carson Consultants LLC ("KCC" or the "Claims, Noticing and Solicitation Agent"). *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING AND SOLICITATION AGENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL NOT BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

---

**R.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**S.      When is the Confirmation Hearing set to occur?**

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for **[May 13], 2024 at [●]:00 a/p.m. (prevailing Eastern Time)**. The Confirmation Hearing may be adjourned from time to time without further notice. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, **[May 7, 2024], at 4:00 p.m. (prevailing Eastern Time)** in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing **three (3) business days following entry of the Disclosure Statement Order**, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**T.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**U.      What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. Following Confirmation, the Plan will be consummated on the Effective Date, which is the first business day after which all conditions to Consummation have been satisfied or waived. *See* Article IX of the Plan. On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**V.      Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

On the Effective Date, the term of the current board of directors of the Debtors shall expire, and the directors for the initial term of the New Board shall be designated and appointed in accordance with the terms set forth in the New Organizational Documents and the New Stockholders Agreement.  The initial members of the New Board will be identified in the Plan Supplement, as well as those Persons that will serve as officers of the Reorganized Debtors. Each such member and officer of the New Board shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents, the New Stockholders Agreement, and other constituent documents of Reorganized Thrasio.

To the extent any identified director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.  Provisions regarding the removal, appointment, and replacement of members of the New Board will be disclosed in the New Organizational Documents.

**W.      What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in Article V herein, as well as in the *Declaration of Josh Burke, Chief Financial Officer of Thrasio Holdings, Inc., in Support of First Day Motions*, filed contemporaneously herewith (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including out-of-court restructuring alternatives, combination transactions, and debt and/or equity investments from third party investors and current stakeholders.

**X.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims, Noticing and Solicitation Agent:

*By electronic mail at:*
 www.kccllc.net/Thrasio/inquiry

*By telephone (toll free) at*:
(866)-967-0496  (domestic) or (310)-751-2696 (international) and request to speak with a member of the Solicitation Team.

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' Claims, Noticing and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims, Noticing and Solicitation Agent at www.kccllc.net/Thrasio (free of charge) or the Bankruptcy Court's website at https://www.njb.uscourts.gov (for a fee).

**Y.      Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative.  The Debtors believe that the Plan, which provides for a substantial deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of the Debtors' stakeholders, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

Z.      **Who Supports the Plan?**

The Debtors commenced these Chapter 11 Cases with the support of holders of 81.1 percent of First Lien Claims, comprised of 81 percent of RCF Loans and 88 percent of Term Loans.

## IV.    THE DEBTORS' HISTORY AND OPERATIONS

### A.     The Debtors' Corporate Structure and History

Thrasio was founded in 2018 by an experienced team of entrepreneurs and investors.  Thrasio grew rapidly—in the more than five years since its inception, Thrasio's platform evolved from a small start-up to become the largest aggregator of e-commerce brands, with more than 36 million unique customer orders in 2023 alone.

As set forth on the structure chart attached **Exhibit C**, Thrasio wholly owns, directly or indirectly, each of the Debtors.

### B.     The Debtors' Assets and Operations

Thrasio acquires brands that are primed for growth and operational synergies even before Thrasio steps in. These brands frequently share certain common features, since Thrasio targets highly ranked, profitable products with a proven track record with consumers.  Thrasio leverages these characteristics when employing its own proprietary processes to build upon the brands' success and boost their growth.  Since inception, Thrasio has acquired over 200 brands and provided over 250 sellers with an "exit" from the brand they founded.

Aside from Amazon sales, Thrasio also pursues wholesale channels through partnerships with Walmart and Nordstrom.  In addition, Thrasio hopes to provide their customers with the unique opportunity to purchase Thrasio products on other platforms by cross listing such products.  Moreover, the Company employs an industry-leading team that continues to develop technology aimed to improve the customer experience, such as pricing tools and automatic inventory restocks.  These channels accounted for approximately $30 million of revenue in 2023.

Thrasio's supply chain management is critical to the company's success.  Each year, Thrasio markets and sources inventory for over 24,000 unique products through a highly complex network of over 350 contract manufacturers, 35 third-party warehouses, and numerous third-party fulfillment centers, including Amazon and Ware2Go, among others.  Thrasio manages all aspects of the shipping and logistics process for its brands and contracts directly with freight forwarders, steamship lines, and international trucking companies to move products around the world.

### C.     The Debtors' Prepetition Corporate and Capital Structure

#### 1.     The Debtors' Debt Obligations

Thrasio has approximately $855.2 million in funded debt outstanding and $2.3 billion of outstanding preferred stock.[8]  The chart below reflects the Debtors' capital structure as of the Petition Date.

---

[8]     Unless otherwise stated, all amounts outstanding referenced herein are inclusive of accrued interest and fees.

| Funded Debt | Maturity | Amount Outstanding (in millions) |
|---|---|---|
| Revolving Credit Facility | December 2025 | $66.2 |
| *Letters of Credit* | | $2.5 |
| Term Loan Facility | December 2026 | $786.5 |
| **Total Debt Obligations** | | **$855.2** |
| **Preferred Equity** | **Liquidation Preference Priority (on proceeds)** | **Amount of Series (in millions)** |
| Series X Redeemable Preferred Stock | First Priority | $739.4 |
| Series D Preferred Stock | Second Priority | $1,075 |
| Series C Preferred Stock & Senior Series B Preferred Stock | Third Priority | $646 |
| Junior Series B Preferred Stock | Fourth Priority | $36 |
| Series A Preferred Stock | Fifth Priority | $16 |
| Series Seed Preferred Stock | Sixth Priority | $6 |
| **Total Preferred Equity Outstanding** | | **$2,518.4** |
| **Total Debt and Preferred Equity Outstanding** | | **$3,373.6** |

## V.      EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.      Industry-Wide Headwinds and the Impact of the COVID-19 Pandemic

Thrasio's business was built on the belief that small e-commerce businesses would be an important part of the slow shift to a retail landscape dominated by online shopping. That "slow shift" in consumer sentiment was radically accelerated by the onset of the COVID-19 pandemic in December 2019 and Thrasio experienced a tremendous boom in growth as demand for online retail skyrocketed.

The dramatic increase in online spending created unique problems that the e-commerce industry was not prepared to address. The sudden increase in demand shocked the global supply chain as suppliers rushed to meet demand and produce inventory. Fear of losing market share caused an inventory buying frenzy, as online sellers, including Thrasio, attempted to keep items in stock. E-commerce sellers thus became mired in a vicious feedback loop between consumer high demand, delays in shipping and out of stock merchandise. In addition, industry experts incorrectly predicted that high e-commerce demand would continue after the end of the COVID- 19 pandemic. However, the post-pandemic demand significantly dropped between 2022 and 2023, as many consumers sought the in-person shopping experience.

### B.      Strategic Missteps

Although the Company's founding in 2018 came prior to the most explosive era for e-commerce growth in history, to keep up with surging consumer demand and support its brands, the Company's previous management team made a number of operational decisions that, ultimately, sacrificed future flexibility and adversely affected the Company's margins when e-commerce demand slowed in 2021.

#### 1.      Inventory Over-purchasing and Overreliance on Amazon

As discussed above, the "vicious cycle" of surging consumer demand led to surging demand for inventory. Thrasio's need for inventory was also influenced by its reliance on Amazon as the sole platform on which it was able to sell goods. However, Amazon penalizes sellers who can't keep their products in stock by deprioritizing their products in the search results and showing fewer ads related to their products. Consequently, Thrasio radically adjusted its inventory purchasing policies and purchased significant amounts of inventory on terms that were

materially above what "market" terms would be in a pandemic-free economy.  As consumer demand began to wane and pandemic restrictions eased, Thrasio found itself burdened by an overhang of expensive, surplus inventory.

### 2.    Over-hiring and Operational Shortcuts

The Company was also not equipped with the internal infrastructure necessary to handle the surge in demand that the Company's portfolio of brands experienced during the pandemic.  In an effort to simply keep up with demand, the Company neglected to implement efficient operational structures or limit fixed costs where possible.  Instead, the Company engaged with third-party logistics companies that hugely increased their fixed costs and acquired many non-core brands that failed to produce expected revenue.

### C.    2022 Operational Initiatives

As demand for the e-commerce solutions began to plateau, and the significant operational issues affecting the Company's margins became more apparent., the Company's Board engaged AlixPartners to implement a number of profit-generating, cost-reduction, and savings initiatives to generate operational flexibility.  AlixPartners' turnaround efforts would ultimately take nearly 11 months to implement.  The Company worked together with AlixPartners on a full assessment of the operating model, including a department-by-department review of organizational structures to ensure right-sizing across all functions.  During AlixPartners' engagement, the Company and AlixPartners implemented price increases to improve profits across the Company's brand portfolio, inventory excess and supply chain.

### D.    2023 Capital Raise

The Company's operational initiatives did not obviate the need for incremental financing.  The Board of Directors and management team understood that the Company's existing debt service obligations would continue to pressure cash flows despite the implementation of various cost saving initiatives.  Further, the Company required additional financing to fund operations until inventory returns to a healthy level and achieve positive cash flow and EBITDA.  In the spring of 2023, Thrasio engaged Centerview to advise on a capital raise process targeting both third-parties and existing investors.  Around the same time, Thrasio engaged Kirkland as legal counsel to assist in evaluating potential transactions.

In June of 2023, Centerview launched a third-party marketing process.  Centerview reached out to potential investors, including investment firms with deep knowledge of the e-commerce or "aggregator" sectors and/or experience executing structured capital investments.  However, Thrasio's external capital raise unfortunately coincided with a period of significant macroeconomic headwinds and global volatility.  Rampant inflation and interest rate "hikes" by the U.S. Federal Reserve contributed to fears of a global recession and pullback in consumer spending, which created a difficult market environment for raising capital.  Thrasio was also in the midst of an operational turnaround, which gave certain potential investors pause.  Additionally, certain third-party investors communicated reluctance to fund into a highly leveraged and complicated capital structure that required the consent of multiple stakeholders with divergent interests.  Ultimately, two parties entered into confidentiality agreements with the Debtors. Centerview provided these parties with a copy of Thrasio's investor presentation and access to a virtual data room with incremental information regarding the Company's business operations and financial position.  However, the third-party capital raise process ultimately did not yield any credible proposals.

In addition, Thrasio explored potential strategic combinations, including combination transactions with other Amazon aggregators.  However, many Amazon aggregators are currently experiencing the same macroeconomic headwinds and capital structure challenges that Thrasio is facing.  Ultimately, Thrasio determined that a restructuring and reorganization presented the Company with a more certain path towards a value-maximizing transaction.

Thrasio and Centerview began to focus on engagement with its existing preferred equity holders to evaluate their appetite to contribute new capital to the business.  To help support their diligence, Centerview prepared an extensive virtual data room and hosted multiple virtual and in-person meetings.  Ultimately, the Company received one transactional proposal for an equity investment in August 2023.  The proposal required certain conditions precedent and stakeholder consents, including unanimous lender consent for a significant reduction of the Company's outstanding secured debt.  In August 2023, the Company began to engage with an ad hoc group that holds 88 percent

of outstanding Term Loans under the First Lien Credit Agreement (the "Ad Hoc Group") to evaluate their willingness to agree to such a transaction.

While discussions with the Ad Hoc Group were ongoing, sustained macroeconomic headwinds and the lack of new capital began to put pressure on the Company's liquidity position, especially in light of the approximately $25 million interest and amortization payment due under the First Lien Credit Agreement on September 29, 2023. As discussions with the Ad Hoc Group progressed, it became clear that agreement on a financing transaction would not be reached prior to the interest and amortization payment deadline. Ultimately, the Company and its lenders' efforts were successful. Following several months of good-faith negotiations, the First Lien Lenders and the Company reached agreement in principle on a comprehensive deleveraging transaction effectuated through a chapter 11 plan of reorganization.

### E.    Ad Hoc Group Negotiations

While discussions with the Ad Hoc Group were ongoing, Thrasio's Board appointed two new disinterested directors to review and evaluate potential strategic alternatives. The Ad Hoc Group retained Gibson, Dunn & Crutcher LLP as legal advisor and Evercore Group LLC as investment banker. The administrative agent under the First Lien Credit Agreement, in its capacity as administrative agent under the Revolving Credit Facility, also retained Simpson Thacher & Bartlett LLP, who engaged with the Company in these negotiations.

The Company and the Ad Hoc Group engaged in multiple rounds of discussions and diligence on the needs of the go-forward business beginning in August 2023. The Company and its advisors hosted multiple in-person meetings, participated in weekly virtual diligence sessions, and maintained an extensive data room with thousands of pages of diligence information for the Ad Hoc Group and its advisors. While discussions with the Ad Hoc Group were ongoing, sustained macroeconomic headwinds and the lack of new capital began to put pressure on the Company's liquidity position, especially in light of the approximately $25 million interest and amortization payment due under the First Lien Credit Agreement on September 29, 2023. As discussions with the Ad Hoc Group progressed, it became clear that agreement on a financing transaction would not be reached prior to the interest and amortization payment deadline.

The Company, in an exercise of its business judgment and after consulting with the Ad Hoc Group, ultimately decided that making the quarterly payments due on September 29, 2023, was not advisable in light of Thrasio's liquidity position. Both the Company and the Ad Hoc Group were also acutely aware of the negative effect that missing the payments could have on the market's perception of Thrasio, especially as other e-commerce aggregators showed signs of distress, and understood that poor messaging could exacerbate Thrasio's liquidity problem. Accordingly, in September, Thrasio pivoted its focus to negotiating the terms of a forbearance with the Ad Hoc Group. Those efforts resulted in a forbearance agreement executed with the Ad Hoc Group on September 29, 2023 (the "Forbearance Agreement") prior to the interest and amortization payment deadline. The Forbearance Agreement contained, among other things, an agreement from the consenting lenders to forbear from exercising their rights and remedies under the First Lien Credit Agreement through November 30, 2023, as well as certain milestones intended to drive parties to consensus on a transaction. Prior to executing the Forbearance Agreement, and as a condition to its execution, the Company drew down on its Revolving Credit Facility under the First Lien Credit Agreement to provide the Company with liquidity to operate while negotiations progressed.

Following execution of the Forbearance Agreement, the Company and the Ad Hoc Group recommenced negotiations on a lender-led restructuring transaction. The Ad Hoc Group extended the Forbearance Agreement several times to facilitate further discussions. However, in January 2024, the Company received a joint proposal from Corner Capital Management, LLC ("Corner"), and J. Safra Sarasin ("Safra"), investment managers for certain existing preferred equityholders, regarding an alternative proposed plan of reorganization. The proposal contemplated a substantial new money cash infusion into the Debtors, though the proposal remained subject to further diligence and final investor sign off. To facilitate further discussions and diligence efforts, the Ad Hoc Group further extended the Forbearance Agreement. The parties engaged in several weeks of discussions but were ultimately unable to reach agreement on terms of a transaction structure prior to the Petition Date. The Company intends to continue discussions with Corner, Safra, and the Ad Hoc Group postpetition.

Following several months of good-faith negotiations between the Company and Ad Hoc Group, the parties reached agreement in principle on a comprehensive deleveraging transaction effectuated through a chapter 11 plan of reorganization.

On February 27, 2024, the Company and the First Lien Lenders executed the Restructuring Support Agreement, a copy of which is attached hereto as **Exhibit B**. The Restructuring Support Agreement represents a significant achievement for Thrasio and is a testament to the strength of its business and the commitment of its lenders to support its go-forward operations. Holders of approximately 81.1 percent of the Company's First Lien Claims executed the Restructuring Support Agreement. The transactions contemplated by the Restructuring Support Agreement will eliminate approximately $ 490 million of the Company's existing $850 million in debt.

## VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.    First Day Motions and First Day Relief

To minimize disruption to the Debtors' operations and effectuate the terms of the Plan, on the Petition Date, the Debtors filed various first-day motions seeking authority to, among other things: (1) approve the DIP Facility; (2) continue utilizing the Debtors' prepetition cash management system, including with respect to intercompany transactions; (3) pay certain prepetition claims in the ordinary course of business; (4) pay prepetition wages and certain administrative costs related to those wages; (5) pay certain taxes and fees that accrued or arose in the ordinary course of business before the Petition Date; (6) provide adequate assurance of payment for future utility services; (7) maintain and administer existing customer programs; (8) approve certain procedures regarding the transfer of stock to preserve the value of certain tax attributes; (9) continue insurance policies and honor existing obligations in respect thereof; (10) continue utilizing Amazon services in the ordinary course of business and honor obligations with respect thereto; (11) appoint Kurtzman Carson Consultants LLC as Claims, Noticing and Solicitation Agent; (12) enforce the worldwide automatic stay; and (13) extend time to file schedules of assets and liabilities. All of the relief requested by the first-day motions and throughout the Chapter 11 Cases will be subject to any orders regarding the DIP Facility and the Debtors' use of cash collateral.

### B.    Appointment of Unsecured Creditors' Committee

On [●], 2024, the U.S. Trustee filed the [*Notice of Appointment of Official Committee of Unsecured Creditors*] [Docket No. [●]] appointing the Creditors' Committee. The Creditors' Committee is comprised of the following entities: [●].

### C.    Contract Rejection and Optimization

In preparation for the filing of these Chapter 11 Cases, and continuing on a postpetition basis, the Debtors, with the assistance of their advisors, undertook a comprehensive review of their contract and lease portfolio, including an analysis of each of their seller contracts and the associated revenues and expenses attendant thereto. As a result of that analysis, the Debtors have determined in their business judgment that the costs incurred under certain contracts and leases constitute an unnecessary burden on the Debtors' Estates and that rejection of such contracts and leases would maximize the value of the Debtors' reorganized business. As of the date hereof, the Debtors have taken the following steps with respect to their lease rejection and optimization strategy.

- [The Debtors filed the *Debtors' First Omnibus Motion Seeking Entry of an Order Authorizing (I) the Rejection of Certain Executory Contracts and Unexpired Leases and (II) Abandonment of Certain Personal Property, If Any, Each Effective as of the Rejection Date* (the "First Omnibus Rejection Motion"), whereby the Debtors sought to reject [over 300 seller agreements and two leases] as of the Petition Date or a certain rejection date listed on Schedule 1 attached to the proposed order.]

### D.    Other Requested First-Day Relief and Retention Applications

In addition, the Debtors shall file motions and/or applications seeking certain customary relief, including an order directing the joint administration of the Chapter 11 Cases under a single docket and orders approving the retention of the Debtors' bankruptcy advisors, including Kirkland and Ellis, LLP as legal counsel, Cole Schotz P.C.

as their co-counsel, Centerview Partners, LLC as their investment banker, Alix Partners, LLP as their restructuring advisor, KPMG as their tax advisor, and KCC as their Claims, Noticing and Solicitation Agent.

### E. Schedules and Statements

The Debtors shall file their Schedules **on or before [March 28, 2024].**

### F. Approval of the DIP Facility and Exit Facilities

As part of the Restructuring Support Agreement, the Consenting Lenders agreed to fund a senior secured credit facility in an aggregate amount of approximately $360 million, consisting of (i) "new money" term loans in an aggregate principal amount equal to $90 million (the "New Money Loans") and (ii) a "roll-up" in the amount of $270 million of the First Lien Claims into the DIP Facility (the "Roll-Up Loans", and together with the New Money Loans, the "DIP Facility"). The DIP Facility and certainty on exit financing are key components of the Restructuring Support Agreement and are critical to preserving and maximizing value for the Debtors' Estates.

The DIP Facility ensures that the Debtors have and will continue to have sufficient liquidity to fund operations during and after these proceedings, enabling business continuity into the foreseeable future. The Debtors will use the proceeds of the DIP Facility to, among other things, (1) pay the costs, fees and expenses associated with the Chapter 11 Cases, (2) make adequate protection payments to Secured parties, and (3) fund working capital needs, capital improvements, and expenditures of the Debtors during the Chapter 11 Cases, in accordance with an approved budget. As part of, and subject to the terms of, the Restructuring Support Agreement, the Consenting Lenders agreed to support entry of the DIP Orders. Obtaining access to the DIP Facility and the consensual use of cash collateral are each key components of the Restructuring Support Agreement and critical to preserving and maximizing value for the Debtors' Estates.

Upon the Debtors' emergence from chapter 11, the New Money Loans shall automatically convert on a dollar-for-dollar basis into a senior secured, first lien "first out" term loan facility (the "First-Out Take-Back Debt Facility") and the Roll-Up Loans shall automatically convert on a dollar-for-dollar basis into a senior secured, first lien "second out" term loan facility (the "Second-Out Take-Back Debt Facility", together with the First-Out Take-Back Debt Facility, the "Exit Facilities") on the Effective Date.

The DIP Facility also requires the Debtors to meet certain milestones that mirror those included in the Restructuring Support Agreement. Failure to meet any of the milestones is an event of default under the DIP Facility.

### G. Independent Investigation

Prior to the Petition Date, the board of directors of Thrasio Holdings, Inc. (the "Board") appointed Stefan M. Selig and Anthony Horton as disinterested directors of the Board (the "Disinterested Directors"). The Disinterested Directors were delegated sole authority (i) on all matters in which a conflict of interest exists or is reasonably likely to exist between Thrasio Holdings, Inc., on the one hand, and any Related Party,[9] on the other hand (each, a "Conflict Matter") and (ii) to make a determination as to whether any matter constitutes a Conflict Matter. The Disinterested Directors participated in the evaluation of all received transaction proposals and, ultimately, the negotiation of the Restructuring Transactions contemplated by the Plan.

In addition, the Board delegated sole authority to the Disinterested Directors to conduct an independent investigation with respect to potential claims or causes of action of the Debtors, if any, against any Related Party (the "Independent Investigation"). The Disinterested Directors retained Katten Muchin Rosenman LLP ("Katten") to provide independent legal counsel in connection with the Independent Investigation.

In furtherance of the Independent Investigation, the Disinterested Directors have, to date, issued document and information requests to, among others, the Debtors and certain of the Debtors' significant equity holders. To date, Katten has received and reviewed approximately [●] documents, comprising [●] pages, relevant to the Independent

---

[9]   As used herein, "Related Party" means the Company or any of its equity holders, affiliates, subsidiaries, directors, managers, officers, or other stakeholders.

Investigation. Katten has also interviewed certain members of Company management team and certain other parties. The Disinterested Directors are continuing to investigate matters in accordance with the authority it has been given by the Board and in accordance with the Disinterested Directors' fiduciary obligations. Accordingly, the Independent Investigation remains ongoing as of the date hereof.

### H.   Proposed Confirmation Schedule

Under the Restructuring Support Agreement, the Debtors agreed to certain milestones to ensure an orderly and timely implementation of the Restructuring Transactions. The Debtors intend to proceed swiftly to confirmation of the Plan and emergence from these Chapter 11 Cases to mitigate uncertainty among employees, customers, and vendors, minimize disruptions to the Company's business, and curtail professional fees and administrative costs. To that end, the Debtors have proposed the following case timeline, subject to Court approval and availability:

| Event | Date |
|---|---|
| Voting Record Date | [April 1], 2024 |
| Solicitation Mailing Deadline | Three (3) business days following entry of the Disclosure Statement Order (or as soon as reasonably practicable thereafter) |
| Publication Deadline | Three (3) business days following entry of the Disclosure Statement Order (or as soon as reasonably practicable thereafter) |
| Plan Supplement Filing Deadline | The date that is no later than seven (7) days prior to the Voting Deadline |
| Voting Deadline | [May 7], 2024 |
| Plan Objection Deadline | [May 7], 2024 |
| Deadline to File Voting Report | [May 9], 2024 |
| Confirmation Brief and Confirmation Reply Deadline | [May 9], 2024 |
| Confirmation Hearing Date | [May 13], 2024 |

**No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

## VII.   SUMMARY OF THE PLAN

### A.   Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have, or any distribution to be made on account of such Allowed Claim or Allowed Interest that have been effectuated through a Rule 9019 Order, or otherwise expressly identified as a settlement as may be set forth herein. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle any Claims and Causes of Action against other Entities.

### B.   Restructuring Transactions

Before, on, and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, in accordance with the terms, conditions, and consent rights of the Restructuring Support Agreement, including: (a) the execution and delivery of

any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including the documents comprising the Plan Supplement and the New Organizational Documents; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and Restructuring Support Agreement and having other terms for which the applicable parties agree; (c) the execution, delivery, and filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law, including any applicable New Organizational Documents; (d) such other transactions that are required to effectuate the Restructuring Transactions; and (e) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all of the foregoing and all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan and the Plan Supplement, including any and all actions required to be taken under applicable non-bankruptcy law, in each case, in accordance with the terms, conditions, and consent rights contained in the Restructuring Support Agreement.

**C.      Cancellation of Notes, Instruments, Certificates, and Other Documents**

Except for the purpose of evidencing a right to a distribution under the Plan, on the Effective Date, except as otherwise specifically provided for in the Plan or the Plan Supplement:  (1) the obligations of any Debtor under all certificates, shares, notes, bonds, indentures, purchase rights, or other instruments or documents, directly or indirectly evidencing or creating any indebtedness or obligations of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be cancelled and deemed surrendered to the Debtors without any need for a Holder to take further action with respect thereto, and the Debtors shall not have any continuing obligations thereunder and Holders of or parties to such cancelled instruments, certificates, and other documentation will have no rights arising from or relating to such instruments, certificates, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to the Plan or the Confirmation Order; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, compromised and discharged.

Notwithstanding such cancellation and discharge, the First Lien Credit Documents shall continue in effect to the extent necessary (i) to allow the holders of First Lien Claims to receive distributions under the Plan; (ii) to allow the Debtors, the Reorganized Debtors, and the Administrative Agent to make post-Effective Date distributions or take such other action pursuant to the Plan on account of such Claims and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims; and (iii) to allow the Administrative Agent and any Issuing Bank to enforce its rights, claims, and interests vis-à-vis any party other than the Debtors, including any rights with respect to priority of payment and/or to seek reimbursement or indemnification.

On the Effective Date, the Administrative Agent shall be relieved of all further duties and responsibilities related to the First Lien Credit Documents.

**D.      Exemption from Certain Taxes and Fees**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto, including the issuance, transfer, or exchange of any debt, security, or other interest in the Debtors or the Reorganized Debtors under the Plan or the granting of security under the Exit Facilities shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or

other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

**E.    Sources of Consideration for Restructuring Transactions**

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date, the revenues and proceeds of all assets of the Debtors, the Exit Facilities, and the New Common Stock.

**F.    New Stockholders Agreement**

On and as of the Effective Date, each Holder of New Common Stock shall be deemed to be a party to the New Stockholders' Agreement without the need for execution by such Holder.  The New Stockholders Agreement shall be binding on all Entities receiving, and all Holders of, the New Common Stock (and their respective successors and assigns), whether such New Common Stock is received or to be received on or after the Effective Date and regardless of whether such Entity executes or delivers a signature page to the New Stockholders Agreement.

**G.    Issuance and Distribution of New Common Stock**

On the Effective Date, Reorganized Thrasio shall issue the New Common Stock to certain Holders of Allowed Claims and Allowed Interests in accordance with Article IV of the Plan.  The issuance of New Common Stock under the Plan, including pursuant to the Management Incentive Plan, shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims or Interests, as applicable.  All New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

On the Effective Date, Reorganized Thrasio and all Holders of New Common Stock then outstanding shall be deemed to be parties to the New Common Stock Documents, substantially in the form contained in the Plan Supplement, without the need for execution by any such Holder.  On the Effective Date, the New Common Stock Documents shall be binding on the Reorganized Debtors and all parties receiving, and all Holders of, the New Common Stock.

**H.    Exit Facilities**

On the Effective Date, Reorganized Thrasio shall enter into the Exit Facilities, the terms of which shall be set forth in the Exit Facilities Documents.

The Confirmation Order shall be deemed final approval of the Exit Facilities and the Exit Facilities Documents and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facilities Documents and such other documents as may be required to effectuate the Exit Facilities.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (i) shall be deemed to be granted, (ii) shall be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Facilities Documents, (iii) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facilities Documents, and (iv) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law.  The Reorganized Debtors and the Entities granting such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order (subject solely to the occurrence of the Effective Date) and any such filings, recordings, approvals, and consents shall not be required unless required by the Exit Facilities Documents), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

On and as of the Effective Date, all DIP Lenders and Holders of Allowed First Lien Claims shall be deemed to be parties to, and bound by, the Exit Facilities Documents, without the need for execution thereof by any such DIP Lender or Holder of an Allowed First Lien Claim.

By voting to accept the Plan, each DIP Lender and First Lien Lender thereby instructs and directs the Distribution Agent and the Exit Facilities Agent (as applicable), to (a) act as Distribution Agent to the extent required by the Plan, (b) execute and deliver the Exit Facilities Documents (each to the extent it is a party thereto), as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, to which the Exit Facilities Agent is a party and to promptly consummate the transactions contemplated thereby, and (c) take any other actions required or contemplated to be taken by the Exit Facilities Agent and/or the Distribution Agent (as applicable) under the Plan or any of the Definitive Documents to which it is a party.

## I.  Corporate Existence

Except as otherwise provided in the Plan, the New Organizational Documents, the Restructuring Transactions Memorandum, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and, to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

## J.  Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or in any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, pursuant to section 1141 of the Bankruptcy Code, all property in each Debtor's Estate, all Causes of Action, and any property acquired by each of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances other than the Liens securing the obligations under the Exit Facilities and such other Liens or other encumbrances as may be permitted thereby.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise, or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## K.  Corporate Action

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan and the Definitive Documents shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action, including, as applicable:  (1) the implementation of the Restructuring Transactions; (2) the adoption, execution, and filing of the New Organizational Documents; (3) the selection of the directors, managers, and officers for the Reorganized Debtors;(4) the execution and delivery of the Exit Facilities and the incurrence of credit thereunder; (5) the adoption of the Management Incentive Plan by the New Board; (6) the issuance and distribution of the New Common Stock and the execution, delivery, and filing of any documents pertaining thereto, as applicable; (7) the formation of any Entities pursuant to the Restructuring Transactions; (8) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (9) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan and the Definitive Documents involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the other Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors.  On or before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Facilities, the New Common

Stock, the Management Incentive Plan, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by Article VII of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### L.        New Organizational Documents

On the Effective Date, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective jurisdiction of incorporation or formation in accordance with the applicable laws of the respective jurisdiction of incorporation or formation.  The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents in accordance with the terms thereof and as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents.

### M.        Directors and Officers of the Reorganized Debtors

On the Effective Date, the term of the current board of directors of the Debtors shall expire, and the directors for the initial term of the New Board shall be designated and appointed in accordance with the terms set forth in the New Organizational Documents and the New Stockholders Agreement.  The initial members of the New Board will be identified in the Plan Supplement, as well as those Persons that will serve as officers of the Reorganized Debtors.  Each such member and officer of the New Board shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents, the New Stockholders Agreement, and other constituent documents of Reorganized Thrasio.

To the extent any identified director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.  Provisions regarding the removal, appointment, and replacement of members of the New Board will be disclosed in the New Organizational Documents.

### N.        Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and Definitive Documents, including both the Exit Facilities and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents.

### O.        Preservation of Causes of Action

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity (other than the Consenting Lenders, the DIP Lenders, the Ad Hoc Group and each member of the Ad Hoc Group, the Administrative Agent, each lender and Issuing Bank and other secured parties under the First Lien Credit Agreement and the DIP Backstop Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res

judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in the Plan, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of the Bankruptcy Court.

### P.    Management Incentive Plan

The New Board shall be authorized to adopt and implement the Management Incentive Plan, which shall be set forth in the Plan Supplement.

### Q.    Employee Obligations and Employee Arrangements

On the Effective Date, the Debtors shall be deemed to have assumed the Employment Agreements in a manner consistent with the Restructuring Support Agreement. Further, the Debtors, for any Employment Agreement to remain in place after the Effective Date, the Debtors will list such agreement on the list of "Assumed Executory Contracts and Unexpired Leases" contained in the relevant exhibit of the Plan, and such agreement will be assumed as of the Effective Date. If the Debtors do not list such agreement on the list of "Assumed Executory Contracts and Unexpired Leases" in the relevant exhibit, such agreement shall be deemed rejected.

After the Effective Date, the Debtors or Reorganized Debtors, as applicable shall be permitted to make payments to employees pursuant to employment programs then in effect, and to implement additional employee programs and make payments thereunder, without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that such payments shall not adversely affect any distributions provided for under the Plan.

### R.    Closing the Chapter 11 Cases

Following the Confirmation Date, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, the Transaction Expenses related to the Plan and implementation, Consummation, and defense of the Restructuring Transactions, whether incurred before, on, or after the Effective Date, in accordance with any applicable engagement letter, the DIP Orders, and the Restructuring Support Agreement.

### S.    Payment of Fees and Expenses of Certain Creditors

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases[ except for the Chapter 11 Case of [●],] and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of [●].

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of [●] in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## VIII.    OTHER KEY ASPECTS OF THE PLAN

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan or otherwise agreed to by the Debtors (with the consent of the Required Consenting Lenders) and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be deemed assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than:  (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired

Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Except as otherwise provided in the Plan, the Debtors shall assume, assume and assign, or reject, as the case may be, Executory Contracts and Unexpired Leases set forth in the applicable Schedules in the Plan Supplement. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease.

Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims.

**B.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contract or Unexpired Lease. Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

**C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing and Solicitation Agent at the address specified in any notice of entry of the Confirmation Order and served on the Reorganized Debtors no later than thirty (30) days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Claims, Noticing and Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.H of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim as set forth in Article III.C of the Plan and may be objected to in accordance with the provisions of Article V the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**D.      Cure of Defaults for Assumed, or Assumed and Assigned, Executory Contracts and Unexpired Leases**

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as

reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree.  In the event of a dispute regarding:  (1) the amount of any Cure Claim; (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned; or (3) any other matter pertaining to assumption or the assumption and assignment, the Cure Claims shall be made following the entry of a Final Order resolving the dispute and approving the assumption or the assumption and assignment.  Notwithstanding the foregoing, nothing herein shall prevent the Reorganized Debtors from settling any Cure Claim without further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors shall provide Cure Notices to the parties to the applicable Assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement.  **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Claim must be Filed by the Cure/Assumption Objection Deadline.**  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Notice will be deemed to have assented to such assumption or assumption and assignment, and Cure Claim.  To the extent that the Debtors seek to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and provide "adequate assurance of future performance" for such assignee (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease to be assumed and assigned.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the Cure Claim, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to, or action, order, or approval of the Bankruptcy Court.

E.    **Survival of the Debtors' Indemnification Obligations and Insurance Obligations[10]**

Except as expressly provided herein, all indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the Indemnified Parties shall be reinstated and shall survive the Effective Date on terms no less favorable to the Indemnified Parties than the indemnification provisions in place prior to the Effective Date.

In addition, after the Effective Date, the Company Parties will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

All Claims arising from or related to any indemnification obligations that are not Reinstated or assumed shall be treated as General Unsecured Claims as set forth in Article III.C of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

F.    **Modifications, Amendments, Supplements, Restatements, or Other Agreements**

---

[10]    For the avoidance of doubt, the survival of indemnification obligations remain subject to the Independent Investigation.

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### G.    Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.

### H.    Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### I.    Contracts and Leases Entered Into After the Petition Date.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### J.    Conditions Precedent to the Effective Date

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.B of the Plan):

1.    the Restructuring Support Agreement shall have not been terminated and shall remain in full force and effect;

2.    there shall not have been instituted or threatened or be pending any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) (or there shall not have been any material adverse development to any action, application, claim, counterclaim, or proceeding currently instituted, threatened, or pending) before or by any court, governmental, regulatory, or administrative agency or instrumentality, domestic or foreign, or by any other Person, domestic or foreign, in connection with the Restructuring Transactions that, in the reasonable judgment of the Company Parties and the Required Consenting Lenders, would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

3.    each document or agreement constituting the applicable Definitive Documents shall have been executed and/or effectuated, shall be in form and substance consistent with the Restructuring Support Agreement, and any conditions precedent related thereto or contained therein, shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

4.    all conditions precedent to the issuance or incurrence of the Exit Facilities shall have been satisfied or duly waived, and the Exit Facilities, including all documentation related thereto, shall be in effect;

5.        the Company Parties shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

6.        the New Organizational Documents and the New Stockholders Agreement shall have been executed and/or effectuated, shall be in form and substance consistent with the Restructuring Support Agreement and the Plan Supplement, and any conditions precedent related thereto, shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

7.        all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses in full after the Effective Date have been placed in the professional fee escrow account;

8.        all accrued and unpaid (i) Transaction Expenses and (ii) fees and expenses of the DIP Agent and its advisors shall have been paid in full in accordance with the Restructuring Support Agreement and the DIP Orders;

9.        there shall be no Events of Default under the DIP Credit Agreement;

10.        the Bankruptcy Court shall have entered the Confirmation Order and such order shall be a Final Order;

11.        the New Common Stock shall have been issued by Reorganized Thrasio;

12.        all conditions denominated "Closing Conditions" in the Plan shall have been satisfied, waived, or satisfied contemporaneously with the occurrence of the Effective Date;

13.        to the extent not otherwise addressed herein, all actions, documents, and agreements necessary to implement and consummate the Restructuring Transactions shall have been effected and executed, and shall be in form and substance consistent with the Restructuring Support Agreement and Restructuring Term Sheet or otherwise reasonably acceptable to the Company Parties and the Required Consenting Lenders; and

14.        the Company Parties shall have otherwise substantially consummated the Restructuring Transactions, including all transactions contemplated in the Restructuring Term Sheet, in a manner consistent in all respects with the Restructuring Support Agreement and the Plan.

**K.        Waiver of Conditions**

The conditions to the Effective Date of the Plan set forth in this Article VIII may be waived, in whole or in part, in writing (which may be via electronic mails) by the agreement of the Debtors and the Required Consenting Lenders, in accordance with the terms of the Restructuring Support Agreement, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

**L.        Substantial Consummation**

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

**M.        Effect of Nonoccurrence of Conditions to the Effective Date**

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect; *provided* that all provisions of the Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

IX.    **RISK FACTORS**

BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.

A.    **Bankruptcy Law Considerations**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.    **The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors**

If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, commencing section 363 sales of the Debtors' assets, and any other transaction that would maximize the value of the Debtors' estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it would adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers and vendors.

2.    **Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as

applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 3.      The Restructuring Support Agreement May Be Terminated

As more fully set forth in the Restructuring Support Agreement, the Restructuring Support Agreement may be terminated upon the occurrence of certain events, including, among others, the Debtors' failure to meet specified milestones relating to the Filing, Confirmation, and Consummation of the Plan, and breaches by the Debtors and/or the Required Consenting Lenders of their respective obligations under the documents.  In the event that the Restructuring Support Agreement is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.

### 4.      The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Confirmation and Effective Date of the Plan will not take place.  In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new plan.  If the Debtors do not secure sufficient working capital to continue their operations of if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

### 5.      The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction, subject to the terms of the Restructuring Support Agreement.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 6.      The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

7. **The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

8. **Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the "aggregator" or e-commerce industries, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the Debtors' services, increasing expenses, and go-forward business plan risks. See Article IX.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions for chapter 11 relief. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

9. **The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit F**.

10. **The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan, subject to the terms of the Restructuring Support Agreement. The estimates set forth in

this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

11.     **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

12.     **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

13.     **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

B.     **Risks Related to Recoveries Under the Plan**

1.     **Estimated Valuations of the Exit Facilities, and the New Common Stock, and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values**

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' Securities. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to maintain adequate liquidity to fund operations; (d) the assumption that capital and equity markets remain consistent with current conditions; and (e) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

2.     **The Reorganized Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service Their Debt and May Be Forced to Take Other Actions to Satisfy Their Obligations, Which May Not Be Successful**

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on their debt, including the Exit Facilities.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt, including the Exit Facilities. These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

**3.     The Terms of the Exit Facilities Documents and the New Organizational Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court**

The final terms of the Exit Facilities Documents and the New Organizational Documents have not been finalized and are subject to negotiations between the Debtors and the Consenting Lenders. Holders of Claims that are not the Consenting Lenders will not participate in these negotiations, and the results of such negotiations may affect the rights of the holders of the [Exit Facilities] and the New Common Stock following the Effective Date. As a result, the final terms of the Exit Facilities Documents and the New Organizational Documents may be less favorable to Holders of Claims and Interests than as described herein and in the Plan.

**4.     A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Refinance Their Debt**

The Debtors' or the Reorganized Debtors' credit ratings could be lowered, suspended, or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the Reorganized Debtors, as applicable. Downgrades in the Reorganized Debtors' long-term debt ratings may make it more difficult to refinance their debt and increase the cost of any debt that they may incur in the future.

**5.     Certain Tax Implications of the Plan May Increase the Tax Liability of the Reorganized Debtors**

Holders of Allowed Claims should carefully review Article XIII of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims.

**C.     Risks Related to the Debtors' and the Reorganized Debtors' Businesses**

**1.     The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness**

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, under the Exit Facilities and upon emergence.

**2.     The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 3.    Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4.    Financial Results May Be Volatile and May Not Reflect Historical Trends

Unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New Common Stock and the ability of the Debtors to make payments with respect to their indebtedness.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Finally, the business plan was developed by the Debtors with the assistance of their advisors. There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan. Any deviations from the Debtors' existing business plan would necessarily cause a deviation.

**5.      The Debtors' Business is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business**

The Debtors' operations are subject to various federal, state and local laws and regulations, including occupational health and safety laws and evolving environmental standards. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.

**6.      The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

**7.      The Loss of Key Personnel Could Adversely Affect the Debtors' Operations**

The Debtors' operations are dependent on a relatively small group of key management personnel. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors may experience increased levels of employee attrition. Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience, and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

**8.      The Debtors' Business Depends on Their Ability to Keep Pace with Rapid Changes That Impact Their Industry, and Ability to Grow and Retain the Debtors' Customer Base**

The Debtors operate in a complex and rapidly shifting industry characterized by swift, and sometimes disruptive, changes in consumer expectations, demand, and habits. The Debtors' future success depends in part on their ability to continue to provide products that keep pace with changing customer demands. The impact of these changes may be magnified by the intense competition in the Debtors' industry. If the Debtors are unable to successfully update and integrate their offerings to adapt to these changes, or if the Debtors do not successfully develop new capabilities needed by their customers to keep pace with these changes, the Debtors' business and financial results may suffer.

The Debtors' ability to keep up with changes is subject to a number of risks, and the Debtors may find it difficult or costly to, among other things: (i) meet customer demands for existing products in the Company's portfolio; (ii) anticipate shifting customer needs and demands; and (iii) update the Debtors' offerings to keep pace with advancements in hardware, software, and data center technology. The Debtors could also incur substantial costs if they need to modify their offerings or business plan to adapt to these changes.

**9.      Acquisitions of Companies, Products, or Technologies, or Internal Restructuring and Cost Savings Initiatives May Disrupt the Debtors' Ongoing Business**

The Debtors have acquired and may continue to acquire sellers or other e-commerce brands.  Acquisitions involve significant risks and uncertainties, including:

- inability to successfully integrate the acquired brands or products into the Debtors' business;

- inability to realize synergies expected to result from an acquisition;

- challenges retaining the key employees, customers, and other business partners of the acquired operation; and

- the internal control environment of an acquired business may not be consistent with the Debtors' standards and may require significant time and resources to improve.

Acquisitions and divestitures are inherently risky.  The Debtors' transactions may not be successful and may, in some cases, harm operating results or their financial condition.  In addition, if the Debtors use debt to fund acquisitions or for other purposes, their interest expense and leverage may significantly increase.  If the Debtors issue equity securities as consideration in an acquisition, current shareholders' percentage ownership and earnings per share may be diluted.

In addition, from time to time, the Debtors may undertake internal restructurings and other initiatives intended to reduce expenses.  These initiatives may not lead to the benefits the Debtors expect, may be disruptive to the Debtors' personnel and operations, and may require substantial management time and attention.  Moreover, the Debtors could encounter delays in executing their plans, which could entail further disruption and associated costs.  If these disruptions result in a decline in productivity of the Debtors' personnel, negative impacts on operations, or if they experience unanticipated expenses associated with these initiatives, the Debtors' business and operating results may be harmed.

**10.  Cyberattacks or the Improper Disclosure or Control of Personal Information Could Result in Liability and Harm the Debtors' Reputation, Which Could Adversely Affect Its Business**

The Debtors are dependent on networks and systems to process, transmit and store electronic information, and they may be required to store sensitive or confidential data in connection with the services they provide.  As a result, the Debtors are subject to contractual terms and numerous U.S. and foreign laws and regulations designed to protect this information.  Furthermore, data privacy is subject to frequently changing rules and regulations, which sometimes conflict among the various jurisdictions and countries in which the Debtors provide services.  Although the Debtors have implemented appropriate policies and procedures to reduce the possibility of physical, logical and personnel security breaches, no such measures can completely eliminate the risk of cybersecurity attacks, especially in light of advances in criminal capabilities (including cyber-attacks or cyber intrusions over the internet, malware, computer viruses and the like), discovery of new vulnerabilities or attempts to exploit existing vulnerabilities in interconnected third party systems that are beyond the Debtors' control systems.

Unauthorized disclosure, either actual perceived, of sensitive or confidential client or customer data, whether through systems failure, system intrusion, employee negligence, fraud, or otherwise could damage the Debtors' reputation and cause the Debtors to lose clients.  Similarly, unauthorized access to or through the Debtors' information systems or those the Debtors develop for clients, whether by the Debtors' employees or third parties, could result in negative publicity, legal liability and damage to the Debtors' reputation, business, financial condition, results of operations and cash flows.

While the Debtors have not experienced a significant compromise to date, significant data loss or material financial losses related to cyber security attacks that has had an adverse effect on the Debtors' operations, there is no assurance that there may not be a material adverse effect in the future.  Although the Debtors maintain cyber liability insurance, such insurance may not adequately or timely compensate the Debtors for all losses they may incur as any of the Debtors' client contracts do not contain limitations of liability for such losses.

**11.  The Debtors May Not Be Able to Accurately Report Their Financial Results**

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

12.    **The Debtors May Fail to Retain or Attract Customers, Which Would Adversely Affect the Debtors' Business and Financial Results**

The Debtors' future revenue is dependent in large part upon the retention and growth of their existing customer base, in terms of customers continuing to purchase products and services, existing customers may decide not to purchase additional products or services from the Debtors in the future, which could have a material adverse effect on the Debtors' business and results of operations. In such cases, there can be no assurance that the Debtors will be able to retain their current customers.

A variety of factors could affect the Debtors' ability to successfully retain and attract customers, including the level of demand for their products and services, the level of customer spending for e-commerce offerings, the quality of the Debtors' customer service, the Debtors' ability to update their products and develop new products and services needed by customers, and the Debtors' ability to integrate and manage any acquired businesses. Further, the industry in which the Debtors operate is highly competitive and the Debtors may not be able to compete effectively.

D.    **Risks Related to the Offer and Issuance of Securities Under the Plan**

1.    **Certain Significant Holders of Shares of New Common Stock May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date**

Assuming that the Effective Date occurs, holders of Claims who receive distributions representing a substantial percentage of the outstanding shares of the New Common Stock may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors. The holders may have interests that differ from those of the other holders of shares of New Common Stock and may vote in a manner adverse to the interests of other holders of shares of New Common Stock. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New Common Stock. In addition, a holder of a significant number of shares of New Common Stock may sell all or a large portion of its shares of New Common Stock within a short period of time, which sale may adversely affect the trading price of the shares of New Common Stock. A holder of a significant number of shares of New Common Stock may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' businesses, and as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors. Such actions by holders of a significant number of shares of New Common Stock may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

2.    **An Active Trading Market May Not Develop for the New Common Stock**

The New Common Stock are a new issue of securities and, accordingly, there is currently no established public trading market for the New Common Stock. The Reorganized Debtors do not intend to seek a listing of the New Common Stock on the New York Stock Exchange, the Nasdaq Stock Market or another comparable national securities exchange upon the Effective Date. If no active trading market in the New Common Stock develops, the market price and liquidity of the New Common Stock may be adversely affected. If a trading market does not develop or is not maintained, holders of New Common Stock may experience difficulty in reselling such securities at an acceptable price or may be unable to sell them at all. Even if a trading market were to exist, such market could have limited liquidity and the New Common Stock could trade at prices higher or lower than the value attributed to such

securities in connection with their distribution under the Plan, depending upon many factors, including, without limitation, markets for similar securities, industry conditions, financial performance, prevailing interest rates, conditions in financial markets, or prospects and investor expectations thereof. As a result, there may be limited liquidity in any trading market that does develop for the New Common Stock. Finally, the New Organizational Documents may also contain restrictions on the transferability of the New Common Stock, which may adversely affect the liquidity in the trading market for the New Common Stock.

       **3.**       **The New Common Stock are an Equity Interest and Therefore Subordinated to the Indebtedness of the Reorganized Debtors**

In any liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Stock would rank junior to all debt claims against the Reorganized Debtors. As a result, holders of New Common Stock will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all of their obligations to their debt holders have been satisfied.

       **4.**       **Certain Holders of New Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Securities**

To the extent that the New Common Stock are issued under the Plan pursuant to section 1145(a) of the Bankruptcy Code, such New Common Stock may be resold by the holders thereof without registration under the Securities Act, subject to applicable securities laws, including state securities laws, unless the holder is an "underwriter" with respect to such securities. Resales by Persons who receive New Common Stock pursuant to the Plan that are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such Persons would only be permitted to sell such securities without registration if they are able to comply with an available exemption from registration under the Securities Act. The exemption from registration provided by Rule 144 under the Securities Act may not be available to affiliated holders or "underwriters" as Reorganized Thrasio will not be a public reporting company and the public information required by Rule 144 may not be available. The resale by any holder of securities issued in reliance of section 1145 of the Bankruptcy Code may also be subject to restrictions under the New Organizational Documents and applicable state and local securities laws, including Blue-Sky Laws.

The New Common Stock will not be registered under the Securities Act or any state securities law, and the Reorganized Debtors make no representation regarding the right of any holder of New Common Stock to freely resell the New Common Stock.

       **5.**       **The New Common Stock is Subject to Dilution**

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from the New Common Stock issued in connection with the conversion of any other options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence, including pursuant to the Management Incentive Plan.

## X.      SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER AND SOLICITATION PROCEDURES FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### A.    Classes Entitled to Vote on the Plan

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "<u>Voting Classes</u>"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3 | First Lien Claims | Impaired |
| 4 | General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below).  If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s).  Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Claims, Noticing and Solicitation Agent on behalf of the Debtors, otherwise provided to you.  If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

### B.    Classes Not Entitled to Vote on the Plan

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan.  Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 1 | Other Secured Claims | Unimpaired |
| 2 | Other Priority Claims | Unimpaired |
| 5 | Series X Redeemable Preferred Stock Interests | Impaired |
| 6 | Series D Preferred Stock Interests | Impaired |
| 7 | Series C Preferred Stock Interests | Impaired |
| 8 | Series B Preferred Stock Interests | Impaired |
| 9 | Series A Preferred Stock Interests | Impaired |
| 10 | Series Seed Preferred Stock Interests | Impaired |
| 11 | Common Stock Interests | Impaired |
| 12 | Intercompany Claims | Unimpaired/Impaired |
| 13 | Intercompany Interests | Unimpaired/Impaired |

### C.    Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### D.    Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article IX of this Disclosure Statement.

### E.      Solicitation Procedures.

#### 1.      Claims, Noticing and Solicitation Agent

The Debtors have applied to retain KCC to act, among other things, as the Claims, Noticing and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

#### 2.      Solicitation Package

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- a copy of the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order);

- the applicable form of Ballot, together with detailed voting instructions and a pre-addressed, postage pre-paid return envelope;

- the Cover Letter (as defined in the Disclosure Statement Order);

- this Disclosure Statement (and exhibits thereto, including the Plan);

- the Disclosure Statement Order (without exhibits, except the Solicitation and Voting Procedures);

- the Confirmation Hearing Notice (as defined in the Disclosure Statement Order); and

- such other materials as the Bankruptcy Court may direct.

#### 3.      Distribution of the Solicitation Package and Plan Supplement

The Debtors are causing the Claims, Noticing and Solicitation Agent to distribute the Solicitation Package to Holders of Claims in the Voting Class by **within three (3) business days following the entry of the Disclosure Statement Order (or as soon as reasonably practicable thereafter).**

The Solicitation Package (without Ballots, unless you are an eligible voting party) may also be obtained from the Claims, Noticing and Solicitation Agent by:  (a) calling the Claims, Noticing and Solicitation Agent at (866)-967-

0496 and asking for the "Solicitation Team" or (b) writing to the Claims, Noticing and Solicitation Agent at Thrasio Ballots Processing Center, c/o 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 900245. You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website www.kccllc.net/Thrasio, or the Bankruptcy Court's website at https://www.njb.uscourts.gov (for a fee). Holders should choose only one method to return their Ballot.

The Debtors shall file the Plan Supplement, to the extent reasonably practicable, with the Bankruptcy Court **no later than seven (7) days before the Voting Deadline**. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.

### F.    Voting Procedures

**[April 1, 2024]** (the "Voting Record Date"), is the date that was used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.[11]

In order for the Holder of a Claim in the Voting Classes to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by (i) using the enclosed pre-paid, pre-addressed return envelope, (ii) electronically through the E-Ballot Portal at https://eballot.kccllc.net/Thrasio (iii) via first class mail, overnight courier, or hand delivery to Thrasio Ballots Processing Center, c/o 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 900245, so that such Holder's Ballot is actually received by the Claims, Noticing and Solicitation Agent on or before the Voting Deadline, *i.e.* **[May 7, 2024] at 4:00 p.m. (prevailing Eastern Time).**

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim Holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the purchaser and agent for the relevant facility provide satisfactory confirmation of the transfer to the Claims, Noticing and Solicitation Agent.

If you hold Claims in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number, and a set of solicitation materials. You may also receive more than one Ballot if you hold Claims through one or more affiliated funds, in which case the vote cast by each such affiliated fund will be counted separately. Separate Claims held by affiliated funds in a particular Class shall not be aggregated, and the vote of each such affiliated fund related to its Claims shall be treated as a separate vote to accept or reject the Plan (as applicable). If you hold any portion of a single Claim, you and all other Holders of any portion of such Claim will be (i) treated as a single creditor for voting purposes and (ii) required to vote every portion of such Claim collectively to either accept or reject the Plan.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT

---

[11]    For the avoidance of doubt, the Debtors and the Claims, Noticing and Solicitation Agent will distribute Solicitation Packages as soon as reasonably practicable following receipt of any valid and timely filed Proof of Claim that is filed after the Voting Record Date but before the Bar Date.

AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.  NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

### G.    Voting Tabulation

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted.  A Ballot will be deemed delivered only when the Claims, Noticing and Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions.  No Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims, Noticing and Solicitation Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to confirmation of the Plan.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court the voting report prepared by the Claims, Noticing and Solicitation Agent (the "Voting Report") no later than **three (3) days prior to the Confirmation Hearing**.  The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged.  The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots.  Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification.

### H.    Ballots Not Counted

No Ballot will be counted toward Confirmation if, among other things:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims, Noticing and Solicitation Agent), an indenture trustee, or the Debtors' financial or legal advisors instead of the Claims, Noticing and Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan.  Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING AND SOLICITATION AGENT TOLL-FREE NUMBER AT (866) 967-0496 (DOMESTIC) or +1(310) 751-2696 (INTERNATIONAL)**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

---

## XI.    CONFIRMATION OF THE PLAN

### A.    Requirements of Section 1129(a) of the Bankruptcy Code

Among the requirements for Confirmation are the following:  (i) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims or Interests has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Impaired Claims or Interests (*i.e.*, Holders of Classes 3-13).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code.  Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment:  (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class.  Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

### B.    Best Interests of Creditors—Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit F**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation. Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

### C.     Feasibility

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan.

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the financial projections (the "Financial Projections"). Creditors and other interested parties should review Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors. The Financial Projections are attached hereto as **Exhibit D** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

Additionally, the Plan provides for the deleveraging of the Debtors and the distribution of their assets. The Debtors believe that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### D.     Valuation

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors, which estimate is attached to this Disclosure Statement as **Exhibit E** (the "Valuation Analysis"). The Valuation Analysis should be considered in conjunction with the Risk Factors discussed in Article IX of this Disclosure Statement, entitled "Risk Factors," and the Financial Projections. The Valuation Analysis is dated as of [●], 2024, and is based on data and information as of that date. The Valuation Analysis is subject to various important qualifiers and assumptions that are set forth in **Exhibit E**, and Holders of Claims and Interests should carefully review the information in **Exhibit E** in its entirety. The Debtors believe that the Valuation Analysis demonstrates that the Plan is "fair and equitable" to the non-accepting classes.

### E.     Acceptance by Impaired Classes

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in

that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

**F.      Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

**2.      No Unfair Discrimination**

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. Accordingly, the Debtors believe that the Plan meets the standard to demonstrate that the Plan does not unfairly discriminate and the Debtors will be prepared to meet their burden to establish that there is no unfair discrimination as part of Confirmation of the Plan.

**3.      Fair and Equitable Test**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

**(a)      Secured Claims**

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the claimant's liens.

#### (b)      Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

#### (c)      Interests

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## XII.     IMPORTANT SECURITIES LAWS DISCLOSURES

The Debtors believe the New Common Stock to be issued pursuant to the Plan to be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable Blue-Sky Laws. The Debtors further believe that the offer, sale, issuance and initial distribution of the New Common Stock pursuant to the Plan is exempt from federal and state securities registration requirements under the Securities Act, the Bankruptcy Code, and applicable state Blue-Sky Laws, as described in more detail below. No registration statement for the New Common Stock issued under the Plan will be filed under the Securities Act or any state securities laws. The rights of holders of the New Common Stock, including the right to transfer such New Common Stock, will also be governed by the New Organizational Documents.

### A.      Issuance of Section 1145 Securities under the Plan

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in exchange for such claim or interest and "partly" for cash or property. In reliance upon this exemption, the Debtors believe that the offer and sale of the New Common Stock (other than the New Common Stock issued on account of the Backstop Payment and any New Common Stock issued in respect of the Management Incentive Plan) to be issued pursuant to the Plan  (collectively, the "1145 Securities") will be exempt from registration under the Securities Act and state securities laws, including Blue-Sky Laws. To the extent such exemption is not available, then such New Common Stock will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws, including Blue-Sky Laws.

### B.      Subsequent Transfers of 1145 Securities Issued under the Plan.

In general, securities issued under section 1145 of the Bankruptcy Code may be resold without registration under federal securities laws, subject to applicable state and local securities laws, including Blue-Sky Laws, unless the recipient is an "underwriter" with respect to those securities.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any entity who, except with respect to ordinary trading transactions of an entity that is not an issuer:

- purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such a claim or interest;

- offers to sell securities offered or sold under the plan of reorganization for the holders of such securities;

- offers to buy securities offered or sold under the plan of reorganization from the holders of such securities, if the offer to buy is (i) with a view to distribution of such securities; and (ii) under an agreement made in connection with the plan of reorganization, with the consummation of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

You should confer with your own legal advisors to help determine whether or not you are an "underwriter."

To the extent that persons who receive the securities issued under the Plan that are exempt from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Persons deemed to be "underwriters" may, however, be permitted to sell such securities without registration pursuant to the provisions of Rule 144 under the Securities Act. These rules generally permit the public sale of securities received by "underwriters" subject to certain holding periods if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met. Reorganized Thrasio is not expected to be a public reporting company and thereby current public information regarding Reorganized Thrasio as may be required by Rule 144 may not be available.

Whether or not any particular person would be deemed to be an "underwriter" with respect to any securities issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving securities under the Plan would be an "underwriter" with respect to such securities.

## C.    Issuance of 4(a)(2)/Regulation S Securities

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Rule 506 of Regulation D is a nonexclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act. Regulation S under the Securities Act provides an exemption from registration under the Securities Act for the offering, issuance, and distribution of securities in certain transactions to persons outside of the United States.

All New Common Stock issued on account of the Backstop Payment will be issued in reliance upon the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and/or Regulation S under the Securities Act. Such Securities are also referred to herein as "4(a)(2)/Regulation S Securities."

The 4(a)(2)/Regulation S Securities will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be resold under the Securities Act and applicable state securities laws absent an effective registration statement, or pursuant to an applicable exemption from registration, under the Securities Act and pursuant to applicable state securities laws, including Blue-Sky Laws. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer (or

50

was an affiliate during the three months preceding the sale), if volume limitations, manner of sale requirements and certain other conditions are met. Reorganized Thrasio is not expected to be a public reporting company and thereby current public information regarding Reorganized Thrasio as may be required by Rule 144 may not be available.

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities pursuant to Rule 144 after a one-year holding period whether or not current public information regarding the issuer is available and without compliance with the volume, manner of sale, and notice requirements described below, subject to applicable state and local securities law.

In addition, in connection with resales of any New Common Stock offered, issued and distributed pursuant to Regulation S under the Securities Act: (i) the offer or sale, if made prior to the expiration of the one-year distribution compliance period (six months for a reporting issuer), may not be made to a U.S. person or for the account or benefit of a U.S. person (other than a distributor); and (ii) the offer or sale, if made prior to the expiration of the applicable one-year or six-month distribution compliance period, is made pursuant to the following conditions: (a) the purchaser (other than a distributor) certifies that it is not a U.S. person and is not acquiring the securities for the account or benefit of any U.S. person or is a U.S. person who purchased securities in a transaction that did not require registration under the Securities Act; and (b) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

Any awards issued under the Management Incentive Plan are expected to be offered pursuant to an exemption from the registration requirements of the Securities Act in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, Regulation S of the Securities Act, or another applicable exemption from registration.

The Debtors express no view as to whether any person may freely resell the New Common Stock pursuant to federal, state, or local securities law, including Blue-Sky Laws.

Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2)/Regulation S Security shall, upon issuance, be stamped or otherwise imprinted with a restrictive legend substantially consistent with the following form:

**THE OFFER AND SALE OF THIS SECURITY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND THIS SECURITY MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED, OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER AND APPLICABLE STATE SECURITIES LAWS.**

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.**

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH HOLDER AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR HOLDER MAY BE AN**

**UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

**XIII.    CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN**

**A.      Introduction**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain Holders of Claims.  The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan.

This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.  This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances.  This discussion does not address tax issues with respect to such Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, non-U.S. taxpayers, controlled foreign corporations, passive foreign investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims, the New Common Stock, or any other consideration to be received under the Plan, as part of a hedge, straddle, conversion, or other integrated transaction).  No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.  Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the IRC).  This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop fees or similar arrangements (including any ramifications such arrangements may have on the treatment of a Holder under the Plan).  This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

For purposes of this discussion, a "U.S. Holder" is a Holder that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons has authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the pass-through entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

B.    **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors**

1.    **In General**

The tax consequences of the implementation of the Plan to the Debtors and Reorganized Debtors will differ depending on whether the Restructuring Transactions are structured as a taxable sale of the assets and/or stock of any Debtor (a "Taxable Transaction") to the Reorganized Debtors or as a recapitalization of the Debtors (a "Recapitalization Transaction").  The Debtors have not yet determined how the Restructuring Transactions will be structured, whether in whole or in part.  Such decision will depend on, among other things, the amount of the expected reduction in the aggregate tax basis of such assets by excluded cancellation of indebtedness income ("COD Income"), whether a Taxable Transaction would give rise to taxable income and whether sufficient tax attributes are available to offset it, the comparative depreciation and amortization deductions that will be available to the Reorganized Debtors in either structure, expectations regarding the Reorganized Debtors' "earnings and profits" in either structure, and the amount and character of any losses with respect to the stock of the Debtors, in each case for U.S. federal, state, and local income tax purposes.

If the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction, the Debtors would realize gain or loss upon the transfer in an amount equal to the difference between the aggregate fair market value of the assets transferred by the Debtors and the Debtors' aggregate tax basis in such assets.  Gain, if any, would be reduced by the amount of such Debtors' available tax attributes, and any remaining gain would be recognized by the Debtors and result in a cash tax obligation.  If a Reorganized Debtor purchases assets or stock of any Debtor pursuant to a Taxable Transaction, the Reorganized Debtor will take a fair market value basis in the transferred assets or stock, and the Reorganized Debtors would not succeed to any of the tax attributes of the selling Debtor or Debtors under section 381 of the IRC.  However, if a Taxable Transaction involves a purchase of stock, the entity whose stock is transferred will retain its basis in its assets (subject to reduction due to COD Income, as described below) unless an election is made pursuant to section 338(h)(10) or 336(e) of the IRC with respect to the purchase to treat the purchase as the purchase of assets.

The disclosures herein assume the transactions undertaken pursuant to the Plan are structured as a Recapitalization Transaction because that structure is currently expected to result in a better tax profile for the Reorganized Debtors.  In the event that the transactions undertaken pursuant to the Plan are structured as anything other than a Recapitalization Transaction, the Debtors will provide a supplemental disclosure statement.

2.    **Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a debtor will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such satisfied indebtedness at the time of the exchange.

Under section 108 of the IRC, a debtor is not, however, required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs") and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity

loss and credit carryovers; and (g) foreign tax credit carryovers.  Alternatively, a debtor with COD Income may elect to first reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.  The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The aggregate tax basis of Thrasio in its assets is not required to be reduced below the amount of indebtedness (determined on an entity-by-entity basis) that Thrasio will be subject to immediately after the cancellation of indebtedness giving rise to COD Income (the "Asset Tax Basis Floor").  Generally, all of an entity's obligations that are treated as debt under general U.S. federal income tax principles (including intercompany debt treated as debt for U.S. federal income tax purposes) are taken into account in determining an entity's Asset Tax Basis Floor.

The exact amount of the COD Income (if any) that will be realized by the Debtors for U.S. federal income tax purposes, and the application of the relevant attribution reduction rules, will not be determinable until after the consummation of the Plan.

### (a)       Limitation of NOL Carryforwards and Other Tax Attributes

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, to the extent the Reorganized Debtors succeed to the Debtors' tax attributes, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

### (i)       General Section 382 Annual Limitation

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and, if the corporation has an overall "net unrealized built-in loss" in its assets, and certain other tax attributes of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation.  This discussion refers to the limitation determined under section 382 of the IRC in the case of an "ownership change" as the "Section 382 Limitation."  The rules of section 382 of the IRC are complicated, but as a general matter the Debtors anticipate that the issuance of New Common Stock would result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC applies.

For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs, approximately 3.44 percent for ownership changes occurring in March 2024).  If the corporation has an overall "net unrealized built-in gain" as determined pursuant to IRS Notice 2003-65, the Section 382 Limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change (or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65).  Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

### (ii) Special Bankruptcy Exception

An exception to the foregoing annual limitation rules generally applies when so called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, together with existing shareholders with respect to their stock, at least 50 percent of the vote and value of the stock of the Reorganized Debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(*l*)(5) Exception").  Under the 382(*l*)(5) Exception, the Reorganized Debtors' Pre-Change Losses are not limited on an annual basis but, instead, the Debtors' NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the Effective Date, and during the part of the taxable year prior to and including the Effective Date, in respect of all debt converted into stock in the reorganization.  If the 382(*l*)(5) Exception applies and the Reorganized Debtors undergoes another ownership change within two years after consummation, then the Reorganized Debtors' Pre-Change Losses are eliminated in their entirety.

Where the 382(*l*)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(*l*)(5) Exception), a second special rule may apply (the "382(*l*)(6) Exception").  When the 382(*l*)(6) Exception applies, the annual limitation will be calculated by reference to the lesser of (a) the value of the New Common Stock (with certain adjustments) immediately after the ownership change or (b) the value of the Debtors' assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(*l*)(6) Exception differs from the 382(*l*)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

The Debtors do not currently know whether they are eligible for the 382(*l*)(5) Exception, and regardless of whether the 382(*l*)(5) Exception is available, the Reorganized Debtors may decide to affirmatively elect out of the 382(*l*)(5) Exception so that the 382(*l*)(6) Exception instead applies. Whether the Reorganized Debtors take advantage of the 382(*l*)(6) Exception or the 382(*l*)(5) Exception, though, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

### C. Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims

#### 1. General Considerations

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

The U.S. federal income tax consequences to U.S. Holders of certain Claims may depend on (x) whether the First Lien Claims surrendered constitute "securities" for U.S. federal income tax purposes, and (y) whether the obligor of the First Lien Claims for U.S. federal income tax purposes is the same regarded entity that is issuing the consideration under the Plan (or, otherwise, an entity that is a "party to a reorganization" with the Debtor against which such Claims were asserted).

Neither the IRC nor the Treasury Regulations promulgated thereunder defines the term "security." Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  Although the matter is not free from doubt, the Debtors expect that the First Lien Claims will be treated as a "security"

for U.S. federal income tax purposes. However, due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of their Claims as "securities" for U.S. federal income tax purposes; if the abovementioned Claims were not treated as "securities," the tax consequences of the Plan to Holders of Claims described below would be materially different (and generally would result in a fully taxable transaction under section 1001 of the IRC).

The character of any gain or loss recognized by a U.S. Holder as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below.

## 2.    Consequences to Holders of Allowed First Lien Claims

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of the First Lien Claims, each U.S. Holder thereof will receive its pro rata share of New Common Stock (subject to dilution by the (i) DIP Exit Fee, (ii) Backstop Payment, and (iii) Management Incentive Plan).

Assuming, as noted above, that the First Lien Claims are "securities," a U.S. Holder of First Lien Claims should be treated as receiving its distribution under the Plan in a "recapitalization" for U.S. federal income tax purposes pursuant to sections 368(a)(1)(E) and 354 of the IRC, and accordingly such U.S. Holder should not recognize any gain or loss in such exchange. Thus, because a U.S. Holder of First Lien Claims should be treated as exchanging its First Lien Claims for the New Common Stock in a transaction that qualifies as a recapitalization under section 368(a)(1)(E) of the IRC, a U.S. Holder can avoid current recognition of gain in connection with such exchange.

Subject to possible integrated treatment of the debtor-in-possession financing facility as discussed below, with respect to the New Common Stock, a U.S. Holder should generally obtain an aggregate tax basis, apart from amounts allocable to accrued but untaxed interest, in such New Common Stock received equal to the tax basis of the First Lien Claim surrendered by such U.S. Holder. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for such New Common Stock received should include the holding period for the First Lien Claim exchanged.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but untaxed interest, OID or market discount, see the sections entitled "Distributions Attributable to Accrued Interest (and OID)" and "Market Discount" below.

There is uncertainty with respect to the extent to which the right to participate in the funding of the debtor-in-possession financing facility and the attendant economic entitlements (including the DIP Facility Fee) should be considered, for these purposes, as a recovery in respect of the First Lien Claims or, instead, as a separate legal entitlement that is entirely attributable to the cash that was used to fund the debtor-in-possession financing facility. The possibility of integrated treatment is not discussed herein, and Holders of First Lien Claims are encouraged to consult their own tax advisors regarding the relevant considerations.

## 3.    Consequences to Holders of Allowed General Unsecured Claims

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of the General Unsecured Claims, each U.S. Holder thereof will receive its pro rata share of the GUC Recovery Pool (which is intended to consist solely of cash).

A U.S. Holder of a General Unsecured Claim will be treated as receiving its distributions under the Plan in a taxable exchange pursuant to Section 1001 of the IRC. Such a U.S. Holder should recognize gain or loss equal to the difference between (a) the Cash to be received by such U.S. Holder (other than any Cash treated as received in satisfaction of accrued but untaxed interest, as discussed below under "Distributions Attributable to Accrued Interest (and OID)") and (b) such U.S. Holder's adjusted tax basis in its Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the U.S. Holder, the rules

regarding "market discount," as discussed below and accrued but untaxed interest, whether the General Unsecured Claim constitutes a capital asset in the hands of the U.S. Holder, the holding period of the General Unsecured Claim, and whether and to what extent the U.S. Holder had previously claimed a bad debt deduction with respect to its General Unsecured Claim.

4.        **Distributions Attributable to Accrued Interest (and OID)**

To the extent that any amount received by a U.S. Holder of a Claim exchanged under the Plan is attributable to accrued but untaxed interest (or OID) on the debt instruments constituting the exchanged Claim, such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder).  Conversely, a U.S. Holder of an exchanged Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point. The tax basis of any New Common Stock treated as received by U.S. Holders of Allowed First Lien Claims in satisfaction of accrued but untaxed interest (or OID) should equal the amount of such accrued but untaxed interest (or OID). The holding period for such New Common Stock should begin on the day following the receipt of such New Common Stock.

The extent to which the consideration received by a U.S. Holder of an exchanged Claim will be attributable to accrued interest on the debt constituting the exchanged Claim is unclear.  Certain legislative history and case law indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest.  The Plan provides that amounts paid to U.S. Holders of Claims will be allocated first to unpaid principal and then to unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims are urged to consult their tax advisor regarding the allocation deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

5.        **Market Discount**

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than at original issuance and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (b) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by more than a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Assuming that the exchange of Claims pursuant to the Plan constitutes a recapitalization, as discussed above, any market discount that accrued on surrendered Claims that the U.S. Holder acquired with market discount, which market discount was not recognized by the U.S. Holder, may be required to be carried over to the New Common Stock received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such New Common Stock may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged Claims.

**U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

6.        **U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Common Stock**

(a)        **Dividends of New Common Stock**

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles. Certain qualified dividends received by a non-corporate taxpayer are taxed at preferential rates. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain. The Debtors currently expect that dividends on the New Common Stock will constitute qualified dividend income under these rules.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

**(b)    Sale, Redemption, or Repurchase of New Common Stock**

Unless a non-recognition provision of the IRC applies, and subject to the market discount rules discussed above, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New Common Stock received pursuant to the Plan. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the applicable New Common Stock consideration for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below. Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on such dispositions of the New Common Stock as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Claim or recognized an ordinary loss on the exchange of its Claim for New Common Stock.

**7.    Limitations on Use of Capital Losses**

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (1) $3,000 annually ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

**8.    Net Investment Income Tax**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, interest, dividends, and gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of debt of, and equity interests in, the Debtors and Reorganized Debtors.

**D.    Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims**

The following discussion assumes that the Debtors will pursue the Restructuring Transaction currently contemplated by the Plan. Non-U.S. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transaction. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex. Each non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences

of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock.

### 1. Gain Recognition

Any gain realized by a non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a non-U.S. Holder is a corporation, it may be subject to a "branch profits tax" equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2. Accrued but Untaxed Interest

Payments made to a non-U.S. Holder pursuant to the Plan that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that (among other requirements) (i) such non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of Thrasio, (ii) such non-U.S. Holder is not a "controlled foreign corporation" that is a "related person" with respect to Thrasio (each, within the meaning of the IRC) and (iii) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person (the "Portfolio Interest Exception"), unless such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a "branch profits tax" with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)). A non-U.S. Holder that does not qualify for the Portfolio Interest Exception to withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 3. Distributions on New Common Stock

Distributions made (or deemed made) on the New Common Stock will generally constitute dividends for U.S. federal income tax purposes to the extent paid out of Reorganized Debtor's current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess of Reorganized Debtor's current and accumulated earnings and profits will generally constitute a return of capital and will be applied against and reduce a non-U.S. Holder's adjusted tax basis in its New Common Stock, but not below zero. Distributions not treated as dividends and in excess of a Holder's adjusted basis will generally be treated as capital gain subject to the rules discussed under "Gain on Disposition of New Common Stock".

Dividends paid to a non-U.S. Holder of New Common Stock will generally be subject to withholding of U.S. federal income tax at a 30 percent rate or such lower rate as may be specified by an applicable income tax treaty. However, dividends that are effectively connected with the conduct of a trade or business by the non-U.S. Holder within the United States (and, if required by an applicable income tax treaty, are attributable to a U.S. permanent establishment of the non-U.S. Holder) are not subject to withholding, provided certain certification and disclosure requirements are satisfied. Instead, such dividends are generally subject to U.S. federal income tax on a net income basis in the same manner as if the non-U.S. Holder were a U.S. Holder. Any such effectively connected dividends received by a foreign corporation may be subject to an additional "branch profits tax" at a 30 percent rate or such lower rate as may be specified by an applicable income tax treaty.

A non-U.S. Holder of New Common Stock who wishes to claim the benefit of an applicable income tax treaty and avoid backup withholding, as discussed below, for dividends, will be required (a) to complete the applicable IRS Form W-8BEN or Form W-8BEN-E and certify under penalty of perjury that such Holder is not a United States person as defined under the IRC and is eligible for treaty benefits or (b) if the New Common Stock are held through certain foreign intermediaries, to satisfy the relevant certification requirements of applicable U.S. Treasury regulations. Special certification and other requirements apply to certain non-U.S. Holders that are pass-through entities rather than corporations or individuals. A non-U.S. Holder of New Common Stock eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

### 3. Gain on Disposition of New Common Stock

Any gain realized on the sale, exchange or other taxable disposition of New Common Stock generally will not be subject to U.S. federal income tax unless:

**(i)** the gain is effectively connected with a trade or business of the non-U.S. Holder in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment of the non-U.S. Holder);

**(ii)** the non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of that disposition, and certain other conditions are met; or

**(iii)** in the case of a disposition of New Common Stock, Reorganized Thrasio is a "U.S. real property holding corporation" (a "USRPHC") for U.S. federal income tax purposes at any time within the shorter of the five-year period preceding the disposition or the non-U.S. Holder's holding period for New Common Stock.

A non-U.S. Holder described in the first bullet point above will generally be subject to tax on the net gain derived from the sale or other disposition under regular graduated U.S. federal income tax rates applicable to such Holder as if it were a U.S. Holder. In addition, if a non-U.S. Holder described in the first bullet point above is a corporation for U.S. federal income tax purposes, it may be subject to a "branch profits tax" equal to 30 percent of its effectively connected earnings and profits (subject to adjustments) or at such lower rate as may be specified by an applicable income tax treaty.

An individual non-U.S. Holder described in the second bullet point above will generally be subject to a flat 30 percent (or such lower rate as may be specified by an applicable income tax treaty) tax on the gain derived from the sale or other disposition, which may be offset by its U.S. source capital losses, even though the individual is not considered a resident of the United States, provided such non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

If the exception in the third bullet applies, a non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Stock under the Foreign Investment in Real Property Tax Act ("FIRPTA"). If the FIRPTA provisions apply with respect to a non-U.S. Holder, taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further the buyer of the New Common Stock may be required to withhold tax equal to 15 percent of the amount realized on the sale and the non-U.S. Holder generally will be required to file a U.S. federal income tax return. The

amount of any such withholding would be allowed as a credit against the non-U.S. Holder's federal income tax liability and may entitle the non-U.S. Holder to a refund, provided that the non-U.S. Holder properly and timely files a tax return with the IRS. In general, FIRPTA will not apply upon a non-U.S. Holder's disposition of its New Common Stock if (x) the New Common Stock is treated as "regularly traded" on an established market and continue to be regularly traded on an established market and (y) the non-U.S. Holder did not directly or indirectly own more than 5 percent of the value of the New Common Stock during a specified testing period. The Debtors do not anticipate that Thrasio has been or is, or that Reorganized Thrasio will be, a USRPHC, although no guarantees can be made in that regard.

### E.    U.S. Information Reporting and Withholding.

The Debtors, Reorganized Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends (or other payments), whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

### F.    FATCA.

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or could be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income (including dividends, if any, on New Common Stock), and, subject to the paragraph below, also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends (which would include New Common Stock). FATCA withholding could apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that were previously scheduled to take effect on January 1, 2019, would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Holder should consider the impact of FATCA withholding rules on such Holder.

> **THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.   ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIV.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Interests than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.


Thrasio Holdings, Inc. on behalf of itself
and each of the other Debtors

By:    */s/ Josh Burke*
Name:   Josh Burke
Title:    Chief Financial Officer

Dated: February 28, 2024

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Jacob S. Frumkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com
            jfurmkin@coleschotz.com


**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com

-and-

Matthew C. Fagen, P.C. (*pro hac vice* pending)
Francis Petrie (*pro hac vice* pending)
Evan Swager (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
matthew.fagen@kirkland.com
francis.petrie@kirkland.com
evan.swager@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**Exhibit A**

**Chapter 11 Plan**

[*Intentionally omitted for the purposes of filing*]

**<u>Exhibit B</u>**

**Restructuring Support Agreement**

[*Intentionally omitted for the purposes of filing*]

**<u>Exhibit C</u>**

**Organizational Chart**

**Thesis Holdings, Inc. — USA, Delaware**

Direct subsidiaries:
- Thesis Ventures, Inc. — USA, Delaware
- Thesis International Holdings, Inc. — USA, Delaware
- Thesis Intermediate Sub, LLC — USA, Delaware

Under Thesis Ventures, Inc.:
- Domain Acquisitions 2 Ltd. — Saint Kitts and Nevis, Nevis
- Thesis Ventures R1, LLC — USA, Delaware
- Thesis Ventures Q1, LLC — USA, Delaware

Under Thesis Intermediate Sub, LLC:
- Thesis, LLC — USA, Delaware
- Thesis Services, LLC — USA, Delaware

Under Thesis International Holdings, Inc.:
- Ohana Parent Holdings — Cayman Islands, Cayman
- Thesis Australia Holdings Pty Ltd — Australia, New South Wales
- Thesis geda katoka (Thesis GK) — Japan
- Thesis Holdings Hong Kong, Ltd. — Hong Kong

Under Thesis Australia Holdings Pty Ltd:
- JSCC bond GK1 — Japan
- Damaco Pty Ltd (Checkered Chef) — Australia, New South Wales
- The NutriLock Company — Australia, Victoria
- Thesis Australia Import Pty Ltd — Australia, New South Wales
- Thesis Global Cross-border E-Commerce (Shenzhen) Co. Ltd. — China, Suzhou
- Thesis Supply Chain (Suzhou) Co. Ltd. — China, Suzhou

Under Thesis Holdings Hong Kong, Ltd.:
- Thesis E-Commerce (Shanghai) Co., Ltd. — China, Shanghai

USA Delaware entities (center-right cluster):
- 1 Thesis One, Inc.
- 2 B Zestful, Inc.
- Ambrosache, Inc.
- Anjan Pvt Thesis Two, Inc.
- Antique, Corp.
- Café Casa, Inc.
- Califfa Company
- Chanque, Inc.
- Eurpple, Inc.
- HIC-Cork Thesis One, Inc.
- Marzencia, Co.
- Metanique, Inc.
- Orchhis, Inc.
- Piantartide, Inc.
- Posttaz Company

International / holding entities:
- Posttax Limited — United Kingdom, England & Wales
- Thesis Deutschland Holdings GmbH — Germany
- Thesis Deutschland Services GmbH — Germany
- Renicalto GmbH — Germany
- Tawabi Limited — United Kingdom, England & Wales
- Thesis Bermuda Holdings Limited — Bermuda
- Thesis Malta Holdings Co. Limited — Malta, Valletta
- Thesis International Co. Limited — Malta, Valletta
- Hippolito, Ltd — USA, Delaware
- Thesis India Holdings, Inc. — USA, Delaware
- Thesis L1 Acquisitions, Inc. — USA, Delaware
- Lifelong Online Private Limited — India
- Thesis UK Holdings, Ltd — United Kingdom, England & Wales

USA Delaware numbered Thesis entities:
- 10 Thesis Two, Inc.
- 11 Thesis Eleven, Inc.
- 12 Thesis Twelve, Inc.
- 14 Thesis Fourteen, Inc.
- 15 Thesis Fifteen, Inc.
- 16 Thesis Sixteen, Inc.
- 17 Thesis Seventeen, Inc.
- 18 Thesis Eighteen, Inc.
- 19 Thesis Nineteen, Inc.
- 20 Thesis Twenty, Inc.
- 21 Thesis Twenty One, Inc.
- 22 Thesis Twenty Two, Inc.
- 23 Thesis Twenty Three, Inc.
- 24 Thesis Twenty Four, Inc.
- 25 Thesis Twenty Five, Inc.
- 3 Thesis Three, Inc.
- 6 Thesis Five, Inc.
- 8 Thesis Six, Inc.
- 7 Thesis Seven, Inc.
- 9 Thesis Eight, Inc.
- 9 Thesis Nine, Inc.

USA Delaware named entities (grid):
- Acorn Creations, Inc.
- Alley Ideas, Inc.
- Amber Ideas, Inc.
- Amber Oasis, Inc.
- Apple Affirmations, Inc.
- Apricot Ideas, Inc.
- Ash Developments, LLC
- Assassin Bug Industries, Inc.
- Autumn Ideas, Inc.
- Autumn Waves, Inc.
- Banana Beginnings, Inc.
- Basketball Beginning, Inc.
- Biscotti Solutions, Inc.
- Bittersweet Ribbons, Inc.
- Bonfire Solutions, Inc.
- Bronze Projects, Inc.
- Burning Sun, Inc.
- Burnt Summer Citrus, Inc.
- Buttercup Creations, Inc.
- Butterscotch Beginnings, Inc.
- California Poppy Projects, Inc.
- Candlelit Creations, Inc.
- Cantaloupe Creations Company
- Carmel Creations, Inc.
- Carnation Creations, Inc.
- Carotene Consortium, Inc.
- Carrot Solutions, Inc.
- Cayenne Solutions, Inc.
- Champagne Projects, Inc.
- Cheddar Creations, Inc.
- Chestnut Creations, Inc.
- Chili Clove, Inc.
- Chili Flakes, Inc.
- Chrysanthemum Creations, Inc.
- Cider Creations, Inc.
- Cinnabar Creations, Inc.
- Citrine Solutions, Inc.
- Classy Mango, Inc.
- Classy Tangerine, Inc.
- Clementine Creations, Inc.
- Clownfish Creations, Inc.
- Coast Honey Design, Inc.
- Coral Chrome, Inc.
- Corn Snake Surprises, Inc.
- Crawfish Creations, Inc.
- Daffodil Design, Inc.
- Dahlia Dreams, Inc.
- Dark Honey Design, Inc.
- Daybreak Developments, Inc.
- Desert Creations, Inc.
- Dhruva Dreams, Inc.
- DWG Group Inc — New Jersey
- Enterprise Ideas, Inc.
- Faint Orange Horizon, Inc.
- Fall Foundations, Inc.
- Fawn Foundations, Inc.
- Foxy Creations, Inc.
- Frosty Dream, Inc.
- Ginger Cat Creations, Inc.
- Ginger Creations, Inc.
- Gingersnap Solutions, Inc.
- Golden Gate Solutions, Inc.
- Golden Keelhaul Enterprises, Inc.
- Goldfish Monarchies, Inc.
- Habanero Pepper Projects, Inc.
- Harley Orange, Inc.
- Harvest Charm, Inc.
- Ideal Movements, Inc.
- Influence Ideas, Inc.
- Innsy Ideas, Inc.
- Jasper Gesture, Inc.
- Jupiter Gesture, Inc.
- Umassicom Consumer Products, LLC
- Khaki Trips, Inc.
- KingFisher Creations
- Koi Creations, Inc.
- Lava Decisions, Inc.
- Lavanja Logistics, Inc.
- Lattie Logistics, Inc.
- Leather Logistics, Inc.
- Lomar Logistics, Inc.
- Lorefox holdings, LLC — Massachusetts
- Lionfish Logistics, Inc.
- Lobster Logistics, Inc.
- Magenta Pearl Solutions, Inc.
- Mahogany Movements, Inc.
- Mango Movements, Inc.
- Mango Wonder, Inc.
- Maple Movements, Inc.
- Marigold Creations, Inc.
- Marmalade Mansions, Inc.
- Marmalade Movements, Inc.
- Mars Makers, Inc.
- Mason Masters, Inc.
- Matt Decisions, Inc.
- Motion Movements, Inc.
- Mimosa Movements, Inc.
- Odro Organization, Inc.
- Orange Days, Inc.
- Orange Margarita, Inc.
- Orange Organization, Inc.
- Orange Peach Projects, Inc.
- Orange Peel Projects, Inc.
- Orange Umbrella Creations, Inc.
- Orangepaper Trading, Inc.
- Orangico Organization, Inc.
- Oyster Oasis, Inc.
- Papaya Projects, Inc.
- Parchment Principles, Inc.
- Peach Projects, Inc.
- Peanut Projects, Inc.
- Penny Rose Solutions, Inc.
- Persian Projects, Inc.
- Persimmon Projects, Inc.
- Pizza Projects, Inc.
- Pumpkin Projects, Inc.
- Pyrohaven Projects, Inc.
- Primrose Projects, Inc.
- Radiant Orange, Inc.
- Rose Bud Creations, Inc.
- Safeflect Holdings, LLC — USA, Florida
- Salmon Solutions, Inc.
- Sandpaper Solutions, Inc.
- Sandstone Solutions, Inc.
- Sapphire Monkey, Inc.
- Scarlet Solutions, Inc.
- Scottish Solutions, Inc.
- Seashell Solutions, Inc.
- Sherbert Solutions, Inc.
- Siberian Tiger Solutions, Inc.
- Sockeye Strategies, Inc.
- Soft Spice, Inc.
- Spicy Solutions, Inc.
- Starfish Solutions, Inc.
- Strawflower Solutions, Inc.
- Sundae Blaze Solutions, Inc.
- Sunflare Solutions, Inc.
- Sunflower Galuretto, Inc.
- Sunkiss Solutions, Inc.
- Sunny Operations, Inc.
- Sunrise Martinis, Inc.
- Sunrise Sunrose, Inc.
- Sweet Nectar Enterprises, Inc.
- Sweet Potato Solutions, Inc.
- Tangela Tendencies, Inc.
- Tangerine Ideas, Inc.
- Tawny Tasks, Inc.
- Tea Rose Rhapsy, Inc.
- Teal Movine, Inc.
- Tiger Affirmations, Inc.
- Tiger Stripe Creations, Inc.
- Tomato Tasks, Inc.
- Topaz Traditions, Inc.
- Tortilla Tasks, Inc.
- Traffic Cone Tuesdays, Inc.
- Turmeric Transitions, Inc.
- Wallaby43 Pty Ltd — Australia, New South Wales
- Warm Red Wonders, Inc.
- Zathia, Inc.
- Orange Fantasy, Inc. — USA, Delaware
- Sunkissed Days, Inc. — USA, Delaware

United Kingdom, England & Wales entities (right cluster):
- AirOrb Ltd
- Altium Recruitment Ltd
- Bezel Ltd
- Bread Gear Limited — Scotland
- BizKasu.com Ltd
- Chipotml Ltd
- Data for Sports Ltd
- E & I Trading Ltd
- E&L Enterprises Limited
- Green Cricket Ltd
- Jimley Ltd
- Jens Solutions 2016 Limited
- Kitchen Tools Ltd
- Madeira Retail Limited
- Peroxifer Ltd
- Pro Grade Products Ltd
- Pure Chimp Ltd
- Rinse Limited
- Sandy Leaf Farm, Ltd
- Savarus Group Limited
- Scouse Ltd
- Tsovargo International
- William Evans Retail Ltd



**<u>Exhibit D</u>**

**Financial Projections**

[TO COME]

**<u>Exhibit E</u>**

**Valuation Analysis**

[TO COME]

**Exhibit F**

**Liquidation Analysis**

[TO COME]