**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com

-and-

Matthew C. Fagen, P.C. (*pro hac vice* pending)
Francis Petrie (*pro hac vice* pending)
Evan Swager (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
matthew.fagen@kirkland.com
francis.petrie@kirkland.com
evan.swager@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Jacob S. Frumkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
jfrumkin@coleschotz.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| THRASIO HOLDINGS, INC., *et al.*, | Case No. 24-11840 (CMG) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF SAMUEL M. GREENE IN
SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (II) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING
THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION,
(V) MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

---

[1] The last four digits of Debtor Thrasio Holdings, Inc.'s tax identification number are 8327. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.kccllc.net/Thrasio. The Debtors' service address for purposes of these chapter 11 cases is 85 West Street, 3rd Floor, Walpole, MA, 02081.

I, Samuel M. Greene, declare under penalty of perjury as follows:

1. I am a Partner in, and Co-Head of, the Debt Advisory and Restructuring Group of Centerview Partners LLC ("Centerview"), which has its principal offices located at 31 West 52nd Street, 22nd Floor, New York, New York 10019. Centerview is the proposed financial advisor and investment banker for the above-captioned debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases.[2]

2. I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing*, filed contemporaneously herewith (the "Motion").[3]

3. Although Centerview is expected to be compensated for its work as the Debtors' proposed financial advisor and investment banker in these chapter 11 cases, I am not being compensated separately for this declaration or testimony. Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by Centerview professionals involved in advising the Debtors in these chapter 11 cases, or information provided to me by the Debtors' management, employees, or advisors. If called upon to testify, I could and would testify to the facts set forth

---

[2] The Debtors anticipate filing an application to retain Centerview as their financial advisor and investment banker, effective as of the commencement of their chapter 11 cases, shortly hereafter.

[3] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

herein on that basis. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors.

## Qualifications

4. I am a Partner at Centerview and Co-Head of the Debt Advisory and Restructuring Group. I have been employed by Centerview since 2011. Centerview is a full-service independent investment banking firm providing financial advisory services, including mergers and acquisitions and restructuring advice, across a broad range of industries. Prior to joining Centerview, I was a Managing Director and founding member at Miller Buckfire & Co. and a member of the financial restructuring group of its predecessor, Wasserstein Perella & Co., which I joined in 1997. I graduated with a B.A. from the University of Pennsylvania and a J.D. from Fordham University School of Law.

5. I personally have over twenty-five (25) years of experience advising companies in connection with in-court and out-of-court financings, restructurings, recapitalizations, reorganizations, and M&A. I have also led numerous assignments representing creditors, acquirers, shareholders, and stakeholders across a wide array of industries. I have experience in structuring, negotiating, and executing debtor-in-possession financings and been involved in numerous restructurings including, among others, Calpine Corporation, Avaya, Inc., Energy Future Intermediate Holding Company LLC, Station Casinos, Residential Capital Partners, SunEdison, Sungard Availability Services, and Westinghouse Electric Company.

## Retention of Centerview

6. Centerview has been engaged as financial advisor and investment banker to the Debtors, and members of my team and I have been working closely with the Debtors since

June 2023.  Since being engaged by the Debtors, Centerview has rendered financial and investment banking advisory services to the Debtors in connection with the Debtors' evaluation of strategic alternatives to improve their liquidity and overall financial condition, including, among other things, debt or equity financing, a potential sale, a strategic acquisition or merger, and an out-of-court restructuring of the Debtors' outstanding debt and, more recently, the Debtors' preparations for these chapter 11 cases.  Centerview worked closely with the Debtors' management and other professionals retained by the Debtors with respect to these strategic alternatives and is well acquainted with the Debtors' capital structure, liquidity needs, and business operations.

### The Debtors' Need for the DIP Facility and Access to Cash Collateral

7.     In the months leading up to these chapter 11 cases, the Debtors, with the assistance of their advisors, explored a variety of strategic and financial alternatives.  Ultimately, however, as explained in the First Day Declaration and in this Declaration, the Debtors determined that an in-court restructuring transaction would be necessary to deleverage the Debtors' balance sheet and obtain access to new capital.

8.     As described in the *Declaration of Terrence F. Grossman in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing*, filed contemporaneously herewith, the Debtors determined that they would require incremental liquidity to fund postpetition operations and chapter 11 costs, while also providing confidence to vendors, customers,

4

employees, and other constituents that the Debtors will continue to operate in the ordinary course and have sufficient liquidity to do so.

**Efforts to Obtain Postpetition Financing**

9.  As described below, it was not possible for the Debtors to raise alternative postpetition financing. My understanding is that the prepetition First Lien Lenders' claims are secured by liens on substantially all of the Debtors' assets, as well as Non-Debtor entities' assets. I understand, based on the advice of counsel, that to avoid an expensive priming fight in connection with an alternative postpetition financing facility, the Debtors would either need to (i) obtain the First Lien Lenders' consent to an alternative financing priming their liens or (ii) identify a third party lender willing to provide postpetition financing on a junior basis (unsecured or secured by a second lien). Gibson, Dunn & Crutcher LLP as legal counsel to the Ad Hoc Group and Evercore, L.L.C. as their financial advisor (together, the "Ad Hoc Group Advisors") informed Centerview that their clients would not consent to an alternative financing priming their liens and, ultimately, the Debtors were unable to raise financing on a junior basis after months of attempting to do so for both in-court and out-of-court transactions.

10. As noted in the Motion, prior to filing these chapter 11 cases, the Debtors, with the assistance of Centerview, conducted a months-long marketing process to obtain financing from either third-party investors or the Debtors' existing stakeholders. In June 2023, Centerview commenced a process seeking a debt or equity investment in the Debtors. At that time, Centerview reached out to parties with deep knowledge of the e-commerce or "aggregator" sectors and/or experience executing structured capital investments. The focus on structured capital investments was because of Centerview's expectation that the new investment would most likely rank junior

to the company's existing debt but senior to most, if not all, of the Debtors' outstanding preferred and common equity.  However, a difficult macroeconomic environment, negative sentiment about the sector, the Debtors' ongoing operational turnaround, and concerns about the Debtors' capital structure, including investing behind the existing secured debt, gave investors pause.  Ultimately, Centerview did not receive any proposals from potential new investors.  The Debtors did receive two proposals from existing stakeholders.  Both proposals contemplated equity investments into the company and were predicated on certain conditions precedent, including the First Lien Lenders' consent to a significant reduction of the Debtors' outstanding secured debt.  The first of these proposals was received in August 2023 and the second was received in January 2024.

      11.     After receiving the first proposal in August 2023, the Debtors started engaging with certain of their largest First Lien Lenders to evaluate their interest in either (i) consenting to a transaction in which lenders would significantly reduce the principal of their debt, among other concessions, alongside a third party investment into the company or (ii) lending to the Debtors in connection with an in-court or out-of-court restructuring.  After the Debtors' initial outreach, a group of term loan lenders that currently holds approximately 88% of the Debtors' term loans under the Debtors' Credit Agreement formed the Ad Hoc Group and retained the Ad Hoc Advisors. Over the course of several months, the Ad Hoc Group conducted diligence, evaluated the aforementioned equity investment proposals, and negotiated a standalone restructuring transaction with the Debtors.  Ultimately, discussions with the Ad Hoc Group resulted in the transactions contemplated by the Restructuring Support Agreement, including the DIP Facility.  Based on my observations of those discussions, the negotiations were extensive and conducted at arm's length. The parties exchanged numerous term sheet mark-ups over a multi-month period.  The

negotiations in which I participated centered around, among other things, the size of the fees to be paid in connection with the DIP Facility, the terms of the roll-up, and the amount of new money financing. These negotiations resulted in concessions by the lenders, including acceptance of many of the changes requested by the Debtors to the terms of the DIP Facility, including, but not limited to, increasing the size of the new money components of the DIP Facility and reducing the size of the roll-up.

12. As the parties negotiated the terms of the DIP Facility, Centerview also reached out to four potential lenders on a "no names" basis to ascertain their interest in providing an alternative debtor-in-possession financing. Three of the parties declined to participate prior to executing a nondisclosure agreement. One party executed a nondisclosure agreement to obtain more diligence information but did not submit an indication of interest. Accordingly, the Debtors focused their efforts on negotiating the Restructuring Support Agreement, and the proposed DIP Facility with the Ad Hoc Group. As noted in the First Day Declaration, the Debtors and the Ad Hoc Group subsequently came to a mutual agreement on terms and conditions of the DIP Facility.

## Material Terms of the Proposed DIP Facility

13. Based on my experience with postpetition financing transactions, as well as my involvement in the negotiations of this facility and pursuit of alternative financing proposals for the Debtors, the DIP Facility is the best, and, in fact, the only financing option available to the Debtors under the circumstances.

14. The DIP Facility provides the Debtors with access to critical funding that, based on my conversations with the Debtors and their advisors, is expected to be sufficient to allow the Debtors and their stakeholders the time necessary to work towards consummation of a transaction

and maximize value by continuing operations with as little disruption as possible under the circumstances.

15. As noted in the Motion, the proposed DIP Facility is comprised of $90 million superpriority senior secured term loan facility (the "<u>New Money Loans</u>") and "roll up" up approximately $270 million of First Lien Term Loans (the "<u>Roll-Up Loans</u>"). Specifically, the DIP Facility consists of: (a) $90 million of new money term loans, with $35 million available upon entry of the Interim Order, $35 million available upon entry of the Final Order, and $20 million of which shall be committed upon entry of the Final Order and available from and upon entry of the Confirmation Order (or available up to five business days prior to the estimated entry of the Confirmation Order, solely with the consent of the Required DIP Lenders, in their sole and absolute discretion); (b) upon entry of the Interim Order, a $35 million roll up on a 1:1 basis of First Lien Term Loans; and (c) upon entry of the Final Order, approval of the roll up of $235 million of First Lien Term Loans deemed funded upon entry of the Final Order. The New Money Loans will convert to a "first-out" term loan on the Plan Effective Date, providing the Debtors with post-emergence financing that will fund the Debtors' go-forward operations. The Roll-Up Loans will convert to a "second out" term loan facility on the Plan Effective Date.

### A. The Roll-Up of the First Lien Term Loans is Reasonable.

16. The roll up of the Roll-Up Loans was a condition precedent to obtaining the New Money Loans from the DIP Lenders and the First Lien Lenders' agreement to be primed by the New Money Loans.

17. As a result, I believe that the Roll-Up Loans are essential for the Debtors to be able to successfully navigate and emerge from the Chapter 11 Cases. Without the Roll-Up Loans, the

First Lien Lenders would not consent to the Debtors' immediate use of Cash Collateral or agree to provide the New Money Loans. Based on my conversations with the Debtors and their advisors, without the DIP Facility's infusion of liquidity, I believe that the Debtors would bear substantial risk with respect to their ability to continue to operate as a going concern. Additionally, I understand that the repayment of a roll up is a common feature in debtor in possession financing arrangements. I also understand that approval of the majority of the Roll-Up Loans are subject to entry of a Final Order and subject to the challenge procedures set forth in the DIP Orders. Thus, the terms of the DIP Facility will not prejudice any party's right to challenge the Roll-Up Loans.

### B. The DIP Facility Fees.

18. In connection with the DIP Facility, as described in the Motion, the Debtors have agreed, subject to Court approval, to grant liens on certain unencumbered property and pay interest and certain fees, including a backstop payment, commitment fee, and maturity extension fee. Specifically, the Debtors have agreed to pay, as noted in the Motion:

(a) *Interest Rates*: with respect to the New Money Loans, SOFR + 8.00%, payable monthly in Cash, and with respect to the Roll-Up Loans, SOFR + 10.00%, payable monthly in kind;

(b) *Original Issue Discount*: two (2) percent (earned and netted on New Money Loans when funded);

(c) *Backstop Payment*: the DIP Backstop Parties' *pro rata* share of an amount of (i) Cash in the aggregate amount of 7.5% of the New Money Loans or (ii) solely upon confirmation of the Plan, 10% of New Common Stock, subject to dilution only from the Management Incentive Plan. The Backstop Commitment shall be fully earned and approved on a final basis upon the entry of the Interim Order, but payable pursuant to the Confirmation Order upon the occurrence of the Plan Effective Date; and

(d) *Maturity Extension Fee*: one (1) percent payable in kind upon each one-month extension of the Initial Maturity Date.

9

19. Each of the fees was the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, was an integral component of the overall terms of the DIP Facility, and was expressly required by the DIP Lenders as consideration for the extension of postpetition financing.

20. With no third party willing to provide postpetition financing to the Debtors, the roll up, interest, and fees are structured to incentivize all First Lien Lenders to participate in the DIP Facility, and, in doing so, participate in the exit financing. Participating lenders are agreeing to not only fund the Debtors during these Chapter 11 Cases but extend capital for a multi-year period via the exit financing. The exit financing contains the option for the company to pay interest in kind for the first twelve months after emergence, among other terms, which is valuable to the company as it provides the company flexibility to manage cash flow and liquidity as it continues execute on its operational turnaround.

21. In light of the operating condition of the Debtors, the lack of viable alternatives and based on my experience as a restructuring professional, in totality, the roll up, fees, and interest are reasonable under the circumstances.

**The Proposed DIP Facility is the Best Postpetition
Financing Arrangement Presently Available to the Debtors**

22. Centerview assisted the Debtors in their review of the principal economic terms of the proposed DIP Facility. As discussed in the Motion, the intent of the proposed DIP Facility is to bridge the Debtors to the effective date of a plan by providing the Debtors with necessary liquidity to administer these chapter 11 cases, as well as to provide the Debtors with sufficient liquidity to operate post-emergence via conversion of the DIP Facility into the exit financing. As further discussed in the Motion, the Debtors also believe that the proposed DIP Facility will

provide a strong and reassuring message to the Debtors' customers, vendors, and employees that these chapter 11 cases are well-funded and that the Debtors' business will continue to operate in the ordinary course.

23. Based on my experience with debtor-in-possession financing transactions, as well as my involvement in the efforts to secure postpetition financing for the Debtors, I believe that the proposed DIP Facility is the best financing option presently available to the Debtors under the circumstances.

24. *First,* the proposed DIP Facility will provide the Debtors with access to the amount of capital that the Debtors, in consultation with their advisors, believe is necessary to administer these chapter 11 cases effectively and efficiently. As the DIP Facility is structured as a "DIP to exit" facility, the New Money Loans provided under DIP Facility are also sized to provide the Debtors with sufficient liquidity to execute on their post-emergence business plan.

25. *Second,* the terms of the proposed DIP Facility are the result of the marketing process and negotiations described above, which, as described herein, enabled the Debtors to obtain debtor-in-possession financing on terms that are appropriate under the current circumstances described herein and in the Motion. The Debtors, with the assistance of their advisors, solicited and considered other sources of prepetition and postpetition financing to determine whether the Debtors could obtain financing on better terms. Ultimately, the Debtors did not receive a single alternative proposal for debtor-in-possession financing.

26. *Third,* I believe that the principal economic terms proposed under the DIP Facility, such as the contemplated fees and interest rate, are reasonable under the circumstances. In my view, based on the discussions I observed, such economic terms were negotiated at arm's length

and are, in the aggregate, comparable with the cost of debtor-in-possession financings in comparable situations.

27. *Fourth*, negotiations around the proposed DIP Facility extended several months and included the exchange of numerous proposals and counterproposals. In my view, based on the discussions I observed in the course of these negotiations, and my experience negotiating other debtor-in-possession financings, these negotiations were conducted at arm's length.

28. *Finally,* I believe that the Roll-Up Loans were a condition to obtaining the New Money Loans provided under the DIP Facility. Based on discussions I observed, the DIP Lenders (through their representatives) expressed during negotiations that the roll-up of the Roll-Up Loans was a condition precedent to obtaining the New Money Loans. Without access to the New Money Loans, the Debtors would not have sufficient liquidity to effectuate the restructuring transactions contemplated by the Restructuring Support Agreement.

## Conclusion

29. Based on my experience with debtor-in-possession financing transactions, as well as my involvement in the above-mentioned solicitation of the potential financing alternatives, I believe that the proposed DIP Facilities are the Debtors' best and only available source of postpetition funding, and that the terms of the DIP Facilities are reasonable and appropriate under the circumstances. The liquidity provided by the proposed DIP Facility will provide the Debtors with a potential path to an expeditious exit from chapter 11 with sufficient liquidity to operate their business post-emergence.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: February 29, 2024

/s/ *Samuel M. Greene*
Samuel M. Greene
Partner
Centerview Partners LLC