**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com

-and-

Matthew C. Fagen, P.C. (*pro hac vice* pending)
Francis Petrie (*pro hac vice* pending)
Evan Swager (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
matthew.fagen@kirkland.com
francis.petrie@kirkland.com
evan.swager@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Jacob S. Frumkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
jfrumkin@coleschotz.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| THRASIO HOLDINGS, INC., *et al.*, | Case No. 24-11840 (CMG) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF TERRENCE F. GROSSMAN IN
SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (II) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE
USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V)
MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

---

[1]    The last four digits of Debtor Thrasio Holdings, Inc.'s tax identification number are 8327.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.kccllc.net/Thrasio.  The Debtors' service address for purposes of these chapter 11 cases is 85 West Street, 3rd Floor, Walpole, MA, 02081.

I, Terrence F. Grossman, hereby declare under penalty of perjury as follows:

1.        I am a Partner at AlixPartners, LLP ("AlixPartners"), which has its principal offices located at 909 Third Avenue New York, New York 10022.  I have served as a restructuring advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors") since late August 2023.  AlixPartners is the proposed restructuring advisor for the Debtors in these chapter 11 cases.[2]

2.        I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing*, filed contemporaneously herewith (the "Motion").[3]

3.        Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by AlixPartners professionals involved in advising the Debtors in these chapter 11 cases, or information provided to me by the Debtors.  If called upon to testify, I could and would testify to the facts set forth herein on that basis.  I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors.

---

[2]    The Debtors anticipate filing an application to retain AlixPartners as their restructuring advisor, effective as of the commencement of their chapter 11 cases, shortly hereafter.

[3]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

**Qualifications**

4.      I am a Partner at AlixPartners, LLP.  I have more than 20 years of experience in providing turnaround services for companies.

5.      I have been employed by AlixPartners since 2017.  AlixPartners is a global independent restructuring consulting firm that has a wealth of experience in providing restructuring advisory services, and has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to these chapter 11 cases.  Since its inception in 1981, AlixPartners, its predecessor entities, and its affiliate, AP Services, LLC, have provided restructuring or crisis management services in numerous large cases.  Some notable, publicly-disclosed restructuring assignments that I have personally played a leadership role in, include Party City Holdco, Inc, JCPenney's, The Children's Place, The Gymboree Corp., Charming Charlies, GMAC / ResCap, Mervyn's and CIT. I have also served in senior-level financial positions, including the Senior Vice President of Corporate Finance, for Tommy Hilfiger (led the sale of the company to Apax Partners), Treasurer of Linen's n' Things and Assistant Treasurer for CVS Corporation.  In each situation I played a leadership role and was responsible for or involved in capital raising, M&A transactions, and assets sales.

6.      I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I am also familiar with the Debtors' supply chain and the status of the Debtors' relationships with various vendors, suppliers, and service-providers.

**AlixPartners Retention**

7.      In February 2022, the Debtors engaged AlixPartners to assist in their efforts to implement a number of profit-generating, cost-reduction, and savings initiatives to generate

operational flexibility.[4] I was one of the project leaders that assisted the Debtors in these efforts. Specifically, I was responsible for establishing treasury and cash management processes to improve cash visibility and controls. I also assisted the Debtors with the implementation of enterprise financial systems and other financial controls. Through January 2023, the Debtors, with the assistance of AlixPartners, implemented numerous cost-reduction and cash flow generation initiatives to position Thrasio for long-term growth and profitability.

8.      In late August 2023, the Debtors re-engaged AlixPartners and I, and several members who advised the Debtors in their operational turnaround efforts, returned to advise the Debtors. Since then, AlixPartners has assisted the Debtors in the development of the Debtors' detailed business plan and weekly cash flow forecast, the evaluation of strategic alternatives, and with contingency planning in the event that a chapter 11 filing became necessary. Related to these efforts, AlixPartners has worked closely with key members of the Debtors, including, but not limited to, members of the treasury, supply chain, legal, human resources, technology, commercial and finance teams.

9.      As it became clear that the Debtors would pursue an in-court restructuring AlixPartners focused on, among other things, a comprehensive evaluation of the Debtors' operations and cash requirements to operate their businesses during these chapter 11 cases as well as post emergence.

**The Debtors' Capital Structure**

10.      As of the Petition Date, the Debtors have approximately $855.2 million in total funded debt obligations. The following table depicts the Debtors' prepetition capital structure as

---

[4]    A detailed description of the Debtors' operational turnaround efforts is included in the *Declaration of Josh Burke, Chief Financial Officer of Thrasio Holdings, Inc., in Support of First Day Motions*, filed contemporaneously herewith (the "First Day Declaration").

of the Petition Date:

| Funded Debt | Maturity | Amount Outstanding (in millions) |
|---|---|---|
| Revolving Credit Facility | December 2025 | $66.2 |
| Letters of Credit | | $2.5 |
| Term Loan Facility | December 2026 | $786.5 |
| **Total Debt Obligations** | | **$855.2** |
| Preferred Equity | Liquidation Preference Priority (on proceeds) | Amount of Series (in millions) |
| Series X Redeemable Preferred Stock | First Priority | $739.4 |
| Series D Preferred Stock | Second Priority | $1,075 |
| Series C Preferred Stock & Senior Series B Preferred Stock | Third Priority | $646 |
| Junior Series B Preferred Stock | Fourth Priority | $36 |
| Series A Preferred Stock | Fifth Priority | $16 |
| Series Seed Preferred Stock | Sixth Priority | $6 |
| **Total Preferred Equity Outstanding** | | **$2,518.4** |
| **Total Debt and Preferred Equity Outstanding** | | **$3,373.6** |

The Debtors have six series of preferred stock outstanding as set forth in greater detail in the First

Day Declaration.

### The Debtors' Immediate Need for the DIP Facility and Cash Collateral

11.     I am familiar with the DIP Facility, the material terms thereto, and the Debtors'

immediate liquidity needs.  Based on my experience in the restructuring industry generally and my

experience with the Debtors in particular, I believe that approval of the proposed DIP Facility, and

the use of Cash Collateral, is essential for the continued operation of the Debtors' business and a

prerequisite to a successful reorganization.

12.     Prior to the commencement of these cases, the Debtors, in consultation with their

advisors, carefully considered a number of potential alternatives to address the Debtors' capital

structure and liquidity challenges, as described in detail in the First Day Declaration and the

*Declaration of Samuel M. Greene in Support of the Debtors' Motion for Entry of Interim and Final*

*Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens*

*and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing*, filed contemporaneously herewith (the "Greene Declaration"). These alternatives included, among other things, multiple marketing processes for an equity or debt investment in the Debtors, the exploration of strategic combinations, and the evaluation of several alternative proposals put forward by the Debtors' investors.  Ultimately, none of the Debtors' efforts materialized in an actionable proposal.  Accordingly, the Debtors focused on preparing for a potential chapter 11 filing with the support of the Debtors' lenders, including negotiations regarding postpetition financing for the Debtors' business.  Those negotiations ultimately resulted in the DIP Facility, which provides up to $90 million of new-money financing and consensual use of Cash Collateral.

13.     In connection with the search for viable postpetition financing, AlixPartners assisted the Debtors in preparing projected cash forecasts for the Debtors' businesses during these chapter 11 cases.  These forecasts accounted for projected cash receipts and disbursements and consider a number of factors, including, but not limited to, the effect of the chapter 11 filing on the operations of the business, fees and interest expenses associated with postpetition financing, professional fees, and customer and vendor obligations, as well as the operational performance of the underlying business.  The Debtors, with the assistance of AlixPartners and their other advisors, used these analyses to determine the necessary size of the DIP Facility, the amount requested on an interim basis, and, ultimately the DIP Facility budget (the "Approved Budget," attached hereto as **Exhibit A**).  Based on my experience in numerous large-scale corporate bankruptcy cases, my familiarity with the Debtors' operations, extensive discussions with the Debtors' management team and advisors, including a team from AlixPartners acting under my supervision, I believe the

6

Approved Budget presents a reasonable estimate of the Debtors' cash sources and needs during these chapter 11 cases.

14.      Based on the projections and my analysis of the various scenarios reflected in the Approved Budget, and my discussions with the Debtors' management and other advisors, the Debtors will need immediate use of Cash Collateral and access to the additional liquidity provided by the DIP Facility to, among other things, administer their estates during these chapter 11 cases, honor employee wages and benefits, procure goods and services integral to the Debtors' ongoing business operations, fund operational expenses, and maintain favorable relationships with their vendors, suppliers, employees, and customers.  As of the Petition Date, the estimated operating cash balance of the Debtors (and their subsidiaries) is approximately $25.7 million, which is insufficient to operate their enterprise and continue paying their debts as they come due.  If the Debtors cannot quickly access liquidity through the DIP Facility and the use of Cash Collateral, the Debtors will not be able to operate their business in the ordinary course and will have insufficient liquidity to implement the restructuring transaction contemplated by the Restructuring Support Agreement.  In turn, this would negatively affect the Debtors' revenues, jeopardize the Debtors' stakeholders' confidence in the Debtors' business, and harm the value of the Debtors' estates to the detriment of all stakeholders.

15.      I believe that the new money made available subject to and upon entry of the Interim Order is warranted under these circumstances.  Access to this liquidity at the outset of these chapter 11 cases will convey a positive message to all stakeholders that (a) the Debtors are adequately funded with the ability to satisfy operational obligations in the ordinary course; and (b) the Debtors are progressing in meaningful negotiations with the DIP Lenders and Prepetition Secured Parties on a consensual and swift consummation of these chapter 11 cases.  This positive

message will help assuage potential stakeholder concerns about the go-forward strength of the Debtors' business, thus allowing the Debtors to focus on operating their business in the ordinary course to the benefit their estates.

16.    Finally, I believe that the "DIP to exit" structure of the DIP Facility is warranted and in the best interests of the Debtors.  Structuring the DIP Facility to provide for exit financing commitments enables the Debtors to lock in post-emergence financing now under favorable conditions.  The DIP Facility also ensures that the Debtors will not need to expend further resources soliciting additional sources of capital to satisfy the DIP Loans upon the Debtors' emergence from chapter 11.  I believe that the DIP Facility will provide the Debtors with sufficient post-emergence liquidity to operate in the ordinary course of business, which best preserves the value of the Debtors' business and operations.

17.    Accordingly, I believe that the liquidity provided by the DIP Facility is necessary to provide the Debtors' customers, vendors, and employees with comfort that the Debtors will continue to operate while in chapter 11.  Interim approval of the DIP Facility, permitting the Debtors to access up to $35 million of New Money Loans and providing access to the use of Cash Collateral during the interim period, will be critical to the Debtors' ability to continue operating and successfully administer these chapter 11 cases.

## Conclusion

18.    I believe that access to the DIP Facility and Cash Collateral will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates, pursue their restructuring goals in the interim period, and responsibly administer these chapter 11 cases throughout the period that the Debtors expect will be necessary to implement and effectuate their restructuring efforts.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: February 29, 2024

/s/ Terrence F. Grossman
Name:  Terrence F. Grossman
Title:   Partner
           AlixPartners, LLP

**Exhibit A**

**DIP Budget**

**Thrasio Holdings, Inc.**
**Approved Budget**
*$ in 000s*

| Forecast / Actual | Fcst Week 1(1) | Fcst Week 2 | Fcst Week 3 | Fcst Week 4 | Fcst Week 5 | Fcst Week 6 | Fcst Week 7 | Fcst Week 8 | Fcst Week 9 | Fcst Week 10 | Fcst Week 11 | Fcst Week 12 | Fcst Week 13 | Fcst 13 Week Total |
| Week Ending | 2-Mar | 9-Mar | 16-Mar | 23-Mar | 30-Mar | 6-Apr | 13-Apr | 20-Apr | 27-Apr | 4-May | 11-May | 18-May | 25-May | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TOTAL COLLECTIONS** | $ 5,402 | $ 6,121 | $ 6,284 | $ 6,691 | $ 7,014 | $ 7,623 | $ 7,795 | $ 7,855 | $ 7,620 | $ 7,716 | $ 7,276 | $ 7,452 | $ 12,447 | $ 97,298 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | |
| Merchandise | - | (5,325) | (2,662) | (2,960) | (2,692) | (2,086) | (2,086) | (2,086) | (2,086) | (2,086) | (2,086) | (2,086) | (2,086) | (30,329) |
| Supply Chain | - | (4,964) | (2,487) | (3,287) | (2,487) | (2,428) | (2,428) | (3,528) | (2,528) | (2,478) | (2,478) | (3,478) | (2,578) | (35,148) |
| SG&A | - | (4,792) | (4,398) | (2,658) | (6,927) | (2,790) | (4,674) | (3,217) | (4,675) | (5,533) | (2,479) | (4,375) | (3,079) | (49,597) |
| Sales & Other Taxes | - | (1,310) | (307) | (217) | (149) | - | (12) | - | (444) | (23) | (3) | (136) | (46) | (2,646) |
| **Total Operating Disbursements** | $ - | $ (16,391) | $ (9,854) | $ (9,122) | $ (12,255) | $ (7,304) | $ (9,200) | $ (8,831) | $ (9,733) | $ (10,121) | $ (7,046) | $ (10,075) | $ (7,790) | $(117,720) |
| Net Cash Flow - Adjacent Businesses | - | (373) | (292) | (284) | (117) | (245) | (130) | (142) | 82 | (119) | 131 | (243) | 166 | (1,566) |
| **NON-OPERATING CASH FLOWS** | | | | | | | | | | | | | | |
| Interest & Fees | - | (828) | - | - | (25) | (401) | (803) | - | - | (375) | (388) | - | - | (2,820) |
| Restructuring Professionals Fees | - | (70) | (228) | - | - | (70) | (1,668) | - | (5,484) | (70) | (1,418) | - | - | (9,008) |
| Divestitures/Asset Dispositions | - | - | - | - | - | - | - | - | - | 200 | - | - | - | 200 |
| Other Non-Operating | - | (475) | (464) | (200) | (354) | (200) | (200) | - | - | - | - | - | - | (1,893) |
| **Total Non-Operating Cash Flows** | $ - | $ (1,373) | $ (692) | $ (200) | $ (379) | $ (671) | $ (2,671) | $ - | $ (5,484) | $ (245) | $ (1,806) | $ - | $ - | $ (13,521) |
| **Net Cash Flow Before Financing** | $ 5,402 | $ (12,015) | $ (4,553) | $ (2,915) | $ (5,736) | $ (596) | $ (4,206) | $ (1,118) | $ (7,515) | $ (2,769) | $ (1,446) | $ (2,866) | $ 4,823 | $ (35,510) |
| DIP Draw / (Repayment) | - | 35,000 | - | - | - | - | 35,000 | - | - | - | - | - | - | 70,000 |
| **NET CASH FLOW** | $ 5,402 | $ 22,985 | $ (4,553) | $ (2,915) | $ (5,736) | $ (596) | $ 30,794 | $ (1,118) | $ (7,515) | $ (2,769) | $ (1,446) | $ (2,866) | $ 4,823 | $ 34,490 |
| **Beginning Operating Cash** | $ 25,692 | $ 31,094 | $ 54,079 | $ 49,526 | $ 46,611 | $ 40,875 | $ 40,279 | $ 71,073 | $ 69,955 | $ 62,440 | $ 59,671 | $ 58,226 | $ 55,359 | $ 25,692 |
| Add: Net Cash Flows | 5,402 | 22,985 | (4,553) | (2,915) | (5,736) | (596) | 30,794 | (1,118) | (7,515) | (2,769) | (1,446) | (2,866) | 4,823 | 34,490 |
| **Ending Operating Cash** | $ 31,094 | $ 54,079 | $ 49,526 | $ 46,611 | $ 40,875 | $ 40,279 | $ 71,073 | $ 69,955 | $ 62,440 | $ 59,671 | $ 58,226 | $ 55,359 | $ 60,182 | $ 60,182 |

*(1) Week 1 covers the period from February 27, 2024 to March 2, 2024*