**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com

-and-

Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Francis Petrie (admitted *pro hac vice*)
Evan Swager (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
matthew.fagen@kirkland.com
francis.petrie@kirkland.com
evan.swager@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Jacob S. Frumkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
jfrumkin@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| THRASIO HOLDINGS, INC., *et al.*, | Case No. 24-11840 (CMG) |
| Debtors.[1] | (Jointly Administered) |

**NOTICE OF FILING OF**
**INDEPENDENT INVESTIGATION RESULTS**
**AS EXHIBIT G TO THE PLAN SUPPLEMENT**

**PLEASE TAKE NOTICE THAT** on April 18, 2024, the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") entered an order [Docket No. 399] (the "Disclosure Statement Order"): (a) authorizing Thrasio Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 398] (as modified, amended, or supplemented

---

[1]   The last four digits of Debtor Thrasio Holdings, Inc.'s tax identification number are 8327.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' Claims, Noticing, and Solicitation Agent at https://www.kccllc.net/Thrasio.  The Debtors' service address for purposes of these chapter 11 cases is 85 West Street, 3rd Floor, Walpole, MA, 02081.

from time to time, the "Plan");[2] (b) approving the *Second Amended Disclosure Statement for the Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 397] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order, the Debtors hereby file with the Bankruptcy Court the Independent Investigation Results as **Exhibit G** to the Plan Supplement.

**PLEASE TAKE FURTHER NOTICE** that the Plan Supplement is integral to, part of, and incorporated by reference into the Plan.  Please note, however, these documents have not yet been approved by the Court.  If the Plan is confirmed, the documents contained in the Plan Supplement (including any amendments, modifications, or supplements thereto) will be approved by the Court pursuant to the order confirming the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Bankruptcy Court will consider Confirmation of the Plan will commence on **June 10, 2024, at 10:00 a.m., (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard (the "Confirmation Hearing") before the Honorable Christine M. Gravelle, United States Bankruptcy Judge, 402 East State Street, Courtroom 3, Trenton, New Jersey 08608.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **June 5, 2024, at 2:00 p.m. (prevailing Eastern Time)** (the "Plan Objection Deadline").  Any objection to the Plan **must**:  (a) be in writing; (b) state with particularity the basis of the objection; and (c) be filed with the Clerk of the Bankruptcy Court electronically by (i) attorneys who regularly practice before the Bankruptcy Court in accordance with the General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002 (the "General Order") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, (ii) by all other parties-in-interest, if not otherwise filed with the Clerk of the Bankruptcy Court electronically, via hard copy, and shall be served in accordance with the General Order and the Supplemental Commentary upon the following parties so as to be **actually received** on or before the Plan Objection Deadline:

---

[2]    Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or the Disclosure Statement, as applicable.

| Co-Counsel to the Debtors | |
|---|---|
| **Kirkland & Ellis LLP**<br>333 West Wolf Point Plaza<br>Chicago, Illinois 60654<br>Attention:  Anup Sathy, P.C.<br><br>-and-<br><br>601 Lexington Avenue<br>New York, New York 10022<br>Attention:  Matthew Fagen, P.C.; Francis Petrie;<br>Evan Swager | **Cole Schotz P.C.**<br>Court Plaza, 25 Main Street<br>Hackensack, New Jersey 10112<br>Attention:  Michael D. Sirota; Warren A. Usatine;<br>Felice R. Yudkin |
| ***Counsel to the Ad Hoc Group*** | ***Counsel to the Administrative Agent Under the Revolving Credit Facility*** |
| **Gibson, Dunn & Crutcher LLP**<br>200 Park Avenue<br>New York, New York 10166<br>Attention:  Scott J. Greenberg; Joe Zujkowski | **Simpson Thacher & Bartlett LLP**<br>425 Lexington Avenue<br>New York, New York 10017<br>Attention:  Nicholas Baker, Philip L. DiDonato,<br>Amy W. Zhuo |
| ***United States Trustee*** | ***Official Committee of Unsecured Creditors*** |
| **Office of the United States Trustee for the District of New Jersey, Region 3**<br>One Newark Center, Suite 2100<br>Newark, New Jersey 07102<br>Attention:  Jeffrey M. Sponder; Lauren Bielskie | **Morrison & Foerster LLP**<br>250 West 55th Street, New York, New York 10019<br>Attention:  Lorenzo Marinuzzi, Theresa Foudy, Douglas Mannal, Raff Ferraioli, and Darren Smolarski<br><br>-and-<br><br>**Kelley Drye & Warren LLP**<br>One Jefferson Road, 2nd Floor, Parsippany, New Jersey 07054<br>Attention:  James S. Carr, Maeghan Mcloughlin, and Connie Choe |

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to **obtain a copy of the Disclosure Statement, the Plan, or related documents at no additional cost,** you should contact Kurtzman Carson Consultants LLC, the Debtors' claims, noticing, and solicitation agent in the chapter 11 cases (the "Claims, Noticing, and Solicitation Agent"), by:  (a) calling (866) 967-0496 (domestic) or +1(310) 751-2696 (international) and asking for a member of the Solicitation Team; (b) submitting an inquiry to http://www.kccllc.net/thrasio/inquiry; (c) writing to Thrasio Ballot Processing Center, c/o KCC 222 N. Pacific Coast Highway, Suite 300 El Segundo, CA 90245; or (d) e-mailing thrasioinfo@kccllc.com and referencing "Thrasio" in the subject line.  You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, http://www.kccllc.net/thrasio, or the Bankruptcy Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

**ARTICLE VIII** OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.F** CONTAINS A THIRD-PARTY RELEASE.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE,**

**PLEASE CALL (866) 967-0496 (DOMESTIC) OR +1 (310) 751-2696 (INTERNATIONAL),**

**OR SUBMIT AN INQUIRY VIA WWW.KCCLLC.NET/THRASIO/INQUIRY.**

[*Remainder of page intentionally left blank*]

Dated: May 23, 2024

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Jacob S. Frumkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:       msirota@coleschotz.com
             wusatine@coleschotz.com
             fyudkin@coleschotz.com
             jfrumkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com

-and-

Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Francis Petrie (admitted *pro hac vice*)
Evan Swager (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
matthew.fagen@kirkland.com
francis.petrie@kirkland.com
evan.swager@kirkland.com

*Co-Counsel to the Debtors and
Debtors in Possession*

**<u>Exhibit G</u>**

**Independent Investigation Results**

**KATTEN MUCHIN ROSENMAN LLP**
Steven J. Reisman, Esq. (admitted *pro hac vice*)
Cindi M. Giglio, Esq. (admitted *pro hac vice*)
Marc B. Roitman, Esq. (admitted *pro hac vice*)
Grace A. Thompson, Esq. (N.J. Bar No. 294072022)
Loredana B. Miranda, Esq. (*pro hac vice* pending)
50 Rockefeller Plaza
New York, NY 10020-1605
Telephone: (212) 940-8700
Email:  sreisman@katten.com
         cgiglio@katten.com
         marc.roitman@katten.com
         grace.thompson@katten.com
         loredana.miranda@katten.com

-and-

Robert T. Smith, Esq. (admitted *pro hac vice*)
Johnjerica Hodge, Esq. (admitted *pro hac vice*)
1919 Pennsylvania Ave., NW. Suite 800
Washington, DC  20006-3404
Telephone: (202) 625-3500
Email:  robert.smith1@katten.com
         johnjerica.hodge@katten.com

*Counsel to Anthony R. Horton and Stefan M. Selig,*
*in their capacity as Disinterested Directors of*
*Thrasio Holdings, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| THRASIO HOLDINGS, INC., *et al.*, | Case No. 24-11840 (CMG) |
| Debtors.[1] | (Jointly Administered) |

**SUMMARY REPORT OF THE DISINTERESTED DIRECTORS OF**
**THRASIO HOLDINGS, INC. REGARDING INDEPENDENT INVESTIGATION**
**OF POTENTIAL ESTATE CAUSES OF ACTION AGAINST RELATED PARTIES**

---

[1] The last four digits of Debtor Thrasio Holdings, Inc.'s tax identification number are 8327. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://www.kccllc.net/Thrasio. The Debtors' service address for purposes of these Chapter 11 Cases is 85 West Street, 3rd Floor, Walpole, MA, 02081.

Anthony R. Horton and Stefan M. Selig, in their capacity as disinterested directors (the "Disinterested Directors") of the board of directors (the "Board") of Thrasio Holdings, Inc. (together with its Debtor Affiliates, collectively, the "Debtors," and together with Thrasio Holdings, Inc.'s non-Debtor Affiliates, collectively, "Thrasio" or the "Company"),[2] by and through their undersigned counsel, Katten Muchin Rosenman LLP ("Katten"), submit this Summary Report of their principal findings and summary conclusions regarding the results of the independent investigation (the "Independent Investigation") of potential estate causes of action against the Debtors' current or former directors, managers, officers, equity holders, subsidiaries, affiliates, and other related parties (each, a "Related Party" and, collectively, the "Related Parties").[3]

## I.      EXECUTIVE SUMMARY

1.      On September 19, 2023, the Board appointed the Disinterested Directors and delegated to them, among other things, sole authority to conduct the Independent Investigation. Messrs. Horton and Selig are highly qualified to serve as the Disinterested Directors and have extensive knowledge and experience in investigations and corporate restructurings:

i.      Mr. Horton is the Chief Executive Officer and Managing Director of AR Horton Advisors LLC and has over 30 years of experience helping public and private companies execute business and financial strategies, including balance sheet

---

[2]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the *Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 40] (as supplemented or amended from time to time, the "Plan"), or the *Second Amended Disclosure Statement for the Joint Plan of Reorganization of Thrasio Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 397] (the "Disclosure Statement").

[3]    The conclusions stated throughout this Summary Report are supported by a number of documents designated as confidential pursuant to the *Confidentiality Stipulation and Protective Order* [Docket No. 445], dated April 30, 2024. Because of this, the Disinterested Directors therefore do not quote from those documents herein or attach any of those documents to this Summary Report.

recapitalizations, turnarounds, and in-court restructurings. Mr. Horton has served as an independent director to numerous companies in distressed situations and has conducted numerous independent investigations. For more than two decades prior to forming AR Horton Advisors LLC, Mr. Horton held a variety of senior executive roles at Energy Future Holdings Corp. ("EFH") and its subsidiaries and affiliates, including Executive Vice President, Chief Financial Officer, Treasurer, Chief Risk Officer, and Head of Corporate Development. In these positions, Mr. Horton guided and advised EFH and its subsidiaries and affiliates through numerous out-of-court restructuring transactions as well as EFH's successful chapter 11 reorganization, which was one of the most complex bankruptcy proceedings in history. Mr. Horton is a Certified Public Accountant, Chartered Financial Analyst, Certified Management Accountant, and Certified Financial Manager. He has a Bachelor's degree in Economics and Management as well as a Masters in Finance and Accounting from The University of Texas at Arlington.

ii.     Mr. Selig is the founder of BridgePark Advisors LLC, which provides strategic advice to a select group of CEOs, boards of directors, and institutional and high net worth investors on business strategy and planning, mergers and acquisitions, financing, corporate governance, activism, and litigation. He has been engaged in this capacity to support various public and private companies facing significant challenges, including financial restructuring and emergence from bankruptcy. Mr. Selig has served as an independent director to numerous companies in distressed situations and has conducted numerous independent investigations. From 2014 to 2016, Mr. Selig served as President Obama's Under Secretary of Commerce for International Trade at the United States Department of Commerce, where he headed the International Trade Administration, a

bureau of 2,200 trade and investment professionals in 75 countries. Before joining the Obama Administration, Mr. Selig spent nearly 30 years holding numerous investment banking positions, including, among others, Executive Vice Chairman of Global Corporate and Investment Banking at Bank of America.

2.    The Disinterested Directors retained independent counsel, Katten, whose work in connection with the Independent Investigation and these Chapter 11 Cases has been at the sole direction of the Disinterested Directors. The lead attorneys from Katten working on this engagement are widely regarded as market leaders in the representation of independent directors and, in recent years, have represented independent directors in some of the largest and most complex chapter 11 cases throughout the United States and in additional confidential out-of-court restructuring matters.[4] The Disinterested Directors have communicated with Katten weekly, and in many instances multiple times a week, to direct the Independent Investigation and obtain updates on the workstreams, progress, and findings of the Independent Investigation.

3.    Katten, on behalf of the Disinterested Directors, held numerous in-person or virtual meetings with advisors to interested parties, including counsel to the Debtors, counsel to the Ad Hoc Group of Lenders, and counsel to the Official Committee of Unsecured Creditors (the "Committee"), throughout the course of the Independent Investigation.

4.    The scope of the Independent Investigation was broad. The Disinterested Directors investigated the course of conduct and material dealings involving Thrasio and its Related Parties,

---

[4]    *See, e.g.*, *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. July 18, 2023) (independent investigation into potential estate claims and causes of action against related parties); *In re Venator Materials PLC*, No. 23-90301 (CML) (Bankr. S.D. Tex. July 27, 2023) (same); *In re GenesisCare Pty Limited*, No. 23-90614 (MI) (Bankr. S.D. Tex. July 27, 2023) (same); *In re GWG Holdings, Inc.*, No. 22-90032 (MI) (Bankr. S.D. Tex. Aug. 23, 2022) (same); *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Jan. 10, 2024) (independent investigation of intercompany matters); *In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Bankr. D. Del. Nov. 19, 2020) (same).

including the activities of Thrasio's directors and officers, spanning a period of more than 5 years. As part of the Independent Investigation, Katten received over 2.3 million documents, and conducted interviews, depositions, or informal meetings with 15 witnesses.[5]

5.     On May 23, 2024, after receiving a detailed 236-page privileged legal presentation providing analysis of potential estate causes of action from Katten, the Disinterested Directors made their determinations and conclusions on these matters. This Summary Report provides the Disinterested Directors' principal findings and conclusions regarding the Independent Investigation, as of the date hereof.

6.     ***The Disinterested Directors have identified certain potentially viable estate causes of action that should be retained by the Debtors pursuant to the Plan***. The Disinterested Directors concluded there are potential estate causes of action that may be pursued against the following individuals (collectively, the "Excluded Parties"):

|  | EXCLUDED PARTY | ROLE | TENURE |
|---|---|---|---|
| 1. | Joshua Silberstein | Former Co-CEO and Director | April 2018 – September 2021 |
| 2. | Carlos Cashman | Former Co-CEO and Current Director | April 2018 – September 2022 as Officer<br>April 2018 – Present as Director |
| 3. | Danny Boockvar | Former President | September 2019 – October 2023 |
| 4. | Joe Falcao | Former Chief Financial Officer | October 2018 – March 2021 as CFO<br>March 2021 – February 2022 as SVP of Finance & Treasurer<br>February 2022 – September 2022 as Consultant |

7.     In addition, the Disinterested Directors concluded there are potential estate avoidance actions that could be pursued against transferees of Thrasio's assets in connection with

---

[5]     Further detail regarding the appointment of the Disinterested Directors and the scope and conduct of the Independent Investigation is set forth herein and in the Disclosure Statement, at 29–30.

transactions involving Yardline Capital Corp. ("Yardline") between April 2020 and January 2022, pursuant to which Thrasio made advances to Yardline and certain of its principals totaling more than $28.5 million in the aggregate (collectively, the "Yardline Transactions").[6]

8.      As described in more detail herein, the Disinterested Directors concluded it is appropriate to carve out the Excluded Parties from the Plan releases because of potential breaches of fiduciary duty relating to, among other things, the following matters:

i.      ***Financial and Inventory Controls***. Conscious disregard of material weaknesses in internal controls over financial, accounting, and inventory systems, resulting in material adjustments to certain line items in Thrasio's financial statements, prior to January 2022;

ii.     ***Secondary Sales***. Prioritizing personal interests over the best interests of Thrasio in connection with certain secondary sales of Thrasio's stock to third parties (collectively, the "Secondary Sales"); and

iii.    ***Yardline Transactions***. Prioritizing personal interests over the best interests of Thrasio in connection with the Yardline Transactions.

9.      The Excluded Parties will not be "Released Parties" under the Plan, and ***all*** potential claims and causes of action against the Excluded Parties will be preserved under the Plan, regardless of whether such potential claims relate to the matters noted above. Moreover, the Plan preserves all claims and causes of action that are determined in a Final Order to have constituted actual fraud or willful misconduct.[7] In addition, avoidance actions related to the Yardline

---

[6]    Yardline is a Related Party transaction. However, some of the transferees subject to potential estate avoidance actions may not be Related Parties.

[7]    See Plan §§ VIII.E-F (releases effectuated "except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or willful misconduct.").

Transactions will be preserved under the Plan.[8] The Plan provides for the retention of these potentially viable estate causes of action as "Retained Causes of Action."[9]

10.     The Independent Investigation remains ongoing as of the date hereof, and the releases and exculpations contemplated in the Plan remain subject to further modification at the direction of the Disinterested Directors. The definitions of Excluded Parties and Retained Causes of Action may be expanded, including as a result of settlement negotiations with the Company's Ad Hoc Group of Lenders and the Committee.

11.     The Disinterested Directors' conclusions are supported by the evidence obtained in connection with the Independent Investigation, taking into account the facts and circumstances relevant to understanding the context of the matters investigated, including that many of the events investigated occurred during the time period of the COVID-19 pandemic. The Excluded Parties have not been afforded an opportunity to review or respond to the statements set forth herein. The Excluded Parties may dispute the merits of the potentially viable estate causes of action and/or assert defenses or counterclaims to such causes of action.

12.     ***The Disinterested Directors have concluded that only certain of the transactions subject to their Independent Investigation give rise to viable estate causes of action worth pursuing against Related Parties***. This conclusion is based on the Disinterested Directors' evaluation of the facts and circumstances of each of the relevant transactions, analyses of the merits

---

[8]     To ensure the effective preservation of these avoidance actions, the transferees of Thrasio's assets in connection with the Yardline Transactions, in such capacity, will also be Excluded Parties under the Plan.

[9]     The description of the Retained Causes of Action set forth herein is non-exclusive. The Disinterested Directors reserve the right to amend this description at any time in accordance with the Plan. The Debtors shall have the right to pursue any and all Retained Causes of Action regardless of whether they are described herein and shall not be limited or prejudiced in any respect by anything contained in this Summary Report. *See* Plan §§ VIII.E-F (providing for the preservation of "any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement").

of any potential estate causes of action, and whether the costs and burdens of litigation justify

pursue of such estate causes of action.[10]

13.     The Independent Investigation found evidence of three key patterns, each of which

supports the Disinterested Directors' conclusion that the costs and burdens of litigation outweigh

the expected recovery other than with respect to the Retained Causes of Action.

14.     *First*, the Disinterested Directors concluded that Thrasio's directors and officers

appear to have appropriately discharged their fiduciary duties from February 2022 to the present.

In February 2022, Thrasio engaged AlixPartners LLP ("AlixPartners") and a new management

team to implement operational and financial changes. Accordingly, the Disinterested Directors

concluded that there are likely no viable breach of fiduciary duty claims with respect to events

occurring after February 2022 that are worthy of pursuit.

15.     *Second*, the Disinterested Directors concluded that Thrasio's non-management

directors likely did not become aware of the extent of the financial and inventory control issues

until approximately September 2021. Thereafter, the non-management directors took appropriate

remedial actions culminating in the efforts to implement the operational and financial changes

noted above. Notably, certain of the non-management directors' investment firms made substantial

investments in Thrasio's equity in October 2021, which implies that they believed Thrasio had

significant equity value at the time. Accordingly, the Disinterested Directors concluded that breach

of fiduciary duty claims against non-management directors are not worthy of further pursuit.

Moreover, Thrasio's corporate charter shields directors from liability for any breaches of the duty

of care.

---

[10]    For the avoidance of doubt, this conclusion does not mean that the Disinterested Directors are unwilling to pursue
any causes of action. If any party in interest believes that the Debtors' estates would benefit from the pursuit of
additional causes of action, the Disinterested Directors will evaluate all evidence in support of such assertions
and, if appropriate, amend the Retained Causes of Action List.

16.     *Third*, the Disinterested Directors concluded that, with certain exceptions described below, material transfers of value by Thrasio to Related Parties (*e.g.*, the Tender Offer) occurred contemporaneously with, or prior to, significant equity investments in Thrasio by sophisticated and highly-experienced parties that bargained at arm's length and engaged in due diligence prior to investing. Because of the substantial contemporaneous evidence regarding Thrasio's financial condition, and to preserve estate resources, the Disinterested Directors determined not to engage a financial advisor.

17.     Set forth below is a description of the scope and conduct of the Independent Investigation, a summary of conclusions relevant to the Retained Causes of Action, and a summary of conclusions relevant to certain other potential claims evaluated by the Disinterested Directors.

## II.     CONDUCT OF THE INDEPENDENT INVESTIGATION

### A.     Document Requests

18.     In furtherance of the Independent Investigation, the Disinterested Directors, working with Katten, issued document and information requests to the Company seeking, among other things, copies of board materials and minutes, corporate governance documents, transaction documents, financial and accounting information, equity purchase agreements, indemnity agreements, correspondence, and intercompany transaction information. Katten delivered an initial document and information request to the Company on December 19, 2023, supplemental document and information requests on February 8, 2024, March 20, 2024, April 9, 2024, April 22, 2024, May 1, 2024, and May 11, 2024, and ad hoc document requests on various other dates. In the aggregate, the Disinterested Directors submitted 79 separate expansive categories of document and information requests related to the Independent Investigation. The Disinterested Directors, working with Katten, received and reviewed approximately 1,100 corporate documents related to the Independent Investigation in response to these requests. Katten also received and reviewed

approximately 3,596 documents in the virtual data room established by the Company and/or insiders for investors in connection with the Company's equity offerings and/or secondary sales in 2020 and 2021.

19.    Thereafter, the Disinterested Directors, working with Katten, requested and received access to approximately 2.3 million emails and other electronic documents, including Slack messages (instant messages). In an effort to be efficient and cost-effective, Katten applied targeted search terms to the electronic documents as they were received. The search terms were derived from Katten's legal analysis and identified documents relevant to the Independent Investigation, while reducing to a manageable number the documents to be individually reviewed by Katten attorneys. Katten expanded and refined the search terms periodically as the Independent Investigation progressed. As a result of this process, Katten identified and individually reviewed over 102,344 emails, attachments, and Slack messages that hit on the targeted search terms.

20.    The electronically stored information was collected from 9 current and former Company employees:

|    | CUSTODIAN | FORMER/CURRENT | ROLE |
|----|-----------|----------------|------|
| 1. | Danny Boockvar | Former | President |
| 2. | Carlos Cashman | Former | Co-CEO |
| 3. | Michael Fahey | Current | General Counsel |
| 4. | Joe Falcao | Former | CFO |
| 5. | Stephanie Fox | Current | Chief Operations Officer |
| 6. | Steve Nee | Current | SVP of Finance |
| 7. | Mounir Ouhadi | Former | Chief Supply Chain Officer |
| 8. | Joshua Silberstein | Former | Co-CEO |
| 9. | Bill Wafford | Former | CFO |

21.     In addition to the foregoing, Katten received and reviewed a subset of approximately 62,445 additional documents from the Debtors and approximately 14,881 documents from third parties produced in response to subpoenas from the Committee.

22.     The chart below summarizes the type and number of documents received and reviewed in the Independent Investigation:

| | DOCUMENT TYPE | NUMBER |
|---|---|---|
| 1. | Emails, Attachments, and Slack Messages | Received: 2,326,988<br>Search Term Hits:   102,344 |
| 2. | Debtor Corporate Documents | 1,100 |
| 3. | Virtual Data Room | 3,596 |
| 4. | Additional Documents Produced by the Debtors in Response to Subpoenas from the Committee | 62,445 |
| 5. | Documents Produced by Third Parties in Response to Subpoenas from the Committee | 14,881 |

23.     The Company and its professionals fully cooperated with the Disinterested Directors in connection with the production of documents for the Independent Investigation.

**B.     Witness Interviews and Depositions**

24.     Beginning in December 2023 and continuing through May 2024, Katten conducted interviews and informal meetings with certain current or former members of the Company's management team and representatives of other parties, including the Company's auditor, PricewaterhouseCoopers ("PwC"), securities counsel, Ropes & Gray LLP, and former corporate counsel, Cooley LLP ("Cooley"). Some witnesses were asked to, and did, return for further discussion on a second day to explore topics not covered earlier or to explore a topic in greater detail, oftentimes based on documents reviewed after the initial interview day. While the Disinterested Directors had access to the Thrasio emails and Slack messages of several former employees, certain of them declined the Disinterested Directors' request for an interview. The

interviews were not recorded or transcribed, though Katten attorneys attending the interviews took

detailed notes. The notes were not shared with any party and are considered by the Disinterested

Directors to be their work product for purposes of conducting the Independent Investigation.

25.    In addition to the interviews, Katten attended depositions of certain witnesses

conducted pursuant to a subpoena from the Committee. Additional interviews and depositions may

be held,[11] and the Disinterested Directors will promptly update the Bankruptcy Court if any

interview or deposition necessitates changes to the conclusions of the Independent Investigation.

26.    A full listing of the interviews, depositions, and informal meetings conducted by

Katten, on behalf of the Disinterested Directors, is set forth in the table below, by witness,

affiliation, and date:

---

[11]   For example, the Disinterested Directors anticipate that Carlos Cashman (former Co-CEO), Daniel Boockvar (former President), Stephen Evans (Director), and Jason Finger (Director) will be deposed prior to the Confirmation Hearing. Depositions that have already occurred are denoted in the chart with an asterisk.

| | WITNESS | AFFILIATION | DATE(S) |
|---|---|---|---|
| 1. | Representative of Ropes & Gray LLP | Securities Counsel to Thrasio | December 27, 2023<br>February 16, 2024 |
| 2. | Representative of Cooley | Former Counsel to Thrasio and Audit Committee of the Board | January 24, 2024 |
| 3. | Steve Nee | Thrasio, SVP of Finance | January 24, 2024 |
| 4. | Representative of PwC | Auditor to Thrasio | April 12, 2024 |
| 5. | David Mussafer | Thrasio, Former Director (Advent International) | April 17, 2024<br>*May 9, 2024 |
| 6. | Holly Etlin | AlixPartners, Former Chief Transformation Officer of Thrasio | April 19, 2024<br>May 3, 2024 |
| 7. | Michael Fahey | Thrasio, General Counsel | April 30, 2024 |
| 8. | Stephanie Fox | Thrasio, Chief Operations Officer | April 30, 2024<br>May 2, 2024 |
| 9. | Bill Wafford | Thrasio, Former Chief Financial Officer | May 2, 2024<br>*May 13, 2024 |
| 10. | Alex Urdea | Thrasio, Former Director (Upper90 Capital Management) | May 9, 2024 |
| 11. | Mounir Ouhadi | Thrasio, Former Chief Supply Chain Officer | May 17, 2024 |
| 12. | Joe Falcao | Thrasio, Former Chief Financial Officer | May 20, 2024 |
| 13. | Aditya Rathod | Thrasio, Former Vice President of Strategic Planning & Analysis | May 20, 2024 |
| 14. | Scott Hutchins | Thrasio, Director (Solamere Capital) | May 22, 2024 |
| 15. | Jay Coppoletta | Thrasio, Director (Peak6 Investments) | May 23, 2024 |

## C.    Additional Meetings with Case Parties

27.    Katten, on behalf of the Disinterested Directors, held numerous in-person or virtual meetings with advisors to interested parties throughout the course of the Independent Investigation, as set forth in the chart below:

| | ADVISOR/INTERESTED PARTY | MEETING DATE |
|---|---|---|
| 1. | Gibson, Dunn & Crutcher LLP, Counsel to Ad Hoc Group of Lenders | January 17, 2024 |
| 2. | Morrison & Foerster LLP, Counsel to Committee | March 20, 2024 |
| 3. | Morrison & Foerster LLP, Counsel to Committee | April 1, 2024 |
| 4. | Gibson, Dunn & Crutcher LLP, Counsel to Ad Hoc Group of Lenders | April 12, 2024 |
| 5. | Morrison & Foerster LLP, Counsel to Committee | April 30, 2024 |
| 6. | Gibson, Dunn & Crutcher LLP, Counsel to Ad Hoc Group of Lenders | May 9, 2024 |
| 7. | Morrison & Foerster LLP and Province, LLC, Counsel and Financial Advisor to Committee[12] | May 10, 2024 |
| 8. | Gibson, Dunn & Crutcher LLP, Counsel to Ad Hoc Group of Lenders | May 12, 2024 |
| 9. | Gibson, Dunn & Crutcher LLP, Counsel to Ad Hoc Group of Lenders Kirkland & Ellis LLP, Counsel to Debtors | May 16, 2024 |
| 10. | Morrison & Foerster LLP, Counsel to Committee Gibson, Dunn & Crutcher LLP, Counsel to Ad Hoc Group of Lenders, Kirkland & Ellis LLP, Counsel to Debtors | May 20, 2024 |
| 11. | Morrison & Foerster LLP, Counsel to Committee Gibson, Dunn & Crutcher LLP, Counsel to Ad Hoc Group of Lenders, Kirkland & Ellis LLP, Counsel to Debtors | May 21, 2024 |
| 12. | Morrison & Foerster LLP, Counsel to Committee Gibson, Dunn & Crutcher LLP, Counsel to Ad Hoc Group of Lenders, Kirkland & Ellis LLP, Counsel to Debtors | May 23, 2024 |
| 13. | Morrison & Foerster LLP, Counsel to Committee | May 23, 2024 |

28.     In addition, Katten maintained an ongoing dialogue with the Debtors' advisors to facilitate the efficient production of documents and information needed for the Independent Investigation and the coordination of witness interviews.

## III.   CONCLUSIONS REGARDING POTENTIAL ESTATE CAUSES OF ACTION

29.     As noted above, the Disinterested Directors have identified certain potentially viable estate causes of action that should be retained by the Debtors. A description of certain of

---

[12]   At the meetings with the Committee's advisors on May 10 and May 23, 2024, Katten provided the Committee's advisors with an oral summary of facts learned in Katten's interviews, as directed by the Bankruptcy Court at the May 7, 2024 hearing.

the Retained Causes of Action and certain additional estate causes of action evaluated by the

Disinterested Directors is set forth below. The summary below does not attempt to describe every

finding and conclusion made by the Disinterested Directors in the Independent Investigation.

Rather, it is intended as an overview of the Disinterested Directors' principal findings and

conclusions.

      **A.**      **Retained Causes of Action**

           **1.**      **Potential Estate Causes of Action Arising from Disregard of Financial Controls**

      30.      From its inception in 2018 through January 2022, Thrasio had persistent issues with

its internal accounting and the preparation of financial statements. Thrasio's auditor, PwC,

concluded that, for fiscal years 2020 and 2021, Thrasio did not maintain an effective control

environment in its financial, accounting and inventory systems commensurate with its financial

reporting requirements. Specifically, PwC found that Thrasio's finance personnel lacked the

knowledge, training, and experience to produce timely and accurate financial statements. These

deficiencies resulted in material discrepancies between Thrasio's unaudited financial statements,

which were provided to investors, and subsequently-prepared audited financial statements.

      31.      Further, in connection with certain private equity issuances and sales, Thrasio

affirmatively represented that its financial statements were prepared in accordance with generally

accepted accounting principles (GAAP) and that it maintained a system of accounting

administered in accordance with GAAP. The Disinterested Directors concluded that these

representations may have been inaccurate. For example, PwC observed in a November 2020

quality of earnings analysis that Thrasio prepared its income statement on a pro forma basis.

      32.      These financial and accounting issues may be attributed, at least in part, to Thrasio

being a start-up business that was rapidly growing in the midst of the COVID-19 pandemic, rather

than bad faith or willful misconduct. However, contemporaneous written documents found in the Independent Investigation show that Silberstein and Cashman, Thrasio's co-founders and Co-CEOs, were aware of financial and accounting issues since 2019. The evidence demonstrates that Silberstein and Cashman made a conscious decision to invest resources to grow the business rather than focusing on adequate controls and accuracy in financial reporting. Numerous emails and Slack messages from 2020 and 2021, involving the Excluded Parties, discussed problems with Thrasio's accounting and financial functions, deviations from GAAP accounting, and concerns raised by Thrasio's auditors. Accordingly, the Disinterested Directors concluded that the Excluded Parties knew or should have known that the Company did not have accurate accounting and control systems in place and failed to address or disclose these issues, either to investors or the Board, in a timely manner, resulting in potential breaches of fiduciary duties.

33.    The Disinterested Directors also analyzed potential estate causes of action arising from alleged mismanagement of Thrasio's inventory. From its inception in 2018, the Company had problems with its inventory processes, including difficulty with forecasting, warehousing, shipping, and overall inventory reporting. The Company also did not have proper systems to track its inventory across its 267 third-party logistics providers (*i.e.*, third-party warehouses). These problems ultimately led to certain business decisions that, with the benefit of hindsight, turned out poorly for the Company. Notably, like a number of other companies, Thrasio over-purchased inventory of certain products to meet outsized demand driven by the COVID-19 pandemic, which Thrasio's management mistakenly projected would continue, and to account for supply chain disruptions related thereto (*e.g.,* the Company had approximately $700 million of excess inventory as of February 2022). The excess inventory purchases resulted in Thrasio suffering significant operating losses.

34.     Evidence uncovered shows that Thrasio's management weighed the impact of purchasing excess inventory, on the one hand, versus running out of stock and being penalized in the rankings of Amazon's search algorithm, on the other hand. Thrasio's management made a determination that loss of rank on Amazon would be more costly to Thrasio than purchasing excess inventory. This decision was based, in part, on projections assuming a higher velocity of sales for certain items than actually occurred. The Disinterested Directors determined that, while these decisions were likely made in the good faith belief that they were in Thrasio's best interests, given the lack of reliable financial controls, as identified by PwC, these decisions may have resulted from a conscious disregard or reckless continuation of flawed business practices, resulting in a potential breach of the duty of care.

35.     In contrast to the officers named above, Thrasio's non-management directors likely did not become aware of the extent of the financial and inventory control issues until approximately September 2021, when certain of the non-management directors received a report from AlixPartners, which had been engaged to assist Advent International ("Advent") and Silver Lake Technology Management ("Silver Lake") in evaluating potential additional equity investments. AlixPartners' report identified concerns with Thrasio's controls over financial reporting, among other things. Notwithstanding the concerns identified by AlixPartners, Advent and Silver Lake made substantial investments in Thrasio's equity in October 2021. By February 2022, the non-management directors had taken steps to implement operational and financial changes within Thrasio, such as appointing a new management team and engaging AlixPartners to lead an operational transformation. In any event, claims based solely on breach of the duty of care will likely not be viable against individuals who were solely directors (not officers) because

of the exculpation clause in Thrasio's charter that relieves directors from any personal liability for breaches of the duty of care.

36.     Although it is challenging to quantify the damages, if any, suffered by the Company as a result of the Excluded Parties' potential breaches of fiduciary duty, these estate causes of action are potentially valuable to the Debtors' estates because the Company may be entitled to the equitable remedy of disgorgement to deprive putative defendants of any benefits derived from their breaches, *e.g.*, the sale of their Thrasio stock at arguably inflated valuations.

## 2.     Potential Estate Causes of Action Arising from the Secondary Sales

37.     From 2020 to 2022, many of Thrasio's insiders participated in secondary sales of Thrasio stock, *i.e.*, selling their Thrasio stock directly to third parties. Thrasio's bylaws imposed certain restrictions on transfers by stockholders, including a right of first refusal in favor of Thrasio, but the Board routinely waived these restrictions to permit the Secondary Sales.

38.     In and of themselves, the Secondary Sales likely do not give rise to viable estate causes of action. The Secondary Sales likely are not transfers by the Debtors. Additionally, certain witnesses expressed the view that, in general, Secondary Sales were beneficial to Thrasio because they diversified the community of equity holders, among other benefits.

39.     However, there is evidence to support allegations that, in connection with the Secondary Sales consummated in July and August 2021, Silberstein may have: (i) concealed material information from investors, the Board, and other officers; and (ii) promoted the disclosure of financial information that potentially materially overstated Thrasio's financial results for July 2020 through June 2021. The Disinterested Directors found that Silberstein (supported by Boockvar, Thrasio's former President, and certain subordinate personnel) made the decision to use potentially erroneous financial information and to disregard other financial information provided by Falcao, Thrasio's former CFO, who was then Thrasio's SVP of Finance & Treasurer.

40.    By mid-August 2021, Cashman and Fahey, Thrasio's General Counsel, among others, became concerned with Silberstein's conduct in connection with the Secondary Sales. At that time, Thrasio engaged outside counsel, Cooley, to perform an investigation into whether Thrasio had provided inaccurate or misleading financial information to investors. In late August 2021, Thrasio began the process of separating from Silberstein, resulting in the execution of the Separation Agreement and Mutual Release between the Company and Silberstein, executed on September 25, 2021 (the "Separation Agreement").

41.    The Disinterested Directors concluded that Silberstein may have prioritized his own financial interests over the best interests of Thrasio in connection with the July and August 2021 Secondary Sales, resulting in potential breaches of fiduciary duties. These estate causes of action are potentially valuable to the Debtors' estates because, in addition to any damages Silberstein's conduct caused the Company, the Company may also be entitled to the equitable remedy of disgorgement from Silberstein to deprive him of the benefits he derived by breaching his fiduciary duties to the Company.

### 3.    Potential Estate Causes of Action Arising from the Yardline Transactions

42.    In 2020, Thrasio made a $1 million strategic investment in Yardline, a startup merchant cash advance business, and became its majority shareholder. In early 2021, Silberstein implemented a strategy on behalf of Thrasio to acquire 100% of the equity in Yardline and to consolidate Yardline as a subsidiary. The course of action taken by Silberstein, with the knowing participation of Cashman and Boockvar, among others, triggered payment obligations from Yardline to its third-party investors. In April and May 2021, Thrasio paid approximately $18.4 million to satisfy Yardline's obligations to third-party investors that had been triggered by Thrasio's actions, and $1.8 million to acquire the remaining equity in Yardline. The evidence

demonstrates that the funds advanced to Yardline by Thrasio were booked as "debt" rather than capital contributions, potentially to avoid approval by the Thrasio Board (required for equity investments by the Company). In September 2021, the Thrasio Board retroactively approved these advances and also forgave approximately $21 million of "debt" purportedly owed by Yardline, which at that time was a consolidated subsidiary of Thrasio. In addition to the April/May 2021 advances, Thrasio also made more than $4.8 million of cash payments in 2021 to or on behalf of Yardline. In sum, between April 2020 and December 2021, Thrasio made transfers to or for the benefit of Yardline or its equity holders totaling more than $28.5 million in the aggregate (collectively, the "Yardline Transfers").

43.    The decision in April 2021 to acquire 100% of Yardline and to consolidate Yardline as a subsidiary of Thrasio—at substantial cost to Thrasio—was likely not a reasonable exercise of business judgment and may have been motivated by personal interests. Moreover, in pursuing this strategy, Thrasio may have acted against the interests of other stakeholders in Yardline, exposing Thrasio to potential liability. The Disinterested Directors concluded that, in taking these actions, certain of the Excluded Parties may have prioritized their own interests ahead of the best interests of Thrasio, resulting in potential breaches of fiduciary duties.

44.    By October 2021, less than 6 months after pursuing the strategy to acquire 100% of Yardline, and approximately 1 month after obtaining retroactive Board approval for the transactions, Thrasio was working on selling the Yardline business back to its principal and original minority owner, with whom Cashman had a close relationship. In November 2021, Thrasio executed a letter of intent to sell the Yardline business for consideration of $7 million in cash and equity securities with an estimated fair value of $5 million (the "Yardline Divestment"). The proceeds of the Yardline Divestment, which closed in January 2022, were significantly less

than the $20 million Thrasio had advanced to Yardline and its principals to acquire 100% ownership (and make required payments to third parties) just 9 months earlier. The Yardline Divestment was consummated in January 2022. Although the decision to divest from Yardline may have been supported by reasonable business judgment, there is evidence that Cashman was motivated, at least in part, by his close relationship with Yardline's principal.

45.     The Disinterested Directors concluded that the Yardline Transfers and/or the Yardline Divestment may be subject to avoidance as constructive fraudulent transfers. There is evidence that Thrasio may not have received reasonably equivalent value in these transactions. In addition, unlike other transfers involving Related Parties (*e.g.*, the Tender Offer, described below), the Yardline Transactions were not specifically linked with any of Thrasio's rounds of equity funding. Accordingly, the Disinterested Directors concluded these potential constructive fraudulent transfer claims may be worthy of pursuit. However, it is important to note that nearly all of the Yardline Transfers occurred prior to the October 2021 initial closing of the Series D Preferred Stock Financing, in which sophisticated third parties (such as Advent and Silver Lake) invested more than $1 billion in Thrasio's equity after engaging in due diligence. As a result, Thrasio likely had significant equity value at the time of most, if not all, of the Yardline Transfers, which would defeat constructive fraudulent transfer claims. In contrast to the Yardline Transfers, the Yardline Divestment occurred after any significant equity investments in Thrasio.

**B.     Additional Potential Estate Causes of Action Evaluated**

46.     As stated above, the Disinterested Directors concluded that all other transactions subject to the Independent Investigation likely do not give rise to viable and valuable estate cause of action worth pursuing. Because of the broad scope of the Independent Investigation, this summary of conclusions does not list all of the potential causes of action that were investigated

and found to be not worthy of pursuit.[13] However, the Disinterested Directors provide below an

overview of certain investigation matters, and relevant conclusions, that the Disinterested

Directors understand have been focal points for certain parties in interest, including the Committee.

### 1. Consideration of Potential Estate Cause of Action Arising from the Silberstein Separation Agreement

47.    As noted above, on September 25, 2021, Thrasio and Silberstein executed a

Separation Agreement and Mutual Release. The Disinterested Directors evaluated whether the

Board and Thrasio's officers appropriately discharged their fiduciary duties in connection with the

Separation Agreement, and in particular with respect to Thrasio's release of claims against

Silberstein.[14]

48.    The departure of Silberstein, Thrasio's co-founder and Co-CEO, amidst allegations

of potential misconduct, presented a challenging situation for Thrasio to navigate. By entering into

the Separation Agreement, Thrasio avoided a potentially value-destructive public dispute—and

potential litigation—with its departing co-founder and Co-CEO. Both Thrasio and Silberstein

engaged outside counsel to negotiate the Separation Agreement. Thrasio obtained numerous

benefits in entering into the Separation Agreement. Specifically, the Separation Agreement

included, among other things: (i) non-compete and non-solicitation provisions; (ii) restrictions on

Silberstein's sales of Thrasio stock; (iii) "true-up" provision that required Silberstein to transfer

Thrasio shares, for no consideration, to purchasers in the July and August 2021 Secondary Sales

---

[13]    Further detail regarding the Investigation Topics is set forth in the Disclosure Statement, at 29–30, and was provided to the Disinterested Directors in the 236-page privileged legal presentation.

[14]    Silberstein may assert the release as a defense against causes of action pursued by the Company or its successors. Thrasio's release of Silberstein does not apply to claims arising from gross negligence, fraudulent conduct, or felony criminal conduct about which neither Thrasio nor its officers or directors had actual or constructive knowledge. Notably, Silberstein made a written representation in connection with the Separation Agreement that he did not have any actual knowledge of any actions he took that would constitute gross negligence, fraudulent conduct or that would result in a felony criminal conviction.

if Thrasio consummated a subsequent equity financing at a lower price per share; (iv) indemnification of Thrasio by Silberstein for losses arising out of any claims or demands in connection with the July and August 2021 Secondary Sales; and (v) a mutual release of claims between Silberstein and Thrasio. The interests of Thrasio's directors (other than Silberstein) were aligned with Thrasio's interests in connection with the Separation Agreement.

49.     Accordingly, the Disinterested Directors concluded that there are no viable claims worthy of pursuit with respect to Thrasio's entry into the Separation Agreement.

### 2.    Consideration of Potential Estate Causes of Action Arising from the 2020 Tender Offer

50.     On July 1, 2020, Thrasio entered into the Series C Preferred Stock Purchase Agreement (as amended on July 20, 2020, the "Series C Agreement"). Pursuant to the Series C Agreement, Thrasio: (i) agreed to sell and issue approximately 5.6 million shares to third-party investors for approximately $259 million, net of issuance costs (the "Series C-1 Stock Issuance"); and (ii) agreed to launch the Tender Offer, as soon as reasonably practicable following the initial closing of the Series C-1 Stock Issuance, to purchase issued and outstanding shares of stock and vested warrants and options at a price per share equal to the Series C Agreement purchase price, using up to $160 million of the proceeds from the Series C-1 Stock Issuance. In August 2020, Thrasio completed the Tender Offer and repurchased approximately 3.1 million shares from existing shareholders for an aggregate price of approximately $146.5 million. The shares repurchased in the Tender Offer were retired by the Company.

51.     The Disinterested Directors concluded that the Series C-1 Stock Issuance and the Tender Offer should be viewed as a single, integrated transaction. The parties agreed to the Series C-1 Stock Issuance and the Tender Offer in a single contract (the Series C Agreement), and the Board approved issuing the Series C-1 Stock and launching the Tender Offer in a single

Unanimous Written Consent, dated as of July 1, 2020. Importantly, Thrasio would not have been required to launch the Tender Offer if the initial closing of the Series C-1 Stock Issuance did not occur. Taken as a whole, Thrasio netted over $112 million in cash from the Series C-1 Stock Issuance after the Tender Offer. Accordingly, the Disinterested Directors concluded that Thrasio likely received reasonably equivalent value in connection with the Series C Agreement, which would defeat a constructive fraudulent transfer claim.

52.     Following the initial closing of the Series C-1 Stock Issuance, the Board approved the consummation of the Tender Offer in a second Unanimous Written Consent, dated as of July 18, 2020. The July 18, 2020 Unanimous Written Consent states that the Board determined that Thrasio's available surplus as calculated in accordance with Delaware General Corporation Law was in excess of the aggregate purchase price to be paid in the Tender Offer, and that the Tender Offer would not impair the Company's capital. Given that Thrasio received approximately $259 million in cash in the Series C-1 Stock Issuance, while paying approximately $146.5 million in the Tender Offer—a net inflow of more than $112 million in cash—Thrasio's directors likely held a good faith belief that Thrasio had a surplus or other funds with which to effectuate the Tender Offer. Accordingly, the Disinterested Directors concluded that a claim asserting that the Tender Offer constituted an unlawful stock purchase or redemption under Delaware General Corporation Law is not worthy of pursuit.

53.     Even if the Tender Offer were viewed independently from the Series C-1 Stock Issuance (which is contrary to the Series C Agreement), the contemporaneous evidence demonstrates that the sophisticated and highly-experienced third-party equity investors in the Series C-1 Stock Issuance believed, based on due diligence, that the Company had significant equity value after accounting for the Tender Offer. Accordingly, the Disinterested Directors

concluded that a constructive fraudulent transfer claim relating to the Tender Offer is not worthy of pursuit. Further, the Disinterested Directors concluded that estate causes of action for breach of fiduciary duty or actual fraudulent transfer relating to the Tender Offer are not worthy of pursuit because, among other reasons, there were valid business reasons to enter into the Tender Offer and there are no indications that Thrasio intended to hinder, delay, or defraud its creditors.

54.    Accordingly, the Disinterested Directors concluded that there are no viable claims worthy of pursuit with respect to the Tender Offer.

## IV.    CONCLUSION AND EXPRESS RESERVATION OF RIGHTS BY DISINTERESTED DIRECTORS

55.    The Plan provides for the retention by the Debtors of the potentially viable causes of action worthy of pursuit identified by the Disinterested Directors. Importantly, neither the Disinterested Directors nor the Debtors make any representation as to whether the pursuit of any of the Retained Causes of Action will ultimately be successful or unsuccessful. Litigation is inherently uncertain and the ability to collect potential damages will depend upon a number of factors, including the probability of success in litigation, the difficulties in collection, and the expense and delay of litigation. These factors are not entirely within the Debtors' control and, notwithstanding the analysis contained herein, litigation of the Retained Causes of Action may not result in any incremental distributable value to the Estates. The Disinterested Directors reserve the right to continue the Independent Investigation of potential estate causes of action, including by evaluating additional document productions and further witness testimony. This could result in

further modifications to the Plan, including, without limitation, changes to the release and exculpation provisions and the Indemnification Obligations.

Dated: May 23, 2024                    Respectfully submitted,
       New York, New York

                              */s/  Steven J. Reisman*
                              **KATTEN MUCHIN ROSENMAN LLP**
                              Steven J. Reisman (admitted *pro hac vice*)
                              Cindi M. Giglio (admitted *pro hac vice*)
                              Marc B. Roitman (admitted *pro hac vice*)
                              Grace A. Thompson (N.J. Bar No. 294072022)
                              Loredana B. Miranda, Esq. (*pro hac vice* pending)
                              50 Rockefeller Plaza
                              New York, NY 10020-1605
                              Telephone: (212) 940-8700
                              Email:    sreisman@katten.com
                                         cgiglio@katten.com
                                         marc.roitman@katten.com
                                         grace.thompson@katten.com
                                         loredana.miranda@katten.com

                              -and-

                              Robert T. Smith (admitted *pro hac vice*)
                              Johnjerica Hodge (admitted *pro hac vice*)
                              1919 Pennsylvania Ave., NW. Suite 800
                              Washington, DC  20006-3404
                              Telephone: (202) 625-3500
                              Email:    robert.smith1@katten.com
                                         johnjerica.hodge@katten.com

                              *Counsel to Anthony R. Horton and Stefan M. Selig,*
                              *in their capacity as Disinterested Directors of*
                              *Thrasio Holdings, Inc.*