UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
UNITED STATES TRUSTEE, REGIONS 3 & 9
Jeffrey M. Sponder, Esquire
Lauren Bielskie, Esquire
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Fax: (973) 645-5993
Email: jeffrey.m.sponder@usdoj.gov
        lauren.bielskie@usdoj.gov

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Thrasio Holdings, Inc., *et al.*,[1] | : | Case No. 24-11840 (CMG) |
| | : | Jointly Administered |
| | : | |
| Debtors. | : | Hearing Date: June 10, 2024 at 10:00 a.m. |
| | : | |

**OBJECTION OF THE UNITED STATES TRUSTEE TO THE FIRST AMENDED JOINT
PLAN OF REORGANIZATION OF THRASIO HOLDINGS, INC. AND ITS DEBTOR
AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

The United States Trustee ("U.S. Trustee") by and through counsel, in furtherance of his

duties and responsibilities under 28 U.S.C. § 586(a)(3) and (5), hereby submits this objection

("Objection") to confirmation of the *First Amended Joint Plan of Reorganization of Thrasio*

*Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan")

(Dkt. 1066)[2], and respectfully states as follows:

---

[1] The last four digits of Debtor Thrasio Holdings, Inc.'s tax identification number are 8327. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.kccllc.net/Thrasio. The Debtors' service address for purposes of these chapter 11 cases is 85 West Street, 3rd Floor, Walpole, MA, 02081.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

## PRELIMINARY STATEMENT

1.      The Plan provides overbroad exculpation provisions, overbroad release provisions, impermissible third-party release provisions as they are not consensual, improper injunction provisions, and a gatekeeping function for the bankruptcy court.  In addition, the language in Art. VIII.A. of the Plan improperly suggests that the Plan itself is a settlement agreement subject to approval under Bankruptcy Rule 9019.  Further, the language included in the Plan concerning the payment of statutory quarterly fees should be revised to reflect the obligation of the Thrasio Legacy Trust and/or the Thrasio Legacy Trust Administrator's responsibility to pay statutory quarterly fees and the Reorganized Debtors obligation to pay statutory quarterly fees post Effective Date until the cases are converted, dismissed, or closed.  Also, there are other issues with the Plan including provisions concerning the closing of the cases, minimum distributions, deadline for filing a motion for reconsideration, final approval of Exit Facilities Documents, the non-disclosure of the Disbursing Agent, the Thrasio Legacy Trust Administrator and the Thrasio Legacy Trust Committee, the failure to include the Thrasio Legacy Trust Documents, and the allowance of revisions to the Restructuring Memorandum without notice and an opportunity to be heard.

## JURISDICTION

2.      Under (i) 28 U.S.C. § 1334, (ii) applicable order(s) of the United States District Court for the District of New Jersey issued pursuant to 28 U.S.C. § 157(a), and (iii) 28 U.S.C. § 157(b)(2), this Court has jurisdiction to hear and determine the Debtors' request for approval of the relief requested in the Motion and the matters raised in this Objection.

3.      The U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district, pursuant to 28 U.S.C. § 586.  This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted

by the courts to guard against abuse and over-reaching to assure fairness in the process and adherence to the provisions of the Bankruptcy Code. *See In re United Artists Theatre Co.*, 315 F.3d 217, 225 (3d Cir. 2003) ("U.S. Trustees are officers of the Department of Justice who protect the public interest by aiding bankruptcy judges in monitoring certain aspects of bankruptcy proceedings."); *United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294, 298 (3d Cir. 1994) ("It is precisely because the statute gives the U.S. Trustee duties to protect the public interest . . . that the Trustee has standing to attempt to prevent circumvention of that responsibility."); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 499 (6th Cir. 1990) ("As Congress has stated, the U.S. trustees are responsible for protecting the public interest and ensuring that the bankruptcy cases are conducted according to [the] law").

4.      Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor and comment on plans and disclosure statements filed in chapter 11 cases.

5.      Under section 307 of title 11 of the United States Code (the "Bankruptcy Code" or "Code"), the U.S. Trustee has standing to be heard on the Debtors' request for confirmation of the Plan.

**BACKGROUND**

**General Background**

6.      On February 28, 2024 ("Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). *See* Lead Case No. 24-11840, at Dkt. 1.

7.      As described in the Declaration of Josh Burke, Chief Financial Officer of Thrasio Holdings, Inc. (the "Burke Declaration"), which was filed on the Petition Date, "Thrasio acquires seller brands and their underlying business from founders or owners and consolidates these

businesses into Thrasio's platform. After completing an acquisition, Thrasio works to generate

cost-saving and revenue enhancing synergies with other businesses in its portfolio to facilitate

growth. This provides sellers with an "exit" from the business and positions Thrasio to realize the

full potential of these brands. Thrasio's current management team has deep experience in growing

such brands—by using data science, logistical and marketing expertise, and a deep understanding

of the e-commerce space, Thrasio allows a brand to expand its offerings. Thrasio also expertly

navigates the Amazon selling process to position its brands to better reach and serve customers

around the globe." *See* Dkt. 38 at ¶ 2.

8.     On March 1, 2023, the Court entered an Order directing that these cases be jointly

administered. *See* Dkt. 64.

9.     The Debtors continue to operate their business(es) as debtors in possession pursuant

to 11 U.S.C. §§ 1107 and 1108.

10.    No trustee or examiner has been appointed in these chapter 11 cases.

11.    On March 12, 2024, the U.S. Trustee filed a *Notice of Appointment of Official

Committee of Unsecured Creditors* (the "UCC"). *See* Dkt. 163.

**Plan and Disclosure Statement**

12.    At the outset of these cases, the Debtors filed a *Joint Plan of Reorganization of

Thrasio Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*,

and corresponding *Disclosure Statement. See* Dkts. 40 and 41.

13.    On April 16, 2024, the Debtors filed an *Amended Disclosure Statement for the Joint

Plan of Reorganization of Thrasio Holdings, Inc, and its Debtor Affiliates Pursuant to Chapter 11

of the Bankruptcy Code. See* Dkt. 375.

14.     On April 18, 2024, the Debtors filed a *Second Amended Disclosure Statement for the Joint Plan of Reorganization of Thrasio Holdings, Inc, and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code.* *See* Dkt. 392.

15.     In addition, on April 18, 2024, the Debtors filed a separate *Second Amended Disclosure Statement for the Joint Plan of Reorganization of Thrasio Holdings, Inc, and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement"), which appears to be the "Solicitation Version", and the *Joint Plan of Reorganization of Thrasio Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, and corresponding *Disclosure Statement.* *See* Dkts. 397 and 398.

16.     Also, on April 18, 2024, the Court entered an *Order Approving (I) the Adequacy of the Second Amended Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto.* *See* Dkt. 399.  The Court scheduled a confirmation hearing for May 22, 2024, which was adjourned to June 10, 2024.  *See id.*

17.     On May 23, 2024, the Debtors filed *a Notice of Filing of Plan Supplement* (the "Plan Supplement").  *See* Dkt. 805.  The Plan Supplement includes a Schedule of Assumed Executory Contracts and Leases, a Schedule of Rejected Executory Contracts and Leases, a Retained Causes of Action List, a Restructuring Transactions Memorandum, an Exit Take Back Credit Agreement Term Sheet, and Independent Investigation Results.  *See id.*

18.     The Plan Supplement fails to include the: (i) Management Incentive Plan[3]; and (ii) a Governance Term Sheet.  In addition, the Plan Supplement only includes the Exit Take Back Credit Agreement Term Sheet and does not include the specific agreements.

---

[3] Art. IV.P of the Plan provides that "[t]he New Board shall be authorized to adopt and implement the Management Incentive Plan, which shall be set forth in the Plan Supplement." *See* Dkt. 1066 at Art. IV.P.

19.     On June 4, 2024, at 11:42 p.m., the Debtors filed a *First Amended Joint Plan of Reorganization of Thrasio Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"). *See* Dkt 1066.

20.     The Plan provides for a Plan Restructuring where each Holder of an Allowed First Lien Claim will receive its *pro rata* share of 100% of the New Common Stock, subject to dilution by the (i) DIP Exit Fee, (ii) Backstop Payment, and (iii) Management Incentive Plan. *See* Dkt. 1066 at Art. III.C.3.  In addition, "[t]he Reorganized Debtors or the Thrasio Legacy Trust, as applicable, will fund distributions under the Plan with Cash on hand on the Effective Date, the revenues and proceeds of all assets of the Debtors, the Exit Facilities, and the New Common Stock." *See id.* at Art. IV.D.   Further, the Plan also incorporates the Committee Settlement, which requires the formation of the Thrasio Legacy Trust, the appointment of the Thrasio Legacy Trust Administrator and the appointment of the Thrasio Legacy Trust Committee. *See id.* at Art. IV.J.   The Thrasio Legacy Trust will be funded by the Debtors through the Thrasio Legacy Trust Initial Funding of $5 million on the Effective Date to pursue any claim, right or cause of action including the Vested Causes of Action. *See id.* at Art. I.A., ¶ 165 and Art. IV.J.2.  Distributions of the Thrasio Legacy Trust Proceeds will be made according to the following waterfall:  "(i) The Reorganized Debtors shall receive 80% of any Thrasio Legacy Trust Proceeds and Thrasio Legacy Trust shall receive 20% of Thrasio Legacy Trust Proceeds until the Thrasio Legacy Trust Initial Funding is repaid in full ("Distribution A"); (ii) After Distribution A, Holders of First Lien Deficiency Claims shall receive 70% of any Thrasio Legacy Trust Proceeds and Holders of General Unsecured Claims that are not First Lien Deficiency Claims shall receive 30% of Thrasio Legacy Trust Proceeds until the First Lien Lenders receive $3.5 million in distributions to compensate the Reorganized Debtors for the professional fees associated with the Independent Investigation and the Committee's

investigation ("Distribution B"); (iii) After Distribution A and Distribution B, Thrasio Legacy Trust

Proceeds shall vest in Thrasio Legacy Trust to be distributed *pro rata* to holders of Thrasio Legacy

Trust Interests." *See id.* at Art. IV.J.6.

21.     The Plan includes Release, Exculpation, and Injunction provisions. *See id*. at Art.

VIII.  The releases include Debtor releases and third-party releases. *See id*.

## OBJECTION

### I.     Confirmation of the Plan

22.     A chapter 11 plan cannot be confirmed unless the court finds the plan complies with

the provisions of 11 U.S.C. § 1129(a). *See Matter of Greate Bay Hotel & Casino, Inc.*, 251 B.R.

213, 220-21 (Bankr. D.N.J. 2000).  Even where there are no objections to a plan, a court must find

that the debtor fulfilled the requirements of Section 1129(a).  *In re Friese*, 103 B.R. 90, 91 (Bankr.

S.D.N.Y. 1989).  A plan proponent bears the burden of proof with respect to each and every element

of section 1129(a).  *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del.

2001).

23.     "Release and exculpation clauses have also been found to be subject to review

pursuant to section 1129(a)(1)."  *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J.

2010), *citing In re Whispering Pines Estates, Inc.*, 370 B.R. 452, 459 (1st Cir. BAP 2007).

Accordingly, complying with section 1129(a) requires that a plan not include improper release and

exculpation language.

24.     There are numerous ways in which the release and exculpation provisions set forth

in the Plan are contrary to applicable case law, including the standards set forth in *In re Wash. Mut.,

Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011), *In re Tribune Company*, 464 B.R. 126 (Bankr. D. Del.

2011) *and In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000).

A.     **The Exculpation Clause is Impermissibly Broad**

25.     The Plan defines "**Exculpated Parties**" as follows:

> means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Lenders; (d) the DIP Lenders; (e) the Ad Hoc Group and each member of the Ad Hoc Group; (f) the Committee and each member of the Committee; (g) the Administrative Agent; (h) each lender and Issuing Banks and other secured parties under the First Lien Credit Agreement; (i) the DIP Backstop Parties; (j) each current and former wholly-owned Affiliate of each Entity in clause (a) through the following clause (k); and (k) each Related Party of each Entity in clauses (a) through this clause (k) that is not an Excluded Party.

*See* Dkt. 1066 at Art. I.A., ¶ 75.

26.     The Plan defines "**Related Party**" as follows:

> means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, successors, assigns, subsidiaries, partners, limited partners, general partners, principals, members, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (including any attorneys or professionals retained by any current or former director or manager of a Debtor in his or her capacity as director or manager as a Debtor), in each case, other than the Excluded Parties.

*See id.* at ¶ 129.

27.     The section of the Plan entitled "**Exculpation**" provides, in part, that:

> Except as otherwise expressly provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Independent Investigation, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Independent Investigation, the filing of the Chapter 11 Cases, the participation in the DIP Facility, the pursuit of Confirmation, the pursuit of Consummation, the administration and

8

> implementation of the Plan, including the issuance of securities pursuant to the Plan, the Plan Supplement, any Definitive Document, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*See id*. at Art. VIII.G.

28.     The Plan's definition of Exculpated Parties is inconsistent with controlling case law because it is not limited to estate fiduciaries.   In *In re PWS Holding Corp*., the Third Circuit considered whether an official committee of unsecured creditors could be exculpated, and held that 11 U.S.C. § 1103(c) implies both a fiduciary duty and a limited grant of immunity to members of the unsecured creditors' committee. 228 F.3d 224, 246 (3d Cir. 2000).   As stated by the court in *Washington Mutual*, an "exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceedings: estate professionals, the Committees and their members, and the Debtors' directors and officers."  442 B.R. at 350-51 (emphasis added).   The court in *In re Tribune Company*, 464 B.R. 126 (Bankr. D. Del. 2011), agreed with the holding in *Washington Mutual* relating to exculpated parties, and held that the exculpation clause in Tribune, "must exclude non-fiduciaries."  *Id*. at 189, *quoting Wash. Mut.*, 422 B.R. at 350-51; *accord*, *Indianapolis Downs*, 486 B.R. 286 (Bankr. D. Del. 2013); *see also In re Diocese of Camden, New Jersey,* 653 B.R. 309, 358-9 (Bankr. D.N.J. 2023) ("the estate itself cannot be granted immunity, nor can consultative bodies that do not qualify as 'fiduciaries' under the Bankruptcy Code.").

29.     Contrary to these limits of exculpation, the Plan includes as "Exculpated Parties" –

and within that definition "Related Parties" – numerous entities that are not fiduciaries of the estate.

The Exculpated Parties should be limited to estate fiduciaries.  As such, the Plan cannot be

confirmed unless its definition of Exculpated Parties is limited to: **(i)** the Debtors; **(ii)** the directors

and officers of the Debtors who served during any portion of the cases; **(iii)** the Committee; **(iv)** the

members of Committee, in their capacity as such; and **(v)** the professionals retained in these cases

by the Debtors and the Committee.  *See Wash. Mut.*, 442 B.R. at 350-51 (an "exculpation clause

must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate

professionals, the Committees and their members, and the Debtors' directors and officers.").

### B.     The Release Clauses are Impermissible under Applicable Law

30.     The Plan defines "**Released Party**" as follows:

> means, collectively, and in each case in its capacity as such: (a) each Debtor;
> (b) each Reorganized Debtor; (c) the Consenting Lenders; (d) the DIP
> Lenders; (e) the DIP Agent; (f) the Ad Hoc Group and each member of the
> Ad Hoc Group; (g) the Committee and each member of the Committee; (h)
> the Administrative Agent; (i) the Arrangers, each lender, and Issuing Banks
> and other secured parties under the First Lien Credit Agreement; (j) the DIP
> Backstop Parties; (k) each current and former wholly-owned Affiliate of
> each Entity in clause (a) through the following clause (l); and (l) each
> Related Party of each Entity in clauses (a) through this clause (l); *provided,*
> *however*, that each Entity that timely and properly opts out of the releases
> contemplated herein shall not be a Released Party, provided, further, that
> the Excluded Parties shall not be deemed Released Parties.

*See* Dkt. 1066 at Art. I.A., ¶ 130.

31.     The Plan defines "**Releasing Parties**" as follows:

> means, collectively, and in each case in its capacity as such: (a) each Debtor;
> (b) each Reorganized Debtor; (c) the Consenting Lenders; (d) the DIP
> Lenders; (e) the Ad Hoc Group and each member of the Ad Hoc Group; (f)
> the Committee and each member of the Committee; (g) the Administrative
> Agent; (h) the Arrangers, each lender, and Issuing Banks and other secured
> parties under the First Lien Credit Agreement; (i) the DIP Backstop Parties;
> (j) all Holders of Claims; (k) all holders of Interests; (l) each current and

former wholly-owned Affiliate of each Entity in clause (a) through the following clause (m); and (m) each Related Party of each Entity in clauses (a) through this clause (m); *provided, however*, that each Entity that timely and properly opts out of the releases contemplated herein shall not be a Releasing Party; *provided, further, however*, that any Holder of Interests who acquired such Interests after the Voting Record Date (as such term is defined in the Disclosure Statement Order) and did not receive an opt out election form shall not be a Releasing Party, provided further, however, that the Excluded Parties shall not be deemed Released Parties.

*See id.* at Art. I.A., ¶ 131.

32.     The section of the Plan entitled "**Debtor Release**" provides, in part, that:

for good and valuable consideration … each Released Party is hereby deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Documents, the Preferred Equity Documents, the Exit Facilities, the Exit Facilities Documents, the DIP Facility, the DIP Orders, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, any Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, the Plan Supplement, any Definitive Document, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or willful misconduct. For the avoidance of doubt, any Claims or Causes of Action relating to actual fraud or willful misconduct shall not be released, and such claims shall be Vested Causes of Action that shall vest in, are preserved for, and may be pursued by Thrasio Legacy Trust. Notwithstanding anything to the contrary in the foregoing, the releases set

forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to (a) a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement or (b) the Committee Settlement. Notwithstanding anything contained in the Plan, any ballot, any prior order of the Court, or otherwise, none of the Excluded Parties shall be Released Parties or Releasing Parties under the Plan.

*See id*. at Art. VIII.E.

33.     The section entitled "**Release by Holders of Claims or Interests**" provides, in part, that:

each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Documents, the Preferred Equity Documents, the Exit Facilities, the Exit Facilities Documents, the DIP Facility, the DIP Orders, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, any Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, the Plan Supplement, any Definitive Document, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or willful misconduct. For the avoidance of doubt, any Claims or Causes of Action relating to actual fraud or willful misconduct shall not be released, and such claims shall be Vested Causes of Action that shall vest in, are preserved for, and may be pursued by Thrasio Legacy Trust.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan,

any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to (a) a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement or (b) the Committee Settlement. Notwithstanding anything contained in the Plan, any ballot, any prior order of the Court, or otherwise, none of the Excluded Parties shall be Released Parties or Releasing Parties under the Plan.

*See id*. at Art. VIII.F.

34.     The provision further provides, in part:

Without limiting the foregoing, from and after the Effective Date, any Entity that is given the opportunity to opt out of the releases contained in this Article VIII.F and does not exercise such opt out may not assert any claim or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors. From and after the Effective Date, any Entity (i) that opted out of the releases contained in this Article VIII.F or (ii) was deemed to reject the Plan may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in Article VIII.F of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article VIII.F of the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in Article XI of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

*See id*.

35.     The Solicitation Packages sent to various claimants include opt-out forms or a ballot with a separate opt-out check box.  *See* Dkt. 399.  The opt-out forms and ballots provide,

AN ENTITY SHALL BE NEITHER A RELEASING PARTY NOR A RELEASED PARTY IF IT VALIDLY OPTS OUT OF THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN.  YOU MAY ELECT NOT TO GRANT AND RECEIVE THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN ONLY IF YOU RETURN A BALLOT CHECKING THE BOX TO "OPT OUT" FROM THE THIRD-PARTY

RELEASE. SUBJECT TO ANY FINAL ORDER OF THE
BANKRUPTCY COURT TO THE CONTRARY, REGARDLESS OF
WHETHER THE BANKRUPTCY COURT DETERMINES THAT YOU
HAVE A RIGHT TO OPT OUT OF THE RELEASE, IF YOU (A) VOTE
TO ACCEPT THE PLAN, (B) FAIL TO SUBMIT A BALLOT BY THE
VOTING DEADLINE, (C) SUBMIT THE BALLOT BUT ABSTAIN
FROM VOTING TO ACCEPT OR REJECT THE PLAN, OR (D) **VOTE**
TO REJECT THE PLAN AND, IN EACH CASE, FAIL TO CHECK THE
BOX TO "OPT OUT" FROM THE THIRD PARTY RELEASE, YOU
WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH
IN ARTICLE VIII OF THE PLAN. THIS MEANS THAT THE DEBTORS
WILL RELEASE ANY CLAIMS AND CAUSES OF ACTION THE
DEBTORS HAVE AGAINST YOU, EXCEPT FOR RETAINED
PREFERENCE CLAIMS, IF APPLICABLE. IF YOU ELECT TO OPT
OUT OF THE THIRD-PARTY RELEASE SET FORTH IN ARTICLE
VIII OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF
OBTAINING THE DEBTOR RELEASE SET FORTH IN ARTICLE
VIII.E OF THE PLAN. THIS MEANS THAT THE REORGANIZED
DEBTORS MAY PURSUE ANY CLAIMS AND CAUSES OF ACTION
THE DEBTORS HAVE AGAINST YOU. IF YOU DO NOT OPT OUT
OF THE THIRD-PARTY RELEASE, YOU WILL BE RELEASED FROM
ANY AND ALL CLAIMS AND CAUSES OF ACTION THE DEBTORS
MAY HAVE AGAINST YOU, EXCEPT FOR RETAINED
PREFERENCE CLAIMS, IF APPLICABLE.

*See id.* (emphasis omitted). As set forth in the opt-out forms and ballots, a claimant that votes to reject the plan but does not separately check the box to opt-out of the releases will nonetheless be considered to consent to the releases set forth in Art. VIII.F. *See id.* Additionally, a claimant that is entitled to vote but abstains from voting and does not affirmatively opt-out, in other words, does not return an opt-out form or ballot, will also be deemed to consent to the releases set forth in Art. VIIIF. *See id.*

### i.      Certain of the Debtor Releases are Overly Broad

36.     The Plan provides for a release by the Debtors to the Released Parties. *See* Dkt. 1066 at Art. VIII.E.

37.     The Plan does not establish that each of the proposed Released Parties are providing adequate consideration in exchange for receiving such releases. In addition, certain persons

included in the Released Party definition do not appear to be entitled to such releases under applicable case law.

38.    In *In re Zenith Elecs. Corp.*, the Court identified five factors that are relevant to determine whether a debtor's release of a non-debtor is appropriate:

> (1) an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources;
>
> (2) a substantial contribution to the plan by the non-debtor;
>
> (3) the necessity of the release to the reorganization;
>
> (4) the overwhelming acceptance of the plan and release by creditors and interest holders; and
>
> (5) the payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*See Zenith*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (*citing Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994).   These factors are neither exclusive nor conjunctive requirements but provide guidance in the court's determination of fairness. *See Master Mortgage*, 168 B.R. at 935 (finding there is no "rigid test" to be applied in every circumstance and that the five factors are neither exclusive, nor conjunctive).

39.     The first *Zenith* factor requires an "identity of interest between the debtor and the third-party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate." *See In re Spansion, Inc.*, 426 B.R. 114, n. 47 (Bankr. D. Del. 2010), *citing Zenith*, 241 B.R. at 110.  An identity of interest exists when, among other things, the debtor has a duty to indemnify the non-debtor receiving the release.  *See Wash. Mut.*, 442 B.R. at 347 (recognizing that indemnification may create an identity of interest thereby satisfying the first factor of *Zenith*).  Here, it is unclear whether an identity of interest exists between the Debtors and each of the Released Parties.

40.     The second *Zenith* factor involves whether the non-debtor party benefiting from the release made a substantial contribution of assets to the debtor's reorganization.  *See In re Congoleum Corp*., 362 B.R. 167, 193 (Bankr. D.N.J. 2007).  In considering releases, substantial contribution does not include contributions to the reorganization related to operational restructuring or negotiating for the financial restructuring.  *See In re Genesis Health*, 266 B.R. at 606-7 ("the officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' to the reorganization.").  Here, it does not appear that each of the Released Parties provided a substantial contribution of assets.

41.     As to the third *Zenith* factor, there is no information provided to support a contention that all of the releases are necessary to a reorganization.

42.     The fourth *Zenith* factor concerning acceptance of the plan cannot be assessed at this time as the Debtors have not filed a certification of ballots.

43.     The fifth *Zenith* factor is not satisfied as it does not appear that unsecured creditors will receive all or substantially all of their claims.  Accordingly, these factors do not support the Debtor Releases.

**ii.        The Opt-Out Clause is Insufficient**

44.     The third-party release in Art. VIII.F of the Plan covers those who do not affirmatively opt-out of the releases including claimants that vote to reject the Plan, claimants that do not vote on the Plan and do not return a ballot, and claimants deemed to reject the Plan. Accordingly, the U.S. Trustee submits that these are not consensual third-party releases and are contrary to applicable case law, including the standards set forth in *Washington Mutual*.

16

45.     In *Washington Mutual*, the court held that "any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases." *Wash. Mut.*, 442 B.R. at 355.  The court clarified that merely having an opt out mechanism is not enough, holding that an "opt out mechanism is not sufficient to support the third party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place.").  *Id*. (emphasis added).  "*Failing to return a ballot is not a sufficient manifestation of consent to a third party release*."  *Id*. (emphasis added), *citing In re Zenith Electronics Corp.*, 241 B.R. at 111.

46.     While the court in *In re Indianapolis Downs*, LLC 486 B.R. 286 (Bankr. D. Del. 2013) reached a different conclusion regarding the need for affirmative consent to third-party releases, the court pointed out that, in that case, unlike the present, "the third party release provision does not apply to any party that is deemed to reject the Plan." *Id.* at 305.

47.     The court in *Spansion* also reached a different conclusion than *Washington Mutual* and the other cases cited above with respect to affirmative consent, but only with respect to releases given by unimpaired classes who were "being paid in full." 426 B.R. at 144.  In fact, in *Spansion*, the court held that non-consensual releases being deemed to be given by parties who were not receiving any distribution under the plan did not pass muster under applicable law, and therefore, "the proposed nonconsensual Third Party Release does not pass muster under *Continental*."  *See id*. at 145, *citing Continental Airlines*, 203 F.3d 203.

48.     In *Emerge Energy Services LP*, 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019), the court rejected the debtor's argument that inferred consent from "silence" should be approved as typical, customary, and routine.  The court held that failure to return a notice can be due to

"carelessness, inattentiveness, or mistake" rather than constituting the manifestation of intent to agree to a third-party release. *Id.*

49.     Here, claimants who are deemed to reject the Plan are treated as giving a release, claimants who do not return a ballot at all are treated as giving a release and claimants who vote to reject the plan but fail to take the extra step of checking an opt-out box – a step that may appear to be superfluous because they have already rejected the plan in its entirety – are also treated as giving a release.

50.     The only way releases should be granted by a creditor that does not opt-out is that if that creditor affirmatively voted in favor of the Plan.  A creditor that rejects the Plan, or that is deemed to reject the Plan, should not be required to also opt-out of the releases.  Additionally, a creditor that takes no action should not be treated as giving affirmative consent.

### iii.     The Non-Debtor Third-Party Releases are Not Fair and Necessary to the Reorganization

51.     Non-consensual third-party releases may only be approved under "special circumstances" if the releases are fair, necessary to the reorganization, and the debtor presents facts sufficient to enable the Court to make those findings.  *See In re Continental Airlines*, 203 F.3d at 214.

52.     In *Continental Airlines*, the Third Circuit determined that fairness requires, among other things, a showing that sufficient consideration was given to creditors whose claims were to be released and that such consideration renders the plan feasible.  203 F.3d at 213-14.  The Third Circuit further noted that the success of the plan must be based on the releases, and that there is an identity of interest between the debtor and the non-debtor so that the debtor would likely bear the costs of the litigation against the non-debtor.  *See id*. at 216.

53.     In *Genesis Health*, the court evaluated whether a non-consensual release fit the "hallmarks" discussed in *Continental* by considering whether: (i) the nonconsensual release was necessary to the success of the reorganization; (ii) the releasees provided a critical financial contribution to the debtor's plan; (iii) the releasees' financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the non-consenting creditors, i.e., whether the non-consenting creditors received reasonable compensation in exchange for the release. In other words, to establish the necessity of such releases, the court declared that the debtors were required to demonstrate that the success of its reorganization was related to such non-consensual releases and the releasees provided a "critical financial contribution" that was necessary to render the plan feasible. *See id.* at 607.

54.     Here, the Debtors have not established the necessity of the releases.

### iv.    Gatekeeping Provision

55.     In addition, the Plan provides that any Entity that opted-out of the releases contained in Art. VIII.F of the Plan, or was deemed to reject the Plan, may not assert any claim or other Cause of Action against any Released Party without first obtaining a Final Order from the Bankruptcy Court: (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article VIII.F of the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party. *See* Dkt. 1066 at Art. VIII.F (full provision set forth at paragraph 36, supra).

56.     The effect of this language is to create a "gatekeeper" role for this Court. It forces a non-debtor who wishes to pursue a claim against another non-debtor to return to this Court – and only this Court – for a determination of whether such claim is "colorable." Thereafter, this Court would have the "sole and exclusive jurisdiction . . . to adjudicate the underlying claim or Cause of

Action." These rules would apply even after these bankruptcy cases have been closed, thereby requiring the non-debtor seeking to pursue a claim against another non-debtor to first move to reopen the bankruptcy cases.

57. The proposed required procedure, which is akin to that to be followed under *Barton v. Barbour*, 104 U.S. 126 (1881), prior to suing a bankruptcy trustee, should not be permitted. The defense of "release" is an affirmative defense to a cause of action asserted in a court of law or other tribunal. Affirmative defenses cannot be adjudicated prior to the filing of the action to which such defense relates. Moreover, as to claims between non-debtors, there is no reason why the court in which the relevant action has been filed cannot make the determination as to whether the claim was released under the Plan.

58. A similar provision was rejected by Judge Owens in the Bankruptcy Court for the District of Delaware in *In re Gulf Coast Health Care, LLC*, et al, Case No. 21-11336 (JTD), where she noted "the plan says what it says and other courts should be entitled to exercise their authority to interpret it." Further, "imposing such a requirement could also impose an unnecessary administrative hurdle and cost the parties when these cases are closed." *See Gulf Coast*, 5/4/22 Tr. at 30:18-23 (attached hereto as Exhibit A).

59. Such provision requiring non-consenting parties to request authorization to bring a claim or Cause of Action against a Released Party should be stricken from the Plan.

**C.     The Injunction Provisions are Impermissible**

60. The section of the Plan entitled "**Injunction**" provides as follows:

> Except as otherwise specifically provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized

Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; and (d) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

*See id*. at Art. VIII.H.

61.     Pursuant to section 524(a)(3), confirmation of a plan does not operate as an injunction.  Only a discharge operates as an injunction.  Instead, pursuant to section 362(c), the automatic stay remains in effect until such time as a discharge is granted or the case is closed.  Additionally, pursuant to section 1141(a), the provisions of a confirmed plan bind all parties, including debtors and creditors, to the terms of the plan.

62.     Because the Bankruptcy Code protects the Debtors by continuing the automatic stay until the earlier of entry of a discharge or the case is closed (11 U.S.C. § 362(c)), and by binding all parties to the terms of the Plan (11 U.S.C. § 1141(a)), the U.S. Trustee submits that Art. VIII.H be removed.

**D.     The Plan Cannot be Confirmed Because it is Not a Settlement Subject to Approval Under Bankruptcy Rule 9019**

63.     Art. VIII.A. of the Plan, entitled "Compromise and Settlement of Claims, Interests, and Controversies" provides:

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the  distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a

Claim or interest may have, or any distribution to be made on account of such Allowed Claim or Allowed interest hat have been effectuated through a Rule 9019 Order, or otherwise expressly identified as a settlement as may be set forth herein.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims, Interests, and controversies, including as pursuant to the Committee Settlement, as well as a finding by the Bankruptcy Court that such compromise or settlement is  in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the bankruptcy Court, after the effective Date, the Reorganized Debtors may compromise and settle any Claims and Causes of Action against other Entities.

*See* Dkt. 1066 at Art. VIII.A.

64.    Bankruptcy Rule 9019(a) confers discretion on the bankruptcy court to approve a compromise or settlement on motion after notice and a hearing. Fed. R. Bankr. P. 9019(a).  "In making its evaluation, the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'" *Wash. Mut.*, 442 B.R. at 328 (*quoting In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).

65.    Section 1123(b)(3)(A) allows a plan proponent to propose "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A).

66.    While a plan may incorporate a settlement, a plan and a settlement are not one and the same.  What may be permissible under a negotiated settlement agreement, that is considered "fair, reasonable, and in the best interest of the estate" is different than what may be permissible under a plan, which is subject to the requirements of sections 1123 and 1129 of the Bankruptcy Code.  *See, e.g., Tribune*, 464 B.R. at 176 (concluding at confirmation stage that a negotiated settlement could be approved because it was fair, reasonable and in the best interest of the Debtors'

estates and making an express finding that the settlement was properly part of the plan pursuant to section 1123(b)(3)(A)).

67.     The language in Art. VIII.A. suggests that the Plan itself is a settlement agreement subject to approval under Bankruptcy Rule 9019.  Sending a plan to impaired creditors for a vote is not the same thing as parties negotiating a settlement among themselves.

68.     Further, Art. VIII.A. does not appear limited to the settlement of claims belonging to the Debtors or the estates and is therefore not permissible under section 1123(b)(3)(A).  For a plan to incorporate a settlement of claims or causes of action of other parties, those parties must have expressly agreed to settle or compromise those items.

69.     The releases described in Art. VIII.F of the Plan are not part of any agreement between the Debtors and all parties affected by the Plan.

70.     Moreover, under section 1123(b)(3)(A), the Plan may only provide for the settlement of claims or interests belonging to the Debtors or the estate-not the settlement of claims held by third parties.

**E.     Statutory Quarterly Fees**

71.     The Plan provides for the creation of the Thrasio Legacy Trust to be established on the Effective Date to receive the Thrasio Legacy Trust Initial Funding ($5 million) and to hold the Thrasio Legacy Interests.  *See* Dkt. 1066 at Art. IV.J.  One of the responsibilities of the Thrasio Legacy Trust is to make "distributions to Holders of Allowed General Unsecured Claims as contemplated by the Plan."  *See id.* at Art. IV.J.4.  The Thrasio Legacy Trust Administrator is selected to administer the Thrasio Legacy Trust.  *See id.* at Art. 1.A., ¶ 162.

72.     Thrasio Legacy Trust Proceeds is defined in the Plan as "any proceeds derived from the Vested Causes of Action, the claims underlying the Vested Causes of Action, or any settlements

related thereto." *See id.* at Art. 1.A., ¶ 167.  Vested Causes of Action is defined in the Plan as "(i)

any Claims and Causes of Action, including Avoidance Actions, against Excluded Parties and (ii)

all Claims and Causes of Action not released under the Plan." *See id.* at Art. 1.A., ¶ 172.

73.   Art. III.C.4 of the Plan provides that the Debtors' unsecured creditors receive their

*pro rata* share of the Thrasio Legacy Trust interests.  *See id.* at Art. III.C.4.  More particularly,

holders of general unsecured claims that do not hold First Lien Deficiency Claims are entitled to

their *pro rata* share of 50% of the Thrasio Legacy Trust Interests and holders of general unsecured

claims that hold a First Lien Deficiency Claim are entitled to their *pro rata* share of 50% of the

Thrasio Legacy Trust Interests.  *See id.*  Thrasio Legacy Trust Interests is defined in the Plan as

"100% of the interests in Thrasio Legacy Trust." *See id.* at Art. 1.A., ¶ 166.

74.   Art. II.F. of the Plan provides the following:

> All fees due and payable pursuant to 28 U.S.C. § 1930(a)(6) plus any
> interest due and payable under 31 U.S.C. § 3717 (together, the "Quarterly
> Fees") before the Effective Date shall be paid by the applicable Reorganized
> Debtor (or the Disbursing Agent on behalf of each applicable Reorganized
> Debtor) for each quarter (including any fraction thereof) until such
> Reorganized Debtor's Chapter 11 Case is converted, dismissed, or closed,
> whichever occurs first.

*See id.* at Art. II.F.

75.   The language in Art. II.F. of the Plan provides that the Reorganized Debtors will pay

Quarterly Fees due and owing to the U.S. Trustee prior to the Effective Date for each quarter until

the case is converted, dismissed, or closed.  However, the Reorganized Debtors are also responsible

for paying Quarterly Fees due and owing after the Effective Date until the cases are converted,

dismissed, or closed.  In addition, the language in Art. II.F of the Plan does not require the Thrasio

Legacy Trust and Thrasio Legacy Trust Administrator to pay Quarterly Fees concerning any

disbursements of the proceeds of any resolutions of the causes of action transferred to it by the

Debtors until the cases are converted, dismissed, or closed.  Perhaps this may have been an oversight with the addition of the Committee Settlement.

76.     Art. II.F. currently would allow the Thrasio Legacy Trust and the Thrasio Legacy Trust Administrator to liquidate what are currently assets of the Debtors' bankruptcy estates and pay the proceeds to recipients that are currently the Debtors' unsecured creditors, yet still avoid paying the mandatory quarterly fee imposed by section 1930(a)(6).

77.     Art. II.F. of the Plan should be revised to reflect that the Debtors, the Reorganized Debtors, the Thrasio Legacy Trust, the Thrasio Legacy Trust Administrator, and any entity making disbursements on behalf of any Debtor or any Reorganized Debtor, or making disbursements on account of an obligation of any Debtor or any Reorganized Debtor are joint and severally liable for the payment of statutory quarterly fees.  In addition, the provision should provide that all monthly operating reports to be filed prior to the Effective Date will be filed using UST Form 11-MOR and that all quarterly operating reports to be filed after the Effective Date will be filed using UST Form 11-PCR.

78.     As such, the U.S. Trustee requests the removal of Art. II.F of the Plan and that it be replaced with the following language:

> All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Debtors, the Reorganized Debtors, the Thrasio Legacy Trust Administrator, the Thrasio Legacy Trust, and any entity making disbursements on behalf of any Debtor or any Reorganized Debtor, or making disbursements on account of an obligation of any Debtor or any Reorganized Debtor (each a "Disbursing Entity") shall be jointly and severally liable to pay Quarterly Fees when due and payable.  The Debtors shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Thrasio Legacy Trust Administrator, the Thrasio Legacy Trust, the Reorganized Debtors, and any Disbursing Entities shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  Each and every one of

the Debtors, the Reorganized Debtors, the Thrasio Legacy Trust Administrator, the Thrasio Legacy Trust, and Disbursing Entities shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

**F.    Miscellaneous Objections**

79.    Pursuant to the Plan and upon the Effective Date, the Debtors seek authority to close all but one of the cases, and to have all contested matters relating to each of the Debtors, including objections to claims, proceed in the one remaining open case:

> Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases, except for the Chapter 11 Case of one Debtor entity, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of such Debtor entity. When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of the remaining Debtor entity in accordance with the Bankruptcy Code and the Bankruptcy Rules.

*See* Dkt. 1066 at Article IV.Q.

80.    Section 350 allows a court to close a case after an estate has been fully administered and the court has discharged the trustee.  *See* 11 U.S.C. 350.  In addition, Fed. R. Bankr. P. 3022 allows a court on its own motion or on a motion from a party-in-interest to enter a final decree closing a case after an estate has been fully administered.  *See* Fed. R. Bankr. P. 3022.  Further, D.N.J. LBR 3022-1 provides that a court will close a chapter 11 case 180 days after entry of the order confirming the plan.  *See* D.N.J. LBR 3022-1.

81.    Pursuant to the above-referenced statute and rules, only fully administered cases are to be closed.  Here, upon the Effective Date, Debtors will be authorized to close all but one of their cases without a showing that such cases are fully administered.  Any such language permitting the

closing of cases upon occurrence of the Effective Date should be removed.  At worst, the language

in the Plan should be revised to require a motion to be filed to close any cases:

> Upon the occurrence of the Effective Date, the Reorganized Debtors **may** ~~**shall**~~ **seek authority from the Bankruptcy Court** ~~**be permitted**~~ to close all of the Chapter 11 Cases, except for the Chapter 11 Case of one Debtor entity, and all contested matters relating to each of the Debtors, including objections to Claims, **which would** ~~**shall**~~ be administered and heard in the Chapter 11 Case of such Debtor entity.

In addition, if the Debtors are able to close all but one of their cases, they will seek authority from

the Court to close the remaining case when all Disputed Claims become Allowed or Disallowed

and all remaining cash has been distributed in accordance with the Plan.  However, the standard is

fully administered not when all Disputed Claims become Allowed or Disallowed and all remaining

cash has been distributed in accordance with the Plan.[4]

82.    The Debtors seek to set a minimum distribution of $250 to receive a distribution in

these cases.  *See* Dkt. 1066 at Art.VI.D.4.  However, as the amount to be distributed is unknown,

there could be many distributions less than $250.  As such, the minimum distribution amount should

be reduced to $25, or at worst, $100.

83.    The Debtors seek to require a motion for reconsideration be filed within 7 days after

a determination is made estimating a Disputed Claim.  *See id.* at Art. VIII.C.   Section 502(j) allows

for reconsideration of an allowed claim or a disallowed claim and does not include a deadline to

file such reconsideration motion.   To the extent the Court agrees on limiting the filing of a

reconsideration motion, the seven (7) days sought by the Debtors should be expanded.

84.    The Plan sets forth that the "Confirmation Order shall be deemed final approval of

the Exit Facilities and the Exit Facilities Documents and all transactions contemplated thereby, and

---

[4] Art. XI.K of the Plan provides that after full administration of the cases, the Debtors will file all documents with the Court required by Fed. R. Bankr. P. 3022 to close the cases.  *See* Dkt. 1066 at Art. XI.K.

all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized

Debtors in connection therewith, including the payment of all fees, indemnities, and expenses

provided for therein, and authorization of the Reorganized Debtors to enter into and execute the

Exit Facilities Documents and such other documents as may be required to effectuate the Exit

Facilities." *See* Dkt. 1066 at Art. IV.G.  However, the Plan Supplement only includes a Term Sheet

for the Exit Facilities and Exit Facilities Documents.  *See* Dkt. 806.  As such, the Debtors seek

confirmation of their Plan and final approval of certain documents, which have yet to be disclosed

to the Court, the U.S. Trustee or parties-in-interest.

      85.    Article VI.B of the Plan provided that "Distributions under the Plan shall be made

by the Disbursing Agent." *See* Dkt. 1066 at Art. VI.B.  The Disbursing Agent is defined in the Plan

as "the Debtors or the Reorganized Debtors, as applicable, or the Entity or Entities selected by the

Debtors or the Reorganized Debtors (in consultation with the Required Consenting Lenders) to

make or facilitate distributions contemplated under the Plan; provided that, the Debtors or the

Reorganized Debtors, as applicable, shall be required to obtain the written consent of the

Administrative Agent prior to selecting the Administrative Agent to serve as a Disbursing Agent."

*See id.*  To the extent the Disbursing Agent will be an Entity or Entities other than the Debtors or

the Reorganized Debtors, such information should be disclosed prior to the confirmation hearing.

      86.    Exhibit C of the Plan Supplement contains the Restructuring Transactions

Memorandum. *See* Dkt. 806.  The Plan Restructuring Memorandum sets forth that it remains under

discussion and that "the Debtors and the Consenting Term Lenders reserve the right to modify this

Restructuring Transactions Memorandum at any time (including after the Plan Effective Date), and

the Restructuring Transactions remain subject to modification, refinement, and change in all

respects at any time, subject to the consent rights in the Plan and Restructuring Support Agreement.

87.    The Debtors and Consenting Term Lenders should not be allowed to alter or modify the Restructuring Transaction Memorandum without notice and an opportunity to be heard.

88.    Art. I.G of the Plan provides that "[i]n the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control; *provided*, that, to the extent the Plan or Confirmation Order is inconsistent with the Thrasio Legacy Trust Documents, the Thrasio Legacy Trust Documents shall govern." *See* Dkt. 1066 at Art. I.G. The Thrasio Trust Documents were not filed with the Plan. As such, the entry of the confirmation order will allow documents that have not been filed or reviewed by the Court, the U.S. Trustee or any parties-in-interest to control should there be any inconsistencies between the confirmation order and the Thrasio Legacy Trust Documents.

89.    Pursuant to the Plan, the Thrasio Legacy Trust Administrator is to be selected by the Committee with the consent of the Required Consenting Lenders. *See id.* at Art. I.A., ¶ 162. Also, pursuant to the Plan, the Thrasio Legacy Trust Administrator will be appointed on the Effective Date. *See id.* at Art. IV.J.3. However, the Thrasio Legacy Trust Administrator should be selected prior to confirmation, which will allow any other parties-in-interest an opportunity to object to such appointment. In addition, the Thrasio Legacy Trust Committee is to be formed consisting of two designees selected by the Required Consenting Lenders, two designs selected by the Committee and that Thrasio Legacy Trust Administrator. *See id.* at Art. IV.J.5. Similar to the selection of the Plan Administrator, the Thrasio Legacy Trust Committee members should be selected prior to confirmation and disclosed prior to confirmation.

**Reservation of Rights**

90.    The U.S. Trustee leaves the Debtors to meet their burden and reserves all rights, remedies, and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this Objection.

## <u>CONCLUSION</u>

For the reasons set forth above, the U.S. Trustee respectfully requests that the Court deny

confirmation of the Plan, and grant such other relief as the Court deems just and proper.

Respectfully submitted,

ANDREW R. VARA
UNITED STATES TRUSTEE
REGIONS 3 & 9

By: */s/ Jeffrey M. Sponder*
       Jeffrey M. Sponder
       Trial Attorney

      */s/ Lauren Bielskie*
       Lauren Bielskie
Dated: June 5, 2024       Trial Attorney