# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 11 |
|  | . |  |
|  | . | Case No. 21-11336(KBO) |
| GULF COAST HEALTH CARE, LLC, | . |  |
| et al, | . |  |
|  | . | 824 Market Street |
|  | . | Wilmington, Delaware 19801 |
| Debtors. | . |  |
| . . . . . . . . . . . . . . . . | . | Wednesday, May 4, 2022 |

TRANSCRIPT OF VIDEO HEARING RE:
CONFIRMATION - COURT DECISION
BEFORE THE HONORABLE KAREN B. OWENS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA ZOOM:

For the Debtors:                David R. Hurst, Esq.
                               Daniel M. Simon, Esq.
                               Emily C. Keil, Esq.
                               MCDERMOTT, WILL & EMERY, LLP


For the U.S. Trustee:          Joseph Cudia, Esq.
                               Juliet Sarkessian, Esq.
                               Richard Schepacarter, Esq.
                               OFFICE OF THE U.S. TRUSTEE


For the Official Committee
of Unsecured Creditors:        David Kurzweil, Esq.
                               Eric Howe, Esq.
                               Joseph Davis, Esq.
                               Nancy Peterman, Esq.
                               GREENBERG TRAURIG, LLP



(Appearances Continued)

Audio Operator:                Electronically Recorded
                               by Leslie Murin, ECRO

Transcription Company:         Reliable
                               1007 N. Orange Street
                               Wilmington, Delaware 19801
                               (302)654-8080
                               Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
APPEARANCES VIA ZOOM:  (Continued)


For Barrow Street Capital:  Alana Page, Esq.
                            Kelly A. Cornish, Esq.
                            Matthew Stachel, Esq.
                            Miriam Levi, Esq.
                            PAUL, WEISS, RIFKIND, WHARTON
                             & GARRISON, LLP


For the United States:      Alexis Daniel, Esq.
                            Augustus Curtis, Esq.
                            U.S. DEPARTMENT OF JUSTICE


For Vista Clinical
Diagnostics, LLC:           Andrew Ballentine, Esq.
                            SHUMAKER, LOOP & KENDRICK, LLP


For the Florida
Plaintiffs:                 Andrew Brown, Esq.
                            Jesse Noa, Esq.
                            R. Stephen McNeill, Esq.
                            POTTER, ANDERSON & CORROON, LLP

                            Blair Mendes, Esq.
                            MENDES, REINS & WILANDER, PLLC

                            James Wilkes, II, Esq.
                            WILKES & ASSOCIATES, PA


For Regions Bank:           Cory Falgowski, Esq.
                            BURR & FORMAN, LLP


For Affiliate:              DANTE SKOURELLOS, ESQ.


For the Estates of
Domenica B. Castellano,
Francis I. Einstein,
Robert F. Einstein, Sr.,
Shelley A. Tambling:        Douglas Candeub, Esq.
                            MORRIS JAMES, LLP


(Appearances Continued)
```

APPEARANCES VIA ZOOM:  (Continued)

For OHI Asset Funding
(DE), LLC and the Omega
Landlords:                          Eric Schwartz, Esq.
                                    Jonathan Weyland, Esq.
                                    MORRIS, NICHOLS, ARSHT
                                     & TUNNELL, LLP

                                    Jason Hufendick, Esq.
                                    Robert Lemons, Esq.
                                    Shreya Gulati, Esq.
                                    WEIL, GOTSHAL & MANGES, LLP

                                    Leighton Aiken, Esq.
                                    FERGUSON BRASWELL FRASER
                                     KUBASTA, PC


For Omnicare, Inc. and
its Affiliates:                     Geoffrey Goodman, Esq.
                                    Tamar Dolcourt, Esq.
                                    FOLEY & LARDNER, LLP

For New Ark Capital, LLC:           James Muenker, Esq.
                                    Jason Hopkins, Esq.
                                    Stuart Brown, Esq.
                                    DLA PIPER, LLP (US)


For Medline Industries,
Inc.:                               Jordana Renert, Esq.
                                    LOWENSTEIN SANDLER, LLP


For Bradford:                       KIMBERLY GIANIS, ESQ.

Patient Care Ombudsman:             MARK FISHMAN

Also Appearing:                     Dara Cooley, Esq.
                                    DARA COOLEY LAW, PA

                                    Jason Gerstein
                                    Matt Shelton
                                    Scott Vogel
                                    GULF COAST HEALTH CARE

                                    Allison Axenrod
                                    CRG FINANCIAL, LLC


(Appearances Continued)

APPEARANCES VIA ZOOM:   (Continued)

Also Appearing:                    Ben Jones
                                   Swapna Deshpande
                                   ANKURA CONSULTING GROUP, LLC

                                   Caroline Salls
                                   NEW GENERATION RESEARCH

                                   Clifford Zucker
                                   Earnestiena Cheng
                                   Narendra Ganti
                                   FTI CONSULTING

                                   Eric Roth
                                   HEALTH CARE NAVIGATOR, LLC

                                   Jeff Kaplan
                                   "BCAS"

                                   Lindsay Simon
                                   "BANKRUPTCY PROF"

                                   Ryan Martin
                                   "CCM"

                                   Deanne Graham, *Pro Se*

                                   James Morrison, *Pro Se*

                                   Julie Gutzmann, *Pro Se*

                                   Ray Mulry, *Pro Se*

                                   Ryan Lin, *Pro Se*

                                   Sheryl Wolf, *Pro Se*

                                   Becky Yerak
                                   WALL STREET JOURNAL

                                   Daniel Gill
                                   BLOOMBERG LAW

                                   Jason DiBattista
                                   LEVFIN INSIGHTS

                                   Jessica Steinhagen
                                   REORG RESEARCH

          (Appearances Continued)

APPEARANCES VIA ZOOM:   (Continued)

Also Appearing:                Maria Chutchian
                               REUTERS

                               Richard Archer
                               LAW 360

                               Taylor Harrison
                               DEBTWIRE

<u>INDEX</u>

<u>Page</u>

COURT DECISION                                                                7

1      (Proceedings commence at 3:30 p.m.)

2          THE COURT:  Good morning, everyone.  This is Judge

3   Owens.  This is the time that we are gathered to hear the

4   ruling in Gulf Coast.

5          Before I begin, I guess I ask the parties:  Is

6   there anything we need to take are of ahead of time?

7          THE COURT:  Okay.

8          UNIDENTIFIED:  Nothing from the debtors, Your

9   Honor.

10          THE COURT:  Okay.  Great.

11          Okay.  As I mentioned, we're here on the Court's

12   ruling on confirmation of the debtors' plan, as modified,

13   found at Docket Number 1217.

14          The confirmation proceedings lasted four days; and,

15   during such time, the Court heard credible and competent

16   testimony from Mr. Jones, the debtors' Chief Restructuring

17   Officer, as well as Mr. Vogel, the debtor's independent

18   manager; Mr. Chermayeff, a representative of Barrow Street

19   Capital, and Ms. Kjontvedt, on behalf of Epiq, the debtors'

20   administrative advisor, assisting the debtors with, among

21   other things, tabulating the votes cast on the plan.

22          In addition, approximately 91 exhibits were

23   admitted into the record by the parties and considered by the

24   Court.

25          And finally, there was voluminous briefing on the

contested confirmation issues filed by interested parties and

extensive argument was had.

The plan embodies a settlement between the debtors

and their key stakeholders; namely, the committee, Omega, and

certain affiliates and insiders known as the "contribution

parties, that was reached following the parties' voluntary

agreement to mediate with former Judge Peck.  It provides for

an aggregate guaranteed minimum recovery of at least $10

million to holders of general unsecured claims in Class 7.A

and litigation claimants, mostly PLGL plaintiffs, in Class

7.B.

Following further discussions among the parties

during the confirmation proceedings, the minimum guarantee

was increased to 11.5 million, with the additional 11 point -

excuse me --  with the additional 1.5 million earmarked for

Class 7.B, to ensure equality of distribution among that

subclass following the assumption of several settlement

agreements.

Additional future amounts may flow to the estates

for distributions for unsecured creditors following the

liquidation of certain business interruption and D&O

insurance policies.

Mr. Jones testified that, as a result of the

guaranteed funds, claim waivers, and redirection of proceeds

agreed to by Omega and the contribution parties, allowed

1    claims of creditors in Class 7.A are projected to receive a

2    recovery of approximately 19 percent, with those in 7.B to

3    receive approximately 21 percent.

4         Mr. Jones further explained that these projected

5    recoveries for unsecured creditors would not be available

6    absent the voluntary contributions of Omega and the

7    contribution parties.

8         Specifically, New Ark, the service providers, and

9    the equity sponsors, collectively known as the "contribution

10   parties," have agreed to contribute 14.75 million in cash to

11   fund a certain amount of allowed professional fee claims and

12   the guaranteed minimum to unsecured creditors.

13        New Ark has also agreed to redirect any recoveries

14   that it is to receive on account of its Section 507(b)

15   priority claim arising from the debtors' use of its cash

16   collateral during the Chapter 11 cases, as well as certain

17   recoveries it's to receive on account of its secured pre-

18   petition claim.

19        Moreover, the service providers agree to waive

20   recoveries on account of their pre-petition claims.

21        Omega has agreed to 1 million for allowed

22   professional fee claims and up to 1 million of business

23   interruption insurance proceeds, if obtained, for the

24   unsecured creditors.  It has also agreed to waive repayment

25   of its DIP financing claim and redirect any recoveries that

1    it's to receive on account of pre- and post-petition claims

2    for the benefit of the unsecured claimants.

3          In toto, the debtors estimate that Omega and the

4    contribution parties have contributed to the plan up to 16.7

5    million of new money, a waiver of approximately 48 million of

6    post-petition DIP, administrative, and priority claims that

7    arose when all the parties knew they would never be repaid,

8    and a waiver or redirection of 124 million of pre-petition

9    claims.

10          Without the agreements to redirect proceeds and

11    waive claims, the debtors' current Class 7 unsecured

12    creditors would be substantially diluted and would only share

13    in approximately 31 percent of the funds available to

14    unsecured creditors in a non-consensual Chapter 11 scenario.

15    Under the current plan, they receive a 100 percent of the

16    guaranteed amount.

17          The unrebutted evidence also indicates that the

18    debtors have little to no available assets with which to fund

19    a plan or a Chapter 7 liquidation, save for potential causes

20    of action stemming from certain insider or affiliate

21    transactions with some of the contribution parties.  As a

22    result of the limited assets and significant amount of claims

23    projected to be allowed against the estates, Mr. Jones

24    testified that the debtors would need to obtain somewhere

25    north of 175 million in litigation proceeds on those causes

1    of action to guarantee the plan's projected minimum recovery

2    to unsecured creditors; 75 million would need to be obtained

3    just to permit any recovery to unsecured creditors in a

4    Chapter 7 scenario.

5          The need for and benefits of the current plan

6    settlement is explained and supported by, among other things,

7    the hypothetical Chapter 7 waterfalls prepared by Mr. Jones

8    and his team as material information was garnered.  Those are

9    found at Debtor Exhibits 19 and 20.  The waterfall and the

10   assumptions underlying it have not been meaningfully

11   challenged.

12         In return for and as a condition to their plan

13   contributions, Omega and the contribution parties have

14   demanded releases for themselves and certain related parties

15   from the debtors, as well as non-consensual releases from the

16   litigation creditors in Class 7.B.

17         Also included in the plan's definition of "third-

18   party released parties" are all the PLGL codefendants and

19   their related parties, which would capture certain former

20   debtor employees and current and former officers.  Pursuant

21   to the plan, creditors who vote in favor of the plan are also

22   giving a release of third-party released parties, but that

23   release is consensual.

24         The plan termsheet found at Debtors' Exhibit 17,

25   executed by the debtors, the creditors' committee, Omega, and

the contribution parties, following their successful

mediation, memorializes the parties' terms, including the

demand for and requirement of the plan's non-consensual

third-party releases.

The Court also heard testimony from Mr. Chermayeff

as to why Barrow Street wants the releases for itself and its

related parties, and why it conditions its plan contributions

on their inclusion in the plan; namely, they wish to buy

peace and finality, a position the debtors' representatives

believe New Ark, the service providers, and all of their

related parties take, as well.

In agreeing to the releases, Mr. Vogel, the

debtors' independent manager, with the sole authority to

pursue, settle, and release the debtors' causes of action,

testified credibly that he believed that it was in the best

interests of the debtors' estates, fair and reasonable to do

so because the releases are a necessary inducement for the

plan contributions of Omega and the contribution parties,

without which the current plan could not be proposed, and

without which unsecured creditors would receive no

distribution.

Supporting that conclusion was Mr. Vogel's

understanding of the nature and value of the debtors' assets

available to fund creditor recoveries; namely, the affiliate

and insider causes of action and the amount and priority of

1    claims, as set forth in Mr. Jones' waterfall scenarios.

2           To gain an understanding of the affiliate and

3    insider causes of action, Mr. Vogel led and controlled an

4    investigation into the estate's causes of action related to

5    the affiliate and insider transactions.  The investigation

6    was independent, sufficient in scope, and conducted by able

7    and experienced professionals.  No real challenge has been

8    made to these conclusions.  The investigation yielded a

9    report that concluded that, at best, the causes of action

10   would yield approximately 64.3 million for the estates.

11          While the objecting parties attempted to discredit

12   some of the conclusions in the investigation report,

13   including the ultimate recovery conclusions, they neither

14   shared with the Court the results of their own investigation,

15   if one was undertaken, nor offered their own valuation

16   conclusions and analysis.

17          Moreover, their targeted challenges to the report

18   failed to seriously impact the material conclusion reached by

19   Mr. Vogel that led to his decision to enter into the plan

20   settlement, that the plan's guaranteed distribution to

21   unsecured creditors resulting from the contributions of the

22   released parties will likely yield far better recoveries to

23   creditors than those that could be achieved absent the plan

24   settlement.

25          Again, the waterfall indicates that 175 million of

litigation proceeds, approximately 2.8 times more than the

debtors' high value estimate, would need to be obtained to

yield the same result as the plan.  And even if there was

credible evidence that 175 million could be obtained in

litigation, which there isn't, the Court cannot discount the

risk of that litigation, the likelihood of recovery against

the defendants, and the time value of money, all additional

considerations of Mr. Vogel in reaching his decision to

approve the plan settlement on behalf of the debtors.

Mr. Jones also offered his support for the plan for

the same reasons as Mr. Vogel.  Moreover, in support of the

plan, the committee filed a statement, representing that it

conducted its own investigation into potential estate claims

and causes of action, including those that may exist against

the contributing parties.  Like Mr. Vogel, the committee used

the results of this investigation, as well as Mr. Jones'

waterfall, to negotiate with the Omega --  with Omega and the

contribution parties, and agreed to the proposed plan.

For similar reasons as the debtors, the committee

concluded that the settlement and its guarantee to unsecured

creditors is the best possible outcome for creditors under

the circumstances.

With respect to the six voting classes of impaired

claims, all but Class 7.B, the litigation claimants, and

those subject to the non-consensual third-party releases

1    voted to accept the plan.

2         While the debtors maintain that Class 7.B accepted

3    the plan, I find that the second ballot cast by Millenia

4    after the voting deadline, which tilted the subclass' vote in

5    favor of the plan, was inappropriately accepted by the

6    debtors, pursuant to the disclosure statement order.

7    Millenia cast its first ballot, which rejected the plan,

8    shortly before the voting deadline.  It has been asserted,

9    but not proven, that Millenia then realized that it submitted

10   its ballot in error as rejecting, when it really wished to

11   accept.  Millenia then sent a second ballot, this time

12   accepting, within two hours after the voting deadline.

13        The debtors agreed to, quote, "waive" the voting

14   deadline and accept that second ballot.  Ms. Kjontvedt

15   testified that there were no defects or irregularities with

16   respect to Millenia's first ballot, but that she accepted the

17   late-filed second ballot after consulting the debtors and

18   reviewing Paragraph 28 of the disclosure statement order.

19        Regardless of Ms. Kjontvedt's belief that accepting

20   Millenia's ballot was appropriate, the terms of the

21   disclosure statement order do not allow its acceptance.  The

22   parties' arguments on this topic were confined to the

23   application of Paragraphs 22 and 28 through 30 of the

24   disclosure statement order.

25        The facts of the Millenia changed vote do not fit

into the circumstances described in Paragraphs 29 or 30 of

the order because Millenia's vote was not withdrawn, which is

Paragraph 29, and the second ballot changing Millenia's vote

was not cast before the voting deadline, and there's no

evidence suggesting that the voting deadline was extended for

Millenia, let alone prior to its expiration, which would

cover Paragraphs 22 and 30.

Moreover, Paragraph 28 does not apply because Ms.

Kjontvedt testified in her capacity as a professional, with

extensive experience with vote tabulation, that the original

Millenia ballot did not contain any defects or irregularities

for the debtors to waive.

Accordingly, with Millenia's accepted vote removed,

54 Class 7.B creditors voted to reject the plan and 53 voted

to accept, resulting in a 50.74 rejecting percentage.

Fifty-two of the fifty-four rejecting creditors

filed objections to the plan that were still extant at the

closing of the confirmation proceedings.

In addition, the Office of the United States

Trustee objected to confirmation of the plan.

All objecting parties object to the inclusion of

the non-consensual third-party releases, with the litigation

creditors focusing mainly on those to be granted in favor of

the insider affiliate contribution parties.

In addition, the litigation creditors object to the

1    debtors' release of those parties, the plan's Class 7

2    subclassification of unsecured creditors, the debtors'

3    allocation of the settlement proceeds between the subclasses,

4    the debtors' best interests test analysis, the good faith of

5    the debtors in proposing the plan, the proposed litigation

6    claims procedures, and the original identity of the

7    litigation claimants trustee.  Excuse me.

8         In addition to the inclusion of the non-consensual

9    third-party releases, the U.S. Trustee also raised limited

10   objections to a number of specific plan provisions.  All but

11   one of those were consensually resolved by the parties

12   following the close of the confirmation proceedings.

13        After considering the evidence and legal position

14   of the parties, I have determined that the debtors have not

15   met their burden necessary to confirm the plan with non-

16   consensual third-party releases.  My decision was not easily

17   reached, but it is one that the law requires.

18        The contributions of Omega and the contribution

19   parties, either on behalf of themselves or other related

20   release parties, are substantial, and have enabled a recovery

21   to unsecured creditors when one otherwise would not exist,

22   and those enabling contributions are conditioned on the grant

23   of releases embodied in the plan.

24        The evidence presented was also sufficient to show

25   that the settlement embodied in the plan was achieved during

1    arm's length, good faith negotiations among the debtors, the

2    committee, Omega, and the contribution parties, and that the

3    debtors' decision to enter into the settlement was the result

4    of reasonable and appropriate business judgment, based on an

5    independent, full and fair investigation into the settled

6    debtor claims and appropriate waterfall analysis, which was

7    updated regularly as material information came to light, and

8    the consideration of other relevant facts and circumstances

9    that support a firm settlement with the litigation targets

10   today.

11          However, while those conclusions lend support for

12   the Court's approval of the debtors' releases of their claims

13   against the nondebtors, they cannot, by themselves, support

14   approval of the non-consensual third-party releases.

15          These types of releases are not broadly sanctioned.

16   They require satisfaction of, quote, "exacting standards" set

17   forth by the Third Circuit in Continental.  Those standards

18   require that the Court conclude, based on specific supportive

19   factual findings, that the non-consensual third-party

20   releases are not only necessary to the success of the

21   debtors' reorganization, but also fair to the releasing

22   creditors and given to them in exchange for reasonable

23   consideration.  Here, critical factors that courts in this

24   circuit traditionally rely on to conclude that a plan's

25   inclusion of non-consensual third-party releases is

1  appropriate are missing.

2          At the outset, I'll note that, while the parties

3  did not focus their presentations on the propriety of the

4  third-party releases granted to Omega, the D&Os, and the

5  employees, many or all of the factors that I will discuss

6  with respect to the contribution parties are also missing

7  with respect to the other released parties.

8          For instance, Omega is making a substantial

9  contribution to the plan, but nothing else in the record

10  supports the receipt of non-consensual third-party releases.

11  There is no record supporting the third-party release of the

12  debtors' former employees.  And debtors admit that all

13  parties are willing to remove them and continue with the

14  proposed plan.  While the D&Os may meet some of the criteria

15  necessary to justify their inclusion as non-consensual

16  released parties, such as identity of interest, no evidence

17  was introduced in support.

18          So, with respect to the contribution parties,

19  first, the debtors do not share an indication of interest

20  with the released parties.

21          Moreover, the debtors did not file these cases due

22  to the PLGL litigation sought to be permanently enjoined.

23  There is no evidence suggesting that the PLGL codefendants

24  and any other relevant released party will be unable to

25  defend themselves in that litigation, unable to satisfy

judgments against them if obtained, or could look to the

debtors' estates for indemnification, contribution, or the

like.  The only justification for the release is the desire

by the contribution parties to achieve peace and finality in

exchange for their contributions to the plan.  While I

appreciate and understand that desire, it is not a sufficient

basis to justify a release of the third-party claims, given

the totality of the circumstances.

Moreover, while the debtors cite to cases for the

proposition that parties may share an indication of interest

simply by possessing a common goal of confirming a plan and

consummating the transactions embodied therein, those cases

are a slim minority and I disagree with them.  If that were

the indication of interest test, every plan in which a debtor

advocates for the inclusion of non-consensual releases on

behalf of a third party could satisfy the test.  Moreover,

I'm puzzled as to the relevancy of a shared common goal to

Continental's required questions of necessity and fairness.

Additionally, and perhaps more critically, the

affected PLGL plaintiffs in Class 7.B have not overwhelming

voted to accept the settlement and release of their claims as

embodied in the plan.  As courts have acknowledged, this is

often the best evidence of fairness of a plan's third-party

release to releasing parties.

Support is commonly garnered through negotiation

1    with the affected creditors or a representative body.  But

2    here, the litigation creditors had no voice in the plan

3    settlement process or the allocation of the contributed

4    funds, either directly or through a seat on the committee.

5         Moreover, while their projected recovery under the

6    plan is more than what they would be entitled to a Chapter 7,

7    the releasing creditors are receiving nowhere close to

8    payment in full.  And at worst, the evidence suggests that

9    Class B --  7.B creditors are not receiving anything on

10   account of the released claims against the third parties by

11   the released parties.  Rather, the evidence suggests that the

12   contributions made by the contribution parties were made on

13   account of the estate's viable causes of action against them.

14        Indeed, no separate analysis was performed by the

15   debtors or the committee as to the value of the third-party

16   released claims at the time the settlement was achieved.  And

17   as will be explained, the debtors, with the support of the

18   all trade committee, worked to allocate the guaranteed

19   amount, so that creditors in Class 7.A, with likely no

20   pending third-party claims, and those in in 7.B with third-

21   party claims, would receive the same or close to the same pro

22   rata distribution of the plan's guaranteed funds.  No other

23   evidence has been provided by the debtors to suggest a

24   valuation of the third-party PLGL claims or to explain how

25   any of the guaranteed amount to be distributed under the plan

1    is on account of those claims.

2        The debtors argue that the third-party claims

3    against the contribution parties are derivative in nature

4    and, thus, are to be released under the release the estates

5    are granting to the contributing parties.  As such, they

6    argue that the third-party claims have *de minimis* value and

7    should not be entitled to disturb plan settlement.

8        The direct derivative issue is complex, not

9    appropriately and fully briefed, and concurrent --  and

10   currently is undecided.  The creditors vigorously dispute the

11   debtors' positions from a legal standpoint and also highlight

12   the debtors' own earlier attempt during these cases to extend

13   the stay to the PLGL lawsuits as not estate claims and the

14   debtors' pre-petition history of sharing the defense of the

15   PLGL lawsuits in State Court with the relevant contribution

16   party codefendants.  These facts certainly confuse the issue

17   even further.

18       As made clear by the Circuit in Continental, third-

19   party releasing creditors must receive consideration on

20   account of the third-party released claims they are forced to

21   give up under a debtor's plan, and it is insufficient for

22   them to receive as consideration only a distribution on

23   account of their claims against the debtor.

24       It is the debtors' burden to establish necessity

25   and fairness, and they have not done so here.  As explained

by the Third Circuit in its Millennium Lab decision, in rendering a decision on a request to include non-consensual third-party releases in a plan, I must exercise caution and diligence and am obligated to approach their inclusion with the utmost care.  I have done so, and I am unable to conclude that there is sufficient justification for the non-consensual third-party releases proposed in the plan.  Excuse me.

While the debtors believe that the plan as proposed cannot go forward without the non-consensual third-party releases, I'll briefly address the remaining issues.

The litigation claimants object to the debtors' release of, among others, the contribution parties.  As explained by Judge Carey in his 2010 Spansion decision, courts may approve such releases after considering the facts and equities of each case.

Section 1123(b)(3)(A) permits debtors to release estate claims against nondebtor third parties if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interest of the estate. While a court can use the five Master Mortgage factors as a guidepost to make that determination, all need not be present for a court to approve a proposed release, and they are not the exclusive set of factors a court may consider in reaching a decision.

For the reasons already described, the debtors'

1    agreement to release the nondebtor parties outlined in the

2    plan is fair, reasonable, and in the best interest of the

3    estates and is a valid exercise of their business judgment.

4         Moreover, the committee, serving as estate

5    fiduciary, supports the releases, and five of the six voting

6    classes voted overwhelmingly in favor of the plan, including

7    the debtors' releases contained therein.  That is

8    unsurprising, since the plan as proposed is the only pathway

9    for a recovery to unsecured creditors and provides a home

10   run, value-maximizing transaction on account of the debtors'

11   assets in exchange for the releases, thus achieving

12   recoveries for unsecured creditors beyond what they could

13   expect in both a Chapter 7 liquidation and a non-consensual

14   Chapter 11 plan scenario.

15        The litigation creditors assert that the debtors

16   have not sufficiently satisfied the best interests test of

17   Section 1129(a)(7) because the analysis excludes the value of

18   third-party claims proposed to be non-consensually released

19   under the plan.  The Court is not approving those releases.

20   But even if it was, I disagree that a valuation of released

21   third-party claims asserted against nondebtors is required

22   under the best interests test.

23        Persuasive case law, including Judge Drain's

24   decision in Purdue Pharma, explains why the plain language of

25   the Code does not require it.  The Code mandates a comparison

1 between the amount objecting creditors would receive under

2 the plan on account of their claims against the debtors and

3 what they would receive on account of such claims if the

4 debtor were liquidated in a Chapter 7.  That conclusion is

5 also supported by the Delaware District Court in its 2012

6 W.R. Grace decision.

7   The litigation creditors argue that the plan

8 improperly separates the Class 7 unsecured claims into two

9 subclasses.  Classification of similar claims or interests

10 must be reasonable to satisfy Sections 1129(a)(1) and 1122.

11 The evidence shows that the debtors separately classified the

12 Class 7.A and 7.B claims to enable quicker distributions to

13 those creditors in Class 7.A who have mostly asserted

14 liquidated, undisputed claims, unlike a sizeable portion of

15 the litigation claimants in Class 7.B.  The 7.B claims would

16 complicate and delay distributions to Class 7.A claimants if

17 the classes were combined because 7.B claims will need to be

18 reconciled and may be estimated.

19   Moreover, the record reflects that the claimants

20 placed in 7.B are those with third-party claims subject to

21 the proposed non-consensual releases.  Placing them in a

22 subclass made it easier to narrow and identify the affected

23 creditors and I think, most importantly to the classification

24 analysis, gave them a voice in the proceeding.

25   If Class 7.B claimants were lumped with Class 7.A

creditors into one divided Class 7, it is undisputed that the

litigation creditors rejecting the plan would be diluted by a

large number of accepting voters that would carry the

undivided class.  As such, it was reasonable and appropriate

for the debtors to place the 7.B claimants into their own

class and give them a separate voice in these proceedings.

Several objecting parties point out a *de minimis*

number of creditors who may have been misclassified between

Classes 7.A and 7.B.  But any misclassification did not cause

any harm because the Class 7.B creditors rejected the plan.

Class 7.B has voted to reject the plan.

Accordingly, Section 1129(a)(8) has not been satisfied and

the debtors must show that the plan does not unfairly

discriminate and it's fair and equitable with respect to

Class 7.B.

The litigation creditors argue that the plan

unfairly discriminates between them and the equal priority

creditors of Class 7.A because the allocation of the

guaranteed funds for distribution to unsecured creditors was

done incorrectly and will result in Class 7.B receiving a

lower percentage recovery from the estates on account of

their allowed claims than those similarly situated in Class

7.A.

Moreover, they argue that creditors in Class 7.A

were given the opportunity to avoid the third-party releases,

1  whereas they were not.  The latter point is moot given my

2  ruling today on the releases.

3        Mr. Jones' testimony reflects that, after the

4  settlement was reached and the guaranteed minimum was

5  earmarked for unsecured creditors, the debtors undertook a

6  process of reconciling the asserted unsecured claims to

7  determine a projected aggregate of likely allowed claims in

8  each Class 7 subclass to divide sufficient funds between the

9  subclasses, so that each Class 7 creditor would receive the

10 same pro rata recovery.  Debtors' Exhibit 21 reflects the

11 ultimate result of that exercise with 63 percent of the

12 guaranteed minimum allocated to Class 7.A and the remaining

13 37 percent to Class B.

14        With respect to litigation claims in 7.B that are

15 disputed and unliquidated, Mr. Jones and his team, with the

16 assistance of personnel from HCN who have historically

17 overseen the debtors' claim and litigation matters, and thus

18 possess relevant knowledge regarding the subject claims,

19 analyzed the historical five-year settlement history and

20 other various factors they determined to be key markers of

21 settlement value to determine ranges of likely claim

22 recoveries.  Prior judgment amounts were unavailable to

23 consider because none exist.

24        The desire and approach taken by the debtors to

25 divide the funds to ensure an equal pro rata recovery to all

unsecured creditors is commendable.  However, for reasons

explored by the litigation creditors during the confirmation

proceedings, there is a likely chance that the debtors'

estimates of the total claims pool of Class 7.B will be

incorrect and that the percentage recoveries to allowed

claimants in that class will be lower than 7.A.

The magnitude of any such disparity, however, is

unknown.  The estimate of aggregate 7.B claim amounts ranges

from the debtors' high estimate of 24.1 million to

approximately forty-eight --  488.7 million, representing the

aggregate of scheduled claims and asserted proofs of claim

that have not been objected to or estimated.

Nonetheless, even if the magnitude was sufficient

shown to be material, the discrimination would not rise to a

level --  to an unfair level.  The recoveries to creditors in

this case result from contributions of third parties.  Absent

the contributions of Omega and the contribution parties,

Class 7.B creditors would receive no recoveries on account of

their claims.  Accordingly, as explained by the Exide,

Nuverra, and Genesis Health decisions, any presumption of

unfairness as a result of possible material unequal

recoveries between creditors in Class 7.A and 7.B would be

rebutted.

In determining when a plan is proposed in good

faith, courts consider the totality of circumstances,

1    focusing more on the process of plan development than to the

2    context of the plan.  Good faith is shown when the plan has

3    been proposed for the purpose of reorganizing the debtor,

4    preserving the value of the estate, and delivering that value

5    to creditors.

6              On the other hand, good faith has been found to be

7    lacking if the plan is proposed with ulterior motives.  While

8    some of the objecting litigation creditors have argued that

9    the debtors lacked good faith in proposing the plan, that

10   objection is not sustainable given the facts adduced at trial

11   underlying the process undertaken to value estate causes of

12   action, analyze possible pathways to creditor recovery,

13   engage in substantive negotiations with key stakeholders

14   regarding a plan settlement with the assistance of an

15   experienced judicial mediator, all while facing extreme

16   liquidity constraints, and continuing to refine the

17   settlement and augment recoveries to unsecured creditors

18   embodied in the plan throughout the confirmation proceedings.

19             Circumstantial evidence relied upon by the

20   objecting parties to support an argument of bad faith,

21   including possible problems with the subclassification of

22   certain Class 7 claims, the Class 7.B vote tabulation, and

23   the assumption of certain 7.B settlements, is not

24   sufficiently persuasive to contradict the Court's conclusion

25   that the debtors acted in good faith when proposing the plan.

1          As related by the parties yesterday via joint email

2     to the Court, all but one of the remaining objections raised

3     by the U.S. Trustee in its formal objection had been

4     resolved.

5          The open objection relates to the debtors' request

6     in Article X(5) -- or excuse me --  10(f) to serve as the

7     exclusive gatekeeper post-confirmation with respect to

8     released claims.  In particular, the debtors had requested

9     that I retain sole and exclusive authority to determine

10    whether a claim or cause of action against a released party

11    arises from or is related to a debtor-released claim or a

12    third-party released claim and, in doing so, authorize such

13    party to bring the claim against the relevant release party.

14         I will sustain the U.S. Trustee's objection on this

15    point.  I see no reason to retain exclusive jurisdiction for

16    a determination that has been requested of me.  The

17    confirmation order says what it says, and the other courts

18    should be entitled to -- or excuse me --  the plan says what

19    it says, and other courts should be entitled to exercise

20    their authority to interpret it.

21         Imposing such a requirement could also impose an

22    unnecessary administrative hurdle and cost the parties when

23    these cases are closed.

24         That takes us to the last objection regarding the

25    trust procedures and trustee identification.  The litigation

1    creditors objected to the debtors' litigation claims

2    procedures and the identity of the litigation clams trustee,

3    as set forth in the plan supplement.  The debtors wish to

4    resolve the objections with the litigation claimants.

5            Given that it's unclear whether the plan will move

6    forward in these cases; and, if so, what form it will take, I

7    will not address these issues as they are not ripe.

8            For similar reasons, the Court --  myself --  has

9    not reviewed the debtors' revised proposed confirmation

10   order, but will do so, if appropriate, at a future time.

11           To the extent that the parties raise other

12   objections to confirmation of the plan that I have not

13   specifically addressed, they are overruled.

14           The plan, the evidence adduced in favor of

15   confirmation and the legal briefing support the conclusion

16   that the debtors have met all other confirmation requirements

17   of the Code, including those of Section 1122, 1123, and 1129,

18   and would be entitled to approval of their plan absent the

19   non-consensual third-party releases.

20           Thank you for enduring that lengthy oral ruling.  I

21   know that this is a lot of information for the parties to

22   process, and you may not have an understanding of how you

23   wish to move forward.  I guess I would suggest to the

24   parties, if they would like it, I'm happy to put a date on

25   the calendar in the near future for a status conference, or

1    you could reach out to my chambers and let me know whether

2    that would be something that the parties are interested in

3    doing.

4                MR. SIMON:  Thank you, Your Honor.

5                THE COURT:  Mr. Simon.

6                MR. SIMON:  Thank you, Your Honor.  Obviously it's

7    a lot to digest.  So perhaps we should convene with the

8    parties and come back to you as --  in connection with next

9    steps, and we'll reach out accordingly.

10               THE COURT:  Okay.  I have some time next week, so,

11   if you want to save any of that time or reserve any of that

12   time --

13               MR. SIMON:  Sure.

14               THE COURT:  -- just email Ms. Lopez and she will

15   get it on the calendar.

16               MR. SIMON:  Okay.

17               THE COURT:  Okay.

18               MR. SIMON:  Thank you, Your Honor.  We appreciate

19   that.

20               THE COURT:  All right.  Thank you all very much.

21   And I apologize, for some reason, my throat was acting up the

22   moment I took the bench today.  So, hopefully, you were able

23   to hear and understand that ruling.

24               And unless there's anything further, we will

25   adjourn for the day.

1            Mr. McNeill, I see that you're on the line.  Is

2      there anything that we need to talk about?

3            MR. MCNEILL:  No, Your Honor.  I just was putting

4      my face on the screen to thank Your Honor for your ruling.

5            THE COURT:  Okay.  Thank you, all, very much.  I

6      look forward to hearing from you all in the near future.  We

7      can consider this hearing adjourned.  Take care.  Have a good

8      night.

9            COUNSEL:  Thank you, Your Honor.  Thank you.

10         (Proceedings concluded at 4:04 p.m.)

11                             *****

1                           CERTIFICATION

2              I certify that the foregoing is a correct

3        transcript from the electronic sound recording of the

4        proceedings in the above-entitled matter to the best of my

5        knowledge and ability.

6

7

8

9

10

11       _____        May 4, 2022

12       Coleen Rand, AAERT Cert. No. 341

13       Certified Court Transcriptionist

14       For Reliable