**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com

-and-

Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Francis Petrie (admitted *pro hac vice*)
Evan Swager (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
matthew.fagen@kirkland.com
francis.petrie@kirkland.com
evan.swager@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Jacob S. Frumkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
jfrumkin@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| THRASIO HOLDINGS, INC., et al., | Case No. 24-11840 (CMG) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' MEMORANDUM OF LAW**
**IN SUPPORT OF AN ORDER CONFIRMING THE FIRST AMENDED**
**JOINT PLAN OF REORGANIZATION OF THRASIO HOLDINGS, INC. AND ITS**
**DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]     The last four digits of Debtor Thrasio Holdings, Inc.'s tax identification number are 8327. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://www.kccllc.net/Thrasio. The Debtors' service address for purposes of these chapter 11 cases is 85 West Street, 3rd Floor, Walpole, MA, 02081.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Preliminary Statement..................................................................................................1

Argument ....................................................................................................................3

I.    Case Background and Objections. ..........................................................................3

     A.           Procedural History. ................................................................................3

     B.           The Plan Solicitation and Notification Process. ...........................................7

II.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code. .................8

     A.           The Plan Complies with the Applicable Provisions of the
                 Bankruptcy Code (§ 1129(a)(1)). ...................................................................9

           1.       The Plan Satisfies the Classification Requirements of Section 1122
                  of the Bankruptcy Code. ....................................................................9

           2.       The Plan Satisfies the Mandatory Plan Requirements of
                  Section 1123(a) of the Bankruptcy Code....................................................12

           3.       The Plan Complies with the Discretionary Provisions of
                    Section 1123(b) of the Bankruptcy Code....................................................14

                 (i)     The Debtor Release Is Appropriate....................................17

                (ii)    The Third-Party Release is Wholly Consensual and
                         Is Appropriate. ...................................................................21

                 (iii)   The Exculpation Provision Is Appropriate. .......................23

                (iv)   The Injunction Is Appropriate...........................................26

            4.       The Plan Complies with Section 1123(d) of the Bankruptcy Code...........26

     B.           The Debtors Complied with the Applicable Provisions of the
                 Bankruptcy Code (§ 1129(a)(2))..................................................................27

           1.       The Debtors Complied with Section 1125 of the Bankruptcy Code. ........27

           2.       The Debtors Complied with Section 1126 of the Bankruptcy Code. ........29

     C.           The Plan Was Proposed in Good Faith (§ 1129(a)(3)). ...........................30

D.  The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)) ..................31

E.  The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders (§ 1129(a)(5)). .......................................32

F.  The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)). ..........................................................................................33

G.  The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)). .........................................................................................33

H.  The Plan Can Be Confirmed Notwithstanding the Requirements of (§ 1129(a)(8)) of the Bankruptcy Code. ....................................................35

I.  The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)). ...............................................................................35

J.  At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)) ...........................................................................37

K.  The Plan Is Feasible (§ 1129(a)(11)). .........................................................37

L.  All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ...............39

M.  Sections 1129(a)(13) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan .........................................................................39

N.  The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code .....................................................40

    1.  The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii)) ................................41

    2.  The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1)) ..........................................................................................41

O.  The Debtors Complied with Sections 1129(c) and 1129(d) of the Bankruptcy Code. ....................................................................................43

P.  Modifications to the Plan. ........................................................................43

Q.  Good Cause Exists to Waive the Stay of the Confirmation Order. ...........45

III.  The Objections Should be Overruled ...............................................................46

A.  The Scope of the Exculpation Provision Is Appropriate. ..........................47

B.  The Debtor Releases Should Be Approved. ..............................................47

C.          The Third-Party Release Should Be Approved. ........................................49

    1.      The Third-Party Release Is Consensual and Appropriate.........................50

    2.      Even if the Third-Party Release Is Non-Consensual, It Is
            Permissible...............................................................................................54

D.          The Gatekeeping Provision Is Integral to the Plan and Should Be
            Approved.................................................................................................56

E.          The Injunction Provision Is Permissible and Appropriate.......................60

F.          The Remainder of the U.S. Trustee Objections Should Be
            Overruled. ...............................................................................................60

G.          Mr. Silberstein's Objections Should be Overruled. ................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 500 Fifth Ave. Assocs.*,
    148 B.R. 1010 (Bankr. S.D.N.Y. 1993) .......................................................................10

*In re 710 Long Ridge Rd. Operating Co., II, LLC*,
    No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014)
    ...........................................................................................................................18, 19, 48

*In re Abbotts Dairies of Pa., Inc.*,
    788 F.2d 143 (3d Cir. 1986)..........................................................................................30

*In re Aceto Corporation*,
    Case No. 19-13448 (VFP) (Bankr D. N.J. Sept. 18, 2019).........................................12

*In re Aceto Corporation*,
    No. 19-13448 (VFP) (Bankr D.N.J. Sept. 18, 2019) ..................................................54

*In re Aegean Marine Petroleum Network, Inc.*,
    599 B.R. 717 (Bankr. S.D.N.Y. 2019)..........................................................................24

*In re Alecto Healthcare Servs., LLC*,
    No. 23-10787, 2024 WL 1208355 (Bankr. D. Del. Mar. 20, 2024) ............................64

*In re Aleris Int'l, Inc.*,
    No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)..............38, 42

*In re Alex & Ani, LLC*,
    No. 21-10918 (CTG) (Bankr. D. Del. Sept. 22, 2021) ................................................50

*In re Am. Family Enters.*,
    256 B.R. 377 (D.N.J. 2000) ..........................................................................................21

*In re Armstrong World Indus.*,
    348 B.R. 111 (Bankr. D. Del. 2006) .............................................................................42

*In re Avaya Inc.*,
    No. 23-90088 (DRJ) (Bankr S.D. Tex. Mar. 21, 2023) ..............................................56

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999)................................................................................................34, 50

*Baron v. Sherman (In re Ondova Ltd. Co.,)*,
    2017 Bankr. LEXIS 325 (Bankr. N.D. Tex. Feb. 1, 2017) ..........................................57

*Barton v. Barbour*,
   104 U.S. 126 (1881)...........................................................................................57

*In re Bed Bath & Beyond Inc.*,
   No. 23-13359 (VFP) (Bankr. D.N.J. September 14, 2023) .............................................*passim*

*In re Blackhawk Mining LLC*,
   No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019).....................................................20, 49

*In re BlockFi, Inc.*,
   No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023)........................................................*passim*

*In re Burns & Roe Enters., Inc.*,
   No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) .............................................44

*In re Careismatic Brands, LLC*,
   No. 24-10561 (VFP) (Bankr. D.N.J. May 31, 2024) ........................................................*passim*

*Carter v. Rodgers*,
   220 F.3d 1249 (11th Cir. 2000) ..............................................................................57

*In re Century Glove, Inc.*,
   Civ. A. Nos. 90-400 and 90-401, 1993 WL 239489 (D. Del. Feb. 10, 1993) ..................30, 31

*In re Chapel Gate Apartments, Ltd.*,
   64 B.R. 569 (Bankr. N.D. Tex. 1986).......................................................................31

*In re Charter Behav. Health Sys.*,
   LLC, 292 B.R. 36 (Bankr. D. Del. 2003)....................................................................12

*In re Chassix Holdings, Inc.*,
   533 B.R. 64 (Bankr. S.D.N.Y. 2015).........................................................................23

*In re Checkout Holding Corp.*,
   No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) .......................................................20, 49

*In re Cobalt Int'l Energy, Inc.*,
   No. 17-36709 (MI)................................................................................................55

*In re Congoleum Corp.*,
   326 B.R. 167 (KCF) (Bankr. D.N.J. Jan. 26, 2007).......................................................24

*In re Congoleum Corporation*,
   No. 20-18488 (MBK) (Bankr. D. N.J. Jan. 25, 2021) .....................................................51

*In re Coram Healthcare Corp., Inc.*,
   315 B.R. 321 (Bankr. D. Del. 2004) .........................................................................22

*In re Ctr. For Autism & Related Disorders, LLC*,
No. 23-90709 (DRJ) (Bankr. S.D. Tex. July 28, 2023) ........................................50

*In re Cypresswood Land Partners, I*,
409 B.R. 396 (Bankr. S.D. Tex. 2009) ...................................................................34

*In re Cyxtera Techs.*,
No. 23-14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023) ......................................50, 51

*In re: Diocese of Camden, New Jersey*,
No. 20-21257 (JNP), 2023 WL 5605156 (Bankr. D.N.J. Aug. 29, 2023) .............30

*In re Drexel Burnham Lambert Grp.*,
960 F.2d 285 (2d Cir. 1992)...................................................................................26

*In re Drexel Burnham Lambert Grp. Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...................................................................10

*In re Extraction Oil & Gas, Inc.*,
No. 20-11548 (CSS) (Bankr. D. Del. Dec. 23, 2020) ............................................50

*In re FAH Liquidating Corp.*,
No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) ...............................................24

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
10 F.3d 944 (2d Cir. 1993)......................................................................................10

*In re Future Energy Corp.*,
83 B.R. 470 (Bankr. S.D. Ohio 1988)....................................................................31

*In re G–1 Holdings Inc.*,
420 B.R. 216 (D.N.J. 2009) ....................................................................................38

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) ................................................................54, 55

*Gillman v. Continental Airlines (In re Continental Airlines)*,
203 F.3d 203 (3d Cir. 2000)....................................................................................54

*In re Glob. Safety Textiles Holdings LLC*,
No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009).............44

*In re Greate Bay Hotel & Casino, Inc.*,
251 B.R. 213 (Bankr. D.N.J. 2000) ........................................................................10

*Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*,
167 B.R. 389 (Bankr. D. Md. 1994) ........................................................................57

*In re Harstad*,
   155 B.R. 500 (Bankr. D. Minn. 1993) ................................................................22

*Helmer v. Pogue*,
   212 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton
   Doctrine to debtor in possession)..........................................................57

*In re Hercules Offshore, Inc.*,
   565 B.R. 732 (Bankr. D. Del. 2016) ...............................................................19

*In re Heritage Org., L.L.C.*,
   375 B.R. 230 (Bankr. N.D. Tex. 2007)............................................................10

*In re Highland Capital Management, L.P.*,
   No. 19-34054 (SGJ) (Bankr. N.D. Tex. Nov. 24, 2020)...........................58, 61

*In re Highland Capital Mgmt.*,
   No.19-34054-SGJ (Bankr. N.D. Tex. Aug. 25, 2023).....................................59

*In re Hollister Construction Services, LLC*,
   No. 19-27439 (MBK) (Bankr. D.N.J. Apr. 16, 2021)......................................45

*In re Horsehead Holding Corp.*,
   No. 16-10287 (CSS) (Bankr. D. Del. Sep. 9, 2016) ..................................49, 50

*In re Indianapolis Downs, LLC*,
   486 B.R. 286 (Bankr. D. Del. 2013) ........................................................*passim*

*In re Jersey City Med. Ctr.*,
   817 F.2d 1055 (3d Cir. 1987)..........................................................................10

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
   987 F.2d 154 (3d Cir. 1993).......................................................................10, 40

*In re L'OCCTAINE, Inc.*,
   No. 21-10632 (MBK) (Bankr. D.N.J. Aug. 25, 2021).....................................45

*In re Laboratory Partners, Inc.*,
   No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) ......................................24

*In re Lannett Co., Inc.*,
   No. 23-10559 (JKS) (Bankr. D. Del. June 8, 2023).............................50, 53, 58

*In re Lisanti Foods, Inc.*,
   329 B.R. 491 (Bankr. D.N.J. 2005), *aff'd*, 241 F. App'x 1 (3d Cir. 2007)............................31

*Lowenbraun v. Canary* (*In re Lowenbraun*),
   453 F.3d 314 (6th Cir. 2006) ..........................................................................57

*In re Mallinckrodt PLC*,
  639 B.R. 837 (Bankr. D. Del. 2022) ....................................................50

*In re Martin*,
  91 F.3d 389 (3d Cir.1996)...................................................................17

*In re Master Mortg. Inv. Fund, Inc.*,
  168 B.R. 930 (Bankr. W.D. Mo. 1994).................................................18

*In re Modell's Sporting Goods, Inc.*,
  No. 20-14179 (VFP) (Bankr. D. N.J. Nov. 12, 2020)......................51, 58

*In re Motors Liquidation Co.*,
  541 B.R. 104 (Bankr. S.D.N.Y. 2015)..................................................58

*In re National Realty Investment Advisors, LLC*,
  No. 22-14539 (JKS) (Bankr. D.N.J. Aug. 10, 2023) ............................57

*In re Nautical Solutions, L.L.C.*,
  No. 23-90002 (CML) (Bankr. S.D. Tex. Feb. 14, 2023) .......................56

*NextPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital
  Mgmt, L.P.)*,
  48 F.4th 419 (5th Cir. 2022) ...............................................................59

*In re Nickels Midway Pier, LLC*,
  No. 03-49462 (GMB), 2010 WL 2034542 (Bankr. D.N.J. May 21, 2010) ...........................10

*In re NII Holdings, Inc.*,
  288 B.R. 356 (Bankr. D. Del. 2002) .....................................................30

*In re Nutraquest, Inc.*,
  434 F.3d 639 (3d Cir.2006)..................................................................17

*In re Nutritional Sourcing Corp.*,
  398 B.R. 816 (Bankr. D. Del. 2008) .......................................................9

*In re Ocean View Motel, LLC*,
  No. 20-21165-ABA, 2022 WL 243213 (Bankr. D.N.J. Jan. 25, 2022) ..................42

*In re One Aviation Corp.*,
  No. 18-12309 (CSS) (Bankr. D. Del. Sep. 18, 2019) ......................20, 49

*In re Premier Int'l Holdings, Inc.*,
  2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010)............................8, 24

*In re Princeton Alternative Income Fund, LP*,
  No. 18-14603 (MBK) (Bankr. D.N.J. Feb. 19, 2020).............................57

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
 390 U.S. 414 (1968)...................................................................................................17

*In re Prussia Assocs.*,
 322 B.R. 572 (Bankr. E.D. Pa. 2005) ........................................................................37

*In re PWS Holding Corp.*,
 228 F.3d 224 (3d Cir. 2000) ..............................................................................*passim*

*In re RCS Cap. Corp.*,
 No. 16-10223 (MFW) ................................................................................................23

*In re Riverbed Tech., Inc.*,
 No. 21-11503 (CTG) (Bankr. D. Del. Dec. 4, 2021) ................................................50

*Matter of Rochem, Ltd.*,
 58 B.R. 641 (Bankr. D.N.J. 1985) .............................................................................10

*In re S B Bldg. Assocs. Ltd. P'ship*,
 621 B.R. 330 (Bankr. D.N.J. 2020) ...............................................................17, 40, 42

*In re S&W Enter.*,
 37 B.R. 153 (Bankr. N.D. Ill. 1984) ............................................................................9

*In re Saint Michael's Medical Center, Inc.*,
 Case No. 15-24999 (VFP) (Bankr D. N.J. Jan. 12, 2017) ..................................51, 52

*In re Samson Resources Corp.*,
 No. 14-11934 (CSS) (Bankr. D. Del. Feb. 13, 2017) ........................................20, 49

*In re Sea Garden Motel & Apartments*,
 195 B.R. 294 (D.N.J. 1996) ......................................................................................38

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
 546 B.R. 284 (Bankr. S.D.N.Y. 2016)......................................................................58

*In re SiO2 Med. Prods., Inc.*,
 No. 23-10366 (JTD) (Bankr. D. Del. July 19, 2023) ................................................50

*In re SLT Holdco, Inc.*,
 Case No 20-18368 (MBK) (Bankr. D. N.J. Oct. 21, 2020) ...............................51, 52

*In re SLT HoldCo, Inc., et al.*
 No. 20-18368 (MBK) (Bankr. D.N.J. Oct. 22, 2020)........................................45, 50

*In re Spansion*,
 2010 WL 2905001 (Bankr. D. Del. April 16, 2010)..................................................24

*In re Spansion, Inc.*,
    426 B.R. 114 (Bankr. D. Del. 2010) ........................................................17, 21, 54, 60

*In re Specialty Equip. Companies, Inc.*,
    3 F. 3d 1043 (7th Cir. 1993) ........................................................................................22

*Su v. Offshore Grp. Invest. Ltd. (In re Vantage Drilling Int'l)*,
    603 B.R. 538 (D. Del. 2019) ........................................................................................19

*Matter of T-H New Orleans Ltd. P'ship*,
    116 F.3d 790 (5th Cir. 1997) ........................................................................................31

*In re TCI 2 Holdings, LLC*,
    428 B.R. 117 (Bankr. D.N.J. 2010) ......................................................................*passim*

*In re TK Holdings Inc.*,
    No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) ........................................20, 49

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011), *overruled in part on other grounds,* 464
    B.R. 208 (Bankr. D. Del. 2011) ....................................................................................38

*In re U.S. Truck Co.*,
    47 B.R. 932 (E.D. Mich. 1985) ....................................................................................38

*Matter of Union Cnty. Wholesale Tobacco & Candy Co., Inc.*,
    8 B.R. 442 (Bankr. D.N.J. 1981) ..................................................................................28

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) ..........................................................................................31

*In re Walker*,
    165 B.R. 994 (E.D. Va. 1994) ......................................................................................38

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ..............................................................17, 18, 24, 50

*In re WebSci Technologies, Inc.*,
    234 Fed. Appx. 26 (3d Cir.2007) ..................................................................................17

*In re WeWork, Inc.*,
    No. 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024)................................20, 49, 51, 58

*In re Wiersma*,
    227 F. App'x 603 (9th Cir. 2007) ...................................................................................9

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ........................................................................*passim*

**Statutes**

11 U.S.C. § 1123 .............................................................................................. *passim*

11 U.S.C. § 1123(a)(1)–(3) ........................................................................................ 12

11 U.S.C. § 1123(a)(1)–(7) ........................................................................................ 12

11 U.S.C. § 1123(a)(1)–(8) ........................................................................................ 12

11 U.S.C. § 1123(b)(1)–(6) ........................................................................................ 15

11 U.S.C. §§ 1123(b)(6), 1141(a), (b), and (c) ................................................................ 56

11 U.S.C. § 1125 ...................................................................................... 27, 28, 29

11 U.S.C. § 1125(b) ................................................................................................. 28

11 U.S.C. § 1126 ............................................................................................... 29, 30

11 U.S.C. § 1126(c) ................................................................................................. 30

11 U.S.C. §§ 1129 101–1532 ...................................................................................... 1

11 U.S.C. § 1129(a)(2) .................................................................................. 25, 27, 30

11 U.S.C. § 1129(a)(5)(A)(i) .............................................................................. 32, 33

11 U.S.C. § 1129(a)(5)(A)(ii) .................................................................................... 32

11 U.S.C. § 1129(a)(15) ............................................................................................ 40

11 U.S.C. § 1129(b) .......................................................................................... 41, 42

31 U.S.C. § 3717 ..................................................................................................... 39

Bankruptcy Code Chapter 11 ................................................................................ *passim*

**Rules**

Fed. R. Bankr. P. 1015(b) .......................................................................................... 1

Fed. R. Bankr. P. 3017 .............................................................................................. 28

Fed. R. Bankr. P. 3018 .............................................................................................. 28

Fed. R. Bankr. P. 3019 ........................................................................................ 44, 45

Fed. R. Bankr. P. 3020 .............................................................................................. 45

Fed. R. Bankr. P. 3020(e) ........................................................................45

Fed. R. Bankr. P. 6004 ............................................................................45

Fed. R. Bankr. P. 6004(h) ........................................................................45

Fed. R. Bankr. P. 6006 ............................................................................45

Fed. R. Bankr. P. 6006(d) ........................................................................45

Fed. R. Bankr. P. 9019 ................................................................17, 62, 12

**Other Authorities**

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C. C.A.N. 5963 (1977) ..........................9

H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977) ...................................27

S. Rep. No. 95-989, *reprinted in* 1978 U.S.C. C.A.N. 5787 (1978)...............................9

S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978) .......................................27

The above-captioned debtors (collectively, the "Debtors") submit this memorandum of law (this "Memorandum") in support of confirmation of the *First Amended Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Technical Modifications)* filed contemporaneously herewith (as modified, amended, or supplemented from time to time),[2] pursuant to section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").  In support of confirmation of the Plan and in response to the objections thereto (the "Objections," and the parties who filed such Objections, the "Objectors"), the Debtors respectfully state as follows:

## Preliminary Statement

1.      The chapter 11 plan currently before the Court is the final step in these chapter 11 cases and realizes the results of over 13 months of hard-fought negotiations with stakeholders. Although the foundation of the Plan remains the Restructuring Support Agreement that was negotiated prepetition by the Debtors and 81% of their secured lenders, which paves the way for Thrasio's transformative efforts, importantly, the current version of the Plan represents a massive achievement: it incorporates the terms of a global settlement with the Committee that fully resolves the Committee's objections to Confirmation and has the Committee's recommendation and support.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or the Confirmation Order (as defined herein), as applicable.

A detailed description of the Debtors and their businesses and the facts and circumstances surrounding the Debtors' chapter 11 cases is set forth in greater detail in the *Declaration of Josh Burke, Chief Financial Officer of Thrasio Holdings, Inc., in Support of First-Day Motions* [Docket No. 38] (the "First Day Declaration"). On February 28, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No 64].  On March 12, 2024, the United States Trustee for the District of New Jersey (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 163].

2.      Reaching this point was no small feat.    The Debtors' restructuring is a true achievement and a testament to the hard work of the Debtors' management team and stakeholders over the course of the last year.  Thrasio is a complex business at both an operational and structural level, and 241 debtors, incorporated domestically and abroad, filed petitions in these chapter 11 cases.  The Debtors' complex business model and operational realities of the industry necessitated creative negotiations to realize a transformation that will create a new, streamlined, sustainable go-forward business.

3.      Due in large part to the Debtors' tireless efforts to forge consensus, the results of the Debtors' solicitation process were decisive.  All Voting Classes overwhelmingly voted to accept the Plan – which has the support of 100% of Holders of First Lien Claims and 92% of voting General Unsecured Claims, all of whom voted to accept the Plan.  More than 99% of all voting creditors submitted Ballots approving the Debtors' Plan.  The creditor body has unequivocally spoken, and the Plan is clearly the best path forward for creditors.

4.      The Plan satisfies the Bankruptcy Code's requirements for confirmation and faces limited opposition.  The Debtors received five objections to the Plan, three of which have been resolved.  Of the two remaining formal objections, only the Objections from the United States Trustee (the "U.S. Trustee") and Joshua Silberstein remain unresolved.  Neither Objection poses an obstacle to Confirmation.  The Debtors will continue to engage with the Objectors leading up to the Confirmation Hearing in hopes of a fully consensual resolution, but as explained in detail below, to the extent not resolved prior to the Confirmation Hearing, the Court should overrule these Objections, confirm the Plan, and position the Debtors to emerge from chapter 11 expeditiously.

## Argument

5.      This Memorandum is divided into three parts.  Part I provides the procedural history of the Plan and the Debtors' solicitation efforts and the voting results.  Part II establishes the Plan's compliance with each applicable requirement for Confirmation, including that certain of the discretionary contents of the Plan, including the Releases, are appropriate.  Part III establishes that the Objections to the Plan should be overruled.  In further support of Confirmation of the Plan, the Debtors have filed the:

- *Declaration of Adam Gorman of Kurtzman Carson Consultants LLC Regarding the Solicitation and Tabulation of Votes on the Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* filed contemporaneously herewith (the "Voting Report");

- *Declaration of Terrence Grossman, Bankruptcy Administration Officer of Thrasio Holdings, Inc., in Support of Confirmation of the First Amended Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1068] (the "Grossman Declaration");

- *Declaration of Whit Graham in Support of Confirmation of the First Amended Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1069] (the "Graham Declaration"); and

- *Declaration of Anthony R. Horton in Support of Confirmation of the First Amended Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to  Chapter 11 of the Bankruptcy Code* [Docket No. 1070] (the "Horton Declaration" and, together with the Voting Report, the Grossman Declaration, and the Graham Declaration, the "Declarations").

6.      For the reasons stated herein, the Debtors respectfully request that the Court find that the Debtors have satisfied all relevant burdens and approve the Plan.

## I.      CASE BACKGROUND AND OBJECTIONS.

### A.      Procedural History.

7.      On February 28, 2024, the Debtors filed the (a) *Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*

[Docket No. 40], (b) *Disclosure Statement for the Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 41], and (c) *Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 42] (the "Disclosure Statement Motion").

8.      On April 4, 2024, the Court entered the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, and (IV) Approving Notice Thereof* [Docket No. 292] (the "Bar Date Order"), which established May 6, 2024, as the General Claims Bar Date, and September 4, 2024, as the Governmental Bar Date, and provided that any Holder of a Claim that fails to timely submit a Proof of Claim by the applicable bar date shall not be treated as a creditor with respect to such claim for the purposes of either (a) voting on any plan of reorganization filed in these chapter 11 cases or (b) participating in any distribution in the Debtors' chapter 11 cases on account of such Claim.

9.      On April 16, 2024, the Debtors filed the *Amended Disclosure Statement for the Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 375].

10.     On April 18, 2024, the Debtors filed the (a) *Solicitation Version of the Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 398] and (b) *Second Amended Disclosure Statement for the Joint*

4

*Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 392] (the "Disclosure Statement").

11.     On April 18, 2024, the Court entered the *Order (I) Approving the Adequacy of the Second Amended Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 399] (the "Disclosure Statement Order").

12.     Pursuant to the Disclosure Statement Order, the Debtors were required to distribute Solicitation Packages to Holders of Claims entitled to vote to accept or reject the Plan on or before two (2) business days following entry of the Disclosure Statement Order.[3]  Thus, as described in more detail in the Voting Report, the Debtors worked to ensure that Solicitation Packages were distributed within two business days following entry of the Disclosure Statement Order and took the following steps:[4]

- the Debtors caused the Confirmation Hearing Notice to be published in *The New York Times* (national edition) on April 25, 2025 as evidenced by the *Proof of Publication*.[5]  The Claims, Noticing and Solicitation Agent also distributed the Confirmation Hearing Notice to Holders of Claims and Interests through hard copy and email service on April 22, 2024, respectively;

- on April 22, 2024, the Claims, Noticing and Solicitation Agent distributed, through email and hard copy service, as applicable, ballots with unique IDs to parties entitled to vote on the Plan;

- on April 22, 2024, the Claims, Noticing and Solicitation Agent caused to be served certain notices of non-voting status together with copies of the Disclosure Statement, the Disclosure Statement Order, and the Plan in lieu of a Solicitation Package on Classes not entitled to vote under the Plan (the "Non-Voting Classes"); and

---

[3]     *See* Disclosure Statement Order ¶ 5.

[4]     *See Affidavit of Service* [Docket No. 700] (the "Affidavit of Solicitation").

[5]     Docket No. 441.

- on April 22, 2024, the Claims, Noticing and Solicitation Agent opened the online portal in which Holders of Claims could submit their votes on the Plan (the "E-Balloting Portal").  As described in further detail in the Voting Report, in addition to allowing for Holders of Claims in the Voting Classes to submit their votes on the Plan, the E-Balloting Portal provided Holders of Claims the opportunity to submit their completed Opt Out Form if they elected to opt out of the Plan's Third-Party Release.[6]

13.     On May 23, 2024, the Debtors filed the Plan Supplement,[7] which includes (a) the Schedule of Assumed Executory Contracts and Unexpired Leases, (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) the Retained Causes of Action List; (d) the Restructuring Transactions Memorandum; (e) the Exit Take Back Debt Credit Agreement Term Sheet; and (f) the Independent Investigation Results.

14.     On May 28, 2024, the Debtors, the Committee, and the Ad Hoc Group agreed to the terms of the Committee Settlement, in which the Debtors agreed to carve out certain Claims and Causes of Action against the Excluded Parties and preserve the proceeds from any such Claims and Causes of Action for the benefit of General Unsecured Creditors.

15.     On June 4, 2024, the Debtors filed the *First Amended Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1066].

16.     On June 7, 2024, the Debtors filed the (a) *First Amended Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of Bankruptcy Code (Technical Modifications)* filed contemporaneously herewith and (b) *First Amended Plan Supplement* filed contemporaneously herewith.

---

6     *See* Voting Report; *see also* Affidavit of Solicitation.

7     Docket Nos. 805, 806.

17.     The deadline to vote on the Plan was June 5, 2024, at 4:00 p.m. (prevailing Eastern Time) and the deadline to file an objection to the Plan was June 5, 2024, at 2:00 p.m. (prevailing Eastern Time).

**B.      The Plan Solicitation and Notification Process.**

18.     In compliance with the Bankruptcy Code, only Holders of Claims in Impaired Classes receiving or retaining property on account of such Claims were entitled to vote on the Plan.[8]  Holders of Claims and Interests were not entitled to vote if their rights are Unimpaired (in which case they were conclusively deemed to accept the Plan) or if they are not receiving or retaining any property under the Plan (in which case they were conclusively deemed to reject the Plan).  The following Classes of Claims and Interests were ***not*** entitled to vote on the Plan, and the Debtors did not solicit votes from the Holders of such Claims and Interests:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5 | Series X Redeemable Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Series D Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Series C Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Series B Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Series A Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Series Seed Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | Common Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 12 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| 13 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |

---

[8]     *See* 11 U.S.C. § 1126.

19.    The Debtors solicited votes on the Plan from Holders of Claims in Class 3 (First Lien Claims) and Class 4 (General Unsecured Claims), which were entitled to vote to accept or reject the Plan (each a "Voting Class" and collectively, the "Voting Classes").  As reflected in the Voting Report and as shown below, Class 3 and Class 4 overwhelmingly voted to accept the Plan. Each of the Debtors strongly believes that the Plan is in the best interests of its estate and represents the best available alternative for all of its stakeholders.  The voting results, as reflected in the Voting Report, are summarized as follows:

| Total Ballots Received | | | |
|---|---|---|---|
| Accept | | Reject | |
| Number (% of Number) | Amounts (% of Amount) | Number (% of Number) | Amount (% of Amount) |
| Class 3 – First Lien Claims | | | |
| 153 (100%) | $854,880,426.26 (100%) | 0 (0%) | $0.00 (0%) |
| Class 4 – General Unsecured Claims | | | |
| 169 (92.35%) | $382,043,092.30 (99.22%) | 14 (7.65%) | $3,014,172.61 $(0.78%) |

20.    The hearing on confirmation of the Plan (the "Confirmation Hearing") is scheduled to commence on June 10, 2024, at 10:00 a.m. (prevailing Eastern Time).  Concurrently with this Memorandum, the Debtors submitted the proposed *Findings of Fact, Conclusions of Law, And Order Confirming the First Amended Joint Plan Of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of The Bankruptcy Code* (the "Confirmation Order").

## II.    THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.

21.    To confirm the Plan, the Court must find that the Debtors have satisfied the requirements of section 1129 of the Bankruptcy Code.[9]  The Plan is confirmable notwithstanding any Rejecting Classes so long as it does not discriminate unfairly and is fair and equitable with respect to any rejecting classes.  As described in detail below, the Plan complies with all relevant provisions of the Bankruptcy Code and all other applicable law.

### A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).

22.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[10]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses and incorporates the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan of reorganization, respectively.[11]  As explained below, the Plan complies with the requirements of sections 1122 and 1123 in all respects.

---

[9]    *See In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *4 (Bankr. D. Del. Apr. 29, 2010) (holding that the plan proponent must prove each element of section 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 148 (Bankr. D.N.J. 2010) ("The plan proponent bears the burden to show by a preponderance of the evidence that the proposed Chapter 11 plan has a reasonable probability of success[] and is more than a visionary scheme") (citing *In re Wiersma*, 227 F. App'x 603, 606 (9th Cir. 2007) (internal quotation marks omitted)).

[10]    11 U.S.C. § 1129(a)(1).

[11]    S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008).

### 1. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

23. The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.[12]

24. Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[13] Moreover, the requirement of substantial similarity does not mean that claims or interests within a particular class must be identical or that all similarly situated claims must receive the same treatment under a plan.[14]

---

[12]  11 U.S.C. § 1122(a).

[13]  *See, e.g.*, *Matter of Rochem, Ltd.*, 58 B.R. 641, 642 (Bankr. D.N.J. 1985) ("Although Section 1122(a) of the Code requires that claims be substantially similar within a particular class, there is no requirement within Section 1122 or elsewhere in the Code that all substantially similar claims be included within a particular class."). Courts have identified grounds justifying separate classification, including: (a) where members of a class possess different legal rights, and (b) where there are good business reasons for separate classification. *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (holding that, as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis on account of the bankruptcy court-approved settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) (explaining that "the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (holding that, although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case") (internal quotations omitted); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims. It does not require that similar classes be grouped together . . . .").

[14]  *See, e.g.*, *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 224 (Bankr. D.N.J. 2000) ("[s]eparate classification of similar claims has been found to be permissible where the classification is offered in good faith, does not foster an abuse of the classification system, and promotes the rehabilitative goals of Chapter 11."); *In re Nickels Midway Pier, LLC*, No. 03-49462 (GMB), 2010 WL 2034542, at *7 (Bankr. D.N.J. May 21, 2010) (proffering just one rule regarding classification of separate classification of similar classes under section 1122,

25.     The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into thirteen (13) separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class in a legal or factual way or based on other relevant criteria.[15] Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

a.      Class 1: Other Secured Claims

b.      Class 2: Other Priority Claims

c.      Class 3: First Lien Claims

d.      Class 4: General Unsecured Claims

e.      Class 5: Series X Redeemable Preferred Stock Interests

f.      Class 6: Series D Preferred Stock Interests

g.      Class 7: Series C Preferred Stock Interests

h.      Class 8: Series B Preferred Stock Interests

i.      Class 9: Series A Preferred Stock Interests

j.      Class 10: Series Seed Preferred Stock Interests

k.      Class 11: Common Stock Interests

l.      Class 12: Intercompany Claims

m.      Class 13: Intercompany Interests

---

only that "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan").

[15]     *See* Plan Art. III.B.

26.    Claims and Interests assigned to each Class described above are substantially similar to the other Claims and Interests in such Class.[16]  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.[17]  Dissimilar Claims and Interests are not classified together under the Plan. For example, secured, priority, and unsecured claims are classified separately as are preferred and common equity interests.  Accordingly, the Debtors submit that the Plan fully complies with and satisfies section 1122(a) of the Bankruptcy Code.

### 2.    The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

27.    Section 1123(a) of the Bankruptcy Code sets forth seven (7) criteria that every chapter 11 plan must satisfy.[18]  The Plan satisfies each of these requirements.[19]

28.    ***Specification of Classes, Impairment, and Treatment***.  The first three requirements of section 1123(a) are that the plan specify (a) the classification of claims and interests, (b) whether such claims and interests are impaired or unimpaired, and (c) the precise nature of their treatment under the Plan.  Article III of the Plan satisfies these requirements by setting forth these specifications in detail, and no party has asserted otherwise.[20]

---

[16]  *See* Grossman Decl. ¶¶ 8–11.

[17]  *See id.*

[18]  11 U.S.C. § 1123(a)(1)–(7).

[19]  *See* 11 U.S.C. § 1123(a)(1)–(8).  Section 1123(a)(8) of the Bankruptcy Code is only applicable to individual debtors.

[20]  11 U.S.C. § 1123(a)(1)–(3).

29.     ***Equal Treatment***.  Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[21]  The Plan meets this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such holders' respective Class.[22]

30.     ***Means for Implementation***.  Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[23]   The Plan satisfies this requirement because Article IV of the Plan, as well as other provisions thereof, provides for the means by which the Plan will be implemented.[24]   Among other things, Article IV of the Plan provides for the:

    a.    consummation of the Restructuring Transactions;

    b.    cancellation of notes, instruments, certificates, and other documents;

    c.    exemption from certain taxes and fees;

    d.    sources of consideration for the Restructuring Transactions;

    e.    execution of the New Stockholders Agreement;

    f.    issuance and distribution of the New Common Stock;

    g.    implementation of the Exit Facilities;

    h.    Committee Settlement;

---

[21]   11 U.S.C. § 1123(a)(4).

[22]   *See* Grossman Decl. ¶ 13.

[23]   11 U.S.C. § 1123(a)(5).

[24]   *See* Grossman Decl. ¶ 14.

i.     corporate existence and corporate actions of the Reorganized Debtors;

j.     vesting of assets in the Reorganized Debtors;

k.     New Organizational Documents;

l.     Directors and Officers of the Reorganized Debtors;

m.     preservation of the Retained Causes of Action;

n.     Management Incentive Plan;

o.     treatment of employee obligations and arrangements;

p.     closing of the Chapter 11 Cases;

q.     authorizing the Payment of Fees and Expenses of Certain Creditors; and

r.     creation of the Thrasio Legacy Trust.

The Debtors submit that the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

31.    ***Non-Voting Stock.***  Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities.  The Reorganized Debtors will not issue any non-voting equity securities.[25]  Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code, and no party has asserted otherwise.

32.    ***Selection of Officers and Directors.***  Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."  The Plan provides that, on the Effective Date, the term of the Debtors' current board of directors will expire,[26] and the directors for the initial term of the

---

[25]  *See* Grossman Decl. ¶ 16.

[26]  Plan Art. IV.M (except in the case of the Disinterested Directors, who shall retain authority following the Effective Date with respect to matters relating to Professional Fee Claims requests).

New Board shall be designated and appointed in accordance with the terms set forth in the New Organizational Documents and the New Stockholders Agreement. Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

### 3. The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

33. Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan. Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may: (a) modify, impair, or leave unimpaired any class of claims or interests; (b) provide for the settlement or adjustment of claims against or interests in a debtor or its estate or the retention and enforcement by a debtor, trustee, or other representative of claims or interests; (c) provide for the assumption or rejection of executory contracts and unexpired leases; (d) provide for the sale of all or substantially all of the property of the Debtors' estates, and the distribution of the proceeds of such sale among holders of claims or interests; or (e) "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[27]

34. The Plan is consistent with section 1123(b) of the Bankruptcy Code.[28] Specifically, under Article III of the Plan, Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims within such Classes.[29] On the other hand, Classes 3, 4, 5, 6, 7, 8, 9, 10, and 11 are Impaired since the Plan modifies the rights of the Holders of Claims and Interests within such

---

[27] *See* 11 U.S.C. § 1123(b)(1)–(6).

[28] *See* Grossman Decl. ¶¶ 18–20 .

[29] *See* Plan Art. III.C.

Classes as contemplated in section 1123(b)(1) of the Bankruptcy Code.[30]  Class 12 (Intercompany Claims) and Class 13 (Intercompany Interests) may be Impaired or Unimpaired under the Plan.

35.     In addition, and under section 1123(b)(2) of the Bankruptcy Code, Article V.A of the Plan provides that, on the Effective Date, all Executory Contracts and Unexpired Leases not previously assumed, assumed and assigned, or rejected shall be deemed assumed pursuant to sections 365 and 1123 of the Bankruptcy Code, except to the extent set forth in the Plan.[31]

36.     Finally, the Plan contains provisions that implement certain releases and exculpations, compromise claims and interests, and enjoin certain causes of action.  These provisions are consistent with those approved by the Court in precedent chapter 11 plans.[32]  Each of these provisions is appropriate because, as applicable, they (a) are supported by the findings of the Independent Investigation;[33] (b) have been critical to obtaining the support of the various constituencies for the Plan, (c) are given for valuable consideration, (d) are fair and equitable and in the best interests of the Debtors, their estates, and these chapter 11 cases, and (e) are consistent with the relevant provisions of the Bankruptcy Code and Third Circuit law.[34]  Such provisions are discussed in turn below, but, in summary, satisfy the requirements of section 1123(b).

37.     ***Settlement of Claims and Controversies.***  The Plan provides for the settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.

---

[30]  *See* Plan Art. III.C.

[31]  *See* Plan Art. V.A.

[32]  *See, e.g.*, *In re BlockFi, Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (confirming a chapter 11 plan with third party and debtor releases consistent with those in the Plan).

[33]  *See* Horton Declaration ¶ 19.

[34]  *See* Horton Decl. ¶¶ 19–29.

38.    ***The Release, Exculpation, and Injunction.***   The Plan includes certain releases, an exculpation provision, and an injunction.   These discretionary provisions are proper because, among other things, they are necessary to bringing these chapter 11 cases to conclusion, securing necessary support for the Plan from the Consenting Lenders, are overwhelmingly supported by the Debtors' creditors as demonstrated by the voting results, and are consistent with applicable precedent.[35]

(i)    ***The Debtor Release Is Appropriate.***

39.    Article VIII.E of the Plan provides for releases by the Debtors, the Reorganized Debtors, and their estates of Causes of Action against the Released Parties[36] (the "<u>Debtor Release</u>").   The Debtor Release is a vital component of the Plan, a sound exercise of the Debtors' business judgment, and it should be approved.

40.    Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[37]   A debtor may release claims under section 1123(b)(3)(A) "if the release is a valid

---

[35]   *See id.*

[36]   Pursuant to the Plan, "Released Parties" means, collectively, in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Lenders; (d) the DIP Lenders; (e) the DIP Agent; (f) the Ad Hoc Group and each member of the Ad Hoc Group; (g) the Committee and each member of the Committee; (h) the Administrative Agent; (i) the Arrangers, each lender, and Issuing Banks and other secured parties under the First Lien Credit Agreement; (j) the DIP Backstop Parties; (k) each current and former wholly-owned Affiliate of each Entity in clause (a) through the following clause (l); and (l) each Related Party of each Entity in clauses (a) through this clause (l); *provided, however,* that each Entity that timely and properly opts out of the releases contemplated herein shall not be a Released Party; *provided, further*, that the Excluded Parties shall not be deemed Released Parties.  Plan Art. I.A.131.

[37]   *See In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 380 (Bankr. D.N.J. 2020) (The standards for approving a settlement are the same under both Bankruptcy Rule 9019 and section 1123(b)(3).).  Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness."  *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010) (citation omitted); *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir.2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them.").  Additionally, the Third Circuit has held that, to approve a settlement pursuant to Rule 9019, the court must balance:  "'(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount

exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[38]

41.    Courts in this jurisdiction generally analyze five factors when determining the propriety of a debtor release, commonly known as the *Zenith* or *Master Mortgage* factors.[39]  The analysis includes an inquiry into whether there is:  (1) identity of interest between the debtor and non-debtor; (2) contribution to the plan by the non-debtor; (3) the necessity of the release to the plan; (4) overwhelming acceptance of the plan and release by creditors and interest holders; and (5) payment of all or substantially all of the claims of the creditors and interest holders.[40]  These factors are "neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in determining fairness of a debtor's releases.[41]  The Debtor Release meets the applicable standard and should be approved.

42.    ***First***, an identity of interest exists between the Debtors and the parties to be released.  Each of the Released Parties, as a stakeholder and critical participant in the Plan process,

---

interest of the creditors.'" *In re WebSci Technologies, Inc.*, 234 Fed. Appx. 26, 29 (3d Cir.2007) (quoting *In re Martin*, 91 F.3d 389, 393 (3d Cir.1996)).  In addition, the court must determine whether the proposed settlement is fair and equitable, and in the best interests of the estate.  *See, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("Under the 'fair and equitable' standard, we look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle.").

[38]    *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citations omitted).

[39]    *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999)); *see also In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994).  The Master Mortgage factors have been adopted by the Third Circuit, including application by the Bankruptcy Court of the District of New Jersey as "neither exclusive nor conjunctive requirements, but . . . guidance in the Court's determination of fairness.  *See, e.g., In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *14 (Bankr. D.N.J. Mar. 5, 2014) (citing *In re Washington Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011)).

[40]    *See In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *In re Zenith Elecs. Corp.*, 241 B.R. at 110 and *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. at 937)

[41]    *In re Wash. Mut., Inc.*, 442 B.R. at 346 (citing *In re Master Mortg.*, 168 B.R. at 935).

shares a common goal with the Debtors in seeing the Plan succeed and each would have been highly unlikely to participate in the negotiations and compromises that led to the ultimate formation of the Plan without the Debtor Release.  The Debtor Release provides needed finality, underpins the settlement and compromise of issues achieved by the Plan, and actually permits the estate to consummate the Plan; therefore, the inclusion of the Debtor Release inures to the benefit of all the Debtors' stakeholders.

43.  **Second**, the substantial contributions are clear.  As Courts in this jurisdiction have recognized, a wide variety of acts may illustrate a substantial contribution to a debtor's reorganization.[42]  Each Released Party has made a substantial contribution to the Debtors' Estates. The Released Parties played an integral role in the formulation of the Plan and contributed to the Plan not only by expending significant time and resources analyzing and negotiating the terms thereof.

44.  **Third**, the Debtor Release is essential to the success of the Debtors' Plan.  Absent the Debtor Release, it is highly unlikely the Released Parties would have agreed to support the Plan, and highly unlikely that the Plan would exist at all.  As described above, each of the Released Parties contributed substantial value to these chapter 11 cases and did so with the understanding that they would receive releases from the Debtors.  In the absence of Released Parties' support,

---

[42]  *See In re Long Ridge Road Operating Company, II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *14 (Bankr. D.N.J. Mar. 5, 2014) (finding that the non-debtor party had substantially contributed by providing financial support, without which, the plan would not be feasible). *Su v. Offshore Grp. Invest. Ltd. (In re Vantage Drilling Int'l)*, 603 B.R. 538, 548 n.5 (D. Del. 2019) ("[A] person receiving a release generally must have provided something of value in return, such as by . . . facilitating the debtor's reorganization."); *In re Zenith Elecs. Corp.*, 241 B.R. at 111 (finding non-debtor parties had substantially contributed where (a) officers and directors made substantial contributions by designing and implementing the operational restructuring and negotiating the financial restructuring and (b) plan sponsor funded the plan and agreed to compromise its claim); *In re Hercules Offshore, Inc.*, 565 B.R. 732, 758–60 (Bankr. D. Del. 2016) (holding that a release of the debtors' officers, directors, and professionals was appropriate where the record reflected an "intensive and thoughtful effort by management and the Special Committee," with the advice and assistance of its hired professionals, "to respond to the market challenges" and who "chose the option that they believed would conserve the value of the [e]states and maximize recovery for all stakeholders, including equity holders").

the Debtors would not be in a position to confirm the Plan, emerge from chapter 11, implement the Plan, and maximize value for creditors. The Debtor Release, therefore, is essential to the Debtors' Restructuring Transactions.

45.    *Fourth*, the Plan, including the Debtor Release, has been overwhelmingly accepted by Class 3 and Class 4.[43]

46.    *Fifth*, the Plan provides meaningful recoveries to creditors in exchange for, among other things, the Debtors' release of certain claims.

47.    Further, as demonstrated by the Liquidation Analysis, the ranges of recoveries for Holders of Claims and Interests are materially higher under the Plan than they would have been in a chapter 7 liquidation scenario. The Plan has been carefully crafted to maximize value and provides meaningful recoveries for stakeholders under the circumstances. As described in the Independent Investigation Results, the Disinterested Directors conducted a review of potential Claims or Causes of Action the Debtors' Estates may have against insiders of the Debtors. The Disinterested Directors found that the Debtors' Estates may have valuable Claims or Causes of Action. If pursuit of these Claims or Causes of Action results in a recovery, the Plan provides for recovery to Holders of General Unsecured Claims.[44]

48.    For the reasons set forth above, and as supported by the Horton Declaration, the *Zenith* factors support approval of the Debtor Release. Moreover, the breadth of the Debtor Release is consistent with those regularly approved in this jurisdiction and others.[45] The Debtors

---

[43]    *See generally* Voting Report.

[44]    *See* Plan Art. IV.O; *see generally Summary Report Of The Disinterested Directors Of Thrasio Holdings, Inc. Regarding Independent Investigation Of Potential Estate Causes Of Action Against Related Parties* [Docket No. 805] (the "Independent Investigation Results").

[45]    *See, e.g.*, *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. May 31, 2024) (approving a Plan providing for releases of certain former directors and officers); *In re WeWork, Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024) (same); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023); *In re Bed*

have easily satisfied the business judgment standard in granting the Debtor Release under the Plan.

The Debtor Release is fair, reasonable, overwhelmingly supported by creditors, and in the best

interests of the Debtors' Estates.  Thus, the Court should approve the Debtor Release.

49.     For the foregoing reasons, the Debtors' agreement to provide the Debtor Release

constitutes a sound exercise of the Debtors' business judgment and should be approved.

**(ii)     *The Third-Party Release is Wholly Consensual and Is Appropriate.***

50.     In addition to the Debtor Release, Article VIII.F of the Plan provides that each

Releasing Party[46] that has not opted out shall release any and all Causes of Action such parties

could assert against the Released Parties (the "Third-Party Release," and together with the Debtor

Release, the "Releases").  The Third-Party Release is consistent with established Third Circuit

law, integral to the Plan, and therefore should be approved.

51.     Numerous courts have recognized that a chapter 11 plan may include a release of

non-debtors by other non-debtors when such release is consensual.[47]  In this district, a release is

---

*Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. September 14, 2023) (same); *In re One Aviation Corp.*, No. 18-12309 (CSS) (Bankr. D. Del. Sep. 18, 2019) (approving Plan providing for definition of Released Parties including, among others, the Debtors' directors and officers); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) (same); *In re Checkout Holding Corp.*, No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) (same); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) (same); *In re Samson Resources Corp.*, No. 14-11934 (CSS) (Bankr. D. Del. Feb. 13, 2017) (same); *In re Horsehead Holding Corp.*, No. 16-10287 (CSS) (Bankr. D. Del. Sep. 9, 2016) (same).

[46]   Pursuant to the Plan, "Releasing Parties" means, collectively, in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Lenders; (d) the DIP Lenders; (e) the Ad Hoc Group and each member of the Ad Hoc Group; (f) the Administrative Agent; (g) the Arrangers, each lender, and Issuing Banks and other secured parties under the First Lien Credit Agreement; (h) the DIP Backstop Parties; (i) all Holders of Claims; (j) all holders of Interests; (k) each current and former wholly-owned Affiliate of each Entity in clause (a) through the following clause (l); and (l) each Related Party of each Entity in clauses (a) through this clause (l); *provided, however*, that each Entity that timely and properly opts out of the releases contemplated herein shall not be a Releasing Party; *provided, further, however*, that any Holder of Interests who acquired such Interests after the Voting Record Date (as such term is defined in the Disclosure Statement Order) and did not receive an opt out election form shall not be a Releasing Party.  *See* Plan Art. I.A.132.

[47]   *See, e.g.*, *In re Am. Family Enters.*, 256 B.R. 377, 390 (D.N.J. 2000) (although in the context of a settlement, the court held that a consensual third-party release "the essential vehicle by which the Debtors c[ould] obtain the funds needed to perform their monetary obligations under the Plan" and is thus "substantially similar to the plan context"); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013) (collecting cases);

consensual where (as here) parties receive notice of a plan's release provisions and have an opportunity to opt out. Here, the ballots distributed to Holders of Claims entitled to vote on the Plan quoted the entirety of the Third-Party Release and clearly informed such Holders of the steps to take if they wanted to opt out of the Third-Party Release.[48] Notices sent to Holders of Claims in Unimpaired Classes not entitled to vote similarly informed them of their ability to opt out. Moreover, the Committee explicitly referenced the "opt-out" choice stakeholders had to make in its letter to creditors.[49] Thus, affected parties were clearly on notice of the Third-Party Release and of their ability to opt out. Sixty-six (66) individual parties exercised the opt out, which illustrates that the parties to these cases were in fact adequately put on notice of their ability to opt out and had every chance to do so.

52.    Moreover, the Plan is a contract between a Debtor and its stakeholders, implemented with approval from the Court.[50] As with any party considering a contract, parties entitled to vote on a chapter 11 plan consider the options in front of them holistically prior to voting to accept or reject such a plan, including the benefits they get in exchange for giving releases.

---

*In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (stating that "a third party release may be included in a plan if the release is consensual"); [*see also infra* ¶¶ 122-131 & nn. 87-88 and 173-182.]

[48]    *See generally* Voting Report.

[49]    The Committee's letter to creditors [Docket No. 393, Exhibit B] makes the choice available to General Unsecured Creditors exceptionally clear:

> The Plan, as proposed, does not treat unsecured creditors fairly and equitably, and should not be confirmed. The Committee strongly urges you to vote to **REJECT** the Plan and **OPT OUT** of the third-party releases.

> The Committee urges you to **opt out** of the third-party release. Failure to opt out of the third-party release acts to inappropriately release various non-debtors (including the Debtors' current and former directors and officers, among others) who could be subject to potential litigation the outcome of which could benefit unsecured creditors.

[50]    *See, e.g.*, *In re Coram Healthcare Corp., Inc.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004) ("[A] Plan is a contract that may bind those who vote in favor of it."); *see also In re Harstad*, 155 B.R. 500, 510 (Bankr. D. Minn. 1993) (holding that "a chapter 11 plan is a contract between the debtor and its creditors" and applying contracts law principle to plan interpretation issues).

Courts in the Third Circuit and others have recognized that voting in favor of a plan is sufficient to demonstrate consent to any third-party release contained therein.[51]  This structure does not take away any party's right to opt-out of the Third-Party Release if they so choose.  Eligible parties were able to opt out of the third-party release by completing the Opt Out Form.[52]

53.    The Third-Party Release is an integral and essential provision of the Plan and helps provide finality for the Released Parties, is in exchange for good and valuable consideration provided by the Released Parties, is in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, is fair and equitable, and reasonable, and is given and made after due notice and opportunity to be heard.  For the foregoing reasons, the Third-Party Release is permissible.

### (iii)    *The Exculpation Provision Is Appropriate.*

54.    Article VIII.G of the Plan provides that each Exculpated Party[53] shall be released and exculpated from any Causes of Action arising out of acts or omissions in connection with these chapter 11 cases and certain related transactions, except for acts or omissions that are found to

---

[51]    *See, e.g.*, *In re Coram Healthcare Corp., Inc.*, 315 B.R. at 336 ("To the extent creditors or shareholders voted in favor of the Trustee's Plan, which provides for the release of claims they may have against the [creditors], they are bound by that."); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (finding that a third-party release binds those voting in favor of the plan); *see also In re Specialty Equip. Companies, Inc.*, 3 F. 3d 1043, 1047 (7th Cir. 1993) ("Unlike the injunction created by the discharge of a debt, a consensual release does not inevitably bind individual creditors.  It binds only those creditors voting in favor of the plan of reorganization."); *In re Chassix Holdings, Inc.*, 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015) (holding that releasing parties "should include creditors who voted in favor of the Plan" and that "case law in this District and elsewhere supports the conclusion that the creditors' vote for the Plan constitutes a consent to the releases.").

[52]    *See In re RCS Cap. Corp.*, No. 16-10210 (MFW), Hr'g Tr. 59:21-60:2 (Bankr. D. Del. Mar. 21, 2016) ("[i]f a creditor doesn't want to grant a release, they can vote no and opt out . . . .").

[53]    Pursuant to the Plan, "Exculpated Parties" means, collectively, and in each case solely in its capacity as such and to the extent they are estate fiduciaries: (a) each Debtor; (b) each Reorganized Debtor; (c) the Committee and each member of the Committee; (d) each current and former wholly-owned Affiliate of each Entity in clause (a) through the following clause (e) that is not an Excluded Party; and (e) each Related Party of each Entity in clauses (a) through this clause (e).  For the avoidance of doubt, none of the Excluded Parties shall be Exculpated Parties. *See* Plan Art. I.A.75.

have been the product of actual fraud, willful misconduct, or gross negligence (the "<u>Exculpation</u>").
The Exculpation is intended to prevent collateral attacks against estate fiduciaries that have acted
in good faith to help facilitate the Debtors' restructuring.  The Exculpation is an integral part of
the Plan and otherwise satisfies the governing standards in the Third Circuit.  This provision
provides necessary and customary protections to estate fiduciaries whose efforts were and continue
to be vital to implementing the Plan.

55.    In the Third Circuit, exculpation provisions like the one set forth in the Plan are
regularly approved.[54]  Courts evaluate the appropriateness of exculpation provisions based on a
number of factors, including whether the plan was proposed in good faith, whether liability is
limited, and whether the exculpation provision was necessary for plan negotiations.[55]  Exculpation
provisions that are limited to claims not involving actual fraud, willful misconduct, or gross
negligence, are customary and generally approved in this district under appropriate
circumstances.[56]  Unlike third-party releases, exculpation provisions do not affect the liability of
third parties *per se* but rather set a standard of care of gross negligence or willful misconduct in
future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the

---

[54]   *See In re Laboratory Partners, Inc.*, No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) (finding that exculpation
was appropriately extended to secured lender who funded the chapter 11 case); *In re FAH Liquidating Corp.*,
No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) (finding that exculpation as applied to a non-debtor Plan
Sponsor was appropriate under section 1123(b)).

[55]   *See, e.g.*, *In re Congoleum Corp.*, 326 B.R. 167, 189–90 (KCF) (Bankr. D.N.J. Jan. 26, 2007) (evaluating the
appropriateness of the plan's exculpation provisions based on whether the parties played a significant role in the
negotiations that led to the plan and whether the exculpation is necessary to the plan).

[56]   *See In re Wash. Mut., Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) (holding that an exculpation clause that
encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the
[c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

Debtors' restructuring.[57]  Exculpation for parties participating in the Plan process is appropriate where Plan negotiations could not have occurred without protection from liability.[58]

56.     The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits related to this chapter 11 process filed by unsatisfied parties.[59]  Moreover, the Exculpation provision and the liability standard it sets represent a conclusion of law that flows logically from certain findings of fact that the Court must reach in confirming the Plan as it relates to the Debtors.  As discussed above, this Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, this Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals.  Further, these findings imply that the Plan was negotiated at arm's-length and in good faith.

57.     Here, the Debtors and their officers, directors, and professionals actively negotiated the Plan with the Consenting Lenders, the Committee, and the U.S. Trustee.[60]  Such negotiations were extensive, and the compromises derived therefrom are embodied in the Plan and will

---

[57]  *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code."); *see also In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *10 (CSS) (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion*, 2010 WL 2905001, at *16 (Bankr. D. Del. April 16, 2010) (same).

[58]  *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019) ("I believe that an appropriate exculpation provision should say that it bars claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court.").

[59]  *See* Horton Decl. ¶ 27.

[60]  *See id.*

maximize value for all stakeholders while enabling the Debtors to emerge swiftly from chapter 11 and give finality to all stakeholders.  Furthermore, the Exculpation provision is limited to acts during these chapter 11 cases and does not extend beyond such time period.  Accordingly, the Court's findings of good faith vis-à-vis the Debtors' chapter 11 cases should also extend to the Exculpated Parties.

58.    Under the circumstances, it is appropriate for the Court to approve the Exculpation and find that the Exculpated Parties have acted in good faith and in compliance with the law.

### (iv)    *The Injunction Is Appropriate.*

59.    The injunction provision set forth in Article VIII.H of the Plan (the "<u>Injunction Provision</u>") is limited in scope to prevent any interference by third parties with the use and distribution of the Debtors' assets in the manner contemplated by the Plan and to implement the release and exculpation provisions of the Plan.  The Injunction Provision is a key provision of the Plan because it enforces the terms that are critically important to the Plan.[61]  As such, the Debtors respectfully submit that the Injunction Provision is appropriate.

60.    The Debtors submit that the discretionary provisions of the Plan are consistent with and permissible under section 1123(b) of the Bankruptcy Code.  In light of the foregoing and because the Plan fully complies with sections 1122 and 1123 of the Bankruptcy Code, the Debtors submit that the Plan fully satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

### 4.    The Plan Complies with Section 1123(d) of the Bankruptcy Code.

---

[61]  *See In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 293 (2d Cir. 1992) (holding that a court may approve injunction provision where such provision "plays an important part in the debtor's reorganization plan").

61.     Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."[62]

62.     The Plan complies with section 1123(d) of the Bankruptcy Code.  The Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan by payment of the default amount, if any, on the Effective Date or as soon as practicable thereafter, subject to the limitations described in Article V.D of the Plan or the Confirmation Order.[63]  In accordance with Article V.D of the Plan and section 365 of the Bankruptcy Code, the Debtors provided notice of the amount and timing of payment of any cure payments to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement.  The Plan also sets forth procedures for counterparties to assumed Executory Contracts or Unexpired Leases to follow in the event that they object to the proposed cure amounts provided by the Debtors.  Accordingly, the Plan satisfies the requirements of section 1123(d) of the Bankruptcy Code, and no party has asserted otherwise.

**B.      The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).**

63.     The principal purpose of section 1129(a)(2) is to ensure that a plan proponent has complied with the requirements of the Bankruptcy Code regarding solicitation of acceptances of a plan.[64]  The legislative history to section 1129(a)(2) provides that section 1129(a)(2) is intended

---

[62]   11 U.S.C. § 1123(d).

[63]   *See* Plan Art. V.D.

[64]   *See, e.g., In re TCI 2 Holdings, LLC*, 428 B.R. 117, 170 (Bankr. D.N.J. 2010) ("Section 1129(a)(2) requires that '[t]he proponent of the plan compl[y] with the applicable provisions of this title.'") (citing 11 U.S.C. § 1129(a)(2)); *In re PWS Holding Corp.,* 228 F.3d 224, 248 (3d Cir.2000) ("§ 1129(a)(2) requires that the plan proponent comply with the adequate disclosure requirements of § 1125").

to encompass the disclosure and solicitation requirements set forth in section 1125 and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.[65]  As set forth below, the Debtors have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their Claims, Noticing, and Solicitation Agent in accordance with the Disclosure Statement Order.[66]

### 1.    The Debtors Complied with Section 1125 of the Bankruptcy Code.

64.    Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[67] Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan.[68]

65.    Section 1125 is satisfied here.  Before the Debtors solicited votes on the Plan, the Court approved the Disclosure Statement.[69]  The Court also approved the Solicitation Packages provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to

---

[65]    *See also In re TCI 2 Holdings, LLC*, 428 B.R. 117, 170 (Bankr. D.N.J. 2010); H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978) (collectively, the legislative history refers to section 1125, regarding disclosure, as an example of one of those "applicable provisions").

[66]    *See* Voting Report.

[67]    11 U.S.C. § 1125(b).

[68]    *See Matter of Union Cnty. Wholesale Tobacco & Candy Co., Inc.*, 8 B.R. 442, 443 (Bankr. D.N.J. 1981) (the standards of section 1125 "essentially require information sufficient to enable a hypothetical reasonable investor to make an informed judgment re acceptance or rejection of the plan").

[69]    *See* Disclosure Statement Order.

parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan.[70]

As stated in the Voting Report, the Debtors, through the Claims, Noticing, and Solicitation Agent,

complied with the content and delivery requirements of the Disclosure Statement Order, satisfying

sections 1125(a) and (b) of the Bankruptcy Code.[71]   The Debtors also satisfied section 1125(c) of

the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to

each holder of a claim or interest in a particular Class.   Here, the Debtors caused the same

Disclosure Statement to be transmitted to all parties entitled to vote on the Plan and all parties

deemed to accept or reject the Plan.[72]

66.     Based on the foregoing, the Debtors submit that they have complied in all respects

with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure

Statement Order, and no party has asserted otherwise.

### 2.     The Debtors Complied with Section 1126 of the Bankruptcy Code.

67.     Section 1126 of the Bankruptcy Code provides that only holders of allowed claims

and equity interests in impaired classes that will receive or retain property under a plan on account

of such claims or equity interests may vote to accept or reject a plan.[73]   As noted above, the Debtors

did not solicit votes on the Plan from the following Classes:

- Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims), which are
  Unimpaired under the Plan (collectively, the "Unimpaired Classes").[74] Pursuant to
  section 1126(f) of the Bankruptcy Code, Holders of Claims in the Unimpaired

---

[70]   *See generally* Disclosure Statement Order.

[71]   *See* Voting Report; *see also* Affidavit of Solicitation.

[72]   *See* Voting Report; *see also* Affidavit of Solicitation.

[73]   *See* 11 U.S.C. § 1126.

[74]   *See* Plan, Art. III.B.

Classes are conclusively presumed to have accepted the Plan and, therefore, were not entitled to vote on the Plan.

- Class 5 (Series X Redeemable Preferred Stock Interests), Class 6 (Series D Preferred Stock Interests), Class 7 (Series C Preferred Stock Interests), Class 8 (Series B Preferred Stock Interests), Class 9 (Series A Preferred Stock Interests), Class 10 (Series Seed Preferred Stock Interests), and Class 11 (Common Stock Interests), which are Impaired and receive no recovery under the Plan (the "<u>Deemed Rejecting Classes</u>").[75]   Pursuant to section 1126(g) of the Bankruptcy Code, Holders of Claims and Interests in the Deemed Rejecting Classes are deemed to have rejected the Plan and, therefore, were not entitled to vote on the Plan.

- Class 12 (Intercompany Claims) and Class 13 (Intercompany Interests), which may be Impaired or Unimpaired under the Plan.  Pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code, as applicable, Holders of Claims in Classes 11 and 12 are conclusively presumed to have accepted the Plan or rejected the Plan, as applicable, and, therefore, were not entitled to vote on the Plan.

68.    Accordingly, the Debtors solicited votes only from Holders of Allowed Claims in the Voting Classes—Classes 3 and 4—because each of these Classes is Impaired and entitled to receive a distribution under the Plan.[76]  With respect to the Voting Classes of Claims, section 1126(e) of the Bankruptcy Code provides that:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan.[77]

---

[75]   *See* Plan, Art. III.B.

[76]   Plan, Art. III.B*; see generally* Affidavit of Solicitation.

[77]   11 U.S.C. § 1126(c).

69.     The Voting Report, summarized above, demonstrates that both Class 3 and Class 4 voted to accept the Plan.[78]  Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(2), and no party has asserted otherwise.

**C.     The Plan Was Proposed in Good Faith (§ 1129(a)(3)).**

70.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[79]  Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) of the Bankruptcy Code is satisfied.[80]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[81]

71.     The Plan was proposed with integrity, good intentions, and with the goal of maximizing stakeholder recoveries.  Throughout these cases, the Debtors, the Debtors' board of directors, and the Debtors' senior management team have upheld their fiduciary duties to stakeholders and protected the interests of all constituents.  Importantly, Class 3 and Class 4 overwhelmingly voted to accept the Plan.  Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code.

---

[78]   *See generally* Voting Report.

[79]   11 U.S.C. § 1129(a)(3); *see also In re: Diocese of Camden, New Jersey*, No. 20-21257 (JNP), 2023 WL 5605156, at *25 (Bankr. D.N.J. Aug. 29, 2023) (citing *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000)); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 134 (Bankr. D.N.J. Apr. 12, 2010).

[80]   *E.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *In re Century Glove, Inc.*, Civ. A. Nos. 90-400 and 90-401, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993); *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[81]   *E.g.*, *Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012); *In re Century Glove, Inc.*, Civ. A. Nos. 90-400 and 90-401, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993).

**D.     The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).**

72.     Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable.[82]   Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Court as to their reasonableness.[83]

73.     The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.[84]   All payments made or to be made by the Debtors for services or for costs or expenses in connection with these chapter 11 cases prior to the Confirmation Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Court.[85]   Article II.B.1 of the Plan provides that all final requests for payment of Professional Fee Claims must be filed no later than (forty-five) 45 days after the Effective Date for determination by the Court, after notice and a hearing, in accordance with the procedures established by the Court.[86]   Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.

---

[82]   11 U.S.C. § 1129(a)(4).

[83]   *In re Lisanti Foods, Inc.*, 329 B.R. 491, 503 (Bankr. D.N.J. 2005) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court"), *aff'd*, 241 F. App'x 1 (3d Cir. 2007); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[84]   *See* Grossman Decl. ¶ 27.

[85]   *See* Plan, Art. II.B.

[86]   *See* Plan, Art. II.B.

**E.** **The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).**

74.     The Plan satisfies 1129(a)(5) of the Bankruptcy Code.  The Bankruptcy Code requires the plan proponent to disclose the affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[87]  Section 1129(a)(5)(A)(ii) further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[88]

75.     In accordance with Article IV.M. of the Plan, the members of the New Board will be disclosed in the Plan Supplement.  As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and the New Board will include those directors set forth in the list of directors of the Reorganized Debtors included in the Plan Supplement.  The New Board shall consist of such members appointed by the First Lien Lenders, in their capacity as Holders of the New Common Stock.

76.     The Plan satisfies section 1129(a)(5)(A)(i) of the Bankruptcy Code because the Debtors will disclose the identities of the New Board as well as the responsibilities and compensation thereof in the Plan Supplement.   Therefore, the requirements under section 1129(a)(5) of the Bankruptcy Code are satisfied.

**F.** **The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).**

77.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has

---

[87]   11 U.S.C. § 1129(a)(5)(A)(i).

[88]   11 U.S.C. § 1129(a)(5)(A)(ii).

approved any rate change provided for in the plan. The Plan does not provide for any rate changes and the Debtors are not subject to any such regulation.[89] Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these chapter 11 cases, and no party has asserted otherwise.

**G.   The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).**

78.    The "best interests test" of section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time. The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the debtor's chapter 11 plan that rejects the plan.[90]

79.    To demonstrate compliance with section 1129(a)(7) of the Bankruptcy Code, the Debtors, with the assistance of Centerview Partners, the Debtors' investment banker, and AlixPartners, LLP, the Debtors' financial advisor, prepared a liquidation analysis, which is attached to the Disclosure Statement as Exhibit F (the "Liquidation Analysis") and discussed at length in the Grossman Declaration.[91] The Liquidation Analysis compares the projected range of recoveries that would result from the liquidation of the Debtors in a hypothetical case under

---

[89]   *See* Grossman Decl. ¶ 29.

[90]   *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 428 (Bankr. S.D. Tex. 2009) ("This provision is known as the 'best-interest-of-creditors-test' because it ensures that reorganization is in the best interest of individual claimholders who have not voted in favor of the plan.").

[91]   *See* Grossman Decl. ¶¶ 32–36.

chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan.[92]    The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions regarding a hypothetical conversion to a chapter 7 liquidation as of a certain date.[93]

80.    Based on the Liquidation Analysis, no Holder of Claims or Interests would receive more in a hypothetical chapter 7 liquidation than it will receive under the Plan.[94]    Accordingly, the Debtors submit that the Plan complies with and satisfies all of the requirements of section 1129(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

**H.    The Plan Can Be Confirmed Notwithstanding the Requirements of (§ 1129(a)(8)) of the Bankruptcy Code.**

81.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.[95]    If any class of claims or interests rejects the plan, the plan must satisfy the "cramdown" requirements with respect to the claims or interests in that class.[96]

82.    Class 3 and Class 4 voted to accept the Plan.    However, because certain Classes are deemed to reject the Plan (together, the "Rejecting Classes"), the Debtors do not satisfy section 1129(a)(8) of the Bankruptcy Code.    Notwithstanding the Rejecting Classes, the Debtors still satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code because, as discussed below, the Plan does not discriminate unfairly and is fair and equitable with respect to

---

[92]    *See* Grossman Decl. ¶ 33.

[93]    *See id.*

[94]    *See* Grossman Decl. ¶ 36.

[95]    11 U.S.C. § 1129(a)(8).

[96]    11 U.S.C. § 1129(b).

the deemed rejecting Classes.  Because the Plan satisfies the cramdown requirements in addition

to the rest of the section 1129 requirements, as set forth herein, the Court should confirm the Plan.

### I.      The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).

83.      Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be

paid in full on the effective date of a plan and that the holders of certain other priority claims

receive deferred cash payments.[97]   In particular, pursuant to section 1129(a)(9)(A) of the

Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the

Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—

must receive on the effective date cash equal to the allowed amount of such claims.[98]

Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind

specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage,

employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of

a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such

class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the

effective date of the plan (if such class has not accepted the plan).  Finally, section 1129(a)(9)(C)

of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8)

of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not

to exceed five years from the petition date, the present value of which equals the allowed amount

of the claim.

---

[97]   11 U.S.C. § 1129(a)(9).

[98]   11 U.S.C. § 1129(a)(9)(A).

84.     The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  *First*, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each holder of an Allowed Administrative Claim allowed on or prior to the Effective Date will receive payment in full in Cash no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter.[99]   *Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan and such Claims have been paid in the ordinary course.[100]   *Third*, Article II.D of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that holders of Allowed Priority Tax Claims will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.[101]   The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code, and no party has asserted otherwise.

**J.      At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).**

85.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.[102]

---

[99]   *See* 11 U.S.C. § 1129(a)(9)(A).

[100]   *See* 11 U.S.C. § 1129(a)(9)(B).

[101]   *See* 11 U.S.C. § 1129(a)(9)(C).

[102]   11 U.S.C. § 1129(a)(10).

86.     As set forth above, Holders of Claims in Class 3 and Class 4—each of which is an

Impaired Class under the Plan—voted to accept the Plan independent of any insiders' votes.[103]

Thus, the Debtors respectfully submit that the Plan satisfies the requirements of

section 1129(a)(10) of the Bankruptcy Code, and no party has asserted otherwise.

### K.     The Plan Is Feasible (§ 1129(a)(11)).

87.     Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine, in

relevant part, that confirmation is not likely to be followed by the liquidation or further financial

reorganization of the Debtors (or any successor thereto), unless such liquidation or reorganization

is proposed in the Plan.  The debtor bears the burden of demonstrating the feasibility of the plan

by a preponderance of the evidence.  There is a relatively low threshold of proof necessary to

satisfy the feasibility requirement.[104]  The Court need not require a guarantee of success to find the

Plan feasible.[105]  Instead, the Court must find that the "plan offers a reasonable expectation of

success . . . ."[106]

88.     In determining standards of feasibility, courts have identified the following

probative factors:

- the adequacy of the capital structure;

---

[103]  *See* Voting Report, Ex. A.

[104]  *See, e.g., In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal citations omitted); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D.N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *overruled in part on other grounds,* 464 B.R. 208 (Bankr. D. Del. 2011).

[105]  *In re Walker*, 165 B.R. 994, 1004 (E.D. Va. 1994) (Noting that the "plan must present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success.").

[106]  *See, e.g., In re G–1 Holdings Inc.,* 420 B.R. 216, 267 (D.N.J. 2009) ("[T]he key element of feasibility is whether there is a reasonable probability the provisions of the Plan can be performed." (citing *In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985))).

- the earning power of the business;

- the economic conditions;

- the ability of management;

- the probability of the continuation of the same management; and

- any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[107]

89.    The Plan is feasible.  Upon the Effective Date, the Debtors expect to have sufficient funds and proceeds from, among other things, Cash on hand, including Cash from operations, and the proceeds from the DIP Facility, which will enable the Debtors to make all distributions contemplated by the Plan.  Following emergence, the Debtors' financial projections demonstrate that the Reorganized Debtors will be well positioned to execute their business plan, service their ordinary course obligations, and successfully operate their businesses.  By significantly deleveraging the Debtors' balance sheet, the Plan will provide the Reorganized Debtors with a manageable liquidity profile and an improved ability to hit operational targets.  Thus, the Plan satisfies section 1129(a)(11).

**L.    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).**

90.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.

---

[107]    *See, e.g.*, *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *28 (Bankr. D. Del. May 13, 2010).

91.     The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article II.F of the Plan provides that all fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by the Reorganized Debtor, or the Disbursing Agent on behalf of each applicable Reorganized Debtor, for each quarter (including any fraction thereof) until such Reorganized Debtors' chapter 11 cases are converted, dismissed, or closed, whichever occurs first.  Accordingly, the Debtors submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code, and no party has asserted otherwise.

**M.   Sections 1129(a)(13) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.**

92.     A number of the Bankruptcy Code's confirmation requirements are inapplicable to the Plan.  Section 1129(a)(13) of the Bankruptcy Code requires chapter 11 plans to continue all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code).[108]  The Debtors have no obligations to pay retiree benefits and, as such, section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan.  Section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Plan because the Debtors are not subject to any domestic support obligations.[109]  Section 1129(a)(15) is inapplicable to the Plan because none of the Debtors are "individuals" as that term is defined in the Bankruptcy Code.[110]  Section 1129(a)(16) of the Bankruptcy Code is also inapplicable because

---

[108]  11 U.S.C. § 1129(a)(13). Section 1114(a) of the Bankruptcy Code defines "retiree benefits" as: "[P]ayments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title."

[109]  *See id.* § 1129(a)(14).

[110]  *See id.* § 1129(a)(15).

the Plan does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.[111]

### N.   The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.

93.     Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[112]

94.     As noted above, Class 3 and Class 4 voted in favor of the Plan.  However, the Rejecting Classes have or are deemed to have rejected the Plan.  Nonetheless, as set forth below, the Plan satisfies the requirements under section 1129(b) of the Bankruptcy Code, and no party has asserted otherwise.

### 1.   The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii)).

95.     A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[113]

---

[111]  *See id.* § 1129(a)(16).

[112]  *In re John Hancock Mut. Life Ins. Co.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993); *In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 375 (Bankr. D.N.J. 2020) (a plan must be "'fair and equitable' and may not unfair[ly] discriminat[e] under the requirements of section 1129(b)").

[113]  *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,526 U.S. 434, 441–42 (1999) ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[114]

96.     The Plan satisfies section 1129(b) of the Bankruptcy Code.  Notwithstanding the fact that the Rejecting Classes have or are deemed to have rejected the Plan, the Plan is confirmable.  No Class of Claims or Interests will receive greater than a 100 percent recovery and no junior Class of Claims or Interests will receive a Distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

> **2.     The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1)).**

97.     Unlike the concept of "fair and equitable," which is defined under the Bankruptcy Code, the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.  Courts typically examine the facts and circumstances of the particular case to make the determination.[115]  In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling

---

[114]   § 1129(b)(2)(B)(ii).

[115]   *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 158 (Bankr. D.N.J. 2010) (neglecting to apply a set standard or test to ascertain whether a plan unfairly discriminates, instead opting to consider "various standards" for a general analysis of unfair discrimination including whether the discrimination is "supported by a reasonable basis" and is "proposed in good faith"); *In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 375 (Bankr. D.N.J. 2020) (considering the unique factual circumstances to determine whether the requirements of section 1129(b) are satisfied).

justifications for doing so.[116]  A threshold inquiry to assessing whether a proposed chapter 11 plan unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[117]

98.    Here, the Plan's treatment of the Rejecting Classes is proper because all similarly situated Holders of Claims and Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale.  Claims in the Rejecting Classes are not similarly situated to any other Classes given their distinctly different legal character from all other Claims and Interests.  The Plan's treatment of the Rejecting Classes is proper because no similarly situated class will receive more favorable treatment.  Furthermore, where the Plan provides differing treatment for certain Classes of Claims or Interests, the Debtors have a rational basis for doing so.

99.    For the reasons set forth above, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code.

**O.    The Debtors Complied with Sections 1129(c) and 1129(d) of the Bankruptcy Code.**

100.    The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.  ***First***, section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans, is not implicated because there is only one proposed plan.[118]  ***Second***, the purpose of the Plan is not

---

[116]  *See In re Ocean View Motel, LLC*, No. 20-21165-ABA, 2022 WL 243213, at *1 (Bankr. D.N.J. Jan. 25, 2022) (stating that "[u]nder 1129(b)(1), a plan unfairly discriminates when it treats similarly situated classes differently without a reasonable basis for the disparate treatment" (internal citations omitted)).

[117]  *See Aleris Int'l, Inc.*, 2010 WL 3492664, at *31 (citing *In re Armstrong World Indus.*, 348 B.R. 111, 121 (Bankr. D. Del. 2006)).

[118]  *See* Grossman Decl. ¶ 52.

to avoid taxes or the application of section 5 of the Securities Act of 1933.[119]   Moreover, no

governmental unit or any other party has requested that the Court decline to confirm the Plan on

such grounds.[120]   Accordingly, the Plan satisfies the requirements of section 1129(d) of the

Bankruptcy Code.   ***Lastly***, section 1129(e) of the Bankruptcy Code is inapplicable because none

of the Debtors' chapter 11 cases is a "small business case."[121]   Accordingly, the Plan satisfies the

requirements of section 1129(c), (d), and (e) of the Bankruptcy Code, and no party has asserted

otherwise.

### P.      Modifications to the Plan.

101.     Section 1127(a) of the Bankruptcy Code provides that a plan proponent may

modify its plan at any time before confirmation as long as such modified plan meets the

requirements of sections 1122 and 1123 of the Bankruptcy Code.   Further, when the proponent of

a plan files the plan with modifications with the court, the plan as modified becomes the

plan.   Bankruptcy Rule 3019 provides that modifications to a plan after such plan has been

accepted will be deemed accepted by all creditors and equity security holders who have previously

accepted the plan if the court finds that the proposed modifications do not adversely change the

treatment of the claim of any creditor or the interest of any equity security holder.   Interpreting

Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously

accepted plan will be deemed accepted where the proposed modification is not material or does

not adversely affect the way creditors and stakeholders are treated.[122]

---

[119]   *See id.*

[120]   *See id.*

[121]   *See id.*

[122]   *See, e.g.*, *In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J.

102.    Following solicitation, the Debtors made certain modifications to the Plan to clarify certain provisions, to resolve formal and informal comments to the Plan by parties in interest, to incorporate the terms of the Committee Settlement, and to provide flexibility with respect to the treatment of certain claims (collectively, the "Modifications").  In particular, the Modifications include carving out certain parties from the Releases and the creation of the Thrasio Legacy Trust. The Modifications will inure to the benefit of creditors and were made in accordance with the Committee Settlement.

103.    The Modifications are either (i) immaterial or (ii) do not affect the treatment and inure to the benefit of creditors absent their consent and thus comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the Modifications, and that such Modifications should be deemed accepted by all creditors that previously accepted the Plan.

**Q.    Good Cause Exists to Waive the Stay of the Confirmation Order.**

104.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of fourteen (14) days after the entry of the order, unless the Court orders otherwise."[123]  Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.[124] Each rule also permits modification of the imposed stay upon court order.[125]

---

Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

[123]  Fed. R. Bankr. P. 3020(e).

[124]  Fed. R. Bankr. P. 6004(h), 6006(d).

[125]  Fed. R. Bankr. P. 6004(h), 6006(d).

105.    The Debtors submit that good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the Confirmation Order will be effective immediately upon its entry.[126]  As noted above, these chapter 11 cases and the related transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information.  The Debtors have undertaken great effort to exit chapter 11 as soon as possible.  Additionally, each day the Debtors remain in chapter 11 they incur significant administrative and professional costs.[127]

106.    In light of the requisite support by Class 3 and Class 4, no parties will be prejudiced by waiver of the stay to facilitate the Debtors' swift emergence from chapter 11.  Accordingly, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the Confirmation Order may be effective immediately upon its entry.

### III.    THE OBJECTIONS SHOULD BE OVERRULED.

107.    The Debtors received five formal Objections and several informal Objections to Confirmation of the Plan, as described in **Exhibit A**.  The parties who filed formal Objections to

---

[126]  *See, e.g., In re L'OCCTAINE, Inc.,* No. 21-10632 (MBK) (Bankr. D.N.J. Aug. 25, 2021); *In re Hollister Construction Services, LLC*, No. 19-27439 (MBK) (Bankr. D.N.J. Apr. 16, 2021) (same); *In re SLT HoldCo, Inc., et al.* No. 20-18368 (MBK) (Bankr. D.N.J. Oct. 22, 2020).

[127]  *See* Grossman Decl. ¶ 57.

the Plan are ESR,[128] PIC20,[129] Bristols 6,[130] the U.S. Trustee,[131] and Mr. Silberstein's limited

objection.[132]  As of the filing of this Memorandum, the Debtors have resolved, or the Objector has

agreed to withdraw, each of the ESR Objection, PIC20 Objection, and Bristols 6 Objection.

However, the U.S. Trustee Objection and the Silberstein Objection remain outstanding.  Although

neither presents a bar to confirmation, for the reasons set forth below, the Court should overrule

the Objections and confirm the Plan.

### A.    The Scope of the Exculpation Provision Is Appropriate.

108.    The U.S. Trustee objects to the Plan's Exculpation Provision, asserting that (a)

inclusion of Exculpated Party's "Related Parties" is impermissible and (b) the Exculpation

Provision is impermissibly broad because includes certain prepetition activities.

109.    At the outset, the Debtors note that the Plan now includes a revised definition of

"Exculpated Party" that narrows the Exculpated Parties to the following:

> "(a) each Debtor; (b) each Reorganized Debtor; (c) the Committee and each
> of its members; and (d) with respect to each of the foregoing Entities in
> clauses (a) through (c), each such Entity's current and former control
> persons (including any officers), directors, members of any committees of
> any Entity's board of directors or managers, equity Holders (regardless of
> whether such interests are held directly or indirectly), principals, members,

---

[128] *ESR, LLC's Objection to Disclosure Statement for the Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code.* [Docket No. 269].

[129] *Joinder of the PIC20 Group in ESR, LLC's Objection to Disclosure Statement for the Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code.* [Docket No. 350].

[130] *Supplemental Objection and Brief in Support of the Bristols 6 Parties to Confirmation of the Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code as it Applies to Autumn Ideas, Inc.* [Docket No. 1072] (the "Bristols 6 Objection").

[131] *Objection to the United States Trustee to the First Amended Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1073] (the "U.S. Trustee Objection").

[132] *Limited Objection of Joshua Silberstein to the Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1074] (the "Silberstein Objection").

employees, agents, advisory board members, financial advisors, attorneys
(including any attorneys or other professionals retained by any current or
former director or manager in his or her capacity as director or manager of
an Entity), accountants, investment bankers, consultants, representatives,
and other professionals, each in their capacity as such.  For the avoidance
of doubt, none of the Excluded Parties shall be Exculpated Parties."

Accordingly, under the circumstances, it is appropriate for the Court to approve the Exculpation

Provision, and to find that the Exculpated Parties have acted in good faith and in compliance with

the law.[133]

### B.      The Debtor Releases Should Be Approved.

110.    The U.S. Trustee argues that certain of the releases contained in the Debtor Release

are overly broad because the Plan does not establish that each of the proposed Released Parties

provided adequate consideration in exchange for receiving the Debtor Release and that certain of

the Released Parties are not entitled to the Debtor Release under applicable case law.  Support for

the Debtors Release is laid out in detail in Section II.A.3.i. herein, including with respect to the

*Zenith* factors set forth in the U.S. Trustee Objection.  However, the Debtors respond to the U.S.

Trustee's objections with respect to each *Zenith* factor below.

111.    The U.S. Trustee Objection asserts that the first *Zenith* factor is not met because it

is unclear whether an identity of interest exists between the Debtors and each of the Released

Parties.[134]  An identity of interest clearly exists between the Debtors and the Released Parties

because each of the Released Parties, as a stakeholder and critical participant in the Plan process,

shares a common goal with the Debtors in seeing the Plan succeed and would have been highly

---

[133]  *See PWS Holding Corp.*, 228 F.3d at 246–47 (approving plan exculpation provision with willful misconduct and
gross negligence exceptions); *In re Indianapolis Downs, LLC*, 486 B.R. at 306 (same).

[134]  *See* U.S. Trustee Objection, ¶ 39.

unlikely to participate in the negotiations and compromises that led to the ultimate formation of the Plan without the Debtor Release.

112.    As for the second *Zenith* factor, the U.S. Trustee argues that contributions related to operational restructuring or negotiating a financial restructuring do not qualify as "substantial contributions."[135]  To the contrary, courts in this district have found that a wide variety of acts, including playing an integral role in the formulation of the Plan and expending significant time and resources negotiating the Plan, constitute substantial contributions for the purposes of a debtor release.[136]

113.    The third *Zenith* factor is met despite the U.S. Trustee's assertion that there is "no information" to support the contention that the Debtor Release is necessary to a reorganization.[137] The Debtor Release was a heavily negotiated term in the Plan, and it is highly unlikely that the Released Parties would have agreed to support the Plan absent the Debtor Release.  Indeed, it is unlikely that the Plan would exist at all without the Debtor Release.

114.    The fourth *Zenith* factor is clearly met given that 100% of the Debtors' secured lenders and approximately 92% of the Debtors unsecured creditors voted to accept the Plan.[138]

115.    Finally, as to the fifth *Zenith* factor, while the Plan does not provide for payment of all or substantially all of the unsecured creditors' claims, the Plan still provides for meaningful recoveries to creditors in exchange for, among other things, the Debtors' release of certain claims.

---

[135]  *See* U.S. Trustee Objection, ¶ 40.

[136]  *See In re Long Ridge Road Operating Company, II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *14 (Bankr. D.N.J. Mar. 5, 2014) (finding that the non-debtor party had substantially contributed by providing financial support, without which, the plan would not be feasible).

[137]  *See* U.S. Trustee Objection, ¶ 41.

[138]  *See* the Voting Report.

116.    The Debtor Release is consistent with Third Circuit Precedent.[139]  Taken together,

the foregoing considerations provide ample support for the appropriateness of the Debtor Release

under the Bankruptcy Code and applicable case law.

**C.    The Third-Party Release Should Be Approved.**

117.    The U.S. Trustee argues that the Third-Party Release is non-consensual given its

opt-out nature, and it is not fair and necessary to the Debtors' reorganization.[140]  As discussed in

section II.A.3.ii herein, the Third-Party Release in Article VIII.F of the Plan is reasonable,

appropriate, consistent with provisions regularly approved in the Third Circuit, and critical to the

Plan.  It should be approved.

**1.    The Third-Party Release Is Consensual and Appropriate.**

118.    The Third-Party Release is a consensual release.  All parties in interest—including

the U.S. Trustee—had ample opportunity to evaluate the propriety of the Third-Party Release and

determine whether or not they should elect to opt out.  To do so, parties in interest needed to (a)

return an opt-out form to the Debtors and check the opt-out box or (b) object (formally or

informally) to the Third-Party Release.  As such, under settled Third Circuit law, the Third-Party

---

[139] *See, e.g.*, *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. May 31, 2024) (approving a Plan providing for releases of certain former directors and officers); *In re WeWork, Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024) (same); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. September 14, 2023) (same); *In re One Aviation Corp.*, No. 18-12309 (CSS) (Bankr. D. Del. Sep. 18, 2019) (approving Plan providing for definition of Released Parties including, among others, the Debtors' directors and officers); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) (same); *In re Checkout Holding Corp.*, No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) (same); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) (same); *In re Samson Resources Corp.*, No. 14-11934 (CSS) (Bankr. D. Del. Feb. 13, 2017) (same); *In re Horsehead Holding Corp.*, No. 16-10287 (CSS) (Bankr. D. Del. Sep. 9, 2016) (same).

[140] *See* U.S. Trustee Objection, ¶ Section I.B.i–ii.

Release is a consensual release given by all creditors and interest holders who did not opt out or

object to the Third-Party Release.[141]

119.    The U.S. Trustee's contention that the Third-Party Release is not consensual is

belied by the extensive notice of the existence of the Third-Party Release, the plain language of

the Plan, the robust service of Court-approved notices to Holders of Claims and Interests alerting

them of the procedures for exercising their right to opt out, and the fact that many parties in interest

(66, to be exact) availed themselves of the opt-out mechanism.    The law is clear that a release is

consensual where parties have received sufficient notice of a plan's release provisions and have

had an opportunity to object to or opt out of the release and failed to do so (including where such

holder abstains from voting altogether).    The Debtors clearly and conspicuously included the

Third-Party Release language in the Disclosure Statement, the Plan, and the Opt-Out Forms.    The

ballots distributed to Holders of Claims entitled to vote on the Plan quoted the entirety of the

Third-Party Release and clearly informed such Holders of the steps to take if they wanted to opt

out of the Third-Party Release.    Notices sent to Holders in Unimpaired Classes not entitled to vote

---

[141]    *See, e.g.*, *In re Indianapolis Downs, LLC,* 486 B.R. 286, 304–05 (Bankr. D. Del. 2013) (approving third-party release that applied to unimpaired holders of claims deemed to accept the plan as consensual); *U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.),* 426 B.R. 114, 144 (Bankr. D. Del. 2010) (same); *In re Wash. Mut., Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011) (observing that consensual third-party releases are permissible); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105, 111 (Bankr. D. Del. 1999) (approving non-debtor releases for creditors that voted in favor of the plan); *In re Mallinckrodt PLC*, 639 B.R. 837, 877 (Bankr. D. Del. 2022) (approving third-party release that applied to shareholders deemed to reject the plan and unsecured creditors who were unimpaired or who did not return a ballot with the opt out box checked or otherwise submit an opt out form as consensual); *In re SLT Holdco, Inc.*, No. 20-18368 (MBK) (Bankr. D.N.J. Oct. 22, 2020) (confirming a plan stating that all holders of claims or interests (whether or not they were entitled to vote) were deemed to consent to the releases unless they affirmatively opted out or objected to the releases); *In re SiO2 Med. Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. July 19, 2023) (same); *In re Lannett Co., Inc.*, No. 23-10559 (JKS) (Bankr. D. Del. June 8, 2023) (same); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022) (same); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Dec. 4, 2021) (same); *In re Alex & Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. Sept. 22, 2021) (same); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Dec. 23, 2020) (same); *In re Ctr. For Autism & Related Disorders, LLC*, No. 23-90709 (DRJ) (Bankr. S.D. Tex. July 28, 2023) (same); *In re Cineworld Grp. PLC*, No. 22-90168 (MI) (Bankr. S.D. Tex. June 28, 2023) (same); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023) (same).

similarly informed Holders of their ability to opt out. Moreover, the Committee explicitly referenced the "opt-out" choice stakeholders had to make in its letter to creditors.[142] Accordingly, there is no question that all applicable stakeholders had proper notice of their rights and could have chosen to opt out of the Third-Party Release.

120.    The U.S. Trustee asserts that the Third-Party Release is non-consensual because Holders that failed to vote or voted to reject the Plan missed the opportunity to opt out of the Third-Party Release, noting that taking the "extra step of checking an opt-out box" may seem "superfluous" to creditors.[143]   However, the overwhelming weight of authority in this district suggests otherwise, and most judges in this district have found that opt out mechanisms such as the one included in the Plan constitute consensual releases.[144]   Specifically, in *In re Saint Michael's Medical Center*, the Court recognized that the releases provided through an opt-out mechanism were "largely consensual," pointing to the numerous creditors who availed themselves of the right to opt out.[145]   Moreover, in *In re Aceto Corporation*, the Court approved third-party releases from all parties who: (a) voted to accept the plan; (b) abstained from voting on the plan,

---

[142]   Docket No. 393, <u>Exhibit B</u>.

[143]   U.S. Trustee Obj. ¶ 49.

[144]   *See, e.g., In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022); *In re WeWork, Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024) (same); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. September 14, 2023); *In re Congoleum Corporation*, Case No. 20-18488 (MBK) (Bankr. D. N.J. Jan. 25, 2021); *In re Modell's Sporting Goods, Inc.*, Case No. 20-14179 (VFP) (Bankr. D. N.J. Nov. 12, 2020); *In re SLT Holdco, Inc.*, Case No 20-18368 (MBK) (Bankr. D. N.J. Oct. 21, 2020); *In re Aceto Corporation*, Case No. 19-13448 (VFP) (Bankr D. N.J. Sept. 18, 2019); *In re Saint Michael's Medical Center, Inc.*, Case No. 15-24999 (VFP) (Bankr D. N.J. Jan. 12, 2017).

[145]   *In re Saint Michael's Medical Center*, Hr'g Tr. 3:13-15 (Jan. 12, 2017).

but failed to return an opt-out form; and (c) voted to reject the plan but did not elect on their ballot to opt out of the third-party release.[146]

121.    Indeed, the Court overruled precisely the same arguments raised by the U.S. Trustee in *In re SLT HoldCo*:

> As far as the third party releases I do not view them as non-consensual. I view it as consensual. I am – I find support in the fact that all creditors who are involved in this bankruptcy, all classes of claims received not only the opt-out provisions as part of a ballot, but if they were not given an opportunity to participate because they were not impaired or otherwise in a position to cast a ballot they were given and presented with the opt-out form.

> I disagree with Emerge Energy Services. That language in which – and was cited by the U.S. Trustee both in argument and in their papers where the court held that the failure to return a notice can be due to carelessness and inattentiveness or mistake, and that's acceptable. That's not acceptable. I guess I'm frustrated with society today where we allow carelessness and inattentiveness and mistake to go without consequence. There is consequence when you ignore your rights even if its through carelessness or inattentiveness. And you forego the ability to pursue certain rights and remedies. Due process requires proper notice, and I'm convinced that proper notice was granted in – was provided in this case.[147]

122.    Courts throughout this Circuit follow similar reasoning. Recent cases have upheld the notion that a non-debtor release is consensual where (as here) holders of claims and interests are provided the opportunity to opt out, even where the holders in such classes did not affirmatively opt out.[148]

---

[146]  *In re Aceto Corporation*, Case No.-15-24999 (VFP) (Bankr D. N.J. Jan. 12, 2017).

[147]  *In re SLT Holdco, Inc., et al.*, Case No. 20-18368 (MBK) (Oct. 21, 2020), Hr'g Tr. 27:18-28:13.

[148]  *In re Bed Bath and Beyond Inc.*, No. 23-13359 (VFP) Hr'g Tr. 39: 17-19 (Bankr. D.N.J. Sept. 14, 2023) ("The obligation to affirmatively opt out appears in the plan, in the disclosure statement, in the ballots. It should come as no surprise."); *In re Lannett Company, Inc.*, No. 23-10559 (JKS) Hr'g Tr. 36: 2-8 (Bankr. D. Del. Jun. 8, 2023) ("As I and others on this Court have previously ruled, when a disclosure is prominent and conspicuous an opt-out mechanism is a valid means of obtaining consent. It is incumbent on effected parties who have been properly

123.    The Court in *In re BlockFi Inc.*, the Court found that a third-party release was consensual and appropriate where parties were provided substantially similar notice of the opt out as they were in these cases:

> With respect to the opt-out provisions, it is no secret that this court has approved in the past in Sur La Table -- let me get my French accent -- in Bed Bath & Beyond recently [. . .] and a host of cases. This court, I, as well as my colleagues within the district, have approved opt-out releases, the lynchpin being the proper notice. And in here, there's no question, in this court's view, that there is proper notice to the creditor body at large, to the stakeholders, through a hearing notice, through a disclosure statement, through a plan which had language advising the parties of the ability to opt out and the need to opt out to preserve their rights. Beyond that, there are websites which -- with pages addressing the issues that were put together by the debtor. There were the plan and disclosure statement which had that language. There's the ballot that had the language. There was the solicitation letter drafted by the Committee explaining the process to creditors. There is no question that creditors were placed on proper notice.[149]

124.    Here, the Third-Party Release only applies to Claims held as of the Voting Record Date for those Holders that received an opt out election form ***only if*** such Holders did not elect to exercise an opt out. Holders of Interests who acquired such interests after the Voting Record Date and did not receive an opt out election form are not subject to the Third-Party Release. The Debtors provided the Holders of Claims and Interests with clear and conspicuous notice of the Third-Party Release via the Ballots and the Opt Out Form.[150] The opportunity to opt out was clear to all Releasing Parties under the Plan.

---

served to protect their own rights. Parties that fail to act in response to a judicial process are routinely bound by the results of the process.").

[149] *In re BlockFi Inc.*, No. 22-19361 (MBK) Hr'g Tr. 109: 4-24 (Bankr. D.N.J. Sept. 26, 2023)

[150] *See* Disclosure Statement Order, Exhibit 2A, Exhibit 2B, and Exhibit 2C.

125.    The Third-Party Release is consensual, and the scope of the Third-Party Release here is necessary for the consummation of the Plan, warranted under the circumstances, clearly permitted by the applicable law, and should be approved.   Accordingly, the U.S. Trustee's objection should be overruled.

### 2.    Even if the Third-Party Release Is Non-Consensual, It Is Permissible.

126.    Even if the Court were to find that the Third-Party Release is non-consensual—which it should not—the Court should nevertheless approve the Third-Party Release under the circumstances of these chapter 11 cases.   Courts in the Third Circuit have held that a non-consensual release may be approved if such release is fair and necessary to the reorganization, and the court makes specific factual findings to support such conclusions.[151]   In addition, the Third Circuit has found that, for such releases to be permissible, fair consideration must be given in exchange for the release.[152]   "[N]ecessity requires a demonstration that the success of the debtors' reorganization bears a relationship to the release of the non-consensual parties, and that the releasees have provided a critical financial contribution to the debtors' plan that is necessary to make the plan feasible in exchange for receiving a release of liability."[153]

127.    Here, as explained in the Horton Declaration, the support of the Released Parties was critical in the strategic development of the Plan and in paving the way for emergence from

---

[151]   *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 213-14 (3d Cir. 2000) (explaining that the "hallmarks" of permissible nonconsensual third-party releases are "fairness, necessity to the reorganization, and specific factual findings to support these conclusions.")

[152]   *In re Cont'l Airlines*, 203 F. 3d 203, 214 (3d. Cir. 2000); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607 (Bankr. D. Del. 2001) (considering whether: (a) the non-consensual release is necessary to the success of the reorganization; (b) the releasees have provided a critical financial contribution to the debtor's plan; (c) the releasees' financial contribution is necessary to make the plan feasible; and (d) the release is fair to the non-consenting creditors, i.e., whether the non-consenting creditors received reasonable compensation in exchange for the release).

[153]   *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607 (Bankr. D. Del. 2001).

these chapter 11 cases.[154]   The Third-Party Releases are integral to the Plan and are fair and appropriate.  Without the efforts and contributions of the Released Parties, the Debtors would not be poised to confirm a plan, thereby further extending these chapter 11 cases and diminishing potential recoveries for all stakeholders.  The Third-Party Release was a material inducement for support that the Released Parties have provided and will continue to provide in connection with the Plan.  Further, the contributions made by the Released Parties are sufficient consideration to the parties bound by the Third-Party Release, as indicated by the broad support of the Plan among the Releasing Parties.

128.    Finally, Holders of claims against the Debtors stand to benefit from the Third-Party Release given the mutuality of such releases.  The mutuality of the Third-Party Release—a "proverbial peppercorn-for-peppercorn"[155]—provides adequate consideration to parties under the Plan.  Accordingly, the Third-Party Release is necessary and reasonable under the circumstances, and the U.S. Trustee's objection should be overruled.

### D.    The Gatekeeping Provision Is Integral to the Plan and Should Be Approved.

129.    The U.S. Trustee objects to the "gatekeeping provision" in the Plan (the "Gatekeeping Provision"), which provides that:

> From and after the Effective Date, any Entity (i) that opted out of the releases contained in this Article VIII.F or (ii) was deemed to reject the Plan may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in Article VIII.F of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the

---

[154]   *See* Horton Decl. ¶ 20.

[155]   *In re Cobalt Int'l Energy, Inc.*, No. 17-36709 (MI) Hr'g Tr. 244:16-18 (Bankr. S.D. Tex. Apr. 4, 2018) [Docket No. 790] ("I simply find that this is, in effect, the proverbial peppercorn-for-peppercorn and that that is adequate consideration for the release, given its mutuality.").

releases contained in <u>Article VIII.F</u> of the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in <u>Article XI</u> of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

130.    The Gatekeeping Provision is a legitimate exercise of this Court's power under sections 105, 1123(b)(6), and 1141(a), (b), and (c) of the Bankruptcy Code.  The purpose of the Gatekeeping Provision is to ensure that the Debtors, the Reorganized Debtors, and the Released Parties do not become bogged down in meritless litigation that never should have been brought in the first place.  Gatekeeping provisions are not a novel attempt to circumvent limitations on bankruptcy court jurisdiction; rather, they have been utilized by courts in this jurisdiction and others to provide a threshold level of review following confirmation of a chapter 11 plan.  Under this construct, which has been approved in numerous jurisdictions[156] (including the District of New Jersey),[157] the Court determines whether a litigant has a claim that remains assertable following confirmation of the Plan.

---

[156] *In re Cineworld Group plc*, Case No. 22-90168 (MI) (Bankr. S.D. Tex. Jun. 26, 2023); *In re Avaya Inc.*, Case No. 23-90088 (DRJ) (Bankr S.D. Tex. Mar. 21, 2023); *In re Nautical Solutions, L.L.C.*, No. 23-90002 (CML) (Bankr. S.D. Tex. Feb. 14, 2023); and *In re Highland Capital Management, L.P.*, Case No.19-34054-SGJ (Bankr. N.D. Tex. Nov. 24, 2020).

[157] *See, e.g.*, *In re BlockFi, Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 4, 2023) (approving a gatekeeping provision after finding that certain parties would not have otherwise agreed to a settlement in connection with the plan); *In re Bed Bath and Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Sept. 14, 2023) (approving a similar gatekeeping provision because the Bankruptcy Court had jurisdiction and was in the best position to interpret the language of the plan and confirmation order); *In re National Realty Investment Advisors, LLC*, Case No. 22-14539 (JKS) (Bankr. D. N.J. Aug. 10, 2023) (providing that the Bankruptcy Court maintained exclusive jurisdiction to adjudicate matters related to the chapter 11 case on a post-effective date basis); *In re Princeton Alternative Income Fund, LP*, Case No. 18-14603 (MBK) (Bankr. D. N.J. Feb. 19, 2020) (explicitly applying the Barton Doctrine to post-confirmation suits).

131.    The Gatekeeping Provision is an outgrowth of the long-standing "Barton Doctrine" established by the Supreme Court in *Barton v. Barbour*.[158]  The Barton Doctrine provides that, as a general rule, before a suit may be brough against a trustee, leave of the appointing court must be obtained.[159]  While the Barton Doctrine originated as a protection for federal receivers, courts have applied the concept to various participants in chapter 11 cases, including debtors in possession,[160] officers and directors of a debtor,[161] and professionals retained by the debtors.[162]  By requiring claimants to seek leave of the Court before pursuing actions against the Released Parties, the Gatekeeping Provision is within the spirit of the protections afforded to fiduciaries and their agents under the Barton Doctrine.  The gatekeeping role is one played by Bankruptcy Courts in numerous contexts.[163]  Under this construct, the Bankruptcy Court effectively serves the same role as it does when it determines whether a statutory committee should be granted standing to file litigation on behalf of a debtor; that is, the Court is asked to make a determination as to whether the claim at issue is colorable.

---

[158]  *Barton v. Barbour*, 104 U.S. 126 (1881).

[159]  *Baron v. Sherman (In re Ondova Ltd. Co.,*), 2017 Bankr. LEXIS 325, *29 (Bankr. N.D. Tex. Feb. 1, 2017).

[160]  *Helmer v. Pogue*, 212 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to debtor in possession).

[161]  *See Carter v. Rodgers*, 220 F.3d 1249, 1252 and n.4 (11th Cir. 2000) (debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court.); *Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*, 167 B.R. 389 (Bankr. D. Md. 1994) (president of debtor).

[162]  *Lowenbraun v. Canary* (*In re Lowenbraun*), 453 F.3d 314, 321 (6th Cir. 2006) (trustees' counsel).

[163]  *See, e.g., In re BlockFi, Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) ("The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in the Plan, shall have jurisdiction to adjudicate the underlying claim or Cause of Action."); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Sept. 14, 2023) (discussing the Bankruptcy Court's gatekeeper role); *In re Motors Liquidation Co.*, 541 B.R. 104 (Bankr. S.D.N.Y. 2015) (same); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 546 B.R. 284 (Bankr. S.D.N.Y. 2016) (same).

132.    Contrary to the U.S. Trustee's assertions, the Gatekeeping Provision is not an attempt to impermissibly extend the Court's jurisdiction past its limits.  Courts in this circuit have confirmed plans on numerous occasions that provide permanent Bankruptcy Court jurisdiction over matters relating to the chapter 11 cases, recognizing that Bankruptcy Courts may continue to exclusively adjudicate such issues on a post-emergence basis.[164]

133.    Nearly all chapter 11 plans in complex cases, including the Plan, contain an injunction permanently preventing parties from asserting released claims against released parties. If a claimant seeks to assert a claim following the effective date of the Plan but is unsure whether that claim constitutes a direct or derivative (*i.e,* a released) claim, the claimant will need a judicial determination that the claim was not released under the Plan; otherwise, the claim could not be properly asserted and the claimant would be in contempt of the Confirmation Order.  The Gatekeeping Provision ensures that the Court—the court most familiar with the facts and circumstances of the chapter 11 cases, and the court best-positioned to determine as to whether the claim may be asserted—is the court making that determination.  This inures to the benefit of all parties, including potential claimants.

134.    The propriety of Gatekeeping Provisions was recently litigated in the Fifth Circuit in *In re Highland Capital*.  There, the debtors sought approval of a provision nearly identical to the Gatekeeping Provision in the Plan.  In upholding confirmation of the plan, the Fifth Circuit

---

[164]  *See, e.g., In re WeWork Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024) (approving a plan that provides that parties asserting a claim or Cause of Action against the Debtors, the Reorganized Debtors, or the Released Parties must first obtain a Final Order of the Bankruptcy Court); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. May 31, 2024); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (approving a plan that provides that parties asserting a claim or Cause of Action against a Released Party must first obtain a Final Order of the Bankruptcy Court); *In re Modell's Sporting Goods, Inc.*, No. 20-14179 (VFP) (Bankr. D.N.J. Nov. 12, 2020) (providing that the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the chapter 11 cases and the plan); *In re Lannett Company, Inc.*, Case No. 23-10559 (JKS) (Bankr. D. Del. Jun. 8, 2023) (same).

recognized that the gatekeeping provision was necessary to ensure the effectiveness of the debtors' plan by "screen[ing] and prevent[ing] bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants."[165]   Indeed, following confirmation of the plan, the U.S. Bankruptcy Court for the Northern District of Texas exercised the gatekeeper provision by denying a suit by a non-debtor against the debtors' former chief executive officer.[166]

135.   The Court should approve the Gatekeeping Provision for the same reasons identified by the Northern District of Texas in *In re Highland Capital*.  Rather than seeking to shift the burden of proof to claimants or provide a further release of claims or causes of action under the Plan, the Gatekeeping Provision simply provides a threshold level of review necessary to ensure the effectiveness of the Plan.  In the absence of the Gatekeeping Provision, it is entirely possible that the parties who opt out of the Third-Party Release (and even those who did not) will seek to assert frivolous claims, or claims barred by the Plan's injunction provisions, thereby hindering the effectiveness of the Debtors' Plan.  Critically, the absence of the Gatekeeper Provision would not hinder creditors from bringing actions related to claim disputes in front of this Court.  Bankruptcy Code 502(a) preserves the ability for any party to object to a claim, even post confirmation.  As the Court noted in its ruling on the gatekeeping provision in *In re BlockFi*:

> [a]s I said in other hearings, we end up in the same place anywhere. When these actions are brought, somebody is bringing it back to the bankruptcy court to determine whether or not it's a discharge injunction, it's a plan injunction . . . . It comes back to this court anyway.  So we're just putting in place in language what it is the practice.  I have no issue with the scope or the provisions of the gatekeeping function.[167]

---

[165]  *NextPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt, L.P.)*, 48 F.4th 419, 435 (5th Cir. 2022).

[166]  *In re Highland Capital Mgmt.,* Case No.19-34054-SGJ (Bankr. N.D. Tex. Aug. 25, 2023).

[167] *In re BlockFi, Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Sept. 26, 2023) Hr'g Tr. 113:5–16.

136.    The Gatekeeping Provision represents a permissible exercise of the Court's jurisdiction, and will inure to the benefit of the Debtors, their successors-in-interest, and potential claimants.  Accordingly, the Court should overrule the Objections and approve the Gatekeeping Provision.

**E.      The Injunction Provision Is Permissible and Appropriate.**

137.    Following discussions with the U.S. Trustee, the Debtors believe they are in agreement with the U.S. Trustee that the Plan expressly constitutes a discharge and the Injunction Provision is appropriately tailored, and thus the U.S. Trustee's Objection as to the Injunction Provision should be overruled.

**F.      The Remainder of the U.S. Trustee Objections Should Be Overruled.**

138.    The U.S. Trustee objected to several other aspects of the Plan, which the Debtors believe have been resolved through revised language in the Plan, the proposed confirmation order, or documents included in the recently filed Plan Supplement.

139.    First, in response to the U.S. Trustee's assertion that the Thrasio Legacy Trust is required to pay quarterly statutory fees, the Debtors have incorporated the following language in their proposed confirmation order (subject to further nonmaterial revisions):

> "All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date (or funded by the Reorganized Debtors and disbursed by the Disbursing Agent on behalf of each of the Reorganized Debtors). After the Effective Date, any Debtor entity making disbursements on behalf of any Debtor or any Reorganized Debtor, or making disbursements on account of an obligation of any Debtor or any Reorganized Debtor (each a "Disbursing Entity"), shall be jointly and severally liable to pay Quarterly Fees when due and payable. The Debtors shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Reorganized Debtors, and any Disbursing Entities shall file with the Bankruptcy Court separate

UST Form 11-PCR reports when they become due. Each and every one of the Debtors, the Reorganized Debtors, and Disbursing Entities shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code. The Thrasio Legacy Trust Assets (including the $5 million Thrasio Legacy Initial Funding) disbursed to the Thrasio Legacy Trust upon the Effective Date will be included in the calculation of the statutory fees payable to the U.S. Trustee by the Debtors and the Reorganized Debtors for the quarter in which the Effective Date occurs, and neither the Debtors, the Reorganized Debtors, nor the Thrasio Legacy Trust will be responsible for any statutory fees based on the Thrasio Legacy Trust's subsequent distribution of such Cash. If the Thrasio Legacy Trust Assets are liquidated and disbursed, the Thrasio Legacy Trust shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. The U.S. Trustee may assess Quarterly Fees against the Thrasio Legacy Trust, and the Thrasio Legacy Trust's rights to contest the assessment and/or amount of such fees are expressly preserved. Notwithstanding the foregoing, any Quarterly Fee assessed on account of the Thrasio Legacy Trust Assets shall be paid by the Thrasio Legacy Trust, and the Reorganized Debtors shall have no obligation to pay such fees (if any). The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan."

140.    Second, the Debtors revised the proposed confirmation order to remove references to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, in response to the U.S. Trustee's argument that the Plan is not a settlement subjection to approval under Bankruptcy Rule 9019.[168]    Third, the Debtors revised the language in the Plan with respect to the closing of the chapter 11 cases to conform to the U.S. Trustee's proposed language.[169]    Fourth, the Debtors set the minimum distribution under the Plan to $100.[170]    Fifth, the Debtors have agreed to extend the time to file a motion for reconsideration after a determination is made estimating a Disputed Claim

---

[168]  U.S. Trustee Obj. ¶¶ 63–70.

[169]  U.S. Trustee Obj. ¶ 81.

[170]  U.S. Trustee Obj. ¶ 82.

in response to the U.S. Trustee's request.[171]  Sixth, the Plan makes clear that the Disbursing Agent will either be the Debtors, the Reorganized Debtors, or the Thrasio Legacy Trust Administrator whose identity has been made known in the Plan Supplement.[172]  Seventh, and finally, the Exit Facilities Documents, the Restructuring Transactions Memorandum, and the Thrasio Legacy Trust Documents will each be filed with the Plan Supplement in advance of confirmation.[173]  Therefore, the U.S. Trustee's Objections should be overruled.

### G.    Mr. Silberstein's Objections Should be Overruled.

141.    The Silberstein Objection argues that (i) to the extent the Plan prejudices Mr. Silberstein's contractual or legal rights without due process, it should not be confirmed, (ii) the releases contained in the Plan are overbroad, and (iii) the retained claims against Mr. Silberstein should be limited to those potential causes of action identified in the Independent Investigation Results.

142.    *First*, the Plan does not, in any way, limit Mr. Silberstein's rights without due process.  Mr. Silberstein's rights are preserved in the event he would like to seek reimbursement and indemnification from the Debtors, and the Debtors reserve all rights to contest, dispute, or otherwise object to their obligation to reimburse or otherwise indemnify Mr. Silberstein.    The Plan only states that Mr. Silberstein is not a "Released Party," and the Thrasio Legacy Trust shall be vested with standing and authority to pursue claims against Mr. Silberstein if it so chooses.  Mr. Silberstein's rights to dispute or defend any such claims brought against him are expressly preserved.

---

[171]  U.S. Trustee Obj. ¶ 83.

[172]  U.S. Trustee Obj. ¶ 85.

[173]  U.S. Trustee Obj. ¶ 84, 86, and 88.

143.     **Second**, the Independent Investigation was thorough. To evaluate the claims that the Debtors and the Estate could potentially pursue against officers, directors, or employees, the Debtors appointed the Disinterested Directors, both of whom have extensive restructuring experience and no prior affiliation with the Debtors' board of directors.[174] The Disinterested Directors were vested with the powers and authority to conduct an investigation into potential estate Claims and Causes of Action against the Debtors' current or former directors, managers, officers, equity holders, subsidiaries, affiliates, and other related parties.[175] The Disinterested Directors engaged Katten as independent legal counsel in connection with the Independent Investigation and to provide advice and legal services in connection with the exercise of the Disinterested Directors' fiduciary duties in carrying out their delegated authority pursuant to the Resolutions.[176] As described in the Horton Declaration, the Independent Investigation was extensive and was done concurrently with a similar investigation undertaken by the Committee.[177] The Independent Investigation Results were filed and formed the basis for the Committee Settlement, which preserves certain Claims and Causes of Action against the Excluded Parties for the benefit of General Unsecured Creditors. Based on their analysis, the Disinterested Directors determined that the Committee Settlement is in the best interests of the Estates.[178] Accordingly, the Releases are appropriately tailored and, as discussed in Section II.A.3 herein, fully comply with controlling law in the Third Circuit.

---

[174] *See* Horton Declaration ¶¶ 1–2, Ex. A.

[175] *See* Horton Declaration ¶ 5.

[176] *See id.*

[177] *See* Horton Declaration ¶ 6.

[178] *See* Horton Declaration ¶ 17.

144.    ***Third***, Mr. Silberstein's objection presupposes that he is entitled to a full release, and the Debtors have inappropriately denied his release.  The standard under the Bankruptcy Code, however, is that it is the Debtors' burden to show that a release of any party "is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[179] Relying on the Independent Investigation Results, the Debtors exercised their business judgment to determine that providing a broader release at this stage is not proper.  The Independent Investigation was not tasked with identifying each and every potential Claim or Cause of Action that the Debtors may hold against Mr. Silberstein.  Due to the potential colorable Claims and Causes of Action the Debtors hold against Mr. Silberstein that the Independent Investigation identified, the Independent Investigation determined that releasing Mr. Silberstein would not be in the best interest of the Debtors' estates.  Based on the results of the Independent Investigation, the Debtors determined, in their business judgement, that releasing Mr. Silberstein is not in the best interests of their estates.  As mentioned above, such a determination does not impair Mr. Silberstein's rights to contest any Claims or Causes of Action brought against him or require that the Thrasio Legacy Trust pursue any Claims or Causes of Action against him.  Accordingly, the scope and structure of the Debtors' release is appropriate.

145.    ***Finally***, the notice provided to Mr. Silberstein in these chapter 11 cases was proper.[180]  The initial chapter 11 plan that was filed in these cases [Docket No. 40] explicitly noted

---

[179]  *In re Alecto Healthcare Servs., LLC*, No. 23-10787, 2024 WL 1208355, at *6 (Bankr. D. Del. Mar. 20, 2024) (quoting *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010))).

[180]  *See* First Day Declaration, Exhibit C (the Restructuring Support Agreement noted that the Plan releases remained "subject to the ongoing Independent Investigation being conducted by the Disinterested Directors); Mar. 1, 2024 H'rg Tr. [Docket No. 0208] ("They are underway in an independent investigation on the restructuring, on the releases that are proposed to be granted upon confirmation of the plan in several months."); Apr. 18, 2024 H'rg Tr. (concluding that the Voting Deadline would be due one week after the results of the Independent Investigation are provided to the Debtors).

that all releases remained subject to the Independent Investigation. The Independent Directors published the Independent Investigation Results, which contained the viable Causes of Action against Mr. Silberstein.[181] The Debtors then published the Settlement Term Sheet [Docket No. 818], which contains the terms of the Committee Settlement and identifies that Mr. Silberstein is an Excluded Party.[182] The Debtors then filed the Plan, which incorporates the terms of the Committee Settlement.[183] Accordingly, Mr. Silberstein's statements that the Plan's "last minute changes" materially disadvantage him are erroneous and ignore months of extensive disclosure and noticing efforts by the Debtors. And, as stated above, carving Mr. Silberstein out of the Plan's releases does not in any way prejudice his rights to contest or defend any Claim or Cause of Action brought against him by the Thrasio Legacy Trust (if any such Claim or Cause of Action is brought).

## Conclusion

146.   For all of the reasons set forth herein and in the Voting Report, the Grossman Declaration, the Graham Declaration, and the Horton Declaration, and as will be further shown at the Combined Hearing, the Debtors respectfully request that the Court confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Proposed Confirmation Order, overruling any remaining Objections, and granting such other and further relief as is just and proper.

*[Remainder of page intentionally left blank]*

---

[181]  *See* Docket No. 805.

[182]  *See* Docket No. 818.

[183]  *See* Plan Art. IV.J.

Dated: June 7, 2024

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Jacob S. Frumkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
jfrumkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com

-and-

Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Francis Petrie (admitted *pro hac vice*)
Evan Swager (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
matthew.fagen@kirkland.com
francis.petrie@kirkland.com
evan.swager@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**<u>Exhibit A</u>**

**Objection Response Chart**

**IN RE THRASIO HOLDINGS, INC., *ET AL.*, CASE NO. 24-11840 (CMG)
CHART OF OBJECTIONS AND PROPOSED RESPONSES TO THE JOINT
PLAN OF REORGANIZATION OF THRASIO HOLDINGS, INC. AND ITS DEBTOR
AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE (THE "PLAN")[184]**

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| 1073 | U.S. Trustee | The Exculpation Provision is overly broad. | Resolved prior to the Confirmation Hearing through revised language incorporated into the Plan. |
| | | The Plan does not establish that each Released Party provided adequate consideration in exchange for the Debtor Release. | The scope of the Debtor Release is appropriate and necessary to reorganize. *See* Section II.A.3.i; Section III.B. |
| | | The Third-Party Release is impermissible because (1) Opt-out releases are non-consensual and contrary to applicable case law; and (2) non-consensual third-party releases can only be approved if the releases are fair and necessary.  They are neither fair nor necessary | The overwhelming weight of authority suggests that opt-out releases are consensual.  Here, parties received ample notice of the opt-outs.  Courts in this district routinely approve opt-out releases where similar notice is given.  Also, the Third-Party Release was, and continues to be, essential to the reorganization.  Without the efforts and contributions of the Released Parties, the Debtors would not be poised to confirm a plan, thereby further extending these chapter 11 cases and diminishing potential recoveries for all stakeholders.  *See* Section II.A.3.ii; Section III.C. |
| | | The Injunction Provision is impermissible because confirmation of | Resolved prior to the Confirmation Hearing through revised language incorporated into the Plan. |

---

[184]  Capitalized terms used but not defined herein have the meanings given to them in the Plan, the Memorandum, or the applicable Objection, as applicable.

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| | | a plan is not an injunction, only a discharge operates as an injunction. | |
| | | The Gatekeeping Provision is improper. Non-consenting parties should not be forced to seek court authorization before bringing a claim against a Released Party. Gatekeeping provisions have been called into question by Judge Owens in the District of Delaware. | The Gatekeeping Provision is regularly confirmed in chapter 11 plans in the District of New Jersey and is reasonable and appropriate. The Gatekeeping Provision ensures that the Court—the governing body most familiar with the facts and circumstances of the Chapter 11 Cases, and the court best-positioned to determine as to whether the claim may be asserted—is the court making that determination. This inures to the benefit of all parties, including potential claimants. Section III.D. |
| | | The Plan is not a settlement under Bankruptcy Rule 9019, although parts of the Plan suggest it is a settlement. | Resolved prior to the Confirmation Hearing through revised language incorporated into the revised proposed confirmation order. |
| | | The Plan should be revised to reflect that any entities making disbursements on behalf of any Debtor or Reorganized Debtor are joint and severally liable for payment of statutory quarterly fees, and payment should be done using certain UST forms. | Discussions ongoing, expected to resolve prior to the Confirmation Hearing. |
| | | A motion is necessary before any cases may be closed. | Resolved prior to the Confirmation Hearing through revised language incorporated into the Plan. |
| | | The minimum distribution amount should be $25 or $100, not $250. | Resolved prior to the Confirmation Hearing through revised language incorporated into the Plan. |
| | | The deadline for a motion to reconsider a determination regarding a disputed | Discussions ongoing, expected to resolve prior to the Confirmation Hearing. |

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| | | claim should be longer than 7 days or should not exist at all. | |
| | | The documents upon which the Debtors seek final approval have not yet been disclosed. | The Debtors expect to file these documents prior to the Confirmation Hearing. |
| | | The identity of the Disbursing Agent, the Thrasio Legacy Trust Administrator, and the Thrasio Legacy Trust Committee should be disclosed prior to confirmation. | The Debtors expect to disclose such identities prior to the Confirmation Hearing. |
| | | The Thrasio Legacy Trust Documents have not been disclosed. To the extent these documents govern over the Plan, they need to be disclosed. | The Debtors expect to file these documents prior to the Confirmation Hearing. |
| | | The Exculpation Provision is overly broad. | Resolved prior to the Confirmation Hearing through revised language incorporated into the Plan. |
| 1074 | Joshua Silberstein | The Plan may deny Mr. Silberstein's contractual and legal rights without due process. | Mr. Silberstein's rights are preserved. The Plan does not limit Mr. Silberstein's rights without due process. *See* Section III.G. |
| | | The Debtors should release fewer potentially liable parties. | The Release is appropriately tailored to the Independent Investigation and the Committee Settlement. *See* Section III.G. |
| | | The Trust should only be permitted to pursue claims identified in the Independent Investigation. | The Debtors should not preemptively limit the Trust. *See* Section III.G. |

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| | | Recent changes to the Plan materially disadvantage Mr. Silberstein. | The Debtors have provided ample notice throughout these chapter 11 cases. *See* Section III.G. |
| 269 | ESR, LLC | The chapter 11 cases are improperly substantively consolidated. | Resolved prior to Confirmation Hearing. |
| | | The Plan improperly classifies the Debtors' general unsecured creditors into one class. | Resolved prior to Confirmation Hearing. |
| 350 | PIC20 Group, LLC | The chapter 11 cases are improperly substantively consolidated. | Resolved prior to Confirmation Hearing. |
| | | The Plan improperly classifies the Debtors' general unsecured creditors into one class. | Resolved prior to Confirmation Hearing. |
| 1072 | Bristols 6, Inc. | The chapter 11 cases are improperly substantively consolidated. | Resolved prior to Confirmation Hearing. |
| | | Autumn Ideas' guaranty and the lien against its assets are avoidable transfers. | Resolved prior to Confirmation Hearing. |
| | | Deemed consolidation is not "fair and equitable." | Resolved prior to Confirmation Hearing. |
| | | Bristols 6 would receive more money in a chapter 7 liquidation. | Resolved prior to Confirmation Hearing. |
| | | The Plan was not proposed in good faith. | Resolved prior to Confirmation Hearing. |

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| | | The Plan provides preferential treatment without a valid basis to the First Lien Lenders. | Resolved prior to Confirmation Hearing. |
| | | The Plan improperly classifies the Debtors' general unsecured creditors into one class. | Resolved prior to Confirmation Hearing. |