**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com

-and-

Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Francis Petrie (admitted *pro hac vice*)
Evan Swager (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
matthew.fagen@kirkland.com
francis.petrie@kirkland.com
evan.swager@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Jacob S. Frumkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
jfrumkin@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| THRASIO HOLDINGS, INC., *et al*., | Case No. 24-11840 (CMG) |
| Debtors.[1] | (Jointly Administered) |

**NOTICE OF FILING FIRST AMENDED JOINT PLAN OF**
**REORGANIZATION OF THRASIO HOLDINGS, INC. AND ITS DEBTOR**
**AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that on April 18, 2024, the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") filed the *Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*

---

[1] The last four digits of Debtor Thrasio Holdings, Inc.'s tax identification number are 8327. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://www.kccllc.net/Thrasio. The Debtors' service address for purposes of these chapter 11 cases is 85 West Street, 3rd Floor, Walpole, MA, 02081.

(the "Plan") [Docket No. 398].

       **PLEASE TAKE FURTHER NOTICE** that on June 4, 2024, the Debtors filed the *First Amended Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1066].

       **PLEASE TAKE FURTHER NOTICE** that on June 7, 2024, the Debtors filed the *First Amended Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Technical Modifications)* (the "First Amended Plan (Technical Modifications) [Docket No. 1102].

       **PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the *First Amended Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Further Technical Modifications)*, attached hereto as **Exhibit A** (the "First Amended Plan (Further Technical Modifications)").

       **PLEASE TAKE FURTHER NOTICE** that a comparison between the First Amended Plan (Technical Modifications) and the First Amended Plan (Further Technical Modifications) is attached hereto as **Exhibit B**.

       **PLEASE TAKE FURTHER NOTICE** that copies of the First Amended Plan and all other documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Kurtzman Carson Consultants LLC at https://www.kccllc.net/thrasio.  You may also obtain copies of any pleadings by visiting the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

Dated: June 10, 2024

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Jacob S. Frumkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:     msirota@coleschotz.com
           wusatine@coleschotz.com
           fyudkin@coleschotz.com
           jfrumkin@coleschotz.com


**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com

-and-

Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Francis Petrie (admitted *pro hac vice*)
Evan Swager (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
matthew.fagen@kirkland.com
francis.petrie@kirkland.com
evan.swager@kirkland.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

## Exhibit A

**First Amended Plan (Technical Modifications)**

*Further Technical Modifications*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| THRASIO HOLDINGS, INC., et al., | Case No. 24-11840 (CMG) |
| Debtors.[1] | (Jointly Administered) |

**FIRST AMENDED JOINT PLAN OF REORGANIZATION OF**
**THRASIO HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO**
**CHAPTER 11 OF THE BANKRUPTCY CODE (FURTHER TECHNICAL MODIFICATIONS)**

> **NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com

-and-

Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Francis Petrie (admitted *pro hac vice*)
Evan Swager (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
matthew.fagen@kirkland.com
francis.petrie@kirkland.com
evan.swager@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Jacob S. Frumkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
jfrumkin@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

---

[1] The last four digits of Debtor Thrasio Holdings, Inc.'s tax identification number are 8327. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://www.kccllc.net/Thrasio. The Debtors' service address for purposes of these chapter 11 cases is 85 West Street, 3rd Floor, Walpole, MA, 02081.

**TABLE OF CONTENTS**

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES** .......................................................................... **1**
    A.    Defined Terms .............................................................................................................. 1
    B.    Rules of Interpretation ................................................................................................ 16
    C.    Computation of Time .................................................................................................. 17
    D.    Governing Law ........................................................................................................... 17
    E.    Reference to Monetary Figures .................................................................................. 17
    F.    Reference to the Debtors or the Reorganized Debtors. ............................................. 18
    G.    Controlling Document. ............................................................................................... 18
    H.    Consultation, Information, Notice, and Consent Rights ............................................ 18
    I.    Nonconsolidated Plan ................................................................................................ 18
**ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND DIP FACILITY CLAIMS** ... **18**
    A.    Administrative Claims ................................................................................................ 18
    B.    Professional Fee Claims ............................................................................................. 19
    C.    DIP Facility Claims .................................................................................................... 20
    D.    Priority Tax Claims .................................................................................................... 20
    E.    Transaction Expenses ................................................................................................. 20
    F.    Statutory Fees ............................................................................................................. 21
**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** .......................... **21**
    A.    Classification of Claims and Interests ....................................................................... 21
    B.    Summary of Classification ......................................................................................... 21
    C.    Treatment of Claims and Interests ............................................................................. 22
    D.    Special Provision Governing Unimpaired Claims ..................................................... 26
    E.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................. 26
    F.    Elimination of Vacant Classes ................................................................................... 26
    G.    Voting Classes; Deemed Acceptance by Non-Voting Classes .................................. 26
    H.    Intercompany Interests ............................................................................................... 26
    I.    Controversy Concerning Impairment ........................................................................ 26
    J.    Subordinated Claims and Interests ............................................................................ 27
**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** .......................................................... **27**
    A.    Restructuring Transactions. ........................................................................................ 27
    B.    Cancellation of Notes, Instruments, Certificates, and Other Documents .................. 27
    C.    Exemption from Certain Taxes and Fees ................................................................... 28
    D.    Sources of Consideration for Restructuring Transactions ......................................... 28
    E.    New Stockholders Agreement .................................................................................... 28
    F.    Issuance and Distribution of New Common Stock ................................................... 28
    G.    Exit Facilities ............................................................................................................. 29
    H.    Corporate Existence .................................................................................................... 29
    I.    Vesting of Assets in the Reorganized Debtors .......................................................... 29
    J.    Committee Settlement. ............................................................................................... 30
    K.    Corporate Action ........................................................................................................ 37
    L.    New Organizational Documents ................................................................................ 37
    M.    Directors and Officers of the Reorganized Debtors .................................................. 37
    N.    Effectuating Documents; Further Transactions ......................................................... 38
    O.    Preservation of Causes of Action ............................................................................... 38
    P.    Management Incentive Plan ........................................................................................ 38
    Q.    Employee Obligations and Employee Arrangements ................................................ 38
    R.    Closing the Chapter 11 Cases ..................................................................................... 39
**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ..................... **39**
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases .............. 39
    B.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases .......... 40
    C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ................ 40

    D.       Cure of Defaults for Assumed, or Assumed and Assigned, Executory Contracts and Unexpired Leases .................................................................................................... 40
    E.       Survival of the Debtors' Indemnification Obligations and Insurance Obligations ...................... 41
    F.       Modifications, Amendments, Supplements, Restatements, or Other Agreements ........................ 41
    G.       Reservation of Rights ........................................................................................................ 41
    H.       Nonoccurrence of Effective Date ........................................................................................ 42
    I.       Contracts and Leases Entered Into After the Petition Date ....................................................... 42
    J.       D&O Policies ....................................................................................................................... 42

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** .................................................. **42**
    A.       Timing and Calculation of Amounts to Be Distributed ............................................................. 42
    B.       Disbursing Agent .............................................................................................................. 43
    C.       Rights and Powers of Disbursing Agent ................................................................................ 43
    D.       Delivery of Distributions and Undeliverable or Unclaimed Distributions ................................... 43
    E.       Manner of Payment ............................................................................................................ 44
    G.       Tax Issues and Compliance with Tax Requirements ................................................................ 45
    H.       Allocations ....................................................................................................................... 46
    I.       No Postpetition Interest on Claims ....................................................................................... 46
    J.       Setoffs and Recoupment .................................................................................................... 46
    K.       Claims Paid or Payable by Third Parties ............................................................................... 46
    L.       Indefeasible Distributions .................................................................................................. 47

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS** ............................................................................................................. **47**
    A.       Allowance of Claims .......................................................................................................... 47
    B.       Claims Administration Responsibilities ................................................................................ 47
    C.       Estimation of Claims ......................................................................................................... 47
    D.       Disputed Claims Reserve .................................................................................................... 48
    E.       Adjustment to Claims Without Objection ............................................................................... 48
    F.       Time to File Objections to Claims ........................................................................................ 48
    G.       Disallowance of Claims ..................................................................................................... 48
    H.       Amendments to Claims ...................................................................................................... 48
    I.       No Distributions Pending Allowance ..................................................................................... 49
    J.       Distributions After Allowance .............................................................................................. 49

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ..................... **49**
    A.       Compromise and Settlement of Claims, Interests, and Controversies ......................................... 49
    B.       Discharge of Claims and Termination of Interests .................................................................. 49
    C.       Term of Injunctions or Stays ............................................................................................... 50
    D.       Release of Liens ............................................................................................................... 50
    E.       Debtor Release ................................................................................................................. 50
    F.       Release by Holders of Claims or Interests ............................................................................. 51
    G.       Exculpation ..................................................................................................................... 52
    H.       Injunction ....................................................................................................................... 52
    I.       Protection Against Discriminatory Treatment ......................................................................... 52
    J.       [Reserved] ...................................................................................................................... 53
    K.       Reimbursement or Contribution ........................................................................................... 53
    L.       Subordination Rights ......................................................................................................... 53

**ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN** ............................ **53**
    A.       Conditions Precedent to the Effective Date ............................................................................ 53
    B.       Waiver of Conditions ......................................................................................................... 54
    C.       Substantial Consummation .................................................................................................. 54
    D.       Effect of Nonoccurrence of Conditions to the Effective Date .................................................... 54

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ........................... **55**
    A.       Modification and Amendments ............................................................................................. 55
    B.       Effect of Confirmation on Modifications ............................................................................... 55
    C.       Revocation or Withdrawal of the Plan ................................................................................... 55

**ARTICLE XI. RETENTION OF JURISDICTION** .................................................................. **55**

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ................................................................ **57**

A.    Immediate Binding Effect............................................................................................57
B.    Additional Documents .................................................................................................57
C.    Dissolution of the Committee and Any Other Statutory Committee..............................58
D.    Reservation of Rights...................................................................................................58
E.    Successors and Assigns................................................................................................58
F.    Service of Documents ..................................................................................................58
G.    Entire Agreement ........................................................................................................59
H.    Exhibits ......................................................................................................................59
I.    Nonseverability of Plan Provisions ..............................................................................60
J.    Votes Solicited in Good Faith ......................................................................................60
K.    Closing of Chapter 11 Cases........................................................................................60
L.    Waiver or Estoppel......................................................................................................60

**INTRODUCTION**

Thrasio Holdings, Inc. ("Thrasio") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this joint chapter 11 plan (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. The Plan does not contemplate substantive consolidation of any of the Debtors.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

A.    *Defined Terms*

Capitalized terms used in this Plan have the meanings ascribed to them below.

1.    "*1145 Securities*" means any Securities offered, issued, or distributed pursuant to the Plan pursuant to Section 1145 of the Bankruptcy Code, including the New Common Stock (excluding the New Common Stock issued in respect of the Backstop Payment and the New Common Stock issued in respect of the Management Incentive Plan).

2.    "*Ad Hoc Group*" means that certain ad hoc group of lenders under the First Lien Credit Agreement represented by the Ad Hoc Group Advisors.

3.    "*Ad Hoc Group Advisors*" means (a) Gibson, Dunn & Crutcher LLP, as counsel to the Ad Hoc Group, (b) Evercore Group L.L.C., as financial advisor to the Ad Hoc Group, (c) Sills Cummis & Gross P.C., as local counsel to the Ad Hoc Group, and (d) such other professionals as may be retained by or on behalf of the Ad Hoc Group with the consent of the Debtors (such consent not to be unreasonably withheld).

4.    "*Administrative Agent*" means Royal Bank of Canada, solely in its capacity as the administrative and collateral agent under the First Lien Credit Agreement, and any successors and permitted assigns, in such capacity.

5.    "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business, (b) Allowed Professional Fee Claims, (c) the Transaction Expenses, and (d) the Disinterested Directors Fee Claims.

6.    "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than for the Transaction Expenses), which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty (30) days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five (45) days after the Effective Date.

7.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

8.    "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest that is listed in the Schedules

as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, (d) a Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (e) solely as it pertains to General Unsecured Claims (other than First Lien Deficiency Claims, which Claims shall be Allowed), any General Unsecured Claim allowed in writing by the Thrasio Legacy Trust; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim or Interest shall have been Allowed by a Final Order. Any Claim (except any First Lien Claim, or any DIP Facility Claim, in each case Allowed pursuant to this Plan or the DIP Orders) or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim or Interest. "Allow" and "Allowing" shall have correlative meanings.

9.      "*Arrangers*" has the meaning ascribed to it in the First Lien Credit Agreement.

10.      "*Assumed Executory Contracts and Unexpired Leases*" means those Executory Contracts and Unexpired Leases to be assumed by the applicable Reorganized Debtors, as set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases.

11.      "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates against third parties or by third parties against the Debtors under the Bankruptcy Code or applicable non-bankruptcy law, including Causes of Action or remedies under sections 502, 542, 544, 545, 547–553, and 724(a) of the Bankruptcy Code or under other similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

12.      "*Backstop Payment*" means the DIP Backstop Parties' *pro rata* share of an amount of (i) Cash in the aggregate amount of 7.5% of the New Money Loans (as defined in the DIP Documents) or (ii) solely upon Confirmation of the Plan, 10% of New Common Stock, subject to dilution only from the Management Incentive Plan. The Backstop Payment shall be fully earned and approved on a final basis upon the entry of the Interim Order, but payable pursuant to the Confirmation Order upon the occurrence of the Effective Date.

13.      "*Ballot*" means the ballot, approved pursuant to the Disclosure Statement Order, distributed to Holders of Impaired Claims entitled to vote on the Plan, on which such Holders desiring to vote shall indicate acceptance or rejection of the Plan and, as applicable, make any additional elections contained in such ballot. For the avoidance of doubt, any Claim that was included on a Ballot in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code shall be deemed temporarily allowed in such amount solely for voting purposes, and not for purposes of allowance or distribution.

14.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

15.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of New Jersey, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the District of New Jersey.

16.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

17.    "*Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

18.    "Bar Date Order" means the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(B)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, and (IV) Approving Notice Thereof* [Docket No. 292] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

19.    "*BlackRock Consenting Creditors*" means all funds and accounts that are managed by BlackRock Capital Investment Advisors, LLC or its affiliates that are signatories to the Restructuring Support Agreement.

20.    "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

21.    "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

22.    "*Causes of Action*" mean any action, Claim, cross-claim, third-party claim, damage, remedy, judgment, cause of action, controversy, proceeding, agreement, demand, right, action, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise. For the avoidance of doubt, "Causes of Action" include: (a) any right of setoff, counterclaim, or recoupment; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any Avoidance Actions. For the avoidance of doubt, all "Causes of Action" that are Vested Causes of Action shall be preserved for, and may be pursued by the Thrasio Legacy Trust, and shall not be released by the Plan, the Confirmation Order, or otherwise.

23.    "*Challenge*" has the meaning ascribed to it in the DIP Orders.

24.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

25.    "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

26.    "*Claims, Noticing, and Solicitation Agent*" means Kurtzman Carson Consultants LLC, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

27.    "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Claims (other than Transaction Expenses, Professional Fee Claims and Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), sixty days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims and

Transaction Expenses), 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors, the Reorganized Debtors, or Thrasio Legacy Trust, as applicable, or by an order of the Bankruptcy Court for objecting to such Claims.

28.　　"*Claims Register*" means the official register of Claims against, and Interests in, the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

29.　　"*Class*" means a class of Claims against, or Interests in, the Debtors as set forth in <u>Article III</u> of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

30.　　"*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

31.　　"*Committee Settlement*" means the comprehensive settlement between the Debtors and the Committee as set forth in <u>Article IV.J</u> of the Plan.

32.　　"*Committee Settlement Term Sheet*" means the term sheet evidencing the key terms of the Committee Settlement, attached to the Plan Supplement as <u>Exhibit H</u> [Docket No 818].

33.　　"*Company Parties*" means Thrasio and each of its affiliates that have executed and delivered counterpart signature pages to the Restructuring Support Agreement to the Consenting Lenders.

34.　　"*Company Representative*" means the employee of the Reorganized Debtors as may be designated from time to time by the Reorganized Debtors to which the Thrasio Legacy Trust's requests for documents or information from the Reorganized Debtors shall be made.

35.　　"*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan.

36.　　"*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

37.　　"*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

38.　　"*Confirmation Order*" means the Bankruptcy Court's order confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

39.　　"*Consenting Lenders*" means, collectively, the Consenting Term Lenders and the Consenting RCF Lenders that are signatories to the Restructuring Support Agreement or any subsequent Consenting Lender that becomes party thereto in accordance with the terms of the Restructuring Support Agreement.

40.　　"*Consenting RCF Lenders*" means the holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold RCF Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a joinder to the Restructuring Support Agreement, or a Transfer Agreement to the Restructuring Support Agreement to counsel to the Company Parties.

41.　　"*Consenting Term Lenders*" means the holders of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts that hold Term Loan Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a joinder to the Restructuring Support Agreement, or a Transfer Agreement to the Restructuring Support Agreement to counsel to the Company Parties.

42.　　"*Consummation*" means the occurrence of the Effective Date.

43.    "*Cooperation Agreements*" means the cooperation agreements that shall be in form and substance reasonably acceptable to the Debtors, the Committee, or the Thrasio Legacy Trust (as applicable) and the Required Consenting Lenders whereby each Cooperating Party will agree to use commercially reasonable efforts to fully cooperate with the investigation and prosecution of the Vested Causes of Action, taking into account the individual circumstances of each Cooperating Party, including personal obligations and go-forward contributions and obligations to the Reorganized Debtors.

44.    "*Cooperating Parties*" means those certain individuals identified and agreed upon with the Committee.

45.    "*Cooperation Default Notice*" means the notice containing a proposed form of order to be filed with the Bankruptcy Court requesting an order causing the defaulting Cooperating Party to become an Excluded Party in the event a Cooperating Party does not cure an alleged default under a Cooperation Agreement.

46.    "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

47.    "*Cure Notice*" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include: (a) procedures for objecting to proposed assumptions or assignments of the applicable Executory Contracts or Unexpired Leases; (b) Cure Claims to be paid in connection therewith; and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

48.    "*Cure/Assumption Objection Deadline*" means the date that is 14 days after Filing of the Schedule of Assumed Executory Contracts and Unexpired Leases with the Plan Supplement and service of the Cure Notice; *provided* that if any Executory Contract or Unexpired Lease is added to the Schedule of Assumed Executory Contracts and Unexpired Leases after the filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, or an Executory Contract or Unexpired Lease proposed to be assumed by the Debtors or Reorganized Debtors is proposed to be assigned to a third party after the filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be the earlier of (a) 14 days after service of the amended Schedule of Assumed Executory Contracts and Unexpired Leases with such modification and (b) the date of the scheduled Confirmation Hearing.

49.    "*D&O Policies*" means any insurance policy for, among others, directors, members, trustees, and officers liability (or any equivalents) maintained by the Debtors or the Debtors' Estates, and all agreements, documents or instruments relating thereto, including any runoff policies or tail coverage.

50.    "*Debtors*" has the meaning provided in the preamble of this Plan.

51.    "*Definitive Documents*" means (a) any documents in connection with the First Day Pleadings or "second day" pleadings and all orders sought pursuant thereto; (b) the DIP Documents; (c) the Solicitation Materials, including the Disclosure Statement and the Disclosure Statement Order; (d) this Plan; (e) the Confirmation Order; (f) the Exit Facilities Documents (g) the New Organizational Documents; (h) the New Stockholders Agreement; (i) the Plan Supplement; (j) the Thrasio Legacy Trust Documents; (k) the Cooperation Agreements; (l) such other definitive documentation relating to a recapitalization or restructuring of the Debtors as is necessary or desirable to consummate the Restructuring Transactions; and (m) any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents, motions, pleadings, and/or agreements relating to any of the foregoing.

52.    "*DIP Agent*" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, and any successors and permitted assigns, in such capacity.

53.    "*DIP Backstop Parties*" has the meaning ascribed to it in the Restructuring Support Agreement.

54. "*DIP Credit Agreement*" means that certain super-priority senior secured debtor-in-possession credit agreement, filed as an attachment to the DIP Motion, as may be amended, restated, supplemented, or otherwise modified from time to time, by and among Thrasio, LLC, as borrower, each subsidiary of the borrower party thereto, as a guarantor, the DIP Agent, and the DIP Lenders.

55. "*DIP Documents*" means, collectively, the documentation governing the DIP Facility, including, without limitation, the DIP Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, the DIP Orders, the DIP Motion, and any amendments, modifications and supplements to or in respect of any of the foregoing.

56. "*DIP Exit Fee*" means 40% of the New Common Stock, subject to dilution only by the Management Incentive Plan. For the avoidance of doubt, the DIP Exit Fee shall not be subject to dilution by the Backstop Payment.

57. "*DIP Facility*" means that certain $360 million superpriority senior secured debtor-in-possession credit facility provided by the DIP Lenders on the terms of, and subject to the conditions set forth in, the DIP Documents, including the DIP Credit Agreement and the DIP Orders.

58. "*DIP Facility Claim*" means any and all Claims against a Debtor arising under, derived from, based upon, or related to the DIP Documents or the DIP Orders.

59. "*DIP Lenders*" means, collectively, the lenders party to the DIP Credit Agreement.

60. "*DIP Motion*" means any motion filed with the Bankruptcy Court seeking approval of the DIP Facility and the DIP Credit Agreement.

61. "*DIP Orders*" means, collectively, (i) *the Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing* [Docket No. 81] and (ii) *the Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, and (V) Modifying the Automatic Stay* [Docket No. 297].

62. "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that: (a) has been disallowed by a Final Order; (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not listed in the Schedules and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

63. "*Disbursing Agent*" means (i) solely as it pertains to Thrasio Legacy Trust Interests and the Thrasio Legacy Trust Proceeds, the Thrasio Legacy Trust, or (ii) or the Debtors, the Reorganized Debtors, or the Thrasio Legacy Trust, as applicable, to make or facilitate distributions contemplated under the Plan; *provided that* the Debtors or the Reorganized Debtors, as applicable, shall be required to obtain the written consent of the Administrative Agent prior to selecting the Administrative Agent to serve as a Disbursing Agent.

64. "*Disclosure Statement*" means the *Amended Disclosure Statement for the Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 375], as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan.

65.     "*Disclosure Statement Order*" means a Final Order of the Bankruptcy Court approving the Disclosure Statement.

66.     "*Disinterested Directors*" means, collectively, Anthony Horton and Stefan M. Selig.

67.     "*Disinterested Directors Fee Claims*" means all unpaid fees and expenses as of the Effective Date due to the Disinterested Directors pursuant to their respective director agreements with Thrasio. On the Effective Date, the Disinterested Directors Fee Claims shall be deemed Allowed Administrative Claims against each of the Debtors. For the avoidance of doubt, the fees owed to the Disinterested Directors pursuant to their respective director agreements with Thrasio shall be paid in the ordinary course during the pendency of these Chapter 11 Cases.

68.     "*Disputed*" means a Claim or an Interest or any portion thereof: (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order; and (c) with respect to which a party in interest has Filed a Proof of Claim, a Proof of Interest, or otherwise made a written request to a Debtor for payment. For the avoidance of doubt, DIP Facility Claims, First Lien Claims, and First Lien Deficiency Claims are not Disputed Claims.

69.     "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Thrasio Legacy Trust or the Reorganized Debtors with the consent of the Required Consenting Lenders for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date, in accordance with Article VII.D hereof.

70.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors (in consultation with the Required Consenting Lenders), designated by an order of the Bankruptcy Court.

71.     "*Effective Date*" means, with respect to the Plan, the first date that is a Business Day on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.B hereof have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan is declared effective.

72.     "*Employment Agreements*" means, collectively, each of the written contracts, agreements, policies, programs, and plans for compensation, bonuses, reimbursement, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance, and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs, and plans for bonuses and other incentives or compensation for the Debtors' current or former employees, directors, officers, and managers, including executive compensation programs and existing compensation arrangements for the employees of the Debtors in existence on or before the date the parties executed the Restructuring Support Agreement. For the avoidance of doubt, the Employment Agreements shall include, without limitation (a) all offer letters, employment letters, or other amendments to the Debtors' Employee Agreements executed in February 2024, and (b) all existing severance plans as of the Petition Date; *provided* that this definition excludes any severance agreements with any of the Debtors' employees that were not employed as of the Petition Date.

73.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

74.     "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

75.     "*Excluded Parties*" means, each in any and all capacities, (i) Joshua Silberstein, Carlos Cashman, Joseph Falcao, Daniel Boockvar, Mounir Ouhadi, and Aditya Rathod, (ii) transferees of Thrasio's assets in connection with transactions involving Yardline Capital Corp. between April 2020 and January 2022, including, but not limited to, Ari Horowitz, (iii) the Cooperating Parties, subject to Article IV.J.9, and (iv) the family members, related trusts, investment vehicles, affiliates, and successors and assigns of the persons in (i), (ii), and (iii), *provided*, that this clause (iv) shall not include any current or former directors and officers of the Debtors or Reorganized Debtors, as applicable,

who are not otherwise identified in clauses (i), (ii), and/or (iii). Notwithstanding anything contained in the Plan, any ballot, any prior order of the Court, or otherwise, none of the Excluded Parties shall be Released Parties or Releasing Parties under the Plan.

76.      "*Exculpated Parties*" means (a) each Debtor; (b) each Reorganized Debtor; (c) the Committee and each of its members; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), each such Entity's current and former control persons (including any officers), directors, members of any committees of any Entity's board of directors or managers, equity Holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, advisory board members, financial advisors, attorneys (including any attorneys or other professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such. Notwithstanding the foregoing and for the avoidance of doubt, none of the Excluded Parties shall be Exculpated Parties.

77.      "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

78.      "*Exit Facilities*" means, collectively, the First-Out Take-Back Debt Facility and the Second-Out Take-Back Debt Facility.

79.      "*Exit Facilities Agent*" means any the financing institution identified in the Plan Supplement in its capacity as administrative agent and collateral agent under the Exit Facilities, and any successors and permitted assigns, in such capacity.

80.      "*Exit Facilities Documents*" means the Exit Take Back Debt Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

81.      "*Exit Take Back Debt Credit Agreement*" means that certain credit agreement evidencing and documenting the First-Out Take-Back Debt Facility and the Second-Out Take-Back Debt Facility.

82.      "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

83.      "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims, Noticing, and Solicitation Agent.

84.      "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

85.      "*First Day Pleadings*" means the "first-day" pleadings that the Debtors made upon or shortly following the commencement of the Chapter 11 Cases, including any proposed orders to approve such first-day pleadings.

86.    "*First Lien Agent Advisors*" means (a) Simpson Thacher & Bartlett LLP, as counsel to the Administrative Agent, and (b) Porzio, Bromberg & Newman, P.C., as local counsel to the Administrative Agent.

87.    "*First Lien Claim*" means, collectively, the RCF Claims and the Term Loan Claims.

88.    "*First Lien Credit Agreement*" means that certain first lien credit agreement, as amended by that certain first amendment, dated as of May 28, 2021, as amended by that certain second amendment, dated as of September 17, 2021, as amended by that certain third amendment, dated as of June 30, 2023, and as amended by that certain forbearance and fourth amendment, dated as of September 29, 2023, and as amended by that certain forbearance and fifth amendment, dated as of December 29, 2023, and as otherwise amended, restated, supplemented, or otherwise modified from time to time.

89.    "*First Lien Credit Documents*" means that First Lien Credit Agreement together with all other related documents, instruments, and agreements including all Loan Documents (as defined in the First Lien Credit Agreement), in each case as supplemented, amended, restated, or otherwise modified from time to time.

90.    "*First Lien Deficiency Claim*" means any deficiency claim held by a First Lien Lender on account of the First Lien Claims.

91.    "*First Lien Lenders*" means, collectively, the RCF Lenders and the Term Loan Lenders.

92.    "*First-Out Take-Back Debt Facility*" means that certain senior secured, first lien "first-out" term loan facility entered into upon the Effective Date, in accordance with the Exit Facilities Documents.

93.    "*General Unsecured Claim*" means any unsecured Claim, including, without limitation, any First Lien Deficiency Claim and any Other General Unsecured Claim.

94.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

95.    "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor, as applicable.

96.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

97.    "*Indemnified Parties*" means all current and former directors and officers, and current and former managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company Parties, as applicable; *provided that* (i) the Excluded Parties and (ii) Alex Urdea shall not be Indemnified Parties, and no indemnification agreements, provisions, or obligations associated with (i) the Excluded Parties or (ii) Alex Urdea shall be assumed or reinstated by the Reorganized Debtors; *provided, further,* that to the extent any Indemnified Party is a former director or officer of Thrasio, any indemnification obligations shall be limited to indemnify such Indemnified Party in their capacity as a former director or officer of Thrasio, rather than in their individual or any other capacity.

98.    "*Independent Investigation*" means that certain investigation undertaken by the Disinterested Directors, as more fully described in the Disclosure Statement.

99.    "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor or a Debtor's Affiliate.

100.    "*Intercompany Interest*" means an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

101.    "*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code), including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity,

including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, and including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

102.    "*IRS*" means the United States Internal Revenue Service.

103.    "*Issuing Bank*" has the meaning ascribed to it in the First Lien Credit Agreement.

104.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

105.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

106.    "*Management Incentive Plan*" means the post-emergence management incentive plan to be implemented with respect to Reorganized Thrasio by the New Board on or as soon as reasonably practicable after the Effective Date.

107.    "*New Board*" means the initial board of directors of Reorganized Thrasio as of the Effective Date, to be appointed in accordance with the Restructuring Support Agreement, Plan, and New Organizational Documents, whose identities shall be disclosed in the Plan Supplement.

108.    "*New Common Stock*" means the common stock or common equity of Reorganized Thrasio to be issued on the Effective Date.

109.    "*New Organizational Documents*" means the New Stockholders Agreement and any other organizational and governance documents for the Reorganized Debtors and its subsidiaries and Affiliates, including, without limitation, certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, and limited liability company agreements (or equivalent governing documents), as applicable.

110.    "*New Stockholders Agreement*" means that certain stockholders' agreement that will govern certain matters related to the governance of Reorganized Thrasio and the New Common Stock, which shall include customary provisions for transactions of this nature including but not limited to: demand, piggy-back and S-3 registration rights; information and inspection rights; preemptive rights; rights of first refusal, co-sale and drag-along protections and obligations; customary non-financial affirmative and negative covenants; free transferability; and indemnification, and shall be consistent in all material respects with the Restructuring Term Sheet.

111.    "*Other General Unsecured Claim*" means any unsecured Claim that is not: (a) a DIP Facility Claim, (b) an Administrative Claim, (c) a Professional Fee Claim; (d) a Priority Tax Claim, (e) an Other Secured Claim, (f) an Other Priority Claim, (g) a First Lien Claim, (h) a First Lien Deficiency Claim, (i) an Intercompany Claim, (j) a Series X Redeemable Preferred Stock Interest, (k) a Series D Preferred Stock Interest, (l) a Series C Preferred Stock Interest, (m) a Series B Preferred Stock Interest, (n) a Series A Preferred Stock Interest, (o) a Series Seed Preferred Stock Interest, or (p) an Intercompany Interest.

112.    "*Other Priority Claim*" means any Claim against a Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases.

113.    "*Other Secured Claim*" means any Secured Claim against a Debtor that is not (a) a DIP Facility Claim or (b) a First Lien Claim.

114.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

115.    "*Petition Date*" means February 28, 2024.

116.    "*Plan*" means this joint chapter 11 plan, as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with Article X.A hereof and the Restructuring Support Agreement, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

117.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Restructuring Support Agreement, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be Filed by the Debtors with the Bankruptcy Court by 7 days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.  The Plan Supplement may include the following, as applicable:  (a) the New Stockholders Agreement; (b) the Schedule of Assumed Executory Contracts and Unexpired Leases; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) Retained Causes of Action List; (e) the Restructuring Transactions Memorandum; (f) the identities of the members of the New Board, as applicable, and the officers of the Reorganized Debtors, if any, including information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (g) the Management Incentive Plan; (h) Exit Take Back Debt Credit Agreement; (i) the Committee Settlement Term Sheet; and (j) any and all documentation necessary to effectuate the Restructuring Transactions or that is contemplated under the Plan.

118.    "*Preferred Equity Documents*" means any and all documents required to implement, issue, and distribute the Series Seed Preferred Stock, Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, and Series X Preferred Stock.

119.    "*Priority Claims*" means, collectively, all Priority Tax Claims and Other Priority Claims.

120.    "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

121.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

122.    "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

123.    "*Professional Fee Claim*" means all claims for accrued, contingent, and/or unpaid fees and expenses incurred by a Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

124.    "*Professional Fee Escrow Account*" means and escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

125.    "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, which shall be estimated pursuant to the method set forth in Article II.B.3 of the Plan.

126.    "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

127.    "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

128.    "*RCF Claims*" means any Claim against a Debtor arising under, derived from, based on, or related to the Revolving Credit Facility, including Claims for all principal amounts outstanding, reimbursement for letters of credit, and accrued and unpaid interest, fees, expenses, costs, and indemnification and other amounts and Obligations (as defined in the First Lien Credit Agreement) arising under or related to the Revolving Credit Facility.

129.    "*RCF Lenders*" means Holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, RCF Claims.

130.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims or Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

131.    "*Related Party*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, successors, assigns, subsidiaries, partners, limited partners, general partners, principals, members, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (including any attorneys or professionals retained by any current or former director or manager of a Debtor in his or her capacity as director or manager as a Debtor), in each case, other than the Excluded Parties.[2]  Notwithstanding the foregoing and for the avoidance of doubt, none of the Excluded Parties shall be Related Parties.

132.    "*Released Party*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Lenders; (d) the DIP Lenders; (e) the DIP Agent; (f) the Ad Hoc Group and each member of the Ad Hoc Group; (g) the Committee and each member of the Committee; (h) the Administrative Agent; (i) the Arrangers, each lender, and Issuing Banks and other secured parties under the First Lien Credit Agreement; (j) the DIP Backstop Parties; (k) each current and former wholly-owned Affiliate of each Entity in clause (a) through the following clause (l); and (l) each Related Party of each Entity in clauses (a) through this clause (l); *provided, however*, that each Entity that timely and properly opts out of the releases contemplated herein shall not be a Released Party; *provided, further*, that the Excluded Parties shall not be deemed Released Parties.

133.    "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Lenders; (d) the DIP Lenders; (e) the Ad Hoc Group and each member of the Ad Hoc Group; (f) the Committee and each member of the Committee; (g) the Administrative Agent; (h) the Arrangers, each lender, and Issuing Banks and other secured parties under the First Lien Credit Agreement; (i) the DIP Backstop Parties; (j) all Holders of Claims; (k) all holders of Interests; (l) each current and former wholly-owned Affiliate of each Entity in clause (a) through the following clause (m); and (m) each Related Party of each Entity in clauses (a) through this clause (m); *provided, however*, that each Entity that timely and properly opts out of the releases contemplated herein shall not be a Releasing Party; *provided, further, however*, that any Holder of Interests who acquired such Interests after the Voting Record Date (as such term is defined in the Disclosure Statement

---

[2]    For the avoidance of doubt, and notwithstanding anything in the Plan to the contrary, for the BlackRock Consenting Creditors, the defined term "Related Party" shall be limited to any Related Party of the BlackRock Consenting Creditors for which such BlackRock Consenting Creditors are legally entitled to bind under applicable law.

Order) and did not receive an opt out election form shall not be a Releasing Party; *provided further, however*, that the Excluded Parties shall not be deemed Releasing Parties.[3]

134.    "*Reorganized Debtors*" means the Debtors, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Thrasio.

135.    "*Reorganized Thrasio*" means either:  (a) Thrasio, as reorganized pursuant to and under the Plan, or any successor or assign thereto, by merger, amalgamation, consolidation, or otherwise, on or after the Effective Date, or (b) in accordance with the Restructuring Transactions Memorandum, a new corporation or limited liability company that may be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors in the Chapter 11 Cases and issue the New Common Stock to be distributed pursuant to the Plan.

136.    "*Required Consenting Lenders*" means, as of the relevant date, the Required Consenting Lenders holding at least 66.66% of the aggregate outstanding principal amount of RCF Claims and Term Loan Claims (taken together) that are held by Consenting Lenders.

137.    "*Restructuring*" means the restructuring of the Debtors pursuant to the terms of the Plan and the Restructuring Support Agreement.

138.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, made and entered into as of February 27, 2024, including all exhibits thereto (including the Restructuring Term Sheet), by and among the Debtors and the Consenting Lenders party thereto from time to time, as such may be amended from time to time in accordance with its terms.

139.    "*Restructuring Term Sheet*" means that certain term sheet attached as <u>Exhibit C</u> to the Restructuring Support Agreement.

140.    "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors reasonably determine to be necessary to implement the transactions described in this Plan, as described in more detail in <u>Article IV.A</u> herein and the Restructuring Transactions Memorandum.

141.    "*Restructuring Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement.

142.    "*Retained Causes of Action List*" means a list of all retained Claims and Causes of Action of the Debtors identified in the Plan Supplement.

143.    "*Revolving Credit Facility*" means that certain prepetition first lien revolving credit facility pursuant to the First Lien Credit Agreement.

144.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be assumed or assumed and assigned by the Debtors or the Reorganized Debtors, as applicable, pursuant to the Plan, as set forth in the Plan Supplement, as amended from time to time in accordance with the Plan.

---

[3]   For the avoidance of doubt, and notwithstanding anything in the Plan to the contrary, for the BlackRock Consenting Creditors, the defined term "Releasing Party" shall be limited to any Releasing Party of the BlackRock Consenting Creditors for which such BlackRock Consenting Creditors are legally entitled to bind under applicable law.

145.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which shall be included in the Plan Supplement, as amended from time to time.

146.    "*Schedules*" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

147.    "*Second-Out Take-Back Debt Facility*" means that certain senior secured, first lien "second-out" term loan facility entered into upon the Effective Date in accordance with the Exit Facilities Documents.

148.    "*Secured*" means, when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a secured Claim.

149.    "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

150.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

151.    "*Series A Preferred Stock Interest*" means any share or interest of Series A Preferred Stock, including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

152.    "*Series B Preferred Stock Interest*" means any share or interest of Series B Preferred Stock, including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

153.    "*Series C Preferred Stock Interest*" means any share or interest of Series C Preferred Stock, including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

154.    "*Series D Preferred Stock Interest*" means any share or interest of Series D Preferred Stock, including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

155.    "*Series Seed Preferred Stock Interest*" means any share or interest of Series Seed Preferred Stock, including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

156.    "*Series X Redeemable Preferred Stock Interest*" means any share or interest of Series X Redeemable Preferred Stock, including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

157.    "*Solicitation Materials*" means all solicitation materials with respect to the Plan.

158.    "*Tax Code*" means the U.S. Internal Revenue Code of 1986, as amended.

159.    "*Term Loan*" shall have the meaning ascribed to the term in the First Lien Credit Agreement.

160.    "*Term Loan Claims*" means any Claim on account of the Term Loan.

161.     "*Term Loan Lenders*" means the Holders of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts that hold, Term Loan Claims.

162.     "*Thrasio*" means Thrasio Holdings, Inc.

163.     "*Thrasio Legacy Trust*" means that certain trust to be established on the Effective Date, in accordance with the Plan, the Committee Settlement, and the Thrasio Legacy Trust Agreement, to, as applicable, administer the Thrasio Legacy Trust Assets and administer, process, settle, resolve, liquidate, satisfy and pay holders of Allowed General Unsecured Claims.

164.     "*Thrasio Legacy Trust A Interests*" means interests in the Thrasio Legacy Trust provided to Holders of First Lien Deficiency Claims representing a right to recovery for Holders of Allowed First Lien Deficiency Claims in accordance with the Thrasio Legacy Trust Waterfall.

165.     "*Thrasio Legacy Trust Assets*" means the Thrasio Legacy Trust Initial Funding, the Vested Causes of Action, and any additional assets that the Reorganized Debtors (subject to the terms of the Exit Facilities Documents), in their reasonable discretion and with the consent of the Thrasio Legacy Trust and the Required Consenting Lenders, may transfer to the Thrasio Legacy Trust from time to time, and any proceeds associated therewith.  For the avoidance of doubt, following the occurrence of the Effective Date of a Plan that incorporates the terms of the Committee Settlement, all Challenge rights and claims against the Prepetition First Lien Secured Parties and the DIP Secured Parties (each as defined in the DIP Orders) shall be deemed settled and released by the Debtors, the Reorganized Debtors, the Committee, and the Thrasio Legacy Trust and, for the avoidance of doubt, shall not become Vested Causes of Action or Thrasio Legacy Trust Assets.

166.     "*Thrasio Legacy Trust Agreement*" means that certain agreement by and among the Debtors and the Thrasio Legacy Trust Administrator, substantially in the form included in the Plan Supplement.

167.     "*Thrasio Legacy Trust Administrator*" means an individual selected by the Committee with the consent of the Required Consenting Lenders to administer Thrasio Legacy Trust.

168.     "*Thrasio Legacy Trust B Interests*" means interests in the Thrasio Legacy Trust provided to Holders of Other General Unsecured Claims representing a right to recovery for Holders of Allowed Other General Unsecured Claims in accordance with the Thrasio Legacy Trust Waterfall.

169.     "*Thrasio Legacy Trust Beneficiaries*" means Holders of Allowed First Lien Deficiency Claims and Allowed Other General Unsecured Claims who receive Thrasio Legacy Trust Interests under the Plan.

170.     "*Thrasio Legacy Trust Committee*" means the oversight committee, which shall oversee the Thrasio Legacy Trust in accordance with the Plan and the Thrasio Legacy Trust Agreement, and which shall be composed of (i) two (2) designees selected by the Required Consenting Lenders, (ii) two (2) designees selected by the Committee, and (iii) the Thrasio Legacy Trust Administrator.

171.     "*Thrasio Legacy Trust Documents*" means the Thrasio Legacy Trust Agreement and the documents necessary to form the Thrasio Legacy Trust, each of which shall be in form and substance acceptable to the Debtors, the Committee, and the Required Consenting Lenders.

172.     "*Thrasio Legacy Trust Fees and Expenses*" means all reasonable and documented fees, expenses, and costs (including any taxes (if any) imposed on or payable by the Thrasio Legacy Trust) incurred by the Thrasio Legacy Trust, any professionals retained by the Thrasio Legacy Trust, and any additional amount determined necessary by the Thrasio Legacy Trust Administrator (subject to any consultation and consent rights of the Thrasio Legacy Trust Committee as may be set forth in the Thrasio Legacy Trust Agreement), in accordance with the terms of the Thrasio Legacy Trust Agreement, to include in the Thrasio Legacy Trust Reserve.

173.     "*Thrasio Legacy Trust Indemnified Parties*" means the Thrasio Legacy Trust Administrator, the Thrasio Legacy Trust Committee and its current and former members, and the Thrasio Legacy Trust's consultants,

agents, attorneys, accountants, financial advisors, estates, employees, officers, directors, principals, professionals, and other representatives, each in their respective capacity as such, and any of such Person's successors and assigns.

174.    "*Thrasio Legacy Trust Initial Funding*" means $5 million in Cash, which shall be provided by the Debtors or Reorganized Debtors, as applicable; *provided* that, for the avoidance of doubt, the Reorganized Debtors shall not be obligated to provide additional funding for the Thrasio Legacy Trust beyond the Thrasio Legacy Trust Initial Funding.

175.    "*Thrasio Legacy Trust Interests*" means the Thrasio Legacy Trust A Interests and the Thrasio Legacy Trust B Interests.

176.    "*Thrasio Legacy Trust Proceeds*" means any proceeds derived from the Vested Causes of Action, the claims underlying the Vested Causes of Action, or any settlements related thereto.  For the avoidance of doubt, Thrasio Legacy Trust Proceeds shall also include any other assets held by the Thrasio Legacy Trust from time to time, including interest on any Cash held by the Thrasio Legacy Trust.

177.    "*Thrasio Legacy Trust Reserve*" means an amount funded with Cash from the Thrasio Legacy Trust Initial Funding or the Thrasio Legacy Trust Proceeds (as applicable) that, prior to the Thrasio Legacy Trust making any distributions, the Thrasio Legacy Trust Administrator determines, in accordance with the terms of the Thrasio Legacy Trust Agreement, and in consultation with the Thrasio Legacy Trust Committee, is reasonably necessary to satisfy current and future Thrasio Legacy Trust Fees and Expenses.

178.    "*Transaction Expenses*" has the meaning ascribed in the Restructuring Support Agreement.

179.    "*U.S. Trustee*" means the United States Trustee for the District of New Jersey.

180.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

181.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that are unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash on the Effective Date.

182.    "*Vested Causes of Action*" means (i) any Claims and Causes of Action, including Avoidance Actions, against the Excluded Parties and (ii) all Claims and Causes of Actions not released under the Plan.  For the avoidance of doubt, Vested Causes of Action shall include (a) subject to Article IV.J.9, all Claims and Causes of Action against Cooperating Parties; and (b) any and all challenges to the validity and enforceability of that certain *Confidential Separation Agreement and Mutual Release* between Thrasio, LLC and Thrasio Holdings, Inc., and Joshua Silberstein dated September 25, 2021, or any other purported releases of any Excluded Party.[4]

183.    "*Voting Deadline*" means the date and time by which the Claims, Noticing, and Solicitation Agent must actually receive the Ballots, as set forth on the Solicitation Materials.

184.    "*Voting Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against the Debtors are eligible to receive distributions under the Plan.

**B.    *Rules of Interpretation***

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) capitalized terms defined only in the plural or singular

---

[4] The Vested Causes of Action shall in no way be limited or impaired by the conclusions of the Independent Investigation.

form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) the use of "include" or "including" is without limitation unless otherwise stated.

## C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

## D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

## E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

**F.**     *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

**G.**     *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the terms of the relevant provision in the Plan shall control (unless stated otherwise in such document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control; *provided*, that, to the extent the Plan or Confirmation Order is inconsistent with the Thrasio Legacy Trust Documents, the Thrasio Legacy Trust Documents shall govern.

**H.**     *Consultation, Information, Notice, and Consent Rights*

Notwithstanding anything to the contrary in this Plan, the Disclosure Statement, or the Confirmation Order, any and all consent and approval rights set forth in the DIP Orders, the DIP Credit Agreement, the Restructuring Support Agreement, and the Committee Settlement Term Sheet, including rights and limitations with respect to the form and substance of any Plan Supplement document or Definitive Document (including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents) shall be incorporated herein by this reference (including to the applicable definitions in Article I.A) and fully enforceable as if stated in full herein.  For the avoidance of doubt, Consenting Lender consent shall not be required for the filing of any ministerial notices and similar ministerial documents, retention applications, fee applications, fee statements, similar pleadings or motions relating to the retention or fees of any professional, or statements of financial affairs and schedules of assets and liabilities.

The absence in this Plan of references to any and all information, notice, and consent rights set forth in the Restructuring Support Agreement (including the exhibits thereto) with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair, modify or negate such rights.

**I.**     *Nonconsolidated Plan*

Although for purposes of administrative convenience, efficiency, and distributions the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

**ARTICLE II.**
**ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND DIP FACILITY CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Facility Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

**A.**     *Administrative Claims*

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Transaction Expenses, Professional Fee Claims, DIP Facility Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Reorganized Debtors and the Thrasio Legacy Trust pursuant to the procedures specified in the Confirmation Order and the notice of entry of the

Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or the Thrasio Legacy Trust, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors, the Thrasio Legacy Trust, and the requesting party by the Claims Objection Bar Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Transaction Expenses, Professional Fee Claims, or DIP Facility Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

**B.**    *Professional Fee Claims*

1.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules. The Reorganized Debtors shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

2.    Professional Fee Escrow Account

No later than the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Debtors' or the Reorganized Debtors, as applicable. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3.    Professional Fee Escrow Amount

The Professionals shall deliver to the Debtors and the Ad Hoc Group Advisors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before the anticipated Effective Date and projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than two days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional for purposes of funding the Professional Fee Escrow Amount. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

4.      Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided for in the Plan, from and after the Confirmation Date, the Debtors and/or the Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to administration of the Chapter 11 Cases, prosecution of Causes of Action, and implementation of the Plan and Consummation incurred by the Debtors, the Reorganized Debtors, and/or the Committee. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

**C.      DIP Facility Claims**

On the Effective Date, except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, on the Effective Date, each such Holder of an Allowed DIP Facility Claim shall receive its *pro rata* share of (a) the First-Out Take-Back Debt Facility; (b) the Second-Out Take-Back Debt Facility; and (c) the DIP Exit Fee. Upon the satisfaction of the Allowed DIP Facility Claims in accordance with the terms of this Plan, or other such treatment as contemplated by this Article II.C of the Plan, all guarantees provided and all Liens and security interests granted, in each case, to secure such obligations shall be automatically released, terminated, and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Entry of the Confirmation Order shall constitute final approval of the DIP Exit Fee to be distributed to the DIP Lenders. Further, upon the date of entry of the Confirmation Order, the terms and conditions of the DIP Exit Fee shall have been fully satisfied by the DIP Lenders and the DIP Exit Fee shall have been fully earned as a bargained for and integral part of the Restructuring Transactions contemplated under the Plan and the DIP Orders.

**D.      Priority Tax Claims**

On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

**E.      Transaction Expenses**

The Transaction Expenses incurred, or estimated to be incurred, up to and after the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid) in accordance with, and subject to, as applicable, the terms of the Restructuring Support Agreement and the DIP Orders and any other fee arrangements, without any requirement to file a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval. All Transaction Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the

Debtors at least two (2) Business Days before the anticipated Effective Date; provided that such estimates shall not be considered an admission or limitation with respect to such Transaction Expenses. Following the Effective Date, invoices for all Transaction Expenses shall be submitted to the Reorganized Debtors.

**F.**      *Statutory Fees*

All fees due and payable pursuant to 28 U.S.C. § 1930(a)(6) plus any interest due and payable under 31 U.S.C. § 3717 (together, the "Quarterly Fees") before the Effective Date shall be paid by the applicable Reorganized Debtor (or the Disbursing Agent on behalf of each applicable Reorganized Debtor) for each quarter (including any fraction thereof) until such Reorganized Debtor's Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**A.**      *Classification of Claims and Interests*

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

**B.**      *Summary of Classification*

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is summarized in the following chart. The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof. Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Class-by-Class basis as set forth above.[5]

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | First Lien Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Series X Redeemable Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Series D Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

---

[5]      The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 7 | Series C Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Series B Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Series A Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Series Seed Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Common Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 12 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 13 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |

**C.**    ***Treatment of Claims and Interests***

Subject to Article VI hereof, each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to as follows: (i) for all Claims and Interests other than General Unsecured Claims, the Debtors, the Reorganized Debtors, and the holder of such Allowed Claim or Allowed Interest, as applicable; and (ii) for all General Unsecured Claims, the holder of such Allowed General Unsecured Claim and the Thrasio Legacy Trust. Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.      Class 1 – Other Secured Claims

(a)      *Classification*:  Class 1 consists of all Other Secured Claims.

(b)      *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtors or Reorganized Debtors, as applicable, either:

(i)      payment in full in Cash of the unpaid portion of its Other Secured Claim on the Effective Date or as soon as reasonably practicable thereafter (or if payment is not then due, shall be paid in accordance with its terms);

(ii)      Reinstatement; or

(iii)      such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

(c)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.      Class 2 – Other Priority Claims

(a)     *Classification*:  Class 2 consists of all Other Priority Claims against any Debtor.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

(c)     *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.     Class 3 – First Lien Claims

(a)     *Classification*:  Class 3 consists of all First Lien Claims.

(b)     *Allowance*:  On the Effective Date, the First Lien Claims shall be Allowed in the aggregate principal amount of $855,200,000 plus all interest, fees, expenses, costs, and other charges due under the First Lien Credit Documents and/or orders of the Bankruptcy Court, including the DIP Orders, through and including the Effective Date.

(c)     *Treatment*:  Except to the extent that a Holder of a First Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed First Lien Claim (which, for the avoidance of doubt, does not include any First Lien Deficiency Claim), each Holder of an Allowed First Lien Claim shall receive its *pro rata* share of 100% of the New Common Stock, subject to dilution by the (i)  DIP Exit Fee, (ii) Backstop Payment, and (iii) Management Incentive Plan.

(d)     *Voting*:  Class 3 is Impaired under the Plan.  Holders of Allowed First Lien Claims are entitled to vote to accept or reject the Plan.

4.     Class 4 – General Unsecured Claims

(a)     *Classification*:  Class 4 consists of all General Unsecured Claims.

(b)     *Treatment*:  Except to the extent that a Holder of a General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each:

a.   Holder of an Allowed First Lien Deficiency Claim shall receive its *pro rata* share of the Thrasio Legacy Trust A Interests; and

b.   Holder of an Allowed Other General Unsecured Claim shall receive its *pro rata* share of the Thrasio Legacy Trust B Interests.

(c)     *Voting*:  Class 4 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.     Class 5 – Series X Redeemable Preferred Stock Interests

(a)     *Classification*:  Class 5 consists of all Series X Redeemable Preferred Stock Interests.

(b)     *Treatment*:  All Series X Redeemable Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series X Redeemable Preferred Stock Interests will receive a distribution under the Plan.

(c)     *Voting*:  Class 5 is Impaired under the Plan.  Holders of Allowed Series X Redeemable Preferred Stock Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Series X Redeemable Preferred Stock Interests are not entitled to vote to accept or reject the Plan.

6.     Class 6 – Series D Preferred Stock Interests

(a)     *Classification*:  Class 6 consists of all Series D Preferred Stock Interests.

(b)     *Treatment*:  All Series D Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series D Preferred Stock Interests will receive a distribution under the Plan.

(c)     *Voting*:  Class 6 is Impaired under the Plan.  Holders of Allowed Series D Preferred Stock Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Series D Preferred Stock Interests are not entitled to vote to accept or reject the Plan.

7.     Class 7 – Series C Preferred Stock Interests

(a)     *Classification*:  Class 7 consists of all Series C Preferred Stock Interests.

(b)     *Treatment*:  All Series C Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series C Preferred Stock Interests will receive a distribution under the Plan.

(c)     *Voting*:  Class 7 is Impaired under the Plan.  Holders of Allowed Series C Preferred Stock Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Series C Preferred Stock Interests are not entitled to vote to accept or reject the Plan.

8.     Class 8 – Series B Preferred Stock Interests

(a)     *Classification*:  Class 8 consists of all Series B Preferred Stock Interests.

(b)     *Treatment*:  All Series B Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series B Preferred Stock Interests will receive a distribution under the Plan.

(c)     *Voting*:  Class 8 is Impaired under the Plan.  Holders of Allowed Series B Preferred Stock Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Series B Preferred Stock Interests are not entitled to vote to accept or reject the Plan.

9.     Class 9 – Series A Preferred Stock Interests

(a)     *Classification*:  Class 9 consists of all Series A Preferred Stock Interests.

(b)     *Treatment*:  All Series A Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series A Preferred Stock Interests will receive a distribution under the Plan.

(c) *Voting*: Class 9 is Impaired under the Plan. Holders of Allowed Series A Preferred Stock Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Series A Preferred Stock Interests are not entitled to vote to accept or reject the Plan.

10. Class 10 – Series Seed Preferred Stock Interests

(a) *Classification*: Class 10 consists of all Series Seed Preferred Stock Interests.

(b) *Treatment*: All Series Seed Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect. No Holders of Series Seed Preferred Stock Interests will receive a distribution under the Plan.

(c) *Voting*: Class 10 is Impaired under the Plan. Holders of Allowed Series Seed Preferred Stock Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Series Seed Preferred Stock Interests are not entitled to vote to accept or reject the Plan.

11. Class 11 – Common Stock Interests

(a) *Classification*: Class 11 consists of all common stock Interests.

(b) *Treatment*: All common stock Interests will be cancelled, released, and extinguished and will be of no further force and effect. No Holders of Common Stock Interests will receive a distribution under the Plan.

(c) *Voting*: Class 11 is Impaired under the Plan. Holders of Allowed Common Stock Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Common Stock Interests are not entitled to vote to accept or reject the Plan.

12. Class 12 – Intercompany Claims

(a) *Classification*: Class 12 consists of all Intercompany Claims.

(b) *Treatment*: In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Intercompany Claim, Allowed Intercompany Claims shall, in a manner consistent with the Restructuring Transactions Memorandum, as applicable, be either (i) Reinstated; or (ii) distributed, contributed, set off, cancelled, and released without any distribution on account of such Claims, or otherwise addressed at the option of the Reorganized Debtors.

(c) *Voting*: Class 12 is either Unimpaired, and the Holders of Allowed Intercompany Claims are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and the Holders of Allowed Intercompany Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

13. Class 13 – Intercompany Interests

(a) *Classification*: Class 13 consists of all Intercompany Interests.

(b) *Treatment*: In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Intercompany Interests, Allowed Intercompany Interests shall, in a manner consistent with the Restructuring Transactions Memorandum, as applicable,

be either (i) Reinstated or (ii) cancelled and released without any distribution on account of such Interests.

(c)     *Voting*:  Class 13 is either Unimpaired, and the Holders of Allowed Intercompany Interests are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and the Holders of Allowed Intercompany Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

**D.     *Special Provision Governing Unimpaired Claims***

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**E.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code***

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Restructuring Support Agreement, the Committee Settlement, the Bankruptcy Code, and the Bankruptcy Rules.

**F.     *Elimination of Vacant Classes***

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**G.     *Voting Classes; Deemed Acceptance by Non-Voting Classes***

If a Class of Claims or Interests is eligible to vote and no Holder of Claims or Interests, as applicable, in such Class votes to accept or reject the Plan, the Plan shall be deemed accepted by such Class.

**H.     *Intercompany Interests***

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of Claims and Interests that receive New Common Stock under the Plan, and the Intercompany Interests shall receive no recovery or distribution.  For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to any modifications).

**I.     *Controversy Concerning Impairment***

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**J.**     *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Reorganized Debtors, and the Thrasio Legacy Trust, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto, other than DIP Facility Claims, First Lien Claims, and First Lien Deficiency Claims.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**A.**     *Restructuring Transactions*

Before, on, and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions in accordance with the terms, conditions, and consent rights under the Restructuring Support Agreement, including:  (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including the documents comprising the Plan Supplement and the New Organizational Documents;  (b) the execution and  delivery of  appropriate instruments  of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and Restructuring Support Agreement and having other terms for which the applicable parties agree; (c) the execution, delivery, and filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law, including any applicable New Organizational Documents; (d) such other transactions that are required to effectuate the Restructuring Transactions; and (e) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all of the foregoing and all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate this Plan and the Plan Supplement, including any and all actions required to be taken under applicable non-bankruptcy law, in each case, in accordance with the terms, conditions, and consent rights contained in the Restructuring Support Agreement.

**B.**     *Cancellation of Notes, Instruments, Certificates, and Other Documents*

Except for the purpose of evidencing a right to a distribution under the Plan, on the Effective Date, except as otherwise specifically provided for in the Plan or the Plan Supplement:  (1) the obligations of any Debtor under all certificates, shares, notes, bonds, indentures, purchase rights, or other instruments or documents, directly or indirectly evidencing or creating any indebtedness or obligations of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be cancelled and deemed surrendered to the Debtors without any need for a Holder to take further action with respect thereto, and the Debtors shall not have any continuing obligations thereunder and Holders of or parties to such cancelled instruments, certificates, and other documentation will have no rights arising from or relating to such instruments, certificates, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to this Plan or the Confirmation Order; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, compromised and discharged.

Notwithstanding such cancellation and discharge, the First Lien Credit Documents shall continue in effect to the extent necessary (i) to allow the holders of First Lien Claims to receive distributions under the Plan; (ii) to allow the Debtors, the Reorganized Debtors, and the Administrative Agent to make post-Effective Date distributions or take such other action pursuant to the Plan on account of such Claims and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims; and (iii) to allow the Administrative Agent and any Issuing Bank to enforce its rights, claims, and interests vis-à-vis any party other than the Debtors, including any rights with respect to priority of payment and/or to seek reimbursement or indemnification.

On the Effective Date, the Administrative Agent shall be relieved of all further duties and responsibilities related to the First Lien Credit Documents.

**C.**      *Exemption from Certain Taxes and Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto, including the issuance, transfer, or exchange of any debt, security, or other interest in the Debtors or the Reorganized Debtors under the Plan or the granting of security under the Exit Facilities shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

**D.**      *Sources of Consideration for Restructuring Transactions*

The Debtors or Reorganized Debtors (subject to the terms of the Exit Facilities Documents), as applicable, will fund distributions under the Plan with Cash on hand on the Effective Date, the revenues and proceeds of all assets of the Debtors, the Exit Facilities, and the New Common Stock, as applicable.

**E.**      *New Stockholders Agreement*

On and as of the Effective Date, each Holder of New Common Stock shall be deemed to be a party to the New Stockholders' Agreement without the need for execution by such Holder.  The New Stockholders Agreement shall be binding on all Entities receiving, and all Holders of, the New Common Stock (and their respective successors and assigns), whether such New Common Stock is received or to be received on or after the Effective Date and regardless of whether such Entity executes or delivers a signature page to the New Stockholders Agreement.

**F.**      *Issuance and Distribution of New Common Stock*

On the Effective Date, Reorganized Thrasio shall issue the New Common Stock to certain Holders of Allowed Claims and Allowed Interests in accordance with Article III of the Plan.  The issuance of New Common Stock under the Plan, including pursuant to the Management Incentive Plan, shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims or Interests, as applicable.  All New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

On the Effective Date, Reorganized Thrasio and all Holders of New Common Stock then outstanding shall be deemed to be parties to the New Organizational Documents, substantially in the form contained in the Plan Supplement, without the need for execution by any such Holder.  On the Effective Date, the New Organizational Documents shall be binding on the Reorganized Debtors and all parties receiving, and all Holders of, the New Common Stock.

### G.    *Exit Facilities*

On the Effective Date, Reorganized Thrasio shall enter into the Exit Facilities, the terms of which shall be set forth in the Exit Facilities Documents.

The Confirmation Order shall be deemed final approval of the Exit Facilities and the Exit Facilities Documents and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facilities Documents and such other documents as may be required to effectuate the Exit Facilities. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (i) shall be deemed to be granted, (ii) shall be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Facilities Documents, (iii) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facilities Documents, and (iv) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law.  The Reorganized Debtors and the Entities granting such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order (subject solely to the occurrence of the Effective Date) and any such filings, recordings, approvals, and consents shall not be required unless required by the Exit Facilities Documents), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

On and as of the Effective Date, all DIP Lenders and Holders of Allowed First Lien Claims shall be deemed to be parties to, and bound by, the Exit Facilities Documents, without the need for execution thereof by any such DIP Lender or Holder of an Allowed First Lien Claim.

By voting to accept this Plan, each DIP Lender and First Lien Lender thereby instructs and directs the Disbursing Agent and the Exit Facilities Agent (as applicable), to (a) act as Disbursing Agent to the extent required by this Plan, (b) execute and deliver the Exit Facilities Documents (each to the extent it is a party thereto), as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, to which the Exit Facilities Agent is a party and to promptly consummate the transactions contemplated thereby, and (c) take any other actions required or contemplated to be taken by the Exit Facilities Agent and/or the Disbursing Agent (as applicable) under this Plan or any of the Definitive Documents to which it is a party.

### H.    *Corporate Existence*

Except as otherwise provided in the Plan, the New Organizational Documents, the Restructuring Transactions Memorandum, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

### I.    *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or in any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including, for the avoidance of doubt, the Committee Settlement and the Thrasio Legacy Trust Documents), on the Effective Date, pursuant to section 1141 of the Bankruptcy Code, all property in

each Debtor's Estate, and any property acquired by each of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances other than the Liens securing the obligations under the Exit Facilities and such other Liens or other encumbrances as may be permitted thereby. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise, or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Notwithstanding the foregoing and for the avoidance of doubt, the Thrasio Legacy Trust Assets shall vest solely in the Thrasio Legacy Trust, and shall not vest in any Reorganized Debtor.

**J.** *Committee Settlement*

On May 29, 2024, the Debtors and the Committee agreed to the terms of the Committee Settlement to be implemented through the Plan and to be approved by the Court in connection with Confirmation thereof. The principal terms of the Committee Settlement are reflected below.

1.  Releases

The Excluded Parties shall not be "Released Parties" or "Releasing Parties" under the Plan, and the Vested Causes of Action shall not be released by the Debtors on the Effective Date. The Plan shall not release, and shall preserve, all other Estate Causes of Action not specifically released or settled pursuant to the Committee Settlement. The Committee, each of its members, and each of its Related Parties shall be "Releasing Parties" and "Released Parties" under the Plan.

2.  Formation of Thrasio Legacy Trust and Vesting of Assets

On the Effective Date, the Debtors and the Thrasio Legacy Trust Administrator shall execute the Thrasio Legacy Trust Agreement and shall take all steps necessary to establish the Thrasio Legacy Trust in accordance with the Plan, and the beneficial interests therein shall be for the benefit of the Thrasio Legacy Trust Beneficiaries. Additionally, on the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Thrasio Legacy Trust all rights, title, and interest in and to the Thrasio Legacy Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Thrasio Legacy Trust Assets shall automatically vest in the Thrasio Legacy Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Thrasio Legacy Trust Interests and the Thrasio Legacy Trust Fees and Expenses, as provided for in the Plan and the Thrasio Legacy Trust Agreement, and shall become assets of the Thrasio Legacy Trust for all purposes. The Thrasio Legacy Trust Administrator shall be the exclusive trustee of the Thrasio Legacy Trust Assets for purposes of 31 U.S.C. § 3713(b), as well as the representative of the Estates appointed pursuant to section 1123(b)(3) of the Bankruptcy Code regarding all Thrasio Legacy Trust Assets including, but not limited to, the Vested Causes of Action.

Notwithstanding anything to the contrary herein, the Thrasio Legacy Trust's primary purpose is to investigate, prosecute, settle, or abandon the Vested Causes of Action and to review, reconcile, object to and resolve General Unsecured Claims other than First Lien Deficiency Claims, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Thrasio Legacy Trust's liquidating purpose and reasonably necessary to conserve and protect the Vested Causes of Action and provide for the orderly liquidation thereof.

Subject to the terms of the Thrasio Legacy Trust Agreement, the Thrasio Legacy Trust shall have sole authority to investigate, prosecute, settle, or abandon the Vested Causes of Action. The Reorganized Debtors, in their reasonable discretion and with the consent of the Thrasio Legacy Trust, may transfer additional assets to the Thrasio Legacy Trust from time to time, in each case subject to the terms of the Exit Facilities Documents.

In pursuing any claim, right, or Vested Cause of Action, the Thrasio Legacy Trust shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code and shall succeed to the Debtors' rights with respect to the time periods in which a Cause of Action may be brought under the Bankruptcy Code. Moreover, any Holder of a Claim that timely filed a Proof of Claim is not required, under section 108 of the Bankruptcy Code or

applicable law, to commence or continue any action in a non-bankruptcy forum in order to further toll or satisfy any limitations period with respect to any such Holder's Claim that had not expired prior to the Petition Date.

3.    Appointment of Thrasio Legacy Trust Administrator

On the Effective Date, the Thrasio Legacy Trust Administrator shall be appointed. The appointment of the Thrasio Legacy Trust Administrator shall be approved in the Confirmation Order, and the Thrasio Legacy Trust Administrator's duties shall commence on the Effective Date. The Thrasio Legacy Trust Administrator shall have all of the rights and responsibilities set forth in this Plan and the Thrasio Legacy Trust Agreement. Without limiting the generality of the foregoing, the Thrasio Legacy Trust Administrator shall administer distributions to Thrasio Legacy Trust Beneficiaries to the extent provided under the Plan and the Thrasio Legacy Trust Documents, and shall serve as the representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of pursuing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan. The structure of powers between the Thrasio Legacy Trust Administrator and the Thrasio Legacy Trust Committee shall be set forth in the Thrasio Legacy Trust Documents.

As set forth below, the Thrasio Legacy Trust Administrator shall act for the Thrasio Legacy Trust in a fiduciary capacity and shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan and the Thrasio Legacy Trust Documents, in accordance with the Plan and as otherwise provided in the Confirmation Order.

4.    Responsibilities of the Thrasio Legacy Trust Administrator

The responsibilities of the Thrasio Legacy Trust Administrator shall be identified in the Thrasio Legacy Trust Documents, subject to any consultation and consent rights of the Thrasio Legacy Trust Committee as may be set forth in the Thrasio Legacy Trust Agreement, and shall include, without limitation:

(a)    investigating, reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue any Vested Causes of Action;

(b)    protecting and enforcing the rights to the Vested Causes of Action by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

(c)    reviewing, reconciling, and where appropriate, allowing or objecting to General Unsecured Claims (other than First Lien Deficiency Claims), and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed General Unsecured Claims;

(d)    administering and adjusting the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court;

(e)    determining and maintaining the Thrasio Legacy Trust Reserve, in consultation with the Thrasio Legacy Trust Committee;

(f)    making distributions to Thrasio Legacy Trust Beneficiaries as contemplated by the Plan and the Thrasio Legacy Trust Documents;

(g)    making repayment to the Reorganized Debtors of the Thrasio Legacy Trust Initial Funding in the timing and manner prescribed by the Plan, to the extent of available funds to do so;

(h)     entering into any agreement or executing any document or instrument required by or consistent with the Plan, the Confirmation Order, or the Thrasio Legacy Trust Documents, and performing all obligations thereunder;

(i)     administering or managing any assets vested in the Thrasio Legacy Trust by the Reorganized Debtors;

(j)     seeking the examination of any Person or Entity pursuant to Bankruptcy Rule 2004;

(k)     retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Thrasio Legacy Trust Documents and paying the reasonable compensation thereof as Thrasio Legacy Trust Fees and Expenses, solely out of the assets of the Thrasio Legacy Trust;

(l)     withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Thrasio Legacy Trust Administrator has reasonably determined, based upon the advice of his agents or professionals, is required to be withheld from such distribution under any U.S. federal income tax or other laws;

(m)     exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Thrasio Legacy Trust Documents; and

(n)     taking all other actions consistent with the provisions of the Plan and the Thrasio Legacy Trust Documents that the Thrasio Legacy Trust Administrator deems reasonably necessary or desirable to administer the Thrasio Legacy Trust.

5.     The Thrasio Legacy Trust Committee

The Thrasio Legacy Trust Committee shall be composed of five members: (1) two designees selected by the Required Consenting Lenders, (2) two designees selected by the Committee, and (3) the Thrasio Legacy Trust Administrator.

The Thrasio Legacy Trust Committee shall have the responsibility to oversee the administration of the Thrasio Legacy Trust and the activities of the Thrasio Legacy Trust Administrator, as set forth in the Thrasio Legacy Trust Documents, and determine and maintain the Thrasio Legacy Trust Reserve.  For the avoidance of doubt, the members of the Thrasio Legacy Trust Committee shall maintain the same fiduciary responsibilities as the Thrasio Legacy Trust Administrator. In all circumstances, the Thrasio Legacy Trust Committee shall act in accordance with the Thrasio Legacy Trust Documents.

6.     Thrasio Legacy Trust Proceeds

Subject to the Thrasio Legacy Trust Documents, the Thrasio Legacy Trust Administrator shall be authorized to make distributions of Thrasio Legacy Trust Proceeds solely in the following waterfall, in all cases, net of the Thrasio Legacy Trust Fees and Expenses and the Thrasio Legacy Trust Reserve (the "Thrasio Legacy Trust Waterfall"):

(a)     The Reorganized Debtors shall receive 80% of any Thrasio Legacy Trust Proceeds and the Thrasio Legacy Trust shall receive 20% of Thrasio Legacy Trust Proceeds until the Thrasio Legacy Trust Initial Funding is repaid in full ("Thrasio Legacy Trust Initial Funding Repayment");

(b)     After the Thrasio Legacy Trust Initial Funding Repayment, Holders of Thrasio Legacy Trust A Interests shall receive 70% of any Thrasio Legacy Trust Proceeds and Holders of Thrasio Legacy Trust B Interests shall receive 30% of Thrasio Legacy Trust Proceeds until the Holders of Thrasio Legacy Trust A Interests receive $3.5 million ("Distribution A");

(c)     After the Thrasio Legacy Trust Initial Funding Repayment and Distribution A, Holders of Thrasio Legacy Trust A Interests shall receive 50% of any Thrasio Legacy Trust Proceeds and Holders of Thrasio Legacy Trust B Interests shall receive 50% of any Thrasio Legacy Trust Proceeds.

7.      Thrasio Legacy Trust Initial Funding and Expenses

On the Effective Date, the Thrasio Legacy Trust shall receive the Thrasio Legacy Trust Initial Funding.  The Thrasio Legacy Trust shall maintain the Thrasio Legacy Trust Reserve.  Prior to any distribution date(s), the Thrasio Legacy Trust Administrator, in consultation with the Thrasio Legacy Trust Committee, shall determine the Reserve, which shall be reasonably necessary to fund the projected reasonable expenses of the Thrasio Legacy Trust.  For the avoidance of doubt, all expenses incurred by Thrasio Legacy Trust shall be paid from Thrasio Legacy Trust Assets.

8.      Fiduciary Duties of the Thrasio Legacy Trust Administrator

Pursuant hereto and the Thrasio Legacy Trust Documents, the Thrasio Legacy Trust Administrator shall act in a fiduciary capacity on behalf of the interests of all Thrasio Legacy Trust Beneficiaries.

9.      Cooperating Parties

The Cooperating Parties shall not be Excluded Parties only upon each respective Cooperating Party's execution of a Cooperation Agreement and the Thrasio Legacy Trust shall not pursue a Cooperating Party on account of any Vested Causes of Action unless and until such Cooperating Party is or becomes an Excluded Party.

In the event that any of the Cooperating Parties fail (as reasonably determined by the Thrasio Legacy Trust Administrator and the Thrasio Legacy Trust Committee) to substantially adhere to the terms of a Cooperation Agreement that takes into account the personal and employment circumstances of each Cooperating Party, the Thrasio Legacy Trust shall provide a written notice to the Cooperating Party of any alleged default under the respective Cooperation Agreement.  Upon receipt of such notice, the Cooperating Party shall have seven (7) days to cure its alleged default.  In the event the Cooperating Party does not cure its alleged default, the Thrasio Legacy Trust may file a Cooperation Default Notice requesting entry of an order causing the defaulting Cooperating Party to become an Excluded Party.  The Cooperating Party will have ten (10) Business Days from the filing of a Cooperation Default Notice to object to such Cooperation Default Notice.  After notice and a hearing, if the Bankruptcy Court enters an order providing the Cooperating Party did not substantially adhere to the terms of its respective Cooperation Agreement, then such Cooperating Party shall become an Excluded Party, and the Thrasio Legacy Trust shall be entitled to pursue any and all Vested Causes of Action against such Excluded Party.  There is no obligation for the Cooperating Parties to incur out of pocket expenses while objecting to any Cooperation Default Notice and under any Bankruptcy Court proceedings involving such Cooperation Default Notice.

10.     Cooperation of the Reorganized Debtors

On or as soon as reasonably practicable following the Effective Date, at the sole cost of the Reorganized Debtors, (i) the Reorganized Debtors and the Committee (prior to the Committee's dissolution on the Effective Date) shall deliver or cause to be delivered to the Thrasio Legacy Trust any and all books and records and all other documents and communications, or copies of the same, related to the Vested Causes of Action and General Unsecured Claims, including, but not limited to, any Disputed General Unsecured Claims; (ii) the Reorganized Debtors shall use commercially reasonable efforts to provide reasonable and continuing access to such officers, directors and employees of the Reorganized Debtors and their agents, advisors, attorneys, accountants or any other professionals with knowledge of matters relevant to the Vested Causes of Action (including any former officers, directors, employees, agents, advisors, attorneys, accountants, or other professionals who owe a continuing duty of cooperation to the Reorganized Debtors); and (iii) the Reorganized Debtors shall promptly following receipt of a reasonable request from the Thrasio Legacy Trust Administrator, use commercially reasonable efforts to, (a) take, or cause to be taken, all such reasonable further actions, and execute and/or deliver all such additional instruments, agreements or documents, as the Thrasio Legacy Trust Administrator may request in order to evidence or effectuate the transfer of the Vested Causes of Action and the Privileges (as defined in Article IV.J.11) to the Thrasio Legacy Trust and the consummation

33

of the transactions contemplated hereby and by the Committee Settlement and to otherwise carry out the intent of the parties herein and under the Committee Settlement, and (b) cooperate with the Thrasio Legacy Trust Administrator in the prosecution of the Vested Causes of Action and fulfilling its duties and obligations as the Thrasio Legacy Trust Administrator.

If the Thrasio Legacy Trust Administrator requires documents or information from the Reorganized Debtors, such requests shall be made by the Thrasio Legacy Trust Administrator to the Company Representative. The Company Representative will use commercially reasonable efforts to respond to such information requests, including providing reasonable access to employees, as appropriate, to facilitate an efficient complex assets recovery process and litigation recovery process. Any dispute regarding access set forth in this Article IV.J.10 shall be resolved by the Thrasio Legacy Trust Committee or the Bankruptcy Court.

11.   Privilege

Except as expressly stated otherwise below, the Thrasio Legacy Trust shall stand in the same position as the Debtors and their Estates (solely with regard to the Vested Causes of Action), and the Committee as to all evidentiary privileges of any type or nature whatsoever, including attorney-client privilege, the work product privilege or doctrine, any other privilege or immunity attaching to any documents or communications in any form, including electronic data hosted on remote servers, and any other applicable evidentiary privileges of each of the foregoing (collectively, the "Privileges"), and shall have all of the rights of the Debtors and their Estates (solely with regard to the Vested Causes of Action), and the Committee to preserve and assert any such Privileges, and shall be deemed to be an assignee by each Debtor and its respective Estate (solely with regard to the Vested Causes of Action), and the Committee of each such Privilege as of the latter of (a) the Effective Date, or (b) the formation of Thrasio Legacy Trust; *provided*, that, notwithstanding the foregoing, the privilege of the Disinterested Directors is hereby recognized and shall remain in full force and effect and shall not be waived, nor shall any such privileged documents be turned over to any person or Entity without the consent of each of the Disinterested Directors. The Disinterested Directors shall produce to Thrasio Legacy Trust, on or shortly after the Effective Date: (i) all interview memoranda regarding the interviews conducted in the Independent Investigation; (ii) a list of all interviews requested in the Independent Investigation; and (iii) all documents produced to the Disinterested Directors by the Debtors and/or any third parties. The Disinterested Directors' agreement to produce these materials does not constitute a waiver of any Privileges or work product protections that might exist, and will not be used by the Thrasio Legacy Trust Administrator or the Thrasio Legacy Trust to argue that such a waiver has occurred. The Disinterested Directors will discuss in good faith whether to produce any additional factual documentation or information related to the Independent Investigation, which shall not include any legal analysis, privileged communications, legal memoranda, or research. For the avoidance of doubt, all Privileges, other than the Disinterested Directors' Privileges, shall be shared with, and shall vest in, the Thrasio Legacy Trust.

Notwithstanding the Committee, the Debtors, the Reorganized Debtors, or any party-in-interest providing any privileged information to the Thrasio Legacy Trust, the Thrasio Legacy Trust Administrator, or the Thrasio Legacy Trust Committee, including any member thereof, such privileged information shall be without waiver in recognition of the joint and/or successor interest in investigating and prosecuting the Vested Causes of Action and shall remain privileged.

For the avoidance of doubt, the actions taken by the Committee, the Disinterested Directors, the Debtors, and the Reorganized Debtors in connection with the Plan, the Committee Settlement, or the formation of the Thrasio Legacy Trust shall not be (or deemed to be) a waiver of any Privilege of any of the Committee, the Disinterested Directors, the Debtors, and the Reorganized Debtors, as applicable, including any Privilege attaching to any document or communications (whether written or oral) transferred to the Thrasio Legacy Trust.

12.   Exculpation and Indemnification

The Thrasio Legacy Trust Administrator and the Thrasio Legacy Trust Committee and each of its members shall be exculpated by the Thrasio Legacy Trust with respect to any potential liability in connection with any actions taken, including distributions, as Thrasio Legacy Trust Administrator or Thrasio Legacy Trust Committee. The Thrasio Legacy Trust shall indemnify the Thrasio Legacy Trust Indemnified Parties for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost, or expense (including the reasonable fees and expenses of their respective professionals) incurred without actual fraud on the part of the

Thrasio Legacy Trust Indemnified Parties (which actual fraud, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered, or omitted to be taken by the Thrasio Legacy Trust Indemnified Parties in connection with the acceptance, administration, exercise, and performance of their duties under the Plan, Confirmation Order, or the Thrasio Legacy Trust Agreement, as applicable. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute actual fraud. In addition, the Thrasio Legacy Trust shall, to the fullest extent permitted by law, indemnify and hold harmless the Thrasio Legacy Trust Indemnified Parties, from and against and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Thrasio Legacy Trust or the implementation or administration of the Plan, if the Thrasio Legacy Trust Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Thrasio Legacy Trust. To the extent the Thrasio Legacy Trust indemnifies and holds harmless any Thrasio Legacy Trust Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Thrasio Legacy Trust in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as Thrasio Legacy Trust Fees and Expenses. The costs and expenses incurred in enforcing the right of indemnification in this Section shall be paid by the Thrasio Legacy Trust. This provision shall survive the termination of the Thrasio Legacy Trust or Thrasio Legacy Trust Agreement, and the death, dissolution, liquidation, resignation, replacement, or removal of the Thrasio Legacy Trust Administrator or any member of the Thrasio Legacy Trust Committee.

13.    <u>No Admission of Liability</u>

The Committee Settlement shall not constitute, be introduced, treated, deemed or otherwise interpreted or construed as (a) an admission, waiver, evidence or concession by any of the Excluded Parties or Cooperating Parties of any fact, liability or wrongdoing or (b) evidence in any judicial or arbitration proceeding, except to enforce or defend the terms thereof.

14.    <u>Recoupment</u>

Nothing in the Plan, the Confirmation Order, the Plan Supplement, or the Definitive Documents (as defined in the Committee Settlement Term Sheet) shall be deemed to affect, diminish, or impair any party's legal and equitable defenses and rights to setoffs and/or recoupment, and all such rights are expressly preserved.

15.    <u>DIP Orders</u>

From entry of the Confirmation Order through the Effective Date of the Plan, the DIP Orders shall remain in full force and effect, *provided that*, solely with respect to the Committee, the deadline to commence a Challenge shall be tolled until the earlier of (a) the occurrence of the Effective Date of a Plan that incorporates the terms of the Committee Settlement and (b) seven (7) calendar days following the withdrawal of the Commitment Settlement or the filing of a Plan that is inconsistent with this with the Committee Settlement (the "<u>Extended Challenge Deadline</u>"). For the avoidance of doubt, the Debtors, the Prepetition First Lien Secured Parties, and the DIP Secured Parties (each as defined in the DIP Orders) expressly preserve their rights to object to any standing motion filed by the Committee. Prior to the Extended Challenge Deadline, the Committee shall not pursue a Challenge.

As provided in the DIP Orders, the deadline for all parties other than the Committee to file a Challenge expired sixty (60) days after entry of the Final DIP Order.

Following the occurrence of the Effective Date of a Plan that incorporates the terms of the Committee Settlement, all Challenge rights and claims against the Prepetition First Lien Secured Parties and the DIP Secured Parties (each as defined in the DIP Orders) shall be deemed settled and released by the Debtors, the Reorganized Debtors, the Committee, and the Thrasio Legacy Trust and, for the avoidance of doubt, shall not become Vested Causes of Action or Thrasio Legacy Trust Assets.

16.    <u>Non-Transferability of Thrasio Legacy Trust Interests</u>

The Thrasio Legacy Trust Interests, and any right to receive a distribution from the Thrasio Legacy Trust, shall not be evidenced by any certificate, security, receipt, or any other form or manner whatsoever, except as maintained on the books and records of the Thrasio Legacy Trust by the Thrasio Legacy Trust Administrator. Any

and all Thrasio Legacy Trust Interests shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law. In addition, any and all Thrasio Legacy Trust Interests will not constitute "securities" and will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such interests constitute "securities," the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer, issuance and distribution under the Plan of the Thrasio Legacy Trust Interests will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

17.   <u>Tax Matters of the Thrasio Legacy Trust</u>

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors intent to treat the Thrasio Legacy Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code with the Thrasio Legacy Trust Beneficiaries treated as grantors and owners of the Thrasio Legacy Trust, and the trustee of the Thrasio Legacy Trust shall take a position on the Thrasio Legacy Trust's tax return accordingly. The Thrasio Legacy Trust shall be established for the primary purpose of liquidating the Thrasio Legacy Trust's assets, reconciling claims asserted against the Debtors and the Reorganized Debtors, and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Thrasio Legacy Trust, and is otherwise intended to comply with the ruling guidelines set forth in Revenue Procedure 94-45, 1994-2 C.B. 684. For all U.S. federal income tax purposes, all parties (including the Debtors, Reorganized Debtors,  the Thrasio Legacy Trust Administrator, and the Thrasio Legacy Trust Beneficiaries) shall treat the transfer of the Thrasio Legacy Trust Assets by the Debtors (or Reorganized Debtors, as applicable) to the Thrasio Legacy Trust, as set forth in the Thrasio Legacy Trust Documents, as (a) a transfer of such Thrasio Legacy Trust Assets directly to the applicable Holders of Allowed General Unsecured Claims, followed by (b) the transfer by the Holders of such Allowed General Unsecured Claims to the Thrasio Legacy Trust of such Thrasio Legacy Trust Assets in exchange for the Thrasio Legacy Trust A Interests and Thrasio Legacy Trust B Interests, as applicable. Accordingly, the Thrasio Legacy Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Thrasio Legacy Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

The Thrasio Legacy Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Thrasio Legacy Trust Proceeds (*e.g.*, income, gain, loss, deduction and credit). Each Thrasio Legacy Trust Beneficiary holding a beneficial interest in the Thrasio Legacy Trust will receive a copy of the information returns and must report on its U.S. federal income tax return its share of all such items. The information provided by the Thrasio Legacy Trust will pertain to the Thrasio Legacy Trust Beneficiaries who receive their interests in the Thrasio Legacy Trust in connection with the Plan.

The Thrasio Legacy Trust shall in no event be dissolved later than five (5) years from the creation of such Thrasio Legacy Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Thrasio Legacy Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Thrasio Legacy Trust Assets.

With respect to any of the assets of the Thrasio Legacy Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Thrasio Legacy Trust, such assets may be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment may also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate U.S. federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

18.  Avoidance Action Waiver

On the Effective Date, the Debtors shall be deemed to waive and release any and all Avoidance Actions held by the Debtors, other than any Avoidance Actions against the Excluded Parties. For the avoidance of doubt, (a) Avoidance Actions against the Excluded Parties are Vested Causes of Action that shall vest in the Thrasio Legacy Trust on the Effective Date, and (b) the waiver of Avoidance Actions as to the Cooperating Parties shall be in full force and effect, unless and until a Cooperating Party is or becomes an Excluded Party, at which time such waiver shall be revoked.

## K.  *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan and the Definitive Documents shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action, including, as applicable:   (1) the implementation of the Restructuring Transactions; (2) the adoption, execution, and filing of the New Organizational Documents; (3) the selection of the directors, managers, and officers for the Reorganized Debtors;(4) the execution and delivery of the Exit Facilities and the incurrence of credit thereunder; (5) the adoption of the Management Incentive Plan by the New Board; (6) the issuance and distribution of the New Common Stock and the execution, delivery, and filing of any documents pertaining thereto, as applicable; (7) the formation of any Entities pursuant to the Restructuring Transactions, including Thrasio Legacy Trust; (8) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (9) entry into the Thrasio Legacy Trust Documents; and (10) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan and the Definitive Documents involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the other Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors. On or before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Facilities, the New Common Stock, the Management Incentive Plan, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

## L.  *New Organizational Documents*

On the Effective Date, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective jurisdiction of incorporation or formation in accordance with the applicable laws of the respective jurisdiction of incorporation or formation.  The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents in accordance with the terms thereof and as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents.

## M.  *Directors and Officers of the Reorganized Debtors*

On the Effective Date, the term of the current board of directors of the Debtors shall expire, and the directors for the initial term of the New Board shall be designated and appointed in accordance with the terms set forth in the New Organizational Documents and the New Stockholders Agreement; *provided*, that the Disinterested Directors shall retain authority following the Effective Date with respect to matters relating to Professional Fee Claims requests by Professionals acting at their authority and direction in accordance with the terms of the Plan. The Disinterested Directors shall not have any of its privileged and confidential documents, communications, or information transferred (or deemed transferred) to Reorganized Thrasio.  The initial members of the New Board will be identified in the Plan Supplement, as well as those Persons that will serve as officers of the Reorganized Debtors.  Each such member and

officer of the New Board shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents, the New Stockholders Agreement, and other constituent documents of Reorganized Thrasio.

To the extent any identified director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Provisions regarding the removal, appointment, and replacement of members of the New Board will be disclosed in the New Organizational Documents.

**N.**     ***Effectuating Documents; Further Transactions***

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and Definitive Documents, including both the Exit Facilities and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents.

**O.**     ***Preservation of Causes of Action***

Other than any Causes of Action against an Entity that are expressly waived, relinquished, exculpated, released, compromised, settled under the Plan or a Final Order, or settled pursuant to the Committee Settlement, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors shall reserve any and all Causes of Action. From and after the Effective Date, the Thrasio Legacy Trust shall have sole and exclusive discretion to pursue and dispose of any Vested Causes of Action. **No Entity (other than the Consenting Lenders, the DIP Lenders, the DIP Agent, the Ad Hoc Group and each member of the Ad Hoc Group, the Administrative Agent, each lender and Issuing Bank and other secured parties under the First Lien Credit Agreement and the DIP Backstop Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, and on and after the Effective Date, the Thrasio Legacy Trust will not pursue any and all available Causes of Action against it. The Debtors or the Thrasio Legacy Trust, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, settled under the Plan or pursuant to a Bankruptcy Court order, or settled pursuant to the Committee Settlement, the Debtors or the Thrasio Legacy Trust, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

**P.**     ***Management Incentive Plan***

The New Board shall be authorized to adopt and implement the Management Incentive Plan, which shall be set forth in the Plan Supplement.

**Q.**     ***Employee Obligations and Employee Arrangements***

On the Effective Date, the Debtors shall be deemed to have assumed the Employment Agreements in a manner consistent with the Restructuring Support Agreement; *provided that* any Employment Agreements listed on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be rejected as of the Effective Date. The Debtors shall be deemed to have assumed the Debtors' prepetition severance plan as of the Effective Date, and such severance plan shall remain in effect for at least six (6) months following the Effective Date. Notwithstanding anything contained in this Plan, the Confirmation Order, or any other order of the Bankruptcy Court, the Employment Agreements and/or separation agreements between the Debtors and the Excluded Parties shall be deemed rejected, and not be in effect on the Effective Date, regardless as to whether such Employment Agreement and/or separation agreement is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases.

After the Effective Date, the Debtors or Reorganized Debtors, as applicable shall be permitted to make payments to employees pursuant to employment programs then in effect, and to implement additional employee programs and make payments thereunder, without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that such payments shall not adversely affect any distributions provided for under this Plan.

**R.**     *Closing the Chapter 11 Cases*

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases, except for the Chapter 11 Case of one Debtor entity, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of such Debtor entity.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of the remaining Debtor entity in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**S.**     *Payment of Fees and Expenses of Certain Creditors*

Following the Confirmation Date, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, the Transaction Expenses related to this Plan and implementation, Consummation, and defense of the Restructuring Transactions, whether incurred before, on, or after the Effective Date, in accordance with any applicable engagement letter, the DIP Orders, and the Restructuring Support Agreement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**     *Assumption and Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided in the Plan or otherwise agreed to by the Debtors (with the consent of the Required Consenting Lenders) and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, including, for the avoidance of doubt, the Employment Agreements, shall be deemed assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than:  (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.  Except as otherwise provided in the Plan, the Debtors shall assume, assume and assign, or reject, as the case may be, Executory Contracts and Unexpired Leases set forth in the applicable Schedules in the Plan Supplement.  Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order.  Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease.

Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims.

39

**B.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases***

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contract or Unexpired Lease. Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

**C.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases***

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent at the address specified in any notice of entry of the Confirmation Order and served on the Reorganized Debtors and the Thrasio Legacy Trust no later than thirty (30) days after the effective date of such rejection.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Claims, Noticing, and Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, the Thrasio Legacy Trust or their property, without the need for any objection by the Debtors, Reorganized Debtors, or the Thrasio Legacy Trust, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.H of the Plan, notwithstanding anything in a Proof of Claim to the contrary.

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim as set forth in Article III.C of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**D.      *Cure of Defaults for Assumed, or Assumed and Assigned, Executory Contracts and Unexpired Leases***

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree. In the event of a dispute regarding: (1) the amount of any Cure Claim; (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned; or (3) any other matter pertaining to assumption or the assumption and assignment, the Cure Claims shall be made following the entry of a Final Order resolving the dispute and approving the assumption or the assumption and assignment. Notwithstanding the foregoing, nothing herein shall prevent the Reorganized Debtors from settling any Cure Claim without further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors shall provide Cure Notices to the parties to the applicable Assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Claim must be Filed by the Cure/Assumption Objection Deadline.** Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Notice will be deemed to have assented to such assumption or assumption and assignment, and Cure Claim. To the extent that the Debtors seek to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and provide "adequate assurance of future performance" for

such assignee (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease to be assumed and assigned.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the Cure Claim, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease.  For the avoidance of doubt, to the extent the Debtors satisfy any Cure Claim prior to the Effective Date, such satisfaction shall result in the release and satisfaction of such Cure Claim up to the amount that was paid, notwithstanding the amount listed on the respective Cure Notice.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to, or action, order, or approval of the Bankruptcy Court.

E.    *Survival of the Debtors' Indemnification Obligations and Insurance Obligations*

Except as expressly provided herein, all indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the Indemnified Parties shall be reinstated and shall survive the Effective Date on terms no less favorable to the Indemnified Parties than the indemnification provisions in place prior to the Effective Date; *provided, however,* that to the extent any Indemnified Party is a former director or officer of Thrasio, any indemnification obligations shall be limited to indemnify such Indemnified Party in their capacity as a former director or officer of Thrasio, rather than in their individual or any other capacity.

In addition, after the Effective Date, the Company Parties will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

All Claims arising from or related to any indemnification obligations that are not Reinstated or assumed shall be treated as General Unsecured Claims as set forth in Article III.C of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.  For the avoidance of doubt, the Thrasio Legacy Trust reserves all rights with respect to any such Claims.

F.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.    *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Assumed Executory Contracts and Unexpired

Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.

**H.** *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**I.** *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**J.** *D&O Policies*

As of the Effective Date, the Debtors shall be deemed to have assumed all of the D&O Policies pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, or otherwise, and coverage for defense and indemnity under any of the D&O Policies shall remain in full force and effect subject to the terms and conditions of the D&O Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each D&O Policy. Notwithstanding anything to the contrary contained in the Plan, and except as otherwise may be provided in an order of the Bankruptcy Court, confirmation of the Plan shall not impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Policies, and each such obligation will be deemed and treated as an executory contract that has been assumed by the Debtors under the Plan as to which no proof of Claim need be filed. The Thrasio Legacy Trust shall be responsible for monitoring and preserving the ability to maintain claims against the D&O Policies. To the extent the Debtors are not the first named insured under any D&O Policy and notwithstanding Confirmation of the Plan or the occurrence of the Effective Date (i) nothing herein shall constitute a rejection of such D&O Policy, (ii) such D&O Policy shall remain in full force and effect, and (iii) any and all rights of the Debtors under such D&O Policy shall remain in full force and effect. For the avoidance of doubt, the Thrasio Legacy Trust shall retain all rights of the applicable Debtors (or Reorganized Debtors, as applicable) to assert claims against the D&O Policies and/or to recover the proceeds thereof, and the dissolution of the Debtors or Reorganized Debtors, if any, shall have no impact upon the rights of the Thrasio Legacy Trust, to assert claims against the D&O Policies or to recover the proceeds thereof.

### ARTICLE VI.
### PROVISIONS GOVERNING DISTRIBUTIONS

**A.** *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest (or such Holder's Affiliate) shall receive the full amount of the distributions that the Plan provides for the Allowed Claims and Allowed Interests in each applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan or the Thrasio Legacy Trust Agreement, as applicable. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**B.**     *Disbursing Agent*

Distributions under the Plan shall be made by a Disbursing Agent.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors or the Thrasio Legacy Trust, as applicable.

**C.**     *Rights and Powers of Disbursing Agent*

    1.     <u>Powers of the Disbursing Agent</u>

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities (as applicable); and (d) exercise such other powers as may be vested in such Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or the Thrasio Legacy Trust Agreement, or as deemed by such Disbursing Agent to be necessary and proper to implement the provisions hereof.

    2.     <u>Expenses Incurred On or After the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by a Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors or the Thrasio Legacy Trust, as applicable.  If the Administrative Agent takes any action in furtherance of disbursements, including any distribution of New Common Stock, all reasonable and documented fees and out-of-pocket expenses (including attorney fees and expenses) of the Administrative Agent shall be paid in Cash by the Reorganized Debtors.

**D.**     *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

    1.     <u>Record Date for Distribution</u>

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date, subject to the Disclosure Statement Order.  The Administrative Agent will recognize only those Holders of First Lien Claims and First Lien Deficiency Claims listed on the Claims Register as of the Distribution Record Date for purposes of making distributions under the Plan, and may implement trading freezes with respect to such Claims to facilitate the determination of such Holders.

    2.     <u>Delivery of Distributions</u>

    3.     Except as otherwise provided in the Plan or the Thrasio Legacy Trust Agreement, as applicable, distributions to Holders of Allowed Claims or Interests, except as otherwise provided in this Article VI shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent: (a) to the signatory set forth on any of the Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the applicable Disbursing Agent after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors or the Thrasio Legacy Trust, as applicable, have not received a written notice of a change of address; or (d) to any counsel that has appeared in the Chapter 11 Cases on such Holder's behalf.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Thrasio Legacy Trust, the Thrasio

Legacy Trust Administrator, any Disbursing Agent, or the Reorganized Debtors, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

4.     Notwithstanding the foregoing, (a) all distributions on account of DIP Facility Claims will be made to the DIP Agent, and the DIP Agent will be, and will act as, the Disbursing Agent with respect to the DIP Facility Claims in accordance with the terms and conditions of this Plan and the applicable debt documents; and (b) all distributions on account of First Lien Claims and First Lien Deficiency Claims will be made to the Administrative Agent, and the Administrative Agent will be, and will act as, the Disbursing Agent with respect to the First Lien Claims and First Lien Deficiency Claims in accordance with the terms and conditions of this Plan and the applicable debt documents.

5.     <u>No Fractional Distributions</u>

No fractional shares of New Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional shares.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows:  (a) fractions of one-half or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

6.     <u>Minimum Distributions</u>

Holders of Allowed Claims entitled to distributions of $100 (whether Cash or otherwise) or less shall not receive distributions, and each such Claim shall be discharged pursuant to Article VIII and its Holder is forever barred pursuant to Article VIII from asserting that Claim against the Debtors, the Reorganized Debtors, or the Thrasio Legacy Trust, as applicable, or their property.

7.     <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the applicable Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code (i) at the expiration of 90 days from the Effective Date with respect to distributions made by the Debtors or the Reorganized Debtors; and (ii) as set forth in the Thrasio Legacy Trust Agreement with respect to distributions made by the Thrasio Legacy Trust.  After such date, all unclaimed property or interests in property shall revert to the applicable Reorganized Debtor or the Thrasio Legacy Trust, without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

**E.     *Manner of Payment.***

Unless otherwise set forth herein, all distributions of Cash and the New Common Stock, as applicable, to the Holders of Allowed Claims under the Plan shall be made by the Disbursing Agent.  At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

**F.     *Registration or Private Placement Exemption.***

The offering, issuance, and distribution of any 1145 Securities pursuant to the Plan, including the New Common Stock (other than the New Common Stock issued in respect of the Backstop Payment and the New Common Stock issued in respect of the Management Incentive Plan), shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. federal, state or local securities laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The 1145 Securities (i) are not

"restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) are freely tradable and transferable without registration under the Securities Act by any initial recipient thereof that (a) is not an "affiliate" of Reorganized Thrasio as defined in Rule 144(a)(1) under the Securities Act, (b) has not been such an "affiliate" within 90 days of such transfer, and (c) is not an entity that is an "underwriter" (as defined in section 1145(b) of the Bankruptcy Code) with respect to such securities.  To the extent that Persons who receive the 1145 Securities as contemplated under the Plan are deemed to be underwriters, resales by such Persons would not be exempted from registration under the Securities Act or other applicable law by Section 1145 of the Bankruptcy Code.  Persons deemed to be underwriters may, however, be permitted to resell the 1145 Securities received pursuant to the Plan without registration pursuant to the provisions of Rule 144 under the Securities Act or another applicable exemption under the Securities Act, subject to applicable state and local securities laws, including state blue sky law.

Any New Common Stock issued in respect of the Backstop Payment or in respect of the Management Incentive Plan, or otherwise not issued pursuant to the exemption from registration provided by section 1145 of the Bankruptcy Code, will be offered, issued, and distributed in reliance upon the exemption from registration provided by Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other exemptions from registration, and similar Blue-Sky Laws, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom, and subject to applicable state and local securities laws, including state blue sky law.

Notwithstanding the foregoing, recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability of any exemptions from registration under the Securities Act and any applicable state and local securities laws, including state blue sky law.  The New Common Stock will also be subject to any restrictions imposed on it by the New Organizational Documents.

## G.      *Tax Issues and Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Reorganized Debtors, the Thrasio Legacy Trust, and each Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors, the Thrasio Legacy Trust, and each Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors, the Thrasio Legacy Trust, and each Disbursing Agent reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

Without limiting the generality of the foregoing, the Thrasio Legacy Trust Administrator shall be authorized to require each Holder of a First Lien Deficiency Claim or Other General Unsecured Claim to provide it with an executed IRS Form W-9, appropriate IRS Form W-8, or any other tax form, documentation or certification as may be requested by the Thrasio Legacy Trust Administrator as a condition precedent to being sent a distribution.  If a Holder of a First Lien Deficiency Claim or Other General Unsecured Claim does not provide the Thrasio Legacy Trust Administrator with the requested forms, documents, or certifications within ninety (90) days after the date of the initial request, the Thrasio Legacy Trust Administrator may, in its sole discretion (a) make such distribution net of applicable withholding, in which case any amounts so withheld shall be treated as having been paid to such Holder of an Other General Unsecured Claim, or (b) reserve such distribution, in which case (i) such Holder shall be deemed to have forfeited the right to receive any current, reserved or future distribution, (ii) any such forfeited distribution shall revert to the Thrasio Legacy Trust for all purposes, including but not limited to, for distribution to other Allowed Other General Unsecured Claims, and (iii) the Claim of the Holder originally entitled to such distribution shall be irrevocably waived and forever barred without further order of the Bankruptcy Court, all notwithstanding any federal, state or provincial escheat, unclaimed or abandoned property law to the contrary.

**H.**    *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

**I.**    *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim; *provided* that interest shall accrue on the DIP Facility Claims in accordance with the terms of the DIP Credit Agreement and the DIP Orders until paid in full in Cash or otherwise satisfied with the consent of the Holders of DIP Facility Claims, as applicable.

**J.**    *Setoffs and Recoupment*

Other than with respect to the DIP Facility Claims, First Lien Claims, and First Lien Deficiency Claims, the Debtors, the Reorganized Debtors, and the Thrasio Legacy Trust, as applicable, may, but shall not be required to, set off against or recoup any payments or distributions to be made pursuant to the Plan in respect of any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors or the Thrasio Legacy Trust may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized Debtors, the Thrasio Legacy Trust, or their successors of any such Claim it may have against the Holder of such Claim.

**K.**    *Claims Paid or Payable by Third Parties*

8.    Claims Paid by Third Parties

To the extent that the Holder of an Allowed Claim receives payment in full on account of such Claim from a party that is not a Debtor, Reorganized Debtor, or the Thrasio Legacy Trust, such Claim shall be Disallowed without an objection having to be Filed and without any further notice to, or action, order, or approval of the Bankruptcy Court. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, Reorganized Debtors or the Thrasio Legacy Trust on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor, Reorganized Debtor, or the Thrasio Legacy Trust, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or the Thrasio Legacy Trust annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

9.    Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to, or action, order, or approval of the Bankruptcy Court.

10.    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything herein to the contrary, nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the

Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**L.**     *Indefeasible Distributions*

Any and all distributions made under the Plan shall be indefeasible and not subject to clawback.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

**A.**     *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors and the Thrasio Legacy Trust, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

**B.**     *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors or Thrasio Legacy Trust, as applicable, shall have the sole authority to (1) File and prosecute objections to Claims; (2) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (3) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (4) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, the Thrasio Legacy Trust shall have the sole responsibility and authority with respect to reconciling General Unsecured Claims in Class 4 other than First Lien Deficiency Claims.

**C.**     *Estimation of Claims*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, with the consent of the Required Consenting Lenders, or the Thrasio Legacy Trust, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Disputed Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Disputed Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors, Reorganized Debtors, or Thrasio Legacy Trust, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before ten (10) days after the date on which such Disputed Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Disputed Claims Reserve*

On or after the Effective Date, the Reorganized Debtors, with the consent of the Required Consenting Lenders, or the Thrasio Legacy Trust, as applicable, shall be authorized to establish one or more Disputed Claims Reserves.

After the Effective Date, the Reorganized Debtors or Thrasio Legacy Trust, as applicable, may hold any property to be distributed pursuant to the Plan, in the same proportions and amounts as provided for in the Plan, in the applicable Disputed Claims Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed by a Final Order after the Effective Date.  The Reorganized Debtors or Thrasio Legacy Trust, as applicable, shall distribute such amounts or property (net of any expenses, including any taxes relating thereto), as provided herein, as such Disputed Claims are Allowed by a Final Order or agreed to by settlement, and such amounts or property shall be distributed as such amounts or property would have been distributable had such Disputed Claims been Allowed Claims as of the Effective Date in accordance with Article III of this Plan solely to the extent of the amounts or property available in the applicable Disputed Claims Reserves.  Any Cash or Securities held in a Disputed Claims Reserve shall be cancelled or returned to the Reorganized Debtors or Thrasio Legacy Trust, in the Reorganized Debtors' or Thrasio Legacy Trust's, sole discretion, as applicable, and without any further action or order of the Bankruptcy Court, as soon as reasonably practicable after the date on which all Disputed Claims are either Allowed or Disallowed in accordance with the Plan.

E.      *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, the Reorganized Debtors, or Thrasio Legacy Trust, as applicable, without an objection having to be Filed and without any further notice to, or action, order, or approval of the Bankruptcy Court.

F.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

G.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Reorganized Debtors, or Thrasio Legacy Trust, as applicable.

Except as otherwise provided herein or as agreed to by the Debtors, the Reorganized Debtors, or Thrasio Legacy Trust, as applicable, any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.

H.      *Amendments to Claims*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court, the Reorganized Debtors, or the Thrasio Legacy Trust, as applicable, and any such new or amended Claim Filed without such prior authorization shall be deemed Disallowed in full and expunged without any further notice to, or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

I.       *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors or Thrasio Legacy Trust, as applicable.

J.       *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors or Thrasio Legacy Trust, as applicable, shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided herein.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.       *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have, or any distribution to be made on account of such Allowed Claim or Allowed Interest that have been effectuated through a Rule 9019 Order, or otherwise expressly identified as a settlement as may be set forth herein.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims, Interests, and controversies, including as pursuant to the Committee Settlement, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle any Claims and Causes of Action against other Entities.

B.       *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action against any Debtor of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests accrued before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  Unless expressly provided in the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

D.      *Release of Liens*

Except as otherwise specifically provided in the Plan, the Confirmation Order, the Exit Facilities Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, as applicable.  The DIP Agent and the Administrative Agent shall, at the Reorganized Debtors' sole cost and expense, execute and deliver all documents reasonably requested by the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests on such assets of the Debtors that are subject to the Restructuring.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then such Holder (or the agent for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder) and take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facilities Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the execution and delivery of such releases and the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings, at the Reorganized Debtors' sole cost and expense, on such Holder's behalf.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.  Notwithstanding the foregoing paragraph, this Article VIII.D shall not apply to any Secured Claims that are Reinstated pursuant to the terms of this Plan.

E.      *Debtor Release*

**Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, as of the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Documents, the Preferred Equity Documents, the Exit Facilities, the Exit Facilities Documents, the DIP Facility, the DIP Orders, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, any Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, the Plan Supplement, any Definitive Document, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement,**

event, or other occurrence taking place on or before the Effective Date; except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or willful misconduct.  For the avoidance of doubt, any Claims or Causes of Action relating to actual fraud or willful misconduct shall not be released, and such claims shall be Vested Causes of Action that shall vest in, are preserved for, and may be pursued by Thrasio Legacy Trust.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to (a) a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement or (b) the Committee Settlement.  Notwithstanding anything contained in the Plan, any ballot, any prior order of the Court, or otherwise, none of the Excluded Parties shall be Released Parties or Releasing Parties under the Plan.

F.    *Release by Holders of Claims or Interests*

Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Documents, the Preferred Equity Documents, the Exit Facilities, the Exit Facilities Documents, the DIP Facility, the DIP Orders, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, any Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, the Plan Supplement, any Definitive Document, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or willful misconduct. For the avoidance of doubt, any Claims or Causes of Action relating to actual fraud or willful misconduct shall not be released, and such claims shall be Vested Causes of Action that shall vest in, are preserved for, and may be pursued by Thrasio Legacy Trust.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to (a) a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement or (b) the Committee Settlement.  Notwithstanding anything contained in the Plan, any ballot, any prior order of the Court, or otherwise, none of the Excluded Parties shall be Released Parties or Releasing Parties under the Plan.

Without limiting the foregoing, from and after the Effective Date, any Entity that is given the opportunity to opt out of the releases contained in this Article VIII.F and does not exercise such opt out may not assert any claim or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors. From and after the Effective Date, any Entity (i) that opted out of the releases contained in this Article VIII.F or (ii) was deemed to reject the Plan may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in Article VIII.F of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article VIII.F of the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided

for in <u>Article XI</u> of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action. ***Notwithstanding the foregoing and for the avoidance of doubt,*** any Vested Cause of Action (x) where (i) the Vested Cause of Action is limited to fraud and/or willful misconduct or (ii) the defendants named in the Vested Cause of Action are limited to Excluded Parties, then such Vested Causes of Action are not subject to any requirement to first obtain a Final Order from the Bankruptcy Court and (y) with respect to Vested Causes of Action, the Bankruptcy Court's jurisdiction shall not be sole and exclusive.

G.      *Exculpation*

Except as otherwise expressly provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any claim related to any act or omission arising prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Independent Investigation, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Independent Investigation, the filing of the Chapter 11 Cases, the participation in the DIP Facility, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, the Plan Supplement, any Definitive Document, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

H.      *Injunction*

Except as otherwise specifically provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; and (d) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

I.      *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Article VI of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

**J.**     *[Reserved]*

**K.**     *Reimbursement or Contribution.*

      If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of Allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**L.**     *Subordination Rights*

      Except as expressly set forth in this Plan, any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

**A.**     *Conditions Precedent to the Effective Date*

      It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.B hereof):

    1.     the Restructuring Support Agreement shall have not been terminated and shall remain in full force and effect;

    2.     there shall not have been instituted or threatened or be pending any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) (or there shall not have been any material adverse development to any action, application, claim, counterclaim, or proceeding currently instituted, threatened, or pending) before or by any court, governmental, regulatory, or administrative agency or instrumentality, domestic or foreign, or by any other Person, domestic or foreign, in connection with the Restructuring Transactions that, in the reasonable judgment of the Company Parties and the Required Consenting Lenders, would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

    3.     each document or agreement constituting the applicable Definitive Documents shall have been executed and/or effectuated, shall be in form and substance consistent with the Restructuring Support Agreement and the Committee Settlement, and any conditions precedent related thereto or contained therein, shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

    4.     all conditions precedent to the issuance or incurrence of the Exit Facilities shall have been satisfied or duly waived, and the Exit Facilities, including all documentation related thereto, shall be in effect;

    5.     the Company Parties shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

    6.     the New Organizational Documents and the New Stockholders Agreement shall have been executed and/or effectuated, shall be in form and substance consistent with the Restructuring Support

Agreement and the Plan Supplement, and any conditions precedent related thereto, shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

7.　　　all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses in full after the Effective Date have been placed in the professional fee escrow account;

8.　　　all accrued and unpaid (i) Transaction Expenses and (ii) fees and expenses of the DIP Agent and its advisors shall have been paid in full in accordance with the Restructuring Support Agreement and the DIP Orders;

9.　　　there shall be no Events of Default under the DIP Credit Agreement;

10.　　　the Bankruptcy Court shall have entered the Confirmation Order and such order shall be a Final Order;

11.　　　the New Common Stock shall have been issued by Reorganized Thrasio;

12.　　　Thrasio Legacy Trust shall have been formed, and the Thrasio Legacy Trust Assets shall have been transferred to Thrasio Legacy Trust;

13.　　　all conditions denominated "Closing Conditions" in the Plan shall have been satisfied, waived, or satisfied contemporaneously with the occurrence of the Effective Date;

14.　　　to the extent not otherwise addressed herein, all actions, documents, and agreements necessary to implement and consummate the Restructuring Transactions shall have been effected and executed, and shall be in form and substance consistent with the Restructuring Support Agreement and Restructuring Term Sheet or otherwise reasonably acceptable to the Company Parties and the Required Consenting Lenders; and

15.　　　the Company Parties shall have otherwise substantially consummated the Restructuring Transactions, including all transactions contemplated in the Restructuring Term Sheet, in a manner consistent in all respects with the Restructuring Support Agreement and this Plan.

**B.**　　*Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in this Article IX may be waived, in whole or in part, in writing (which may be via electronic mails) by the agreement of the Debtors and the Required Consenting Lenders, in accordance with the terms of the Restructuring Support Agreement, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

**C.**　　*Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

**D.**　　*Effect of Nonoccurrence of Conditions to the Effective Date*

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect; *provided* that all provisions of the

Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**A.**    *Modification and Amendments*

Subject to the limitations contained in the Plan and the consent rights of the Consenting Lenders as set forth in the Plan and the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, those restrictions on modifications set forth in the Plan, and the consent rights of the Consenting Lenders as set forth in the Plan and the Restructuring Support Agreement, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

**B.**    *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.**    *Revocation or Withdrawal of the Plan*

Subject to the terms of the Restructuring Support Agreement, the Debtors, with the consent of the Required Consenting Lenders (such consent not to be unreasonably withheld), reserve the right to revoke or withdraw the Plan before the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of or related to the Chapter 11 Cases and the Plan, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.    resolve any matters related to: (a) the assumption or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom,

including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Claims pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.     ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.     adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.     adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

8.     enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.    resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

13.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K.  hereof;

14.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.    determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.    adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

21.     hear and determine all disputes related to the Thrasio Legacy Trust, Thrasio Legacy Trust Administrator, and Thrasio Legacy Trust Committee;

22.     enforce all orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

23.     hear any other matter not inconsistent with the Bankruptcy Code;

24.     enter an order closing the Chapter 11 Cases; and

25.     enforce the injunction, release, and exculpation provisions provided in Article VIII hereof.

Notwithstanding the foregoing, (a) any dispute arising under or in connection with the Exit Facilities, the New Organizational Documents and the New Stockholders' Agreement shall be dealt with in accordance with the provisions of the applicable document, (b) if the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI of this Plan, the provisions of this Article XI shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter; and (c) the Bankruptcy Court's jurisdiction to adjudicate, decide, or resolve any and all matters related to Vested Causes of Action shall be non-exclusive.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

**A.**     *Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order, shall be immediately effective and enforceable and deemed binding upon the Debtors or Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests have accepted or are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

**B.**     *Additional Documents*

On or before the Effective Date, and subject to the terms of the Restructuring Support Agreement, the Debtors, with the consent of the Required Consenting Lenders (such consent not to be unreasonably withheld) may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims and Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from

time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.**     *Dissolution of the Committee and Any Other Statutory Committee*

On the Effective Date, the Committee and any other statutory committee appointed in the Chapter 11 Cases shall dissolve automatically and the members thereof and the Professionals retained by the Committee shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code; *provided* that, the Committee shall continue to exist after the Effective Date and have standing and a right to be heard for the following limited purposes: (a) requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date, and (b) any appeals of the Confirmation Order or other appeal to which the Committee is a party.

**D.**     *Reservation of Rights*

Before the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to any Claims or Interests.

**E.**     *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to, the benefit of any heir, executor, administrator, successor, assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**F.**     *Service of Documents*

All notices, requests, and demands to or upon the Debtors, the Committee, or the Consenting Lenders to be effective shall be in writing (including by facsimile transmission and electronic mails) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**If to the Debtors:**

**Thrasio Holdings, Inc.**
Attention: Greg Greeley, Josh Burke, Mike Fahey
E-mail address: greg.greeley@thras.io, josh.burke@thras.io, mike@thras.io

      with copies to:

**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
333 West Wolf Point Plaza
Chicago, Illinois 60654
Attention: Anup Sathy. P.C.
E-mail address: asathy@kirkland.com

-and-

**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
601 Lexington Avenue
New York, New York 10022
Attention:  Matthew C. Fagen, P.C., Francis Petrie, and Evan Swager

E-mail addresses:  matthew.fagen@kirkland.com
francis.petrie@kirkland.com
evan.swager@kirkland.com

**If to a Consenting Term Lender:**

**Gibson, Dunn & Crutcher LLP**
200 Park Ave
New York, New York 10166
Attention:  Scott J. Greenberg, Joe Zujkowski, Matt Rowe
Email addresses:  sgreenberg@gibsondunn.com
jzujkowski@gibsondunn.com
mrowe@gibsondunn.com

**If to a Consenting RCF Lender:**

**Simpson Thacher & Bartlett LLP, as counsel to the Administrative Agent**
425 Lexington Ave
New York, New York 10017
Attention:  Nicholas Baker, Hyang-Sook Lee, Philip L. DiDonato, Amy W. Zhou
Email addresses:  nbaker@stblaw.com
slee@stblaw.com
Philip.didonato@stblaw.com
amy.zhou@stblaw.com

**If to the Committee:**

**Morrison & Foerster LLP**
250 W 55th St.
New York, NY 10019
Attn:    Lorenzo Marinuzzi, Doug Mannal, Raff Ferraioli
Email addresses:  lmarinuzzi@mofo.com
dmannal@mofo.com
rferraioli@mofo.com

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to parties in interest providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such party must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

**G.**     *Entire Agreement*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**H.**     *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such

exhibits and documents from http://www.kccllc.net/Thrasio or the Bankruptcy Court's website at https://www.njb.uscourts.gov/. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control. The documents considered in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

**I.      *Nonseverability of Plan Provisions***

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; provided that any such alteration or interpretation shall be inconsistent with the Restructuring Support Agreement. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Required Consenting Lenders, as well as that of the Debtors' or Reorganized Debtors', as applicable; and (3) nonseverable and mutually dependent.

**J.      *Votes Solicited in Good Faith***

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals nor the Reorganized Debtors or Reorganized Thrasio, as applicable, will have any liability for the violation of any applicable law (including the Securities Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

**K.      *Closing of Chapter 11 Cases***

Upon the occurrence of the Effective Date, the Reorganized Debtors may seek authority from the Bankruptcy Court to close all of the chapter 11 cases, except for the chapter 11 case of one Debtor entity, and all contested matters relating to each of the Debtors, including objections to Claims, which would be administered and heard in the chapter 11 case of such Debtor entity.

**L.      *Waiver or Estoppel***

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

[Remainder of page intentionally left blank.]

Respectfully submitted, as of the date first set forth above,

Dated:  June 10, 2024

THRASIO HOLDINGS, INC.
on behalf of itself and each of its Debtor
affiliates

*/s/ Josh Burke*
_____

Name:  Josh Burke
Title:   Chief Financial Officer

## **Exhibit B**

## **Comparison**

*Further* Technical Modifications

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| THRASIO HOLDINGS, INC., et al., | Case No. 24-11840 (CMG) |
| Debtors.[1] | (Jointly Administered) |

### FIRST AMENDED JOINT PLAN OF
### REORGANIZATION OF
### THRASIO HOLDINGS, INC. AND ITS DEBTOR AFFILIATES
### PURSUANT TO
### CHAPTER 11 OF THE BANKRUPTCY CODE (FURTHER TECHNICAL MODIFICATIONS)

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com

-and-

Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Francis Petrie (admitted *pro hac vice*)
Evan Swager (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
matthew.fagen@kirkland.com
francis.petrie@kirkland.com
evan.swager@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Jacob S. Frumkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
jfrumkin@coleschotz.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

---

[1] The last four digits of Debtor Thrasio Holdings, Inc.'s tax identification number are 8327. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://www.kccllc.net/Thrasio. The Debtors' service address for purposes of these chapter 11 cases is 85 West Street, 3rd Floor, Walpole, MA, 02081.

i

**TABLE OF CONTENTS**

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES** ........................................................ 1

    A.    Defined Terms ........................................................................................................ 1

    B.    Rules of Interpretation ......................................................................................... 15~~15~~6

    C.    Computation of Time ........................................................................................... 16~~16~~7

    D.    Governing Law ..................................................................................................... 16~~16~~7

    E.    Reference to Monetary Figures ........................................................................... 16~~16~~7

    F.    Reference to the Debtors or the Reorganized Debtors. ...................................... 17~~17~~8

    G.    Controlling Document ......................................................................................... 17~~17~~8

    H.    Consultation, Information, Notice, and Consent Rights ..................................... 17~~17~~8

    I.    Nonconsolidated Plan .......................................................................................... 17~~17~~8

**ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND DIP FACILITY CLAIMS** ...... 17~~17~~8

    A.    Administrative Claims ......................................................................................... 17~~17~~8

    B.    Professional Fee Claims ...................................................................................... 18~~18~~9

    C.    DIP Facility Claims ............................................................................................. ~~19~~20

    D.    Priority Tax Claims ............................................................................................. ~~19~~20

    E.    Transaction Expenses .......................................................................................... ~~19~~20

    F.    Statutory Fees ...................................................................................................... 20~~20~~1

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** .................. 20~~20~~1

    A.    Classification of Claims and Interests ................................................................ 20~~20~~1

    B.    Summary of Classification .................................................................................. 20~~20~~1

    C.    Treatment of Claims and Interests ...................................................................... 21~~21~~2

    D.    Special Provision Governing Unimpaired Claims ............................................. 25~~25~~6

    E.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ...... 25~~25~~6

    F.    Elimination of Vacant Classes ............................................................................ 25~~25~~6

    G.    Voting Classes; Deemed Acceptance by Non-Voting Classes ........................... 25~~25~~6

    H.    Intercompany Interests ........................................................................................ 25~~25~~6

    I.    Controversy Concerning Impairment .................................................................. 25~~25~~6

    J.    Subordinated Claims and Interests ..................................................................... 26~~26~~7

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ........................................ 26~~26~~7

    A.    Restructuring Transactions .................................................................................. 26~~26~~7

    B.    Cancellation of Notes, Instruments, Certificates, and Other Documents ......... 26~~26~~7

    C.    Exemption from Certain Taxes and Fees ........................................................... 27~~27~~8

    D.    Sources of Consideration for Restructuring Transactions .................................. 27~~27~~8

    E.    New Stockholders Agreement ............................................................................ 27~~27~~8

    F.    Issuance and Distribution of New Common Stock ............................................ 27~~27~~8

    G.    Exit Facilities ...................................................................................................... 27~~27~~9

    H.    Corporate Existence ............................................................................................ 28~~28~~9

    I.    Vesting of Assets in the Reorganized Debtors ................................................... 28~~28~~9

    J.    Committee Settlement ......................................................................................... ~~29~~30

    K.    Corporate Action ................................................................................................. 35~~35~~7

    L.    New Organizational Documents .......................................................................... 35~~35~~7

    M.    Directors and Officers of the Reorganized Debtors ........................................... 35~~35~~7

    N.    Effectuating Documents; Further Transactions .................................................. 36~~36~~8

    O.    Preservation of Causes of Action ....................................................................... 36~~36~~8

    P.    Management Incentive Plan ................................................................................ 36~~36~~8

    Q.    Employee Obligations and Employee Arrangements ........................................ 36~~36~~8

    R.    Closing the Chapter 11 Cases ............................................................................ 37~~37~~9

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ........ 37~~37~~9

    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ...... 37~~37~~9

    B.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases ...... ~~37~~40

    C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ........ ~~38~~40

D.    Cure of Defaults for Assumed, or Assumed and Assigned, Executory Contracts and Unexpired Leases .......................................................................................... 3840
E.    Survival of the Debtors' Indemnification Obligations and Insurance Obligations .......... 3941
F.    Modifications, Amendments, Supplements, Restatements, or Other Agreements ............ 3941
G.    Reservation of Rights ................................................................................................ 3941
H.    Nonoccurrence of Effective Date .............................................................................. 402
I.    Contracts and Leases Entered Into After the Petition Date ........................................... 402
J.    D&O Policies ........................................................................................................... 402

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ............................................... 402
A.    Timing and Calculation of Amounts to Be Distributed ............................................... 402
B.    Disbursing Agent ...................................................................................................... 403
C.    Rights and Powers of Disbursing Agent .................................................................... 413
D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ................... 413
E.    Manner of Payment. .................................................................................................. 424
G.    Tax Issues and Compliance with Tax Requirements .................................................. 435
H.    Allocations .............................................................................................................. 436
I.    No Postpetition Interest on Claims ............................................................................ 436
J.    Setoffs and Recoupment ........................................................................................... 446
K.    Claims Paid or Payable by Third Parties .................................................................... 446
L.    Indefeasible Distributions ......................................................................................... 447

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS** ............................................................................................................... 457
A.    Allowance of Claims ................................................................................................ 457
B.    Claims Administration Responsibilities ..................................................................... 457
C.    Estimation of Claims ................................................................................................ 457
D.    Disputed Claims Reserve .......................................................................................... 458
E.    Adjustment to Claims Without Objection ................................................................... 468
F.    Time to File Objections to Claims ............................................................................. 468
G.    Disallowance of Claims ............................................................................................ 468
H.    Amendments to Claims ............................................................................................. 468
I.    No Distributions Pending Allowance ......................................................................... 469
J.    Distributions After Allowance ................................................................................... 479

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ...... 479
A.    Compromise and Settlement of Claims, Interests, and Controversies ........................... 479
B.    Discharge of Claims and Termination of Interests ...................................................... 479
C.    Term of Injunctions or Stays ..................................................................................... 4750
D.    Release of Liens ....................................................................................................... 4850
E.    Debtor Release ......................................................................................................... 4850
F.    Release by Holders of Claims or Interests .................................................................. 4951
G.    Exculpation .............................................................................................................. 4952
H.    Injunction ................................................................................................................ 502
I.    Protection Against Discriminatory Treatment ............................................................ 502
J.    [Reserved] ............................................................................................................... 503
K.    Reimbursement or Contribution. ............................................................................... 503
L.    Subordination Rights ................................................................................................ 513

**ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN** ................ 513
A.    Conditions Precedent to the Effective Date ................................................................ 513
B.    Waiver of Conditions ................................................................................................ 524
C.    Substantial Consummation ........................................................................................ 524
D.    Effect of Nonoccurrence of Conditions to the Effective Date ...................................... 524

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** .............. 525
A.    Modification and Amendments .................................................................................. 525
B.    Effect of Confirmation on Modifications ................................................................... 535
C.    Revocation or Withdrawal of the Plan ....................................................................... 535

**ARTICLE XI. RETENTION OF JURISDICTION** .............................................................. 535

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ............................................................ 557

A.    Immediate Binding Effect ..................................................................... 55~~7~~
B.    Additional Documents ........................................................................... 55~~7~~
C.    Dissolution of the Committee and Any Other Statutory Committee ...... 55~~8~~
D.    Reservation of Rights ........................................................................... 56~~8~~
E.    Successors and Assigns ......................................................................... 56~~8~~
F.    Service of Documents ........................................................................... 56~~8~~
G.    Entire Agreement .................................................................................. 57~~9~~
H.    Exhibits ................................................................................................ 57~~9~~
I.    Nonseverability of Plan Provisions ....................................................... ~~57~~60
J.    Votes Solicited in Good Faith ............................................................... ~~58~~60
K.    Closing of Chapter 11 Cases ................................................................. ~~58~~60
L.    Waiver or Estoppel ............................................................................... ~~58~~60

**INTRODUCTION**

   Thrasio Holdings, Inc. ("Thrasio") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this joint chapter 11 plan (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. The Plan does not contemplate substantive consolidation of any of the Debtors.

   ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

**A.**  *Defined Terms*

   Capitalized terms used in this Plan have the meanings ascribed to them below.

   1.  "*1145 Securities*" means any Securities offered, issued, or distributed pursuant to the Plan pursuant to Section 1145 of the Bankruptcy Code, including the New Common Stock (excluding the New Common Stock issued in respect of the Backstop Payment and the New Common Stock issued in respect of the Management Incentive Plan).

   2.  "*Ad Hoc Group*" means that certain ad hoc group of lenders under the First Lien Credit Agreement represented by the Ad Hoc Group Advisors.

   3.  "*Ad Hoc Group Advisors*" means (a) Gibson, Dunn & Crutcher LLP, as counsel to the Ad Hoc Group, (b) Evercore Group L.L.C., as financial advisor to the Ad Hoc Group, (c) Sills Cummis & Gross P.C., as local counsel to the Ad Hoc Group, and (d) such other professionals as may be retained by or on behalf of the Ad Hoc Group with the consent of the Debtors (such consent not to be unreasonably withheld).

   4.  "*Administrative Agent*" means Royal Bank of Canada, solely in its capacity as the administrative and collateral agent under the First Lien Credit Agreement, and any successors and permitted assigns, in such capacity.

   5.  "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business, (b) Allowed Professional Fee Claims, (c) the Transaction Expenses, and (d) the Disinterested Directors Fee Claims.

   6.  "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than for the Transaction Expenses), which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty (30) days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five (45) days after the Effective Date.

   7.  "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

   8.  "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of

Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, (d) a Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (e) solely as it pertains to General Unsecured Claims (other than First Lien Deficiency Claims, which Claims shall be Allowed), any General Unsecured Claim allowed in writing by the Thrasio Legacy Trust; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim or Interest shall have been Allowed by a Final Order.  Any Claim (except any First Lien Claim, or any DIP Facility Claim, in each case Allowed pursuant to this Plan or the DIP Orders) or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes.  A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim or Interest.  "Allow" and "Allowing" shall have correlative meanings.

9.     "*Arrangers*" has the meaning ascribed to it in the First Lien Credit Agreement.

10.     "*Assumed Executory Contracts and Unexpired Leases*" means those Executory Contracts and Unexpired Leases to be assumed by the applicable Reorganized Debtors, as set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases.

11.     "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates against third parties or by third parties against the Debtors under the Bankruptcy Code or applicable non-bankruptcy law, including Causes of Action or remedies under sections 502, ~~510,~~ 542, 544, 545, 547–553, and 724(a) of the Bankruptcy Code or under other similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

12.     "*Backstop Payment*" means the DIP Backstop Parties' *pro rata* share of an amount of (i) Cash in the aggregate amount of 7.5% of the New Money Loans (as defined in the DIP Documents) or (ii) solely upon Confirmation of the Plan, 10% of New Common Stock, subject to dilution only from the Management Incentive Plan.  The Backstop Payment shall be fully earned and approved on a final basis upon the entry of the Interim Order, but payable pursuant to the Confirmation Order upon the occurrence of the Effective Date.

13.     "*Ballot*" means the ballot, approved pursuant to the Disclosure Statement Order, distributed to Holders of Impaired Claims entitled to vote on the Plan, on which such Holders desiring to vote shall indicate acceptance or rejection of the Plan and, as applicable, make any additional elections contained in such ballot.  For the avoidance of doubt, any Claim that was included on a Ballot in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code shall be deemed temporarily allowed in such amount solely for voting purposes, and not for purposes of allowance or distribution.

14.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

2

15. "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of New Jersey, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the District of New Jersey.

16. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

17. "*Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

18. "Bar Date Order" means the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(B)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, and (IV) Approving Notice Thereof* [Docket No. 292] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

19. "*BlackRock Consenting Creditors*" means all funds and accounts that are managed by BlackRock Capital Investment Advisors, LLC or its affiliates that are signatories to the Restructuring Support Agreement.

20. "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

21. "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

22. "*Causes of Action*" mean any action, Claim, cross-claim, third-party claim, damage, remedy, judgment, cause of action, controversy, proceeding, agreement, demand, right, action, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise. For the avoidance of doubt, "Causes of Action" include: (a) any right of setoff, counterclaim, or recoupment; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any Avoidance Actions; ~~*provided* that~~. For the avoidance of doubt, all "Causes of Action" ~~shall not include the~~that are Vested Causes of Action shall be preserved for, and may be pursued by the Thrasio Legacy Trust, and shall not be released by the Plan, the Confirmation Order, or otherwise.

23. "*Challenge*" has the meaning ascribed to it in the DIP Orders.

24. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

25. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

26.     "*Claims, Noticing, and Solicitation Agent*" means Kurtzman Carson Consultants LLC, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

27.     "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Claims (other than Transaction Expenses, Professional Fee Claims and Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), sixty days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims and Transaction Expenses), 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors, the Reorganized Debtors, or Thrasio Legacy Trust, as applicable, or by an order of the Bankruptcy Court for objecting to such Claims.

28.     "*Claims Register*" means the official register of Claims against, and Interests in, the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

29.     "*Class*" means a class of Claims against, or Interests in, the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

30.     "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

31.     "*Committee Settlement*" means the comprehensive settlement between the Debtors and the Committee as set forth in Article IV.J of the Plan.

32.     "*Committee Settlement Term Sheet*" means the term sheet evidencing the key terms of the Committee Settlement, attached to the Plan Supplement as Exhibit H [Docket No 818].

33.     "*Company Parties*" means Thrasio and each of its affiliates that have executed and delivered counterpart signature pages to the Restructuring Support Agreement to the Consenting Lenders.

34.     "*Company Representative*" means the employee of the Reorganized Debtors as may be designated from time to time by the Reorganized Debtors to which the Thrasio Legacy Trust's requests for documents or information from the Reorganized Debtors shall be made.

35.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan.

36.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

37.     "*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

38.     "*Confirmation Order*" means the Bankruptcy Court's order confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

39.     "*Consenting Lenders*" means, collectively, the Consenting Term Lenders and the Consenting RCF Lenders that are signatories to the Restructuring Support Agreement or any subsequent Consenting Lender that becomes party thereto in accordance with the terms of the Restructuring Support Agreement.

40.     "*Consenting RCF Lenders*" means the holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold RCF Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a joinder to the Restructuring Support Agreement, or a Transfer Agreement to the Restructuring Support Agreement to counsel to the Company Parties.

41.      "*Consenting Term Lenders*" means the holders of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts that hold Term Loan Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a joinder to the Restructuring Support Agreement, or a Transfer Agreement to the Restructuring Support Agreement to counsel to the Company Parties.

42.      "*Consummation*" means the occurrence of the Effective Date.

43.      "*Cooperation Agreements*" means the cooperation agreements that shall be in form and substance reasonably acceptable to the Debtors, the Committee, or the Thrasio Legacy Trust (as applicable) and the Required Consenting Lenders whereby each Cooperating Party will agree to use commercially reasonable efforts to fully cooperate with the investigation and prosecution of the Vested Causes of Action, taking into account the individual circumstances of each Cooperating Party, including personal obligations and go-forward contributions and obligations to the Reorganized Debtors.

44.      "*Cooperating Parties*" means those certain individuals ~~who execute a Cooperation Agreement~~identified and agreed upon with the Committee.

45.      "*Cooperation Default Notice*" means the notice containing a proposed form of order to be filed with the Bankruptcy Court requesting an order causing the defaulting Cooperating Party to become an Excluded Party in the event a Cooperating Party does not cure an alleged default under a Cooperation Agreement.

46.      "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

47.      "*Cure Notice*" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include:  (a) procedures for objecting to proposed assumptions or assignments of the applicable Executory Contracts or Unexpired Leases; (b) Cure Claims to be paid in connection therewith; and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

48.      "*Cure/Assumption Objection Deadline*" means the date that is 14 days after Filing of the Schedule of Assumed Executory Contracts and Unexpired Leases with the Plan Supplement and service of the Cure Notice; *provided* that if any Executory Contract or Unexpired Lease is added to the Schedule of Assumed Executory Contracts and Unexpired Leases after the filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, or an Executory Contract or Unexpired Lease proposed to be assumed by the Debtors or Reorganized Debtors is proposed to be assigned to a third party after the filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be the earlier of (a) 14 days after service of the amended Schedule of Assumed Executory Contracts and Unexpired Leases with such modification and (b) the date of the scheduled Confirmation Hearing.

49.      "*D&O Policies*" means any insurance policy for, among others, directors, members, trustees, and officers liability (or any equivalents) maintained by the Debtors or the Debtors' Estates, and all agreements, documents or instruments relating thereto, including any runoff policies or tail coverage.

50.      "*Debtors*" has the meaning provided in the preamble of this Plan.

51.      "*Definitive Documents*" means (a) any documents in connection with the First Day Pleadings or "second day" pleadings and all orders sought pursuant thereto; (b) the DIP Documents; (c) the Solicitation Materials, including the Disclosure Statement and the Disclosure Statement Order; (d) this Plan; (e) the Confirmation Order; (f) the Exit Facilities Documents (g) the New Organizational Documents; (h) the New Stockholders Agreement; (i) the Plan Supplement; (j) the Thrasio Legacy Trust Documents; (k) the Cooperation Agreements; (l) such other definitive documentation relating to a recapitalization or restructuring of the Debtors as is

5

necessary or desirable to consummate the Restructuring Transactions; and (m) any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents, motions, pleadings, and/or agreements relating to any of the foregoing.

52.    "*DIP Agent*" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, and any successors and permitted assigns, in such capacity.

53.    "*DIP Backstop Parties*" has the meaning ascribed to it in the Restructuring Support Agreement.

54.    "*DIP Credit Agreement*" means that certain super-priority senior secured debtor-in-possession credit agreement, filed as an attachment to the DIP Motion, as may be amended, restated, supplemented, or otherwise modified from time to time, by and among Thrasio, LLC, as borrower, each subsidiary of the borrower party thereto, as a guarantor, the DIP Agent, and the DIP Lenders.

55.    "*DIP Documents*" means, collectively, the documentation governing the DIP Facility, including, without limitation, the DIP Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, the DIP Orders, the DIP Motion, and any amendments, modifications and supplements to or in respect of any of the foregoing.

56.    "*DIP Exit Fee*" means 40% of the New Common Stock, subject to dilution only by the Management Incentive Plan.  For the avoidance of doubt, the DIP Exit Fee shall not be subject to dilution by the Backstop Payment.

57.    "*DIP Facility*" means that certain $360 million superpriority senior secured debtor-in-possession credit facility provided by the DIP Lenders on the terms of, and subject to the conditions set forth in, the DIP Documents, including the DIP Credit Agreement and the DIP Orders.

58.    "*DIP Facility Claim*" means any and all Claims against a Debtor arising under, derived from, based upon, or related to the DIP Documents or the DIP Orders.

59.    "*DIP Lenders*" means, collectively, the lenders party to the DIP Credit Agreement.

60.    "*DIP Motion*" means any motion filed with the Bankruptcy Court seeking approval of the DIP Facility and the DIP Credit Agreement.

61.    "*DIP Orders*" means, collectively, (i) *the Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing* [Docket No. 81] and (ii) *the Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, and (V) Modifying the Automatic Stay* [Docket No. 297].

62.    "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that:  (a) has been disallowed by a Final Order; (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not listed in the Schedules and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

63.     "*Disbursing Agent*" means (i) solely as it pertains to Thrasio Legacy Trust Interests and the Thrasio Legacy Trust Proceeds, the Thrasio Legacy Trust, or (ii) or the Debtors, the Reorganized Debtors, or the Thrasio Legacy Trust, as applicable, to make or facilitate distributions contemplated under the Plan; *provided that* the Debtors or the Reorganized Debtors, as applicable, shall be required to obtain the written consent of the Administrative Agent prior to selecting the Administrative Agent to serve as a Disbursing Agent.

64.     "*Disclosure Statement*" means the *Amended Disclosure Statement for the Joint Plan of Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 375], as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan.

65.     "*Disclosure Statement Order*" means a Final Order of the Bankruptcy Court approving the Disclosure Statement.

66.     "*Disinterested Directors*" means, collectively, Anthony Horton and Stefan M. Selig.

67.     "*Disinterested Directors Fee Claims*" means all unpaid fees and expenses as of the Effective Date due to the Disinterested Directors pursuant to their respective director agreements with Thrasio. On the Effective Date, the Disinterested Directors Fee Claims shall be deemed Allowed Administrative Claims against each of the Debtors. For the avoidance of doubt, the fees owed to the Disinterested Directors pursuant to their respective director agreements with Thrasio shall be paid in the ordinary course during the pendency of these Chapter 11 Cases.

68.     "*Disputed*" means a Claim or an Interest or any portion thereof: (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order; and (c) with respect to which a party in interest has Filed a Proof of Claim, a Proof of Interest, or otherwise made a written request to a Debtor for payment. For the avoidance of doubt, DIP Facility Claims, First Lien Claims, and First Lien Deficiency Claims are not Disputed Claims.

69.     "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Thrasio Legacy Trust or the Reorganized Debtors with the consent of the Required Consenting Lenders for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date, in accordance with Article VII.D hereof.

70.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors (in consultation with the Required Consenting Lenders), designated by an order of the Bankruptcy Court.

71.     "*Effective Date*" means, with respect to the Plan, the first date that is a Business Day on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in <u>Article IX.B</u> hereof have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan is declared effective.

72.     "*Employment Agreements*" means, collectively, each of the written contracts, agreements, policies, programs, and plans for compensation, bonuses, reimbursement, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance, and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs, and plans for bonuses and other incentives or compensation for the Debtors' current or former employees, directors, officers, and managers, including executive compensation programs and existing compensation arrangements for the employees of the Debtors in existence on or before the date the parties executed the Restructuring Support Agreement. For the avoidance of doubt, the Employment Agreements shall include, without limitation (a) all offer letters, employment letters, or other amendments to the Debtors' Employee Agreements executed in February 2024, and (b) all existing severance plans as of the Petition Date; *provided* that this definition excludes any severance agreements with any of the Debtors' employees that were not employed as of the Petition Date.

73.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

74.    "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

75.    "*Excluded Parties*" means, each in any and all capacities, (i) Joshua Silberstein, Carlos Cashman, Joseph Falcao, Daniel Boockvar, Mounir Ouhadi, and Aditya Rathod, (ii) transferees of Thrasio's assets in connection with transactions involving Yardline Capital Corp. between April 2020 and January 2022, including, but not limited to, Ari Horowitz, ~~and~~ (iii) the Cooperating Parties, subject to Article IV.J.9, and (iv) the family members, related trusts, investment vehicles, affiliates, and successors and assigns of the persons in (i) ~~and,~~ (ii), and (iii), *provided*, that this clause (~~iii~~iv) shall not include any current or former directors and officers of the Debtors or Reorganized Debtors, as applicable, who are not otherwise ~~listed as Excluded Parties~~identified in clauses (i); ~~subject to Article IV.J.9,~~ (ii), and/or (iii).  Notwithstanding anything contained in the Plan, any ballot, any prior order of the Court, or otherwise, none of the Excluded Parties shall be Released Parties or Releasing Parties under the Plan.

76.    "*Exculpated Parties*" means (a) each Debtor; (b) each Reorganized Debtor; (c) the Committee and each of its members; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), each such Entity's current and former control persons (including any officers), directors, members of any committees of any Entity's board of directors or managers, equity Holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, advisory board members, financial advisors, attorneys (including any attorneys or other professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.  ~~For~~Notwithstanding the foregoing and for the avoidance of doubt, none of the Excluded Parties shall be Exculpated Parties.

77.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

78.    "*Exit Facilities*" means, collectively, the First-Out Take-Back Debt Facility and the Second-Out Take-Back Debt Facility.

79.    "*Exit Facilities Agent*" means any the financing institution identified in the Plan Supplement in its capacity as administrative agent and collateral agent under the Exit Facilities, and any successors and permitted assigns, in such capacity.

80.    "*Exit Facilities Documents*" means the Exit Take Back Debt Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

81.    "*Exit Take Back Debt Credit Agreement*" means that certain credit agreement evidencing and documenting the First-Out Take-Back Debt Facility and the Second-Out Take-Back Debt Facility.

82.    "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

83.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims, Noticing, and Solicitation Agent.

84.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument,

reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

85.     "*First Day Pleadings*" means the "first-day" pleadings that the Debtors made upon or shortly following the commencement of the Chapter 11 Cases, including any proposed orders to approve such first-day pleadings.

86.     "*First Lien Agent Advisors*" means (a) Simpson Thacher & Bartlett LLP, as counsel to the Administrative Agent, and (b) Porzio, Bromberg & Newman, P.C., as local counsel to the Administrative Agent.

87.     "*First Lien Claim*" means, collectively, the RCF Claims and the Term Loan Claims.

88.     "*First Lien Credit Agreement*" means that certain first lien credit agreement, as amended by that certain first amendment, dated as of May 28, 2021, as amended by that certain second amendment, dated as of September 17, 2021, as amended by that certain third amendment, dated as of June 30, 2023, and as amended by that certain forbearance and fourth amendment, dated as of September 29, 2023, and as amended by that certain forbearance and fifth amendment, dated as of December 29, 2023, and as otherwise amended, restated, supplemented, or otherwise modified from time to time.

89.     "*First Lien Credit Documents*" means that First Lien Credit Agreement together with all other related documents, instruments, and agreements including all Loan Documents (as defined in the First Lien Credit Agreement), in each case as supplemented, amended, restated, or otherwise modified from time to time.

90.     "*First Lien Deficiency Claim*" means any deficiency claim held by a First Lien Lender on account of the First Lien Claims.

91.     "*First Lien Lenders*" means, collectively, the RCF Lenders and the Term Loan Lenders.

92.     "*First-Out Take-Back Debt Facility*" means that certain senior secured, first lien "first-out" term loan facility entered into upon the Effective Date, in accordance with the Exit Facilities Documents.

93.     "*General Unsecured Claim*" means any unsecured Claim, including, without limitation, any First Lien Deficiency Claim and any Other General Unsecured Claim.

94.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

95.     "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor, as applicable.

96.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

97.     "*Indemnified Parties*" means all current and former directors and officers, and current and former managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company Parties, as applicable; *provided that* (i) the Excluded Parties and (ii) Alex Urdea shall not be Indemnified Parties, and no indemnification agreements, provisions, or obligations associated with (i) the Excluded Parties or (ii) Alex Urdea shall be assumed or reinstated by the Reorganized Debtors; *provided, further,* that to the extent any Indemnified Party is a former director or officer of Thrasio, any indemnification obligations shall be

limited to indemnify such Indemnified Party in their capacity as a former director or officer of Thrasio, rather than in their individual or any other capacity.

98.     "*Independent Investigation*" means that certain investigation undertaken by the Disinterested Directors, as more fully described in the Disclosure Statement.

99.     "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor or a Debtor's Affiliate.

100.     "*Intercompany Interest*" means an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

101.     "*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code), including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, and including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

102.     "*IRS*" means the United States Internal Revenue Service.

103.     "*Issuing Bank*" has the meaning ascribed to it in the First Lien Credit Agreement.

104.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

105.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

106.     "*Management Incentive Plan*" means the post-emergence management incentive plan to be implemented with respect to Reorganized Thrasio by the New Board on or as soon as reasonably practicable after the Effective Date.

107.     "*New Board*" means the initial board of directors of Reorganized Thrasio as of the Effective Date, to be appointed in accordance with the Restructuring Support Agreement, Plan, and New Organizational Documents, whose identities shall be disclosed in the Plan Supplement.

108.     "*New Common Stock*" means the common stock or common equity of Reorganized Thrasio to be issued on the Effective Date.

109.     "*New Organizational Documents*" means the New Stockholders Agreement and any other organizational and governance documents for the Reorganized Debtors and its subsidiaries and Affiliates, including, without limitation, certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, and limited liability company agreements (or equivalent governing documents), as applicable.

110.     "*New Stockholders Agreement*" means that certain stockholders' agreement that will govern certain matters related to the governance of Reorganized Thrasio and the New Common Stock, which shall include customary provisions for transactions of this nature including but not limited to: demand, piggy-back and S-3 registration rights; information and inspection rights; preemptive rights; rights of first refusal, co-sale and drag-along

protections and obligations; customary non-financial affirmative and negative covenants; free transferability; and indemnification, and shall be consistent in all material respects with the Restructuring Term Sheet.

111.     "*Other General Unsecured Claim*" means any unsecured Claim that is not: (a) a DIP Facility Claim, (b) an Administrative Claim, (c) a Professional Fee Claim; (d) a Priority Tax Claim, (e) an Other Secured Claim, (f) an Other Priority Claim, (g) a First Lien Claim, (h) a First Lien Deficiency Claim, (i) an Intercompany Claim, (j) a Series X Redeemable Preferred Stock Interest, (k) a Series D Preferred Stock Interest, (l) a Series C Preferred Stock Interest, (m) a Series B Preferred Stock Interest, (n) a Series A Preferred Stock Interest, or (o) a Series Seed Preferred Stock Interest, or (p) an Intercompany Interest.

112.     "*Other Priority Claim*" means any Claim against a Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases.

113.     "*Other Secured Claim*" means any Secured Claim against a Debtor that is not (a) a DIP Facility Claim or (b) a First Lien Claim.

114.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

115.     "*Petition Date*" means February 28, 2024.

116.     "*Plan*" means this joint chapter 11 plan, as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with Article X.A hereof and the Restructuring Support Agreement, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

117.     "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Restructuring Support Agreement, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be Filed by the Debtors with the Bankruptcy Court by 7 days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.  The Plan Supplement may include the following, as applicable:  (a) the New Stockholders Agreement; (b) the Schedule of Assumed Executory Contracts and Unexpired Leases; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) Retained Causes of Action List; (e) the Restructuring Transactions Memorandum; (f) the identities of the members of the New Board, as applicable, and the officers of the Reorganized Debtors, if any, including information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (g) the Management Incentive Plan; (h) Exit Take Back Debt Credit Agreement; (i) the Committee Settlement Term Sheet; and (j) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated under the Plan.

118.     "*Preferred Equity Documents*" means any and all documents required to implement, issue, and distribute the Series Seed Preferred Stock, Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, and Series X Preferred Stock.

119.     "*Priority Claims*" means, collectively, all Priority Tax Claims and Other Priority Claims.

120.     "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

121.     "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear

to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

122.    "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

123.    "*Professional Fee Claim*" means ~~any Administrative Claim by a Professional for compensation for services rendered or reimbursement of~~all claims for accrued, contingent, and/or unpaid fees and expenses incurred by ~~such~~a Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

124.    "*Professional Fee Escrow Account*" means and escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

125.    "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, which shall be estimated pursuant to the method set forth in Article II.B.3 of the Plan.

126.    "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

127.    "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

128.    "*RCF Claims*" means any Claim against a Debtor arising under, derived from, based on, or related to the Revolving Credit Facility, including Claims for all principal amounts outstanding, reimbursement for letters of credit, and accrued and unpaid interest, fees, expenses, costs, and indemnification and other amounts and Obligations (as defined in the First Lien Credit Agreement) arising under or related to the Revolving Credit Facility.

129.    "*RCF Lenders*" means Holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, RCF Claims.

130.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims or Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

131.    "*Related Party*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, successors, assigns, subsidiaries, partners, limited partners, general partners, principals, members, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (including any attorneys or professionals retained by any current or former director or manager of a Debtor in his or her capacity as director or manager as a Debtor), in each case,

other than the Excluded Parties.[2]  ~~For~~Notwithstanding the foregoing and for the avoidance of doubt, none of the Excluded Parties shall be Related Parties.

132.    "*Released Party*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Lenders; (d) the DIP Lenders; (e) the DIP Agent; (f) the Ad Hoc Group and each member of the Ad Hoc Group; (g) the Committee and each member of the Committee; (h) the Administrative Agent; (i) the Arrangers, each lender, and Issuing Banks and other secured parties under the First Lien Credit Agreement; (j) the DIP Backstop Parties; (k) each current and former wholly-owned Affiliate of each Entity in clause (a) through the following clause (l); and (l) each Related Party of each Entity in clauses (a) through this clause (l); *provided, however,* that each Entity that timely and properly opts out of the releases contemplated herein shall not be a Released Party; *provided, further,* that the Excluded Parties shall not be deemed Released Parties.

133.    "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Lenders; (d) the DIP Lenders; (e) the Ad Hoc Group and each member of the Ad Hoc Group; (f) the Committee and each member of the Committee; (g) the Administrative Agent; (h) the Arrangers, each lender, and Issuing Banks and other secured parties under the First Lien Credit Agreement; (i) the DIP Backstop Parties; (j) all Holders of Claims; (k) all holders of Interests; (l) each current and former wholly-owned Affiliate of each Entity in clause (a) through the following clause (m); and (m) each Related Party of each Entity in clauses (a) through this clause (m); *provided, however*, that each Entity that timely and properly opts out of the releases contemplated herein shall not be a Releasing Party; *provided, further, however*, that any Holder of Interests who acquired such Interests after the Voting Record Date (as such term is defined in the Disclosure Statement Order) and did not receive an opt out election form shall not be a Releasing Party; *provided further, however*, that the Excluded Parties shall not be deemed Releasing Parties.[3]

134.    "*Reorganized Debtors*" means the Debtors, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Thrasio.

135.    "*Reorganized Thrasio*" means either:  (a) Thrasio, as reorganized pursuant to and under the Plan, or any successor or assign thereto, by merger, amalgamation, consolidation, or otherwise, on or after the Effective Date, or (b) in accordance with the Restructuring Transactions Memorandum, a new corporation or limited liability company that may be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors in the Chapter 11 Cases and issue the New Common Stock to be distributed pursuant to the Plan.

136.    "*Required Consenting Lenders*" means, as of the relevant date, the Required Consenting Lenders holding at least 66.66% of the aggregate outstanding principal amount of RCF Claims and Term Loan Claims (taken together) that are held by Consenting Lenders.

137.    "*Restructuring*" means the restructuring of the Debtors pursuant to the terms of the Plan and the Restructuring Support Agreement.

138.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, made and entered into as of February 27, 2024, including all exhibits thereto (including the Restructuring Term Sheet), by

---

[2]    For the avoidance of doubt, and notwithstanding anything in the Plan to the contrary, for the BlackRock Consenting Creditors, the defined term "Related Party" shall be limited to any Related Party of the BlackRock Consenting Creditors for which such BlackRock Consenting Creditors are legally entitled to bind under applicable law.

[3]    For the avoidance of doubt, and notwithstanding anything in the Plan to the contrary, for the BlackRock Consenting Creditors, the defined term "Releasing Party" shall be limited to any Releasing Party of the BlackRock Consenting Creditors for which such BlackRock Consenting Creditors are legally entitled to bind under applicable law.

and among the Debtors and the Consenting Lenders party thereto from time to time, as such may be amended from time to time in accordance with its terms.

139.    "*Restructuring Term Sheet*" means that certain term sheet attached as <u>Exhibit C</u> to the Restructuring Support Agreement.

140.    "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors reasonably determine to be necessary to implement the transactions described in this Plan, as described in more detail in <u>Article IV.A</u> herein and the Restructuring Transactions Memorandum.

141.    "*Restructuring Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement.

142.    "*Retained Causes of Action List*" means a list of all retained Claims and Causes of Action of the Debtors identified in the Plan Supplement.

143.    "*Revolving Credit Facility*" means that certain prepetition first lien revolving credit facility pursuant to the First Lien Credit Agreement.

144.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be assumed or assumed and assigned by the Debtors or the Reorganized Debtors, as applicable, pursuant to the Plan, as set forth in the Plan Supplement, as amended from time to time in accordance with the Plan.

145.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which shall be included in the Plan Supplement, as amended from time to time.

146.    "*Schedules*" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

147.    "*Second-Out Take-Back Debt Facility*" means that certain senior secured, first lien "second-out" term loan facility entered into upon the Effective Date in accordance with the Exit Facilities Documents.

148.    "*Secured*" means, when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a secured Claim.

149.    "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

150.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

151.    "*Series A Preferred Stock Interest*" means any share or interest of Series A Preferred Stock, including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

14

152.    "*Series B Preferred Stock Interest*" means any share or interest of Series B Preferred Stock, including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

153.    "*Series C Preferred Stock Interest*" means any share or interest of Series C Preferred Stock, including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

154.    "*Series D Preferred Stock Interest*" means any share or interest of Series D Preferred Stock, including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

155.    "*Series Seed Preferred Stock Interest*" means any share or interest of Series Seed Preferred Stock, including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

156.    "*Series X Redeemable Preferred Stock Interest*" means any share or interest of Series X Redeemable Preferred Stock, including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

157.    "*Solicitation Materials*" means all solicitation materials with respect to the Plan.

158.    "*Tax Code*" means the U.S. Internal Revenue Code of 1986, as amended.

159.    "*Term Loan*" shall have the meaning ascribed to the term in the First Lien Credit Agreement.

160.    "*Term Loan Claims*" means any Claim on account of the Term Loan.

161.    "*Term Loan Lenders*" means the Holders of, or nominees, investment advisors, sub-advisors, or managers of discretionary accounts that hold, Term Loan Claims.

162.    "*Thrasio*" means Thrasio Holdings, Inc.

163.    "*Thrasio Legacy Trust*" means that certain trust to be established on the Effective Date, in accordance with the Plan, the Committee Settlement, and the Thrasio Legacy Trust Agreement, to, as applicable, administer the Thrasio Legacy Trust Assets and administer, process, settle, resolve, liquidate, satisfy and pay holders of Allowed General Unsecured Claims.

164.    "*Thrasio Legacy Trust A Interests*" means interests in the Thrasio Legacy Trust provided to Holders of First Lien Deficiency Claims representing a right to recovery for Holders of Allowed First Lien Deficiency Claims in accordance with the Thrasio Legacy Trust Waterfall.

165.    "*Thrasio Legacy Trust Assets*" means the Thrasio Legacy Trust Initial Funding, the Vested Causes of Action, and any additional assets that the Reorganized Debtors (subject to the terms of the Exit Facilities Documents), in their reasonable discretion and with the consent of the Thrasio Legacy Trust and the Required Consenting Lenders, may transfer to the Thrasio Legacy Trust from time to time, and any proceeds associated therewith, in each case subject to the terms of the Exit Facilities Documents.  For the avoidance of doubt, following the occurrence of the Effective Date of a Plan that incorporates the terms of the Committee Settlement, all Challenge rights and claims against the Prepetition First Lien Secured Parties and the DIP Secured Parties (each as defined in the DIP Orders) shall be deemed settled and released by the Debtors, the Reorganized Debtors, the Committee, and the Thrasio Legacy Trust and, for the avoidance of doubt, shall not become Vested Causes of Action or Thrasio Legacy Trust Assets.

166. "*Thrasio Legacy Trust Agreement*" means that certain agreement by and among the Debtors and the Thrasio Legacy Trust Administrator, substantially in the form included in the Plan Supplement.

167. "*Thrasio Legacy Trust Administrator*" means an individual selected by the Committee with the consent of the Required Consenting Lenders to administer Thrasio Legacy Trust.

168. "*Thrasio Legacy Trust B Interests*" means interests in the Thrasio Legacy Trust provided to Holders of Other General Unsecured Claims representing a right to recovery for Holders of Allowed Other General Unsecured Claims in accordance with the Thrasio Legacy Trust Waterfall.

169. "*Thrasio Legacy Trust Beneficiaries*" means Holders of Allowed First Lien Deficiency Claims and Allowed Other General Unsecured Claims who receive Thrasio Legacy Trust Interests under the Plan.

170. "*Thrasio Legacy Trust Committee*" means the oversight committee, which shall oversee the Thrasio Legacy Trust in accordance with the Plan and the Thrasio Legacy Trust Agreement, and which shall be composed of (i) two (2) designees selected by the Required Consenting Lenders, (ii) two (2) designees selected by the Committee, and (iii) the Thrasio Legacy Trust Administrator.

171. "*Thrasio Legacy Trust Documents*" means the Thrasio Legacy Trust Agreement and the documents necessary to form the Thrasio Legacy Trust, each of which shall be in form and substance acceptable to the Debtors, the Committee, and the Required Consenting Lenders.

172. "*Thrasio Legacy Trust Fees and Expenses*" means all reasonable and documented fees, expenses, and costs (including any taxes (if any) imposed on or payable by the Thrasio Legacy Trust) incurred by the Thrasio Legacy Trust, any professionals retained by the Thrasio Legacy Trust, and any additional amount determined necessary by the Thrasio Legacy Trust Administrator (~~with the~~subject to any consultation and consent ~~rights~~ of the Thrasio Legacy Trust Committee as may be set forth in the Thrasio Legacy Trust Agreement), in accordance with the terms of the Thrasio Legacy Trust Agreement, to include in the Thrasio Legacy Trust Reserve.

173. "*Thrasio Legacy Trust Indemnified Parties*" means the Thrasio Legacy Trust Administrator, the Thrasio Legacy Trust Committee and its current and former members, and the Thrasio Legacy Trust's consultants, agents, attorneys, accountants, financial advisors, estates, employees, officers, directors, principals, professionals, and other representatives, each in their respective capacity as such, and any of such Person's successors and assigns.

174. "*Thrasio Legacy Trust Initial Funding*" means $5 million in Cash, which shall be provided by the Debtors or Reorganized Debtors, as applicable; *provided* that, for the avoidance of doubt, the Reorganized Debtors shall not be obligated to provide additional funding for the Thrasio Legacy Trust beyond the Thrasio Legacy Trust Initial Funding.

175. "*Thrasio Legacy Trust Interests*" means the Thrasio Legacy Trust A Interests and the Thrasio Legacy Trust B Interests.

176. "*Thrasio Legacy Trust Proceeds*" means any proceeds derived from the Vested Causes of Action, the claims underlying the Vested Causes of Action, or any settlements related thereto. For the avoidance of doubt, Thrasio Legacy Trust Proceeds shall also include any other assets held by the Thrasio Legacy Trust from time to time, including interest on any Cash held by the Thrasio Legacy Trust.

177. "*Thrasio Legacy Trust Reserve*" means an amount funded with Cash from the Thrasio Legacy Trust Initial Funding or the Thrasio Legacy Trust Proceeds (as applicable) that, prior to the Thrasio Legacy Trust making any distributions, the Thrasio Legacy Trust Administrator determines, in accordance with the terms of the Thrasio Legacy Trust Agreement, and in consultation with the ~~consent of the~~ Thrasio Legacy Trust Committee, is reasonably necessary to satisfy current and future Thrasio Legacy Trust Fees and Expenses.

178. "*Transaction Expenses*" has the meaning ascribed in the Restructuring Support Agreement.

179.    "*U.S. Trustee*" means the United States Trustee for the District of New Jersey.

180.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

181.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that are unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash on the Effective Date.

182.    "*Vested Causes of Action*" means (i) any Claims and Causes of Action, including Avoidance Actions, against the Excluded Parties and (ii) all Claims and Causes of Actions not released under the Plan.  For the avoidance of doubt, ~~subject to Article [IV.J.8] hereof,~~ Vested Causes of Action shall include (a) subject to Article IV.J.9, all Claims and Causes of Action against Cooperating Parties; and (b) any and all challenges to the validity and enforceability of that certain *Confidential Separation Agreement and Mutual Release* between Thrasio, LLC and Thrasio Holdings, Inc., and Joshua Silberstein dated September 25, 2021, or any other purported releases of any Excluded Party.[4]

183.    "*Voting Deadline*" means the date and time by which the Claims, Noticing, and Solicitation Agent must actually receive the Ballots, as set forth on the Solicitation Materials.

184.    "*Voting Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against the Debtors are eligible to receive distributions under the Plan.

**B.    *Rules of Interpretation***

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or

---

[4] The Vested Causes of Action shall in no way be limited or impaired by the conclusions of the Independent Investigation.

approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) the use of "include" or "including" is without limitation unless otherwise stated.

## C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

## D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

## E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

## F.    *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## G.    *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the terms of the relevant provision in the Plan shall control (unless stated otherwise in such document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control; *provided*, that, to the extent the Plan or Confirmation Order is inconsistent with the Thrasio Legacy Trust Documents, the Thrasio Legacy Trust Documents shall govern.

## H.    *Consultation, Information, Notice, and Consent Rights*

Notwithstanding anything to the contrary in this Plan, the Disclosure Statement, or the Confirmation Order, any and all consent and approval rights set forth in the DIP Orders, the DIP Credit Agreement, the Restructuring Support Agreement, and the Committee Settlement Term Sheet, including rights and limitations with respect to the form and substance of any Plan Supplement document or Definitive Document (including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents) shall be incorporated herein by this reference (including to the applicable

definitions in Article I.A) and fully enforceable as if stated in full herein.  For the avoidance of doubt, Consenting Lender consent shall not be required for the filing of any ministerial notices and similar ministerial documents, retention applications, fee applications, fee statements, similar pleadings or motions relating to the retention or fees of any professional, or statements of financial affairs and schedules of assets and liabilities.

The absence in this Plan of references to any and all information, notice, and consent rights set forth in the Restructuring Support Agreement (including the exhibits thereto) with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair, modify or negate such rights.

I.      *Nonconsolidated Plan*

Although for purposes of administrative convenience, efficiency, and distributions the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

**ARTICLE II.**
**ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND DIP FACILITY CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Facility Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims*

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Transaction Expenses, Professional Fee Claims, DIP Facility Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Reorganized Debtors and the Thrasio Legacy Trust pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or the Thrasio Legacy Trust, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors, the Thrasio Legacy Trust, and the requesting party by the Claims Objection Bar Date.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Transaction Expenses, Professional Fee Claims, or DIP Facility Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such

Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

**B.**     *Professional Fee Claims*

1.     <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules. The Reorganized Debtors shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

2.     <u>Professional Fee Escrow Account</u>

No later than the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Debtors' or the Reorganized Debtors~~' Estates~~, as applicable. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3.     <u>Professional Fee Escrow Amount</u>

The Professionals shall deliver to the Debtors and the Ad Hoc Group Advisors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before the anticipated Effective Date and projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than ~~five Business~~two Ddays prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional for purposes of funding the Professional Fee Escrow Amount. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

4.     <u>Post-Confirmation Date Fees and Expenses</u>

Except as otherwise specifically provided for in the Plan, from and after the Confirmation Date, the Debtors and/or the Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to administration of the Chapter 11 Cases, prosecution of Causes of Action, and implementation of the Plan and Consummation incurred by the Debtors, the Reorganized Debtors, and/or the Committee. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after

such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

**C.**     *DIP Facility Claims*

On the Effective Date, except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, on the Effective Date, each such Holder of an Allowed DIP Facility Claim shall receive its *pro rata* share of (a) the First-Out Take-Back Debt Facility; (b) the Second-Out Take-Back Debt Facility; and (c) the DIP Exit Fee.  Upon the satisfaction of the Allowed DIP Facility Claims in accordance with the terms of this Plan, or other such treatment as contemplated by this Article II.C of the Plan, all guarantees provided and all Liens and security interests granted, in each case, to secure such obligations shall be automatically released, terminated, and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Entry of the Confirmation Order shall constitute final approval of the DIP Exit Fee to be distributed to the DIP Lenders.  Further, upon the date of entry of the Confirmation Order, the terms and conditions of the DIP Exit Fee shall have been fully satisfied by the DIP Lenders and the DIP Exit Fee shall have been fully earned as a bargained for and integral part of the Restructuring Transactions contemplated under the Plan and the DIP Orders.

**D.**     *Priority Tax Claims*

On the Effective Date or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

**E.**     *Transaction Expenses*

The Transaction Expenses incurred, or estimated to be incurred, up to and after the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid) in accordance with, and subject to, as applicable, the terms of the Restructuring Support Agreement and the DIP Orders and any other fee arrangements, without any requirement to file a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval. All Transaction Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; provided that such estimates shall not be considered an admission or limitation with respect to such Transaction Expenses.  Following the Effective Date, invoices for all Transaction Expenses shall be submitted to the Reorganized Debtors.

**F.**     *Statutory Fees*

All fees due and payable pursuant to 28 U.S.C. § 1930(a)(6) plus any interest due and payable under 31 U.S.C. § 3717 (together, the "Quarterly Fees") before the Effective Date shall be paid by the applicable Reorganized Debtor (or the Disbursing Agent on behalf of each applicable Reorganized Debtor) for each quarter (including any fraction thereof) until such Reorganized Debtor's Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

**A.**     *Classification of Claims and Interests*

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions

pursuant to the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

**B.**     *Summary of Classification*

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is summarized in the following chart. The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof. Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Class-by-Class basis as set forth above.[5]

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | First Lien Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Series X Redeemable Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Series D Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Series C Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Series B Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Series A Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Series Seed Preferred Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Common Stock Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 12 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 13 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |

---

[5]    The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

C.      *Treatment of Claims and Interests*

Subject to Article VI hereof, each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to as follows: (i) for all Claims and Interests other than General Unsecured Claims, the Debtors, the Reorganized Debtors, and the holder of such Allowed Claim or Allowed Interest, as applicable; and (ii) for all General Unsecured Claims, the holder of such Allowed General Unsecured Claim and the Thrasio Legacy Trust.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.      Class 1 – Other Secured Claims

(a)      *Classification*:  Class 1 consists of all Other Secured Claims.

(b)      *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtors or Reorganized Debtors, as applicable, either:

(i)      payment in full in Cash of the unpaid portion of its Other Secured Claim on the Effective Date or as soon as reasonably practicable thereafter (or if payment is not then due, shall be paid in accordance with its terms);

(ii)      Reinstatement; or

(iii)      such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

(c)      *Voting*: Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.      Class 2 – Other Priority Claims

(a)      *Classification*:  Class 2 consists of all Other Priority Claims against any Debtor.

(b)      *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

(c)      *Voting*: Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.      Class 3 – First Lien Claims

(a)      *Classification*:  Class 3 consists of all First Lien Claims.

(b) *Allowance*: On the Effective Date, the First Lien Claims shall be Allowed in the aggregate principal amount of $855,200,000 plus all interest, fees, expenses, costs, and other charges due under the First Lien Credit Documents and/or orders of the Bankruptcy Court, including the DIP Orders, through and including the Effective Date.

(c) *Treatment*: Except to the extent that a Holder of a First Lien Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed First Lien Claim (which, for the avoidance of doubt, does not include any First Lien Deficiency Claim), each Holder of an Allowed First Lien Claim shall receive its *pro rata* share of 100% of the New Common Stock, subject to dilution by the (i) DIP Exit Fee, (ii) Backstop Payment, and (iii) Management Incentive Plan.

(d) *Voting*: Class 3 is Impaired under the Plan. Holders of Allowed First Lien Claims are entitled to vote to accept or reject the Plan.

4. Class 4 – General Unsecured Claims

(a) *Classification*: Class 4 consists of all General Unsecured Claims.

(b) *Treatment*: Except to the extent that a Holder of a General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each:

   a. Holder of an Allowed First Lien Deficiency Claim shall receive its *pro rata* share of the Thrasio Legacy Trust A Interests; and

   b. Holder of an Allowed Other General Unsecured Claim shall receive its *pro rata* share of the Thrasio Legacy Trust B Interests.

(c) *Voting*: Class 4 is Impaired under the Plan. Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

5. Class 5 – Series X Redeemable Preferred Stock Interests

(a) *Classification*: Class 5 consists of all Series X Redeemable Preferred Stock Interests.

(b) *Treatment*: All Series X Redeemable Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect. No Holders of Series X Redeemable Preferred Stock Interests will receive a distribution under the Plan.

(c) *Voting*: Class 5 is Impaired under the Plan. Holders of Allowed Series X Redeemable Preferred Stock Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Series X Redeemable Preferred Stock Interests are not entitled to vote to accept or reject the Plan.

6. Class 6 – Series D Preferred Stock Interests

(a) *Classification*: Class 6 consists of all Series D Preferred Stock Interests.

(b) *Treatment*: All Series D Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect. No Holders of Series D Preferred Stock Interests will receive a distribution under the Plan.

(c)    *Voting*:  Class 6 is Impaired under the Plan.  Holders of Allowed Series D Preferred Stock Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Series D Preferred Stock Interests are not entitled to vote to accept or reject the Plan.

7.    Class 7 – Series C Preferred Stock Interests

(a)    *Classification*:  Class 7 consists of all Series C Preferred Stock Interests.

(b)    *Treatment*:  All Series C Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series C Preferred Stock Interests will receive a distribution under the Plan.

(c)    *Voting*:  Class 7 is Impaired under the Plan.  Holders of Allowed Series C Preferred Stock Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Series C Preferred Stock Interests are not entitled to vote to accept or reject the Plan.

8.    Class 8 – Series B Preferred Stock Interests

(a)    *Classification*:  Class 8 consists of all Series B Preferred Stock Interests.

(b)    *Treatment*:  All Series B Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series B Preferred Stock Interests will receive a distribution under the Plan.

(c)    *Voting*:  Class 8 is Impaired under the Plan.  Holders of Allowed Series B Preferred Stock Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Series B Preferred Stock Interests are not entitled to vote to accept or reject the Plan.

9.    Class 9 – Series A Preferred Stock Interests

(a)    *Classification*:  Class 9 consists of all Series A Preferred Stock Interests.

(b)    *Treatment*:  All Series A Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series A Preferred Stock Interests will receive a distribution under the Plan.

(c)    *Voting*:  Class 9 is Impaired under the Plan.  Holders of Allowed Series A Preferred Stock Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Series A Preferred Stock Interests are not entitled to vote to accept or reject the Plan.

10.    Class 10 – Series Seed Preferred Stock Interests

(a)    *Classification*:  Class 10 consists of all Series Seed Preferred Stock Interests.

(b)    *Treatment*:  All Series Seed Preferred Stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Series Seed Preferred Stock Interests will receive a distribution under the Plan.

(c)    *Voting*:  Class 10 is Impaired under the Plan.  Holders of Allowed Series Seed Preferred Stock Interests are conclusively deemed to have rejected the Plan under section 1126(g)

of the Bankruptcy Code.  Therefore, Holders of Series Seed Preferred Stock Interests are not entitled to vote to accept or reject the Plan.

11.     Class 11 – Common Stock Interests

(a)     *Classification*:  Class 11 consists of all common stock Interests.

(b)     *Treatment*:  All common stock Interests will be cancelled, released, and extinguished and will be of no further force and effect.  No Holders of Common Stock Interests will receive a distribution under the Plan.

(c)     *Voting*:  Class 11 is Impaired under the Plan.  Holders of Allowed Common Stock Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Common Stock Interests are not entitled to vote to accept or reject the Plan.

12.     Class 12 – Intercompany Claims

(a)     *Classification*:  Class 12 consists of all Intercompany Claims.

(b)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Intercompany Claim, Allowed Intercompany Claims shall, in a manner consistent with the Restructuring Transactions Memorandum, as applicable, be either (i) Reinstated; or (ii) distributed, contributed, set off, cancelled, and released without any distribution on account of such Claims, or otherwise addressed at the option of the Reorganized Debtors.

(c)     *Voting*:  Class 12 is either Unimpaired, and the Holders of Allowed Intercompany Claims are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and the Holders of Allowed Intercompany Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

13.     Class 13 – Intercompany Interests

(a)     *Classification*:  Class 13 consists of all Intercompany Interests.

(b)     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Intercompany Interests, Allowed Intercompany Interests shall, in a manner consistent with the Restructuring Transactions Memorandum, as applicable, be either (i) Reinstated or (ii) cancelled and released without any distribution on account of such Interests.

(c)     *Voting*:  Class 13 is either Unimpaired, and the Holders of Allowed Intercompany Interests are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and the Holders of Allowed Intercompany Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

D.      *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

E.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Restructuring Support Agreement, the Committee Settlement, the Bankruptcy Code, and the Bankruptcy Rules.

F.      *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

G.      *Voting Classes; Deemed Acceptance by Non-Voting Classes*

If a Class of Claims or Interests is eligible to vote and no Holder of Claims or Interests, as applicable, in such Class votes to accept or reject the Plan, the Plan shall be deemed accepted by such Class.

H.      *Intercompany Interests*

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of Claims and Interests that receive New Common Stock under the Plan, and the Intercompany Interests shall receive no recovery or distribution.  For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to any modifications).

I.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

J.      *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Reorganized Debtors, and the Thrasio Legacy Trust, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto, other than DIP Facility Claims, First Lien Claims, and First Lien Deficiency Claims.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.**     *Restructuring Transactions*

Before, on, and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions in accordance with the terms, conditions, and consent rights under the Restructuring Support Agreement, including: (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including the documents comprising the Plan Supplement and the New Organizational Documents; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and Restructuring Support Agreement and having other terms for which the applicable parties agree; (c) the execution, delivery, and filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law, including any applicable New Organizational Documents; (d) such other transactions that are required to effectuate the Restructuring Transactions; and (e) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all of the foregoing and all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate this Plan and the Plan Supplement, including any and all actions required to be taken under applicable non-bankruptcy law, in each case, in accordance with the terms, conditions, and consent rights contained in the Restructuring Support Agreement.

**B.**     *Cancellation of Notes, Instruments, Certificates, and Other Documents*

Except for the purpose of evidencing a right to a distribution under the Plan, on the Effective Date, except as otherwise specifically provided for in the Plan or the Plan Supplement: (1) the obligations of any Debtor under all certificates, shares, notes, bonds, indentures, purchase rights, or other instruments or documents, directly or indirectly evidencing or creating any indebtedness or obligations of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be cancelled and deemed surrendered to the Debtors without any need for a Holder to take further action with respect thereto, and the Debtors shall not have any continuing obligations thereunder and Holders of or parties to such cancelled instruments, certificates, and other documentation will have no rights arising from or relating to such instruments, certificates, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to this Plan or the Confirmation Order; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, compromised and discharged.

Notwithstanding such cancellation and discharge, the First Lien Credit Documents shall continue in effect to the extent necessary (i) to allow the holders of First Lien Claims to receive distributions under the Plan; (ii) to allow the Debtors, the Reorganized Debtors, and the Administrative Agent to make post-Effective Date distributions or take such other action pursuant to the Plan on account of such Claims and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims; and (iii) to allow the Administrative Agent and any Issuing Bank to enforce its rights, claims, and interests vis-à-vis any party other than the Debtors, including any rights with respect to priority of payment and/or to seek reimbursement or indemnification.

On the Effective Date, the Administrative Agent shall be relieved of all further duties and responsibilities related to the First Lien Credit Documents.

**C.**    ***Exemption from Certain Taxes and Fees***

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto, including the issuance, transfer, or exchange of any debt, security, or other interest in the Debtors or the Reorganized Debtors under the Plan or the granting of security under the Exit Facilities shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

**D.**    ***Sources of Consideration for Restructuring Transactions***

The Debtors or Reorganized Debtors ~~or the Thrasio Legacy Trust~~(subject to the terms of the Exit Facilities Documents), as applicable, will fund distributions under the Plan with Cash on hand on the Effective Date, the revenues and proceeds of all assets of the Debtors, the Exit Facilities, ~~the Thrasio Legacy Trust Assets,~~ and the New Common Stock, as applicable~~, in each case subject to the terms of the Exit Facilities Documents~~.

**E.**    ***New Stockholders Agreement***

On and as of the Effective Date, each Holder of New Common Stock shall be deemed to be a party to the New Stockholders' Agreement without the need for execution by such Holder.  The New Stockholders Agreement shall be binding on all Entities receiving, and all Holders of, the New Common Stock (and their respective successors and assigns), whether such New Common Stock is received or to be received on or after the Effective Date and regardless of whether such Entity executes or delivers a signature page to the New Stockholders Agreement.

**F.**    ***Issuance and Distribution of New Common Stock***

On the Effective Date, Reorganized Thrasio shall issue the New Common Stock to certain Holders of Allowed Claims and Allowed Interests in accordance with Article III of the Plan.  The issuance of New Common Stock under the Plan, including pursuant to the Management Incentive Plan, shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims or Interests, as applicable.  All New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

On the Effective Date, Reorganized Thrasio and all Holders of New Common Stock then outstanding shall be deemed to be parties to the New Organizational Documents, substantially in the form contained in the Plan Supplement, without the need for execution by any such Holder.  On the Effective Date, the New Organizational Documents shall be binding on the Reorganized Debtors and all parties receiving, and all Holders of, the New Common Stock.

**G.**    ***Exit Facilities***

On the Effective Date, Reorganized Thrasio shall enter into the Exit Facilities, the terms of which shall be set forth in the Exit Facilities Documents.

The Confirmation Order shall be deemed final approval of the Exit Facilities and the Exit Facilities Documents and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and

execute the Exit Facilities Documents and such other documents as may be required to effectuate the Exit Facilities. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (i) shall be deemed to be granted, (ii) shall be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Facilities Documents, (iii) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facilities Documents, and (iv) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law.  The Reorganized Debtors and the Entities granting such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order (subject solely to the occurrence of the Effective Date) and any such filings, recordings, approvals, and consents shall not be required unless required by the Exit Facilities Documents), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

On and as of the Effective Date, all DIP Lenders and Holders of Allowed First Lien Claims shall be deemed to be parties to, and bound by, the Exit Facilities Documents, without the need for execution thereof by any such DIP Lender or Holder of an Allowed First Lien Claim.

By voting to accept this Plan, each DIP Lender and First Lien Lender thereby instructs and directs the Disbursing Agent and the Exit Facilities Agent (as applicable), to (a) act as Disbursing Agent to the extent required by this Plan, (b) execute and deliver the Exit Facilities Documents (each to the extent it is a party thereto), as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, to which the Exit Facilities Agent is a party and to promptly consummate the transactions contemplated thereby, and (c) take any other actions required or contemplated to be taken by the Exit Facilities Agent and/or the Disbursing Agent (as applicable) under this Plan or any of the Definitive Documents to which it is a party.

## H.     *Corporate Existence*

Except as otherwise provided in the Plan, the New Organizational Documents, the Restructuring Transactions Memorandum, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

## I.     *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or in any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including, for the avoidance of doubt, the Committee Settlement and the Thrasio Legacy Trust Documents), on the Effective Date, pursuant to section 1141 of the Bankruptcy Code, all property in each Debtor's Estate, and any property acquired by each of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances other than the Liens securing the obligations under the Exit Facilities and such other Liens or other encumbrances as may be permitted thereby.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise, or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  ~~For~~Notwithstanding the foregoing and for the avoidance of doubt, the

Thrasio Legacy Trust Assets shall vest solely in the Thrasio Legacy Trust, and shall not vest in any Reorganized Debtor.

**J.**    *Committee Settlement*

On May 29, 2024, the Debtors and the Committee agreed to the terms of the Committee Settlement to be implemented through the Plan and to be approved by the Court in connection with Confirmation thereof. The principal terms of the Committee Settlement are reflected below.

1.    Releases

The Excluded Parties shall not be "Released Parties" or "Releasing Parties" under the Plan, and the Vested Causes of Action shall not be released by the Debtors on the Effective Date. The Plan shall not release, and shall preserve, all other Estate Causes of Action not specifically released or settled pursuant to the Committee Settlement. The Committee, each of its members, and each of its Related Parties shall be "Releasing Parties" and "Released Parties" under the Plan.

2.    Formation of Thrasio Legacy Trust and Vesting of Assets

On the Effective Date, the Debtors and the Thrasio Legacy Trust Administrator shall execute the Thrasio Legacy Trust Agreement and shall take all steps necessary to establish the Thrasio Legacy Trust in accordance with the Plan, and the beneficial interests therein, which shall be for the benefit of the Thrasio Legacy Trust Beneficiaries. Additionally, on the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Thrasio Legacy Trust all rights, title, and interest in and to the Thrasio Legacy Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Thrasio Legacy Trust Assets shall automatically vest in the Thrasio Legacy Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Thrasio Legacy Trust Interests and the Debtors on the Effective Date. The Plan shall not release, and shall Plan and the Thrasio Legacy Trust Agreement, and shall become assets of the Thrasio Legacy Trust for all purposes. The Thrasio Legacy Trust Administrator shall be the exclusive trustee of the Thrasio Legacy Trust Assets for purposes of 31 U.S.C. § 3713(b), as well as the representative of the Estates appointed pursuant to section 1123(b)(3) of the Bankruptcy Code regarding all Thrasio Legacy Trust Assets including, but not limited to, the Vested Causes of Action.

Notwithstanding anything to the contrary herein, the Thrasio Legacy Trust's primary purpose is to investigate, prosecute, settle, or abandon the Vested Causes of Action and to review, reconcile, object to and resolve General Unsecured Claims other than First Lien Deficiency Claims, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Thrasio Legacy Trust's liquidating purpose and reasonably necessary to conserve and protect the Vested Causes of Action and provide for the orderly liquidation thereof.

Subject to the terms of the Thrasio Legacy Trust Agreement, the Thrasio Legacy Trust shall have sole authority to investigate, prosecute, settle, or abandon the Vested Causes of Action. The Reorganized Debtors, in their reasonable discretion and with the consent of the Thrasio Legacy Trust, may transfer additional assets to the Thrasio Legacy Trust from time to time, in each case subject to the terms of the Exit Facilities Documents.

In pursuing any claim, right, or Vested Cause of Action, the Thrasio Legacy Trust shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code and shall succeed to the Debtors' rights with respect to the time periods in which a Cause of Action may be brought under the Bankruptcy Code. Moreover, any Holder of a Claim that timely filed a Proof of Claim is not required, under section 108 of the Bankruptcy Code or applicable law, to commence or continue any action in a non-bankruptcy forum in order to further toll or satisfy any limitations period with respect to any such Holder's Claim that had not expired prior to the Petition Date.

3.    Appointment of Thrasio Legacy Trust Administrator

On the Effective Date, the Thrasio Legacy Trust Administrator shall be appointed. The appointment of the Thrasio Legacy Trust Administrator shall be approved in the Confirmation Order, and the Thrasio Legacy Trust Administrator's duties shall commence on the Effective Date. The Thrasio Legacy Trust Administrator shall have all of the rights and responsibilities set forth in this Plan and the Thrasio Legacy Trust Agreement. Without limiting the generality of the foregoing, the Thrasio Legacy Trust Administrator shall administer distributions to Thrasio Legacy Trust Beneficiaries to the extent provided under the Plan and the Thrasio Legacy Trust Documents, and shall serve as the representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of pursuing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan. The structure of powers between the Thrasio Legacy Trust Administrator and the Thrasio Legacy Trust Committee shall be set forth in the Thrasio Legacy Trust Documents.

As set forth below, the Thrasio Legacy Trust Administrator shall act for the Thrasio Legacy Trust in a fiduciary capacity and shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan and the Thrasio Legacy Trust Documents, in accordance with the Plan and as otherwise provided in the Confirmation Order.

4.    Responsibilities of the Thrasio Legacy Trust Administrator

The responsibilities of the Thrasio Legacy Trust Administrator shall be identified in the Thrasio Legacy Trust Documents, subject to any consultation and consent rights of the Thrasio Legacy Trust Committee as may be set forth in the Thrasio Legacy Trust Agreement, and shall include, without limitation:

(a)    investigating, reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue any Vested Causes of Action, in each case with the consent of the Thrasio Legacy Trust Committee;

(b)    protecting and enforcing the rights to the Vested Causes of Action by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise, in each case with the consent of the Thrasio Legacy Trust Committee;

(c)    reviewing, reconciling, and where appropriate, allowing or objecting to General Unsecured Claims (other than First Lien Deficiency Claims), and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed General Unsecured Claims, in each case with the consent of the Thrasio Legacy Trust Committee;

(d)    administering and adjusting the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court;

(e)    determining and maintaining the Thrasio Legacy Trust Reserve, in consultation with the consent of the Thrasio Legacy Trust Committee;

(f)    making distributions to Thrasio Legacy Trust Beneficiaries as contemplated by the Plan and the Thrasio Legacy Trust Documents;

(g)    making repayment to the Reorganized Debtors of the Thrasio Legacy Trust Initial Funding in the timing and manner prescribed by the Plan, to the extent of available funds to do so;

(h) entering into any agreement or executing any document or instrument required by or consistent with the Plan, the Confirmation Order, or the Thrasio Legacy Trust Documents, and performing all obligations thereunder;

(i) administering or managing any assets vested in the Thrasio Legacy Trust by the Reorganized Debtors;

(j) seeking the examination of any Person or Entity pursuant to Bankruptcy Rule 2004;

(k) ~~with the consent of the Thrasio Legacy Trust Committee,~~ retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Thrasio Legacy Trust Documents and paying the reasonable compensation thereof as Thrasio Legacy Trust Fees and Expenses, solely out of the assets of the Thrasio Legacy Trust;

(l) withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Thrasio Legacy Trust Administrator has reasonably determined, based upon the advice of his agents or professionals, is required to be withheld from such distribution under any U.S. federal income tax or other laws;

(m) exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Thrasio Legacy Trust Documents; and

(n) taking all other actions consistent with the provisions of the Plan and the Thrasio Legacy Trust Documents that the Thrasio Legacy Trust Administrator deems reasonably necessary or desirable to administer the Thrasio Legacy Trust.

5.    The Thrasio Legacy Trust Committee

The Thrasio Legacy Trust Committee shall be composed of five members: (1) two designees selected by the Required Consenting Lenders, (2) two designees selected by the Committee, and (3) the Thrasio Legacy Trust Administrator.

The Thrasio Legacy Trust Committee shall have the responsibility to oversee the administration of the Thrasio Legacy Trust and the activities of the Thrasio Legacy Trust Administrator, as set forth in the Thrasio Legacy Trust Documents, and determine and maintain the Thrasio Legacy Trust Reserve. For the avoidance of doubt, the members of the Thrasio Legacy Trust Committee shall maintain the same fiduciary responsibilities as the Thrasio Legacy Trust Administrator. In all circumstances, the Thrasio Legacy Trust Committee shall act in accordance with the Thrasio Legacy Trust Documents.

6.    Thrasio Legacy Trust Proceeds

Subject to the Thrasio Legacy Trust Documents, the Thrasio Legacy Trust Administrator shall be authorized to make distributions of Thrasio Legacy Trust Proceeds solely in the following waterfall, in all cases, net of the Thrasio Legacy Trust Fees and Expenses and the Thrasio Legacy Trust Reserve (the "Thrasio Legacy Trust Waterfall"):

(a) The Reorganized Debtors shall receive 80% of any Thrasio Legacy Trust Proceeds and the Thrasio Legacy Trust shall receive 20% of Thrasio Legacy Trust Proceeds until the Thrasio Legacy Trust Initial Funding is repaid in full ("Thrasio Legacy Trust Initial Funding Repayment");

(b) After the Thrasio Legacy Trust Initial Funding Repayment, Holders of Thrasio Legacy Trust A Interests shall receive 70% of any Thrasio Legacy Trust Proceeds and Holders of

Thrasio Legacy Trust B Interests shall receive 30% of Thrasio Legacy Trust Proceeds until the Holders of Thrasio Legacy Trust A Interests receive $3.5 million ("Distribution A");

(c)      After the Thrasio Legacy Trust Initial Funding Repayment and Distribution A, Holders of Thrasio Legacy Trust A Interests shall receive 50% of any Thrasio Legacy Trust Proceeds and Holders of Thrasio Legacy Trust B Interests shall receive 50% of any Thrasio Legacy Trust Proceeds.

7.      Thrasio Legacy Trust Initial Funding and Expenses

On the Effective Date, the Thrasio Legacy Trust shall receive the Thrasio Legacy Trust Initial Funding. The Thrasio Legacy Trust shall maintain the Thrasio Legacy Trust Reserve. Prior to any distribution date(s), the Thrasio Legacy Trust Administrator, in consultation with the Thrasio Legacy Trust Committee, shall determine the Reserve, which shall be reasonably necessary to fund the projected reasonable expenses of the Thrasio Legacy Trust. For the avoidance of doubt, all expenses incurred by Thrasio Legacy Trust shall be paid from Thrasio Legacy Trust Assets.

8.      Fiduciary Duties of the Thrasio Legacy Trust Administrator

Pursuant hereto and the Thrasio Legacy Trust Documents, the Thrasio Legacy Trust Administrator shall act in a fiduciary capacity on behalf of the interests of all Thrasio Legacy Trust Beneficiaries.

9.      Cooperating Parties

The Cooperating Parties shall not be Excluded Parties only upon each respective Cooperating Party's execution of a Cooperation Agreement and the Thrasio Legacy Trust shall not pursue a Cooperating Party on account of any Vested Causes of Action unless and until such Cooperating Party is or becomes an Excluded Party.

In the event that any of the Cooperating Parties fail (as reasonably determined by the Thrasio Legacy Trust Administrator and the Thrasio Legacy Trust Committee) to substantially adhere to the terms of a Cooperation Agreement that takes into account the personal and employment circumstances of each Cooperating Party, the Thrasio Legacy Trust shall provide a written notice to the Cooperating Party of any alleged default under the respective Cooperation Agreement. Upon receipt of such notice, the Cooperating Party shall have seven (7) days to cure its alleged default. In the event the Cooperating Party does not cure its alleged default, the Thrasio Legacy Trust may file a Cooperation Default Notice requesting entry of an order causing the defaulting Cooperating Party to become an Excluded Party. The Cooperating Party will have ten (10) Business Days from the filing of a Cooperation Default Notice to object to such Cooperation Default Notice. After notice and a hearing, if the Bankruptcy Court enters an order providing the Cooperating Party did not substantially adhere to the terms of its respective Cooperation Agreement, then such Cooperating Party shall become an Excluded Party, and the Thrasio Legacy Trust shall be entitled to pursue any and all Vested Causes of Action against such Excluded Party. There is no obligation for the Cooperating Parties to incur out of pocket expenses while objecting to any Cooperation Default Notice and under any Bankruptcy Court proceedings involving such Cooperation Default Notice.

10.      Cooperation of the Reorganized Debtors

On or as soon as reasonably practicable following the Effective Date, at the sole cost of the Reorganized Debtors, (i) the Reorganized Debtors and the Committee (prior to the Committee's dissolution on the Effective Date) shall deliver or cause to be delivered to the Thrasio Legacy Trust any and all books and records and all other documents and communications, or copies of the same, related to the Vested Causes of Action and General Unsecured Claims, including, but not limited to, any Disputed General Unsecured Claims; (ii) the Reorganized Debtors shall use commercially reasonable efforts to provide reasonable and continuing access to such officers, directors and employees of the Reorganized Debtors and their agents, advisors, attorneys, accountants or any other professionals with knowledge of matters relevant to the Vested Causes of Action (including any former officers, directors, employees, agents, advisors, attorneys, accountants, or other professionals who owe a continuing duty of

cooperation to the Reorganized Debtors); and (iii) the Reorganized Debtors shall promptly following receipt of a reasonable request from the Thrasio Legacy Trust Administrator, use commercially reasonable efforts to, (a) take, or cause to be taken, all such reasonable further actions, and execute and/or deliver all such additional instruments, agreements or documents, as the Thrasio Legacy Trust Administrator may request in order to evidence or effectuate the transfer of the Vested Causes of Action and the Privileges (as defined in Article IV.J.[10]11) to the Thrasio Legacy Trust and the consummation of the transactions contemplated hereby and by the Committee Settlement and to otherwise carry out the intent of the parties herein and under the Committee Settlement, and (b) cooperate with the Thrasio Legacy Trust Administrator in the prosecution of the Vested Causes of Action and fulfilling its duties and obligations as the Thrasio Legacy Trust Administrator.

If the Thrasio Legacy Trust Administrator requires documents or information from the Reorganized Debtors, such requests shall be made by the Thrasio Legacy Trust Administrator to the Company Representative. The Company Representative will use commercially reasonable efforts to respond to such information requests, including providing reasonable access to employees, as appropriate, to facilitate an efficient complex assets recovery process and litigation recovery process.  Any dispute regarding access set forth in this Article IV.J.[9]10 shall be resolved by the Thrasio Legacy Trust Committee or the Bankruptcy Court.

11.    Privilege

Except as expressly stated otherwise below, the Thrasio Legacy Trust shall stand in the same position as the Debtors and their Estates (solely with regard to the Vested Causes of Action), and the Committee as to all evidentiary privileges of any type or nature whatsoever, including attorney-client privilege, the work product privilege or doctrine, any other privilege or immunity attaching to any documents or communications in any form, including electronic data hosted on remote servers, and any other applicable evidentiary privileges of each of the foregoing (collectively, the "Privileges"), and shall have all of the rights of the Debtors and their eEstates (solely with regard to the Vested Causes of Action), and the Committee to preserve and assert any such Privileges, and shall be deemed to be an assignee by each Debtor and its respective eEstate (solely with regard to the Vested Causes of Action), and the Committee of each such Privilege as of the latter of (a) the Effective Date, or (b) the formation of Thrasio Legacy Trust; *provided*, that, notwithstanding the foregoing, the privilege of the Disinterested Directors is hereby recognized and shall remain in full force and effect and shall not be waived, nor shall any such privileged documents be turned over to any person or Entity without the consent of each of the Disinterested Directors.  The Disinterested Directors shall produce to Thrasio Legacy Trust, on or shortly after the Effective Date: (i) all interview memoranda regarding the interviews conducted in the Independent Investigation; (ii) a list of all interviews requested in the Independent Investigation; and (iii) all documents produced to the Disinterested Directors by the Debtors and/or any third parties.  The Disinterested Directors' agreement to produce these materials does not constitute a waiver of any Privileges or work product protections that might exist, and will not be used by the Thrasio Legacy Trust Administrator or the Thrasio Legacy Trust to argue that such a waiver has occurred.  The Disinterested Directors will discuss in good faith whether to produce any additional factual documentation or information related to the Independent Investigation, which shall not include any legal analysis, privileged communications, legal memoranda, or research.  For the avoidance of doubt, all Privileges, other than the Disinterested Directors' Privileges, shall be shared with, and shall vest in, the Thrasio Legacy Trust.

Notwithstanding the Committee, the Debtors, the Reorganized Debtors, or any party-in-interest providing any privileged information to the Thrasio Legacy Trust, the Thrasio Legacy Trust Administrator, or the Thrasio Legacy Trust Committee, including any member thereof, such privileged information shall be without waiver in recognition of the joint and/or successor interest in investigating and prosecuting the Vested Causes of Action and shall remain privileged.

For the avoidance of doubt, the actions taken by the Committee, the Disinterested Directors, the Debtors, and the Reorganized Debtors in connection with the Plan, the Committee Settlement, or the formation of the Thrasio Legacy Trust shall not be (or deemed to be) a waiver of any Privilege of any of the Committee, the Disinterested Directors, the Debtors, and the Reorganized Debtors, as applicable, including any Privilege attaching to any document or communications (whether written or oral) transferred to the Thrasio Legacy Trust.

12.    Exculpation and Indemnification

The Thrasio Legacy Trust Administrator and the Thrasio Legacy Trust Committee and each of its members shall be exculpated by the Thrasio Legacy Trust with respect to any potential liability in connection with any actions taken, including distributions, as Thrasio Legacy Trust Administrator or Thrasio Legacy Trust Committee. The Thrasio Legacy Trust shall indemnify the Thrasio Legacy Trust Indemnified Parties for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost, or expense (including the reasonable fees and expenses of their respective professionals) incurred without actual fraud on the part of the Thrasio Legacy Trust Indemnified Parties (which actual fraud, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered, or omitted to be taken by the Thrasio Legacy Trust Indemnified Parties in connection with the acceptance, administration, exercise, and performance of their duties under the Plan, Confirmation Order, or the Thrasio Legacy Trust Agreement, as applicable. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute actual fraud. In addition, the Thrasio Legacy Trust shall, to the fullest extent permitted by law, indemnify and hold harmless the Thrasio Legacy Trust Indemnified Parties, from and against and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Thrasio Legacy Trust or the implementation or administration of the Plan, if the Thrasio Legacy Trust Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Thrasio Legacy Trust. To the extent the Thrasio Legacy Trust indemnifies and holds harmless any Thrasio Legacy Trust Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Thrasio Legacy Trust in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as Thrasio Legacy Trust Fees and Expenses.  The costs and expenses incurred in enforcing the right of indemnification in this Section shall be paid by the Thrasio Legacy Trust.  This provision shall survive the termination of the Thrasio Legacy Trust or Thrasio Legacy Trust Agreement, and the death, dissolution, liquidation, resignation, replacement, or removal of the Thrasio Legacy Trust Administrator or any member of the Thrasio Legacy Trust Committee.

13.    No Admission of Liability

The Committee Settlement shall not constitute, be introduced, treated, deemed or otherwise interpreted or construed as (a) an admission, waiver, evidence or concession by any of the Excluded Parties or Cooperating Parties of any fact, liability or wrongdoing or (b) evidence in any judicial or arbitration proceeding, except to enforce or defend the terms thereof.

14.    Recoupment

Nothing in the Plan, the Confirmation Order, the Plan Supplement, or the Definitive Documents (as defined in the Committee Settlement Term Sheet) shall be deemed to affect, diminish, or impair any party's legal and equitable defenses and rights to setoffs and/or recoupment, and all such rights are expressly preserved.

15.    DIP Orders

From entry of the Confirmation Order through the Effective Date of the Plan, the DIP Orders shall remain in full force and effect, *provided that*, solely with respect to the Committee, the deadline to commence a Challenge shall be tolled until the earlier of (a) the occurrence of the Effective Date of a Plan that incorporates the terms of the Committee Settlement and (b) seven (7) calendar days following the withdrawal of the Commitment Settlement or the filing of a Plan that is inconsistent with this with the Committee Settlement (the "Extended Challenge Deadline"). For the avoidance of doubt, the Debtors, the Prepetition First Lien Secured Parties, and the DIP Secured Parties (each as defined in the DIP Orders) expressly preserve their rights to object to any standing motion filed by the Committee. Prior to the Extended Challenge Deadline, the Committee shall not pursue a Challenge.

As provided in the DIP Orders, the deadline for all parties other than the Committee to file a Challenge expired sixty (60) days after entry of the Final DIP Order.

Following the occurrence of the Effective Date of a Plan that incorporates the terms of the Committee Settlement, all Challenge rights and claims against the Prepetition First Lien Secured Parties and the DIP Secured Parties (each as defined in the DIP Orders) shall be deemed settled and released by the Debtors, the Reorganized

Debtors, the Committee, and the Thrasio Legacy Trust and, for the avoidance of doubt, shall not become Vested Causes of Action or Thrasio Legacy Trust Assets.

16.     <u>Non-Transferability of Thrasio Legacy Trust Interests</u>

The Thrasio Legacy Trust Interests, and any right to receive a distribution from the Thrasio Legacy Trust, shall not be evidenced by any certificate, security, receipt, or any other form or manner whatsoever, except as maintained on the books and records of the Thrasio Legacy Trust by the Thrasio Legacy Trust Administrator.  Any and all Thrasio Legacy Trust Interests shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law.  In addition, any and all Thrasio Legacy Trust Interests will not constitute "securities" and will not be registered pursuant to the Securities Act or any applicable state or local securities law.  However, if it should be determined that any such interests constitute "securities," the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer, issuance and distribution under the Plan of the Thrasio Legacy Trust Interests will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

17.     <u>Tax Matters of the Thrasio Legacy Trust</u>

Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors intent to treat the Thrasio Legacy Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code with the Thrasio Legacy Trust Beneficiaries treated as grantors and owners of the Thrasio Legacy Trust, and the trustee of the Thrasio Legacy Trust shall take a position on the Thrasio Legacy Trust's tax return accordingly. The Thrasio Legacy Trust shall be established for the primary purpose of liquidating the Thrasio Legacy Trust's assets, reconciling claims asserted against the Debtors and the Reorganized Debtors, and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Thrasio Legacy Trust, and is otherwise intended to comply with the ruling guidelines set forth in Revenue Procedure 94-45, 1994-2 C.B. 684. For all U.S. federal income tax purposes, all parties (including the Debtors, Reorganized Debtors,  the Thrasio Legacy Trust Administrator, and the Thrasio Legacy Trust Beneficiaries) shall treat the transfer of the Thrasio Legacy Trust Assets by the Debtors (or Reorganized Debtors, as applicable) to the Thrasio Legacy Trust, as set forth in the Thrasio Legacy Trust Documents, as (a) a transfer of such Thrasio Legacy Trust Assets directly to the applicable Holders of Allowed General Unsecured Claims, followed by (b) the transfer by the Holders of such Allowed General Unsecured Claims to the Thrasio Legacy Trust of such Thrasio Legacy Trust Assets in exchange for the Thrasio Legacy Trust A Interests and Thrasio Legacy Trust B Interests, as applicable.  Accordingly, the Thrasio Legacy Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Thrasio Legacy Trust Assets.  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

The Thrasio Legacy Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Thrasio Legacy Trust Proceeds (*e.g.*, income, gain, loss, deduction and credit).  Each Thrasio Legacy Trust Beneficiary holding a beneficial interest in the Thrasio Legacy Trust will receive a copy of the information returns and must report on its U.S. federal income tax return its share of all such items.  The information provided by the Thrasio Legacy Trust will pertain to the Thrasio Legacy Trust Beneficiaries who receive their interests in the Thrasio Legacy Trust in connection with the Plan.

The Thrasio Legacy Trust shall in no event be dissolved later than five (5) years from the creation of such Thrasio Legacy Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Thrasio Legacy Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Thrasio Legacy Trust Assets.

With respect to any of the assets of the Thrasio Legacy Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Thrasio Legacy Trust, such assets may be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment may also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate U.S. federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

18.      Avoidance Action Waiver

On the Effective Date, the Debtors shall be deemed to waive and release any and all Avoidance Actions held by the Debtors, other than any Avoidance Actions against the Excluded Parties. For the avoidance of doubt, (a) Avoidance Actions against the Excluded Parties are Vested Causes of Action that shall vest in the Thrasio Legacy Trust on the Effective Date, and (b) the waiver of Avoidance Actions as to the Cooperating Parties shall be in full force and effect, unless and until a Cooperating Party is or becomes an Excluded Party, at which time such waiver shall be revoked.

**K.      *Corporate Action***

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan and the Definitive Documents shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action, including, as applicable:  (1) the implementation of the Restructuring Transactions; (2) the adoption, execution, and filing of the New Organizational Documents; (3) the selection of the directors, managers, and officers for the Reorganized Debtors;(4) the execution and delivery of the Exit Facilities and the incurrence of credit thereunder; (5) the adoption of the Management Incentive Plan by the New Board; (6) the issuance and distribution of the New Common Stock and the execution, delivery, and filing of any documents pertaining thereto, as applicable; (7) the formation of any Entities pursuant to the Restructuring Transactions, including Thrasio Legacy Trust; (8) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (9) entry into the Thrasio Legacy Trust Documents; and (10) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan and the Definitive Documents involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the other Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors.  On or before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Facilities, the New Common Stock, the Management Incentive Plan, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this Article IV.JK shall be effective notwithstanding any requirements under non-bankruptcy law.

**L.      *New Organizational Documents***

On the Effective Date, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective jurisdiction of incorporation or formation in accordance with the applicable laws of the respective jurisdiction of incorporation or formation.  The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents in accordance with the terms thereof and

as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents.

**M.**  ***Directors and Officers of the Reorganized Debtors***

On the Effective Date, the term of the current board of directors of the Debtors shall expire, and the directors for the initial term of the New Board shall be designated and appointed in accordance with the terms set forth in the New Organizational Documents and the New Stockholders Agreement; *provided*, that the Disinterested Directors shall retain authority following the Effective Date with respect to matters relating to Professional Fee Claims requests by Professionals acting at their authority and direction in accordance with the terms of the Plan. The Disinterested Directors shall not have any of its privileged and confidential documents, communications, or information transferred (or deemed transferred) to Reorganized Thrasio. The initial members of the New Board will be identified in the Plan Supplement, as well as those Persons that will serve as officers of the Reorganized Debtors. Each such member and officer of the New Board shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents, the New Stockholders Agreement, and other constituent documents of Reorganized Thrasio.

To the extent any identified director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Provisions regarding the removal, appointment, and replacement of members of the New Board will be disclosed in the New Organizational Documents.

**N.**  ***Effectuating Documents; Further Transactions***

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and Definitive Documents, including both the Exit Facilities and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents.

**O.**  ***Preservation of Causes of Action***

Other than any Causes of Action against an Entity that are expressly waived, relinquished, exculpated, released, compromised, settled under the Plan or a Final Order, or settled pursuant to the Committee Settlement, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors shall reserve any and all Causes of Action. From and after the Effective Date, the Thrasio Legacy Trust shall have sole and exclusive discretion to pursue and dispose of any Vested Causes of Action. **No Entity (other than the Consenting Lenders, the DIP Lenders, the DIP Agent, the Ad Hoc Group and each member of the Ad Hoc Group, the Administrative Agent, each lender and Issuing Bank and other secured parties under the First Lien Credit Agreement and the DIP Backstop Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, and on and after the Effective Date, the Thrasio Legacy Trust will not pursue any and all available Causes of Action against it. The Debtors or the Thrasio Legacy Trust, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, settled under the Plan or pursuant to a Bankruptcy Court order, or settled pursuant to the Committee Settlement, the Debtors or the Thrasio Legacy Trust, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

**P.**    *Management Incentive Plan*

The New Board shall be authorized to adopt and implement the Management Incentive Plan, which shall be set forth in the Plan Supplement.

**Q.**    *Employee Obligations and Employee Arrangements*

On the Effective Date, the Debtors shall be deemed to have assumed the Employment Agreements in a manner consistent with the Restructuring Support Agreement; *provided that* any Employment Agreements listed on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be rejected as of the Effective Date. The Debtors shall be deemed to have assumed the Debtors' prepetition severance plan as of the Effective Date, and such severance plan shall remain in effect for at least six (6) months following the Effective Date. ~~No~~Notwithstanding anything contained in this Plan, the Confirmation Order, or any other order of the Bankruptcy Court, the Employment Agreements and/or separation agreements ~~by and~~ between the Debtors and the Excluded Parties shall be ~~in effect upon emergence of the chapter 11~~deemed rejected, and not be in effect on the Effective Date, regardless as to whether such Employment Agreement and/or separation agreement is listed on the Schedule of Rejected Executory Contracts and Unexpired ~~e~~Leases.

After the Effective Date, the Debtors or Reorganized Debtors, as applicable shall be permitted to make payments to employees pursuant to employment programs then in effect, and to implement additional employee programs and make payments thereunder, without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that such payments shall not adversely affect any distributions provided for under this Plan.

**R.**    *Closing the Chapter 11 Cases*

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases, except for the Chapter 11 Case of one Debtor entity, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of such Debtor entity.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of the remaining Debtor entity in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**S.**    *Payment of Fees and Expenses of Certain Creditors*

Following the Confirmation Date, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, the Transaction Expenses related to this Plan and implementation, Consummation, and defense of the Restructuring Transactions, whether incurred before, on, or after the Effective Date, in accordance with any applicable engagement letter, the DIP Orders, and the Restructuring Support Agreement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided in the Plan or otherwise agreed to by the Debtors (with the consent of the Required Consenting Lenders) and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, including, for the avoidance of doubt, the Employment Agreements, shall be deemed assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code and regardless of whether such Executory Contract or Unexpired Lease is set forth on

the Schedule of Assumed Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Except as otherwise provided in the Plan, the Debtors shall assume, assume and assign, or reject, as the case may be, Executory Contracts and Unexpired Leases set forth in the applicable Schedules in the Plan Supplement. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease.

Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims.

**B.**      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contract or Unexpired Lease. Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

**C.**      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent at the address specified in any notice of entry of the Confirmation Order and served on the Reorganized Debtors and the Thrasio Legacy Trust no later than thirty (30) days after the effective date of such rejection.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Claims, Noticing, and Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, the Thrasio Legacy Trust or their property, without the need for any objection by the Debtors, Reorganized Debtors, or the Thrasio Legacy Trust, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.H of the Plan, notwithstanding anything in a Proof of Claim to the contrary.

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim as set forth in Article III.C of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**D.**      ***Cure of Defaults for Assumed, or Assumed and Assigned, Executory Contracts and Unexpired Leases***

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree.  In the event of a dispute regarding:  (1) the amount of any Cure Claim; (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned; or (3) any other matter pertaining to assumption or the assumption and assignment, the Cure Claims shall be made following the entry of a Final Order resolving the dispute and approving the assumption or the assumption and assignment.  Notwithstanding the foregoing, nothing herein shall prevent the Reorganized Debtors from settling any Cure Claim without further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors shall provide Cure Notices to the parties to the applicable Assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement.  **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Claim must be Filed by the Cure/Assumption Objection Deadline.**  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Notice will be deemed to have assented to such assumption or assumption and assignment, and Cure Claim.  To the extent that the Debtors seek to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and provide "adequate assurance of future performance" for such assignee (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease to be assumed and assigned.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the Cure Claim, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease.  For the avoidance of doubt, to the extent the Debtors satisfy any Cure Claim prior to the Effective Date, such satisfaction shall result in the release and satisfaction of such Cure Claim up to the amount that was paid, notwithstanding the amount listed on the respective Cure Notice.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to, or action, order, or approval of the Bankruptcy Court.

**E.**      ***Survival of the Debtors' Indemnification Obligations and Insurance Obligations***

Except as expressly provided herein, all indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the Indemnified Parties shall be reinstated and shall survive the Effective Date on terms no less favorable to the Indemnified Parties than the indemnification provisions in place prior to the Effective Date; *provided, however,* that to the extent any Indemnified Party is a former director or officer of Thrasio, any indemnification obligations shall be limited to indemnify such Indemnified Party in their capacity as a former director or officer of Thrasio, rather than in their individual or any other capacity.

In addition, after the Effective Date, the Company Parties will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

All Claims arising from or related to any indemnification obligations that are not Reinstated or assumed shall be treated as General Unsecured Claims as set forth in Article III.C of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.  For the avoidance of doubt, the Thrasio Legacy Trust reserves all rights with respect to any such Claims.

**F.**    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**G.**    *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.

**H.**    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**I.**    *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**J.**    *D&O Policies*

As of the Effective Date, the Debtors shall be deemed to have assumed all of the D&O Policies pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, or otherwise, and coverage for defense and indemnity under any of the D&O Policies shall remain in full force and effect subject to the terms and conditions of the D&O Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each D&O Policy. Notwithstanding anything to the contrary contained in the Plan, and except as otherwise may be provided in an order of the Bankruptcy Court, confirmation of the Plan shall not impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Policies, and each such obligation will be deemed and treated as an executory contract that has been assumed by the Debtors under the Plan as to which no proof of Claim need be filed. The Thrasio Legacy Trust shall be responsible for monitoring and preserving the ability to maintain claims against the D&O Policies.  To the extent the Debtors are not the first named insured under any D&O Policy and notwithstanding Confirmation of the Plan or the occurrence of the Effective Date

(i) nothing herein shall constitute a rejection of such D&O Policy, (ii) such D&O Policy shall remain in full force and effect, and (iii) any and all rights of the Debtors under such D&O Policy shall remain in full force and effect. For the avoidance of doubt, the Thrasio Legacy Trust shall retain all rights of the applicable Debtors (or Reorganized Debtors, as applicable) to assert claims against the D&O Policies and/or to recover the proceeds thereof, and the dissolution of the Debtors or Reorganized Debtors, if any, shall have no impact upon the rights of the Thrasio Legacy Trust, to assert claims against the D&O Policies or to recover the proceeds thereof.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**A.**    ***Timing and Calculation of Amounts to Be Distributed***

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest (or such Holder's Affiliate) shall receive the full amount of the distributions that the Plan provides for the Allowed Claims and Allowed Interests in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan or the Thrasio Legacy Trust Agreement, as applicable.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**B.**    ***Disbursing Agent***

Distributions under the Plan shall be made by a Disbursing Agent.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors or the Thrasio Legacy Trust, as applicable.

**C.**    ***Rights and Powers of Disbursing Agent***

1.    Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities (as applicable); and (d) exercise such other powers as may be vested in such Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or the Thrasio Legacy Trust Agreement, or as deemed by such Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.    Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by a Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors or the Thrasio Legacy Trust, as applicable.  If the Administrative Agent takes any action in furtherance of disbursements, including any distribution of New Common Stock, all reasonable and documented fees and out-of-pocket expenses (including attorney fees and expenses) of the Administrative Agent shall be paid in Cash by the Reorganized Debtors.

**D.**      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date, subject to the Disclosure Statement Order. The Administrative Agent will recognize only those Holders of First Lien Claims and First Lien Deficiency Claims listed on the Claims Register as of the Distribution Record Date for purposes of making distributions under the Plan, and may implement trading freezes with respect to such Claims to facilitate the determination of such Holders.

2.      Delivery of Distributions

3.      Except as otherwise provided in the Plan or the Thrasio Legacy Trust Agreement, as applicable, distributions to Holders of Allowed Claims or Interests, except as otherwise provided in this Article VI shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent:  (a) to the signatory set forth on any of the Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the applicable Disbursing Agent after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors or the Thrasio Legacy Trust, as applicable, have not received a written notice of a change of address; or (d) to any counsel that has appeared in the Chapter 11 Cases on such Holder's behalf.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Thrasio Legacy Trust, the Thrasio Legacy Trust Administrator, any Disbursing Agent, or the Reorganized Debtors, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

4.      Notwithstanding the foregoing, (a) all distributions on account of DIP Facility Claims will be made to the DIP Agent, and the DIP Agent will be, and will act as, the Disbursing Agent with respect to the DIP Facility Claims in accordance with the terms and conditions of this Plan and the applicable debt documents; and (b) all distributions on account of First Lien Claims and First Lien Deficiency Claims will be made to the Administrative Agent, and the Administrative Agent will be, and will act as, the Disbursing Agent with respect to the First Lien Claims and First Lien Deficiency Claims in accordance with the terms and conditions of this Plan and the applicable debt documents.

5.      No Fractional Distributions

No fractional shares of New Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional shares.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows:  (a) fractions of one-half or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

6.      Minimum Distributions

Holders of Allowed Claims entitled to distributions of $100 (whether Cash or otherwise) or less shall not receive distributions, and each such Claim shall be discharged pursuant to Article VIII and its Holder is forever barred pursuant to Article VIII from asserting that Claim against the Debtors, the Reorganized Debtors, or the Thrasio Legacy Trust, as applicable, or their property.

7.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the applicable Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code (i) at the expiration of ~~six months~~90 days from the Effective Date with respect to distributions made by the Debtors or the Reorganized Debtors; and (ii) as set forth in the Thrasio Legacy Trust Agreement with respect to distributions made by the Thrasio Legacy Trust.  After such date, all unclaimed property or interests in property shall revert to the applicable Reorganized Debtor or the Thrasio Legacy Trust, without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

**E.      *Manner of Payment.***

Unless otherwise set forth herein, all distributions of Cash and the New Common Stock, as applicable, to the Holders of Allowed Claims under the Plan shall be made by the Disbursing Agent.  At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

**F.      *Registration or Private Placement Exemption.***

The offering, issuance, and distribution of any 1145 Securities pursuant to the Plan, including the New Common Stock (other than the New Common Stock issued in respect of the Backstop Payment and the New Common Stock issued in respect of the Management Incentive Plan), shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. federal, state or local securities laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The 1145 Securities (i) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) are freely tradable and transferable without registration under the Securities Act by any initial recipient thereof that (a) is not an "affiliate" of Reorganized Thrasio as defined in Rule 144(a)(1) under the Securities Act, (b) has not been such an "affiliate" within 90 days of such transfer, and (c) is not an entity that is an "underwriter" (as defined in section 1145(b) of the Bankruptcy Code) with respect to such securities.  To the extent that Persons who receive the 1145 Securities as contemplated under the Plan are deemed to be underwriters, resales by such Persons would not be exempted from registration under the Securities Act or other applicable law by Section 1145 of the Bankruptcy Code.  Persons deemed to be underwriters may, however, be permitted to resell the 1145 Securities received pursuant to the Plan without registration pursuant to the provisions of Rule 144 under the Securities Act or another applicable exemption under the Securities Act, subject to applicable state and local securities laws, including state blue sky law.

Any New Common Stock issued in respect of the Backstop Payment or in respect of the Management Incentive Plan, or otherwise not issued pursuant to the exemption from registration provided by section 1145 of the Bankruptcy Code, will be offered, issued, and distributed in reliance upon the exemption from registration provided by Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other exemptions from registration, and similar Blue-Sky Laws, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom, and subject to applicable state and local securities laws, including state blue sky law.

Notwithstanding the foregoing, recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability of any exemptions from registration under the Securities Act and any applicable state and local securities laws, including state blue sky law.  The New Common Stock will also be subject to any restrictions imposed on it by the New Organizational Documents.

**G.**      *Tax Issues and Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Reorganized Debtors, the Thrasio Legacy Trust, and each Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors, the Thrasio Legacy Trust, and each Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors, the Thrasio Legacy Trust, and each Disbursing Agent reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

Without limiting the generality of the foregoing, the Thrasio Legacy Trust Administrator shall be authorized to require each Holder of a First Lien Deficiency Claim or Other General Unsecured Claim to provide it with an executed IRS Form W-9, appropriate IRS Form W-8, or any other tax form, documentation or certification as may be requested by the Thrasio Legacy Trust Administrator as a condition precedent to being sent a distribution. If a Holder of a First Lien Deficiency Claim or Other General Unsecured Claim does not provide the Thrasio Legacy Trust Administrator with the requested forms, documents, or certifications within ninety (90) days after the date of the initial request, the Thrasio Legacy Trust Administrator may, in its sole discretion (a) make such distribution net of applicable withholding, in which case any amounts so withheld shall be treated as having been paid to such Holder of an Other General Unsecured Claim, or (b) reserve such distribution, in which case (i) such Holder shall be deemed to have forfeited the right to receive any current, reserved or future distribution, (ii) any such forfeited distribution shall revert to the Thrasio Legacy Trust for all purposes, including but not limited to, for distribution to other Allowed Other General Unsecured Claims, and (iii) the Claim of the Holder originally entitled to such distribution shall be irrevocably waived and forever barred without further order of the Bankruptcy Court, all notwithstanding any federal, state or provincial escheat, unclaimed or abandoned property law to the contrary.

**H.**      *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

**I.**      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim; *provided* that interest shall accrue on the DIP Facility Claims in accordance with the terms of the DIP Credit Agreement and the DIP Orders until paid in full in Cash or otherwise satisfied with the consent of the Holders of DIP Facility Claims, as applicable.

**J.**      *Setoffs and Recoupment*

Other than with respect to the DIP Facility Claims, First Lien Claims, and First Lien Deficiency Claims, the Debtors, the Reorganized Debtors, and the Thrasio Legacy Trust, as applicable, may, but shall not be required to, set off against or recoup any payments or distributions to be made pursuant to the Plan in respect of any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors or the Thrasio Legacy Trust may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized Debtors, the Thrasio Legacy Trust, or their successors of any such Claim it may have against the Holder of such Claim.

**K.**     *Claims Paid or Payable by Third Parties*

8.        Claims Paid by Third Parties

To the extent that the Holder of an Allowed Claim receives payment in full on account of such Claim from a party that is not a Debtor, Reorganized Debtor, or the Thrasio Legacy Trust, such Claim shall be Disallowed without an objection having to be Filed and without any further notice to, or action, order, or approval of the Bankruptcy Court.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, Reorganized Debtors or the Thrasio Legacy Trust on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor, Reorganized Debtor, or the Thrasio Legacy Trust, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or the Thrasio Legacy Trust annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

9.        Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to, or action, order, or approval of the Bankruptcy Court.

10.        Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Notwithstanding anything herein to the contrary, nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**L.**     *Indefeasible Distributions*

Any and all distributions made under the Plan shall be indefeasible and not subject to clawback.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**

**A.**     *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors and the Thrasio Legacy Trust, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

**B.**     *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors or Thrasio Legacy

Trust, as applicable, shall have the sole authority to (1) File and prosecute objections to Claims; (2) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (3) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (4) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, the Thrasio Legacy Trust shall have the sole responsibility and authority with respect to ~~administering~~reconciling General Unsecured Claims in Class 4 other than First Lien Deficiency Claims.

**C.**    *Estimation of Claims*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, with the consent of the Required Consenting Lenders, or the Thrasio Legacy Trust, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Disputed Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Disputed Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors, Reorganized Debtors, or Thrasio Legacy Trust, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before ten (10) days after the date on which such Disputed Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**D.**    *Disputed Claims Reserve*

On or after the Effective Date, the Reorganized Debtors, with the consent of the Required Consenting Lenders, or the Thrasio Legacy Trust ~~(with the consent of the Thrasio Legacy Trust Committee)~~, as applicable, shall be authorized to establish one or more Disputed Claims Reserves.

After the Effective Date, the Reorganized Debtors or Thrasio Legacy Trust ~~(with the consent of the Thrasio Legacy Trust Committee)~~, as applicable, may hold any property to be distributed pursuant to the Plan, in the same proportions and amounts as provided for in the Plan, in the applicable Disputed Claims Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed by a Final Order after the Effective Date.  The Reorganized Debtors or Thrasio Legacy Trust ~~(with the consent of the Thrasio Legacy Trust Committee)~~, as applicable, shall distribute such amounts or property (net of any expenses, including any taxes relating thereto), as provided herein, as such Disputed Claims are Allowed by a Final Order or agreed to by settlement, and such amounts or property shall be distributed as such amounts or property would have been distributable had such Disputed Claims been Allowed Claims as of the Effective Date in accordance with Article III of this Plan solely to the extent of the amounts or property available in the applicable Disputed Claims Reserves.  Any Cash or Securities held in a Disputed Claims Reserve shall be cancelled or returned to the Reorganized Debtors or Thrasio Legacy Trust, in the Reorganized Debtors' or Thrasio Legacy Trust's ~~(with the consent of the Thrasio Legacy Trust Committee)~~, sole discretion, as applicable, and without any further action or order of the Bankruptcy Court, as soon as reasonably practicable after the date on which all Disputed Claims are either Allowed or Disallowed in accordance with the Plan.

**E.**      *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, the Reorganized Debtors, or Thrasio Legacy Trust, as applicable, without an objection having to be Filed and without any further notice to, or action, order, or approval of the Bankruptcy Court.

**F.**      *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

**G.**      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Reorganized Debtors, or Thrasio Legacy Trust, as applicable.

Except as otherwise provided herein or as agreed to by the Debtors, the Reorganized Debtors, or Thrasio Legacy Trust, as applicable, any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.

**H.**      *Amendments to Claims*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court, the Reorganized Debtors, or the Thrasio Legacy Trust, as applicable, and any such new or amended Claim Filed without such prior authorization shall be deemed Disallowed in full and expunged without any further notice to, or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

**I.**      *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors or Thrasio Legacy Trust, as applicable.

**J.**      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors or Thrasio Legacy Trust, as applicable, shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided herein.

## ARTICLE VIII.
### SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

**A.**     *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have, or any distribution to be made on account of such Allowed Claim or Allowed Interest that have been effectuated through a Rule 9019 Order, or otherwise expressly identified as a settlement as may be set forth herein.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims, Interests, and controversies, including as pursuant to the Committee Settlement, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle any Claims and Causes of Action against other Entities.

**B.**     *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action against any Debtor of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests accrued before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  Unless expressly provided in the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

**C.**     *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**D.**     *Release of Liens*

Except as otherwise specifically provided in the Plan, the Confirmation Order, the Exit Facilities Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case,

without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, as applicable.  The DIP Agent and the Administrative Agent shall, at the Reorganized Debtors' sole cost and expense, execute and deliver all documents reasonably requested by the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests on such assets of the Debtors that are subject to the Restructuring.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then such Holder (or the agent for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder) and take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facilities Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the execution and delivery of such releases and the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings, at the Reorganized Debtors' sole cost and expense, on such Holder's behalf.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.  Notwithstanding the foregoing paragraph, this Article VIII.D shall not apply to any Secured Claims that are Reinstated pursuant to the terms of this Plan.

E.     *Debtor Release*

**Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, as of the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Documents, the Preferred Equity Documents, the Exit Facilities, the Exit Facilities Documents, the DIP Facility, the DIP Orders, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, any Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, the Plan Supplement, any Definitive Document, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or willful misconduct.  For the avoidance of doubt, any Claims or Causes of Action relating to actual fraud or willful misconduct shall not be released, and such claims shall be Vested Causes of Action that shall vest in, are preserved for, and may be pursued by Thrasio Legacy Trust.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to (a) a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement or (b) the Committee Settlement.  Notwithstanding anything contained in the Plan, any ballot, any prior order of the Court, or otherwise, none of the Excluded Parties shall be Released Parties or Releasing Parties under the Plan.**

**F.**     *Release by Holders of Claims or Interests*

Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Documents, the Preferred Equity Documents, the Exit Facilities, the Exit Facilities Documents, the DIP Facility, the DIP Orders, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, any Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, the Plan Supplement, any Definitive Document, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or willful misconduct.  For the avoidance of doubt, any Claims or Causes of Action relating to actual fraud or willful misconduct shall not be released, and such claims shall be Vested Causes of Action that shall vest in, are preserved for, and may be pursued by Thrasio Legacy Trust.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) any Causes of Action specifically retained by the Debtors pursuant to (a) a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement or (b) the Committee Settlement.  Notwithstanding anything contained in the Plan, any ballot, any prior order of the Court, or otherwise, none of the Excluded Parties shall be Released Parties or Releasing Parties under the Plan.

Without limiting the foregoing, from and after the Effective Date, any Entity that is given the opportunity to opt out of the releases contained in this <u>Article VIII.F</u> and does not exercise such opt out may not assert any claim or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors.  From and after the Effective Date, any Entity (i) that opted out of the releases contained in this <u>Article VIII.F</u> or (ii) was deemed to reject the Plan may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in <u>Article VIII.F</u> of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in <u>Article VIII.F</u> of the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in <u>Article XI</u> of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.  *Notwithstanding the foregoing and for the avoidance of doubt,* **any Vested Cause of Action (x) where (i) the Vested Cause of Action is limited to fraud and/or willful misconduct or (ii) the defendants named in the Vested Cause of Action are limited to Excluded Parties, then such Vested Causes of Action are not subject to any requirement to first obtain a Final Order from the Bankruptcy Court and (y) with respect to Vested Causes of Action, the Bankruptcy Court's jurisdiction shall not be sole and exclusive.**

**G.**     *Exculpation*

Except as otherwise expressly provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is

exculpated from any Cause of Action for any claim related to any act or omission arising prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Independent Investigation, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Independent Investigation, the filing of the Chapter 11 Cases, the participation in the DIP Facility, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, the Plan Supplement, any Definitive Document, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**H.**     *Injunction*

Except as otherwise specifically provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; and (d) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

**I.**     *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Article VI of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

**J.**     *[Reserved]*

**K.**     *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of Allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**L.**    *Subordination Rights*

Except as expressly set forth in this Plan, any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

# ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

**A.**    *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.B hereof):

1.    the Restructuring Support Agreement shall have not been terminated and shall remain in full force and effect;

2.    there shall not have been instituted or threatened or be pending any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) (or there shall not have been any material adverse development to any action, application, claim, counterclaim, or proceeding currently instituted, threatened, or pending) before or by any court, governmental, regulatory, or administrative agency or instrumentality, domestic or foreign, or by any other Person, domestic or foreign, in connection with the Restructuring Transactions that, in the reasonable judgment of the Company Parties and the Required Consenting Lenders, would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

3.    each document or agreement constituting the applicable Definitive Documents shall have been executed and/or effectuated, shall be in form and substance consistent with the Restructuring Support Agreement and the Committee Settlement, and any conditions precedent related thereto or contained therein, shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

4.    all conditions precedent to the issuance or incurrence of the Exit Facilities shall have been satisfied or duly waived, and the Exit Facilities, including all documentation related thereto, shall be in effect;

5.    the Company Parties shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

6.    the New Organizational Documents and the New Stockholders Agreement shall have been executed and/or effectuated, shall be in form and substance consistent with the Restructuring Support Agreement and the Plan Supplement, and any conditions precedent related thereto, shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

7.    all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses in full after the Effective Date have been placed in the professional fee escrow account;

8.      all accrued and unpaid (i) Transaction Expenses and (ii) fees and expenses of the DIP Agent and its advisors shall have been paid in full in accordance with the Restructuring Support Agreement and the DIP Orders;

9.      there shall be no Events of Default under the DIP Credit Agreement;

10.     the Bankruptcy Court shall have entered the Confirmation Order and such order shall be a Final Order;

11.     the New Common Stock shall have been issued by Reorganized Thrasio;

12.     Thrasio Legacy Trust shall have been formed, and the Thrasio Legacy Trust ~~Initial Funding~~Assets shall have been transferred to Thrasio Legacy Trust;

13.     all conditions denominated "Closing Conditions" in the Plan shall have been satisfied, waived, or satisfied contemporaneously with the occurrence of the Effective Date;

14.     to the extent not otherwise addressed herein, all actions, documents, and agreements necessary to implement and consummate the Restructuring Transactions shall have been effected and executed, and shall be in form and substance consistent with the Restructuring Support Agreement and Restructuring Term Sheet or otherwise reasonably acceptable to the Company Parties and the Required Consenting Lenders; and

15.     the Company Parties shall have otherwise substantially consummated the Restructuring Transactions, including all transactions contemplated in the Restructuring Term Sheet, in a manner consistent in all respects with the Restructuring Support Agreement and this Plan.

**B.**      *Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in this Article IX may be waived, in whole or in part, in writing (which may be via electronic mails) by the agreement of the Debtors and the Required Consenting Lenders, in accordance with the terms of the Restructuring Support Agreement, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

**C.**      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

**D.**      *Effect of Nonoccurrence of Conditions to the Effective Date*

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect; *provided* that all provisions of the Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**A.**      *Modification and Amendments*

Subject to the limitations contained in the Plan and the consent rights of the Consenting Lenders as set forth in the Plan and the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, those restrictions on modifications set forth in the Plan, and the consent rights of the Consenting Lenders as set forth in the Plan and the Restructuring Support Agreement, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

**B.**      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.**      *Revocation or Withdrawal of the Plan*

Subject to the terms of the Restructuring Support Agreement, the Debtors, with the consent of the Required Consenting Lenders (such consent not to be unreasonably withheld), reserve the right to revoke or withdraw the Plan before the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of or related to the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.      resolve any matters related to:  (a) the assumption or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Claims pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or

supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to ~~Article VI.K.1~~ Article VI.K. hereof;

14.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.      determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.      hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

21.      hear and determine all disputes related to the Thrasio Legacy Trust, Thrasio Legacy Trust Administrator, and Thrasio Legacy Trust Committee;

22.      enforce all orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

23.      hear any other matter not inconsistent with the Bankruptcy Code;

24.      enter an order closing the Chapter 11 Cases; and

25.      enforce the injunction, release, and exculpation provisions provided in Article VIII hereof.

Notwithstanding the foregoing, (a) any dispute arising under or in connection with the Exit Facilities, the New Organizational Documents and the New Stockholders' Agreement shall be dealt with in accordance with the provisions of the applicable document and, (b) if the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Plan, the provisions of this Article XI of this Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter; and (c) the Bankruptcy Court's jurisdiction to adjudicate, decide, or resolve any and all matters related to Vested Causes of Action shall be non-exclusive.

**ARTICLE XII.**
**MISCELLANEOUS PROVISIONS**

A.     ***Immediate Binding Effect***

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order, shall be immediately effective and enforceable and deemed binding upon the Debtors or Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests have accepted or are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.     ***Additional Documents***

On or before the Effective Date, and subject to the terms of the Restructuring Support Agreement, the Debtors, with the consent of the Required Consenting Lenders (such consent not to be unreasonably withheld) may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims and Interests receiving distributions pursuant to the Plan, and all other parties in interest shall,

from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.**     *Dissolution of the Committee and Any Other Statutory Committee*

On the Effective Date, the Committee and any other statutory committee appointed in the Chapter 11 Cases shall dissolve automatically and the members thereof and the Professionals retained by the Committee shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code; *provided* that, the Committee shall continue to exist after the Effective Date and have standing and a right to be heard for the following limited purposes: (a) requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date, and (b) any appeals of the Confirmation Order or other appeal to which the Committee is a party. ~~The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Committee or any other statutory committee after the Effective Date.~~

**D.**     *Reservation of Rights*

Before the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to any Claims or Interests.

**E.**     *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to, the benefit of any heir, executor, administrator, successor, assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**F.**     *Service of Documents*

All notices, requests, and demands to or upon the Debtors, the Committee, or the Consenting Lenders to be effective shall be in writing (including by facsimile transmission and electronic mails) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**If to the Debtors:**

**Thrasio Holdings, Inc.**
Attention: Greg Greeley, Josh Burke, Mike Fahey
E-mail address: greg.greeley@thras.io, josh.burke@thras.io, mike@thras.io

         with copies to:

**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
333 West Wolf Point Plaza
Chicago, Illinois 60654
Attention: Anup Sathy. P.C.
E-mail address: asathy@kirkland.com

        -and-

**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
601 Lexington Avenue

New York, New York 10022
Attention:  Matthew C. Fagen, P.C., Francis Petrie, and Evan Swager
E-mail addresses:  matthew.fagen@kirkland.com
                   francis.petrie@kirkland.com
                   evan.swager@kirkland.com

**If to a Consenting Term Lender:**

**Gibson, Dunn & Crutcher LLP**
200 Park Ave
New York, New York 10166
Attention:  Scott J. Greenberg, Joe Zujkowski, Matt Rowe
Email addresses:  sgreenberg@gibsondunn.com
                  jzujkowski@gibsondunn.com
                  mrowe@gibsondunn.com

**If to a Consenting RCF Lender:**

**Simpson Thacher & Bartlett LLP, as counsel to the Administrative Agent**
425 Lexington Ave
New York, New York 10017
Attention:  Nicholas Baker, Hyang-Sook Lee, Philip L. DiDonato, Amy W. Zhou
Email addresses:  nbaker@stblaw.com
                  slee@stblaw.com
                  Philip.didonato@stblaw.com
                  amy.zhou@stblaw.com

**If to the Committee:**

**Morrison & Foerster LLP**
250 W 55th St.
New York, NY 10019
Attn:     Lorenzo Marinuzzi, Doug Mannal, Raff Ferraioli
Email addresses:  lmarinuzzi@mofo.com
                  dmannal@mofo.com
                  rferraioli@mofo.com

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to parties in interest providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such party must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

**G.**     *Entire Agreement*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### H. *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from http://www.kccllc.net/Thrasio or the Bankruptcy Court's website at https://www.njb.uscourts.gov/. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control. The documents considered in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

### I. *Nonseverability of Plan Provisions*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; provided that any such alteration or interpretation shall be inconsistent with the Restructuring Support Agreement. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Required Consenting Lenders, as well as that of the Debtors' or Reorganized Debtors', as applicable; and (3) nonseverable and mutually dependent.

### J. *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals nor the Reorganized Debtors or Reorganized Thrasio, as applicable, will have any liability for the violation of any applicable law (including the Securities Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

### K. *Closing of Chapter 11 Cases*

Upon the occurrence of the Effective Date, the Reorganized Debtors may seek authority from the Bankruptcy Court to close all of the chapter 11 cases, except for the chapter 11 case of one Debtor entity, and all contested matters relating to each of the Debtors, including objections to Claims, which would be administered and heard in the chapter 11 case of such Debtor entity.

### L. *Waiver or Estoppel*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

[Remainder of page intentionally left blank.]

Respectfully submitted, as of the date first set forth above,

Dated:  June ~~7~~[9], 2024                                    THRASIO HOLDINGS, INC.
                                                              on behalf of itself and each of its Debtor affiliates


                                                              /s/ *~~Josh Burke~~Draft*
                                                              _____
                                                              Name:  Josh Burke
                                                              Title:   Chief Financial Officer

64

| Summary report: | |
|---|---|
| **Litera Compare for Word 11.7.0.54 Document comparison done on 6/10/2024 7:45:29 AM** | |
| **Style name:** Color (Kirkland Default) | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://dms.kirkland.com/LEGAL/108556695/23 | |
| **Modified DMS:** iw://dms.kirkland.com/LEGAL/108556695/25 | |
| **Changes:** | |
| Add | 191 |
| Delete | 173 |
| Move From | 4 |
| Move To | 4 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 372 |